1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   JEFFREY S. CROWE, Cal. Bar No. 216055
2  650 Town Center Drive, 10th Floor
   Costa Mesa, California 92626
3  Telephone:    714.513.5100
   Facsimile:    714.513.5130
4  Email:        jcrowe@sheppardmullin.com

5  SCOTT SVESLOSKY, Cal. Bar No. 217660
   MARY E. GREGORY, Cal. Bar No. 210247
6  350 South Grand Ave., 40th Floor
   Los Angeles, California 90071-3460
7  Telephone:    213.620.1780
   Facsimile:    213.620.1398
8  Email:        ssveslosky@sheppardmullin.com
                 mgregory@sheppardmullin.com
9
   Attorneys for Defendant
10 LIBERTY INSURANCE CORPORATION

11                  **UNITED STATES DISTRICT COURT**

12      **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

| | |
|---|---|
| 13 RLC INDUSTRIES CO. and ROSEBURG FOREST PRODUCTS CO., | Case No. 2:23-cv-00649-TLN-SCR |
| 14 | Assigned to the Hon. Troy L. Nunley and Magistrate Judge Sean C. Riordan |
| 15 Plaintiffs, | |
| 16 v. | **DEFENDANT LIBERTY INSURANCE CORPORATION'S:** |
| 17 LIBERTY INSURANCE CORPORATION, EVEREST NATIONAL INSURANCE COMPANY, and THE OHIO CASUALTY INSURANCE COMPANY, | **(1) NOTION OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT; AND,** |
| 18 | |
| 19 Defendants. | |
| 20 | **(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.** |
| 21 | |
| 22 | [Filed Concurrently with Statement of Undisputed Facts, Compendium of Exhibits, Declarations of A. David Bona, Sarah Kaufman, Christopher Faddis, and Jeffrey S. Crowe, Request for Judicial Notice, and Proposed Order] |
| 23 | |
| 24 | |
| 25 | Date:    February 6, 2025 |
| 26 | Time:    2:00 p.m. |
| 27 | Place:   Courtroom 2, 15th Floor |

28

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 6, 2025, at 2:00 p.m. or as soon thereafter as counsel may be heard in Courtroom 2 on the 15th floor of the above-entitled Court, located at 501 I Street, Sacramento, CA 95814, defendant Liberty Insurance Corporation ("Liberty") will and hereby does move the Court for an order granting summary judgment in favor of Liberty and against plaintiffs RLC Industries Co. and Roseburg Forest Products Co. (collectively, "Roseburg"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260.

Liberty brings this Motion for Summary Judgment on grounds there are no genuine disputes as to any material fact, and thus, Liberty is entitled to judgment as a matter of law on the two claims for relief asserted by Roseburg against Liberty for "Breach of Contract (Duty to Defend)" (Count I) and "Breach of the Covenant of Good Faith and Fair Dealing" (Count II).

The undisputed material facts demonstrate that Liberty timely agreed and discharged its duty to defend Roseburg against "suits" alleging Roseburg's liability for property damage and bodily injuries arising from a September 2, 2022 fire that started at Roseburg's veneer mill and spread to neighboring communities in Weed and Lake Shastina, California – dubbed the "Mill Fire." Because Liberty's agreement to defend Roseburg did not include a reservation of rights that triggered Roseburg's right to select independent or *Cumis* defense counsel, Liberty properly retained and appointed competent counsel to defend Roseburg against Mill Fire suits – which negates Roseburg's breach of contract and bad faith claims as a matter of law. Roseburg has not and cannot identify any fact to support that Liberty's appointed defense counsel could have influenced the outcome of any purported coverage defense.

Roseburg refused and co-opted Liberty's defense and claims investigation by selecting its own counsel and consultants to investigate Mill Fire claims and defend against Mill Fire suits. Roseburg did so voluntarily and at its own expense.

In the absence of summary judgment, Liberty will and hereby does move for an order granting partial summary judgment on the following claims or parts of each claim asserted in Roseburg's Complaint, pursuant to Federal Rule of Civil Procedure 56(a), on grounds there are no

genuine disputes as to any material fact and Liberty is entitled to judgment as a matter of law:

1.    To the extent Roseburg asserts its breach of contract and bad faith claims, in part, on Liberty's alleged failure to appoint competent defense counsel, Roseburg's claims fail because the undisputed material facts demonstrate that Liberty properly retained and appointed competent counsel to defend Roseburg against Mill Fire suits.

Alternatively, the Court should enter an order that this material fact is not genuinely in dispute and treat it as a fact established in the case, pursuant to Federal Rule of Civil Procedure 56(g).

2.    To the extent Roseburg asserts its breach of contract and bad faith claims, in part, on Liberty's alleged failure to allow Roseburg to select independent or *Cumis* counsel to defend it against Mill Fire suits, Roseburg's claims fail because Liberty's agreement to defend Roseburg did not include a reservation of rights that resulted in a *Cumis*-creating conflict.  Roseburg has not and cannot identify any fact to support that Liberty's appointed defense counsel could have influenced the outcome of any purported coverage defense.  Thus, pursuant to the applicable policy and California law, Liberty had the right and duty to control Roseburg's defense through Liberty's retention and appointment of competent defense counsel.

Alternatively, the Court should enter an order that this material fact is not genuinely in dispute and treat it as a fact established in the case, pursuant to Federal Rule of Civil Procedure 56(g).

3.    Roseburg's Count II for Breach of the Covenant of Good Faith and Fair Dealing asserted against Liberty fails in its entirety and as a matter of law, because the undisputed material facts demonstrate that Liberty acted with proper cause in its claims investigation and defense of Roseburg against Mill Fire suits.

4.    Roseburg's claim for punitive damages asserted against Liberty (Prayer for Relief, Para. (3)) fails in its entirety and as a matter of law, because Roseburg has not and cannot demonstrate that Liberty acted with any malice, fraud or oppression in its claims investigation and defense of Roseburg against Mill Fire suits.

1    Liberty's Motion is based on this Notice of Motion and Motion, the attached Memorandum

2    of Points and Authorities, the concurrently filed Statement of Undisputed Facts, Compendium of

3    Exhibits, Declarations of A. David Bona, Sarah Kaufman, Christopher Faddis, and Jeffrey S.

4    Crowe, and Request for Judicial Notice, the records and pleadings on file in this matter, and on

5    such other evidence and argument as may be presented to the Court.

6    Dated:  December 12, 2024

7                         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

8

9                 By:    _____
                                    /s/ Jeffrey S. Crowe
10                               JEFFREY S. CROWE
                                 SCOTT SVESLOSKY
11                               MARY E. GREGORY
                                 Attorneys for Defendant
12                         LIBERTY INSURANCE CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2
**Page**

3  I.      INTRODUCTION.................................................................................................10

4  II.     FACTUAL BACKGROUND ...............................................................................12

5          A.    The Liberty Policy and Liberty's Right and Duty to Defend "Suits." ....................12

6          B.    The Mill Fire, Roseburg's Community Relief Fund and Retention of Baker
                 Hostetler and Others *Without* Liberty's Knowledge or Consent..............................13
7
8          C.    Liberty Timely Accepts Roseburg's Tender of Defense to Mill Fire Suits
                 and Appoints Counsel Highly Skilled and Experienced in Defending Mass
                 Fire Claims. ...............................................................................................................13
9
10         D.    Roseburg Refuses Liberty's Defense, Co-Opts Liberty's Claims
                 Investigation, and Voluntarily Incurs $15 Million in Alleged Attorneys'
                 Fees and Consultant Costs.........................................................................................15
11
12         E.    Roseburg Concocts Phantom Coverage Defenses to Claim a Right to *Cumis*
                 Counsel......................................................................................................................16

13         F.    At Roseburg's Request, Liberty Pays Its $4 Million Policy Limits Toward
                 Settlement of Mill Fire Suits and Claims, Which Ends Its Duty to Defend. ...........17
14
15         G.    Roseburg's Complaint Against Liberty and Ohio...................................................18

   III.    LIBERTY IS ENTITLED TO SUMMARY JUDGMENT.................................19
16
17         A.    Liberty Had the Right to Control Roseburg's Defense. ..........................................19

18         B.    Liberty Discharged Its Duty to Defend When It Appointed Competent
                 Counsel.......................................................................................................................20

19         C.    Liberty Did Not Owe a *Cumis* Obligation. ..........................................................22

20               1.    Liberty's General Reservation of Rights Did Not Trigger *Cumis*,
                       Nor Did Roseburg's Assertion of Phantom Coverage Defenses.................22
21
22               2.    Liberty Never Raised a Wildfire Coverage Defense..................................24

23         D.    Liberty is Not Responsible for the Fees/Costs that Roseburg Voluntarily
                 Incurred. ....................................................................................................................27

24 IV.     AT A MINIMUM, LIBERTY IS ENTITLED PARTIAL SUMMARY
           JUDGMENT .......................................................................................................28
25
26         A.    Roseburg's "Bad Faith" Claim Fails on the Law and Undisputed Facts. ...............28

           B.    Roseburg's Punitive Damages Claim Fails. ............................................................29
27
   V.      CONCLUSION ...................................................................................................29
28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American Claims Mgmt., Inc. v. Allied World Surplus Lines Ins. Co.*
  484 F.Supp.3d 869 (S.D. Cal., 2020) (rev'd on other grounds, 2022 WL 964217 (9th
  Cir. 2022) .................................................................................................................................. 20

*American Mut. Liab. Ins. Co. v. Sup. Ct.*
  38 Cal.App.3d 579 (1974) ........................................................................................................ 14

*Basich v. Allstate Ins. Co.*
  87 Cal.App.4th 1112 (2001) ..................................................................................................... 29

*Bilezikjian v. Unum Life Ins. Co.*
  692 F.Supp.2d 1203 (C.D. Cal. 2010) ..................................................................................... 28

*Blanchard v. State Farm Fire & Cas. Co.*
  2 Cal.App.4th 345 (1991) .................................................................................................. 23, 25

*Careau & Co. v. Security Pacific Business Credit, Inc.*
  222 Cal.App.3d 1371 (1990) .................................................................................................... 28

*Case v. State Farm Mutual Auto. Ins. Co., Inc.*
  30 Cal.App.5th 397 (2018) ....................................................................................................... 28

*Centex Homes v. St. Paul Fire & Marine Ins. Co.*
  19 Cal.App.5th 789 (2018) ....................................................................................................... 23

*Chateau Chamberay HOA v. Assoc. Intl. Ins. Co.*
  90 Cal.App.4th 335 (2001) ....................................................................................................... 28

*Dynamic Concepts, Inc. v. Truck Ins. Exch.*
  61 Cal.App.4th 999 (1998) .............................................................................................. 23, 24, 25

*Faust v. The Travelers*
  55 F.3d 471 (9th Cir. 1995) ...................................................................................................... 27

*Federal Ins. Co. v. MBL, Inc.*
  219 Cal.App.4th 29 (2013) ............................................................................................... 23, 24, 26

*Foster-Gardner, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*
  18 Cal.4th 857 (1998) .............................................................................................................. 22

*Fraley v. Allstate Ins. Co.*
  81 Cal.App.4th 1282 (2000) ..................................................................................................... 28

*Gafcon, Inc. v. Ponsor & Assocs.*
  98 Cal.App.4th 1388 (2002) ............................................................................................. 23, 25

*Ghiglione v. Discover Prop. & Cas. Co.*
  2007 WL 963250 (N.D. Cal. 2007 ) ................................................................. 20

*Gribaldo, Jacobs, Jones & Assoc. v. Agrippina Versicherunges, A.G.*
  3 Cal.3d 434 (1970) ......................................................................................... 27

*Guebara v. Allstate Ins. Co.*
  237 F.3d 987 (9th Cir. 2001) ........................................................................... 28

*Icasiano v. Allstate Ins. Co.*
  103 F.Supp.2d 1187 (N.D. Cal. 2000) ............................................................. 22

*Love v. Fire Ins. Exch.*
  221 Cal.App.3d 1136 (1990) ............................................................................ 28

*Low v. Golden Eagle Ins. Co.*
  110 Cal.App.4th 1532 (2003) ........................................................................... 27

*Manzarek v. St. Paul Fire & Marine Ins. Co.*
  519 F.3d 1025 (9th Cir. 2008) ......................................................................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio*
  475 U.S. 574 (1986) ........................................................................................ 20

*Merritt v. Reserve Ins. Co.*
  34 Cal.App.3d 858 (1973) ........................................................................ 20, 28

*Nede Mgmt., Inc. v. Aspen American Ins. Co.*
  68 Cal.App.5th 1121 (2021) ...................................................................... 22, 23

*New York Marine and General Ins. Co. v. Lafarge North America, Inc.*
  599 F.3d 102 (2nd Cir. 2010) .......................................................................... 21

*Park Townsend, LLC v. Clarendon America Ins. Co.*
  916 F.Supp.2d 1045 (N.D. Cal. 2013) ............................................................. 25

*Peterson v. Reliance Ins. Co.*
  5 Fed.Appx. 687 (9th Cir. 2001) ..................................................................... 19

*Pitzer College v. Indian Harbor Ins. Co.*
  8 Cal.5th 93 (2019) .......................................................................................... 27

*Powerine Oil Co., Inc. v. Sup. Ct.*
  37 Cal.4th 377 (2005) ...................................................................................... 22

*Safeco Ins. Co. v. Sup. Ct.*
  71 Cal.App.4th 782 (1999) ......................................................................... 19, 27

*Samson v. Allstate Ins. Co.*
  949 F.Supp. 748 (N.D. Cal. 1996) ................................................................... 22

*San Diego Navy Fed. Credit Union v. Cumis Ins. Society, Inc.*
    162 Cal.App.3d 358 (1984) ......................................................................... 22, 23

*Santa Clara Valley Water Dist. v. Century Indem. Co.*
    89 Cal.App.5th 1016 (2023) ............................................................................... 27

*Shade Foods, Inc. v. Innovative Prods.*
    78 Cal.App.4th 847 (2000) ................................................................................. 29

*Sovereign Gen. Ins. Servs., Inc. v. Natl. Cas. Co.*
    2008 WL 448041 (E.D. Cal. 2008) ..................................................................... 27

*State Farm Mut. Auto Ins. Co. v. Fed. Ins. Co.*
    72 Cal.App.4th 1422 (1999) ............................................................................... 19

*Swanson v. State Farm Gen. Ins. Co.*
    219 Cal.App.4th 1153 (2013) ............................................................................. 23

*Travelers Prop. v. Centex Homes*
    2011 WL 1225982 (N.D. Cal. 2011) .................................................................. 19

*Truck Ins. Exch. v. Unigard Ins. Co.*
    79 Cal.App.4th 966 (2000) ................................................................................. 19

*Westoil Terminals Co., Inc. v. Industrial Indem. Co.*
    110 Cal.App.4th 139 (2003) ............................................................................... 21

*Zenith Ins. Co. v. O'Connor*
    148 Cal.App.4th 998 (2007) ............................................................................... 25

**Statutes**

Cal. Civ. Code § 2860 ................................................................................................. 22

Cal. Civ. Code § 2860(b) ............................................................................................ 23

Cal. Civ. Code § 3294 ................................................................................................. 29

Cal. Health & Safety Code § 13007 ............................................................................ 26

**Other Authorities**

10 Cal.C.Regs. § 2695.5(e) ......................................................................................... 19

10 Cal.C.Regs. § 2695.7(b) ......................................................................................... 19

Cal. R. Prof. Conduct 1.1 ............................................................................................ 21

Cal. R. Prof. Conduct 1.1(b) ....................................................................................... 20

California Civil Jury Instruction 400 ........................................................................... 26

California Civil Jury Instruction 1000 ........................................................................ 26

California Civil Jury Instruction 2000 ........................................................................ 26

California Civil Jury Instruction 2020 ........................................................................ 26

California Civil Jury Instruction 2021 ........................................................................ 26

California Civil Jury Instruction 3500 ........................................................................ 26

Fed. R. Civ. Proc. 56(a) ............................................................................................... 28

Fed. R. Civ. Proc. 56(g) ............................................................................................... 28

SMRH:4857-1655-7033.15

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

## I.    <u>INTRODUCTION</u>

Liberty has no duty to reimburse Roseburg for the $15 million in attorneys' fees and costs that it voluntarily incurred defending claims that arose from a catastrophic fire that it allegedly caused.  Roseburg disagrees, contending that Liberty breached its duty to defend when it refused Roseburg's preferred counsel and assigned defense counsel instead.  Roseburg is wrong.  Liberty's liability policy gave Liberty the right to control Roseburg's defense, which Roseburg refused based on fabricated conflicts of interest.  As a result, Roseburg's claims lack merit and Liberty is entitled to summary judgment as a matter of law.

This case arises out of a September 2022 fire that started at Roseburg's veneer mill and spread to two communities in Northern California (the "Mill Fire").  Within 24 hours of the fire, Roseburg hired the Baker Hostetler law firm, even though the Baker attorneys had no prior experience defending against mass fire claims.  Baker, in turn, hired consulting firm AlixPartners to adjust the expected damages claims, even though Alix had no insurance claims adjusting training or license.  *After* hiring Baker, Roseburg gave notice of the Mill Fire to Liberty, who timely accepted Roseburg's defense and assigned defense counsel David Bona, a highly skilled lawyer with significant experience defending mass fire suits.  Liberty also tendered its $4 million policy limits to help settle Mill Fire claims and suits.

Unsatisfied, and in violation of the policy terms, Roseburg rejected Mr. Bona, handled the claims with Baker and Alix, obstructed Liberty's investigation, and racked-up a staggering $15 million in fees and costs in just over 5 months – all because ███████████████████ ████████████████████████  Roseburg now seeks to foist that cost on Liberty based on three arguments, all of which fail.

First, Roseburg argues that Liberty should have consented to Roseburg's retention of Baker and Alix to defend against Mill Fire suits and handle Mill Fire claims.  Not so.  California law squarely holds that liability insurers (like Liberty) that have the "right and duty to defend the insured" are vested with control of the insured's defense through the insurer's appointment of competent defense counsel.  Here, Liberty did so and had no obligation to consent to Roseburg's

1    preferred counsel, Baker.  Nor did Liberty ask Roseburg to incur the Alix expenses.  Instead,

2    Roseburg refused Liberty's defense and co-opted Liberty's right to investigate and settle claims.

3    It did so voluntarily and at its own expense.

4        Second, Roseburg argues that Liberty breached its duty to defend because it failed to

5    appoint "competent" defense counsel.  However, Roseburg's experts concede that Mr. Bona "had

6    the requisite skill and experience to defend Roseburg against lawsuits arising from the Mill Fire."

7    They do not question his competency, nor could they.  Instead, they take issue with the size of Mr.

8    Bona's law firm.  All to no avail, because under applicable ethical rules and caselaw, the size of a

9    firm is not a measure of competency.

10        Third, Roseburg argues that a conflict of interest gave it the right to select independent or

11    *Cumis* defense counsel.  Roseburg is wrong again.  A conflict of interest triggers the right to

12    independent counsel when an insurer reserves rights on *specific* coverage defenses and its

13    appointed defense counsel can control the outcome of the coverage issue.  Here, Liberty did not

14    reserve rights on any specific coverage defense.  Instead, Liberty provided a "general" reservation

15    of the right to later decline coverage and withdraw its defense, which California courts have held,

16    as a matter of law, does not trigger a right to independent defense counsel.  A *Cumis*-creating

17    conflict must be "actual, not merely potential," and a general reservation of rights is just that –

18    general – and at most, creates a theoretical conflict, not an actual one.

19        In light of these rules negating their *Cumis* arguments, Roseburg goes on to manufacturing

20    conflicts that do not exist.  Specifically, Roseburg speculates that Liberty could later decline

21    coverage based on policy exclusions that Liberty *never* raised.  California courts have rejected

22    identical arguments, holding that an insured cannot manufacture a *Cumis* conflict by relying on

23    phantom coverage defenses.

24        In a final stretch of the imagination, Roseburg argues that Liberty owed a *Cumis* obligation

25    because one of Roseburg's excess insurers, Ohio Casualty Insurance Company ("Ohio"), had a

26    wildfire exclusion in its policy.  According to Roseburg, because Liberty and Ohio are related

27    entities, Liberty's appointed counsel could control the outcome of any wildfire coverage defense.

28    Roseburg can offer no authority to support this novel theory.  Nor does the argument make any

sense, where, as here, neither Liberty nor Ohio staked their coverage position on a wildfire exclusion.  Indeed, Ohio paid its $20 million excess policy limit in settlements of Mill Fire claims and suits, *without* any reservation of rights.

Roseburg's argument also fails because the type of fire was never a material issue in Mill Fire suits.  As a result, Mr. Bona could not control the outcome of a coverage defense that neither carrier asserted in any reservation of rights.

Roseburg's bad faith and punitive damages claims likewise fail, because Liberty acted with proper cause in its response to Roseburg's tender of defense, and there is no evidence that it acted with any malice, fraud or oppression.

For these and the following reasons, the Court should grant summary judgment, or alternatively, partial summary judgment, in Liberty's favor.

## II.    FACTUAL BACKGROUND

### A.    The Liberty Policy and Liberty's Right and Duty to Defend "Suits."

Liberty issued Commercial General Liability Policy No. TB7-661-067089-031 to Roseburg for the policy period November 1, 2021 to November 1, 2022 (the "Policy"). ("Undisputed Fact ("UF") 1.)  The Policy scheduled a $2 million per occurrence "bodily injury" limit and a $2 million per occurrence "logger's property damage liability" limit.  (UF 2.)  Pursuant to those limits, Liberty agreed to indemnify Roseburg for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' and … 'logger's property damage' to which this insurance applies…"  (UF 4-5.)  The Policy further provided that Liberty "may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result."  (UF 4-5.)

The Policy also contained the following defense coverage:  "We will have the right and duty to defend the insured against any 'suit' seeking those damages. . . ."  (UF 4-5.)

The Policy expressly defined "suit" to mean "a civil proceeding" seeking damages "to which this insurance applies . . . ."  (UF 6.)  Liberty also agreed to "pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend . . . [a]ll expenses *we incur*" and "[a]ll reasonable expenses incurred by the insured *at our request* to assist us in the investigation or defense of the claim or 'suit.'"  (UF 7 (emphasis added).)  The Policy separately precluded

1  Roseburg from voluntarily incurring any expense, except at Roseburg's own cost:

2         No insured will, except at the insured's own cost, voluntarily make a
       payment, assume any obligation, or incur any expense, other than

3         first aid, without our consent.  (UF 8 ("Conditions").)

4  **B.**    **The Mill Fire, Roseburg's Community Relief Fund and Retention of Baker Hostetler**

5        **and Others _Without_ Liberty's Knowledge or Consent.**

6        On September 2, 2022, the "Mill Fire" started inside Roseburg's mill and traveled through

7  Weed and Lake Shastina, California.  (UF 16)  It burned just under 4,000 acres, caused three

8  fatalities, and damaged or destroyed "about 89 home and businesses."  (UF 16.)

9  ████████████████████████████████████████████████████████████

10 ████████████████  (UF 24.)  Thus, _one day after the Mill Fire_, Roseburg unilaterally hired

11 Robert Julian of Baker to lead Roseburg's response and defense to Mill Fire liability.  (UF 17, 18.)

12 It did so even though Julian had no prior experience defending against mass fire claims.  (UF 20.)

13 Rather, Julian had only represented the tort claimants committee (_not_ defendants) in bankruptcy

14 claims against PG&E arising from fires in 2015, 2017 and 2018.  (UF 20.)

15       Roseburg's retention of Baker also involved matters well beyond the defense of Mill Fire

16 suits.  It retained Baker to ████████████████████████████████████

17 ████████████████████████████████████████████████████████  (UF 19.)

18       Baker, in turn, hired Alix, a consulting company with no insurance claims adjusting

19 training or applicable license, to undertake claims handling work.  (UF 21, 23.)  Then, on

20 September 7, 2022, Roseburg announced a $50 million "Community Relief Fund" (the "Fund") to

21 aid fire victims.  (UF 26-27.)  Ultimately, ██████████████████████████

22 ████████████████████████████████  (UF 26-27.)

23       It was not until September 6, 2022, after Roseburg had retained Baker, that Roseburg gave

24 notice of the Mill Fire to Liberty.  (UF 28.)  Roseburg acknowledges that it voluntarily retained

25 Baker and Alix without Liberty's knowledge or consent.  (UF 18, 22.)

26 **C.**    **Liberty Timely Accepts Roseburg's Tender of Defense to Mill Fire Suits and**

27       **Appoints Counsel Highly Skilled and Experienced in Defending Mass Fire Claims.**

28       Roseburg had no expectation that Liberty would approve of Baker's retention, but had

-13-

1    hoped Liberty would consider appointing Baker as "tripartite" counsel to defend it against

2    anticipated suits.[1]  (UF 29.)  At the time, Roseburg did *not* claim a right to independent or *Cumis*

3    counsel.  (UF 30.)  Liberty initially considered Baker as tripartite counsel because it had its own

4    pre-existing attorney-client relationship with Baker.  (UF 31.)  Initial communications ensued, but

5    Roseburg and Baker acknowledge that no agreement on Baker's rates had been reached.  (UF 34.)

6         Then, in a September 9, 2022 call with all of Roseburg's liability insurers, Baker

7    announced themselves as Roseburg's coverage counsel – consistent with Baker's role in pursuing

8    insurance recovery.  (UF 32.)  Given concerns that Baker could not serve as both tripartite defense

9    counsel and Roseburg's coverage counsel – particularly because it could place Baker in an adverse

10   position with Liberty, a current Baker client – Liberty declined to proceed with Baker.[2]  (UF 33.)

11        Beginning on September 9, 2022, Roseburg tendered to Liberty for defense and indemnity

12   a series of five suits.  (UF 38, 47, 49-50.)  On September 22, 2022 – *13 days after the tender* –

13   Liberty accepted Roseburg's defense subject to a limited reservation of rights that it would not

14   cover (i) uninsurable punitive damages, (ii) expenses voluntarily incurred by Roseburg, or (iii)

15   damages other than for "bodily injury" or "logger's property damage."  (UF 46.)  Liberty did *not*

16   reserve the right to deny coverage based on any exclusion.  (UF 46.)  Nor did it reserve the right to

17   contest that the Mill Fire constituted an "occurrence," as Roseburg's expert concedes.  (UF 58.)

18        In a November 9, 2022 letter responding to the tender of a later suit, Liberty again accepted

19   Roseburg's defense subject to the same limited reservation of rights.  (UF 48.)  Liberty explained

20   further that it was "prepared to indemnify Roseburg against reasonable settlements or judgments

21   for covered 'bodily injury' and 'logger's property damage' claims arising from the fire up to the

22   Policy's" aggregate $4 million policy limit.  (UF 48.)

23        According to Roseburg's own expert, Liberty *timely* responded to and accepted Roseburg's

24

_____

25   [1] In the tripartite relationship, "the attorney characteristically is engaged and paid by the carrier to defend
     the insured. . . .  In such a situation, the attorney has two clients whose primary, overlapping and common
26   interest is the speedy and successful resolution of the claim and litigation."  *American Mut. Liab. Ins. Co. v.
     Sup. Ct.*, 38 Cal.App.3d 579, 591-92 (1974).

27   [2] Liberty's concern that Baker could have an ethical conflict of interest later proved to be true, ████████████
28   ███████████████████████████████████████████████████████████████████████████████████
                                                                                        (UF 35.)

1  tenders for defense under applicable regulations.  (UF 32.)

2          In its letters, Liberty advised that it had selected and appointed David Bona of Carlson,

3  Calladine & Peterson LLP to defend Roseburg against Mill Fire suits.  (UF 46, 48.)  Liberty did so

4  because Mr. Bona is one of the most skilled and experienced lawyers in California in defending

5  mass fire suits.  (UF 39-45.)  Since 2008, he has defended no less than 19 mass fire lawsuits, many

6  involving hundreds of millions of dollars in damages and others proceeding to trial.  (UF 44-45.)

7          Importantly, Roseburg's own expert concedes that Mr. Bona had the requisite experience

8  and skill to defend Roseburg against Mill Fire suits, noting that "it appeared he was a qualified

9  lawyer on fire – on fire losses, yeah."  (UF 81.)  Roseburg's expert had no basis to question or

10  doubt Mr. Bona's abilities.  (UF 81.)  Roseburg's other expert offered no opinion on Mr. Bona's

11  competency.  (UF 82.)  She only opined that Mr. Bona and his firm did not have the resources to

12  perform all tasks that Baker undertook, but conceded that Baker's retention went well beyond the

13  defense of Mill Fire suits.  (UF 82.)  She also agreed that the comparison of resources as between

14  Mr. Bona and Baker did not render Mr. Bona incompetent to defend Mill Fire suits.  (UF 82.)

15  **D.    Roseburg Refuses Liberty's Defense, Co-Opts Liberty's Claims Investigation, and**

16          **Voluntarily Incurs $15 Million in Alleged Attorneys' Fees and Consultant Costs.**

17          Notwithstanding Liberty's agreement to defend Roseburg and its appointment of defense

18  counsel, Roseburg refused to allow Liberty and Mr. Bona to participate in its defense.  As

19  Roseburg's insurance coverage counsel would later express:  "[I]t is important to underscore that

20  Roseburg is represented by Baker - and Baker only - and that Carlson is not to speak with anyone

21  on Roseburg's behalf."  (UF 90.)  Indeed, ████████████████████████████████████

22  ██████████████████████████████  and at other times refusing to respond to his calls and

23  inquiries.  (UF 62-65, 68, 70-73.)  Roseburg and Baker did so without interviewing Mr. Bona,

24  without asking for his recommendations, and without involving him in case strategy.  (UF 80.)

25          Nevertheless, Mr. Bona tried to participate in Roseburg's defense, which Baker and

26  Roseburg declined.  (UF 61-66, 70-79.)  Separately, Liberty tried to proceed with its claims

27  investigation.  It reviewed available material about the Mill Fire, and asked Roseburg and Baker

28  for information and documents.  (UF 57-61, 64, 67.)  As it noted internally, Liberty was prepared

1    to hire experts to investigate liability and a licensed third-party administrator to assist in

2    investigating and settling claims.  (UF 57-59.)  Roseburg, Baker and Alix, however, had already

3    co-opted the claims investigation and defense.  (UF 58-59_.)

4            At no time did Liberty request that Roseburg incur the Baker or Alix expenses.  (UF 18-

5    22.)  Roseburg did so entirely on its own.  (UF 18-22.)

6            Rather than allowing an insurance-funded defense, Roseburg gave Baker and Alix

7    unfettered discretion in their response to the Mill Fire.  Roseburg did so without ever consulting or

8    interviewing any other lawyers, without negotiating Baker's and Alix's rates, without any

9    oversight of staffing, and ███████████████████.  (UF 25.)  As a result, in just over

10   five months, Baker staffed the matter with 60 lawyers and paralegals across nine different offices

11   – most of them outside of California – and with rates ranging from $380/hour for support staff to

12   $2,155/hour for partners.  In just that period, Baker proceeded to bill over $8.5 million.  (UF 87.)

13           Separately, Alix purported to perform claims handling work using 47 consultants at rates

14   ranging from $310/hour to $1,305/hour, and billed Roseburg over $6.6 million.  (UF 88.)

15           Importantly, almost all of those fees and costs had nothing to do with defending Roseburg

16   against Mill Fire suits.  Although never served, Roseburg and Baker voluntarily removed four

17   filed Mill Fire suits to federal court.  (UF 85.)  And even then, Baker never filed a responsive

18   pleading, never conducted written discovery, and took no depositions.  (UF 86.)  Still, for the

19   period from Roseburg's tender (9/6/22) to Liberty's acceptance of Roseburg's defense (9/22/22)

20   (so-called post-tender, pre-acceptance fees and costs), Liberty reimbursed Roseburg $946,794.70

21   for reasonable attorneys' fees and costs incurred.  (UF 89.)

22   **E.    <u>Roseburg Concocts Phantom Coverage Defenses to Claim a Right to *Cumis* Counsel.</u>**

23           On October 7, 2022, Roseburg claimed for the first time that Liberty owed a *Cumis* duty,

24   and thus, Roseburg had properly selected Baker for that role.  (UF 90.)  Roseburg made that claim

25   on coverage defenses Liberty never asserted, and on arguments Roseburg's experts flatly reject.

26           Roseburg first argued that Liberty's "open-ended reservation of rights" to later withdraw

27   its defense "invites a conflict of interest."  (UF 91.)  Specifically, Roseburg claimed that Liberty

28   could later assert policy exclusions for "expected or intended injury" or "pollution," or could

otherwise later rely on the Policy's "occurrence" definition to deny coverage  (UF 91.)  Liberty, however, never raised those exclusions in its reservation of rights.  (UF 93.)  And Roseburg's expert agrees that Liberty did not reserve rights on "occurrence" as a coverage defense.  (UF 53.)

Next, Roseburg claimed that Liberty's reservation of the right to potentially deny payment for non-covered losses triggered a *Cumis* obligation.  (UF 91.)  But as Liberty explained, that argument is contrary to California law, which holds that *Cumis* is not triggered merely because a complaint involves covered and uncovered damages.  (UF 54, 92.)  Nor could it present a conflict, because Liberty tendered its $4 million policy limits to settle covered claims.  (UF 92, 106.)

Roseburg also claimed that Liberty's reservation of the right to withdraw its defense upon exhaustion of its policy limits triggered a *Cumis* obligation.  (UF 91.)  Not so according to Roseburg's own expert, who conceded that an insured is not entitled to *Cumis* counsel because they have been sued in excess of policy limits, and further, that a liability insurer properly withdraws its defense upon exhaustion of its policy limits.  (UF 54-55, 93.)

Over two months later, Roseburg relied on another phantom coverage defense.  Roseburg claimed that a wildfire exclusion in excess policies issued by Everest Insurance and Ohio triggered a *Cumis* right.  (UF 94.)  However, Roseburg admits that Liberty's Policy did *not* contain any such exclusion, and Liberty never reserved the right to deny coverage on that basis.  (UF 96.)  Similarly, Ohio never reserved rights on any such exclusion.  (UF 97.)  Indeed, Ohio never stated a coverage position.  (UF 97.)  Roseburg's own experts assert that Ohio's failure to do so waived the wildfire exclusion.  (UF 98.)  Still, Roseburg claimed that Mr. Bona could steer the defense to control the outcome of a coverage defense that neither carrier raised simply because Liberty and Ohio are affiliated entities.  (UF 95.)

**F.    At Roseburg's Request, Liberty Pays Its $4 Million Policy Limits Toward Settlement of Mill Fire Suits and Claims, Which Ends Its Duty to Defend.**

Roseburg decided to settle Mill Fire suits and claims.  Thus, on October 19, 2022, Roseburg asked its liability insurers for authority to settle certain claims for $17.5 million of the

1  insurers' $49 million in limits.[3]  Roseburg planned to fund those settlements and then seek

2  reimbursement from the carriers, and asked for a response by October 25, 2022.  (UF 105.)

3         Liberty did not obstruct Roseburg's plan.  On October 25, 2022, Liberty tendered the

4  Policy's $4 million policy limits for the settlement and release of covered "bodily injury" and

5  "logger's property damage" claims, without any reservation of rights.  (UF 106.)

6         On November 22, 2022, Roseburg again asked for Liberty's "consent to settle" certain

7  claims at an upcoming mediation.  (UF 107.)  In response, Liberty again tendered its full $4

8  million policy limits toward the settlement of covered claims.  (UF 108.)  Roseburg proceeded to

9  settle 95% of Mill Fire claims.  (UF 108.)  As Roseburg made settlement payments, it then made

10 reimbursement requests to its insurers, including Liberty.  (UF 109,112.)  Liberty exhausted its $4

11 million in policy limits when it issued a final reimbursement payment to Roseburg on February 9,

12 2023.  (UF 110-111, 113-114.)  Because it exhausted its policy limits in reimbursement payments

13 to Roseburg, Liberty ended its defense of Roseburg against Mill Fire suits on February 10, 2023.

14 (UF 114.)  Roseburg does not challenge Liberty's termination of its defense obligation.  (UF 121.)

15 **G.     Roseburg's Complaint Against Liberty and Ohio.**

16        On April 7, 2023, Roseburg sued Liberty and two excess insurers, Everest and Ohio.  (UF

17 117.)

18        It sued Ohio seeking a declaration that, once "the Everest Policy exhausts, Roseburg

19 Forest's claim triggers the Ohio Casualty Policy."  (UF 118.)  Just two weeks prior, on March 24,

20 2023, Roseburg submitted reimbursement demands to its excess insurers for Mill Fire settlements

21 that reached the excess limits.  (UF 115.)  Even though Everest had not yet paid its policy limit, on

22 June 21, 2023, Ohio tendered its $20 million in policy limits to Roseburg without a reservation of

23 rights.  (UF 116.)  Roseburg thereafter dismissed Ohio from the action with prejudice.  (UF 119.)

24        As to Liberty, Roseburg asserts claims for Breach of Contract (Duty to Defend) and

25 Breach of the Implied Covenant of Good Faith and Fair Dealing.  (UF 120.)  It concedes that

26 Liberty "accepted its duty to defend Roseburg" (UF 121), but claims that Liberty:  (1) failed "to

27 _____

28 [3] The tower of insurance totaled $49 million across six insurers, with Ohio as the top-level excess insurer
with a $20 million policy limit.  (UF 3, 10.)

-18-

1  select adequate, competent, and conflict-free counsel to represent Roseburg"; and (2) failed to

2  recognize Roseburg's "right to independent counsel, Baker Hostetler." (UF 121.) In its "bad

3  faith" claim, Roseburg asserts that "Liberty's refusal to pay for Roseburg Forest's choice of

4  counsel . . . [was] without proper cause." (UF 122.)

5      Thus, according to Roseburg, it is entitled to recover the attorneys' fees and costs that it

6  paid to Baker, Alix, and others. (UF 123.) Roseburg also seeks punitive damages. (UF 123.)

7              **III.    LIBERTY IS ENTITLED TO SUMMARY JUDGMENT**

8  **A.    Liberty Had the Right to Control Roseburg's Defense.**

9      Liberty had no obligation to approve Roseburg's choice of counsel, Baker, because

10  California law vests the insurer with control over the insured's defense.[4] "[I]n the event of a

11  claim, occurrence, or suit, the insured will tender the defense to the insurer, which will provide a

12  defense and control the litigation with the full cooperation of the insured." *Truck Ins. Exch. v.*

13  *Unigard Ins. Co.*, 79 Cal.App.4th 966, 979 (2000). The right to control the insured's defense

14  generally includes the right to select defense counsel. *State Farm Mut. Auto Ins. Co. v. Fed. Ins.*

15  *Co.*, 72 Cal.App.4th 1422, 1429 (1999); *Travelers Prop. v. Centex Homes*, 2011 WL 1225982 *17

16  (N.D. Cal. 2011) (same). And "[w]hen the insurer provides a defense to its insured, the insured

17  has no right to interfere with the insurer's control of the defense." *Safeco Ins. Co. v. Sup. Ct.*, 71

18  Cal.App.4th 782, 787 (1999); *Peterson v. Reliance Ins. Co.*, 5 Fed.Appx. 687, 688 (9th Cir. 2001)

19  ("The duty to defend gives the insurer absolute right to control the defense . . . .").

20      Roseburg and its experts agree that, absent a *Cumis* obligation, Liberty had the right to

21  control Roseburg's defense, including the right to select and appoint defense counsel. (UF 36-37.)

22  Consequently, they also agree that, absent Roseburg's right to *Cumis* counsel, Liberty had no

23  obligation to consent to Baker as Roseburg's preferred defense counsel. (UF 36-37.)

24      Here, Liberty timely responded to and accepted Roseburg's defense of Mill Fire suits. *See*

25  10 Cal.C.Regs. § 2695.7(b) (accepted defense within 40 days); 10 Cal.C.Regs. § 2695.5(e)

26  (acknowledged receipt of tenders within 15 days). As Roseburg's expert explained it, Liberty

27  ───────────────

28  [4] In diversity cases, involving insurance coverage claims in California, federal courts apply California law. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

1    "gave a timely response to those matters" when it accepted Roseburg's defense.  (UF 52.)

2       Thus, because Liberty owed no *Cumis* obligation (*infra*, Section III.C.), Liberty had the

3    right to control Roseburg's defense, without interference.

4    **B.**      **Liberty Discharged Its Duty to Defend When It Appointed Competent Counsel.**

5       Liberty properly discharged its duty to defend Roseburg against Mill Fire suits when it

6    selected and appointed Mr. Bona as defense counsel – one of the most experienced and skilled

7    lawyers in defending against mass fire claims.

8       A liability insurer's duty to defend requires that, upon the filing of a suit, it employ

9    competent counsel to represent the insured.  *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 882

10    (1973).  Under California Rules of Professional Conduct, "competence" in "any legal service" is

11    defined to mean "to apply the (i) learning and skill, and (ii) mental, emotional, and physical ability

12    reasonably necessary for the performance of such service."  Cal. R. Prof. Conduct 1.1(b); *see also*

13    *Ghiglione v. Discover Prop. & Cas. Co.*, 2007 WL 963250 at *3 (N.D. Cal. 2007 ) (in a personal

14    injury action, finding as competent insurer-appointed counsel who had jury trial experience, four

15    of which involved personal injury actions); *American Claims Mgmt., Inc. v. Allied World Surplus*

16    *Lines Ins. Co.*, 484 F.Supp.3d 869, 882 (S.D. Cal., 2020) (rev'd on other grounds, 2022 WL

17    964217 (9th Cir. 2022) (counsel competent because he had decades of law and trial experience).

18       Here, Liberty appointed competent defense counsel.  Mr. Bona had the skill and decades'

19    experience in defending mass fire claims – including at trial and in matters significantly larger

20    than the Mill Fire.  (UF 44-45.)  Had Roseburg given him the chance, Mr. Bona was prepared to

21    fully defend Roseburg.  (UF 56.)  On Mr. Bona's record alone, no rational trier of fact could find

22    him incompetent to defend Mill Fire suits.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S.

23    574, 588 (1986) (rational trier of fact standard on summary judgment).  Equally significant,

24    Roseburg's expert concedes Mr. Bona's competency:

25              Q:      But do you agree that Mr. Bona had the requisite skill and
26              experience to defend Roseburg against lawsuits arising from the
               Mill Fire?

27              A:      From what I saw, I didn't – I didn't – I didn't see anything –
               it appeared he was a qualified lawyer on fire – on fire losses, yeah.

28

1   (UF 81; *see also* "I'm not questioning or doubting his experience" (*Id.*).)  Roseburg's other expert

2   did *not* "take a position on whether Mr. Bona and Carlson Calladine were competent counsel."

3   (UF 82.)  Instead, she "point[ed] out just the difference in capacity between [Bona] and Baker."

4   (UF 82.)  Even then, she did *not* conclude that their differences in "capacity" or "resources"

5   somehow rendered Mr. Bona incompetent to handle Roseburg's defense.  (UF 82.)

6           Nevertheless, for several reasons, a comparison of resources is inapposite here.

7           First, rules of "competency" say nothing about resources or capacity.  Rather, Rule 1.1

8   defines competency on the basis of learning, skill, and mental, emotional, and physical ability.

9   Mr. Bona checked all of those boxes.  Rule 1.1 also provides that "incompetent" lawyers may still

10  undertake legal services by associating or consulting with competent lawyers or acquiring the

11  necessary learning and skill.  If "resources" ever became an issue, Mr. Bona would have engaged

12  those resources, as necessary.  (UF 83.)

13          Second, law firm size is irrelevant to assessing "competency."  In *New York Marine and*

14  *General Ins. Co. v. Lafarge North America, Inc.*, 599 F.3d 102 (2nd Cir. 2010), the Second Circuit

15  rejected challenges to the competency of insurer-appointed counsel based on size.  There, the

16  insured faced significant liability for causing a levee to breach during Hurricane Katrina.  Arguing

17  that the insured's liability justified its retention of three separate law firms, the insured rejected

18  insurer-appointed counsel as "too small" for the matter.  The Court rejected this argument:

19              Lafarge claims that the firms offered by NYMAGIC were
                unqualified to defend its interests in the barge litigation because
20              Sutterfield is "only a five-person firm" . . . . Lafarge's argument is
                predicated on the unwarranted assumption that a "five-person firm"
21              is less competent than a larger firm or that the "five-person firm"
                would knowingly fail in its duties to adequately prepare for
22              Lafarge's defense. . . .  There is nothing to suggest that Sutterfield
                lacks expertise in complex maritime defense or that it would not
23              associate itself with another firm in the absence of Goodwin Procter
                and Chaffe.
24

25  *Lafarge*, 599 F.3d at 123-24.  Similarly here, Roseburg relies on "the unwarranted assumption"

26  that the size of Mr. Bona's firm made him unqualified to defend against the Mill Fire suits.

27          Third, a comparison of "resources" disregards the scope and nature of Liberty's duties

28  under the Policy.  As courts have explained, the duty to defend is "not without limits."  *Westoil*

1  *Terminals Co., Inc. v. Industrial Indem. Co.*, 110 Cal.App.4th 139, 153 (2003).  Here, the Policy

2  sets forth one of those limits.  It gives Liberty the right and duty defend "suits," *not* "claims."  (UF

3  4-5.)  That is a material distinction, because an insurer with the duty to defend "suits" does *not*

4  owe a duty to defend "claims" that have not yet become suits.  *Foster-Gardner, Inc. v. National*

5  *Union Fire Ins. Co. of Pittsburgh, Pa.*, 18 Cal.4th 857, 878-79 (1998); *Powerine Oil Co., Inc. v.*

6  *Sup. Ct.*, 37 Cal.4th 377, 393-94 (2005).  While the Policy also gives Liberty the discretion to

7  investigate and settle "claims," it had no obligation to do so here for the claims that were not suits.

8  *Foster-Gardner*, 18 Cal.4th at 883 (pre-suit investigation of claim "is a judgment call left solely to

9  the insurer"); *Icasiano v. Allstate Ins. Co.*, 103 F.Supp.2d 1187, 1190-91 (N.D. Cal. 2000)

10  ("insurer's obligation to defend and investigate is not triggered until Plaintiff tenders the defense

11  of a third party lawsuit to the insurer"); *Samson v. Allstate Ins. Co.*, 949 F.Supp. 748, 750-53

12  (N.D. Cal. 1996) (insurer "did not oblige itself to defend or settle threats of future litigation").

13  Those limitations matter here, because only five lawsuits had been filed against Roseburg

14  arising from the Mill Fire.  The scope of Baker's work included all other claims that had not yet

15  become suits.  Baker's work also involved matters well beyond Roseburg's defense.  Thus, the

16  comparison of resources as between Mr. Bona's firm and Baker is one without any material

17  difference for the purpose of determining Mr. Bona's competency to defend Mill Fire suits.

18  **C.    Liberty Did Not Owe a *Cumis* Obligation.**

19        **1.    *Liberty's General Reservation of Rights Did Not Trigger Cumis, Nor Did***

20              ***Roseburg's Assertion of Phantom Coverage Defenses.***

21  Liability insurers have the right to control an insured's defense, including through the

22  appointment of defense counsel.  *Nede Mgmt., Inc. v. Aspen American Ins. Co.*, 68 Cal.App.5th

23  1121, 284 Cal.Rptr.3d 122, 129 (2021).  Under California Civil Code section 2860, an exception

24  to that rule exists when an insurer appoints defense counsel whose ability to represent the insured

25  is impaired by a disqualifying conflict of interest.  *See also San Diego Navy Fed. Credit Union v.*

26  *Cumis Ins. Society, Inc.*, 162 Cal.App.3d 358, 364 (1984).  In that instance, the insured is

27

28

1    generally permitted to hire independent or *Cumis* defense counsel at the insurer's expense.[5]  *Id.*

2        The *Cumis* rule, however, is not based on insurance law, but instead, on the ethical duty of

3    an attorney to avoid representing conflicting interests.  *Federal Ins. Co. v. MBL, Inc.*, 219

4    Cal.App.4th 29, 41-42 (2013).  Thus, "when an insurer reserves its rights on a given issue and the

5    outcome of that coverage issue can be controlled by counsel first retained by the insurer for the

6    defense of the claim, a conflict of interest may exist."  Cal. Civ. Code § 2860(b).

7        However, "[w]here the insurer has not expressly reserved its right to deny coverage under

8    a particular exclusion in its policy, there can be no actual conflict based on the application of that

9    exclusion during the pendency of the action."  *Dynamic Concepts, Inc. v. Truck Ins. Exch.*, 61

10   Cal.App.4th 999, 1010 fn. 10 (1998).  As other courts have explained it, the "mere possibility of

11   an unspecified conflict does not require independent counsel.  The conflict must be significant, not

12   merely theoretical, actual, not merely potential."  *Nede*, 284 Cal.Rptr.3d at 130 (quoting *Centex

13   Homes v. St. Paul Fire & Marine Ins. Co.*, 19 Cal.App.5th 789, 797 (2018)).

14       And, "[a]s statutory and case law make clear, not every conflict of interest triggers an

15   obligation on the part of the insurer to provide the insured with independent counsel at the

16   insurer's expense."  *MBL*, 219 Cal.App.4th at 41.  "For example, the mere fact the insurer disputes

17   coverage does not entitle the insured to *Cumis* counsel; nor does the fact the complaint seeks

18   punitive damages or damages in excess of policy limits."  *Id.*  There is also no right to *Cumis*

19   merely because the insurer reserves the right to deny coverage or seek reimbursement of defense

20   costs for uncovered claims.  *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal.App.4th 1388, 1421 (2002);

21   *Dynamic Concepts*, 61 Cal.App.4th at 1007-08.  It is also proper for an insurer to forego reserving

22   rights on coverage defenses to avoid a *Cumis* duty.  *Dynamic Concepts*, 61 Cal.App.4th at 1010;

23   *Swanson v. State Farm Gen. Ins. Co.*, 219 Cal.App.4th 1153, 1164-65 (2013).

24       Under these predicate rules, California courts have rejected the argument that "global" or

25   "general" reservations of rights trigger a right to *Cumis* counsel.  *Dynamic Concepts*, 61

26   Cal.App.4th at 1007 (no "per se rule requiring the appointment of an independent counsel

27   _____

28   [5] Under California law, the existence of a conflict of interest entitling the insured to independent counsel is
     a question of law.  *Blanchard v. State Farm Fire & Cas. Co.*, 2 Cal.App.4th 345, 350 (1991).

1 whenever a carrier issues a so-called 'global reservation of rights.'").  As the *MBL* court explained

2 further:  "General reservations are just that: general reservations.  At most, they create a

3 theoretical, potential conflict of interest – nothing more."  *MBL*, 219 Cal.App.4th at 925.

4 Similarly here, Liberty's general reservation to later withdraw from the defense or seek

5 reimbursement of defense costs allocable to uncovered claims did not constitute an actual conflict.

6      California courts have also rejected efforts by insureds to manufacture conflicts by relying

7 on non-existent coverage defenses:

8         Again, we find that MBL cannot manufacture a conflict of interest
        by claiming a particular right was reserved by an insurer when, in

9         fact, no such right was reserved.  Nationwide's reservation of rights
        letter did not reserve the right to assert that the loss arose out of one

10         occurrence.  Without an express reservation of a right under the
        policy, there can be no conflict of interest based on the application

11         of that exclusion or policy term during the pendency of the action.

12 *MBL*, 219 Cal.App.4th at 923.

13      Similarly here, Roseburg seeks to manufacture a *Cumis* conflict by relying on coverage

14 defenses that Liberty never raised – i.e., that Liberty might assert the pollution exclusion, the

15 intended injury exclusion, or the lack of an "occurrence."  Roseburg's highly theoretical

16 "conflicts" failed to trigger a right to *Cumis* counsel under California law.

17         **2.**    ***Liberty Never Raised a Wildfire Coverage Defense.***

18      Roseburg claims that Liberty owed a *Cumis* obligation because its appointed counsel, Mr.

19 Bona, could have steered the defense toward application of a wildfire exclusion contained in

20 Ohio's excess policy.  That argument fails under the most basic rules governing *Cumis* conflicts.

21      First, Roseburg can offer no authority to support its novel argument.  Roseburg's argument

22 fails in light of the fundamental rule that "[w]here the insurer has not expressly reserved its right

23 to deny coverage under a particular exclusion in its policy, there can be no actual conflict based on

24 the application of that exclusion during the pendency of the action."  *Dynamic Concepts*, 61

25 Cal.App.4th at 1010 fn. 10.  Here, Liberty never asserted a wildfire coverage defense in its limited

26 reservation of rights.  Nor could it, because Liberty's Policy contained no such exclusion.

27      Second, Ohio never reserved rights on its wildfire exclusion.  Indeed, Roseburg's experts

28 conclude that Ohio waived any such coverage defense because it never advised Roseburg of its

1  coverage position.  (UF 97-98.)  Nevertheless, Roseburg argues that "Ohio Casualty's interest in

2  proving the Mill Fire was a wildfire *may have* influenced Liberty's claims handling . . . because

3  they *consciously or subconsciously* wanted to protect the Ohio Casualty Policy's limits."  (UF 95

4  (emphasis added).)  Roseburg's argument amounts to a theoretical conflict that California courts

5  have rejected.  *See Park Townsend, LLC v. Clarendon America Ins. Co.*, 916 F.Supp.2d 1045,

6  1053 (N.D. Cal. 2013) (rejecting as speculative that appointed-defense counsel could "consciously

7  or subconsciously" control destructive testing to affect coverage issues).

8      Third, Roseburg ignores that, under the excess policy, Ohio had no duty to defend.  (UF

9  11-13.)  Rather, Liberty owed the primary duty to defend and hired Mr. Bona as counsel.  (UF 99.)

10  Mr. Bona therefore owed no duty of care to Ohio and could have no ethical conflict in

11  representing any divergent interests between Roseburg and Ohio.  *Zenith Ins. Co. v. O'Connor*,

12  148 Cal.App.4th 998, 1002 (2007) (counsel appointed by primary insurer owed no duty of care to

13  excess reinsurer).

14      Fourth, Roseburg has not and cannot identify any facts to show that Mr. Bona intended to

15  violate his ethical responsibilities to Roseburg by deferring to Liberty's or Ohio's interests.  *See*

16  *Dynamic Concepts*, 61 Cal.App.4th at 1008 ("At no time . . . did [appointed counsel] prefer the

17  [insurer's] interests to those of his client, [the insured], nor did he allow questions of coverage . . .

18  to interfere with his litigation decisions regarding the third party claims."); *Blanchard*, 2

19  Cal.App.4th at 350 (rejecting *Cumis* claim where insured "produced no evidence to show in what

20  specific way the defense attorney could have controlled the outcome of the damage issue to

21  appellant's detriment, or had incentive to do so").   Nor could he, because Mr. Bona had *no*

22  knowledge of any wildfire coverage defense, which neither carrier asserted.  (UF 99-103.)

23      Fifth, there was nothing Mr. Bona could do to control the outcome of any wildfire

24  coverage issue.  (UF 104.)  The right to *Cumis* counsel "depends upon the nature of the coverage

25  issue, as it relates to the issues in the underlying case."  *Blanchard*, 2 Cal.App.4th at 350.

26  "[W]here the reservation of rights is based on coverage disputes that have nothing to do with the

27  issues being litigated in the underlying action, there is no conflict of interest requiring independent

28  counsel."  *Gafcon*, 98 Cal.App.4th at 1422.

1    Here, there was no coverage issue for Mr. Bona to control, because neither Liberty nor

2    Ohio asserted the wildfire exclusion as a defense. *See MBL*, 219 Cal.App.4th at 42 (no *Cumis*

3    conflict where insurer did not reserve the right to deny coverage based on exclusion). But even if

4    they had, Mr. Bona could not control its application because the type or characterization of the

5    Mill Fire was not a material element to the claims asserted against Roseburg in Mill Fire suits.

6    (UF 51, 104.) Rather, those claims centered around the cause and origin of the Mill Fire, and

7    Roseburg's liability for the property damage and bodily injuries resulting therefrom. (*Id.*)

8    Mill Fire plaintiffs alleged causes of action for negligence, trespass, public and private

9    nuisance, inverse condemnation, premises liability and violation of Health and Safety Code

10   section 13007.[6] (UF 51.) None of those claims required the trier of fact to conclude that a

11   "wildfire" caused plaintiffs' damages and injuries. The jury only had to conclude that Roseburg's

12   alleged negligence or other wrongful conduct was a cause or substantial factor in causing each

13   plaintiffs' injuries. *See* Judicial Council of California Civil Jury Instructions 400 (negligence);

14   1000 (premises liability); 2000 (trespass); 2020-2021 (public and private nuisance); and 3500

15   (eminent domain/inverse condemnation). And Health & Safety Code section 13007 simply

16   establishes liability for a fire caused by the defendant that escapes to another's property.

17   Finally, whether the wildfire exclusion in Ohio's excess policy barred any claim arising

18   out of Roseburg's activities leading to the Mill Fire was *not* an issue to be litigated in Mill Fire

19   suits. *MBL* is again instructive. There, the insurer reserved the right to deny coverage under an

20   absolute pollution exclusion for claims against its insured seeking indemnity and contribution to

21   remediate soil and groundwater contamination. *MBL*, 219 Cal.App.4th at 44. In rejecting that

22   such a coverage defense triggered a *Cumis* obligation, the court explained that the exclusion was

23   "strictly a matter of contract interpretation. Either the loss arose out of a government claim to

24   remediate pollution or it did not." *Id.* There was "nothing counsel . . . could do to change the

25   answer to that question." *Id.*

26   The same is true here. Ohio's excess policy "does not apply to: a. Uncontrolled and

27

28

_____

[6] No Mill Fire plaintiff referred to the Mill Fire as a "wildfire." (UF 51.)

1   widespread wildfire . . . ."  (UF 9, 14-15.)  To the extent Ohio reserved the right to deny coverage

2   on that exclusion (which it did not), the exclusion amounts to a matter of contract interpretation –

3   that is, whether Mill Fire losses arose out of a wildfire or not.  Mr. Bona could not control that

4   issue or answer that question.  *See Sovereign Gen. Ins. Servs., Inc. v. Natl. Cas. Co.,* 2008 WL

5   448041, *7 (E.D. Cal. 2008) (counsel "could control the outcome of the coverage issue").

6   **D.      Liberty is Not Responsible for the Fees/Costs that Roseburg Voluntarily Incurred.**

7          Roseburg incurred and paid the Baker and Alix fees and costs without Liberty's knowledge

8   or consent, and did so voluntarily – *not* at Liberty's request.  (UF 18, 22.)  Liberty's Policy

9   prohibits coverage for such voluntary payments.  (UF 8.)

10         Under California law, the purpose of the "no voluntary payments" provision in liability

11  policies is to ensure that defending insurers, like Liberty here, gain control over the defense of

12  suits and the settlement of claims.  *Pitzer College v. Indian Harbor Ins. Co.*, 8 Cal.5th 93, 108

13  (2019); *Low v. Golden Eagle Ins. Co.*, 110 Cal.App.4th 1532, 1546 (2003) (insurer not required to

14  reimburse insured for settlement without insurer's consent).  It is only when the insurer has denied

15  a defense that the insured may then disregard the "no voluntary payments" provision.  *Gribaldo,*

16  *Jacobs, Jones & Assoc. v. Agrippina Versicherunges, A.G.*, 3 Cal.3d 434, 449 (1970).

17         Courts regularly enforce no-voluntary payments provisions.  *Santa Clara Valley Water*

18  *Dist. v. Century Indem. Co.*, 89 Cal.App.5th 1016, 1036-37 (2023) (provision "designed to ensure

19  that responsible insurers that promptly accept a defense tendered by their insureds thereby gain

20  control over the defense and settlement of the claim."); *Safeco Ins. Co. v. Sup. Ct.*, 71 Cal.App.4th

21  782 (1999) ("Safeco indisputably provided a defense and, accordingly, had the right to control that

22  defense"); *Faust v. The Travelers*, 55 F.3d 471, 472 (9th Cir. 1995) ("California courts have

23  consistently honored [no-]voluntary payment provisions").

24         Here, Roseburg disregarded Liberty's defense and co-opted Liberty's right to investigate

25  and settle claims when it unilaterally hired Baker and Alix.  Roseburg did so voluntarily and

26  without Liberty's knowledge or consent, which negates its claims for reimbursement of such fees

27  and costs under the Policy.

28

## IV.     AT A MINIMUM, LIBERTY IS ENTITLED PARTIAL SUMMARY JUDGMENT[7]

### A.     Roseburg's "Bad Faith" Claim Fails on the Law and Undisputed Facts.

The undisputed material facts negate Roseburg's "bad faith" claim. Those facts prove that Liberty timely accepted Roseburg's defense, appointed defense counsel, reimbursed Roseburg for reasonable post-tender, pre-acceptance fees and costs, and paid its full $4 million policy limits.

For Roseburg's "bad faith" claim to survive, it must assert facts that would establish that "(1) benefits due under the policy [were] withheld; and (2) the reason for withholding benefits [was] unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1151 (1990)). Even if Roseburg could establish that Liberty withheld benefits (which it did not), Roseburg cannot show that Liberty did so without proper cause.

To prove tort liability, an insured must demonstrate misconduct by the insurer more egregious than an incorrect withholding of policy benefits. *Case v. State Farm Mutual Auto. Ins. Co., Inc.*, 30 Cal.App.5th 397, 402 (2018). "Bad faith implies dishonesty, fraud and concealment." *Merritt v. Reserve Ins. Co.,* 34 Cal.App.3d 858, 876 (1973). It requires a "failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act . . . ." *Careau & Co. v. Security Pacific Business Credit, Inc*., 222 Cal.App.3d 1371, 1395 (1990).

Moreover, withholding benefits is not unreasonable if a legitimate question exists regarding coverage. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). This genuine dispute doctrine applies to issues of fact and law. *Chateau Chamberay HOA v. Assoc. Intl. Ins. Co.*, 90 Cal.App.4th 335, 348, fn. 7 (2001); *Bilezikjian v. Unum Life Ins. Co.*, 692 F.Supp.2d 1203, 1221, 1225 (C.D. Cal. 2010) (insurer's interpretation of policy term was "objectively reasonable" demonstrating a "good faith dispute" over coverage). And where the undisputed facts demonstrate the existence of a "genuine dispute," it is a question of law for summary judgment. *Fraley v. Allstate Ins. Co.*, 81 Cal.App.4th 1282, 1292 (2000).

---

[7] In the absence of summary judgment, the Court should grant partial summary judgment on the parts of Roseburg's claims alleging that Liberty failed to appoint competent defense counsel and/or owed a *Cumis* obligation. Fed. R. Civ. Proc. 56(a). Liberty appointed competent counsel and owed no *Cumis* obligation. The Court can also treat these as facts established in the case. Fed. R. Civ. Proc. 56(g).

1    Here, the disputed legal issue is whether Liberty owed a *Cumis* duty to Roseburg pursuant

2  to its limited reservation of rights.  According to Roseburg, "Liberty's refusal to pay for Roseburg

3  Forest's choice of counsel . . . [was] without proper cause."  (UF 122.)  But that allegation is

4  antithetical to the undisputed facts, which demonstrate that Liberty accepted Roseburg's defense

5  and appointed defense counsel, because it had not reserved rights on any specific policy exclusion

6  or coverage defense.  To the extent Roseburg relies on Ohio's wildfire exclusion to assert that

7  Liberty owed a *Cumis* obligation, that theory is entirely novel and without any direct support.

8    Thus, to the extent there is any dispute as to whether Liberty owed a *Cumis* obligation, it

9  reflects a genuine legal dispute that negates Roseburg's bad faith claim.

10  **B.**    **Roseburg's Punitive Damages Claim Fails.**

11    To support its punitive damages claim, Roseburg must offer clear and convincing evidence

12  that Liberty acted with malice, fraud, or oppression.  Cal. Civ. Code § 3294; *Basich v. Allstate Ins.*

13  *Co.*, 87 Cal.App.4th 1112, 1118-21 (2001).  Such evidence must be "of a different dimension from

14  that needed to support a finding of bad faith."  *Shade Foods, Inc. v. Innovative Prods.*, 78

15  Cal.App.4th 847, 909-10 (2000) (internal quotes omitted).

16    Here, Roseburg has no evidence that Liberty acted with malice, fraud or oppression when

17  it responded to Roseburg's defense tender.  The undisputed facts show that Liberty performed all

18  obligations required under the Policy – it agreed to defend Roseburg, retained competent counsel

19  to defend it, and paid its indemnity limits.  (UF 44-46, 48, 111, 114.)

20  **V.    CONCLUSION**

21    Liberty respectfully requests that the Court grant this Motion for Summary Judgment, or

22  alternatively, Motion for Partial Summary Judgment.

23  Dated:  December 12, 2024

24                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

25
                        By:    _____
26                                   */s/ Jeffrey S. Crowe*
                                 JEFFREY S. CROWE
27                            Attorneys for Defendant
                          LIBERTY INSURANCE CORPORATION
28