1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    JEFFREY S. CROWE, Cal. Bar No. 216055
2   650 Town Center Drive, 10th Floor
    Costa Mesa, California 92626
3   Telephone:    714.513.5100
    Facsimile:     714.513.5130
4   Email:          jcrowe@sheppardmullin.com

5   SCOTT SVESLOSKY, Cal. Bar No. 217660
    MARY E. GREGORY, Cal. Bar No. 210247
6   350 S. Grand Ave., 40th Floor
    Los Angeles, California 90071-3460
7   Telephone:    213.620.1780
    Facsimile:     213.620.1398
8   Email:          ssveslosky@sheppardmullin.com
                    mgregory@sheppardmullin.com
9
    Attorneys for Defendant
10  LIBERTY INSURANCE CORPORATION

11                  **UNITED STATES DISTRICT COURT**

12      **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

13

14  RLC INDUSTRIES CO. and ROSEBURG        Case No. 2:23-cv-00649-TLN-SCR
    FOREST PRODUCTS CO.,
15                                         Assigned to the Hon. Troy L. Nunley and
                Plaintiffs,                Magistrate Judge Sean C. Riordan
16
        v.                                **COMPENDIUM OF EXHIBITS IN**
17                                         **SUPPORT OF DEFENDANT LIBERTY**
    LIBERTY INSURANCE CORPORATION,         **INSURANCE CORPORATION'S**
18  EVEREST NATIONAL INSURANCE             **MOTION FOR SUMMARY JUDGMENT,**
    COMPANY, and THE OHIO CASUALTY         **OR ALTERNATIVELY, PARTIAL**
19  INSURANCE COMPANY,                     **SUMMARY JUDGMENT**

20              Defendants.               **VOLUME 2 OF 2 (EXHIBITS 21 – 62)**

21                                         Date:      February 6, 2025
                                           Time:      2:00 p.m.
22                                         Place:     Courtroom 2, 15th Floor

23

24

25

26

27

28

Defendant Liberty Insurance Corporation ("Liberty") hereby submits the following Compendium of Evidence in support of its Motion for Summary Judgment, or Alternatively, Partial Summary Judgment:

| EXHIBIT NO. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| 1. | Certified copy of Liberty Commercial General Liability Policy No. TB7-661-067089-031 issued to RLC Industries Co. | 1-127 |
| 2. | Copy of Ohio Casualty Insurance Company Policy No. ECO (22) 60 07 79 06 issued to RLC Industries | 1-34 |
| 3. | *Smith v. Roseburg Forest Products Co.,* Siskiyou County Superior Court Case No. CV PO 22-951 (filed September 6, 2022)<br><br>Removed to the United States District Court, Eastern District of California, Case No. 2:22-cv-01763 | 1-4 |
| 4. | *Hammond, et al. v. Roseburg Forest Products Co.,* Sacramento County Superior Court Case No. 34-2022-00326413-CU-NP-GDS (filed September 8, 2022)<br><br>Removed to the United States District Court, Eastern District of California, Case No. 2:22-cv-01767 | 1-12 |
| 5. | *Candasa v. Roseburg Forest Products Co.,* San Francisco County Superior Court Case No. CGC-22-601752 (filed September 13, 2022)<br><br>Removed to the United States District Court, Northern District of California, Case No. 4:22-cv-05778 | 1-10 |
| 6. | *Robert Davies v. Roseburg Forest Products Co.,* San Francisco County Superior Court Case No. CGC-22-602159 (filed October 4, 2022) | 1-21 |

| EXHIBIT NO. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| | Removed to the United States District Court, Northern District of California, Case No. 3:22-cv-05780 | |
| 7. | *Dorothy Dixon, et al., v. Roseburg Forest Products Co., Benjamin Hornsby and Jeffery Lee,* San Francisco County Superior Court Case No. CGC-22-602896 (filed November 18, 2022) | 1-20 |
| 8. | Baker-Roseburg Retention Letter dated September 6, 2022 | 1-10 |
| 9. | Letter from BakerHostetler ("Baker") to Liberty dated September 7, 2022 | 1-7 |
| 10. | Email from Steve Hurley to Sarah Kaufman dated September 8, 2022 | 1-2 |
| 11. | Letter from Baker to Liberty dated September 9, 2022 | 1-14 |
| 12. | Letter from Baker to Liberty dated September 12, 2022 | 1-6 |
| 13. | AlixPartners-Roseburg Retention Letter dated September 12, 2022 | 1-9 |
| 14. | Email from Sarah Kaufman to David Bona dated September 13, 2022 | 1 |
| 15. | Letter from Baker to Liberty dated September 14, 2022 | 1-12 |
| 16. | Emails between Sarah Kaufman and David Bona dated September 22, 2022 | 1-3 |
| 17. | Letter from Liberty to Baker dated September 22, 2022 | 1-11 |
| 18. | Emails between Sarah Kaufman and David Bona dated September 27, 2022 and attachments | 1-4 |
| 19. | Emails between Sarah Kaufman and David Bona dated September 28, 2022 | 1-2 |
| 20. | Letter from Baker to Liberty dated October 5, 2022 | 1-23 |
| 21. | Email from Sarah Kaufman to David Bona dated October 5, 2022 | 1-2 |

| EXHIBIT NO. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| 22. | Email from David Bona to Sarah Kaufman dated October 5, 2022 | 1 |
| 23. | Letter from Scott DeVries and Rachel Hudgins of Hunton Andrews Kurth to Sarah Kaufman and Phil Meagher of Liberty dated October 7, 2022 | 1-36 |
| 24. | Email from David Bona to Victoria Weatherford dated October 12, 2022 | 1 |
| 25. | Emails between David Bona and Victoria Weatherford dated October 19, 2022 | 1-6 |
| 26. | Email from Victoria Weatherford to Dustin Dow dated October 19, 2022; Spreadsheet of Baker Fees and Costs billed | 1-9 |
| 27. | Letter from Scott DeVries and Rachel Hudgins to Sarah Kaufman and the other carrier adjusters in Roseburg's insurance tower dated October 19, 2022 | 1-18 |
| 28. | Email from Robert Julian to James Frantz dated October 24, 2022 (BH00024348) | 1-3 |
| 29. | Letter from Jeffrey Crowe of Sheppard Mullin to Scott DeVries and Rachel Hudgins dated October 25, 2022 | 1-5 |
| 30. | Letter from Mary Gregory of Sheppard Mullin to Scott DeVries and Rachel Hudgins dated November 9, 2022 | 1-13 |
| 31. | Letter from Mary Gregory to Scott DeVries and Rachel Hudgins dated November 22, 2022 | 1-8 |
| 32. | Email from Scott DeVries and Rachel Hudgins to Sarah Kaufman dated November 22, 2022 | 1-6 |
| 33. | Letter from Baker to Liberty dated November 22, 2022 | 1-22 |
| 34. | Emails between Sarah Kaufman and David Bona dated November 28, 2022 | 1-2 |

-4-

| EXHIBIT NO. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| 35. | Emails between David Bona and Victoria Weatherford of Baker dated November 28, 2022 | 1-2 |
| 36. | Emails between David Bona and Sarah Kaufman dated November 30, 2022 and December 1, 2022 | 1-2 |
| 37. | Email from Rachel Hudgins to David Bona dated December 1, 2022 | 1-3 |
| 38. | Email from Mary Gregory to Scott DeVries and Rachel Hudgins dated December 1, 2022 | 1-7 |
| 39. | Letter from Scott DeVries and Rachel Hudgins to Mary Gregory dated December 21, 2022 | 1-6 |
| 40. | Emails between Scott DeVries, Mary Gregory and David Bona dated December 5, 2022 | 1-4 |
| 41. | Email from Scott DeVries to David Bona dated December 14, 2022 | 1-6 |
| 42. | Email from Rachel Hudgins to Sarah Kaufman and the other carrier adjusters in Roseburg's insurance tower dated January 6, 2023 | 1-2 |
| 43. | Letter from Mary Gregory to Matthew Lawless of Roseburg dated January 24, 2023 | 1-7 |
| 44. | Emails between Rachel Hudgins, Sarah Kaufman and the other carrier adjusters in Roseburg's insurance tower and Mary Gregory dated January 25, 2023 and January 26, 2023 | 1-4 |
| 45. | Letter from Mary Gregory to Matthew Lawless of Roseburg dated February 9, 2023 | 1-7 |
| 46. | Email from Rachel Hudgins to Chris Faddis and the carrier adjusters in Roseburg's insurance tower dated March 24, 2023 | 1-5 |

-5-

| EXHIBIT NO. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| 47. | Emails between Scott DeVries and Jeffrey Crowe dated June 21, 2023 | 1-2 |
| 48. | Letter from Scott DeVries and Rachel Hudgins to Jeffrey Crowe, Mary Gregory and Frank Falzetta dated December 19, 2023 | 1-10 |
| 49. | Complaint filed by RLC Industries Co. and Roseburg Forest Products Co. on April 7, 2023 (ECF 1) | 1-340 |
| 50. | Court's Minute Order Dismissing Ohio Casualty Insurance Company With Prejudice dated August 7, 2023 (ECF 28) | 1-2 |
| 51. | Liberty's Requests for Production of Documents to Roseburg Forest Products, Co. dated July 18, 2023 | 1-7 |
| 52. | Liberty's Requests for Production of Documents to RLC Industries Co. dated July 18, 2023 | 1-7 |
| 53. | Roseburg Forest Products Co.'s Responses to Liberty's First Set of Interrogatories dated September 20, 2023 | 1-21 |
| 54. | RLC Industries Co.'s Responses to Liberty's First Set of Interrogatories dated September 20, 2023 | 1-21 |
| 55. | Liberty's Subpoena to BakerHostetler dated January 24, 2024 | 1-12 |
| 56. | Roseburg Forest Products Co.'s Responses to Liberty's Second Set of Requests for Admissions dated April 22, 2024 | 1-12 |
| 57. | Liberty's Subpoena to AlixPartners dated October 9, 2024 | 1-5 |
| 58. | Excerpts from the deposition of Baker and Robert Julian taken in this matter on May 30, 2024 | 1-66 |
| 59. | Excerpts from the deposition of Roseburg taken in this matter on April 26 and 29, 2024 | 1-125 |
| 60. | Excerpts from the deposition of David Frangiamore taken in this matter on October 10, 2024 | 1-111 |

-6-

| EXHIBIT NO. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| 61. | Excerpts from the deposition of Merri Baldwin taken in this matter on November 5, 2024 | 1-137 |
| 62. | Excerpts from the deposition of Robert McEvoy taken in this matter on November 13, 2024 | 1-8 |

Dated:  December 12, 2024          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By          _____
                          */s/ Jeffrey S. Crowe*
                          JEFFREY S. CROWE
                          SCOTT SVESLOSKY
                          MARY E. GREGORY
                          Attorneys for Defendant
                          LIBERTY INSURANCE CORPORATION

-7-

SMRH:4925-9171-3029.3          COMPENDIUM OF EXHIBITS IN SUPPORT OF LIBERTY'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

EXHIBIT 21

EXHIBIT 21

EXHIBIT 21

| From: | Kaufman, Sarah [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=48109347E6F24467B4543F8D692501AB-KAUFMAN, SA] |
|---|---|
| Sent: | 10/5/2022 8:30:38 PM |
| To: | David Bona [dbona@ccplaw.com] |
| Subject: | FW: RLC Industries Co. - Date of Loss 9/2/2022 - Claim # P 413-291000 & 24056967 |
| Attachments: | 10.5.22 correspondence to Roseburg's carriers re 4th complaint.pdf; 2022.10.04 - Davies v. Roseburg Forest Products Co. - Complaint.pdf |

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex

Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

How are we doing?

Send us a document

The information contained in this email message and any attachments to this message are confidential and may be privileged or constitute attorney work product. If you are not the intended recipient, please (1) notify me immediately by replying to this message or calling 414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (3) destroy all copies of this message and attachments. A copy of our privacy notice can be obtained at our Privacy Policy website.

**From:** Steven Hurley <Steven.Hurley@alliant.com>
**Sent:** Wednesday, October 05, 2022 3:29 PM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>
**Subject:** {EXTERNAL} RLC Industries Co. - Date of Loss 9/2/2022 - Claim # P 413-291000 & 24056967

Good Afternoon,

Please see the attached additional complaint related to RLC Industries' 9/2/2022 date of loss.

-Steve

**Steven Hurley**
Vice President, Claims Advocate - Lead
Alliant Specialty
805 SW Broadway Ste 480
Portland OR 97205

**D** (503) 444-6731
**C** (503) 729-3483
**E** Steven.Hurley@Alliant.com
Alliant.com

**Alliant**

Alliant Insurance Services, Inc.
CA License No. 0C36861

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This email may also contain information that is confidential, or otherwise protected from disclosure by contract or law. Any unauthorized use,

disclosure, or distribution of this email and its attachments is prohibited. If you are not the intended recipient, let us know by reply email and then destroy all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.

LIC_0029040

EXHIBIT 22

EXHIBIT 22

EXHIBIT 22

Message

| From: | David Bona [dbona@ccplaw.com] |
|---|---|
| Sent: | 10/5/2022 3:15:26 PM |
| To: | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa] |
| Subject: | {EXTERNAL} Mill fire - materials to request |

Sarah,

Below is the preliminary list of items I would like to get from Baker. I am sure there are some things that I have not thought of yet and there will likely be more requests once we get the initial batch of items, but this should be a good start. One thing I did not include is a list of the people to whom payments have been made and any documents or other materials associated with the payments. I am not sure how sensitive an issue the claims and payments are at this point and we can always get that information at a later time, so I leave it to you to decide whether to include that request.

1.      A list of all experts retained by RLC and copies of their CVs

2.      Any photographs or video recordings of the facilities or equipment that could be implicated in the cause of the fire

3.      A list of all persons or entities that were put on notice about the fire and inspections and any correspondence to or from those persons or entities

4.      Any other persons or entities that are potential third-parties who are not included on the list above and any correspondence to or from those persons or entities

5.      All correspondence to and from Cal Fire about the fire or the inspection (I believe we have one letter)

6.      A list of all of the people who attended the Cal Fire inspection

7.      A list of the items or material Cal Fire collected or removed from RLC facilities

8.      Any photographs or video taken during the Cal Fire Investigation

9.      Any internal memos or reports regarding RLC's experts impressions or findings from the Cal Fire inspection

10.     All correspondence to or from any party regarding the inspection that took place this week or any proposed inspections or evidence collection

11.     List of all persons/parties who attended the inspection that took place this week

12.     List of all items of evidence collected during the inspection that took place this week

13.     Any photographs or video taken during the inspection that took place this week

LIC0016996

EXHIBIT 23

EXHIBIT 23

EXHIBIT 23

Message

| | |
|---|---|
| **From:** | Eloriaga, Rey [REloriaga@hunton.com] |
| **Sent:** | 10/7/2022 2:58:01 PM |
| **To:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Meagher, Phil [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=52b356124b6d48af916eb6651d1bac82-Meagher, Ph] |
| **CC:** | DeVries, Scott [SDeVries@hunton.com]; Hudgins, Rachel [RHudgins@hunton.com]; matthew.lawless@rfpco.com; lisaf@frpco.com; melisa.thompson@markel.com; drothman@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; Faddis, Christopher [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8487e97ba7a4212ba649a04cdaac7f9-Faddis, Chr]; steven.hurley@alliant.com |
| **Subject:** | {EXTERNAL} Roseburg Forest Products Co. - Claim Number P 413-291000 |
| **Attachments:** | 2022.10.07 - Letter from S. DeVries to S. Kaufman re Claim P413-291000.pdf |

Good afternoon,

Please find the attached letter from Scott P. DeVries and Rachel E. Hudgins regarding Claim number P 413-291000.

Thank you,



**Rey Alexander Eloriaga**
Legal Support Assistant
reloriaga@HuntonAK.com
p 415.975.3716

Hunton Andrews Kurth LLP
50 California Street
Suite 1700
San Francisco, CA 94111

HuntonAK.com

LIC0017000



HUNTON ANDREWS KURTH LLP
50 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CALIFORNIA 94111

TEL   415 • 975 • 3700
FAX   415 • 975 • 3701

SCOTT P. DEVRIES
DIRECT DIAL: 415 • 975 • 3720
EMAIL: sdevries@HuntonAK.com

RACHEL E. HUDGINS
DIRECT DIAL: 404 • 888 • 4110
EMAIL: rhudgins@HuntonAK.com

October 7, 2022

*Via Email*

Mr. Phil Meagher
Director Client Services – West
Liberty Mutual Insurance
Rocklin, CA
phil.meagher@libertymutual.com

Ms. Sarah Kaufman
Senior Technical Claims Specialist II
Liberty Mutual Insurance
sarah.kaufman@libertymutual.com

> **Re:**   Insured:       Roseburg Forest Products Co.
>             Claim No.:   P 413-291000

Dear Mr. Meagher and Ms. Kaufman:

We are insurance coverage counsel for Roseburg Forest Products Co. ("Roseburg") for the claims that have arisen from the "Mill Fire" in Weed, California that occurred in September 2022.

The Mill Fire devastated the Weed community. According to Cal Fire, the fire burned nearly four thousand acres, destroyed 118 structures, killed two people, and burned three others. Roseburg intends to work closely with its community to ensure all recover as quickly as possible.

ATLANTA  AUSTIN  BANGKOK  BEIJING  BOSTON  BRUSSELS  CHARLOTTE  DALLAS  DUBAI  HOUSTON  LONDON
LOS ANGELES  MIAMI  NEW YORK  NORFOLK  RICHMOND  SAN FRANCISCO  THE WOODLANDS  TOKYO  TYSONS  WASHINGTON, DC
www.HuntonAK.com

LIC0017001

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 2

Since then, there have been over 150 pending or potential claims against Roseburg stemming from the fire, including four lawsuits.[1] Roseburg immediately notified Liberty Insurance Corp. and its excess general liability insurers (copied here) of these claims and lawsuits and has kept them apprised of developments and strategies in calls and written communications.

To carry out a strategy meant to benefit the community, Roseburg, and its insurers alike, Roseburg hired the lawyer who represented the 70,000 fire victims' interests in the PG&E bankruptcy, San Francisco counsel Robert Julian, and his firm, BakerHostetler ("Baker") to head up its response to the fire and help the community as quickly and efficiently as possible. Roseburg requested Liberty's approval to continue using Baker as its defense counsel. Baker is a known quantity to Liberty, since Liberty uses them too. Liberty approved this request, instructing Baker to submit its bills to Liberty and to follow Liberty's litigation guidelines. (Email from J. Sroczynski, Liberty to D. Dow, Baker (Sept. 7, 2022).)

But weeks later, when Roseburg's response to the Mill Fire was well underway, Liberty reversed course. In a "reservation of rights" letter, Liberty formally accepted Roseburg's tender of defense but rejected Roseburg's selection of counsel and "appointed its own"—the nine-attorney firm of Carlson, Calladine & Peterson ("Carlson"). (Letter from S. Kaufman, Liberty to J. Chairez, Baker (Sept. 22, 2022).) In taking this position, Liberty acknowledged that conflicts exist between Roseburg and Liberty and others may develop in the future. So, Liberty reserved the right to walk away from the defense at any time.

Roseburg contested this decision and several conversations between Roseburg and Liberty ensued. During these, Liberty stated that it was now taking exception to Baker because Baker was providing coverage advice to Roseburg. And yet, Liberty provides no legal support for the proposition that a firm cannot represent

---

[1] *Smith v. Roseburg Forest Products Co.*, Siskiyou County Superior Court, Case No. CV PO 22-951; *Hammond v. Roseburg Forest Products Co.*, Sacramento County Superior Court, Case No. 34-2022-00326413-CU-NP-GDS; *Candasa v. Roseburg Forest Products Co.*, San Francisco County Superior Court, Case No. CGC-22-601752; and *Davies v. Roseburg Forest Products Co.*, San Francisco County Superior Court, Case No. TBD. The *Davies* complaint was forwarded to the insurers yesterday, so we understand Liberty's position thus far has not taken it into account.

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 3

a client on both the underlying cases and the related coverage cases and this routinely happens. We are not aware of any such authority.

In the hopes of resolving Liberty's professed concern, Roseburg hired Hunton Andrews Kurth as coverage counsel. This was still not good enough. On October 4, Liberty representative Holly Keahey told Steven Hurley (with Roseburg's broker, Alliant) that inserting Hunton Andrews Kurth as coverage counsel was insufficient and that Baker's initial involvement in providing Liberty notice and giving them status updates somehow disqualified Baker from representing Roseburg entirely—even as defense counsel. This makes no sense. It is contrary to California law and not supported by the facts. Furthermore panel, appointed, or even independent counsel as a normal part of the defense of the client are required to know about the available insurance, policy limits, and insurers' positions. *See* Cal. Form Judicial Interrogatory 4.1. And, as here, panel, appointed, or independent counsel has to report to insurers about the investigation, lawsuits, and all matters that might affect the litigation's resolution. Baker provided Liberty notice of the claim, as required of the insured, and updates *that Liberty asked for* in connection with Baker's role as defense counsel.

Bluntly put, Liberty's changing positions, illogical explanations, and flat-out misrepresentations raise grievous doubts about its motivations. There are now very real conflicts between Liberty and Roseburg.

To say that Roseburg is disappointed would be an understatement. Liberty and its predecessor have been mainstays on Roseburg's insurance program for the better part of the last 40 years. Throughout, Liberty professed to be a partner; it would be there when Roseburg needed it. But when a major claim arose, Liberty delayed its response, took inconsistent positions, and rejected a law firm which it deems good enough to use itself. This culminated in additional, high-value litigation against Roseburg brought by one of the most sophisticated plaintiffs' law firms in California. This suit, which exposes Roseburg and its excess insurers, was entirely avoidable but for Liberty's delays. Not done yet, Liberty dropped Roseburg as an insured. So much for "partnership."

This letter responds to the September 22, 2022 reservation of rights letter that you sent on Liberty's behalf to Baker and subsequent communications about Liberty's coverage positions. We write this letter in the hopes that Liberty will comply with

LIC0017003

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 4

its legal obligations, that it will reconsider its position, and that it will do right by its insured and the community.

***Baker is Best Positioned and Best Suited to Represent Roseburg***

Roseburg has selected and wishes to continue using Baker as its counsel—with good reason.

The claims Roseburg has received so far represent just the beginning when it comes to the scrutiny Roseburg has and will experience, especially as internal, governmental, and third-party investigations progress. Roseburg needs counsel with the workforce capacity and experience to handle this complex, high-profile, and fast-moving crisis. Baker is at the forefront of legal practice anywhere in the country with this kind of experience. That is why Roseburg chose them. For instance,

- Baker represented the Tort Claimants Committee in the PG&E bankruptcy, which turned on the 2017 North Bay Fires and the 2018 Camp Fire.
- Baker represents fire victims, including Roseburg, in the Oregon 2020 Labor Day Fire litigation, a complex case involving issues like causation, damages, and liability arising from multiple fire ignitions.
- Baker represents parties involved in government and civil litigation in the 2019 Kincade Fire.

Carlson, which has nine attorneys (only two of whom appear to have fire experience), simply cannot handle the claims so far (150+ claimants and four lawsuits) or the claims that will stack up in the weeks and months to some. Carlson might have the capacity serve as Liberty's *monitoring* counsel, but it cannot spearhead—much less take an active role in—Roseburg's response.[2]

---

[2] This assumes, of course, that Carlson has not represented any of the insurance companies in Roseburg's tower of liability insurance nor other insurers in coverage disputes on issues in question here, which may present disqualifying issue conflicts.

LIC0017004

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 5

Roseburg needs a holistic and integrated defense. Baker has the deep bench and experience to provide a single source of service for all of Roseburg's exposures. So far, it has:

- Negotiated with plaintiffs' counsel about claims that may be filed in litigation or asserted as part of a streamlined claims process;

- Established the community and emergency fund response, essential to assisting the community on a real time basis and reducing the need for time-consuming litigation;

- Coordinated third-party indemnification claims;

- Led Roseburg's response to government investigations; and

- Supervised Roseburg's privileged internal investigation.

Bringing in another firm, for one part of the defense or another, creates a material risk for inconsistent positions and ensuing liabilities. Even if Carlson had enough attorneys with the needed experience to handle this sort of litigation (not just the two that are advertised on its website), adding them to the existing mix would be inefficient at best. At worst (and more likely), it invites disaster. If Liberty insists on this division of labor over its insured's preferences, Roseburg will look to it and to Roseburg's excess insurers—and perhaps even the Carlson firm—for any judgment or settlement above its policies' limits.

The duty to defend requires that an insurer employ competent counsel to represent its insured. *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 882 (1973). While its website states that Carlson has experience with fire cases, at nine attorneys with two fire lawyers (again, according to its website), it simply does not have the functional ability to handle this case. Roseburg needs experienced, trusted counsel with the necessary capacity to steer it through this crisis. It chose Baker. Not only should Liberty honor that decision, it is in its best interests to do so.

### *Roseburg is Entitled to Independent Counsel*

Liberty's September 22nd letter recognized that its reservation of rights creates a conflict of interest. Even so, Liberty said the conflict is not "disqualifying," so it can still select Roseburg's defense counsel. We do not agree. A conflict of interest, absent a waiver, is *per se* disqualifying.

LIC0017005

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 6

### 1. *Cumis* and Civil Code Section 2860

When an existing or potential conflict of interest arises between the insurer and insured, such as a dispute over coverage, California law requires the insurer to retain separate counsel for the insured. Cal. Civ. Code §2860; *San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y*, 162 Cal.App.3d 358 (1984). Such a conflict exists here not only because of Liberty's reservation of rights, but because of the claims that have been made and are likely to be made.

Section 2860 says:

> (a) If the provisions of a policy of insurance impose a duty to defend upon an insurer and a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured, the insurer shall provide independent counsel to represent the insured unless, at the time the insured is informed that a possible conflict may arise or does exist, the insured expressly waives, in writing, the right to independent counsel…

> (b) For purposes of this section,…when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim, a conflict of interest may exist…

### 2. Roseburg has identified multiple conflicts that give rise to a need for independent counsel.

Roseburg has identified at least four conflicts of interest that entitle it to independent counsel. Roseburg reserves the right to amend this list as other conflicts arise.

### i. *Liberty's Open-Ended Reservation of Rights*

After listing numerous specific allegations in the complaints and quoting five pages' worth of policy provisions (in a nine-page letter), Liberty reserved its right to withdraw from Roseburg's defense for *any* reason. While the open ended nature

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 7

of Liberty's reservation presents substantial concerns in and of itself, subsequent events have crystalized the very real conflicts that exist here.

The *Davies* suit, which was filed after Liberty provided its reservation of rights, is an example of why an open-ended reservation of the right to withdraw as counsel at any time and for any reason invites a conflict of interest (even if one did not already exist, which it does). The *Davies* suit includes these allegations (as numbered in the complaint):

4.  The BIOMASS PLANT creates electricity by burning wood, which creates a hot ash *byproduct*…

9.  Despite these *obvious and known* fire risks, ROSEBURG *deliberately* failed to take measures sufficient to mitigate or prevent fire ignition at the FACILITY, including but not limited to failing to design, construct, inspect, or maintain an adequate fire suppression system at the FACILITY or adequately manage the ignition-prone byproducts of its BIOMASS PLANT.

36. Yet, ROSEBURG chose a reactive approach to fire risk - only acting once an ignition began - rather than implementing a plan, process, or procedure to proactively address fire risks at the FACILITY and, in particular, SHED 17. Accordingly, ROSEBURG *deliberated [sic] failed* to take critical and life-saving measures in light of *obvious and known fire risks* and did so, at least in part, because ROSEBURG's reactive approach was cheaper.

41. Ultimately, ROSEBURG engaged in a pattern and practice of managing the FACILITY that *consciously and deliberately* disregarded known and foreseeable risks posed by hot ashes from the BIOMASS PLANT which could ignite a catastrophic wildfire, damage property, cause injuries, and take lives.

50. PLAINTIFF's harm and injury could have been avoided if ROSEBURG and all other DEFENDANTS exercised reasonable care-in the management of the FACILITY. DEFENDANTS' failures include but are not limited to: the *willful disregard* of known fire risks associated with the FACILITY;… and *deliberately* pursuing a

LIC0017007

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 8

> course of conduct with respect to the storage of hot ash that increased
> the risk of a catastrophic wildfire.

(Emphasis added.)

The policy contains an "Expected Or Intended Injury" exclusion that excludes coverage for bodily injuries or property damage "expected or intended from the standpoint of the insured." (Policy, I.A.2.a.) The policy also contains a "Total Pollution Exclusion" endorsement. (Policy, Form CG 21 65 12 04.) Although Roseburg would dispute that these exclusions apply, invocation of either one of these exclusions would give rise to a right to independent counsel. *See, e.g.,* *Cumis*, 162 Cal.App.3d at 375.

In fast-moving, wide-ranging claims like the ones Roseburg is facing, consistency is key. Liberty's reservation of its right to walk away at any moment based on the allegations in any given complaint leaves Roseburg without a reliable defense. Liberty's appointed defense counsel will always be half in—ready to withdraw whenever the next suit is filed. This is no way to handle the liabilities Roseburg faces right now. Liberty owes Roseburg a stalwart defense via independent counsel.

     *ii.   Covered vs. Non-covered Losses*

Liberty generally claims that the claimants in the lawsuits against Roseburg do not "fully describe [their] injuries." (Letter, p. 9) Thus far, the claims against Roseburg have been numerous, but the nature and types of damages plaintiffs allege have not been. They have been detailed and explicit. For instance, the *Hammond* plaintiffs seek:

    (1)  General and/or special damages determined on an individual basis according to proof;

    (2)  Loss of use, benefit, goodwill, and enjoyment of Plaintiffs' real and/or personal property;

    (3)  Loss of wages, earning capacity, goodwill, and/or business profits or proceeds and/or any related displacement expenses;

    (4)  Evacuation expenses and alternate living expenses;

    (5)  Erosion damage to real property;

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 9

(6) Past and future medical expenses and incidental expenses;

(7) Damages for personal injury, emotional distress, fear, annoyance, disturbance, inconvenience, mental anguish, and loss of quiet enjoyment of property;

(8) Attorneys' fees, expert fees, consultant fees, and litigation costs and expenses as allowed under applicable law;

(9) Prejudgment interest;

(10) For punitive and exemplary damages against Defendants in an amount sufficient to punish Defendants' conduct and deter similar conduct in the future, as allowed under Public Utilities Code §2106 and all other applicable law; and

(11) Any and all other and further such relief as the Court shall deem proper, all according to proof.

While more claims may be made in the future (now a higher risk because of Liberty's delays), the claims made so far are clear. Liberty's mischaracterization of plaintiffs' damages—claiming they are somehow *un*clear—looks like an attempt to create an opportunity to walk away from its policyholder down the road. This is wrong on any number of fronts and certainly not permitted under California law.

Beyond this, while plaintiffs' counsel controls the damages sought, defense counsel undeniably influences how the claims are litigated and, where possible, settled. Given Liberty's apparent intent to avoid paying some of the claimed damages, and what appears to be an established relationship between Carlson and its insurance clients, including Liberty, who account for a substantial portion of its revenue (whether it be as direct clients or by steering their insured's defense to them), this is obviously a conflict of interest.

  *iii.* *"Occurrence"*

Liberty cites the "occurrence" definition in its reservation of rights. The policy defines an "occurrence," in part, as an "accident." The policy provides coverage if the bodily injury and property damage claims were caused by an accident or an occurrence. But if Roseburg's actions were not accidental, then Liberty might maintain that it did not owe Roseburg a duty to defend. *See also* Ins. Code § 533

LIC0017009

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 10

("An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.").

Claims involving an element of intent (*i.e.*, not an accident) are quintessential conflicts of interest. They are the reason the right to independent counsel exists in the first place. Insurer-appointed counsel could be tempted to litigate the action in a way that shifts the insured's liability toward intentional acts rather than liability premised on negligence, benefiting the insurer but at the expense of the insured's best interests. *Cumis*, 162 Cal.App.3d at 375. To avoid that possibility, insurers owe their insureds independent counsel that is not susceptible to the same temptation.

That's the case here. The complaints allege that Roseburg knew about the conditions that led to the Mill Fire. Roseburg denies this, but the point is that defense counsel controls the development of facts—should any exist—that could allow Liberty to avoid coverage, *i.e.*, the Mill Fire was not an accidental occurrence. This scenario presents an incentive for Liberty's appointed defense counsel to steer facts toward a particular finding that avoids coverage—the very same incentive that led the courts and legislature to codify an insured's right to independent counsel. These circumstances present an actual conflict of interest demanding the appointment of independent counsel.

### iv. Defense Costs, Claims Resolution and Exhaustion of Limits

There are any number of other conflicts between Baker and Liberty in the context of defense costs, claims resolution, and limits exhaustion. Some of these arise from a purported reservation to "not pay for legal fees and costs unrelated to Roseburg's defense of the claims/and/or the current lawsuits and/or future lawsuits arising from the fire." (Letter, p. 9) This position runs afoul of two California Supreme Court cases: *Buss v. Superior Court*, 16 Cal.4th 35 (1997) (obligating insurer to pay all defense costs with a limited right to reimbursement in a later action) and *Aerojet-General v. Transport. Ind. Co.*, 17 Cal.4th 38 (1997) (where a cost supports defense and indemnity, it is recoverable as a defense cost.) Both present obvious conflicts here.

Another conflict consists of the approach to claims resolution. As was explained at the very outset, Roseburg is committed to doing right by its community. A core

LIC0017010

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 11

component of this plan is a claims resolution processes—on both an emergency and longer term basis—by which affected individuals and businesses can be compensated and can focus on the arduous process of putting their lives and businesses back together. When insurers were briefed on this strategy during a September 9 call, they agreed. Yet days later, they backtracked to say that they were "evaluating." The "evaluation" process is ongoing. This vividly reflects the fundamental conflicts between Roseburg and Liberty (and presumably the other insurers in the tower).

Here, Liberty reserved the right to withdraw from Roseburg's defense when "Liberty has exhausted all applicable policy limits by payment of covered claims." (Letter, p. 9) Liberty's primary policy limits are $2 million per occurrence and $4 million aggregate. Roseburg asked Liberty to contribute to its $50 million Community Relief Fund. If Liberty agrees to contribute, that contribution will exhaust Liberty's primary limits and, presumably, trigger Liberty's purported right to withdraw its defense. We understand that Liberty is still deciding whether to agree to contribute to the fund, pending its consideration of "the basis and/or reasonableness of those payments." (Letter, p. 9) If Liberty's appointed defense counsel participates in this review, that would give rise to yet another conflict of interest.

### *Liberty's Delay Has Already Irretrievably Prejudiced Roseburg*

Roseburg gave Liberty notice of the potential claims against it on September 7, 2022. Liberty's vague reservation of rights came two weeks later on September 22nd. Liberty has had two more weeks to clarify its position. It hasn't. Liberty's delay has irretrievably prejudiced Roseburg, and Liberty has fallen short of its obligations under California law:

> To defend meaningfully, the insurer must defend immediately. To defend immediately, it must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not. To do so would be time consuming. It might also be futile: The "plasticity of modern pleading" allows the transformation of claims that are at least potentially covered into claims that are not, and vice versa. The fact remains: As to the

LIC0017011

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 12

> claims that are at least potentially covered, the insurer
> gives, and the insured gets, just what they bargained for,
> namely, the mounting and funding of a defense. But as to
> the claims that are not, the insurer may give, and the
> insured may get, more than they agreed, depending on
> whether defense of these claims necessitates any
> additional costs.

*Buss v. Superior Ct.*, 16 Cal.4th 35, 49 (1997).

Roseburg asked for Liberty's consent and contribution to the Community Relief
Fund right after the fire. Liberty did not object to the fund then. But all of a sudden,
Liberty now says that it is "unable to consent to Roseburg's payments toward the
Relief Fund or to Relief Fund recipients until it has had an opportunity to review
and consider the basis and/or reasonableness of those payments." (Letter, p. 9.)

Liberty's delay is unjustifiable. It has had weeks to review this information, but
Roseburg still does not know Liberty's position—not even whether Liberty has
accepted the duty to indemnify at all. Liberty's delay caused Roseburg real,
tangible consequences.

Roseburg had an opportunity to avoid the *Davies* suit, filed by the most aggressive
plaintiffs' firm in California. But because of Liberty's delay in approving defense
counsel and "review[ing] and considering[ing]" the fund, Roseburg lost its
chance. To be clear, Liberty's delay needlessly exposed Roseburg to additional
liability, scrutiny, and inevitable follow-on suits. Suffice to say, it is in the
interests of all parties—Roseburg, the claimants, Liberty, and the excess
insurers—to resolve these representation issues promptly. If Liberty does not do
so, Roseburg will look to Liberty for all losses that it incurs because of Liberty's
delays in handling claims and reaching reasonable settlements.

Liberty still has not said whether it will contribute to the fund, which Roseburg
established to ensure that the community can recover as quickly as possible. Each
day Liberty delays its decision compounds the prejudice to Roseburg and
Roseburg's community.

Roseburg awaits Liberty's response.

LIC0017012

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 13

<p style="text-align:center">*    *    *</p>

Liberty's coverage position gave rise to multiple conflicts of interest and Roseburg is entitled to independent counsel. Carlson, besides being saddled with a disqualifying conflict of interest, simply does not have the functional capability and experience to handle—much less to participate in—this matter in a material way. And Liberty's insistence on using Carlson could create additional exposure for Roseburg, exposure for which Roseburg believes that Liberty, others in the tower and Carlson would be liable.

In a stunning follow-on, Liberty decided not to renew Roseburg's insurance coverage, slamming the door on a decades' long relationship. Liberty has not explained its decision to non-renew, but those reasons—whatever they may be—deserve a hard look.

Roseburg has one chance to get this right. It selected a firm qualified to help it do so—Baker. It intends to stay with Baker. Roseburg eagerly awaits Liberty's approval of Roseburg's chosen counsel. Time is of the essence.

While Baker will continue to provide information to Carlson while Roseburg and Liberty sort out any role that Carlson may play, it is important to underscore that Roseburg is represented by Baker—and Baker only—and that Carlson is not to speak with anyone on Roseburg's behalf.

Roseburg reserves all rights under the policy and at law.

Please direct any future communications about insurance coverage for this matter to us.

Sincerely,

Scott P. DeVries     Rachel E. Hudgins

Enclosure: *Davies* Complaint

cc:    Mr. Matthew Lawless (matthew.lawless@rfpco.com)

LIC0017013

Mr. Phil Meagher
Ms. Sarah Kaufman
October 7, 2022
Page 14

    Ms. Lisa Fairchild (lisaf@rfpco.com)
    Ms. Melisa Thompson (melisa.thompson@markel.com)
    Mr. Doug Rothman (drothman@chubb.com)
    Mr. Vincent Sweeney (vincent.sweeney@awac.com)
    Mr. Ryan Gaffney (ryan.gaffney@everestre.com)
    Mr. Christopher Faddis (christopher.faddis@libertymutual.com)
    Mr. Steven Hurley (steven.hurley@alliant.com)

LIC0017014

1  FRANK M. PITRE (SBN 100077)
   fpitre@cpmlegal.com
2  DONALD J. MAGILLIGAN (SBN 257714)
   dmagilligan@cpmlegal.com
3  NABILAH A. HOSSAIN (SBN 329689)
   nhossain@cpmlegal.com
4  ANDREW W. BRITTON (SBN 340052)
   abritton@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
6  San Francisco Airport Office Center
   840 Malcolm Road
7  Burlingame, CA 94010
   Telephone: (650) 697-6000
8  Facsimile: (650) 697-0577
9
   P. TERRY ANDERLINI (SBN 044783)
10 **ANDERLINI & MCSWEENEY**
   66 Bovet Road, Suite 285
11 San Mateo, California 94402
   Telephone: (650) 212-0001
12 Facsimile: (650) 212-0001
   tanderlini@amlawoffice.com
13
14 *Counsel for Plaintiff*
15
16          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
17           **IN AND FOR THE COUNTY OF SAN FRANCISCO**
18 **ROBERT DAVIES**, an individual;          Case No.:
19        Plaintiff,
20                                            **COMPLAINT FOR:**
21     vs.                                    1)    **INVERSE CONDEMNATION**
22 **ROSEBURG FOREST PRODUCTS CO.,**          2)    **TRESPASS**
23 an Oregon corporation; and DOES 1 through  3)    **NEGLIGENCE**
   100, inclusive,
24                                            4)    **PRIVATE NUISANCE**
        Defendants.
25                                            5)    **PUBLIC NUISANCE**
26                                            6)    **VIOLATION OF HEALTH
                                                    AND SAFETY CODE § 13007**
27                                            <u>**JURY TRIAL DEMANDED**</u>
28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

LIC0017015

<u>**TABLE OF CONTENTS**</u>

PAGE NO.

I.   INTRODUCTION................................................................................................................ 1

II.  THE PARTIES ................................................................................................................ 2

    A.  PLAINTIFF.................................................................................................................. 2

    B.  DEFENDANT.............................................................................................................. 2

    C.  DOE DEFENDANTS .................................................................................................. 3

    D.  AGENCY, JOINT VENTURE, AND CONCERT OF ACTION ................................. 3

    E.  JURISDICTION AND VENUE ................................................................................... 3

III. FACTUAL BASIS FOR THE CLAIMS ASSERTED .................................................... 4

    A.  FIRE-PRONE BYPRODUCTS FROM ROSEBURG'S
       BIOMASS PLANT CAUSED THE MILL FIRE.......................................................... 4

    B.  THE ROSEBURG FACILITY AND BYPRODUCTS
       FROM ITS BIOMASS PLANT POSED OBVIOUS AND
       KNOWN FIRE RISKS ................................................................................................ 5

    C.  DEFENDANTS' NEGLIGENCE CAUSED PLAINTIFF
       SUBSTANTIAL HARM .............................................................................................. 9

IV.  CAUSES OF ACTION ................................................................................................. 11

    FIRST CAUSE OF ACTION – INVERSE CONDEMNATION
    (Against All Defendants) ............................................................................................... 12

    SECOND CAUSE OF ACTION - TRESPASS
    (Against All Defendants) ............................................................................................... 12

    THIRD CAUSE OF ACTION – NEGLIGENCE
    (Against All Defendants) ............................................................................................... 12

    FOURTH CAUSE OF ACTION – PRIVATE NUISANCE
    (Against All Defendants) ............................................................................................... 15

    FIFTH CAUSE OF ACTION – PUBLIC NUISANCE
    (Against All Defendants) ............................................................................................... 16

    SIXTH CAUSE OF ACTION – VIOLATION OF HEALTH & SAFETY CODE § 13007
    (Against All Defendants) ............................................................................................... 17

V.   PRAYER FOR RELIEF ............................................................................................... 18

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                                    i

LIC0017016

## I.    INTRODUCTION

1.    On the afternoon of September 2, 2022, a fire began at a mill in Weed, California which was owned and operated by **ROSEBURG FOREST PRODUCTS CO.** ("**ROSEBURG**"). Later named the **MILL FIRE**, it tore through Siskyou County for 11 days, burned 3,935 acres, destroyed 118 structures, injured three people, and killed two.

2.    The **MILL FIRE** was the result of **ROSEBURG's** deliberate failure to avoid known risks of fire ignition associated with the industrial processes conducted at its mill ("**FACILITY**").

3.    In addition to creating wood veneer, the **FACILITY** generates electricity at an onsite plant ("**BIOMASS PLANT**"). **ROSEBURG** uses the electricity to power the **FACILITY**, but also transfers the electricity generated by the **BIOMASS PLANT** into Siskiyou County's electrical grid for public use.

4.    The **BIOMASS PLANT** creates electricity by burning wood, which creates a hot ash byproduct. The hot ash, if not properly cooled or treated, poses an obvious risk of fire ignition. This was not news to **ROSEBURG**. Previously, it had been observed that hot ash from the **BIOMASS PLANT** ignited fires at the **FACILITY** on a frequent basis.

5.    **ROSEBURG** installed a fire suppression system but it did not function as intended. Instead of fixing the system, **ROSEBURG** depended on its own employees promptly reacting to extinguish the fires -- rather than designing and maintaining an effective fire suppression system. **ROSEBURG** relied on this practice because it was cheaper, thereby sacrificing the safety of the community which surrounded the facility.

6.    Worse, the **FACILITY** itself, and in particular the aging wooden shed where the hot ash created by the **BIOMASS PLANT** was stored ("**SHED 17**"), was a ticking time bomb.

7.    By September 2022, **SHED 17** was about 100 years old. For years, **ROSEBURG** used **SHED 17** to house truckloads of hot ash from the **BIOMASS PLANT**. The rafters which ran across the ceiling of **SHED 17** were covered with dust and other material. On several occasions, the hot ash would cause sparks to ignite the dust and other random debris hanging from the rafters.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                      1

LIC0017017

8.    Due to the abundant fuel and risk of ignition, proper management of fire risk at the **FACILITY** was paramount.  Further, **ROSEBURG** knew or should have known that severe and enduring drought in Siskiyou County made the region susceptible to wildfires.

9.    Despite these obvious and known fire risks, **ROSEBURG** deliberately failed to take measures sufficient to mitigate or prevent fire ignition at the **FACILITY**, including but not limited to failing to design, construct, inspect, or maintain an adequate fire suppression system at the **FACILITY** or adequately manage the ignition-prone byproducts of its **BIOMASS PLANT**.

10.    **ROSEBURG** could have and should have prevented the **MILL FIRE**. Instead, **ROSEBURG** chose to save money, placing profits above the safety of its employees and the public.

11.    As a result of **ROSEBURG's** acts and omission in operating its **FACILITY**, including its operation of the **BIOMASS PLANT** and treatment of the hot ash byproduct it generated, the **MILL FIRE** spread from the **FACILITY**, irreparably harmed a community, destroyed homes, and killed citizens of Siskiyou County.

## II.    THE PARTIES

### A.    PLAINTIFF

12.    **PLAINTIFF ROBERT DAVIES** ("**PLAINTIFF**" or "**ROBERT**") is an individual who was, at all times relevant, a natural person and resident of Siskiyou County, California. As a result of the **MILL FIRE**, **PLAINTIFF**, a 61-year-old person with disabilities, lost his home of over 30 years and all of its contents, is displaced, and suffers enduring harm.

### B.    DEFENDANT

13.    Defendant **ROSEBURG FOREST PRODUCTS CO.** ("**DEFENDANT ROSEBURG**" "**ROSEBURG**" or "**DEFENDANT**") is a privately-held corporation doing business in California.  At all times relevant, **ROSEBURG** owned, operated, managed, or otherwise exercised control over a wood-products processing and biomass facility which supplied energy to customers in Northern California ("**FACILITY**").

/ / /

/ / /

LIC0017018

Exhibit 23, Page 019

## C.    DOE DEFENDANTS

14.    Except as described herein, **PLAINTIFF** is ignorant of the true names and/or capacities of the Defendants sued as Does 1 through 100, inclusive, and therefore, **PLAINTIFF** sues these Defendants by such fictitious names. Following further investigation and discovery, **PLAINTIFF** will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named Doe Defendants are responsible in some manner for the acts, occurrences, and events alleged herein. These Doe Defendants aided, abetted, and/or conspired with Defendants in the wrongful acts and course of conduct, or otherwise negligently caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

## D.    AGENCY, JOINT VENTURE, AND CONCERT OF ACTION

15.    At all relevant times, **DEFENDANTS** were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each **DEFENDANT** has ratified and approved the acts of each of the remaining **DEFENDANTS**. Each **DEFENDANT** aided and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in breaching their obligations to **PLAINTIFF**. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary wrongdoing and realized his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## E.    JURISDICTION AND VENUE

16.    This Court is a court of general jurisdiction and, therefore, has subject matter jurisdiction over all causes of action alleged herein.

17.    This Court has personal jurisdiction over all parties to this action because each and every party has sufficient minimum contacts with the State of California arising out of or

LIC0017019

Exhibit 23, Page 020

1  relating to the causes of action herein alleged such that this Court's exercise of personal

2  jurisdiction comports with traditional notions of fair play and substantial justice.

3      18.    Plaintiff is informed and believes, and thereon alleges, that **DEFENDANT**

4  **ROSEBURG** is a business entity that has not filed a statement designating a principal office in

5  California. Therefore, venue is proper in any Court in the State. (*Easton v. Superior Court* (1970)

6  12 Cal.App.3d 243, 246.)

7  III.    **FACTUAL BASIS FOR THE CLAIMS ASSERTED**

8      A.    **FIRE-PRONE BYPRODUCTS FROM ROSEBURG'S BIOMASS PLANT**
          **CAUSED THE MILL FIRE**

9

10     19.    On September 2, 2022, the **MILL FIRE** ignited at a wood-products processing

11 facility ("**FACILITY**") in Weed, California owned and operated by **DEFENDANT**

12 **ROSEBURG**. The **MILL FIRE** burned for 11 days, torched 3,935 acres, destroyed 118

13 structures, injured three people, and killed two.

14     20.    The residents of Siskiyou County, and in particular the residents of Weed – where

15 the **FACILITY** and **ROSEBURG** were the second-largest employer – were ambushed by flame.

16 To illustrate just how fast this fire moved, one only has to look to the location of the local fire

17 department. The City of Weed's Fire Department is located adjacent to the Roseburg Mill, at

18 128 Roseburg Parkway. Nonetheless, the **MILL FIRE** was burning so ferociously at onset a

19 trained battalion – *responding from an onsite position* – had no chance to halt the progression of

20 this blaze.

21 / / /

22 / / /

23

24

25

26

27

28

LIC0017020

Exhibit 23, Page 021



*Figure 1*: Residential neighborhood in Weed, CA after the Mill Fire.

### B. THE ROSEBURG FACILITY AND BYPRODUCTS FROM ITS BIOMASS PLANT POSED OBVIOUS AND KNOWN FIRE RISKS

21.    **ROSEBURG** and all **DEFENDANTS** knew or should have known that the **FACILITY** and its operations posed obvious risks of igniting a fire that could harm property and life.

22.    **ROSEBERG** and all **DEFENDANTS** also knew or should have known that the **FACILITY** was located in an area with high fire risk. By September 2021, 94% of Siskiyou County was categorized as "extreme drought" with over 40% qualifying for "exceptional drought." To date, 2022 has been the 4th driest year in Siskiyou County over the past 128 years, creating an increased risk of wildfire.

23.    Further, **ROSEBURG** knew that Siskiyou County had a recent history of substantial wildfires including the McKinney Fire in 2022 (60,138 acres; 4 deaths), the Lava Fire in 2021 (26,409 acres), the Slater Fire in 2020 (157,220 acres), and the Klamathon Fire in 2018 (38,008 acres).

LIC0017021

Exhibit 23, Page 022

24. In addition to the surrounding drought-stricken areas of Siskiyou County, the **FACILITY** itself and its operations posed a known fire risk.

25. **ROSEBURG** used the **FACILITY** for, among other purposes, processing logs, chips, and larger pieces of wood to create wood veneer. To perform the steps necessary for its industrial process, the **FACILITY** used various powered industrial equipment.

26. **ROSEBURG** also used the **FACILITY** to generated electricity for itself and for public through the **BIOMASS PLANT**. Like a fireplace, the **BIOMASS PLANT** created heat by burning solid fuel. In this case, the **FACILITY** used byproducts of its wood processing, such as wood chips, as fuel for the **BIOMASS PLANT**. Once burned, the wood became ash.

27. **ROSEBURG** then removed the hot ash byproduct from the **BIOMASS PLANT** and stored it in a large wooden building built in the 1920s ("**SHED 17**") at the **FACILITY** so it could cool. Just like ashes in a fireplace, the hot ashes from the **BIOMASS PLANT** could ignite a fire if not properly cooled or treated.



*Figure 2*: A building similar to Shed 17 that had stores hot ash at Roseburg Mill.

28. For decades, **SHED 17** housed ashes from the **BIOMASS PLANT** at the **FACILITY**. Over time, ash, debris, wood chips, and other flammable material accumulated in and around **SHED 17**. Inside, the potentially hot ashes from the **BIOMASS PLANT** lay piled

LIC0017022

Exhibit 23, Page 023

1  several feet high in various containers under the building's wooden rafters and beside its wooden

2  walls, which were scarred with burn marks from previous fires. **PLAINTIFF** is further informed

3  and believes that **SHED 17** and its surrounding areas were also the location of industrial

4  equipment, chemicals, and other materials and byproducts associated with the **FACILITY's**

5  operations.

6      29.    Essentially, **ROSEBURG's** management of the **FACILITY** and the manner in

7  which it stored the hot ashes from the **BIOMASS PLANT** made **SHED 17** a tinderbox awaiting

8  a spark. Yet, **ROSEBURG** continued to use **SHED 17** as the primary storage site for the hot ash

9  and potentially flammable product for many years.

10     30.    **ROSEBURG** knew that hot ashes from the **BIOMASS PLANT** posed a fire risk.

11 Fire ignitions caused by hot ashes from the **BIOMASS PLANT** were typical and at the

12 **FACILITY** and a matter of common knowledge to **ROSEBURG's** management and employees

13 overseeing or working at the **FACILITY**. **PLAINTIFF** is informed that while the **FACILITY**

14 experienced many operations-related fire ignitions in recent years (including substantial wood-

15 product ignitions in 2015 and 2017), hot ashes from the **BIOMASS PLANT** stored in **SHED 17**

16 actually caused fires at the **FACILITY** on a frequent basis – with the exact number of these

17 internally-combated "near miss" catastrophes unknown to the public because no formal reports

18 to administrative agencies were generated by Roseburg managers.

19     31.    In an attempt to combat this known ignition risk at the **FACILITY**, **ROSEBURG**

20 installed a suppression system in **SHED 17** that was intended to cool the hot ashes from the

21 **BIOMASS PLANT** and mitigate or prevent fires.

22     32.    However, **ROSEBURG** failed to ensure that the suppression system was

23 adequately designed, constructed, inspected, maintained, managed, or upgraded. **PLAINTIFF** is

24 informed, and thereon alleges, that **ROSEBURG's** management, in an effort to maximize profit

25 from **FACILITY's** operations, failed to allocate sufficient funds to upgrade and/or maintain its

26 fire suppression system and its components.

27

28

**COMPLAINT**                                                                    7

LIC0017023

Exhibit 23, Page 024

33. Further, the suppression system in **SHED 17** had or was meant to function as a standard sprinkler system which, when it detected a certain amount of heat, was supposed to discharge water to mitigate or eliminate a potential fire.

34. **PLAINTIFF** is informed and believes that the sprinkler system in **SHED 17** was also inadequately designed, constructed, inspected, or maintained by **ROSEBURG**. As a result, the sprinkler system did not function as intended and, to the extent that it did function, **SHED 17's** suppression system was not capable of suppressing a foreseeable ignition such as the initial stages of **MILL FIRE**.

35. **ROSEBURG** also knew or should have known that **SHED 17's** fire suppression system did not function as intended and could not stop an ignition caused by hot ashes from the **BIOMASS PLANT** from becoming a deadly wildfire.

36. Yet, **ROSEBURG** chose a reactive approach to fire risk – only acting once an ignition began – rather than implementing a plan, process, or procedure to proactively address fire risks at the **FACILITY** and, in particular, **SHED 17**. Accordingly, **ROSEBURG** deliberated failed to take critical and life-saving measures in light of obvious and known fire risks and did so, at least in part, because **ROSEBURG's** reactive approach was cheaper.

37. As a result, the **FACILITY's** suppression system did not function as intended and hot ashes from the **BIOMASS PLANT**, which could have and should have been cooled or treated, remained hot and piled several feet high in the wooden tinderbox that was **SHED 17**.

38. Fires were so typical at the **FACILITY**, that **ROSEBURG's** management developed a policy, practice, and procedure under which its own employees would act as "firefighters" if and when a fire ignited the **FACILITY**. By using its own employees to fight fires at the **FACILITY**, **ROSEBURG** could avoid the financial consequences of shutting down the **FACILITY**, sending employees home, paying cleanup costs, or having the fire risks become known to the surrounding community.

39. **PLAINTIFF** is further informed and believes, however, that **ROSEBURG** did not take reasonable steps to educate or train its deputized employees in the critical methods, techniques, and science of fire suppression.

LIC0017024

Exhibit 23, Page 025

40.    Simply, it was more important that **ROSEBURG** keep the **FACILITY** running and profitable than keeping its employees and the public safe. In fact, **ROSEBURG's** decision to enlist its employees as private "firefighters" only heightened the risk of a fire at the **FACILITY** growing and spreading due to the lack of education, training, and experience of those employees in the relevant disciplines required for proper emergency fire suppression.

41.    Ultimately, **ROSEBURG** engaged in a pattern and practice of managing the **FACILITY** that consciously and deliberately disregarded known and foreseeable risks posed by hot ashes from the **BIOMASS PLANT** which could ignite a catastrophic wildfire, damage property, cause injuries, and take lives

42.    Accordingly, hot ashes from the **BIOMASS PLANT** remained hot and at risk of ignition. As a foreseeable result, the **MILL FIRE** ignited causing catastrophic harm to the surrounding community.

**C.    DEFENDANTS' NEGLIGENCE CAUSED PLAINTIFF SUBSTANTIAL HARM**

43.    **PLAINTIFF ROBERT DAVIES** ("**PLAINTIFF**") lived in his family home in Weed, Calfornia for over 30 years. While living in that home, **PLAINTIFF** raised a family, developed cherished memories, and accumulated precious and irreplaceable personal effects.

44.    **PLAINTIFF**, a widowed 61-year old person with disabilities, felt safe and comfortable in the home he cared so much for.

45.    The **MILL FIRE** transformed **PLAINTIFF's** home to rubble, robbing him of all his material possessions while reducing his life and sense of safety to nothing more than a memory.

46.    **PLAINTIFF** was at his home when the **MILL FIRE** arrived and was forced to evacuate as he saw the flames approaching his property.

47.    Yet, the true depth of **PLAINTIFF's** losses cannot be quantified in numbers, since his greatest loss could never be replaced: In addition to the material contents of his home, Robert Davies also lost the remains of his late wife which were contained in an urn on the

LIC0017025

Exhibit 23, Page 026

1    mantle. Now, because of a fire Roseburg should have prevented, he will never be allowed to

2    honor his pledge and scatter his wife's ashes in Greece in accordance with her last wishes.



*Figure 3*: Plaintiff Robert Davies' Home after the Mill Fire.

15        48.    **PLAINTIFF** is now displaced, suffers substantial economic harm, and further

16    suffers severe and enduring emotional distress associated with the loss of his primary residence

17    and the discomfort, annoyance, disturbance associated with the loss of and attempts to replace

18    his home.

19        49.    **PLAINTIFF** did not contribute to nor could he have avoided the harm and injury

20    that he suffered as a legal result of **DEFENDANTS'** wrongful conduct.

21        50.    **PLAINTIFF's** harm and injury could have been avoided if **ROSEBURG** and all

22    other **DEFENDANTS** exercised reasonable care in the management of the **FACILITY**.

23    **DEFENDANTS'** failures include but are not limited to: the willful disregard of known fire risks

24    associated with the **FACILITY**; failing to adequately design, construct, inspect, and/or maintain

25    the fire suppression system in **SHED 17** in a manner so as to make it capable of performing at a

26    level commiserate with the clear and known risks of fire ignition; and deliberately pursuing a

27    course of conduct with respect to the storage of hot ash that increased the risk of a catastrophic

28    wildfire.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

10

LIC0017026

1    IV.    **CAUSES OF ACTION**

2              **FIRST CAUSE OF ACTION – INVERSE CONDEMNATION**

3                          **(Against All Defendants)**

4              51.    **PLAINTIFF** incorporate and re-allege by this reference each of the paragraphs

5    set forth above as though fully set forth herein.

6              52.    On or about September 2, 2022, **PLAINTIFF** owned real property and/or

7    personal property located within Siskiyou County in the area of the **MILL FIRE**.

8              53.    Prior to or about September 2, 2022, **DEFENDANTS** installed, owned, operated,

9    used, controlled, and/or maintained the **BIOMASS PLANT**, which generated electricity for use

10   by the public and, by doing so, created hazardous hot-ash byproduct.

11             54.    On or about September 2, 2022, as a direct, necessary, and legal result of the

12   **DEFENDANTS'** installation, ownership, operation, use, control, management, and/or

13   maintenance for a public use of the **FACILITY** and the **BIOMASS PLANT**, the hazardous hot-

14   ash byproduct ignited the **MILL FIRE**, which destroyed nearly 40,000 acres of land and

15   destroyed nearly 200 properties, including property owned or occupied by **PLAINTIFF**,

16   including **PLAINTIFF's** real and personal property.

17             55.    The damage to **PLAINTIFF's** real and personal property was caused by the

18   actions and omissions of the **DEFENDANTS** in their design, construction, maintenance,

19   inspection, and oversight of the **BIOMASS PLANT**, as well as its attendant safety and fire

20   suppression systems, for public use and the benefit of the public at large.

21             56.    **PLAINTIFF** has not received adequate compensation for the damage to and/or

22   destruction of their real and personal property, thus constituting a taking of **PLAINTIFF's**

23   property by the **DEFENDANTS** without just compensation.

24             57.    As a result of the actions and omissions of the **DEFENDANTS, PLAINTIFF**

25   suffered damages to their real and personal property, including loss of use, interference with

26   access, and diminution in value and/or marketability in an amount according to proof at trial.

27             58.    As a result of the actions and omissions of the **DEFENDANTS, PLAINTIFF** has

28   incurred and will continue to incur costs, disbursements, and expenses, including reasonable

LIC0017027

Exhibit 23, Page 028

1    attorney, appraisal, engineering, and other expert fees due to the conduct of the **DEFENDANTS**

2    in amounts that cannot yet be ascertained, but which are recoverable pursuant to Code of Civil

3    Procedure § 1036.

4                   **SECOND CAUSE OF ACTION - TRESPASS**

5                        **(Against All Defendants)**

6        59.    **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as

7    though fully set forth herein.

8        60.    At all relevant times herein, **PLAINTIFF** was the owner, tenant and/or lawful

9    occupier of property damaged by the **MILL FIRE**.

10       61.    **DEFENDANTS** in wrongfully acting and/or failing to act in the manner set forth

11   above, caused the **MILL FIRE** to ignite and/or spread out of control, causing harm, damage,

12   and/or injury to **PLAINTIFF**, resulting in a trespass upon **PLAINTIFF'S** property interests.

13       62.    **PLAINTIFF** did not grant permission for **DEFENDANTS** to wrongfully act in a

14   manner so as to cause the **MILL FIRE** that spread and wrongfully entered upon his property,

15   resulting in the harm, injury, and/or damage alleged above.

16       63.    As a direct and legal result of the wrongful conduct of **DEFENDANTS** that led to

17   the trespass, **PLAINTIFF** has suffered and will continue to suffer damages in an amount

18   according to proof at trial.

19       64.    As a further direct and legal result of the conduct of **DEFENDANTS**,

20   **PLAINTIFF** seeks treble damages for wrongful injuries to timber, trees, or underwood on their

21   property, as allowed under Civil Code § 3346.

22       65.    As a result of the **ROSEBURG DEFENDANTS'** actions and omissions,

23   **PLAINTIFF** seeks the imposition of punitive and exemplary damages against the **ROSEBURG**

24   **DEFENDANTS** as allowed under Cal. Civil Code § 3294.

25               **THIRD CAUSE OF ACTION – NEGLIGENCE**

26                        **(Against All Defendants)**

27       66.    **PLAINTIFF** incorporates and re-alleges by this reference each of the paragraphs

28   set forth above as though fully set forth herein.

LIC0017028

Exhibit 23, Page 029

1      67.     The Mill Fire was a direct and legal result of the negligence, carelessness,

2   recklessness, and/or unlawfulness of **DEFENDANTS** who breached their respective duties owed

3   individually and/or collectively to **PLAINTIFF** by, including but not limited to: (1) failing to

4   comply with the applicable statutory, regulatory, and/or professional standards of care;  (2)

5   failing to timely and properly maintain, manage, inspect, and/or monitor the subject mill;

6      68.     The conduct of **DEFENDANTS** failed to meet the requisite standard of care

7   under Public Resources Code § 4437(a) which states: every processor of forest products shall

8   exercise due diligence in the disposal of flammable material incident to the processing, so that

9   the material does not cause the inception or spread of uncontrolled fire. Furthermore,

10   **DEFENDANTS** failed to comply with Public Resources Code § 4437(b) which states: every

11   person, co-partnership, firm, corporation, or company that operates a sawmill or plant engaged in

12   the processing or converting of forest products into lumber, shook, ties, poles, posts, veneer,

13   shakes, shingles, and planed or milled products, shall dispose of flammable material incident to

14   that operation. If such flammable material is not to be used as fuel, or as a byproduct, within the

15   operation, it shall be disposed of by burning or by other alternative methods which effectively

16   prevent the flammable material from constituting a fire hazard.

17      69.     The conduct of **DEFENDANTS** failed to meet the requisite standard of care

18   under Public Resources Code § 4440(a) which states: flammable forest product residue may only

19   be accumulated in piles when the area surrounding the piles is cleared and kept clear of all

20   flammable vegetation and debris.

21      70.     **DEFENDANTS** breached their duties, including but not limited to: (i) failing to

22   design, construct, operate, monitor, inspect, and/or maintain the **FACILITY** including but not

23   limited to the management of its **BIOMASS PLANT**, its byproducts, and its suppression system

24   for hot ashes from the **BIOMASS PLANT** in a manner that would reduce the foreseeable risk of

25   fire in the area affected by the **MILL FIRE**; (ii) failing to properly design, construct, operate,

26   monitor, inspect, and/or maintain the sprinkler system and/or fire suppression system at the

27   **FACILITY** and, in particular, **SHED 17**, in a reasonable manner that could be expected to

28   mitigate the risk of foreseeable ignitions; (iii) failing to commit appropriate resources to ensure

LIC0017029

Exhibit 23, Page 030

1   that the sprinkler system and/or fire suppression system at the **FACILITY** and, in particular,

2   **SHED 17** was properly designed, constructed, operated, monitored, inspected, and/or maintained

3   so that it may operate as intended; (iv) failing to adequately educate or train their agents,

4   employees, or representatives in the methods necessary to adequately mitigate or prevent fire

5   risks at the **FACILITY**; (v) failing to implement and/or follow regulations and reasonably

6   sensible practices to avoid dangerous conditions prone to fire ignition. These breaches and

7   others, in isolation or in combination with one another, were the factual and proximate causes of

8   **PLAINTIFF's** harm.

9      71.    As a result of **DEFENDANTS'** actions and omissions, in isolation or in

10   combination, **PLAINTIFF** has suffered damage to real property, including but not limited to, the

11   loss of his beloved home of 30 years and a loss of use, benefit, goodwill, diminution in value

12   and/or enjoyment of such property in an amount according to proof at trial.

13      72.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** has suffered

14   damage to and/or loss of personal property, including but not limited to items of peculiar value to

15   **PLAINTIFF** in an amount according to proof at trial.

16      73.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** has incurred

17   and will continue to incur expenses and other economic damages related to the damage to his

18   property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or

19   replacement of his property and other related consequential damages in an amount according to

20   proof at trial.

21      74.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** was injured

22   in his health, strength, and activity in an amount according to proof at trial.

23      75.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** was

24   required to and/or continue to employ physicians and other health care providers to examine,

25   treat, and care for his physical injuries. **PLAINTIFF** has incurred, and will continue to incur,

26   medical and incidental expenses in an amount according to proof at trial.

27      76.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** has suffered

28   great mental pain and suffering, including worry, emotional distress, humiliation,

LIC0017030

Exhibit 23, Page 031

1  embarrassment, anguish, anxiety, and nervousness. **PLAINTIFF** is informed and believes and
2  upon such information and belief alleges, that such injuries have resulted in debilitating injury in
3  an amount according to proof at trial.

4       77.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** has suffered
5  a loss of income, loss of earning capacity, loss of profits, increased expenses due to
6  displacement, and/or other consequential economic losses in an amount according to proof at
7  trial.

8       78.    As a result of **DEFENDANTS'** wrongful acts and omissions, as here to for
9  alleged **PLAINTIFF** seeks the imposition of punitive and exemplary damages against the
10  **DEFENDANTS** as allowed under Cal. Civil Code § 3294.

11              **FOURTH CAUSE OF ACTION – PRIVATE NUISANCE**
12                      **(Against All Defendants)**

13      79.    **PLAINTIFF** incorporates and re-alleges by this reference each of the paragraphs
14  set forth above as though fully set forth herein.

15      80.    **PLAINTIFF** owns and/or occupies property at or near the site of the **MILL**
16  **FIRE**. At all relevant times, **PLAINTIFF** had a right to occupy, enjoy, and/or use their property
17  without interference by **DEFENDANTS**.

18      81.    **DEFENDANTS**, by their acts and omissions set forth above, directly and legally
19  caused an obstruction to the free use of **PLAINTIFF'S** property, an invasion of the
20  **PLAINTIFF'S** right to use his property, and/or an interference with the enjoyment of
21  **PLAINTIFF'S** property resulting in the **PLAINTIFF** suffering unreasonable harm and
22  substantial actual damages constituting a nuisance pursuant to Civil Code §§ 3479 and 3481.

23      82.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** suffered
24  harm, injury, and damages in an amount according to proof at trial.

25      83.    As a result of the **ROSEBURG DEFENDANTS'** actions and omissions,
26  **PLAINTIFF** seeks the imposition of punitive and exemplary damages against the **ROSEBURG**
27  **DEFENDANTS**.

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                    15

LIC0017031

### FIFTH CAUSE OF ACTION – PUBLIC NUISANCE

#### (Against All Defendants)

84.    **PLAINTIFF** incorporates and re-alleges by this reference each of the paragraphs set forth above as though fully set forth herein.

85.    **PLAINTIFF** owns and/or occupies property at or near the site of the **MILL FIRE**. At all relevant times, **PLAINTIFF** had a right to occupy, enjoy, and/or use his property without interference by **DEFENDANTS**.

86.    **DEFENDANTS** owed a duty to the public, including **PLAINTIFF**, to conduct the maintenance and/or operation of the subject mill in Siskiyou County, specifically including the sprinkler system and/or fire suppression system, in a manner that did not threaten harm or injury to the public welfare, or offend the public or interfere with public use and enjoyment of their property.

87.    The **MILL FIRE** burned nearly 4,000 acres of land leaving nothing where there were once homes, farms, meadows, fields, and forests. **DEFENDANTS** created a condition that was harmful to the health of the public, including **PLAINTIFF**, and that interfered with the comfortable occupancy, use, and/or enjoyment of **PLAINTIFF'S** property. **PLAINTIFF** did not consent, expressly or impliedly, to **DEFENDANTS'** wrongful conduct.

88.    The hazardous condition that **DEFENDANTS** created and/or permitted to exist affected a substantial number of people within the general public, including **PLAINTIFF**, and constituted a public nuisance under Civil Code §§ 3479 and 3480, and Public Resources Code § 4171. Further, the ensuing uncontrolled wildfire constituted a public nuisance under Public Resources Code § 4170.

89.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** suffered harm that is different from the type of harm suffered by the general public. Specifically, **PLAINTIFF** has lost occupancy, possession, use, and/or enjoyment of their land, real, and/or personal property, including, but not limited to: a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of his property; an impairment of the salability of his property; soils that have become hydrophobic; exposure to an array of toxic substances on

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                16

LIC0017032

Exhibit 23, Page 033

1  his land; the presence of "special waste" (as defined in 22 California Code of Regulations §

2  66261.120) on his property that requires special management and disposal; and a lingering smell

3  of smoke, and/or constant soot, ash, and/or dust in the air

4    90.    As a result of **DEFENDANTS'** actions and omissions, **PLAINTIFF** has suffered,

5  and will continue to suffer, discomfort, anxiety, fear, worries, and stress attendant to the

6  interference with **PLAINTIFF'S** occupancy, possession, use, and/or enjoyment of his property,

7  as alleged above.

8    91.    A reasonable, ordinary person would be annoyed or disturbed by the condition

9  created by **DEFENDANTS** and the resulting fire.

10    92.    The conduct of **DEFENDANTS** is unreasonable and the seriousness of the harm

11  to the public, including **PLAINTIFF**, outweighs the social utility of **DEFENDANTS'** conduct.

12    93.    The unreasonable conduct of **DEFENDANTS** is a direct and legal cause of the

13  harm, injury, and/or damage to the public, including **PLAINTIFF.**

14    94.    The conduct of **DEFENDANTS** constitutes a public nuisance within the meaning

15  of Civil Code §§ 3479 and 3480, Public Resources Code §§ 4104 and 4170, and Code of Civil

16  Procedure § 731. Under Civil Code § 3493, **PLAINTIFF** has standing to maintain an action for

17  public nuisance because the nuisance is one that is especially injurious and/or offensive to the

18  senses of the **PLAINTIFF**, unreasonably interferes with the comfortable enjoyment of his

19  property, unlawfully obstructs the free and customary use of **PLAINTIFF'S** property, and

20  caused individualized harm, injury, and damages to **PLAINTIFF.**

21    **SIXTH CAUSE OF ACTION – VIOLATION OF HEALTH & SAFETY CODE § 13007**

22    **(Against All Defendants)**

23    95.    **PLAINTIFF** incorporates and re-alleges by this reference each of the paragraphs

24  set forth above as though fully set forth herein.

25    96.    By engaging in the acts and/or omissions alleged herein, **DEFENDANTS**

26  willfully, negligently, carelessly, recklessly, and/or in violation of law, set fire to and/or allowed

27  fire to be set to the property of another in violation of Health and Safety Code § 13007.

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                    17

LIC0017033

Exhibit 23, Page 034

97.     As a result of **DEFENDANTS'** violation of Health and Safety Code § 13007, **PLAINTIFF** suffered recoverable damages to property under Health and Safety Code § 13007.21

98.     As a result of **DEFENDANTS'** violation of Health and Safety Code § 13007, **PLAINTIFF** are entitled to reasonable attorneys' fees under Code of Civil Procedure § 1021.9.

99.     As a result of the act and omissions of the **DEFENDANTS, PLAINTIFF**, and each of them have suffered harm, injury and damages as set forth above.

100.    As a result of the **DEFENDANTS'** actions and omissions, **PLAINTIFF** seeks the imposition of punitive and exemplary damages against the **ROSEBURG DEFENDANTS**.

**V.    PRAYER FOR RELIEF**

101.    WHEREFORE, **PLAINTIFF** prays for judgment against **DEFENDANTS ROSEBURG** and DOES 1 through 100, and each of them as follows:

For an award against **DEFENDANTS** for Inverse Condemnation, all according to proof, for:

1.      Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.      Loss of wages, earning capacity and/or business profits, use, goodwill, and/or proceeds and/or any related displacement expenses;

3.      All costs of suit, including reasonable attorneys' fees, appraisal fees, engineering fees, other expert fees, and related costs;

4.      Prejudgment interest;

5.      For such other and further relief as the Court shall deem just and proper.

For an award against **DEFENDANTS** for Trespass, Negligence, Private Nuisance, Public Nuisance, and Violation of Health and Safety Code § 13007, all according to proof, for:

1.      Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.      Loss of the use and benefit of Plaintiff real and/or personal property;

LIC0017034

Exhibit 23, Page 035

1      3.     Loss of wages, earning capacity, goodwill, and/or business profits or proceeds

2           and/or any related displacement expenses;

3      4.     Past and future medical expenses and incidental expenses according to proof;

4      5.     Attorneys' fees, expert fees, consultant fees, and litigation costs and expenses as

5           allowed under Code of Civil Procedure § 1021.9;

6      6.     Treble damages for wrongful injuries to timber, trees, or underwood as allowed

7           under Civil Code § 3346;

8      7.     General damages for fear, worry, annoyance, disturbance, inconvenience, mental

9           anguish, emotional distress, loss of quiet enjoyment of property, and personal

10         injury;

11     8.     All costs of suit;

12     9.     Prejudgment interest;

13     10.    Punitive and exemplary damages as allowed under Cal. Civil Code § 3294; and

14     11.    For such other and further relief as the Court shall deem just and proper.

15  **VI.**   **JURY DEMAND**

16     Plaintiff demands trial by jury on all issues so triable.

17  Dated: October 4, 2022             **COTCHETT, PITRE & McCARTHY LLP**

18

19

20                           FRANK M. PITRE

                              DONALD J. MAGILLIGAN

21                           NABILAH A. HOSSAIN

                              ANDREW W. BRITTON

22                           *Counsel for Plaintiff*

23  Dated: October 4, 2022             **ANDERLINI & MCSWEENEY**

24

25

26                           P. TERRY ANDERLINI

                           *Counsel for Plaintiff*

27

28

**COMPLAINT**                                                             19

LIC0017035

EXHIBIT 24




EXHIBIT 24




EXHIBIT 24

Message
_____

**From:**      David Bona [dbona@ccplaw.com]
**Sent:**      10/12/2022 2:47:54 PM
**To:**        Weatherford, Victoria L. [vweatherford@bakerlaw.com]; Dow, Dustin M. [ddow@bakerlaw.com]
**CC:**        Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group
               (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]
**Subject:**   {EXTERNAL} RE: Mill Fire: Roseburg facility inspection


Victoria and Dustin,

I assume your office is preparing answers to the various complaints that are now in federal court.
Have any other complaints been filed?

Additionally, I would like to get copies of some of the documents and information related to the inspections that have
taken place so far, the parties that have attended and who has been put on notice. We discussed some of these topics
during our call last week, but I would like to get more detail.

First, with regard to experts, I understand that your office retained Paul Way and Michael J. Schulz to work on this
case. Have you retained any other experts, and if so what are their names and areas of expertise. Additionally, I
understand that the experts have not been asked to prepare any type of report, but is there a memo or some type of
report that describes or discusses the experts initial impressions or findings?

Second, with respect to the facility and machinery that could be implicated in the cause of the fire, I would like copies of
any photographs or videos of the facility and/or machinery taken before or after the fire. I was provided 5 videos that
appear to have come from a security camera and 7 photos of the machinery, but I was hoping there might be
more. Also, during our phone call you mentioned that there is a video recording of the Cal Fire inspection. Will you
please send me a copy of that video and any photographs that were taken during the Cal Fire inspection. I would also
appreciate it if you would send me the list of people who attended the Cal Fire inspection along with a list of evidence, if
any, that Cal Fire took from the scene. I would also like any photos or videos that were taken during the subsequent
inspection(s) conducted by the other interested parties, a list of the people who attended those inspections and a list of
any items of evidence any of those parties took from the scene.

Finally, during our call you mentioned that your firm has a list of the people and entities that were put on notice about
the fire and subsequent inspections. Will you please provide me that list and any letters that were sent to or received
from those persons or entities.

Thank you,


**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:    415.391.9857*
*Cellular:       415.218.4156*
*Website:* www.ccplaw.com

LIC0017108

EXHIBIT 25

EXHIBIT 25

EXHIBIT 25

Message

| | |
|---|---|
| **From**: | David Bona [dbona@ccplaw.com] |
| **Sent**: | 10/19/2022 8:25:53 PM |
| **To**: | Weatherford, Victoria L. [vweatherford@bakerlaw.com]; Dow, Dustin M. [ddow@bakerlaw.com] |
| **CC**: | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Keahey, Holly [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a17fe218cd7d4d2b97bd9db31a6c0031-Keahey, Hol]; Peppin, Logan F. [lpeppin@bakerlaw.com] |
| **Subject**: | {EXTERNAL} RE: Mill Fire: Roseburg facility inspection |
| **Attachments**: | Mill Fire Inspection Waiver of Liability.pdf |

Victoria,

Thank you for the information. The signed waiver is attached. I will sign off on the protocol once it is complete. I will be bring my own PPE. Please let me know if the PPE requirements change.

**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:   415.391.9857*
*Cellular:       415.218.4156*
*Website:* www.ccplaw.com

**From:** Weatherford, Victoria L. [mailto:vweatherford@bakerlaw.com]
**Sent:** Wednesday, October 19, 2022 7:29 PM
**To:** David Bona; Dow, Dustin M.
**Cc:** Kaufman, Sarah; Keahey, Holly; Peppin, Logan F.
**Subject:** RE: Mill Fire: Roseburg facility inspection

Hi David,

Thanks for letting us know you will attend on Monday. I am attaching the waiver of liability that we will need you to sign. And once the final protocol is ready, I will send it to all interested third parties (I have been including you on those emails and letters) and need you to sign and return that as well. Please note the protocol will require minimum personal protective equipment still TBD, but to help you get a head start the last site inspection required steel toed slip resistant footwear, pants, reflective safety vest, gloves (as you deem necessary), safety glasses/goggles (as you deem necessary) and a hard hat.

We are still collecting a lot of the information you have requested below. But to provide you with some initial answers:

Access to photos and videos: We are still in the process of obtaining the videos and photos from the inspections but will provide you with what we have, including access to the Cal Fire inspection preservation video, the October 3-5

LIC0017174

inspection videos and photos, and the recovered photos and composite video from the video cameras before the fire on 8/31 until the cameras stopped operation on 9/2.
**Logan** – please facilitate access for David.

Drafting answers to the four complaints: Yes we are working on answers. Today we filed declinations to the magistrate judges in all four cases. There are no additional filed cases to our knowledge.

List of evidence CalFire took from the scene: Attached is the evidence log we received from the Sheriff.

Additional experts: We have also retained Doug Carpenter, whose area of expertise is fire suppression systems.

Third parties on notice: You have the most up-to-date list of entities we have put on notice of the inspections, from my letters that I have sent this week. Please let me know if you need anything else regarding this.

Thank you,

Victoria


**Victoria Weatherford**
Partner

**BakerHostetler**
Transamerica Pyramid Center
600 Montgomery Street | Suite 3100
San Francisco, CA 94111-2806
T +1.415.659.2634

vweatherford@bakerlaw.com
bakerlaw.com


**From:** David Bona <dbona@ccplaw.com>
**Sent:** Wednesday, October 19, 2022 10:30 AM
**To:** Weatherford, Victoria L. <vweatherford@bakerlaw.com>; Dow, Dustin M. <ddow@bakerlaw.com>
**Cc:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>
**Subject:** RE: Mill Fire: Roseburg facility inspection

Victoria and Dustin,

I am following up on the requests below asking for information and materials regarding potentially responsible third parties, the initial impressions of RLC's experts and the photos or videos taken during the Cal Fire and subsequent inspections.  Will you please let me know when I can expect those materials.  I would like to get them before the inspection on Monday.

Also, I will be attending the inspection on Monday, October 24.  Will you please add me to the list of attendees.

Thank you,

**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:    415.391.9857*
*Cellular:        415.218.4156*

LIC0017175

*Website:* www.ccplaw.com

**From:** David Bona
**Sent:** Friday, October 14, 2022 9:32 AM
**To:** 'Weatherford, Victoria L.'; 'Dow, Dustin M.'
**Cc:** 'Kaufman, Sarah'
**Subject:** RE: Mill Fire: Roseburg facility inspection

Victoria and Dustin,

Good morning.  During our call last week you mentioned that you have someone looking into possible claims against third parties.  In addition to the materials requested below, will you also please send me any information you have about the investigation into those potentially culpable parties and the role those parties may have played in causing the fire or allowing it to spread.

Thanks

**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:    415.391.9857*
*Cellular:       415.218.4156*
*Website:* www.ccplaw.com

**From:** David Bona
**Sent:** Wednesday, October 12, 2022 2:48 PM
**To:** 'Weatherford, Victoria L.'; Dow, Dustin M.
**Cc:** 'Kaufman, Sarah'
**Subject:** RE: Mill Fire: Roseburg facility inspection

Victoria and Dustin,

I assume your office is preparing answers to the various complaints that are now in federal court. Have any other complaints been filed?

Additionally, I would like to get copies of some of the documents and information related to the inspections that have taken place so far, the parties that have attended and who has been put on notice.  We discussed some of these topics during our call last week, but I would like to get more detail.

First, with regard to experts, I understand that your office retained Paul Way and Michael J. Schulz to work on this case.  Have you retained any other experts, and if so what are their names and areas of expertise.  Additionally, I understand that the experts have not been asked to prepare any type of report, but is there a memo or some type of report that describes or discusses the experts initial impressions or findings?

LIC0017176

Second, with respect to the facility and machinery that could be implicated in the cause of the fire, I would like copies of any photographs or videos of the facility and/or machinery taken before or after the fire. I was provided 5 videos that appear to have come from a security camera and 7 photos of the machinery, but I was hoping there might be more. Also, during our phone call you mentioned that there is a video recording of the Cal Fire inspection. Will you please send me a copy of that video and any photographs that were taken during the Cal Fire inspection. I would also appreciate it if you would send me the list of people who attended the Cal Fire inspection along with a list of evidence, if any, that Cal Fire took from the scene. I would also like any photos or videos that were taken during the subsequent inspection(s) conducted by the other interested parties, a list of the people who attended those inspections and a list of any items of evidence any of those parties took from the scene.

Finally, during our call you mentioned that your firm has a list of the people and entities that were put on notice about the fire and subsequent inspections. Will you please provide me that list and any letters that were sent to or received from those persons or entities.

Thank you,


**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:    415.391.9857*
*Cellular:        415.218.4156*
*Website:  www.ccplaw.com*


---

**From:** Weatherford, Victoria L. [mailto:vweatherford@bakerlaw.com]
**Sent:** Tuesday, October 11, 2022 9:15 AM
**To:** David Bona
**Cc:** Dow, Dustin M.
**Subject:** RE: Mill Fire: Roseburg facility inspection

Hi David,

Will do. Right now there are no subsequent inspections scheduled.

Thank you,

Victoria

**Victoria Weatherford**
Partner

**BakerHostetler**
Transamerica Pyramid Center
600 Montgomery Street | Suite 3100
San Francisco, CA 94111-2806
T +1.415.659.2634

vweatherford@bakerlaw.com
bakerlaw.com

LIC0017177

**From:** David Bona <dbona@ccplaw.com>
**Sent:** Monday, October 10, 2022 2:19 PM
**To:** Weatherford, Victoria L. <vweatherford@bakerlaw.com>
**Cc:** Dow, Dustin M. <ddow@bakerlaw.com>
**Subject:** RE: Mill Fire: Roseburg facility inspection

Victoria,

Please let me know when the boiler start-up dates gets scheduled. I would also appreciate it if you would let keep me informed about any other inspections that are being discussed.

Thank you,

**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:    415.391.9857*
*Cellular:        415.218.4156*
*Website:*  www.ccplaw.com

---

**From:** Weatherford, Victoria L. [mailto:vweatherford@bakerlaw.com]
**Sent:** Friday, October 7, 2022 6:34 PM
**To:** David Bona; Dow, Dustin M.
**Cc:** Chairez, Joseph; Bator, Chris; Petre, Timothy P.; Divok, Eva; Lisa Fairchild; Attard, Lauren; Kaufman, Sarah; Matthew Lawless; Keahey, Holly; Steven Hurley; Scott DeVries; Hudgins, Rachel; Marinucci, Dante A.
**Subject:** RE: Mill Fire: Roseburg facility inspection

David,

I will let you know when an inspection and boiler start-up are set to occur. Presently, Roseburg is not going to restart the boiler next week.

Thank you,

Victoria

**Victoria Weatherford**
Partner

**BakerHostetler**
Transamerica Pyramid Center
600 Montgomery Street | Suite 3100
San Francisco, CA 94111-2806
T +1.415.659.2634

vweatherford@bakerlaw.com
bakerlaw.com

LIC0017178



**From:** David Bona <dbona@ccplaw.com>
**Sent:** Friday, October 7, 2022 5:18 PM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren <lattard@bakerlaw.com>; Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; Steven Hurley <Steven.Hurley@alliant.com>; Weatherford, Victoria L. <vweatherford@bakerlaw.com>; Scott DeVries <SDeVries@hunton.com>; Hudgins, Rachel <RHudgins@hunton.com>; Marinucci, Dante A. <dmarinucci@bakerlaw.com>
**Subject:** RE: Mill Fire: Roseburg facility inspection

Dustin,

During our call on Wednesday you mentioned that the boiler at the Roseburg facility was going to be started up as part of an inspection set for early next week. I would like to attend the inspection and observe the boiler start-up process. Will you please provide the details of when it will take place or put me in touch with the person who has that information.

Thank you and have a good weekend.

**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*275 Battery Street, 16th Floor*
*San Francisco, California 94111*
*Direct Dial:   415.391.9857*
*Cellular:       415.218.4156*
*Website:*  www.ccplaw.com

**From:** Dow, Dustin M. [mailto:ddow@bakerlaw.com]
**Sent:** Wednesday, October 5, 2022 12:26 PM
**To:** David Bona; Kaufman, Sarah
**Cc:** Chairez, Joseph; Bator, Chris; Petre, Timothy P.; Divok, Eva; Lisa Fairchild; Attard, Lauren; Matthew Lawless; Keahey, Holly; Steven Hurley; Weatherford, Victoria L.; Scott DeVries; Hudgins, Rachel; Marinucci, Dante A.
**Subject:** RE: Mill Fire: status update

David and Sarah,
I will send a teams invite for 12:30.

**Dustin Dow**
Partner

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098

EXHIBIT 26

EXHIBIT 26

EXHIBIT 26

# EXHIBIT 26 FILED UNDER SEAL

EXHIBIT 27

EXHIBIT 27

EXHIBIT 27

Message
_____

**From:**        DeVries, Scott [SDeVries@hunton.com]
**Sent:**        10/19/2022 3:22:08 PM
**To:**          Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group
                 (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa];
                 melisa.thompson@markel.com; drothman@chubb.com; vincent.sweeney@awac.com;
                 ryan.gaffney@everestre.com; Faddis, Christopher [/o=ExchangeLabs/ou=Exchange Administrative Group
                 (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8487e97ba7a4212ba649a04cdaac7f9-Faddis, Chr]
**CC:**          matthew.lawless@rfpco.com; lisaf@frpco.com; Hudgins, Rachel [RHudgins@hunton.com]
**Subject:**     {EXTERNAL} Roseburg Forest Products / Mill Fire in Weed, California
**Attachments:** Roseburg - 2022.10.19 Letter to all liability insurers with Exhibits A,B, and C.pdf

Please find attached a letter on behalf of Roseburg Forest Products to its general liability insurers concerning potential resolution of claims of unrepresented claimants.



**Scott P. DeVries**
Special Counsel
sdevries@HuntonAK.com
p  415.975.3720
m 707.888.7887

Hunton Andrews Kurth LLP
50 California Street
Suite 1700
San Francisco, CA 94111

HuntonAK.com

LIC0017156

Exhibit 27, Page 001



HUNTON ANDREWS KURTH LLP
50 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CALIFORNIA 94111

TEL  415 • 975 • 3700
FAX  415 • 975 • 3701

SCOTT P. DEVRIES
DIRECT DIAL: 415 • 975 • 3720
EMAIL: sdevries@HuntonAK.com

RACHEL E. HUDGINS
DIRECT DIAL: 404 • 888 • 4110
EMAIL: rhudgins@HuntonAK.com

October 19, 2022

*Via Email*

To: General Liability Insurers for Roseburg Forest Products:

    Ms. Sarah Kaufman (sarah.kaufman@libertymutual.com)
    Ms. Melisa Thompson (melisa.thompson@markel.com)
    Mr. Doug Rothman (drothman@chubb.com)
    Mr. Vincent Sweeney (vincent.sweeney@awac.com)
    Mr. Ryan Gaffney (ryan.gaffney@everestre.com)
    Mr. Christopher Faddis (christopher.faddis@libertymutual.com)

**Re:**   Insured:     Roseburg Forest Products Co.
         Claim:      Mill Fire in Weed, California

Dear Sirs and Madams:

In the October 13, 2022 update call, counsel for Roseburg Forest Products Co., Robert Julian at BakerHostetler, briefed you on the cause and origin of the Mill Fire and resulting claims (pending and future) against Roseburg. This letter addresses one category of these claims—those made by individuals who fled the fire and whose homes were destroyed or damaged by who have not retained counsel. Many of these claimants have asked Roseburg to pay their claims immediately and without litigation. Others are claimants that we believe would be amenable to a settlement.

The individuals' names, their respective home Assessor Parcel Numbers, and description of the estimated litigation value of their claims are included on Exhibit A. Roseburg has reviewed their claims and determined a reasonable settlement range for each claim, which also is included in Exhibit A. These settlement ranges were computed based on the settlement history for similar categories of fire claims in the Camp, Zogg, and Dixie fires in California. Those historical settlement

ATLANTA  AUSTIN  BANGKOK  BEIJING  BOSTON  BRUSSELS  CHARLOTTE  DALLAS  DUBAI  HOUSTON  LONDON
LOS ANGELES  MIAMI  NEW YORK  NORFOLK  RICHMOND  SAN FRANCISCO  THE WOODLANDS  TOKYO  TYSONS  WASHINGTON, DC
www.HuntonAK.com

LIC0017157

All Liability Insurers
October 19, 2022
Page 2

averages are explained in Exhibit B. We appreciate that insurers have extensive experience with these and other fire claims and can validate these damage ranges.

It is anticipated that the settlement agreements would contain a broad waiver provision, making clear that the claimants would be waiving any and all claims against Roseburg that they may have. The claimants will also be required to acknowledge that they have not received payment from their own property insurers agreements and to the extent they have, this amount would be subtracted from the settlement or it would be directed to their property insurer. A copy of the working version of the proposed settlement agreement is attached at Exhibit C. This agreement is still in draft form, and we invite your comments. Settlement offers would only be extended to those individuals who remain unrepresented.

In the call last week, Roseburg provided the insurers an opportunity to ask questions of defense counsel and/or to request additional information and documentation. The insurers did not ask any questions or request additional information. From those insurers who were unable to make the call (Markel and AWAC), we did not receive any emails or letters with additional questions. Earlier today, BakerHostetler provided you a memo addressing liability for the Mill Fire. We trust that the call and/or the memo answer any questions that the insurers may have. If not, we are happy to arrange a follow-up call to answer any such questions or respond to information requests. Please advise as soon as possible.

Roseburg believes that resolution of these claims now, within the recommended range values, would be the right thing for the community. Resolving these matters now, without the need for time consuming and costly litigation, also makes economic sense for both Roseburg and its insurers. Historical valuation indicates that the claims for damaged real property alone will be north of $60 million, to say nothing of the wrongful death claims pending against Roseburg.

While Roseburg looks to Liberty and other liability insurers to make payment on these and other claims, Roseburg recognizes that one or more insurers may still have questions or need additional time. Given the need to resolve these claims now, rather than await ultimate funding approval, Roseburg requests the insurers either consent to such resolution by Roseburg or waive their respective consent provisions subject to a reservation of all other rights. In a similar vein, we trust that insurers would agree that resolution before litigation is desirable for all

LIC0017158

All Liability Insurers
October 19, 2022
Page 3

concerned and would not affect Roseburg's coverage rights. For its part, Roseburg similarly would reserve any and all of its rights to seek reimbursement of these settlement funds. And apart from eroding policy limits, Roseburg would reserve all rights to defense and indemnity under its liability policies.

Time is of the essence. Roseburg believes that it has a narrow window of time to resolve these unrepresented claims at these values. To this end, it is critical that Roseburg receive the insurers' response by **Tuesday, October 25, 2022**.

Sincerely,

Scott P. DeVries    Rachel Hudgins

Enclosures: Exhibits A,B, and C

cc:    Mr. Matthew Lawless (matthew.lawless@rfpco.com)
       Ms. Lisa Fairchild (lisaf@rfpco.com)
       Mr. Steven Hurley (steven.hurley@alliant.com)

LIC0017159

# Exhibit A

LIC0017160

Redacted Per Sealing Order

Redacted Per Sealing Order

**Exhibit B**

# Redacted Per Sealing Order

Redacted Per Sealing Order

Redacted Per Sealing Order

Redacted Per Sealing Order

Exhibit 27, Page 011

# Redacted Per Sealing Order

# Exhibit C

LIC0017168

# Redacted Per Sealing Order

# Redacted Per Sealing Order

# Redacted Per Sealing Order

LIC0017171

# Redacted Per Sealing Order

LIC0017172

# Redacted Per Sealing Order

LIC0017173

EXHIBIT 28

EXHIBIT 28

EXHIBIT 28

# EXHIBIT 28 FILED UNDER SEAL

EXHIBIT 29

EXHIBIT 29

EXHIBIT 29

Message
_____

| | |
|---|---|
| **From:** | Jeffrey Crowe [JCrowe@sheppardmullin.com] |
| **Sent:** | 10/25/2022 2:02:16 PM |
| **To:** | sdevries@HuntonAK.com; rhudgins@HuntonAK.com |
| **CC:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Falzetta, Frank |
| | [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; Mary |
| | Gregory [/o=ExchangeLabs/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=useraef619e0] |
| **Subject:** | [EXTERNAL] Roseburg Claim No. P 413-291000 |
| **Attachments:** | 10-25-22 Letter to S. DeVries.pdf |

Dear Mr. DeVries and Ms. Hudgins:

On behalf of Liberty Insurance Corporation, attached please find correspondence from our office in connection with the above matter and in response to your October 19, 2022 correspondence.

Sincerely,

**Jeffrey S. Crowe**
+1 714-424-8231 | direct
JCrowe@sheppardmullin.com | Bio

**SheppardMullin**
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626-1993
+1 714-513-5100 | main
www.sheppardmullin.com | LinkedIn | Twitter

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

LIC0017203

# **Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
714.513.5100 main
714.513.5130 fax
www.sheppardmullin.com

Jeffrey S. Crowe
714.424.8231 direct
jcrowe@sheppardmullin.com

October 25, 2022

File Number: 080B-364458

**VIA E-MAIL AND U.S. MAIL**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
Hunton Andrews Kurth
50 California Street
Suite 1700
San Francisco, CA 94111
E-Mail: sdevries@HuntonAK.com
        rhudgins@HuntonAK.com

Re:  Insured:       Roseburg Forest Products Co. (a subsidiary of RLC Industries Co.)
     Claim No.      P 413-291000
     Policy No.     TB7-661-067089-031 (11/01/2021-11/01/2022)
     Company:       Liberty Insurance Corporation
     Date Of Loss:  September 2, 2022

Dear Mr. DeVries and Ms. Hudgins:

This follows my separate telephone calls with both of you on October 24, 2022. We are counsel for Liberty Insurance Corporation ("Liberty") and The Ohio Casualty Insurance Company ("Ohio Casualty") in coverage matters arising from the September 2, 2022 fire (the "Fire") that occurred at Roseburg Forest Products Co.'s ("Roseburg's") veneer production mill located in Weed, California. We write in response to your October 19, 2022 correspondence asking that, within four business days, Liberty and various other insurers consent to and agree to fund between them up to approximately $17.5 million in anticipated settlements with unrepresented claimants who assert property damage and/or bodily injury claims against Roseburg arising from the Fire. Please direct all future correspondence regarding coverage issues to our attention.

Because your correspondence involves levels or limits of insurance *below* Ohio Casualty's Excess Liability Policy, we write now on behalf of Liberty only. In separate correspondence to follow later, we also intend to respond to your October 7, 2022 letter pertaining to Liberty's defense of Roseburg in pending lawsuits arising from the Fire.

Liberty previously wrote to you on September 22, 2022, and explained that its Commercial General Liability Policy (No. TB7-661-067089-031) issued to First Named Insured RLC Industries Co. (the "CGL Policy") contains a $2 million per occurrence limit of liability for "bodily injury" and "property damage" and $4 million general aggregate limit. Liberty's correspondence also identified the CGL Policy's "Logger's Property Damage Liability Endorsement" (the "Logger's Endorsement"), which excludes coverage for "property damage" under the CGL Policy where coverage is provided under the Logger's Endorsement. More specifically, the Logger's

LIC0017204

# SheppardMullin

Scott P. DeVries
Rachel E. Hudgins
October 25, 2022
Page 2

Endorsement covers "logger's property damage," including "fire fighting expenses," resulting from "your logging and lumber operations."[1]  Pursuant to its stated schedule, the Logger's Endorsement offers a $2 million logger's each occurrence limit of insurance and $4 million logger's property damage aggregate limit.

Liberty has also already explained that, pursuant to the "Broad Form Named Insured – Majority Interest" endorsement, the CGL Policy and Logger's Endorsement apply to Roseburg as a wholly owned subsidiary of RLC Industries.

Liberty has concluded that the pending and anticipated claims against Roseburg arising from the Fire constitute, in whole or in part, covered:  (1) "bodily injury" under the CGL Policy form; and (2) "logger's property damage" arising out of Roseburg's "logging and lumber operations" under the Logger's Endorsement.  Thus, as a threshold matter, Liberty hereby tenders toward a full and final global settlement and release of *all* claims against Roseburg and *all* other insureds under the CGL Policy, the CGL Policy's full $2 million per occurrence limit for "bodily injury"[2] and the Logger Endorsement's full $2 million logger's each occurrence limit of insurance for "logger's property damage."

Your October 19 letter, however, does not yet contemplate a full and final global settlement and release of all claims.  Instead, your letter contemplates the potential for full and final settlements and releases of all claims against Roseburg (and all insureds under the CGL Policy) by unrepresented parties only who assert "bodily injury" and/or "logger's property damage" claims arising from the Fire.  According to your letter, Roseburg calculates reasonable settlements of those claims to total between $13,730,494 and $16,548,262 (plus $950,000 in "proposed rebuild payments") to settle claims with the owners/residents of 31 destroyed or damaged homes located in Weed and Lake Shastina (the "Unrepresented Claims").  These owners/residents have not retained counsel or filed lawsuits at this time.

By demanding that Liberty consent to and agree to indemnify Roseburg toward settlements of only the Unrepresented Claims at this time, Roseburg acknowledges that it remains exposed to "bodily injury" and/or "logger's property damage" claims by various other parties and claimants – including, without limitation, represented claimants or plaintiffs, subrogated property insurers, CalFire and other agencies who may have incurred firefighting suppression expenses, and wrongful death claimants.  Those other pending or anticipated claims expose Roseburg to liability far in excess of the CGL Policy's limits of insurance, and may expose Roseburg to personal liability in excess of all applicable or available insurance.

---

[1] Please refer to the CGL Policy and Liberty's prior correspondence for defined terms.

[2] The CGL Policy's Section I Coverages, including for "bodily injury," is subject to a $250,000 per occurrence deductible.  For purposes of this response, Liberty intends to advance the deductible as part of its tender or payment of settlements or judgments, subject to its right to seek reimbursement from Roseburg.

# **Sheppard**Mullin

Scott P. DeVries
Rachel E. Hudgins
October 25, 2022
Page 3

Thus, Liberty now responds to Roseburg's specific request that it consent to and fund, up to its limits of liability, the settlement and release of the Unrepresented Claims. Liberty agrees to do so, subject to the following:

- Within the range for each of the Unrepresented Claims as identified in Exhibit A to your letter, Liberty consents and agrees to fund toward the *actual* settlement of the Unrepresented Claims up to the CGL Policy's: (1) $2 million per occurrence limit of liability for "bodily injury"; and (2) $2 million logger's each occurrence limit of insurance for "logger's property damage." Actual settlements require the full and complete release by each of the settling unrepresented claimants of all claims against all insureds arising from or relating to the Fire.[3]

- By countersigning below, Roseburg expressly: (1) requests and consents to the piecemeal settlement of some but not all pending or anticipated claims against it arising from or relating to the Fire; and (2) acknowledges and understands that it will remain exposed to liability in excess of the limits of liability of the CGL Policy, and possibly in excess of all applicable or available insurance.

- The CGL Policy and Logger's Endorsement's provision that Liberty's "right and duty to defend ends when we have used up" the applicable limit of insurance "in the payment of judgments or settlements" under Coverage A or the Logger's Endorsement. (In your letter, you state: "And apart from eroding policy limits, Roseburg would reserve all rights to defense and indemnity under its liability policies." If you intended that reservation of rights to apply to Liberty upon exhaustion of its limits, please explain.)

We ask that you have a representative of Roseburg acknowledge Roseburg's request and consent to Liberty's payment in settlement of or toward some but not all of the pending and anticipated claims for "bodily injury" and/or "logger's property damage" against Roseburg arising from the Fire by signing this letter below and returning a copy to us.

> Roseburg hereby requests and consents to Liberty's settlement of Unrepresented Claims up to the CGL Policy's $2 million per occurrence limit of liability for "bodily injury" and $2 million logger's each occurrence limit of insurance for "logger's property damage." Roseburg acknowledges and understands that Liberty's payment of or toward actual settlements of the Unrepresented Claims will not settle all of the present and future claims against it arising out of the Fire, and that the CGL Policy and Logger's Endorsement provide that Liberty's "right and duty to defend ends when we have used up" the applicable limit of insurance "in the payment of

---

[3] Liberty has reviewed and generally approves of the form settlement agreement attached to your letter, but subject to its right to review and approve all final versions of each settlement agreement to ensure that they provide full and complete releases.

LIC0017206

# SheppardMullin

Scott P. DeVries
Rachel E. Hudgins
October 25, 2022
Page 4

judgments or settlements" under Coverage A or the Logger's Endorsement.

_____
[Name]

_____
[Title]

If you have any questions regarding this correspondence, please do not hesitate to contact us.

Sincerely,

*Jeffrey S. Crowe*

Jeffrey S. Crowe
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4892-1481-5547.1

cc:    Sarah Kaufman (via e-mail)
       Frank Falzetta, Esq.
       Mary E. Gregory, Esq.

LIC0017207

EXHIBIT 30

EXHIBIT 30

EXHIBIT 30

Message

| | |
|---|---|
| **From:** | Vicki Castro [VCastro@sheppardmullin.com] |
| **Sent:** | 11/9/2022 11:57:17 AM |
| **To:** | sdevries@HuntonAK.com; rhudgins@huntonAK.com |
| **CC:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Falzetta, Frank [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955]; Mary Gregory [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=useraef619e0] |
| **Subject:** | [EXTERNAL] Robert Davies v . Roseburg Forest Products Co. - ROR Letter to DeVries-Hudgins [ROR Davies Lawsuit] |
| **Attachments:** | 2022-11-09 DeVries-Hudgins [ROR Davies Lawsuit] 4868-8511-4170 v.3 4873-6110-1630 v.1.pdf; 10.5.22 correspondence to Roseburg's carriers re 4th complaint.pdf; 2022.10.04 - Davies v. Roseburg Forest Products Co. - Complaint.pdf |

At Mary Gregory's request, I am sending the attached reservation of rights letter and attachments regarding the above-referenced matter.

**Vicki Castro** | Practice Specialist
Assistant to Frank Falzetta, Esquire
and Mary E. Gregory, Esquire
+1 213-617-5430 | direct
VCastro@sheppardmullin.com

**Sheppard**Mullin
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

LIC0017233

**Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

Mary E. Gregory
213.617.5426 direct
mgregory@sheppardmullin.com

File Number: 080B-364458

November 9, 2022

**VIA E-MAIL AND U.S. MAIL**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
Hunton Andrews Kurth
50 California Street, Suite 1700
San Francisco, CA 94111
E-Mail: sdevries@HuntonAK.com
       rhudgins@HuntonAK.com

Re:   *Robert Davies v. Roseburg Forest Products Co.*
      United States District Court, Northern District of California Case No. 3:22-cv-05780

|            |                                                              |
|------------|--------------------------------------------------------------|
| Insured:   | Roseburg Forest Products Co. (a subsidiary of RLC Industries Co.) |
| Claim No.  | P 413-291000                                                 |
| Policy No. | TB7-661-067089-031 (11/01/2021-11/01/2022)                   |
| Company:   | Liberty Insurance Corporation                                |
| Date Of Loss: September 2, 2022                                            |

Dear Mr. DeVries and Ms. Hudgins:

On October 5, 2022, Joseph Chairez of Baker Hostetler ("Baker") tendered the above-referenced lawsuit ("Lawsuit") to Liberty Insurance Corporation ("Liberty") on behalf of Roseburg Forest Products Company ("Roseburg"). We enclose a copy of Mr. Chairez's correspondence for your convenience. We direct this letter to your attention because we understand your firm is handling all coverage issues relating to the September 2, 2022 fire giving rise to this Lawsuit. If you are unwilling or unable to transmit this letter to Roseburg, or address any issues arising from this letter, please provide us with the contact information of the individual(s) to whom we should forward this letter.

This letter provides Liberty's coverage position with regard to the Lawsuit. As more fully described in this letter, Liberty will defend Roseburg in the Lawsuit under the captioned policy, subject to a limited reservation of rights.

Liberty issued policy number TB7-661-067089-031 to First Named Insured RLC Industries Co., effective November 1, 2021 to November 1, 2022. As a wholly owned subsidiary of RLC Industries Co., Roseburg is an insured under the Policy. The Policy was in effect at the time of the September 2, 2022 fire giving rise to the Lawsuit. The Policy affords General Liability

LIC0017234

**Sheppard**Mullin

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 2

Coverage, as modified by the Logger's Property Damage Liability Endorsement, that applies to the Lawsuit. Based on the information received to date, Liberty will provide a defense under the General Liability Coverage form and its endorsements, subject to Policy conditions and limits of insurance.

Mr. Davies has alleged punitive and exemplary damage claims against Roseburg. Liberty will not indemnify Roseburg against any punitive and exemplary damages a jury may award in the Lawsuit, as these damages are not insurable under California law. Aside from this limited reservation, Liberty is not reserving rights under any Policy exclusion or on the grounds that Roseburg's conduct was non-accidental.

Liberty bases this explanation of its coverage position and reservation of rights on its current understanding of Mr. Davies' claims in his Lawsuit.

I.
**THE LAWSUIT**

We understand from Mr. Chairez's October 5, 2022 letter that Mr. Davies filed his complaint (the "Complaint") in San Francisco County Superior Court on October 4, 2022. We further understand that Baker removed the action to the United Stated District Court for the Northern District of California on or about October 5, 2022.

In his Complaint, Mr. Davies alleges that:

1.    On the afternoon of September 2, 2022, a fire began at a mill in Weed, California which was owned and operated by ROSEBURG FOREST PRODUCTS CO. ("ROSEBURG"). Later named the MILL FIRE, it tore through Siskiyou County for 11 days, burned 3,935 acres, destroyed 118 structures, injured three people, and killed two.

2.    The MILL FIRE was the result of ROSEBURG's deliberate failure to avoid known risks of fire ignition associated with the industrial processes conducted at its mill ("FACILITY").

3.    In addition to creating wood veneer, the FACILITY generates electricity at an onsite plant ("BIOMASS PLANT"). ROSEBURG uses the electricity to power the FACILITY, but also transfers the electricity generated by the BIOMASS PLANT into Siskiyou County's electrical grid for public use.

4.    The BIOMASS PLANT creates electricity by burning wood, which creates a hot ash byproduct. The hot ash, if not properly cooled or treated, poses an obvious risk of fire ignition. This was not news to ROSEBURG. Previously, it had been observed that hot ash from the BIOMASS PLANT ignited fires at the FACILITY on a frequent basis.

LIC0017235

**SheppardMullin**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 3

5.    ROSEBURG installed a fire suppression system but it did not function as intended.  Instead of fixing the system, ROSEBURG depended on its own employees promptly reacting to extinguish the fires – rather than designing and maintaining an effective fire suppression system.  ROSEBURG relied on this practice because it was cheaper, thereby sacrificing the safety of the community which surrounded the facility.

6.    Worse, the FACILITY itself, and in particular the aging wooden shed where the hot ash created by the BIOMASS PLANT was stored ("SHED 17"), was a ticking time bomb.

7.    By September 2022, SHED 17 was about 100 years old.  For years, ROSEBURG used SHED 17 to house truckloads of hot ash from the BIOMASS PLANT.  The rafters which ran across the ceiling of SHED 17 were covered with dust and other material.  On several occasions, the hot ash would cause sparks to ignite the dust and other random debris hanging from the rafters.

8.    Due to the abundant fuel and risk of ignition, proper management of fire risk at the FACILITY was paramount.  Further, ROSEBURG knew or should have known that severe and enduring drought in Siskiyou County made the region susceptible to wildfires.

9.    Despite these obvious and known fire risks, ROSEBURG deliberately failed to take measures sufficient to mitigate or prevent fire ignition at the FACILITY, including but not limited to failing to design, construct, inspect, or maintain an adequate fire suppression system at the FACILITY or adequately manage the ignition-prone byproducts of its BIOMASS PLANT.

10.   ROSEBURG could have and should have prevented the MILL FIRE.  Instead, ROSEBURG chose to save money, placing profits above the safety of its employees and the public.

11.   As a result of ROSEBURG's acts and omission in operating its FACILITY, including its operation of the BIOMASS PLANT and treatment of the hot ash byproduct it generated, the MILL FIRE spread from the FACILITY, irreparably harmed a community, destroyed homes, and killed citizens of Siskiyou County.

                                        *        *        *

43.   PLAINTIFF ROBERT DAVIES ("PLAINTIFF") lived in his family home in Weed, California for over 30 years.  While living in that home, PLAINTIFF raised a family, developed cherished memories, and accumulated precious and irreplaceable personal effects.

LIC0017236

# SheppardMullin

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 4

44. PLAINTIFF, a widowed 61-year old person with disabilities, felt safe and comfortable in the home he cared so much for.

45. The MILL FIRE transformed PLAINTIFF's home to rubble, robbing him of all his material possessions while reducing his life and sense of safety to nothing more than a memory.

46. PLAINTIFF was at his home when the MILL FIRE arrived and was forced to evacuate as he saw the flames approaching his property.

47. Yet, the true depth of PLAINTIFF's losses cannot be quantified in numbers, since his greatest loss could never be replaced: In addition to the material contents of his home, Robert Davies also lost the remains of his late wife which were contained in an urn on the mantle. Now, because of a fire Roseburg should have prevented, he will never be allowed to honor his pledge and scatter his wife's ashes in Greece in accordance with her last wishes.

48. PLAINTIFF is now displaced, suffers substantial economic harm, and further suffers severe and enduring emotional distress associated with the loss of his primary residence and the discomfort, annoyance, disturbance associated with the loss of and attempts to replace his home.

Mr. Davies alleges causes of action for: (1) Inverse Condemnation; (2) Trespass; (3) Negligence; (4) Private Nuisance; (5) Public Nuisance; and (6) Violation of Health and Safety Code section 13007. Mr. Davies seeks repair or replacement of his damaged or destroyed real and personal property; loss of use damages; lost wages; past and future medical expenses; attorneys' fees and expert and consultant fees; general damages; treble damages for wrongful injuries to trees; punitive damages; costs of suit and prejudgment interest.

## II.
## THE POLICY

Liberty issued the following Commercial General Liability policy to RLC Industries Co. (the "First Named Insured"):[1]

| | |
|---|---|
| Policy Number: | TB7-661-067089-031 |
| Effective Dates: | 11/01/2021 to 11/01/2022 |
| Stated Limits: | |
| $2,000,000 | Per Occurrence Limit for Bodily Injury and Property Damage |
| $2,000,000 | Personal and Advertising Injury Limit |

---

[1]    Please refer to the Policy for original font and format. Should the quotation of Policy wording in this letter contain any typographical or formatting error(s), the actual Policy wording and formatting controls.

# SheppardMullin

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 5

$4,000,000    General Aggregate Limit
$4,000,000    Products-Completed Operations Aggregate Limit

The Policy also schedules a $250,000 per occurrence deductible.

Roseburg Forest Products Co. is a wholly owned subsidiary of RLC Industries, and is also an insured pursuant to the "Broad Form Named Insured – Majority Interest" endorsement in the Policy.

The Policy includes Coverage Form CG 00 01 04 13 (the "Coverage Form"). It also includes "Commercial General Liability Enhancement Form for Manufacturers" Form LC 04 46 01 17 (the "Enhancement Form"). The Policy also includes Logger's Property Damage Liability Endorsement Form LD 04 16 07 11 (the "Logger's Endorsement").

## A.    The CGL Coverage Form

On page 1 of the CGL Coverage Form, it states, in part:

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1.    Insuring Agreement**

    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1)    The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

        (2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

    b.    This insurance applies to "bodily injury" and "property damage" only if:

LIC0017238

# SheppardMullin

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 6

    (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    (2)    The "bodily injury" or "property damage" occurs during the policy period; . . .

The CGL Coverage Form contains the following definitions:

    3.    "Bodily injury" means:[2]

    a.    Bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time;

    b.    Mental anguish, shock or humiliation arising out of injury as defined in Paragraph a. above.  Mental anguish means any type of mental or emotional illness or distress.

    *    *    *

    13.    "Occurrence" means:[3]

    a.    With respect to "bodily injury" or "property damage", an accident, including continuous or repeated exposure to substantially the same general harmful conditions…

    *    *    *

    17.    "Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it: or

    b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. . . .

On page 10 of the Coverage Form, it states, in part:

---

[2]    The definition of "bodily injury" is amended by the Enhancement Form.
[3]    The definition of "occurrence" is amended by Form LC 29 06 08 08.

**SheppardMullin**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 7

**SECTION III – LIMITS OF INSURANCE**

    1.    The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

        a.    Insureds;

        b.    Claims made or "suits" brought; or

        c.    Persons or organizations making claims or bringing "suits".

On page 11 of the Coverage Form, it states, in part:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

    2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit

                      \*      \*      \*

        d.    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**B.**    **The Logger's Endorsement**

The Logger's Endorsement includes the following schedule:

| Limits of Insurance: | $ 2,000,000 | Logger's Each Occurrence Limit |
| --- | --- | --- |
| | $ 4,000,000 | Logger's Property Damage Aggregate Limit |
| Deductible: | $    N/A | |

Among other things, the Logger's Endorsement adds a "property damage" exclusion to the CGL Coverage Form and provides exceptions to that exclusion, in part, as follows:

The following exclusion is added to Paragraph 2. Coverage A (Section I):

This insurance does not apply to "property damage" for which coverage is provided under Logger's Property Damage Liability Coverage.

The following coverage is added to Section I - Coverages:

**LOGGER'S PROPERTY DAMAGE LIABILITY COVERAGE**

LIC0017240

**SheppardMullin**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 8

1. **Insuring Agreement:**

   a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "logger's property damage" to which this insurance applies arising out of "your logging and lumbering operations". We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

      (1)   The amount we will pay for damages is limited as described in Section III – Limits of Insurance; and

      (2)   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under the Logger's Property Damage Liability Coverage.

      As used above, damages because of "logger's property damage" includes "fire fighting expenses" resulting from "your logging and lumbering operations" only if no "forester" has suspended these operations.

      Supplementary Payments - Coverages A and B shall apply to the Logger's Property Damage Liability Coverage. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b.   This insurance applies to "logger's property damage" only if:

      (1)   The "logger's property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2)   The "logger's property damage" occurs during the policy period; and

      (3)   The "logger's property damage" arises out of "your logging and lumbering operations" performed pursuant to a written contract for a Designated Customer listed in the Schedule.

                        *        *        *

3. The following changes apply to Section III – Limits of Insurance:

   a.   The following is added to Paragraph 2.

LIC0017241

**SheppardMullin**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 9

2.  The General Aggregate Limit is the most we will pay for the sum of:

    d.  Damages under the Logger's Property Damage Liability Coverage.

b.  The following paragraphs are added:

    8.  The Logger's Property Damage Aggregate Limit shown in the Schedule is the most we will pay for the sum of all damages because of "logger's property damage".

    9.  Subject to 2. and 8. above, the Logger's Each Occurrence Limit shown in the Schedule is the most we will pay for all damages because of "logger's property damage" arising out of any one "occurrence".

c.  You are responsible, up to the Deductible Amount shown above, for the total of:

    (1)  all damages, including amounts paid in settlement of a claim or "suit", plus

    (2)  all "allocated loss adjustment expense";

because of all "property damage" as the result of any one "occurrence". We are responsible for those amounts of damages to which this insurance applies (subject to the applicable limits of insurance) and "allocated loss adjustment expense" that exceed the applicable deductible amount shown above.

The Logger's Each Occurrence Limit and the Logger's Property Damage Aggregate Limit shown in the Schedule shall be reduced by amounts paid or payable by you within the deductible amount.

We have the right to advance any part or all of the deductible to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible as has been advanced by us. Exercise of our right to advance such amount shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy.

4.  **Additional Definitions**

a.  "Your logging and lumbering operations" means logging, the felling and bucking of timber, log road building, sawmilling, planning, plywood,

LIC0017242

**SheppardMullin**

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 10

    veneer, pulp or paper milling, and all operations necessary or incidental to logging including railroading or trucking of felled trees or timber, maintenance of logging campsites, and the ownership, management, or reforestation of timberlands by you or on your behalf.

b.    "Logger's property damage" means:

(1)    physical injury to any "vehicle" or railroad rolling stock while being loaded or unloaded including all resulting loss of use; and

(2)    "property damage" due to fire resulting from "your logging and lumbering operations" including physical injury to timberlands, standing timber, felled or bucked timber, owned by others.

c.    "Vehicle," as used in the Logger's Property Damage Liability Coverage means any land motor vehicle, trailer or semi-trailer.

d.    "Fire fighting expenses" means your portion of the actual cost incurred by others in controlling or extinguishing a fire. It does not include your expenses for your "employees", or others you may hire to fulfill your obligation to use a reasonable effort, to control or extinguish a fire.

e.    "Forester" means a federal or state forester, including any of his or her authorized representatives.

f.    "Allocated loss adjustment expense" includes, but is not limited to:

(1)    Attorneys' fees for claims in "suit";

(2)    Court costs and other items of expense such as:

(a)    costs for medical, expert and other witnesses at trials or hearings, stenographic costs and costs of copies of documents and transcripts; and

(b)    medical, expert, or consultant fees and expenses relating to the defense of any claim or "suit"; and

(3)    Any other expense described in Supplementary Payments – Coverages A and B.

Although we have attempted to include all of the Policy provisions that we believe are pertinent to the instant determination, the Policy provisions set forth above in no way replace the provisions of the actual Policy issued.  If you or Roseburg have any questions regarding the terms, definitions, conditions, endorsements and/or limits of liability contained in the applicable

LIC0017243

# SheppardMullin

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 11

Policy, please refer to the Policy itself.  To the extent there is any discrepancy between this letter and the Policy, the Policy controls.

## III.
## LIBERTY'S COVERAGE POSITION

Liberty has concluded that the Lawsuit alleges the potential of covered damages against Roseburg because of "bodily injury" and "logger's property damage" caused by an "occurrence," as those terms are defined in the Policy.

However, Mr. Davies also seeks punitive damages on all causes of action alleged in the Complaint except for the Inverse Condemnation and Public Nuisance claims.  Under California law, an insurer cannot indemnify its insureds for punitive damages.  Therefore, Liberty declines to indemnify Roseburg against Mr. Davies' punitive damage claims.

The Policy provides $2 million in "bodily injury" limits per occurrence under Coverage A and $2 million in "logger's property damage" limits per occurrence under the Logger's Endorsement, subject to a $4 million general aggregate limit.  Liberty is prepared to indemnify Roseburg against reasonable settlements or judgments for covered "bodily injury" and "logger's property damage" claims arising from the fire up to the Policy's $2 million per occurrence "bodily injury" and $2 million per occurrence "logger's property damage" limits of liability.

Liberty does not believe that its limited reservation of rights creates a conflict of interest for an attorney retained by it to defend Roseburg against the Lawsuits.  Therefore, Liberty has retained David Bona of Carlson, Calladine & Peterson, LLP, 275 Battery Street, 16th Floor, San Francisco, California, 94111 (415) 391-3911 to represent Roseburg at this time.

## IV.
## CONCLUSION

The above discussion of applicable and potentially applicable provisions of the Policy, are based upon Liberty's current understanding of the claims asserted against Roseburg and the nature of the damages or other relief sought.  It is not an inclusive list of all potentially applicable provisions of the Policy.  Liberty may amend its position and reservation of rights as its investigation proceeds.  Additional investigation may provide new or different information bearing on the Policy and questions of coverage, and Liberty may choose to rely on such other information to modify its coverage position and/or reservation of rights, including, but not limited to, grounds upon which to deny, reject, limit, or decline coverage.  Liberty is not waiving any of its rights to rely upon any other provision in the Policy, or any other policy, or under the law.

If you and/or any party seeking coverage believes this claim, or any part of this claim, has been wrongfully denied or rejected, you/they may contact the following State of California agency:

LIC0017244

**Sheppard**Mullin

Scott P. DeVries, Esq.
Rachel E. Hudgins, Esq.
November 9, 2022
Page 12

California Department of Insurance
Consumer Services Division
300 South Spring Street
Los Angeles, California 90013
1-800-927-HELP or (213 )897-8921
www.insurance.ca.gov

We trust that Liberty's coverage position, as outlined here, and its limited reservation of rights is clear, but we welcome any questions you may have. Also, if you believe Liberty's understanding of the facts set forth above is inaccurate, please let us know at your earliest opportunity. As always, Liberty welcomes receipt of any additional information you believe bears on any of the coverage issues discussed above.

Very truly yours,

*Mary E. Gregory*

Mary E. Gregory
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Encl.

cc:    Sarah Kaufman  (via email only)
       Jeffrey S. Crowe, Esq.  (via email only)
       Frank Falzetta, Esq.  (via email only)

SMRH:4868-8511-4170

LIC0017245

EXHIBIT 31

EXHIBIT 31

EXHIBIT 31

Message

| | |
|---|---|
| **From:** | Vicki Castro [VCastro@sheppardmullin.com] |
| **Sent:** | 11/22/2022 12:05:09 PM |
| **To:** | sdevries@HuntonAK.com; rhudgins@huntonAK.com |
| **CC:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Falzetta, Frank [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955]; Mary Gregory [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=useraef619e0] |
| **Subject:** | {EXTERNAL} Roseburg Forest Products Co./Liberty Mutual - Letter to S. Devries and R. Hudgins |
| **Attachments:** | 2022-11-22 Letter to DeVries-Hudgins re Roseburg Forest Products, 4857-8730-1695 v 1.pdf |

At Mary Gregory's request, I am sending you the attached letter in regards to the above-referenced matter.

**Vicki Castro** | Practice Specialist
Assistant to Frank Falzetta, Esquire
and Mary E. Gregory, Esquire
+1 213-617-5430 | direct
VCastro@sheppardmullin.com

**SheppardMullin**
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

LIC0017938

# **Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

Mary E. Gregory
213.617.5426 direct
mgregory@sheppardmullin.com

File Number: 080B-364458

November 22, 2022

**VIA E-MAIL AND U.S. MAIL**

Scott P. DeVries
Rachel E. Hudgins
Hunton Andrews Kurth
50 California Street
Suite 1700
San Francisco, CA 94111
E-Mail:  sdevries@HuntonAK.com
          rhudgins@HuntonAK.com

Re:    Insured:     Roseburg Forest Products Co. (a subsidiary of RLC Industries Co.)
       Claim No.    P 413-291000
       Policy No.   TB7-661-067089-031 (11/01/2021-11/01/2022)
       Company:     Liberty Insurance Corporation
       Date Of Loss: September 2, 2022

Dear Mr. DeVries and Ms. Hudgins::

As you know, we are counsel for Liberty Insurance Corporation ("Liberty") in coverage matters arising from the September 2, 2022 fire (the "Fire") that occurred at Roseburg Forest Products Co.'s ("Roseburg's") veneer production mill located in Weed, California.  We write in response to your October 7, 2022 letter directed to Sarah Kaufman and Phil Meagher of Liberty.

Liberty disagrees with your characterization of its actions as described in your letter.  As you know, Liberty has timely agreed to defend all of the lawsuits Roseburg has tendered to it, under a limited reservation of rights on the uninsurability of punitive damages.  Liberty has also, at Roseburg's request, agreed to make its limits available under Liberty Policy number TB7-661-067089-031 (effective November 1, 2021 to November 1, 2022) (the "Policy") to settle certain homeowner and resident claims (please see our letter of October 25, 2022).  We understand that Roseburg retained your firm to act as coverage counsel after many of the events you describe in your letter took place.  We therefore take this opportunity to correct factual inaccuracies in your letter and also respond to Roseburg's concerns regarding Liberty's coverage position.

We understand your letter to address three main issues: (1) Roseburg's demand that Baker remain in place as its defense counsel; (2) Roseburg's claim that it is entitled to independent

LIC0017939

# SheppardMullin

Scott P. DeVries
Rachel E. Hudgins
November 22, 2022
Page 2

counsel; and (3) Roseburg's alleged prejudice due to Liberty's purported delay in sending its reservation of rights letter.  We respond to each issue below.

## 1.    Roseburg's Retention Of Baker Hostetler.

Liberty understands that Roseburg retained Baker Hostetler ("Baker") before its broker placed Liberty on notice of the claim on September 6, 2022.  Jamie Sroczynski of Liberty's Legal Strategic Services Group emailed Dustin Dow of Baker on September 7, 2022, to discuss Baker's retention.  However, Ms. Sroczynski's email did not confirm in any way that Liberty agreed to appoint or pay for Baker to defend Roseburg.  Rather, Ms. Sroczynski explained:

> I am reaching out on behalf of RLC Industries who I understand
> have retained you to represent them in the above-referenced
> matter.  At your earliest convenience, please provide me with your
> proposed rates for handling this case.  Please be sure to include
> all timekeepers you expect will assist on the file.

Mr. Dow never responded to Ms. Sroczynski's email.  Thus, Liberty and Baker never reached any agreement that Liberty would pay Baker to defend Roseburg and Liberty never consented to Baker's appointment as defense counsel.

In your letter, you argue that Liberty should have no problem with Baker's retention as defense counsel for Roseburg in this matter, because Liberty has approved Baker's retention in other matters.  In those instances, however, Liberty enjoyed a tripartite relationship with Baker and its insured.  Based on Baker's ongoing relationship with Liberty as tripartite counsel, Ms. Sroczynski believed the same would be true here, if Liberty and Baker could agree to hourly billing rates.

When Mr. Chairez announced during a September 9, 2022 call with the carriers that he was Baker's coverage counsel, and not just its defense counsel, Liberty realized that Baker had created an irreconcilable conflict of interest with Liberty.  For that reason, and because Liberty's September 22, 2022 Reservation of Rights letter did not create any conflict of interest entitling Roseburg to independent or *Cumis* defense counsel, Liberty elected to retain David Bona to defend Roseburg.

In light of the above facts, Liberty will not agree to pay Baker to defend Roseburg for claims and lawsuits arising from the Fire.  Instead, Mr. Bona and Carlson, Calladine & Peterson will continue to defend Roseburg.  The Policy requires Roseburg to cooperate with Liberty and Mr. Bona, and to provide Mr. Bona with any information he requests to further Roseburg's defense. If Roseburg continues to involve Baker in its defense, it will have to pay for Baker's attorneys' fees and costs incurred as Roseburg's separate counsel.

Your correspondence also suggested that Mr. Bona and his office do not have the requisite experience or capacity to defend Roseburg, but you have offered no meaningful information to support that claim.  Liberty understands that Mr. Bona has over 20 years of experience in

LIC0017940

# **Sheppard**Mullin

Scott P. DeVries
Rachel E. Hudgins
November 22, 2022
Page 3

defending clients in high exposure, complex, wildfire cases, in addition to floods, equipment failures, catastrophic injury and wrongful death cases. He has extensive experience and knowledge of forensic investigation techniques and the admissibility of technical and scientific evidence. He also has extensive experience in fire progression analysis and other issues that arise in complex litigation. He routinely handles mass-tort cases involving thousands of parties, including in California, Texas and other states, and has managed all aspects of multi-party, complex litigation.

In sum, Liberty believes that Mr. Bona and his office have the requisite experience to competently handle Roseburg's defense. If you have any information that suggests otherwise, we ask that you immediately provide it to us.

2.    **Liberty's September 22, 2022 Reservation Of Rights Letter Does Not Create A Conflict Of Interest Entitling Roseburg To Independent Counsel.**

a.    **Liberty's Only Specific Reservation Is On Punitive Damages.**

You also claim that Liberty acknowledged that its September 22, 2022 Reservation of Rights letter ("ROR Letter") created a conflict of interest. We disagree. Liberty's ROR Letter reserved rights on one specific issue – the uninsurability of any punitive damages. Liberty further noted that that reservation did *not* create a disqualifying conflict of interest.

Liberty's ROR Letter responded to three tendered lawsuits: *Smith*, *Hammond* and *Candasa*. Of those three, only the *Hammond* lawsuit alleged a claim for punitive damages. California law clearly holds that a claim for punitive damages does not create a conflict of interest. *See* Cal. Civ. Code § 2860(b) ("No conflict of interest shall be deemed to exist as to allegations of punitive damages…"). As such, Liberty's reservation of rights to decline to indemnify Roseburg for any future punitive damage awards did not create a conflict of interest entitling Roseburg to independent counsel.

b.    **Liberty Did Not Reserve Rights Regarding The Exclusions Or Policy Terms Quoted In Your October 7, 2022 Letter And Does Not Intend To Do So.**

Your letter further states that Roseburg has identified "multiple conflicts that give rise to a need for independent counsel." You quote certain terms and exclusions in the Policy and state that the recently filed *Davies* Complaint, and future complaints, may trigger these exclusions, thus creating a conflict: (1) the Policy's "Expected or Intended Injury" exclusion; (2) the Policy's "Pollution Exclusion" endorsement; and (3) the Policy's definition of "Occurrence".

Liberty did *not* raise any Policy terms or exclusions as potential bars to coverage in its ROR Letter. Thus, Liberty's ROR Letter did not create a conflict of interest based on the Policy's exclusions. "Where the insurer has not expressly reserved its right to deny coverage under a particular exclusion in its policy, there can be no actual conflict based on the application of that exclusion during the pendency of the action." *Federal Ins. Co. v. MBL, Inc.,* 219 Cal.App.4th 29, 44, 47 (2013) (general reservation of rights that did not refer to qualified pollution exclusion did

LIC0017941

**SheppardMullin**

Scott P. DeVries
Rachel E. Hudgins
November 22, 2022
Page 4

not create conflict of interest based on whether pollution was "sudden and accidental"); *Dynamic Concepts, Inc. v. Truck Ins. Exch.*, 61 Cal.App.4th 999, 1010, n.10 (1998).

Roseburg's arguments are therefore anticipatory and unfounded. Roseburg appears to argue that, because Liberty may assert these Policy terms and exclusions in the future, a conflict of interest exists now. This is contrary to California law. "The conflict of interest must be 'significant, not merely theoretical, actual, not merely potential.'" *Dynamic Concepts, Inc., supra*, 61 Cal.App.4th at 1007. There is no present actual conflict of interest based on the ROR Letter and the Policy's terms and exclusions.

Nevertheless, while Liberty disagrees with Roseburg's position, please accept this letter as confirmation that Liberty has not asserted, and does not intend to assert, the Policy's "Expected or Intended Injury" or "Pollution" exclusions as grounds to reserve rights and/or deny coverage to Roseburg with respect to lawsuits arising from the Fire. Liberty also does not intend to assert the lack of an "occurrence" as a bar to coverage.

    **c.**    **Roseburg's Other Purported Conflicts.**

Your letter also identifies other alleged conflicts of interest that purportedly entitle Roseburg to independent counsel: (1) Liberty's "open-ended" reservation of rights; (2) covered vs. non-covered losses; and (3) defense costs, claims resolution and exhaustion of limits. Again, Liberty disagrees with Roseburg's position. Liberty does not believe that any of these issues, as raised in Liberty's ROR Letter, create a conflict of interest. We address each of Roseburg's concerns below.

        **i.**    *Liberty's "Open-Ended"` Reservation.*

Liberty's ROR Letter did reserve the right to withdraw from Roseburg's defense upon reasonable notice including, but not limited to, the point at which Liberty has exhausted all applicable Policy limits by payment of covered claims. As you know, Liberty has advised Roseburg that the $2 million per occurrence Bodily Injury limit under Coverage A and the $2 million per occurrence Logger's Property Damage Limit under the Logger's Property Damage Liability Endorsement (that modifies Coverage A) are available to settle covered claims arising out of the Fire.[1] Liberty will continue to defend Roseburg for the *Smith*, *Hammond*, *Candasa*, *Davies*, and all future lawsuits, until its applicable Policy limits are exhausted.[2]

---

[1]    Please see our letter of October 25, 2022.

[2]    If, for example, Roseburg tenders a lawsuit asserting only property damage claims after the $2 million per occurrence Logger's Property Damage limit is exhausted, Liberty will decline that tender due to exhaustion of the applicable limit. Liberty will defend any "mixed" actions alleging "bodily injury" and "logger's property damage" damages until the $2 million per occurrence "bodily injury" limit is also exhausted.

LIC0017942

Exhibit 31, Page 005

# SheppardMullin

Scott P. DeVries
Rachel E. Hudgins
November 22, 2022
Page 5

At this time, it does not appear that new, additional facts will come to light that will require Liberty to withdraw from Roseburg's defense of lawsuits arising from the Fire. Even if that does occur, Roseburg cannot create a present conflict based on Liberty's reservation of its right to withdraw should future facts give rise to an absence of coverage. A potential conflict is insufficient to compel an insurer to appoint independent counsel. *See Centex Homes v. St. Paul Fire & Marine Ins. Co.*, 19 Cal. App. 5th 789, 798 (2018). The fact Liberty agreed to defend Roseburg under a reservation of its right to deny coverage does not, by itself, create a conflict entitling Roseburg to select independent counsel. *See Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal.App.4th 1388, 1421 (2002) (It is established that a conflict does not arise when an insurer provides a general reservation of rights); *McGee v. Sup.Ct. (Pedersen)*, 176 Cal.App.3d 221, 227-28 (1985).

You also expressed concern that the *Davies* lawsuit would allow Liberty to exercise its alleged "open-ended reservation of rights" to withdraw its defense. Liberty intends to defend Roseburg in the *Davies* lawsuit, which it has already confirmed under a similar reservation of rights. Thus, Roseburg has no basis to support its claim that Liberty intends to use future lawsuits as a reason to withdraw from its defense.

## ii.    *Covered vs. Non-Covered Losses.*

Liberty disagrees with your contention that it intends to avoid paying "some of the claimed damages," or "steer" Roseburg's defense towards uncovered claims. First, Liberty has no such intention. Second, Roseburg is not automatically entitled to independent counsel where the damages alleged in the Lawsuits are only partially covered by the Policy. *Blanchard v. State Farm Fire & Casualty Co.*, 2 Cal.App.4th 345, 350 (1991) (no *Cumis* counsel required for complaint involving covered and uncovered damages); *Dynamic Concepts, Inc., supra,* 61 Cal. App. 4th at 1006.

Moreover, Liberty believes this is a non-issue. As you know from our October 25, 2022 letter, Liberty has tendered the Policy's $2 million per occurrence Logger's Property Damage limit and the $2 million per occurrence Bodily Injury limit towards a global resolution of all claims against all insureds, and also towards settlement of unrepresented residents' claims. In that letter, we advised that Liberty's available Policy limits will likely exhaust long before all of the losses related to the Fire are paid. Thus, even if some claimants seek "non-covered" losses, other claimants seek "covered" losses well in excess of Liberty's Policy limits. Liberty remains prepared to fund all reasonable settlements of covered claims within its Policy limits.

Because Liberty does not know what claims Weed and Lake Shastina residents may assert against Roseburg in the future, Liberty cannot provide a blanket confirmation that it will pay all claims tendered to Roseburg arising from the Fire. But, for the reasons we discuss above, speculation regarding future potentially non-covered claims does not create an immediate, actual conflict of interest.

Additionally, whether an alleged damage constitutes "bodily injury" or "logger's property damage," as those terms are defined in the Policy, represents a pure legal issue – not one that

LIC0017943

## **Sheppard**Mullin

Scott P. DeVries
Rachel E. Hudgins
November 22, 2022
Page 6

appointed defense counsel can influence. For this reason too, your claim that the ROR Letter established a *Cumis*-creating conflict is unsupported.

### iii.    *Defense Costs, Claims Resolution And Exhaustion Of Limits.*

Your letter asserts that "there are any number of conflicts between Baker and Liberty" regarding defense costs, claims resolution and limits exhaustion. Assuming the alleged conflicts are actually between *Roseburg* (not Baker) and Liberty, even if they do exist, they do not create a right to independent counsel, as defense counsel does not control these issues. Rather, they consist of claims handling issues. "[W]here the reservation of rights is based on coverage disputes which have nothing to do with the issues being litigated in the underlying action, there is no conflict of interest requiring independent counsel." *Federal Ins. Co., supra,* 219 Cal.App.4th. at 42 (quoting *Foremost Ins. Co. v. Wilks,* 206 Cal.App.3d 251, 261 (1988)). Nevertheless, we wish to correct some of the assertions set forth in this section of your letter.

In its ROR Letter, Liberty advised Roseburg that it will "not pay for legal fees and costs unrelated to Roseburg's defense of the claims or lawsuits." At the time Liberty sent that letter, Baker was providing coverage advice to Roseburg, in addition to acting as Roseburg's defense counsel. Liberty simply reserved its right to decline to pay for fees and costs relating to Baker's coverage work, as well as any other work it may be performing for Roseburg unrelated to the defense of the lawsuits. Liberty understands its obligation to fully defend Roseburg in the lawsuits and intends to do so until the Policy is exhausted by the payment of covered claims.

With respect to claims resolution and the Community Relief Fund, since your October 7, 2022 letter, Liberty has tendered its $2 million per occurrence limit of liability for "bodily injury" and the $2 million per occurrence limit of liability for "Logger's Property Damage" to Roseburg toward a full and final global settlement and release of all claims against Roseburg and all other insureds under the Policy. In addition, on October 19, 2022, Roseburg asked Liberty to agree to fund settlements within a group of "Test Claimants." In response, Liberty advised Roseburg it will consent and agree to indemnify Roseburg towards "piecemeal" settlements up to the Policy's $2 million per occurrence limit of liability for "bodily injury" and the $2 million per occurrence limit of liability for "Logger's Property Damage" with Roseburg's understanding that it will remain exposed to "bodily injury" and "logger's property damage" claims by various other parties and claimants.

Those claims expose Roseburg to liability in excess of the Policy's limits of insurance, and may expose Roseburg to personal liability in excess of *all* applicable or available insurance. Thus, Liberty's response to Roseburg's request to reimburse it for Community Fund payments is no longer relevant, since Roseburg subsequently asked Liberty to pay its Policy limits toward other claims.

### 3.    Liberty's Conduct Has Not Prejudiced Roseburg.

Your letter asserts that Liberty's conduct has prejudiced Roseburg, but does not specifically explain how. For example, you claim that Liberty delayed in responding to Roseburg's notice of

LIC0017944

Exhibit 31, Page 007

**SheppardMullin**

Scott P. DeVries
Rachel E. Hudgins
November 22, 2022
Page 7

the claim.  Roseburg (through its broker) placed Liberty on notice of the Fire on September 6, 2022, four days after the Fire started and after it retained Baker.  Baker then tendered the *Hammond* lawsuit to Liberty by letter dated September 9, 2022, the *Smith* lawsuit by letter dated September 12, 2022, and the *Candasa* lawsuit by letter dated September 14, 2022.  Liberty timely responded to all three tenders on September 22, 2022.  Among other things, Liberty agreed to defend Roseburg in all three lawsuits and appointed defense counsel.  At no time did Liberty ever state that it would not immediately start defending Roseburg, or that it would defend anything less than 100% of each lawsuit.  Those facts negate any alleged prejudice to Roseburg.[3]

Roseburg also claims that Liberty had an opportunity to settle Robert Davies' claim before he filed suit.  But no one ever contacted Liberty to discuss Mr. Davies' claim before Mr. Davies filed suit.  Liberty first learned of the Davies claim when it received Mr. Chairez's October 4, 2022 letter transmitting Mr. Davies' complaint.  If you have any facts to suggest otherwise, please provide them.

Roseburg appears to claim that Mr. Davies filed his lawsuit because Liberty had not agreed to participate in the Relief Fund.  In reviewing Mr. Davies' complaint, it does not appear that the damages he seeks are the types of damages that Roseburg created the Relief Fund to pay.  Although Roseburg has since asked the carriers to cede their policy limits to it to fund substantive settlements, at the time of your October 7, 2022 letter, Liberty understood that the Relief Fund's purpose was to provide cash for the Weed and Lake Shastina residents' immediate needs, such as housing, clothing, food and transportation.  It is unclear how Liberty's approval of the Relief Fund would have precluded Mr. Davies from filing his lawsuit seeking other types of damages that would not have been paid from the Relief Fund.

Should you have any questions, or which to discuss further, please do not hesitate to contact us.

Sincerely,

*Mary E. Gregory*

Mary E. Gregory
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4854-4137-5546
cc:    Sarah Kaufman (sarah.kaufman@libertymutual.com)
        Jeffrey Crowe, Esq.
        Frank Falzetta, Esq.

---

[3]    We are not aware that Baker has submitted any post-tender/pre-acceptance invoices to Liberty for payment.  We invite you to forward those invoices to Liberty and our office for consideration.

LIC0017945

EXHIBIT 32

EXHIBIT 32

EXHIBIT 32

Message

| | |
|---|---|
| **From:** | DeVries, Scott [SDeVries@hunton.com] |
| **Sent:** | 11/22/2022 7:53:28 PM |
| **To:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa] |
| **CC:** | Keahey, Holly [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a17fe218cd7d4d2b97bd9db31a6c0031-Keahey, Hol]; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8487e97ba7a4212ba649a04cdaac7f9-Faddis, Chr]; vincent.sweeney@awac.com; Mary Gregory [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=useraef619e0]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955]; Lisa Fairchild [LisaF@rfpco.com]; Matthew Lawless [Matthew.Lawless@rfpco.com]; Attard, Lauren [lattard@bakerlaw.com]; Julian, Robert [rjulian@bakerlaw.com]; Dow, Dustin M. [ddow@bakerlaw.com] |
| **Subject:** | {EXTERNAL} RE: Mill Fire - Settlement |

This follows up on Ms. Lauren Attard's e-mail to you dated November 16 concerning represented claimants.

A mediation has now been scheduled for December 7 before Michael Ornstil. https://www.jamsadr.com/michael-ornstil/ In advance of that mediation, Roseburg anticipates settlement discussions with plaintiffs' counsel within the ranges provided in the attachment to Ms. Attard's e-mail. We assume that your position here would be the same as it is with respect to the unrepresented claimants: that insurers consent to settle the claims or, in the alternative, to waive the voluntary payments and consent provisions as respects these settlements. Insurers, of course, would reserve all other rights they otherwise might have. We would appreciate your confirming that you have the same position as respects both sets of claims. To the extent your position differs, please advise us of that as well.

Sincerely, Scott DeVries and Rachel Hudgins



**Scott P. DeVries**
Special Counsel
sdevries@HuntonAK.com
p  415.975.3720
m  707.888.7887

Hunton Andrews Kurth LLP
50 California Street
Suite 1700
San Francisco, CA 94111

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** Attard, Lauren <lattard@bakerlaw.com>
**Sent:** Wednesday, November 16, 2022 1:45 PM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>;

LIC0017946

vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; Julian, Robert <rjulian@bakerlaw.com>; Dow, Dustin M. <ddow@bakerlaw.com>; Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; McEvoy, Bob <rmcevoy@alixpartners.com>
**Subject:** Mill Fire - Settlement

# Redacted Per Sealing Order

Thank you.
Lauren

**Lauren Attard**
Counsel

**BakerHostetler**

LIC0017947

Exhibit 32, Page 002

11601 Wilshire Boulevard | Suite 1400
Los Angeles, CA 90025-0509
T +1.310.442.8896

lattard@bakerlaw.com
bakerlaw.com



**From:** Dow, Dustin M. <ddow@bakerlaw.com>
**Sent:** Monday, November 7, 2022 6:33 AM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P.
<tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren
<lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob
<rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly
<HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com;
Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>;
vincent.sweeney@awac.com
**Subject:** RE: P 413-291000-01 Mill Fire - Wrongful Death claims

Sarah,
Please see attached.

**Dustin Dow**
Partner

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



**From:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Sent:** Monday, November 07, 2022 8:52 AM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P.
<tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren
<lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob
<rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly
<HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com;
Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>;
vincent.sweeney@awac.com
**Subject:** RE: P 413-291000-01 Mill Fire - Wrongful Death claims

Good Morning Dustin,

Please provide us with a copy of the demand received from children of Mrs. Hilliard.

LIC0017948

Thank you,

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex
_____
Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

**How are we doing?**          **Send us a document**

The information contained in this email message and any attachments to this message are confidential and may be privileged or constitute attorney work product. If you are not the intended recipient, please (1) notify me immediately by replying to this message or calling 414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (3) destroy all copies of this message and attachments. A copy of our privacy notice can be obtained at our Privacy Policy website.

**From:** Dow, Dustin M. <ddow@bakerlaw.com>
**Sent:** Monday, November 07, 2022 7:33 AM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com
**Subject:** {EXTERNAL} RE: P 413-291000-01 Mill Fire - Wrongful Death claims

# Redacted Per Sealing Order

Redacted Per Sealing Order

**Dustin Dow**
Partner

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



---

**From:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Sent:** Wednesday, November 02, 2022 10:58 AM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com
**Subject:** Acc: P 413-291000-01 Mill Fire - Wrongful Death claims

[External Email: Use caution when clicking on links or opening attachments.]

Good Morning Dustin,

Please advise of the status of the investigation into the wrongful death claims. Do you think that the parties would be interested in an early mediation to attempt to resolve these losses?

Thank you,

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex

Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

LIC0017950

Exhibit 32, Page 005

How are we doing?        Send us a document

The information contained in this email message and any attachments to this message are confidential and may be privileged or constitute attorney work product. If you are not the intended recipient, please (1) notify me immediately by replying to this message or calling 414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (3) destroy all copies of this message and attachments. A copy of our privacy notice can be obtained at our Privacy Policy website.

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

LIC0017951

EXHIBIT 33

EXHIBIT 33

EXHIBIT 33

# BakerHostetler

Baker&Hostetler LLP

600 Anton Boulevard
Suite 900
Costa Mesa, CA 92626-7221

T 714.754.6600
F 714.754.6611
www.bakerlaw.com

Joseph L. Chairez
direct dial: 714.966.8822
jchairez@bakerlaw.com

November 22, 2022

Liberty Mutual Insurance
175 Berkley Street
Boston, MA 02116
(primary CGL policy)

Markel American Insurance Company
4521 Highwoods Parkway
Glen Allen VA 23060

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

Allied World Assurance Company (US) Inc.
ATTN: General Casualty
199 Water Street 24th Floor
New York, NY 10038

Everest National Insurance Company
Warren Corporate Center
100 Everest Way
Warren, NJ 07059

Liberty Mutual Insurance
175 Berkley Street
Boston, MA 02116
(excess liability policy)

Atlanta     Chicago     Cincinnati     Cleveland     Columbus     Costa Mesa     Dallas     Denver     Houston
Los Angeles     New York     Orlando     Philadelphia     San Francisco     Seattle     Washington, DC     Wilmington

LIC0017953

Re:   *Insured: Roseburg Forest Products Co. (subsidiary of RLC Industries Co.)*
      *Liability Claim: "Mill Fire"*
      *Date of Loss: September 2, 2022*

      *Policies: --Liberty Mutual primary CGL No. TB7-661-067089-031 (11-1-21 to 11-1-22)*
              *Liberty Claim No. P 413-291000*
          *--Markel Commercial Umbrella No. MKLM6MM70000398 (11-1-21 to 11-1-22)*
              *Markel Claim No. MXUL86123.*
          *--Chubb/Federal Insurance Co. Commercial Excess No. 7819-50-57 (11-1-21 to 11-1- 22)*
              *Chubb Claim No. 076922029278*
          *--Allied World Excess Liability No. 0311-5913 (11-1-21 to 11-1-22)*
              *Allied World Claim No. 2022021688*
          *--Everest National Commercial Excess No. XC2EX00126-211 (11-1-21 to 11-1- 22)*
              *Everest Claim No. 9-2489*
          *--Liberty Mutual Excess Liability No. ECO (22) 60 07 79 06 (11-1-21 to 11-1-22)*
              *Liberty Excess Claim No. 24056967*

Dear Insurance Carriers:

Since Roseburg's initial notice to you of the Mill Fire occurrence, Roseburg has received the attached complaint filed on November 18, 2022: *Dorothy Dixon, et al. v. Roseburg Forest Products Co, et al.,* San Francisco Superior Court, Case No. T-22-746 (the "Dixon lawsuit"). A copy of the complaint in the Dixon lawsuit is attached.

Pursuant to your respective policies, Roseburg is submitting the Dixon lawsuit to each carrier for defense and indemnity of both Roseburg and the individual defendants who are Roseburg employees. If additional pleadings or demands are received, we will promptly forward them to you. Please contact me if you have any questions.

Very truly yours,

*/s/ Joseph L. Chairez*

Joseph L. Chairez

Encl.

4865-2734-5216.1

LIC0017954

1 | Brett R. Parkinson (SBN: 230150)
2 | Email: brettp@potterhandy.com
   | Mark D. Potter (SBN: 166317)
3 | Email: mark@potterhandy.com
   | **PARKINSON BENSON POTTER**
4 | 100 Pine Street, Ste. 1250
5 | San Francisco, CA 94111
   | Phone: (858) 375-7385
6 | Fax: (888) 422-5191

7 | Bret D. Cook (SBN: 226489)
8 | Email: bretcook@frontiernet.net
   | **LAW OFFICE OF BRET D. COOK, P.C.**
9 | P.O. Box 425
   | Greenville, CA 95947
10 | Phone: (530) 313-7901
11 | Fax: (530) 280-4805

12 | Attorneys for Plaintiffs

13 | **SUPERIOR COURT OF CALIFORNIA**

14 | **COUNTY OF SAN FRANCISCO**

15 |

16 | DOROTHY DIXON, CLARK WRIGHT,     Case No.
   | KAREN WRIGHT, SOUN KAYARATH,
17 | SOMBOTH KAYARATH, DEBORAH     **COMPLAINT FOR DAMAGES**
   | DALTON, JILL DONNELLAN and
18 | HAMEDO MURPHY,     **JURY TRIAL DEMANDED**

19 |              1. **Negligence**
20 |       Plaintiffs,        2. **Trespass**
   | vs.                3. **Premises Liability**
21 |                4. **Nuisance**
   | ROSEBURG FOREST PRODUCTS CO., an   5. **Violation of Health and Safety**
22 | Oregon corporation; BENJAMIN           **Code Section 13007**
   | HORNSBY, an individual; JEFFERY LEE,
23 | an INDIVIDUAL, and DOES 1 through 100,
   | inclusive,
24 |
25 |       Defendants.

26 |

27 |      Plaintiffs hereby bring the following Complaint for damages against all Defendants and
28 |

            COMPLAINT FOR DAMAGES - 1

LIC0017955

DOES 1-100 ("Defendants"), as a result of the damages that Plaintiffs sustained in the Mill Fire that began on September 2, 2002. Plaintiffs allege as follows:

## INTRODUCTION

1.      This Complaint arises from a fire known as the "Mill Fire" that ravaged the area in and around Weed, California for 11 days in Siskiyou County.  The Mill Fire destroyed 118 structures, leveled the historic neighborhood of Lincoln Heights, burned more than 3,935 acres and tragically resulted in multiple fatalities before it was finally contained on September 13, 2022.



**Homes destroyed in the Mill Fire-Photo by Noah Berger, AP Photo**

2.      The Mill Fire ignited on September 2, 2022, at a mill (the "Mill") located at or near Woodridge Court and Woodridge Way in Weed, California. The Mill is owned and operated by ROSEBURG FOREST PRODUCTS CO. ("ROSEBURG").

3.      The Mill Fire resulted from ROSEBURG's deliberate failure to avoid the risk of

COMPLAINT FOR DAMAGES - 2

LIC0017956

fire caused by ROSEBURG's operations at the Mill.

4.      Plaintiffs are informed and believe, and thereon allege, that Defendants ROSEBURG and BENJAMIN HORNSBY ("HORNSBY"), ROSEBURG's Safety Manager for the Mill, and JEFFERY LEE ("LEE"), ROSEBURG's Operations Manager, as well as other individual employees and/or agents of ROSEBURG, or other persons or entities that supplied equipment or services for ROSEBURG's use at the Mill, whose identities are unknown to Plaintiffs at this time (and who, therefore, are sued herein as DOES), are responsible for causing the Mill Fire. Among other acts and omissions, Defendants failed to comply with even the most basic safety standards, instead conducting operations at the Mill in a reckless manner that they knew or should have known caused an unreasonable risk of catastrophic fire.

5.      The fire catastrophically impacted the local community and deeply affected Plaintiffs, taking an unimaginable emotional and physical toll on them in addition to destroying their homes, landscape, personal property, and community.

6.      Plaintiffs are homeowners, renters and other individuals whose property and lives were destroyed by the Mill Fire.  Plaintiffs now sue ROSEBURG, HORNSBY, LEE and Does 1-100 for just compensation for that immense destruction.

**JURISDICTION AND VENUE**

7.      This Court is a court of general jurisdiction and has subject matter jurisdiction over all causes of action alleged herein.

8.      This Court has personal jurisdiction over all parties to this action because Defendants, including ROSEBURG, have conducted significant business in the State of California so as to render the exercise of jurisdiction over Defendants by California courts reasonable and consistent with the traditional notions of fair play and substantial justice.

COMPLAINT FOR DAMAGES - 3

LIC0017957

9.      Venue is proper in this Court because, at all times relevant, Defendant

ROSEBURG was and is a foreign corporation, making venue proper in any county in California.

**THE PARTIES**

**A. PLAINTIFFS**

10.     Plaintiffs are individual residents of Weed, California and/or the surrounding

areas, who owned or rented properties that were destroyed or damaged by the Mill Fire. The

properties owned and/or occupied by Plaintiffs, or any of them, are collectively referred to herein

as "Plaintiffs' Properties" or "Plaintiffs' Property."

11.     From on or about September 2, 2022, and continuing through the present, Plaintiff

DOROTHY DIXON owned, occupied and had personal property located at 420 Cypress Street,

Weed, CA, APN: 060-163-080-000.  DIXON was a long-time resident of Lincoln Heights at the

time of the fire.  DIXON's home was only several hundred feet from the origin of the fire.  On or

about September 2, 2022, DIXON, 88 years old at the time, was home reading the bible when

she heard a large explosion.  Black smoke quickly consumed the neighborhood.  Fearing for her

life and worried that she would not make it out, DIXON grabbed her wallet and fled the fast-

approaching flames with only the clothes.  But for her pastor rescuing her, DIXON may have lost

her life.  DIXON incurred physical injuries during her evacuation.  Her home was completely

destroyed in the Mill Fire along with all of her personal property and she continues to struggle

with nightmares, PTSD, and related emotional trauma as a result of the destruction of her home

and the loss of her community.

12.     From on or about September 2, 2022, and continuing through the present,

Plaintiffs SOUN KAYARATH and SOMBOTH KAYARTH rented, occupied and had personal

property located at 386 Cypress Street, Weed CA, APN: 060-163-090-000 at the time of the Mill

COMPLAINT FOR DAMAGES - 4

LIC0017958

Fire. The KAYARATHS were in their backyard when they heard an explosion from the fire. When they looked up, their neighbor's house was already on fire and the fire was overhead by the time they got to their car. They narrowly escaped the flames, losing all of their possessions when the home they lived in was lost.

13.    From on or about September 2, 2022, and continuing through the present, Plaintiffs CLARK and KAREN WRIGHT owned, occupied and had personal property located at 5604 Palmer Drive, Weed, CA, APN 107-410-160-000 at the time of the Mill Fire. The WRIGHTS' home was completely destroyed in the Mill Fire along with substantial personal property.

14.    From on or about September 2, 2022, and continuing through the present, Plaintiff DEBORAH DALTON and JILL DONNELLAN owned, occupied and had personal property located at 17525 Marmot Road, Weed, CA, APN 107-280-070-000.  DALTON and DONNELLAN'S home was completely destroyed in the Mill Fire along with substantial personal property.

15.    From on or about September 2, 2022, and continuing through the present, Plaintiff HAMEDO MURPHY owned, occupied and had personal property located at 17827 Fisher Place, Weed, CA, APN 107-340-040-000.  MURPHY's home sustained substantial damage due to the Mill Fire.

**B. DEFENDANTS**

16.    Defendant ROSEBURG is, and was at all times relevant to this pleading, an Oregon corporation authorized to do business, and doing business, in California, with its headquarters in Springfield, Oregon.  At all times relevant to this pleading, ROSEBURG has manufactured wood products that are then supplied to members of the public in California and

COMPLAINT FOR DAMAGES - 5

LIC0017959

elsewhere throughout the United States.  ROSEBURG, among other things, conducts business operations in northern California at the Mill, which it uses as a veneer mill that produces engineered wood products from raw lumber.

17.     Defendant BENJAMIN HORNSBY is an employee of ROSEBURG and the Mill's Safety Manager, who resides and works in Weed, California. At all times relevant to the facts and circumstances alleged in this pleading, HORNSBY's job responsibilities included making sure that the Mill was operated safely and in accordance with all applicable safety standards.

18.     Defendant JEFFERY LEE is an employee of ROSEBURG and the Mill's Operations Manager, who resides and works in Weed, California. At all times relevant to the facts and circumstances alleged in this pleading, LEE's job responsibilities on the day of the Mill Fire included overseeing all Mill operations and making sure that the Mill was operated safely and in accordance with all applicable safety standards.

19.     The true names and capacities of defendants DOES 1 through 100 are currently unknown to Plaintiffs who, therefore, sue these defendants under these fictitious names pursuant to Code of Civil Procedure section 474. These defendants are each directly and/or vicariously responsible, in some manner, for the harms alleged herein.  If/when Plaintiffs learns these defendants' true names and capacities, Plaintiffs will seek leave to amend this pleading accordingly.

20.     "Defendants" refers collectively to ROSEBURG, HORNSBY, HORNSBY, and DOES 1 through 100.

21.     Plaintiffs are informed and believe that Defendants herein, and each of them, were at all times relevant hereto, the agent, servant, employee, partner, aider and abettor, contractor,

COMPLAINT FOR DAMAGES - 6

subcontractor, co-conspirator and/or joint venturer of each of the remaining Defendants named herein and were at all times operating and acting within the purpose, course and scope of said agency, service, employment, partnership, conspiracy, contract, alter ego and/or joint venture, and with the permission and consent of their co-Defendants. Each Defendant has rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct was wrongful and/or unlawful, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

**FACTS**

22.    Plaintiffs allege the following on information and belief.

23.    On or around September 2, 2022, the Mill Fire was started by Defendants at the Mill.

24.    On or around September 2, 2022, and for many months and years prior thereto, Defendants knew that ROSEBURG's operations at the Mill were being conducted in a reckless and dangerous manner. The dangers inherent in the Mill's operations were, or should have been, open and obvious to ROSEBURG and its employees, including HORNSBY and HORNSBY, for many months and years.

25.    In addition to producing wood veneer, ROSEBURG produces its own electricity at the Mill in a co-generation plan fueled by wood chips resulting in a byproduct of hot ash. The hot ash, if not properly cooled, is combustible and poses an obvious risk of fire.

26.    To make matters worse, ROSEBURG stored the hot ash in an area that was not adequately designed or intended for the storage of such ash. ROSEBURG used an aging wooden building that was close to 100 years old to store the ash. The hot ash had previously ignited fires at the Mill on a regular basis making the risk of fire a clear and ever-present danger.

COMPLAINT FOR DAMAGES - 7

LIC0017961

27.    ROSEBURG installed a fire suppression system in the building but the system was not in operation at the time the Mill Fire ignited.  Instead of spending the funds to fix the system, ROSEBURG relied on the ash-cooling system to properly function and on ROSEBURG employees to extinguish the fires. The wood building, the immediately adjacent structure and the surround vegetation represented abundant fuel for a fire.

28.    ROSEBURG knew of the residential properties surrounding the Mill, including the historic Lincoln Heights neighborhood that was only hundreds of feet from where the hot ash was stored.  Lincoln Heights had originally been company housing and most of the homes were older wooden structures laid out close together and thus more susceptible to fire.  ROSEBURG knew that any fire started in the Mill directly threatened the residents of Weed and the surrounding areas, especially those neighborhoods right next to the Mill.

29.    ROSEBURG also knew or should have known due to, among other things, its timber operations, that Siskiyou County is, and historically has been, categorized as a "Very High Fire Hazard Severity Zone" ("VHFHSZ") by Cal Fire.  ROSEBURG knew or should have known that the majority of Siskiyou County has been in either extreme drought or severe drought since 2016, increasing the danger in the area Defendants operate.

30.    In fact, ROSEBURG was specifically aware of the risk of fire in the area due to the nearby 2021 McKinney Fire just a month prior that burned over 60,000 acres and destroyed over 194 structures and caused multiple fatalities. ROSEBURG was also aware of the 2020 Slater Fire that ignited nearby and destroyed approximately 158,000 acres and over 200 structures.  ROSEBURG was also aware of the 2014 Boles Fire that ignited near Weed and burned over 150 structures, including many in Weed.

COMPLAINT FOR DAMAGES - 8

LIC0017962

31.    In addition to allowing the dangerous conditions and operations at the Mill to continue despite the unreasonable risk of fire, Defendants were or should have been aware of the hot, dry weather conditions that existed on September 2, 2022, and were or should have been aware of the need to exercise even greater precautions to prevent the ignition and spread of fire in the community, which they knew or should have known would quickly spread. The fire began during a Red Flag Warning.

32.    On September 2, 2022, as a direct result of the dangerous conditions described above, as well as Defendants' failure to take reasonable measures to eliminate or mitigate the dangerous conditions and the recklessness of the ongoing operations, a fire broke out at the Mill. The fire quickly spread to the nearby vegetation and then exploded into the nearby homes in Lincoln Heights, destroying homes and causing two deaths.

33.    Propelled by strong winds, the Mill Fire grew to 2,580 acres within hours, moving into the Lake Shastina and Edgewood communities.  After 11 days, the Mill Fire had destroyed 118 structures, burned 3,935 acres in addition to causing multiple fatalities.



**Lincoln Heights after the Fire- photo by Karl Mondon/Bay Area News Group**

COMPLAINT FOR DAMAGES - 9

LIC0017963

34.    For each of the reasons stated above, potentially among many others, Defendants breached their duty of reasonable care owed to Plaintiffs and the general public. Defendants' failure to exercise reasonable caution and prudence resulted in the Mill Fire and caused Plaintiffs to suffer substantial harms, including, but not limited to, destruction of and damage to real property, destruction of and damage to structures, destruction of and damage to personal property and cherished possessions, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, and emotional distress. The harms caused by Defendants are extensive and ongoing.

**FIRST CAUSE OF ACTION**
**Negligence**
**(Against All Defendants)**

35.    Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein at length.

36.    Defendants, and each of them, had a duty to operate, maintain, design, engineer, construct and repair the Mill in a reasonably safe and prudent manner commensurate with the risk of fire, and to take all precautions that a reasonably prudent person in their position would take to prevent ignition and spread of a fire. Defendants' duty included the duty to vigilantly oversee the operation, maintenance, design, engineering, construction and repair of the Mill in light of the risk of fire, including but not limited to the increased risk that a fire ignited at the Mill would spread uncontrollably due to changing geographic, weather, and ecological conditions into the residential structures next to the Mill in Lincoln Heights and into surrounding areas.

COMPLAINT FOR DAMAGES - 10

LIC0017964

37.     Storing ash from a co-generation plant involves a peculiar and inherent danger and risk of fire.  Defendants, and each of them, knew of that risk and knew that given the existing drought conditions and proximity of residential structures to the Mill, any failure to properly cool the ash would likely result in a fire and that such a fire was likely to pose a risk of serious injury, damage and/or death to the general public, including these Plaintiffs.

38.     Further, California Public Resources Code §4437 required Defendants to dispose the ash by methods which "effectively prevent the flammable material from constituting a fire hazard" to eliminate the potential of fire and to prevent any fire from escaping the storage or disposal area. California Public Resources Code §4440 required Defendants to only accumulate the ash in piles when the surrounding area is cleared and kept clear of all flammable vegetation and debris.

39.     Defendants, and each of them, negligently breached the duty of care they owed to Plaintiffs, by, among other things:

a.     Failing to maintain and operate the Mill in a reasonably prudent manner in order to avoid exposing neighboring properties to a risk of fire;

b.     Failing to conduct reasonably prompt, proper, and frequent inspections of the Mill, and the equipment, infrastructure used in the Mill's operations and clearance space around the ash storage area;

c.     Failing to reasonably monitor and maintain their property and operations in a manner that avoids igniting fires, especially during fire-prone weather conditions;

COMPLAINT FOR DAMAGES - 11

LIC0017965

d.  Failing to take steps reasonably necessary to prevent the fire that ignited on Defendants' property and spread into the community, especially given the recent history of fires that had ignited on the property;

e.  Failing to properly train and supervise Defendants' agents and/or employees responsible for operations and maintenance on the Mill property;

f.  Failing to implement and follow statutes and regulations and reasonably prudent practices to avoid fire ignition and spread;

g.  Failing to maintain proper clearance for flammable residue; and

h.  Failing to prevent the spread of fire from its premises to neighboring property.

40.  Defendants' failure to comply with applicable provisions of the statutes, regulations, orders and rules as alleged herein, is negligence per se because these statutes, regulations, orders, and rules are aimed at preventing the exact type of harm that Plaintiffs suffered.  Plaintiffs are within the class of individuals these statutes, orders, and rules were implemented to protect.

41.  Defendants' negligence was a substantial factor in causing Plaintiffs to suffer economic and non-economic damages including, but not limited to, destruction of and damage to real property, destruction of and damage to structures, destruction of and damage to personal property and cherished possessions, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, and emotional distress. Plaintiffs each seek damages to be determined on an individual basis, according to proof at trial.

COMPLAINT FOR DAMAGES - 12

LIC0017966

42.     Defendants, including one or more ROSEBURG officers, directors, and/or managers, acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about the Mill Fire. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants and deter such conduct in the future.

## SECOND CAUSE OF ACTION
### Trespass
**(Against all Defendants)**

43.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein at length.

44.     At all times relevant herein, Plaintiffs were the owners, tenants, and/or lawful occupiers of property damaged by the Mill Fire.

45.     Defendants negligently and/or recklessly allowed the Mill Fire to ignite and/or spread out of control, causing injury to Plaintiffs.  The spread of a negligently or recklessly caused fire to the land of another constitutes a trespass.

46.     Plaintiffs did not grant permission for Defendants to cause the Mill Fire to enter their properties.

47.     As a direct, proximate and substantial cause of the trespass, Plaintiffs have suffered and will continue to suffer damages, including but not limited to destruction of and /or damage to property, discomfort, annoyance, loss of enjoyment and emotional distress in an amount to be proved at the time of trial.

48.     Plaintiffs suffered damage to timber, trees, and/or underwood as a result of Defendants' trespass; accordingly, Plaintiffs seek treble or double damages for wrongful injuries

COMPLAINT FOR DAMAGES - 13

LIC0017967

to their property inclusive of timber, trees, or underwood, on their property as permitted by Civil Code section 3346.

49.     Defendants' conduct was willful and wanton, and with a conscious contempt and disdain for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct.  As a further direct and legal result of the conduct of Defendants, Plaintiffs seek exemplary damages against Defendants including punitive damages for injuries to Plaintiffs' animals as allowed under Code of Civil Procedure § 3340

### THIRD CAUSE OF ACTION
### Premises Liability
### (Against All Defendants)

50.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein at length.

51.     Defendant ROSEBURG and DOES 1-10 were, at all relevant times, the owner of the Mill, which was the origin of the Mill Fire.

52.     Defendants ROSEBURG and DOES 1-10 acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly maintain, control, manage, repair and/or inspect Mill and its ongoing operations, allowing an unsafe set of conditions presenting a foreseeable risk of fire danger to exist on said property.

53.     The risk of and danger presented by fire to the persons and property surrounding the Mill was reasonably foreseeable to ROSEBURG and DOES 1-10.

54.     As a direct result of the wrongful acts and/or omissions of Defendants ROSEBURG and DOES 1-100, Plaintiffs suffered, and continue to suffer, the injuries and/or damages described herein.

COMPLAINT FOR DAMAGES - 14

LIC0017968

Exhibit 33, Page 016

55.     As alleged herein, Defendants, including ROSEBURG and one or more of its

officers, directors, and/or managers, allowed ongoing operations at the Mill to occur in a reckless

and dangerous manner that prioritized profits over safety. This is despicable, malicious, and

oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish

Defendants and to deter such conduct in the future.

### FOURTH CAUSE OF ACTION
### Nuisance
### (Against all Defendants)

56.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully

set forth herein at length.

57.     Plaintiffs own and/or occupy real property at or near the site of the Mill Fire.

Plaintiffs have a right to own, enjoy and/or use of their property without interference by

Defendants, and each of them.

58.     Defendants, and each of them, by acting or failing to act, as alleged herein,

created a condition or permitted a condition to exist which was harmful to the health; offensive

to the senses; obstructed the free use of property so as to interfere with the comfortable

enjoyment of life and property; unlawfully obstructed the free passage or us, in the customary

manner, of public streets and highways; and a completely predictable fire hazard.

59.     Plaintiffs did not consent, expressly or impliedly, to the conduct of Defendants

and each of them.

60.     The dangerous condition(s) which was/were created by and/or allowed to exist by

Defendants, and each of them, affected a substantial number of people within the general public

at the same time, including these Plaintiffs.

COMPLAINT FOR DAMAGES - 15

LIC0017969

61.     A reasonable ordinary person would be reasonably annoyed or disturbed by the condition created by the actions or inactions of the Defendants, and each of them, and the resulting fire.

62.     The conduct of Defendants, and each of them, is unreasonable and the seriousness of the harm to the public, including these Plaintiffs, outweighs the social utility of Defendants' actions or inactions.

63.     Defendant's actions or inactions were a substantial factor in causing Plaintiffs' harm. As a result of Defendant's conduct, Plaintiffs suffered a type of harm that is different from the type of harm suffered by the general public. Specifically, Plaintiffs have lost the use and enjoyment of their land, including, but not limited to, a legitimate and rational fear that the area is still dangerous, and/or diminution in the fair market value of their property, and/or impairment of the salability of their property, and/or exposure to an array of toxic substances on their land, and/or a lingering smell of smoke, and/or constant soot, ash, and dust in the air.

64.     As a further legal result of the conduct of Defendants, and each of them, Plaintiffs have suffered, and will continue to suffer, discomfort, anxiety, fear, worries, and stress attendant to the interference with Plaintiffs' use and enjoyment of their property, as alleged herein.

65.     Defendants' conduct resulting in this fire is not an isolated incident, but is ongoing and repeated course of conduct, and Defendants' conduct and failures have resulted in other fires and damage to the public.

66.     Defendants' unreasonable conduct is a direct, proximate and legal cause of condition and the damage to the public, including Plaintiffs.

67.     The conduct of Defendants, and each of them, constitutes a nuisance within the meaning of section 3479 of the Civil Code in that it is injurious and/or offensive to the senses of

COMPLAINT FOR DAMAGES - 16

LIC0017970

Exhibit 33, Page 018

Plaintiffs and/or unreasonably interferes with their comfortable enjoyment of their properties and/or unlawfully obstructs the free use, in the customary manner, of Plaintiffs' properties, including, but not limited to, all residential uses.

68.     Defendants, including one or more ROSEBURG officers, directors, and/or managers, have deliberately, and repeatedly, prioritized profits over safety.  That is, Defendants have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Mill Fire.  This is despicable and oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of prioritizing profits over safety and to deter such conduct in the future.

<div align="center">

**FIFTH CAUSE OF ACTION**
**Violation of Health & Safety Code §13007**
**(Against All Defendants)**

</div>

69.     Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

70.     By engaging in the acts and omissions alleged in this Complaint, Defendants, and each of them, willfully, negligently, and in violation of law, set fire to and/or allowed fire to be set to the property of another in violation of California Health & Safety Code § 13007.

71.     As a legal result of Defendants' violation of California Health & Safety Code §13007, Plaintiffs suffered recoverable damages to property under California Health & Safety Code § 13007.

72.     As a further legal result of the violation of California Health & Safety Code §13007 by Defendants, some Plaintiffs suffered damages that are entitled to reasonable attorney

<div align="center">

COMPLAINT FOR DAMAGES - 17

</div>

LIC0017971

fees under California Code of Civil Procedure § 1021.9 for the prosecution of this cause of action.

73.    Defendants, including one or more ROSEBURG officers, directors, and/or managers, have deliberately, and repeatedly, prioritized profits over safety.  That is, Defendants have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Mill Fire.  This is despicable and oppressive conduct.  Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of prioritizing profits over safety and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, ROSEBURG CORPORATION, PACIFIC GAS & ELECTRIC COMPANY, and DOES 1 through 100, each of them, as follows:

1.    Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

2.    Loss of the use, benefit, goodwill, and enjoyment of Plaintiffs' real and/or personal property;

3.    Loss of wages, earning capacity and/or business profits or proceeds and/or any related displacement expenses;

4.    Past and future medical expenses and incidental expenses according to proof at trial;

5.    Attorney fees, expert fees, consultant fees, and litigation costs and expense, as allowed under California Code of Civil Procedure, Section 1021.9;

COMPLAINT FOR DAMAGES - 18

LIC0017972

1    6.    All costs of suit;

2    7.    Prejudgment interest, according to proof;

3
4    8.    For punitive and exemplary damages against ROSEBURG in an amount

5        sufficient to punish Defendants' conduct and deter similar conduct in the

6        future, as allowed under Public Utilities Code section 2106 and all other

7        applicable law; and

8
9    9.    General damages for fear, worry, annoyance, disturbance, inconvenience,

10       mental anguish, emotional distress, loss of quiet enjoyment of property,

11       personal injury, and for such other and further relief as the Court shall deem

12       proper, all according to proof.

13

14                  **Parkinson Benson & Potter**

15  DATED: November 18, 2022

16                  By:_____

17                    Brett R. Parkinson
                       Attorneys for Plaintiffs

18

19  DATED: November 18, 2022       **Law Office of Bret D. Cook, P.C.**

20                  By:_____

21                    Bret D. Cook
                       Attorneys for Plaintiffs

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES - 19

LIC0017973

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues of which trial by jury is permitted by law.

**Parkinson Benson & Potter**

DATED:  November 18, 2022

By:_____

Brett R. Parkinson
Attorneys for Plaintiffs

**Law Office of Bret D. Cook, P.C.**

DATED:  November 18, 2022

By:_____

Bret D. Cook
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES - 20

LIC0017974

EXHIBIT 34

EXHIBIT 34

EXHIBIT 34

| From: | David Bona [dbona@ccplaw.com] |
|---|---|
| Sent: | 11/28/2022 1:31:41 PM |
| To: | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa] |
| Subject: | {EXTERNAL} RE: RLC Industries Co. - Date of Loss 9/2/2022 - Claim # P 413-291000 |

I will reach out to them this morning.

**From:** Kaufman, Sarah [mailto:SARAH.KAUFMAN@LibertyMutual.com]
**Sent:** Monday, November 28, 2022 5:15 AM
**To:** David Bona
**Subject:** FW: RLC Industries Co. - Date of Loss 9/2/2022 - Claim # P 413-291000

Good Morning David,

Please see the new summons and complaint I have enclosed. Please reach out to Baker and determine if you should prepare and file the responsive pleadings.

Thank you,

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex

Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

How are we doing?                     Send us a document

The information contained in this email message and any attachments to this message are confidential and may be privileged or constitute attorney work product. If you are not the intended recipient, please (1) notify me immediately by replying to this message or calling 414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (3) destroy all copies of this message and attachments. A copy of our privacy notice can be obtained at our Privacy Policy website.

**From:** Steven Hurley <Steven.Hurley@alliant.com>
**Sent:** Wednesday, November 23, 2022 12:58 PM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Subject:** {EXTERNAL} RLC Industries Co. - Date of Loss 9/2/2022 - Claim # P 413-291000

Hi Sarah,

Please see the additional complaint that has been received related to the mill fire.

-Steve

**Steven Hurley**
Vice President, Claims Advocate - Lead
Alliant Specialty
805 SW Broadway Ste 480
Portland OR 97205

**D** (503) 444-6731
**C** (503) 729-3483

LIC_0028644

Exhibit 34, Page 001

**E** Steven.Hurley@Alliant.com
Alliant.com

**Alliant**

Alliant Insurance Services, Inc.
CA License No. 0C36861

This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This email may also contain information that is confidential, or otherwise protected from disclosure by contract or law. Any unauthorized use, disclosure, or distribution of this email and its attachments is prohibited. If you are not the intended recipient, let us know by reply email and then destroy all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.

LIC_0028645

EXHIBIT 35

EXHIBIT 35

EXHIBIT 35

Message

| From: | Weatherford, Victoria L. [vweatherford@bakerlaw.com] |
|---|---|
| Sent: | 11/28/2022 12:37:09 PM |
| To: | David Bona [dbona@ccplaw.com]; Dow, Dustin M. [ddow@bakerlaw.com] |
| CC: | Attard, Lauren [lattard@bakerlaw.com]; Fischbach, Ryan D. [rfischbach@bakerlaw.com] |
| Subject: | RE: Mill Fire: New Complaint |

Hi David,

Hope you had a very nice Thanksgiving. Yes, we saw that another lawsuit has been filed. Roseburg has not been served yet, so we don't currently have a deadline to do anything. Given that Jeff and Ben have also been sued, we currently don't think we have a basis to remove the case and are not planning on doing a "snap" removal before we have been served, but will wait to see if the plaintiff chooses to serve us and then re-evaluate from there.

Thanks for the offer on a responsive pleading, but we're holding off for now on drafting anything until we are served (if we ever are).

I am cc'ing Ryan as I am heading into a trial and Ryan is stepping in to my role for this matter. Please begin directing communications to him.

Best,

Victoria

**Victoria Weatherford**
Partner

BakerHostetler
Transamerica Pyramid Center
600 Montgomery Street | Suite 3100
San Francisco, CA 94111-2806
T +1.415.659.2634

vweatherford@bakerlaw.com
bakerlaw.com
 

**From:** David Bona <dbona@ccplaw.com>
**Sent:** Monday, November 28, 2022 7:39 AM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>; Weatherford, Victoria L. <vweatherford@bakerlaw.com>
**Cc:** Attard, Lauren <lattard@bakerlaw.com>
**Subject:** RE: Mill Fire: New Complaint

[External Email: Use caution when clicking on links or opening attachments.]

Dustin and Victoria,
I understand that another complaint was filed in San Francisco Superior court.
Is the plan to try to remove this case even though the two Roseburg employees are residents of California?
Would you like my office to prepare an answer or other responsive pleading?

LIC0017977

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

LIC0017978

EXHIBIT 36

EXHIBIT 36

EXHIBIT 36

| From: | Kaufman, Sarah [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=48109347E6F24467B4543F8D692501AB-KAUFMAN, SA] |
|---|---|
| Sent: | 12/1/2022 5:57:46 PM |
| To: | David Bona [dbona@ccplaw.com] |
| Subject: | RE: Mill Fire: Confidential mediation update |

**Importance:** High

Good Morning David,

This is new to us as well, are you able to attend on our behalf?

Please let me know.

Thank you,

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex

Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

How are we doing?　　　　　Send us a document

The information contained in this email message and any attachments to this message are confidential and may be privileged or constitute attorney work product. If you are not the intended recipient, please (1) notify me immediately by replying to this message or calling 414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (3) destroy all copies of this message and attachments. A copy of our privacy notice can be obtained at our Privacy Policy website.

**From:** David Bona <dbona@ccplaw.com>
**Sent:** Wednesday, November 30, 2022 7:14 PM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Subject:** {EXTERNAL} Fw: Mill Fire: Confidential mediation update

Sarah,

Were you aware this mediation was in the works? This is the first I have heard of it.

It looks like they intend to settle well into the available insurance limits. Can we talk in the morning about what, if anything, you need from me in advance of the mediation?

**From:** Dow, Dustin M. <ddow@bakerlaw.com>
**Sent:** Wednesday, November 30, 2022 4:45 PM
**To:** Keahey, Holly; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; SARAH.KAUFMAN@LibertyMutual.com
**Cc:** Julian, Robert; Attard, Lauren; Matthew Lawless; Lisa Fairchild; David Bona; Hudgins, Rachel; Scott DeVries
**Subject:** Mill Fire: Confidential mediation update

*Re: Roseburg Forest Products/Mill Fire*

Everyone,

Please see the attached confidential correspondence and enclosures concerning the December 7 mediation.

**Dustin Dow**
Partner

BakerHostetler
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content
of this email is limited to the matters specifically addressed herein
and may not contain a full description of all relevant facts or a
complete analysis of all relevant issues or authorities

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

LIC_0033324

EXHIBIT 37

EXHIBIT 37

EXHIBIT 37

| | |
|---|---|
| **From:** | David Bona [dbona@ccplaw.com] |
| **Sent:** | 12/1/2022 11:46:46 PM |
| **To:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa] |
| **Subject:** | {EXTERNAL} FW: Mill Fire: Confidential mediation update |
| **Attachments:** | In Re Mill Fire Confidentiality Agreement Docusign.pdf |

I will sign and return this.

**From:** Hudgins, Rachel [mailto:RHudgins@hunton.com]
**Sent:** Thursday, December 1, 2022 3:02 PM
**To:** David Bona
**Cc:** Julian, Robert; Dow, Dustin M.; Keahey, Holly; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; SARAH.KAUFMAN@LibertyMutual.com; Attard, Lauren; Matthew Lawless; Lisa Fairchild; DeVries, Scott
**Subject:** RE: Mill Fire: Confidential mediation update

David,

The mediation with Michael Ornstil is taking place at the JAMS Downtown San Francisco office (2 Embarcadero Ctr., Ste 1500) beginning at 9:30 a.m., Tuesday, December 7th. We appreciate and look forward to your attendance on behalf of Liberty Mutual. To ensure that Roseburg is speaking with one voice at the mediation, we respectfully ask that you limit your role accordingly. Baker Hostetler will be representing Roseburg at the mediation.

Attached is a confidentiality agreement that all attendees must sign. Can you please sign and return it to us at your earliest convenience so that we may proceed with finalizing the mediation logistics?

Kind regards,
Rachel



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p  404.888.4110

Hunton Andrews Kurth LLP
Bank of America Plaza, Ste. 4100
600 Peachtree Street, N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** David Bona <dbona@ccplaw.com>
**Sent:** Thursday, December 1, 2022 1:29 PM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; SARAH.KAUFMAN@LibertyMutual.com

**Cc:** Julian, Robert <rjulian@bakerlaw.com>; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; Hudgins, Rachel <RHudgins@hunton.com>; DeVries, Scott <SDeVries@hunton.com>
**Subject:** RE: Mill Fire: Confidential mediation update

Caution: This email originated from outside of the firm.

Dustin,

I have been asked to attend the mediation for Liberty Mutual Insurance and RLC/Roseburg Forest Products.
Please send me the details for the mediation, including the start time, the location and the mediator's name.
Thank you,


**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*One Post Street, Suite 500*
*San Francisco, California 94104*
*Direct Dial:    415.391.9857*
*Cellular:      415.218.4156*
*Website:*  www.ccplaw.com




**From:** Dow, Dustin M. [mailto:ddow@bakerlaw.com]
**Sent:** Wednesday, November 30, 2022 4:45 PM
**To:** Keahey, Holly; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; SARAH.KAUFMAN@LibertyMutual.com
**Cc:** Julian, Robert; Attard, Lauren; Matthew Lawless; Lisa Fairchild; David Bona; Hudgins, Rachel; Scott DeVries
**Subject:** Mill Fire: Confidential mediation update

*Re: Roseburg Forest Products/Mill Fire*
Everyone,

Please see the attached confidential correspondence and enclosures concerning the December 7 mediation.

**Dustin Dow**
Partner

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying

or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in their email is for information purposes only. The content
of this email is limited to the matters specifically addressed herein
and may not contain a full description of all relevant facts or a
complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

LIC_0028952

Exhibit 37, Page 003

EXHIBIT 38

EXHIBIT 38

EXHIBIT 38

Message

| | |
|---|---|
| **From**: | Mary Gregory [MGregory@sheppardmullin.com] |
| **Sent**: | 12/1/2022 4:01:34 PM |
| **To**: | DeVries, Scott [SDeVries@hunton.com]; Hudgins, Rachel [RHudgins@hunton.com] |
| **CC**: | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Keahey, Holly [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a17fe218cd7d4d2b97bd9db31a6c0031-Keahey, Hol]; Faddis, Christopher [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8487e97ba7a4212ba649a04cdaac7f9-Faddis, Chr]; ddow@bakerlaw.com; Frank Falzetta [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955] |
| **Subject**: | [EXTERNAL] Roseburg/Mill Fire - Upcoming Mediation |

Dear Scott and Rachel:

This responds to your email below on behalf of Liberty Insurance Corporation ("Liberty") and Ohio Casualty Insurance Company ("Ohio Casualty"). We have included Mr. Dow in our response since he asked the same questions in his letter to the carriers sent last night.

As you know, Liberty previously tendered its full $2 million per occurrence limit for "bodily injury" and the Logger Endorsement's full $2 million logger's each occurrence limit of insurance for "logger's property damage" toward a full and final global settlement and release of all claims against Roseburg and all other insureds under Commercial General Liability Policy No. TB7-661-067089-031. Liberty will also agree to tender these limits towards settlement of the "represented claimants'" claims, should Roseburg request that it do so at the December 7, 2022 mediation.

To the extent Roseburg uses all or part of Liberty's $2 million per occurrence limit for "bodily injury" to settle "represented claimants" claims, Liberty has required Medicare and other lien language that must be included in any settlement and release agreement. Liberty and David Bona will need to review any settlement agreement and release to which Liberty is contributing funds (either "bodily injury" or "logger's property damage") before the agreement is finalized.

As before, we ask Roseburg to acknowledge that it understands that such a piecemeal settlement of claims will expose Roseburg to liability in excess of the Liberty Policy's limits of insurance, and may expose Roseburg to personal liability in excess of all applicable or available insurance.

Finally, to the extent there is coverage under the Ohio Casualty policy (which remains under investigation and under which there may be no coverage at all), Ohio Casualty agrees that it will not assert the "no voluntary payments/consent" provision in its policy as a ground to

LIC0018039

object to or otherwise challenge a settlement with the "represented claimants." Ohio
Casualty reserves all other rights and defenses under the policy.

Sincerely,
Mary Gregory

**Mary E. Gregory** | Special Counsel
+1 213-617-5426 | direct
MGregory@sheppardmullin.com | Bio

**Sheppard**Mullin
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com | LinkedIn | Twitter

**From:** DeVries, Scott <SDeVries@hunton.com>
**Sent:** Tuesday, November 22, 2022 7:53 PM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com;
Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>;
vincent.sweeney@awac.com; Mary Gregory <MGregory@sheppardmullin.com>; Jeffrey Crowe
<JCrowe@sheppardmullin.com>; Lisa Fairchild <LisaF@rfpco.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>;
Attard, Lauren <lattard@bakerlaw.com>; Julian, Robert <rjulian@bakerlaw.com>; Dow, Dustin M.
<ddow@bakerlaw.com>
**Subject:** RE: Mill Fire - Settlement

This follows up on Ms. Lauren Attard's e-mail to you dated November 16 concerning represented claimants.

A mediation has now been scheduled for December 7 before Michael Ornstil. https://www.jamsadr.com/michael-
ornstil/ In advance of that mediation, Roseburg anticipates settlement discussions with plaintiffs' counsel within the
ranges provided in the attachment to Ms. Attard's e-mail. We assume that your position here would be the same as it is
with respect to the unrepresented claimants: that insurers consent to settle the claims or, in the alternative, to waive the
voluntary payments and consent provisions as respects these settlements. Insurers, of course, would reserve all other
rights they otherwise might have. We would appreciate your confirming that you have the same position as respects both
sets of claims. To the extent your position differs, please advise us of that as well.

Sincerely, Scott DeVries and Rachel Hudgins



**Scott P. DeVries**
Special Counsel
sdevries@HuntonAK.com
p 415.975.3720
m 707.888.7887

Hunton Andrews Kurth LLP
50 California Street
Suite 1700
San Francisco, CA 94111

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and
backups.

LIC0018040

**From:** Attard, Lauren <lattard@bakerlaw.com>
**Sent:** Wednesday, November 16, 2022 1:45 PM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; Julian, Robert <rjulian@bakerlaw.com>; Dow, Dustin M. <ddow@bakerlaw.com>; Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; McEvoy, Bob <rmcevoy@alixpartners.com>
**Subject:** Mill Fire - Settlement

# Redacted Per Sealing Order

LIC0018041

# Redacted Per Sealing Order

Thank you.
Lauren

**Lauren Attard**
Counsel

**Baker**Hostetler
11601 Wilshire Boulevard | Suite 1400
Los Angeles, CA 90025-0509
T +1.310.442.8896

lattard@bakerlaw.com
bakerlaw.com



**From:** Dow, Dustin M. <ddow@bakerlaw.com>
**Sent:** Monday, November 7, 2022 6:33 AM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com
**Subject:** RE: P 413-291000-01 Mill Fire - Wrongful Death claims

Sarah,
Please see attached.

**Dustin Dow**
Partner

**Baker**Hostetler
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



**From:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Sent:** Monday, November 07, 2022 8:52 AM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren

<lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob
<rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly
<HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com;
Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>;
vincent.sweeney@awac.com
**Subject:** RE: P 413-291000-01 Mill Fire - Wrongful Death claims

Good Morning Dustin,

Please provide us with a copy of the demand received from children of Mrs. Hilliard.

Thank you,

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex

Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

How are we doing?        Send us a document

The information contained in this email message and any attachments to this message are confidential and may be privileged or
constitute attorney work product. If you are not the intended recipient, please (1) notify me immediately by replying to this message or
calling 414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment, and (3) destroy
all copies of this message and attachments. A copy of our privacy notice can be obtained at our Privacy Policy website.

**From:** Dow, Dustin M. <ddow@bakerlaw.com>
**Sent:** Monday, November 07, 2022 7:33 AM
**To:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P.
<tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren
<lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob
<rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly
<HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com;
Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>;
vincent.sweeney@awac.com
**Subject:** {EXTERNAL} RE: P 413-291000-01 Mill Fire - Wrongful Death claims

# Redacted Per Sealing Order

LIC0018043

We are also aware that Lorenza Glover, 63, died while attempting to flee the Mill Fire. Her son is Russ Reiner. While we have not received a formal demand, we believe Reiner would be interested in mediating claims related to Ms. Glover's death. We do anticipate receiving a demand from Reiner in the near future.

# Redacted Per Sealing Order

**Dustin Dow**
Partner

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



**From:** Kaufman, Sarah <SARAH.KAUFMAN@LibertyMutual.com>
**Sent:** Wednesday, November 02, 2022 10:58 AM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>
**Cc:** Chairez, Joseph <jchairez@bakerlaw.com>; Bator, Chris <CBator@bakerlaw.com>; Petre, Timothy P. <tpetre@bakerlaw.com>; Divok, Eva <edivok@bakerlaw.com>; Lisa Fairchild <LisaF@rfpco.com>; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Scott DeVries <SDeVries@hunton.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com
**Subject:** Acc: P 413-291000-01 Mill Fire - Wrongful Death claims

[External Email: Use caution when clicking on links or opening attachments.]

Good Morning Dustin,

Please advise of the status of the investigation into the wrongful death claims.   Do you think that the parties would be interested in an early mediation to attempt to resolve these losses?

Thank you,

LIC0018044

**SARAH KAUFMAN**
Sr Tech Claims Specialist II
Central West Region Complex

Liberty Mutual Insurance | Helmsman Management Services
Milwaukee, WI
Office: 414-290-4484

How are we doing?    Send us a document

The information contained in this email message and any attachments to this message are
confidential and may be privileged or constitute attorney work product. If you are not the
intended recipient, please (1) notify me immediately by replying to this message or calling
414-290-4484, (2) do not use, disseminate, distribute or reproduce any part of the message
or any attachment, and (3) destroy all copies of this message and attachments. A copy of
our privacy notice can be obtained at our Privacy Policy website.

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content
of this email is limited to the matters specifically addressed herein
and may not contain a full description of all relevant facts or a
complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If
you received this transmission in error, please notify the sender by reply e-mail and delete the message and any
attachments.

LIC0018045

EXHIBIT 39

EXHIBIT 39

EXHIBIT 39



HUNTON ANDREWS KURTH LLP
50 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CALIFORNIA 94111

TEL   415 • 975 • 3700
FAX  415 • 975 • 3701

SCOTT P. DEVRIES
DIRECT DIAL: 415 • 975 • 3720
EMAIL: sdevries@HuntonAK.com

RACHEL E. HUDGINS
DIRECT DIAL: 404 • 888 • 4110
EMAIL: rhudgins@HuntonAK.com

December 21, 2022

*Via Email*

Mary E. Gregory, Esq.
Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
mgregory@sheppardmullin.com

     **Re:**   Insured:     Roseburg Forest Products Co.
             Policy No.:  TB7-661-067089-031
             Claim No.:  P 413-291000

Dear Ms. Gregory:

We respond on Roseburg Forest Products Co.'s behalf to your November 22, 2022, letter sent on behalf of Liberty Insurance Corporation. While your letter makes several characterizations and assertions, we limit our response to the issues of Liberty's appointment of David Bona and Carlson, Callandine & Peterson, Roseburg's enduring right to independent counsel, and its selection of BakerHostetler for that role.

***Liberty's Retention of and Roseburg's Cooperation with David Bona and Carlson, Callandine & Peterson***

Roseburg provided its insurers with notice of the Mill Fire on September 6, 2022. While Liberty initially indicated that it was amenable to Roseburg being represented by BakerHostetler, it reversed course on September 22, 2022, advising that it was reserving rights and appointing David Bona with Carlson, Callandine & Peterson to represent Roseburg. Roseburg did not agree to Mr. Bona's representation. Instead, in our October 7, 2022, letter to Liberty, we

LIC0021645
CTRL00000982_0001
Exhibit 39, Page

Mary E. Gregory, Esq.
Sheppard, Mullin, Richter & Hampton LLP
December 21, 2022
Page 2

questioned the Carlson firm's capacity to handle this matter. We also raised several conflicts of interest that entitle Roseburg to independent counsel. While awaiting Liberty's decision about whether to appoint independent counsel, Baker continued to represent Roseburg, but Roseburg cooperated with Mr. Bona. For instance, Roseburg agreed to and welcomed Mr. Bona's presence at mediation as Liberty's representative, while BakerHostetler represented Roseburg's interests. We understand that Mr. Bona kept Liberty apprised of developments throughout the day. It was not until your November 22, 2022, letter that Liberty purported to waive all conflicts and give Roseburg the "final word" on Liberty's appointment of Mr. Bona.

Roseburg still questions the Carlson firm's capacity and its capability to adequately defend Roseburg. Since we last wrote to you, the number of claims or potential claims against Roseburg has increased many-fold from 150 to 1,000 (and more when unrepresented claimants are considered). Even if the Carlson firm, which has nine attorneys, two of whom practice fire law, has the requisite capacity to adequately handle some aspects of some fire claims, that surely is not the case here. Your letter does not address Roseburg's concerns of capacity and adequate representation at all.[1]

Your letter says that Roseburg also questioned Mr. Bona's experience, but it did not. Nonetheless, your letter cites Mr. Bona's "over 20 years of experience in defending clients in high exposure, complex, wildfire cases." Mr. Bona, in an

---

[1] To be clear, the other seven lawyers at Carlson are not fire lawyers, they are insurance coverage specialists, representing liability and other insurers in lawsuits against policyholders like Roseburg. Carlson's website proclaims, "Insurance partners at Carlson, Calladine & Peterson LLP have more than 100 years of collective experience handling complex liability . . . insurance coverage issues in civil suits, arbitrations, and regulatory proceedings." So, even if the remaining seven attorneys did have fire experience which they don't, their representation of insurers who are opposing policyholders like Roseburg, likely on similar issues to those presented here, would conflict them out of working with Roseburg. Moreover, there are substantial issues concerning whether Carlson's insurance industry practice conflicts the entire firm out of representing policyholders with claims against insurers similarly situated to their clients. Since Roseburg is entitled to independent counsel and has selected Baker, it is sufficient at this juncture to state that Roseburg has not waived conflicts associated with Carlson.

Mary E. Gregory, Esq.
Sheppard, Mullin, Richter & Hampton LLP
December 21, 2022
Page 3

email to our firm, also described his firm as having "represented clients in large, multiparty wildland fire litigation, defending "numerous wildland fire cases," and having a "long history of defending wildfire cases." (Email from D. Bona to S. DeVries (Dec. 5, 2022).)

This is not a wildfire case. Liberty and Mr. Bona's continued mischaracterization of this matter not only ignores the facts surrounding the Mill Fire itself, it goes to the heart of the conflict between Roseburg and its insurers, and does an extreme disservice to Roseburg's coverage position.

### *Liberty and Mr. Bona's Characterization of this Mill Fire as a "Wildfire" Creates Another Conflict of Interest*

The Mill Fire began in a shed at Roseburg's veneer mill in Weed, California, hence the fire's name. It damaged the mill and demolished homes and other structures in the town of Weed and the surrounding communities, as we have explained previously. It was an urban structural fire; not a "non-structure fire that occur[ed] in vegetation and natural fuels" (National Park Service www.nps.gov/orgs/1965/wildfires-prescribed-fires-fuels.htm) (Similarly, "A fire that starts, usually by itself, in a wild area such as a forest, and spreads rapidly, causing great damage" (collinsdictionary.com), or "a fire in a wild area (such as a forest) that is not controlled and that can burn a large area very quickly" (britannica.com)).

The distinction matters, because Everest National Insurance Company, one of Roseburg's excess insurers, contends that its Wildfire Exclusion Endorsement may preclude coverage for the Mill Fire. Roseburg does not agree that the Wildfire Exclusion Endorsement applies to the Mill Fire on a factual or legal basis, but Everest has reserved its rights on the issue all the same. Enclosed is a copy of Everest's reservation of rights letter.

Liberty's sister company, The Ohio Casualty Insurance Company, issued Roseburg an excess policy on Liberty paper. The Liberty excess policy has a Following Form Endorsement that purports to adopt "the exact terms and conditions" of the Everest policy. Although we have not received a formal coverage position from Liberty excess (despite providing notice of the claim over three months ago), on December 1, 2022, Liberty excess advised that coverage under that policy "remains under investigation" and "there may be no coverage at

Mary E. Gregory, Esq.
Sheppard, Mullin, Richter & Hampton LLP
December 21, 2022
Page 4

all." (Email from M. Gregory to S. DeVries (Dec. 1, 2022).) Liberty excess reserved "all other rights and defenses under the policy." Although Liberty excess has not "formally" reserved rights under the Wildfire Exclusion Endorsement, the lack of a formal coverage position would be a hypertechnical, unconvincing excuse to avoid acknowledging a known conflict of interest. After all, delinquent claims communications are one hallmark of unfair claims settlement practices, *see* Cal. Ins. Code §790.03(h)(2). Please let us know what information Liberty excess needs to complete its coverage investigation. Or if Liberty excess intends to waive the Wildfire Exclusion Endorsement, please let us know immediately. If it does not, and in the absence of any further guidance from Liberty excess, Roseburg will presume that it is Liberty excess's position that the Wildfire Exclusion Endorsement falls within Liberty excess's reserved rights and is a potential basis for Liberty excess's statement that its policy provides "no coverage at all."

And so, Roseburg and Liberty's interests diverge as to the particulars of the source of the Mill Fire (*e.g.,* source, how and where it spread) as well as its characterization. These facts and this characterization are intrinsic to the defense of the claims against Roseburg and to Liberty's coverage position. Liberty and Mr. Bona's continued reference to the Mill Fire as a wildfire is not only incorrect as a matter of fact, it could affect coverage as a matter of law. (Again, Roseburg believes that the Wildfire Exclusion Endorsement does not apply as a matter of fact or law, but this does not abate the conflict of interest.) Thus, a conflict of interest exists such that Roseburg is entitled to independent counsel.

Roseburg does not waive or withdraw any of the conflicts it identified in our October 7, 2022, letter.

### *Roseburg's Retention of BakerHostetler*

Roseburg retained BakerHostetler to represent it in all claims arising out of the Mill Fire and as its independent counsel for those claims potentially covered by its insurance policies. At the outset, Liberty was open to appointing Baker as defense counsel. Jamie Sroczynski of Liberty's Legal Strategic Services Group emailed Dustin Dow of Baker on September 7, 2022, to discuss Baker's retention and to request Baker's rates. During the ensuing weeks, Baker and Mr. Dow provided considerable information to Liberty and other insurers. While they did

Mary E. Gregory, Esq.
Sheppard, Mullin, Richter & Hampton LLP
December 21, 2022
Page 5

not respond to this specific inquiry in the two weeks between that email and
Liberty's reservation of rights and appointment of Mr. Bona, the simple fact
remains that Liberty had a general fee agreement with Baker, that the complexity
of the Mill Fire clearly warranted a fee at the upper end of this agreement (if not
higher), and that the only issue was one of tying down the specifics. This is a far
cry from your assertion that "Liberty and Baker never reached any agreement that
Liberty would pay Baker to defend Roseburg and Liberty never consented to
Baker's appointment as defense counsel." We do not see why failure to
specifically provide the Baker rates for this case would yield this conclusion, but
in any event, we provide that information now:

| Position | Hourly Rate |
|---|---|
| Senior Partners | $735 |
| Junior Partners and Counsel | $575 |
| Senior Associates | $535 |
| Junior Associates | $415 |
| Clerks and Paralegals | $315 |

Liberty should be familiar with this rate structure. These are the rates that Liberty
has approved for Baker when it retains Baker. Once we have received your
concurrence, we will submit Baker's fee statements for reimbursement at these
rates and will submit further statements through the time that Liberty exhausts its
limits.

\*    \*    \*

Baker will continue to provide information to Mr. Bona while Roseburg and
Liberty sort out any role that he may play, but we must again underscore that
Roseburg is represented by Baker—and Baker only — and that he is not to have
any communications on Roseburg's behalf.

Roseburg reserves all rights under the policy and at law.

LIC0021649
CTRL00000982_0005
Exhibit 39, Page

Mary E. Gregory, Esq.
Sheppard, Mullin, Richter & Hampton LLP
December 21, 2022
Page 6

Please direct any future communications about insurance coverage for this matter to us.

Sincerely,


Scott P. DeVries
Rachel Hudgins

Enclosure: Everest's Reservation of Rights Letter

cc:    Mr. Matthew Lawless (matthew.lawless@rfpco.com)
       Ms. Lisa Fairchild (lisaf@rfpco.com)

EXHIBIT 40

EXHIBIT 40

EXHIBIT 40

| | |
|---|---|
| **From:** | David Bona [dbona@ccplaw.com] |
| **Sent:** | 12/5/2022 9:41:35 PM |
| **To:** | DeVries, Scott [SDeVries@hunton.com]; Mary Gregory [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=useraef619e0] |
| **CC:** | Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Keahey, Holly [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a17fe218cd7d4d2b97bd9db31a6c0031-Keahey, Hol]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955]; Frank Falzetta [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; matthew.lawless@rfpco.com; Lisa Fairchild [lisaf@rfpco.com]; Hudgins, Rachel [RHudgins@hunton.com]; rjulian@bakerlaw.com; Lauren T. Attard (lattard@bakerlaw.com) [lattard@bakerlaw.com]; Dustin M. Dow (ddow@bakerlaw.com) [ddow@bakerlaw.com] |
| **Subject:** | {EXTERNAL} RE: Mill Fire: Confidential mediation update |

Mr. DeVries,

I do not agree with your statement that our firm does not have the capacity to serve as defense counsel in this case. My firm and I have represented clients in large, multiparty wildland fire litigation for over a decade. I, and my firm, have worked and are working as defense counsel in numerous wildland fire cases involving thousands of claimants. We have never lacked the capacity to defend the case or properly serve our clients.

You must not know our firm or our long history of defending wildfire cases.

---

**From:** DeVries, Scott [mailto:SDeVries@hunton.com]
**Sent:** Monday, December 5, 2022 11:59 AM
**To:** Mary Gregory
**Cc:** SARAH.KAUFMAN@LibertyMutual.com; HOLLY.KEAHEY@LibertyMutual.com; Jeffrey Crowe; Frank Falzetta; David Bona; matthew.lawless@rfpco.com; Lisa Fairchild; Hudgins, Rachel; rjulian@bakerlaw.com; Lauren T. Attard (lattard@bakerlaw.com); Dustin M. Dow (ddow@bakerlaw.com)
**Subject:** Mill Fire: Confidential mediation update

Mary: We were surprised to receive your e-mail. As we have explained in considerable detail in our letter of October 7, 2022, Roseburg is entitled to independent counsel, it selected BakerHostetler which is uniquely qualified to serve in this role, and the nine (9) attorney Carlson firm with which Mr. Bona is associated simply doesn't have the capacity to serve as defense counsel. Since that date, BakerHostetler has continued to serve in this role, defending all aspects of this multi-faceted matter, keeping Liberty (and its counsel Mr. Bona) and other insurers apprised of developments. Roseburg has not accepted Mr. Bona as its counsel and he has not participated in the defense. This said, Liberty has requested that he be permitted to sit in on the upcoming mediation and, as Ms. Hudgins explained in her December 1 e-mail below, Roseburg is agreeable to his doing so in his role as Liberty's counsel. It follows that Roseburg has no relationship with Mr. Bona and certainly not a tripartite relationship with him and Liberty Mutual.



**Scott P. DeVries**
Special Counsel
sdevries@HuntonAK.com
p  415.975.3720
m  707.888.7887

Hunton Andrews Kurth LLP
50 California Street

Suite 1700
San Francisco, CA 94111

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** Mary Gregory <MGregory@sheppardmullin.com>
**Sent:** Friday, December 2, 2022 2:42 PM
**To:** Hudgins, Rachel <RHudgins@hunton.com>; David Bona <dbona@ccplaw.com>
**Cc:** Julian, Robert <rjulian@bakerlaw.com>; Dow, Dustin M. <ddow@bakerlaw.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; Jeffrey Crowe <JCrowe@sheppardmullin.com>; SARAH.KAUFMAN@LibertyMutual.com; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>; Frank Falzetta <FFalzetta@sheppardmullin.com>
**Subject:** RE: Mill Fire: Confidential mediation update

Caution: This email originated from outside of the firm.

Dear Rachel-

Mr. Bona maintains a tripartite relationship with RLC Industries/Roseburg Forest Products and their insurer Liberty Insurance Corporation. Mr. Bona is attending the mediation on behalf of all three. However, if Roseburg wishes that its personal counsel at Baker Hostetler lead the mediation on its behalf – and not Mr. Bona -- Liberty will not interfere with that approach.

Sincerely,
Mary

**Mary E. Gregory** | Special Counsel
+1 213-617-5426 | direct
MGregory@sheppardmullin.com | Bio

**Sheppard**Mullin
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com | LinkedIn | Twitter

**From:** Hudgins, Rachel <RHudgins@hunton.com>
**Sent:** Thursday, December 1, 2022 3:02 PM
**To:** David Bona <dbona@ccplaw.com>
**Cc:** Julian, Robert <rjulian@bakerlaw.com>; Dow, Dustin M. <ddow@bakerlaw.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com; Mary Gregory <MGregory@sheppardmullin.com>; Jeffrey Crowe <JCrowe@sheppardmullin.com>; SARAH.KAUFMAN@LibertyMutual.com; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>
**Subject:** RE: Mill Fire: Confidential mediation update

David,

LIC_0029273

The mediation with Michael Ornstil is taking place at the JAMS Downtown San Francisco office (2 Embarcadero Ctr., Ste 1500) beginning at 9:30 a.m., Tuesday, December 7th. We appreciate and look forward to your attendance on behalf of Liberty Mutual. To ensure that Roseburg is speaking with one voice at the mediation, we respectfully ask that you limit your role accordingly. Baker Hostetler will be representing Roseburg at the mediation.

Attached is a confidentiality agreement that all attendees must sign. Can you please sign and return it to us at your earliest convenience so that we may proceed with finalizing the mediation logistics?

Kind regards,
Rachel



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p 404.888.4110

Hunton Andrews Kurth
LLP
Bank of America Plaza,
Ste. 4100
600 Peachtree Street,
N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** David Bona <dbona@ccplaw.com>
**Sent:** Thursday, December 1, 2022 1:29 PM
**To:** Dow, Dustin M. <ddow@bakerlaw.com>; Keahey, Holly <HOLLY.KEAHEY@LibertyMutual.com>; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher <Christopher.Faddis@LibertyMutual.com>; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; SARAH.KAUFMAN@LibertyMutual.com
**Cc:** Julian, Robert <rjulian@bakerlaw.com>; Attard, Lauren <lattard@bakerlaw.com>; Matthew Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; Hudgins, Rachel <RHudgins@hunton.com>; DeVries, Scott <SDeVries@hunton.com>
**Subject:** RE: Mill Fire: Confidential mediation update

Caution: This email originated from outside of the firm.

Dustin,
I have been asked to attend the mediation for Liberty Mutual Insurance and RLC/Roseburg Forest Products. Please send me the details for the mediation, including the start time, the location and the mediator's name.
Thank you,

**David Bona, Esq.**
*Carlson, Calladine & Peterson LLP*
*One Post Street, Suite 500*
*San Francisco, California 94104*
*Direct Dial:    415.391.9857*
*Cellular:       415.218.4156*

LIC_0029274

*Website:* www.ccplaw.com

**From:** Dow, Dustin M. [mailto:ddow@bakerlaw.com]
**Sent:** Wednesday, November 30, 2022 4:45 PM
**To:** Keahey, Holly; melisa.thompson@Markel.com; drothman@chubb.com; Ryan.Gaffney@everestre.com; Faddis, Christopher; vincent.sweeney@awac.com; MGregory@sheppardmullin.com; JCrowe@sheppardmullin.com; SARAH.KAUFMAN@LibertyMutual.com
**Cc:** Julian, Robert; Attard, Lauren; Matthew Lawless; Lisa Fairchild; David Bona; Hudgins, Rachel; Scott DeVries
**Subject:** Mill Fire: Confidential mediation update

*Re: Roseburg Forest Products/Mill Fire*
Everyone,
Please see the attached confidential correspondence and enclosures concerning the December 7 mediation.

**Dustin Dow**
Partner

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7098
M +1.513.290.2345

ddow@bakerlaw.com
bakerlaw.com



This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

**Attention:** This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

EXHIBIT 41

EXHIBIT 41

EXHIBIT 41

Message

| | |
|---|---|
| **From:** | DeVries, Scott [SDeVries@hunton.com] |
| **Sent:** | 12/14/2022 6:47:07 PM |
| **To:** | David Bona [dbona@ccplaw.com] |
| **CC:** | Lauren T. Attard (lattard@bakerlaw.com) [lattard@bakerlaw.com]; Hudgins, Rachel [RHudgins@hunton.com]; Mary Gregory [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=useraef619e0]; Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Lauren T. Attard (lattard@bakerlaw.com) [lattard@bakerlaw.com]; Keahey, Holly [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a17fe218cd7d4d2b97bd9db31a6c0031-Keahey, Hol]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955]; Frank Falzetta [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; matthew.lawless@rfpco.com; Lisa Fairchild [lisaf@rfpco.com; rjulian@bakerlaw.com; Dustin M. Dow (ddow@bakerlaw.com) [ddow@bakerlaw.com] |
| **Subject:** | {EXTERNAL} Mill Fire - continued mediation |

David, sorry about the short notice. The mediator has been trying to wrap up the remaining plaintiffs and has scheduled a mediation for tomorrow, Thursday, with the small grouping of plaintiffs' lawyers that were referenced in the Reiner MOU (Sieglock, Fox, Brandi, McNicholas, and Franz) as well as Crump. You are invited in your capacity as Liberty counsel and Zoom contact information is provided below. If you want/need any additional information, I suggest that you reach out to Lauren Attard who I have copied on this e-mail. Scott



**Scott P. DeVries**
Special Counsel
sdevries@HuntonAK.com
p 415.975.3720
m 707.888.7887

Hunton Andrews Kurth LLP
50 California Street
Suite 1700
San Francisco, CA 94111

HuntonAK.com

**From:** Lorena Harrell <LHarrell@jamsadr.com>
**Sent:** Wednesday, December 14, 2022 4:11 PM
**To:** Ornstil Michael (michael@ornstil.com) <michael@ornstil.com>; Sophia Arim <sba@mcnicholaslaw.com>
**Cc:** Julian, Robert <rjulian@bakerlaw.com>; Patrick McNicholas <pmc@mcnicholaslaw.com>; Attard, Lauren <lattard@bakerlaw.com>; Fischbach, Ryan D. <rfischbach@bakerlaw.com>; DeVries, Scott <SDeVries@hunton.com>; Dow, Dustin M. <ddow@bakerlaw.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Brandon Castor <bic@mcnicholaslaw.com>; Christie Casas <cac@mcnicholaslaw.com>
**Subject:** RE: Mill Fire

Caution: This email originated from outside of the firm.

Regarding the above-referenced matter with **Michael Ornstil** set for **Thursday, December 15, 2022 at 1:30 PM (PT)**, please see the Zoom video conference login information below. If your clients or any other participants are not included on this email, please forward this information to them.

Your Moderator will be: **Terran Artis**
Instructions

LIC0018150

**Exhibit 41, Page 001**

Please join the meeting **10-15 minutes in advance** to ensure your session starts timely. To join your video conference, please click the link below. If you do not have Zoom on your device, you will be prompted to download it at that time. Thereafter, you will be connected to your session's waiting room. A JAMS Moderator will then check you in for your session and place you into your respective breakout room.

Please verify your application is up to date by downloading the most *recent* version here.

If using a Chromebook, please join the meeting through this link.

Should you experience any technical issues during your session, please contact the **JAMS Virtual Session Hotline at 415-683-4090** and a JAMS associate will log on to assist.

*Important note: You should treat this information as private and confidential. You should not share your unique Zoom link and identifier with anyone outside of those in the confidentiality agreement. You should not post your Zoom meeting information on any public facing platform or social media.*

JAMS Admin48 is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://jamsadr.zoom.us/j/97372220231

Meeting ID: 973 7222 0231
Passcode: 809336

One tap mobile
+16699006833,,97372220231# US (San Jose) 16694449171,,97372220231# US

Dial by your location
        +1 669 900 6833 US (San Jose)
        +1 669 444 9171 US
        +1 253 215 8782 US (Tacoma)
        +1 346 248 7799 US (Houston)
        +1 719 359 4580 US
        +1 253 205 0468 US
        +1 301 715 8592 US (Washington DC)
        +1 305 224 1968 US
        +1 309 205 3325 US
        +1 312 626 6799 US (Chicago)
        +1 360 209 5623 US
        +1 386 347 5053 US
        +1 507 473 4847 US
        +1 564 217 2000 US
        +1 646 558 8656 US (New York)
        +1 646 931 3860 US
        +1 689 278 1000 US
Meeting ID: 973 7222 0231
Find your local number: https://jamsadr.zoom.us/u/aA3KyAkG7

Join by SIP
97372220231@zoomcrc.com

Join by H.323
162.255.37.11 (US West)

LIC0018151

162.255.36.11 (US East)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)
213.19.144.110 (Amsterdam Netherlands)
213.244.140.110 (Germany)
103.122.166.55 (Australia Sydney)
103.122.167.55 (Australia Melbourne)
149.137.40.110 (Singapore)
64.211.144.160 (Brazil)
149.137.68.253 (Mexico)
69.174.57.160 (Canada Toronto)
65.39.152.160 (Canada Vancouver)
207.226.132.110 (Japan Tokyo)
149.137.24.110 (Japan Osaka)
Meeting ID: 973 7222 0231
Passcode: 809336

<image001.png>

**Lorena D. Harrell**
ADR Specialist
Please note JAMS will be closed Dec. 23 - Jan. 2. Happy Holidays!

**JAMS - *Local Solutions. Global Reach.*™**
1255 Treat Blvd. | Suite 700 | Walnut Creek, CA 94597
P: 925-975-5707 | F: 925-938-6732
**www.jamsadr.com**

Follow us on **Facebook**, **LinkedIn**, and **Twitter**.

*JAMS was Recently Recognized at **Legalweek's Leaders in Tech Law Awards.**
Learn more about our **virtual and hybrid capabilities.***

**From:** Michael Ornstil <michael@ornstil.com>
**Sent:** Wednesday, December 14, 2022 4:10 PM
**To:** Sophia Arim <sba@mcnicholaslaw.com>
**Cc:** Julian, Robert <rjulian@bakerlaw.com>; Patrick McNicholas <pmc@mcnicholaslaw.com>; Attard, Lauren <lattard@bakerlaw.com>; Fischbach, Ryan D. <rfischbach@bakerlaw.com>; Scott DeVries <SDeVries@hunton.com>; Dow, Dustin M. <ddow@bakerlaw.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Brandon Castor <bic@mcnicholaslaw.com>; Christie Casas <cac@mcnicholaslaw.com>; Lorena Harrell <LHarrell@jamsadr.com>
**Subject:** Re: Mill Fire

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi All:

I'm checking on the Zoom link. We will send it out as soon as we can.

Michael

LIC0018152

On Wed, Dec 14, 2022 at 3:54 PM Sophia Arim <sba@mcnicholaslaw.com> wrote:

Michael and Bob:

Would you be able to share the Zoom link ahead of time? Brandon Castor from our office will also attend, virtually.

Thank you,

**Sophia B. Arim**

McNicholas & McNicholas, LLP

10866 Wilshire Blvd., Suite 1400

Los Angeles, CA 90024

Tel: (310) 474-1582 ext. 555

Direct Dial: (424) 343-2926

Fax: (310) 475-7871

Email: sba@mcnicholaslaw.com

Website: http://www.mcnicholaslaw.com

CONFIDENTIALITY NOTICE: This email message may contain legally privileged and/or confidential information. This e-mail message may contain material that is protected by the attorney-client and/or attorney work product privileges. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited by law. If you have received this message in error, please immediately notify the sender at (310) 474-1582, delete this e-mail message from your computer, and destroy any and all copies.

**From:** "Julian, Robert" <rjulian@bakerlaw.com>
**Date:** Wednesday, December 14, 2022 at 3:35 PM
**To:** Patrick McNicholas <pmc@mcnicholaslaw.com>
**Cc:** "Attard, Lauren" <lattard@bakerlaw.com>, ORNSTIL MICHAEL <michael@ornstil.com>, "Fischbach, Ryan D." <rfischbach@bakerlaw.com>, Scott DeVries <SDeVries@hunton.com>, "Dow, Dustin M." <ddow@bakerlaw.com>, "McEvoy, Bob" <rmcevoy@alixpartners.com>, Sophia Arim <sba@mcnicholaslaw.com>, Brandon Castor <bic@mcnicholaslaw.com>, Christie Casas <cac@mcnicholaslaw.com>, Fisher Lorena <lharrell@jamsadr.com>
**Subject:** Re: Mill Fire

Patrick,

Jams at 2 Embarcadero 15th floor. We will ask Lorena copied here to put you and anyone else you inform us about in this email thread to go on security. You will need to sign a mediation agreement via docusign and your share of the plaintiff one half side fees.

Thanks,

Bob Julian

LIC0018153

Sent from my iPhone

On Dec 14, 2022, at 3:30 PM, Patrick McNicholas <pmc@mcnicholaslaw.com> wrote:

As fate would have it, I am in SF this week. Are you attending in person? Is it at JAMS on California?

My cell (text) is 310-497-2222 which is the easiest way to reach me.

Thank you for the email.

Patrick McNicholas

On Dec 14, 2022, at 2:30 PM, Attard, Lauren <lattard@bakerlaw.com> wrote:

Hi Pat —

We have a mediation scheduled tomorrow at 1:30 at JAMS San Francisco, which is both happening in person and on zoom. Can you make it tomorrow to discuss settlement?

Thanks very much.

Lauren

**From:** Patrick McNicholas <pmc@mcnicholaslaw.com>
**Sent:** Sunday, December 11, 2022 11:46 AM
**To:** Attard, Lauren <lattard@bakerlaw.com>
**Cc:** ORNSTIL MICHAEL <michael@ornstil.com>; Julian, Robert <rjulian@bakerlaw.com>; Fischbach, Ryan D. <rfischbach@bakerlaw.com>; Scott DeVries <SDeVries@hunton.com>; Dow, Dustin M. <ddow@bakerlaw.com>; McEvoy, Bob <rmcevoy@alixpartners.com>; Sophia Arim <sba@mcnicholaslaw.com>; Brandon Castor <bic@mcnicholaslaw.com>; Christie Casas <cac@mcnicholaslaw.com>
**Subject:** Re: Mill Fire

[External Email: Use caution when clicking on links or opening attachments.]

Thank you very much. We appreciate the email and will be back in touch tomorrow, Monday, Dec 12. We are in the process of fact checking our client information.

We look forward to speaking with you. In the meantime, enjoy your Sunday.

Patrick McNicholas

On Dec 9, 2022, at 6:24 PM, Attard, Lauren <lattard@bakerlaw.com> wrote:

LIC0018154

Hi Pat –

We understand that you represent clients with regard to the Mill Fire.  As I believe you know, we represent Roseburg.  If you could provide a demand, or at a minimum, the names and addresses of the people you represent, and if possible, the nature of their claim, that would help us move forward with settlement.  We are copying the mediator, Michael Ornstil, here.  Once we receive your data we will discuss it with Michael and get back to you.  Feel free to reach out to him separately as well.

I don't have Todd's email address, so if you can please forward this to him, that would be helpful.

Thank you.

Lauren

**Lauren Attard**
Counsel

<image001.png>

11601 Wilshire Boulevard | Suite 1400
Los Angeles, CA 90025-0509
T +1.310.442.8896

lattard@bakerlaw.com
bakerlaw.com

<image002.png>

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

LIC0018155

EXHIBIT 42

EXHIBIT 42

EXHIBIT 42

# EXHIBIT 42 FILED UNDER SEAL

EXHIBIT 43

EXHIBIT 43

EXHIBIT 43

**Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

213.617.5426 direct
mgregory@sheppardmullin.com

File Number: 080B-364458

January 24, 2023

**VIA FEDERAL EXPRESS**

Matthew Lawless
Roseburg Forest Products
3660 Gateway Street
Springfield, OR 97477

Re:   Insured:      Roseburg Forest Products Co. (a subsidiary of RLC Industries Co.)
      Claim No.     P 413-291000
      Policy No.    TB7-661-067089-031 (11/01/2021-11/01/2022)
      Company:      Liberty Insurance Corporation
      Date Of Loss: September 2, 2022

Dear Mr. Lawless:

In response to Roseburg Forest Products Co.'s January 6, 2023[1] request for reimbursement of certain settlement payments related to the September 2, 2022 Mill Fire, Liberty Insurance Corporation ("Liberty") has issued the following two checks, which I am enclosing with this letter:

- Check number 80479694 in the amount of $1,208,000; and

- Check number 80479695 in the amount of $2,000,000.

Check number 80479694, in the amount of $1,208,000, represents reimbursement of the following property damage settlement payments:

# Redacted Per Sealing Order

This reimbursement payment reduces the $2 million per occurrence "logger's property damage liability" limit available to pay claims arising out of the Mill Fire under Liberty policy number TB7-661-067089-031 (the "Policy"). Liberty will reimburse Roseburg an additional $792,000

---

[1]      We enclose a copy of Roseburg's request, sent by Scott DeVries and Rachel Hudgins, for your convenience.

LIC0018332

**SheppardMullin**

Matthew Lawless
January 24, 2023
Page 2

in "logger's property damage" claims under the Policy when requested. Once Liberty pays Roseburg that additional amount, the Policy's per occurrence "logger's property damage liability" limit will be exhausted.

Check number 80479695, in the amount of $2,000,000.

This payment exhausts the $2 million per occurrence "bodily injury" limit of the Policy available to pay "bodily injury" claims arising from the Mill Fire.

As we have previously stated in letters to Roseburg's coverage counsel, Scott DeVries and Rachel Hudgins, by requesting that Liberty indemnify and reimburse Roseburg for only certain settlements, Roseburg is acknowledging that it remains exposed to additional "bodily injury" and/or "logger's property damage" claims by various other parties and claimants, including, without limitation, represented and unrepresented claimants or plaintiffs, subrogated property insurers, CalFire and other governmental agencies that may have incurred firefighting suppression expenses, and other wrongful death claimants. Those additional claims expose Roseburg to liability far in excess of the Policy's limits of insurance, and likely in excess of *all* applicable or available insurance.

We therefore ask that an authorized Roseburg representative acknowledge Roseburg's request that Liberty reimburse it for the settlement payments it has made to claimants/plaintiffs totaling $3,208,000 as described above, and consent to Liberty's payment of Policy proceeds in that amount toward settlement of some, but not all, of the pending and/or settled claims for "bodily injury" and/or "logger's property damage" asserted against Roseburg arising from the Mill Fire, by signing this letter below and returning a copy to us.

If you have any questions regarding this correspondence, please do not hesitate to contact us.

Very truly yours,

*Mary E. Gregory*

Mary E. Gregory
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4866-5281-9531.2

Enclosures

LIC0018333

Exhibit 43, Page 002

# SheppardMullin

Matthew Lawless
January 24, 2023
Page 3

## **ACKNOWLEDGEMENT**

On behalf of Roseburg Forest Products Co., I hereby acknowledge the statements made above regarding Liberty's payment of $3,208,000 of its Policy proceeds in reimbursement of Roseburg's settlement of some, but not all, claims that have been or may be made against Roseburg arising out of the Mill Fire.

By: _____

_____
Its:


cc:    (Via email only)
        Scott DeVries, Esq.
        Rachel Hudgins, Esq.
        Sarah Kaufman
        Holly Keahey
        David Bona, Esq.
        Frank Falzetta, Esq.
        Jeffrey Crowe, Esq.

LIC0018334

CLAIM OFFICE ADDRESS

100 LIBERTY WAY
DOVER, NH 03820
CONTACT: KAUFMAN, S
PHONE: 603-749-2600



CHECK NUMBER
80479694

ISSUE DATE
01/17/2023

| INSURED NAME | ACCIDENT DATE | CLAIM NUMBER |
|---|---|---|
| RLC INDUSTRIES CO. | 09/02/2022 | P 413-291000-01 |

| CLAIMANT NAME | INSURED OPERATOR | POLICY NUMBER |
|---|---|---|
| HAMMOND, NICHOLE | | TB7661067089031922 |

| COV TYPES | PROVIDER | SERVICE FROM - THRU | CHARGE | ADJUST CODE | PAID AMOUNT |
|---|---|---|---|---|---|
| OPLG | | 01/13/2023 | 1208000.00 | | 1208000.00 |

PAYMENT SENT TO:
ROSEBURG FOREST PRODUCTS CO

| | |
|---|---|
| SUB TOTAL 1 | 1208000.00 |
| DEDUCTIBLE | 0.00 |
| SUB TOTAL 2 | 1208000.00 |
| WITHHOLDING TAX | 0.00 |
| CHECK AMOUNT | 1208000.00 |

COVERAGE TYPES
OPLG: LOGGERS PROPERTY DAMAGE

ADJUSTMENT CODE NOTES

EOP NOTES
SETTLEMENT REIMBURSEMENT - PROPERTY DAMAGE

VERIFY THE AUTHENTICITY OF THIS MULTIPLE SECURITY DOCUMENT. THE BACK CONTAINS AN ARTIFICIAL WATERMARK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

100 LIBERTY WAY
DOVER, NH 03820

Bank of America
Hartford, CT

01/17/2023
VOID IF NOT PRESENTED WITHIN 6 MONTHS FROM ISSUE DATE

AO - 80479694

51-44/119
000000067589O

| B. CODE | CLAIM NO. |
|---|---|
| 281 | P 413-291000-01 |

$ 1208000.00**

PAY  One Million Two Hundred  Eight Thousand  and 00/100ths Dollars*****

PAY TO THE
ORDER OF

ROSEBURG FOREST PRODUCTS CO
C/O F. FALZETTA - SHEPPARD MULLIN
333 S. HOPE ST, 43RD FLOOR
LOS ANGELES, CA 90071

Liberty Mutual Insurance Group

⑈00804796940 ⑆011900445⑆ 0000000675890

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

LIC0018335

CLAIM OFFICE ADDRESS
100 LIBERTY WAY
DOVER,NH 03820
CONTACT: KAUFMAN, S
PHONE: 603-749-2600


**Liberty Mutual.**
INSURANCE

CHECK NUMBER
80479695

ISSUE DATE
01/17/2023

| INSURED NAME | ACCIDENT DATE | CLAIM NUMBER |
|---|---|---|
| RLC INDUSTRIES CO. | 09/02/2022 | P 413-291000-06 |

| CLAIMANT NAME | INSURED OPERATOR | POLICY NUMBER |
|---|---|---|
| HILLIARD,MARILYN | | TB7661067089031922 |

| COV TYPES | PROVIDER | SERVICE FROM - THRU | CHARGE | ADJUST CODE | PAID AMOUNT |
|---|---|---|---|---|---|
| OPBI | | 01/13/2023 | 2000000.00 | | 2000000.00 |

PAYMENT SENT TO:
ROSEBURG FOREST PRODUCTS CO

| | |
|---|---|
| SUB TOTAL 1 | 2000000.00 |
| DEDUCTIBLE | 0.00 |
| SUB TOTAL 2 | 2000000.00 |
| WITHHOLDING TAX | 0.00 |
| CHECK AMOUNT | 2000000.00 |

COVERAGE TYPES
OPBI: OPERATIONS - BI

ADJUSTMENT CODE NOTES

EOP NOTES
REIMBURSEMENT FOR BODILY INJURY SETTLEMENT

---

VERIFY THE AUTHENTICITY OF THIS MULTIPLE-TONED DOCUMENT. THE BACK CONTAINS AN ARTIFICIAL WATERMARK HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT

100 LIBERTY WAY
DOVER,NH 03820

**Liberty Mutual.**
INSURANCE

Bank of America.
Hartford, CT

01/17/2023
VOID IF NOT PRESENTED WITHIN
6 MONTHS FROM ISSUE DATE

AO - 80479695

51-44/119
000000067589O

B. CODE
281

CLAIM NO.
P 413-291000-06

$ 2000000.00**

PAY  Two Million and 00/100ths Dollars*****

PAY TO THE
ORDER OF
ROSEBURG FOREST PRODUCTS CO
C/O F. FALZETTA - SHEPPARD MULLIN
333 S. HOPE ST, 43RD FL
LOS ANGELES, CA 90071

Liberty Mutual Insurance Group

⑈0080479695⑈ ⑆011900445⑆ 000000067589⑈

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK  HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

LIC0018336

| | |
|---|---|
| **From:** | Hudgins, Rachel |
| **To:** | sarah.kaufman@libertymutual.com; HOLLY.KEAHEY@LibertyMutual.com; melisa.thompson@markel.com; drothman@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; christopher.faddis@libertymutual.com; Jeffrey Crowe; Mary Gregory; Frank Falzetta; dbona@ccplaw.com; Jerry.Garcia@lewisbrisbois.com; Rebecca.Weinreich@lewisbrisbois.com |
| **Cc:** | Matt Lawless; Lisa Fairchild; DeVries, Scott |
| **Subject:** | Roseburg / Mill Fire - Settlement Notices |
| **Date:** | Friday, January 6, 2023 12:42:30 PM |
| **Attachments:** | Executed Releases.pdf<br>Wire Transfer Requests.xlsx<br>Wire Payment Confirmations.pdf |

CONFIDENTIAL

Dear Insurers and Counsel,

# Redacted Per Sealing Order

LIC0018337

# Redacted Per Sealing Order

Kind regards,
Rachel



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p  404.888.4110

Hunton Andrews Kurth LLP
Bank of America Plaza, Ste. 4100
600 Peachtree Street, N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

LIC0018338

EXHIBIT 44

EXHIBIT 44

EXHIBIT 44

Message

| | |
|---|---|
| **From:** | Mary Gregory [MGregory@sheppardmullin.com] |
| **Sent:** | 1/26/2023 12:25:46 PM |
| **To:** | Hudgins, Rachel [RHudgins@hunton.com]; Kaufman, Sarah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48109347e6f24467b4543f8d692501ab-Kaufman, Sa]; Keahey, Holly [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a17fe218cd7d4d2b97bd9db31a6c0031-Keahey, Hol]; melisa.thompson@markel.com; dplette@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; Faddis, Christopher [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8487e97ba7a4212ba649a04cdaac7f9-Faddis, Chr]; Jeffrey Crowe [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=user3f343955]; Frank Falzetta [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=userbacd026d]; dbona@ccplaw.com; Jerry.Garcia@lewisbrisbois.com; Rebecca.Weinreich@lewisbrisbois.com |
| **CC:** | Matt Lawless [Matthew.Lawless@rfpco.com]; Lisa Fairchild [LisaF@rfpco.com]; DeVries, Scott [SDeVries@hunton.com] |
| **Subject:** | {EXTERNAL} RE: Roseburg / Mill Fire - Additional Settlement Notices |

Liberty will pay $792,000 towards reimbursement of these additional claims. This payment will exhaust the $2 million per occurrence Logger's Property Damage Liability limit on the Liberty primary policy. The balance of this reimbursement request will need to fund from Roseburg's excess coverage.

 Sincerely,
Mary

**Mary E. Gregory** | Special Counsel
+1 213-617-5426 | direct
MGregory@sheppardmullin.com | Bio

**SheppardMullin**
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com | LinkedIn | Twitter

**From:** Hudgins, Rachel <RHudgins@hunton.com>
**Sent:** Wednesday, January 25, 2023 8:45 PM
**To:** sarah.kaufman@libertymutual.com; HOLLY.KEAHEY@LibertyMutual.com; melisa.thompson@markel.com; dplette@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; christopher.faddis@libertymutual.com; Jeffrey Crowe <JCrowe@sheppardmullin.com>; Mary Gregory <MGregory@sheppardmullin.com>; Frank Falzetta <FFalzetta@sheppardmullin.com>; dbona@ccplaw.com; Jerry.Garcia@lewisbrisbois.com; Rebecca.Weinreich@lewisbrisbois.com
**Cc:** Matt Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>
**Subject:** RE: Roseburg / Mill Fire - Additional Settlement Notices

CONFIDENTIAL

Dear Insurers and Counsel,

LIC0018391

Exhibit 44, Page 001

# Redacted Per Sealing Order



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p  404.888.4110

Hunton Andrews Kurth LLP
Bank of America Plaza, Ste. 4100
600 Peachtree Street, N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** Hudgins, Rachel
**Sent:** Friday, January 6, 2023 3:40 PM
**To:** sarah.kaufman@libertymutual.com; HOLLY.KEAHEY@LibertyMutual.com; melisa.thompson@markel.com; drothman@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; christopher.faddis@libertymutual.com; jcrowe@sheppardmullin.com; mgregory@sheppardmullin.com; Frank Falzetta <FFalzetta@sheppardmullin.com>; dbona@ccplaw.com; Jerry.Garcia@lewisbrisbois.com; Rebecca.Weinreich@lewisbrisbois.com
**Cc:** Matt Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>
**Subject:** Roseburg / Mill Fire - Settlement Notices

CONFIDENTIAL

# Redacted Per Sealing Order

Kind regards,
Rachel



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p  404.888.4110

Hunton Andrews Kurth LLP
Bank of America Plaza, Ste. 4100
600 Peachtree Street, N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

LIC0018393

<u>Attention:</u> This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

LIC0018394

EXHIBIT 45

EXHIBIT 45

EXHIBIT 45

**Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

Mary E. Gregory
213.617.5426 direct
mgregory@sheppardmullin.com

File Number:  080B-364458

February 9, 2023

<u>**VIA FEDERAL EXPRESS**</u>

Matthew Lawless
Roseburg Forest Products
3660 Gateway Street
Springfield, OR 97477

Re:    Insured:        Roseburg Forest Products Co. (a subsidiary of RLC Industries Co.)
       Claim No.       P 413-291000
       Policy No.      TB7-661-067089-031 (11/01/2021-11/01/2022)
       Company:        Liberty Insurance Corporation
       Date Of Loss:   September 2, 2022

Dear Mr. Lawless:

In response to Roseburg Forest Products Co.'s January 25, 2023[1] request for reimbursement of certain settlement payments related to the September 2, 2022 Mill Fire, Liberty Insurance Corporation ("Liberty") has issued check number 80479937 in the amount of $792,000, which I am enclosing with this letter.  This check represents reimbursement of a portion of Roseburg's request for reimbursement of the following property damage claims:

# Redacted Per Sealing Order

On January 24, 2023, we transmitted Liberty's reimbursement payment of $1,208,000 towards reimbursement of other "logger's property damage liability" claims.  Thus, this reimbursement payment exhausts the $2 million per occurrence "logger's property damage liability" limit available to pay claims arising out of the Mill Fire under Liberty policy number TB7-661-067089-031 (the "Policy").

Also on January 24, 2023, we transmitted Liberty's $2 million reimbursement payment

'# Redacted Per Sealing Order

---

[1]     We enclose a copy of Roseburg's request, sent by Scott DeVries and Rachel Hudgins, for your convenience.

**Sheppard**Mullin

Matthew Lawless
February 9, 2023
Page 2

<span style="color:blue">Redacted Per Sealing Order</span> We advised that that payment exhausted the $2 million per occurrence "bodily injury" limit of the Policy available to pay "bodily injury" claims arising from the Mill Fire.

Liberty has now paid all policy limits available to Roseburg for the Mill Fire. Consequently, the Policy is now exhausted for all Mill Fire claims, and Liberty has no further obligations to Roseburg under the Policy.

Liberty's obligation to defend Roseburg also terminates at this time. Liberty will advise Mr. Bona that his retention will conclude on February 16, 2023.

As we have previously stated in letters to both you and Roseburg's coverage counsel, Scott DeVries and Rachel Hudgins, by requesting that Liberty indemnify and reimburse Roseburg for only certain settlements, Roseburg is acknowledging that it remains exposed to additional "logger's property damage" and/or "property damage" claims by various other parties and claimants, including, without limitation, represented and unrepresented claimants or plaintiffs, subrogated property insurers, CalFire and other governmental agencies that may have incurred firefighting suppression expenses. Those additional claims expose Roseburg to liability far in excess of the Policy's limits of insurance, and likely in excess of *all* applicable or available insurance.

We therefore ask that an authorized Roseburg representative acknowledge Roseburg's request that Liberty reimburse it for the settlement payments it has made to claimants/plaintiffs totaling $792,000 as described above, and consent to Liberty's payment of Policy proceeds in that amount toward settlement of some, but not all, of the pending and/or settled claims for "logger's property damage" asserted against Roseburg arising from the Mill Fire, by signing this letter below and returning a copy to us.

If you have any questions regarding this correspondence, please do not hesitate to contact us.

Very truly yours,

*Mary E. Gregory*

Mary E. Gregory
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4871-3790-8045.1

Enclosure

**Sheppard**Mullin

Matthew Lawless
February 9, 2023
Page 3

## ACKNOWLEDGEMENT

On behalf of Roseburg Forest Products Co., I hereby acknowledge the statements made above regarding Liberty's payment of $792,000 of its Policy proceeds in reimbursement of Roseburg's settlement of some, but not all, claims that have been or may be made against Roseburg arising out of the Mill Fire.


By: _____


_____
Its:


cc:     (Via email only)
        Scott DeVries, Esq.
        Rachel Hudgins, Esq.
        Sarah Kaufman
        Holly Keahey
        David Bona, Esq.
        Frank Falzetta, Esq.
        Jeffrey Crowe, Esq.

**Vicki Castro**

| | |
|---|---|
| **From:** | Hudgins, Rachel <RHudgins@hunton.com> |
| **Sent:** | Wednesday, January 25, 2023 8:45 PM |
| **To:** | sarah.kaufman@libertymutual.com; HOLLY.KEAHEY@LibertyMutual.com; melisa.thompson@markel.com; dplette@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; christopher.faddis@libertymutual.com; Jeffrey Crowe; Mary Gregory; Frank Falzetta; dbona@ccplaw.com; Jerry.Garcia@lewisbrisbois.com; Rebecca.Weinreich@lewisbrisbois.com |
| **Cc:** | Matt Lawless; Lisa Fairchild; DeVries, Scott |
| **Subject:** | RE: Roseburg / Mill Fire - Additional Settlement Notices |
| **Attachments:** | Redacted Per Sealing Order |

Redacted Per Sealing Order

Kind regards,
Rachel

1



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p  404.888.4110

Hunton Andrews Kurth LLP
Bank of America Plaza, Ste. 4100
600 Peachtree Street, N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** Hudgins, Rachel
**Sent:** Friday, January 6, 2023 3:40 PM
**To:** sarah.kaufman@libertymutual.com; HOLLY.KEAHEY@LibertyMutual.com; melisa.thompson@markel.com; drothman@chubb.com; vincent.sweeney@awac.com; ryan.gaffney@everestre.com; christopher.faddis@libertymutual.com; jcrowe@sheppardmullin.com; mgregory@sheppardmullin.com; Frank Falzetta <FFalzetta@sheppardmullin.com>; dbona@ccplaw.com; Jerry.Garcia@lewisbrisbois.com; Rebecca.Weinreich@lewisbrisbois.com
**Cc:** Matt Lawless <Matthew.Lawless@rfpco.com>; Lisa Fairchild <LisaF@rfpco.com>; DeVries, Scott <SDeVries@hunton.com>
**Subject:** Roseburg / Mill Fire - Settlement Notices

# Redacted Per Sealing Order

LIC0018404
Exhibit 45, Page 005

# Redacted Per Sealing Order

Kind regards,
Rachel



**Rachel E. Hudgins**
Associate
rhudgins@HuntonAK.com
p  404.888.4110

Hunton Andrews Kurth LLP
Bank of America Plaza, Ste. 4100
600 Peachtree Street, N.E.
Atlanta, GA 30308

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

LIC0018405
Exhibit 45, Page 006

CLAIM OFFICE ADDRESS
100 LIBERTY WAY
DOVER,NH 03820
CONTACT: KAUFMAN, S
PHONE: 603-749-2600


**Liberty Mutual.** INSURANCE

CHECK NUMBER
80479937

ISSUE DATE
01/31/2023

| INSURED NAME | ACCIDENT DATE | CLAIM NUMBER |
|---|---|---|
| RLC INDUSTRIES CO. | 09/02/2022 | P 413-291000-01 |

| CLAIMANT NAME | INSURED OPERATOR | POLICY NUMBER |
|---|---|---|
| HAMMOND,NICHOLE | | TB7661067089031922 |

| COV TYPES | PROVIDER | SERVICE FROM - THRU | CHARGE | ADJUST CODE | PAID AMOUNT |
|---|---|---|---|---|---|
| OPLG | | 01/30/2023 | 792000.00 | | 792000.00 |

PAYMENT SENT TO:
ROSEBURG FOREST PRODUCTS CO

| | |
|---|---|
| SUB TOTAL 1 | 792000.00 |
| DEDUCTIBLE | 0.00 |
| SUB TOTAL 2 | 792000.00 |
| WITHHOLDING TAX | 0.00 |
| CHECK AMOUNT | 792000.00 |

COVERAGE TYPES
OPLG: LOGGERS PROPERTY DAMAGE

ADJUSTMENT CODE NOTES

EOP NOTES
REIMBURSEMENT FOR PD SETTLEMENT

---

VERIFY THE AUTHENTICITY OF THIS MULTICOLORED DOCUMENT. THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER. REVIEW EACH CHECK BEFORE DEPOSITING. RETAIN A STATEMENT FOR YOUR RECORDS. THE COLOR GRADUALLY FROM TOP TO BOTTOM.

100 LIBERTY WAY
DOVER,NH 03820

**Liberty Mutual.** INSURANCE

Bank of America.
Hartford, CT

01/31/2023
VOID IF NOT PRESENTED WITHIN
6 MONTHS FROM ISSUE DATE

AO - 80479937

51-44/119
000000067589O

| B. CODE | CLAIM NO. |
|---|---|
| 281 | P 413-291000-01 |

$ 792000.00**

PAY  Seven Hundred  Ninety-Two Thousand  and 00/100ths Dollars*****

PAY TO THE
ORDER OF

ROSEBURG FOREST PRODUCTS CO
C/O F. FALZETTA/SHEPPARD MULLIN
333 S. HOPE ST, 43RD FLOOR
LOS ANGELES,CA 90071

Liberty Mutual Insurance Group

⑈"008047993?"⑈ ⑆011900445⑆ 000000067589⑈"

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

EXHIBIT 46

EXHIBIT 46

EXHIBIT 46

# EXHIBIT 46 FILED UNDER SEAL

EXHIBIT 47

EXHIBIT 47

EXHIBIT 47

| | |
|---|---|
| **From:** | DeVries, Scott |
| **To:** | Jeffrey Crowe |
| **Cc:** | Mary Gregory; Frank Falzetta; Hudgins, Rachel |
| **Subject:** | RE: Roseburg v. Everest, et al. |
| **Date:** | Wednesday, June 21, 2023 3:22:32 PM |

Jeff, following up on our call, and in consideration of Ohio Casualty's tender of policy limits w/o reservation of rights (as more fully described in your e-mail), Roseburg is prepared to release and dismiss its claims against Ohio Casualty with prejudice.  Rachel will provide the payment instructions (these should be the same as those that she previously provided to Mary in connection with the Liberty indemnity payments).

Also, as discussed, we are agreeable to putting defense cost issues on a mediation track.  For this to be productive, we understand that Liberty will need the invoices and look forward to sorting through ways to facilitate the process while accommodating the necessary redactions.

Sincerely, Scott and Rachel



**Scott P. DeVries**
Special Counsel
sdevries@HuntonAK.com
p  415.975.3720
m  707.888.7887

Hunton Andrews Kurth LLP
50 California Street
Suite 1700
San Francisco, CA 94111

HuntonAK.com

This communication is confidential. If you are not an intended recipient, please advise by return email immediately and then delete this message, including all copies and backups.

**From:** Jeffrey Crowe <JCrowe@sheppardmullin.com>
**Sent:** Wednesday, June 21, 2023 3:03 PM
**To:** DeVries, Scott <SDeVries@hunton.com>; Hudgins, Rachel <RHudgins@hunton.com>
**Cc:** Mary Gregory <MGregory@sheppardmullin.com>; Frank Falzetta <FFalzetta@sheppardmullin.com>

**Subject:** Roseburg v. Everest, et al.

Caution: This email originated from outside of the firm.

Dear Scott:

Thanks for taking my call this afternoon.  I called to let you know that Ohio Casualty intends to tender its $20 million limit to Roseburg in reimbursement for Roseburg's settlement of Mill Fire bodily injury and property damage claims, which will exhaust Ohio Casualty's indemnity coverage.  If you could please provide payment instructions, we would appreciate it.  I also advised that Ohio Casualty is prepared to tender its limit without any reservation of rights if Roseburg will agree to release and dismiss its claims against Ohio Casualty, with prejudice.  We look forward to hearing back from you in that regard.

Separately, I called to discuss the defense fee/cost issues as between Roseburg and Liberty, and suggested that the parties consider putting those issues on a mediation track.  To do so, however, Liberty will require the Baker defense fee invoices and all other invoices that Roseburg contends reflect defense fees/costs.  We look forward to further discussing opportunities to exchange information/documents and proceeding with possible settlement discussions.

Sincerely,

**Jeffrey S. Crowe**
+1 714-424-8231 | direct
JCrowe@sheppardmullin.com | Bio

**Sheppard**Mullin
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626-1993
+1 714-513-5100 | main
www.sheppardmullin.com | LinkedIn | Twitter

<u>Attention:</u> This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

EXHIBIT 48

EXHIBIT 48

EXHIBIT 48



HUNTON ANDREWS KURTH LLP
50 CALIFORNIA ST, SUITE 1700
SAN FRANCISCO, CA 94111

TEL   415 • 975 • 3700
FAX   415 • 975 • 3701

SCOTT P. DEVRIES
DIRECT DIAL: 415 • 975 • 3720
EMAIL: sdevries@HuntonAK.com

RACHEL E. HUDGINS
DIRECT DIAL: 404 • 888 • 4110
EMAIL: rhudgins@HuntonAK.com

December 19, 2023

*Via Email*

Frank Falzetta                                   Jeffrey S. Crowe
Mary E. Gregory                                  Sheppard Mullin Richter & Hampton LLP
Sheppard Mullin Richter & Hampton LLP            650 Town Center Drive, 10th Floor
333 South Hope St., 43rd Floor                   Costa Mesa, California  92626
Los Angeles, California  90071                   jcrowe@sheppardmullin.com
ffalzetta@sheppardmullin.com
mgregory@sheppardmullin.com

        **Re:**    **Liberty's Responses to Roseburg's Discovery Requests**

Dear Counsel:

       This letter concerns Liberty's responses to Roseburg's discovery requests.  It is Roseburg's position that Liberty's discovery responses are insufficient under the Federal Rules.  Roseburg requests that Liberty supplement its discovery requests to completely and accurately respond to Roseburg's requests and to conform with the rules by January 15, 2024. If you disagree or wish to discuss any of these requests, please let us know your availability for a meet and confer by phone or video conference by December 29, 2023.  To the extent Liberty's further document production from last week addresses some of the issues described below, please advise.

**Background And Applicable Standards**

       Rule 26 entitles Roseburg to discovery on any non-privileged matter, both relevant to its claims and proportional to the needs of the case.  FRCP 26(b)(1).  Relevancy is defined broadly, and relevant evidence need not be admissible.  *In re Apple iPhone Antitrust Litig.*, No. 11-cv-06714, 2020 WL 5993223, at *3 (N.D. Cal. Oct. 9, 2020).  Likewise, Liberty must respond to each of Roseburg's discovery requests and interpret them in good faith.  FRCP 33(b)(1-4); FRCP 34(b)(2)(A-D); FRCP 36(a)(3-5); *see Chea v. Best Buy Stores, L.P.*, No. 14-cv-00020, 2015 WL 12806553, at *1 (N.D. Cal. Mar. 10, 2015).

       If Liberty finds Roseburg's discovery requests objectionable, it must state specifically what it is objecting to, on what grounds, and whether it is refusing to provide a complete and

ATLANTA  AUSTIN  BANGKOK  BEIJING  BOSTON  BRUSSELS  CHARLOTTE  DALLAS  DUBAI  HOUSTON
LONDON  LOS ANGELES  MIAMI  NEW YORK  RICHMOND  SAN FRANCISCO  TOKYO  TYSONS  WASHINGTON, DC
www.HuntonAK.com

Exhibit 48, Page 001



SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
December 19, 2023
Page 2 of 10

accurate answer or withholding documents. *Big Baboon Corp. v. Dell, Inc.*, 723 F.Supp.2d 1224, 1229 (C.D. Cal. 2010) ("It is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery."). Failure to do so waives the objection. *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005). Liberty must still provide all documents and evidence outside the scope of its objection(s). FRCP 34(b)(2)(C). Any "evasive or incomplete" response has the effect of failing to respond. FRCP 37(a)(4).

Judge Barnes's discovery standing order (Informal Telephonic Conferences re: Discovery Disputes) requires the parties to meet and confer in good faith to resolve the dispute informally. Pursuant to this Order, Roseburg explains why Liberty's responses are deficient, and why amended responses and a full and meaningful document production is in order. If needed, please provide Liberty's availability to meet and confer by December 29, 2023.

**General Objections**

Liberty asserts general, boilerplate objections at the beginning of all of its Responses. Then Liberty incorporates the general objections into each individual response. General and boilerplate objections are prohibited. Local Rule 250.2(b) ("Each objection to any interrogatory shall include a statement of reasons …"); *see Taylor v. Cnty. of Calaveras*, No. 1:18-cv-760, 2019 WL 6341131, at *3 (E.D. Cal. Nov. 27, 2019) ("Generic, boilerplate objections to discovery are not sufficient."). And in the specific responses, it often proceeds to repeat those of the general objections it deems salient. Liberty must withdraw all of its general objections.

**Issues with Particular Categories of Objections**

Some of Liberty's general objections will still be inappropriate even if they are raised separately and in response to specific requests.

*Confidential Information.* Liberty objected to producing information that is confidential, proprietary, or a trade secret. Now that a confidentiality agreement has been entered, Liberty should have no objection to producing that information. *VBS Distribution, Inc. v. Nutrivita Labs., Inc.*, No. SA CV 16-01553, 2017 WL 8239229, at *1 (C.D. Cal. Sept. 6, 2017) (overruling confidentiality objection as moot following entry of protective order). Please confirm that Liberty will withdraw this objection.

*Burden.* Liberty also objected to providing documents and information "disproportionate to the needs of the case." Liberty has neither explained what it considers disproportionate, nor indicated whether it is withholding documents pursuant to this objection.



SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
December 19, 2023
Page 3 of 10

FRCP 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection.").  Further, Liberty has no right to unilaterally determine what is "disproportionate" and cannot withhold documents on this ground.  *Big Baboon*, 723 F.Supp.2d at 1229.  If Liberty continues to withhold documents on these grounds, please describe why the request is disproportionate to the needs of the case, including a description of the type of documents Liberty is withholding.

**Ohio Casualty's Documents and Information**

Liberty objected to the inclusion of The Ohio Casualty Insurance Company ("Ohio Casualty") in Roseburg's definition of "LIBERTY" and to producing documents in its "constructive" possession, custody, or control.  Liberty must produce any documents that it has a legal right to obtain or that are held by an entity that Liberty controls.  *Soto v. City of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995); *Goodrich Corp. v. Emhart Indus., Inc.*, No. EDCV0300079VAPSSX, 2005 WL 6440828, at *3 (C.D. Cal. June 10, 2005).  Liberty has a legal right to obtain or has actual control over documents held by Ohio Casualty:  Liberty has admitted that it owns 78% of Ohio Casualty's stock.

Liberty cannot avoid its discovery obligations by parking relevant documents with its sister entity, particularly when that entity remains relevant to this litigation.  *SF Assocs. v. Liberty Mut. Ins. Co.*, No. CV 19-07100, 2019 WL 10189959, at *2-3 (C.D. Cal. Oct. 10, 2019) (deeming Liberty and Ohio Casualty entities alter egos); *Stein v. Farmers Ins. Co. of Ariz.*, No. 3:19-cv-00410, 2021 WL 148076, at *2-3 (S.D. Cal. Jan. 15, 2021) (ordering production from insurer of claims file for its sister entity).

Nor can Liberty avoid answering relevant interrogatories and requests for admission by claiming that Ohio Casualty is not relevant to this dispute.  Compl. ¶¶ 73, 115.  Liberty and Ohio Casualty are related entities.  A conflict of interest arose between Liberty and Roseburg when Ohio Casualty denied coverage on its $20 Million policy on the basis of the wildfire exclusion.  Liberty's subsequent actions—including, but not limited to, refusing to appoint independent counsel—were informed by that conflict.  Roseburg has the right to probe Liberty about its claims-handling and other internal processes, especially whether they overlap with Ohio Casualty's.  *Walker v. Metro. Life Ins. Co.*, No. C 07-03772, 2008 WL 426068, at *1 (N.D. Cal. Feb. 14, 2008) (information bearing on conflict of interest discoverable).

Again, please explain whether Liberty has withheld relevant documents or information on the basis that they are related to Ohio Casualty, or in Ohio Casualty's possession, custody or control rather than Liberty's.



SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
December 19, 2023
Page 4 of 10

**Liberty's Responses To Roseburg's Requests For Production**

Liberty has provided no affirmative statement of what it will produce.  In its Preliminary Statement and nearly every response to Roseburg's requests for production, Liberty states that it will produce "all non-privileged and non-objectionable documents in its possession, custody or control responsive to this Request."  *See, e.g.*, Responses to Requests Nos. 1-7.  It is unclear what Liberty means by "non-objectionable."  But it is clear that Liberty's assertion deprives the response of any meaning.  Regardless of whether Liberty objects, responsive documents must be produced unless they are protected by privilege.  For each response, please explain whether Liberty is withholding relevant documents, and if so, on what grounds.  *Grodzitsky v. Am. Honda Motor Co.*, No. CV 12-1142, 2017 WL 2616917, at *3 (C.D. Cal. June 13, 2017).  If Liberty has withheld documents for privilege, it must provide a sufficiently detailed privilege log.  *In re Citimortgage, Inc., Home Affordable Modification Program ("HAMP") Litig.*, No. MDL 11-2274, 2012 WL 10450139, at *2 (C.D. Cal. June 7, 2012) ("[T]he party who withholds discovery materials must provide sufficient information (*i.e.*, a privilege log) to enable the other party to evaluate the applicability of an asserted privilege or protection.").

Additionally, if Liberty has withheld documents based on attorney-client privilege, please explain whether Liberty claims the privilege in relation to attorneys acting as claims handlers, in-house counsel, or coverage counsel.  Liberty may not shield relevant documents and communications from production that relate to mere coverage determinations or claims-handling activities.  *See* Opinion and Order, *Wolverine World Wide, Inc. v. Am. Ins. Co., et al.*, No. 1:19-cv-00010 (S.D. Mich. Dec. 1, 2023) (that attorney involved in claims handling does not shield attorney's documents and communications from privilege).

**RFP No. 1**.  Liberty objected to producing documents that a Person "may have reviewed but not used in formulating these responses" (to Roseburg's interrogatories).  Roseburg does not understand how someone could have reviewed a document in connection with preparing responses to Roseburg's interrogatories without relying on that document, in some way, in preparing those responses.  Regardless, Roseburg sought all documents and communications "referred to, identified, or relied upon" in answering its interrogatories.  If the reviewed document falls within this definition, it must be produced.  Please explain whether Liberty withheld any responsive documents on this ground.

**RFP No. 2**.  Liberty objected that documents in its claim files for the Mill Fire and Underlying Claims "may seek documents that are not relevant to the subject matter of this litigation" or "any party's claims or defenses."  Any documents within Liberty and Ohio Casualty's claims files for the Mill Fire and/or Underlying Claims are relevant to this litigation.  *Paolo v. Amco Ins. Co.*, No. 02-02367, 2003 WL 24027878, at *1 (N.D. Cal. Dec. 16, 2003).  Roseburg will prove that Liberty acted inappropriately by prioritizing its own


SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
December 19, 2023
Page 5 of 10

interests over Roseburg's by refusing to appoint independent counsel despite the conflict of interest between Roseburg and Liberty. Liberty and Ohio Casualty's actions and communications following receipt of the Roseburg claim are highly relevant sources of proof, and Liberty must produce their entire claims files. If Liberty has withheld documents on this objection, please explain.

**RFP No. 3**. Liberty objected to producing documents and communications related to the Mill Fire and Underlying Claims "that are not relevant" or are protected by attorney-client privilege. First, any documents and communications related to the Mill Fire and Underlying Claims are relevant because Liberty's conduct in relation to both is disputed. *Ellis v. Infinite Labs, LLC*, No. SACV 13-00241, 2014 WL 12617353, at *1 (C.D. Cal. May 1, 2014) (entitled to discovery "relevant to a party's claim or defense").

Second, Roseburg does not understand how any documents and communications related to the Mill Fire and Underlying Claims could be privileged (other than communications with Sheppard Mullin). Roseburg and Liberty operated under joint defense privilege with regards to the Mill Fire and Underlying Claims. *Travelers Cas. Ins. v. Am. Home Realty*, No. C-13-00360, 2014 WL 1048555, at *3 (N.D. Cal. Mar. 17, 2014). If Liberty has withheld documents on these objections, please explain.

**RFP No. 4**. Liberty objected to producing documents and communications relating to wildfire exclusion endorsements used by Liberty on the grounds that such information seeks relevant information, "lacks foundation," and is overbroad and unduly burdensome and oppressive. Liberty's boilerplate objections are inappropriate and have not been sustained by Liberty, so they must fail. *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006).

In any case, Roseburg does not understand how this request is irrelevant or "lacks foundation." Ohio Casualty, Liberty's sister entity, asserted that the wildfire exclusion might limit or negate coverage under its policy.(Ohio Casualty Ans. ¶¶ 15, 79, 82, 95, 97; Second Affirmative Defense). To do so, presumably Ohio Casualty's personnel—many of whom overlap with Liberty's—investigated the Mill Fire and determined that the Mill Fire, in its view, was a wildfire. Ohio Casualty's interest in proving the Mill Fire was a wildfire may have influenced Liberty's claims handling. In handling Roseburg's claim under the Liberty Policy, Liberty's personnel—who overlapped with Ohio Casualty's personnel—may have sought out evidence that the Mill Fire was caused by a wildfire rather than any other cause because they consciously or subconsciously wanted to protect the Ohio Casualty Policy's limits. Liberty's use and understanding of wildfire exclusions, particularly those similar to the wildfire exclusion in the Everest Policy, is therefore highly relevant to whether Liberty's personnel understood and sought out evidence that the Mill Fire was caused by a wildfire. *Ellis*, No. SACV 13-00241, 2014 WL 12617353, at *1. For the same reasons, Liberty cannot

# HUNTON
## ANDREWS KURTH

Sheppard, Mullin, Richter & Hampton LLP
December 19, 2023
Page 6 of 10

claim that discovery about wildfire exclusions used by Liberty is unduly burdensome and oppressive.

**RFP No. 5**.  Liberty objected to Roseburg's request for information relating to Liberty's attempt to appoint Carlson or other law firms as Roseburg's counsel for the Mill Fire and Underlying Claims as privileged, "vague," and lacking foundation.  Liberty's conduct in relation to and communications with counsel it tried to appoint for Roseburg are not privileged, as these actions and communications were apparently done on Roseburg's behalf.  If Liberty disagrees, please provide a privilege log so we can evaluate the documents withheld on this basis.

Moreover, to the extent Liberty contends "attempt to appoint" is vague, please provide Liberty's understanding of the phrase.  *Chea*, No. 14-cv-00020, 2015 WL 12806553, at *1 (Liberty must interpret discovery requests in good faith).  Roseburg submits that the meaning of "attempt to appoint" is apparent—Liberty tried, unsuccessfully, to appoint other firms (including Carlson) to represent Roseburg in relation to the specified claims.  And Liberty's attempted appointment of other firms to represent Roseburg is of central contention to this case.  As Liberty knows, Liberty owed Roseburg a full and adequate defense, and Roseburg will prove that defense by the Carlson firm would not have been full and adequate.  Liberty cannot possibly contend that there is no foundation to ask for the specified information.  If Liberty objects because Liberty did not consult firms other than Carlson to represent Roseburg, please state so.  If not, please confirm that Liberty will withdraw these objections.

**RFPs 6-7, 21**.  For the reasons expressed in Roseburg's critique of Liberty's response to RFP No. 5, Liberty cannot claim that communications with or about, analysis about, or invoices from Carlson (and any other attorneys or firms Liberty sought to appoint) to defend Roseburg are privileged.  If Liberty disagrees, please provide a privilege log.  Liberty also objected that RFPs No. 6 and 7 were "vague," but does not explain why (nor could it:  the request is perfectly clear).  *Chea*, No. 14-cv-00020, 2015 WL 12806553, at *1.  Please explain.

**RFPs 11-12, 16, 18-20**.  Liberty objected to Roseburg's requests for documents relating to Liberty's analyses of Baker Hostetler as privileged and "protected from disclosure by rights to privacy" (RFP No. 11).  For the reasons expressed in Roseburg's critique of Liberty's response to RFP No. 5, Liberty cannot claim that documents and communications related to Baker Hostetler are privileged.  If Liberty disagrees, please provide a privilege log.  Also, Liberty, as a corporation, has no "rights to privacy" objection (particularly when a confidentiality order has been entered).  *Vepo Design Corp. v. Am. Econ. Ins. Co.*, No. CV 20-04950, 2021 WL 6882161, at *2 (C.D. Cal. Sept. 23, 2021) ("[Vepo] failed to conduct the analysis required for state privacy objections … [and] as American notes, Vepo's privacy



S̲ʜᴇᴘᴘᴀʀᴅ, M̲ᴜʟʟɪɴ, R̲ɪᴄʜᴛᴇʀ & H̲ᴀᴍᴘᴛᴏɴ ʟʟᴘ
December 19, 2023
Page 7 of 10

objections also fail because corporations have no privacy rights."). Please confirm that Liberty is not withholding any documents under that objection.

Finally, Liberty stated that it would produce documents relating to this request, then provides several bullet points with cases handled by Baker Hostetler. To be clear, Liberty's disclosure obligation is not limited to documents relating to those cases. Liberty must produce any documents and communications reflecting Baker Hostetler's role as Roseburg's counsel related to the Mill Fire <u>and</u> Underlying Claims (conjunctive). Any documents involving Baker Hostetler in its capacity as Roseburg's counsel in these matters must be produced, whether or not they relate to litigation.

**RFP No. 14**. Roseburg argues that there is a conflict between itself and Liberty that activates a right to independent counsel. Liberty disagrees. Because Liberty has not chosen to avail itself of California Civil Code § 2860, Liberty is not eligible for the protections provided by § 2860 (to wit, Liberty's payment for defense counsel topping out at rates Liberty pays counsel in the normal course of business for similar claims in the relevant community). Liberty's response to request no. 14 appears to maintain this position, not producing documents tending to prove § 2860 rates. If Liberty is foregoing section 2860's rate limitations, Roseburg will agree these documents are not relevant. If not, Liberty must produce them. Otherwise, there will be no evidence of what Liberty has paid counsel in the community for defending similar matters, and that evidence cannot be introduced later. *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 583 (9th Cir. 2010).

**RFP No. 15, 17**. Liberty objected to Roseburg's requests for information about Liberty's internal and external communications about the Mill Fire and Underlying Claims on the grounds that they are privileged, and with respect to its response to No. 15, overbroad, and irrelevant. First, any communications external to Liberty with third-party insurance companies cannot be privileged. Second, Liberty cannot seriously contend that requests for information about the Mill Fire and Underlying Claims is overbroad or irrelevant. Liberty has put its understanding of the Mill Fire and Underlying Claims in contention by refusing to pay for Roseburg's selected defense counsel and attempting to appoint Carlson instead. Liberty's assessment of the Mill Fire and Underlying Claims informed its decision to reject Roseburg's chosen counsel and attempt to appoint Carlson and is therefore highly relevant. *Ellis*, No. SACV 13-00241, 2014 WL 12617353, at *1. Please confirm Liberty will produce any documents it withheld under these objections.

**RFP Nos. 22-25**. Liberty objected to providing information about its denials of Roseburg's contentions on privilege grounds. But Liberty cannot rely on privileged information to support its defenses. Please explain.



SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
December 19, 2023
Page 8 of 10

As noted above, many of these issues are present throughout Liberty's responses. The listing above should not be seen as comprehensive.

**Liberty's Responses To Roseburg's Interrogatories**

As noted above, Liberty's objection to Roseburg's definition of YOU insofar as it includes Ohio Casualty is improper, and Liberty cannot refuse to answer or provide an incomplete answer on such grounds.

<u>General Objections</u>. Besides those identified above, Liberty's general objections in its responses to Roseburg's interrogatories have additional deficiencies. Liberty objects to answering Roseburg's interrogatories "to the extent that the burden or expense of responding to such Interrogatory outweighs the benefit of such Interrogatory." Not only does Roseburg not understand Liberty's objection, but it is inappropriate for Liberty to unilaterally determine which of its responses "outweigh[] the benefit" of responding, particularly without further explanation. *Big Baboon*, 723 F. Supp. 2d at 1229. Please explain whether Liberty has declined to answer any interrogatories on such grounds, and why.

Liberty also objects to the extent that Roseburg exceeded the number of interrogatories permitted under FRCP 33, which permits twenty-five interrogatories. Roseburg served fourteen interrogatories. If Liberty believes this is incorrect, please advise.

<u>ROG No. 1</u>. Liberty objected that this interrogatory sought irrelevant information and was "vague and uncertain." Who participated in formulating Liberty's interrogatory responses and which documents they relied on is highly relevant, as Roseburg must understand the foundation for Liberty's positions. Liberty also did not explain how this request was "vague and uncertain," as Liberty must. *Big Baboon*, 723 F.Supp.2d at 1229. Liberty also failed to specify which documents responding Persons relied on. *Boston Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361, 2023 WL 7311187, at *2 (N.D. Cal. Nov. 6, 2023) (ordering insurers to specify which documents they reviewed). Please provide a list of those documents or point to where in Liberty's production those documents can be found.

<u>ROGs No. 2-3</u>. Liberty objected to these interrogatories as unduly burdensome and oppressive without explaining why. These objections are improper because they are not explained. *Big Baboon*, 723 F.Supp.2d at 1229. But in any case, Roseburg fails to understand how identifying persons involved in the underwriting and placement of the Liberty Policy, and handling the Mill Fire and Underlying Claims, is burdensome and oppressive given that Liberty must simply provide a list of names. If Liberty has objected on the grounds that those persons are not reasonably identifiable or employed by Liberty or Ohio Casualty, please explain. Liberty also objected to ROG No. 3 as "vague and ambiguous" but has not



S‌HEPPARD, M‌ULLIN, R‌ICHTER & H‌AMPTON LLP
December 19, 2023
Page 9 of 10

explained why, which is improper and unsubstantiated by the interrogatory, which simply requests Liberty to identity persons involved with Roseburg's claim for coverage.

**ROG No. 4**.  Liberty states that following a September 8, 2022 email from Mr. Meagher to Ms. Sroczynski, "Liberty discussed options for negotiating a rate with Baker." This response does not explain with whom "Liberty" discussed options for negotiating rates, nor the contents of those discussions.  Please provide greater detail.

**ROG No. 5-8**.  Liberty objects to Roseburg's request for information about Liberty's claims and denials of Roseburg's contentions on privilege grounds.  But Liberty cannot rely on privileged information to support its claims and defenses.  *Boston Ret.*, No. 19-cv-06361, 2023 WL 7311187, at *2 ("Plaintiff is entitled to discover the facts supporting the Individual Defendants' contentions.").  Please explain.  Liberty also objected to interrogatories nos. 5-7 on the grounds that they lack foundation.  But again, these interrogatories seek information about the bases for Liberty's denials of Roseburg's allegations and its defenses; Liberty laid the foundation by denying Roseburg's allegations and stating its defenses.  Please confirm that these objections will be withdrawn.

**ROG No. 9**.  Liberty objected to providing information about David Bona's qualifications on the grounds that the request is overly broad, unduly burdensome, oppressive, and harassing in part because it is not limited to a reasonable time period.  Roseburg disagrees that this request is improper because Liberty has placed Mr. Bona's qualifications in dispute by refusing to consent to Roseburg's chosen defense counsel and attempting to appoint Mr. Bona as Roseburg's counsel.  Also, Liberty cannot object on the basis that no time period was specified without providing one of its own.  *Big Baboon*, 723 F.Supp.2d at 1229.  Please confirm that these objections will be withdrawn.  Please also confirm that no relevant information has been withheld because of Liberty's time period objection.  But if information has been withheld, explain on what basis and how Liberty chose a time period.

Finally, Liberty failed to provide a complete answer to Roseburg's interrogatory. With respect to Mr. Bona's cases, Liberty did not provide the following information:  whether the case was a tripartite representation, the amount of alleged monetary exposure to Mr. Bona's client, the time period during which Mr. Bona participated in the case, and the litigation outcome.  Liberty has no grounds to withhold relevant evidence.  Please confirm Liberty will provide this information.

**ROG No. 10**.  Liberty objected to identifying the law firms it retains in the ordinary course of business in the defense of similar actions in the community on several grounds, including relevance and overbreadth.  As noted above, Liberty has not chosen to avail itself of California Civil Code § 2860; as a result, Liberty is not eligible for the protections provided by § 2860 (including Liberty's payment for defense counsel topping out at rates Liberty pays



SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
December 19, 2023
Page 10 of 10

counsel in the normal course of business for similar claims in the relevant community).  If
Liberty agrees, Roseburg will agree these documents are not relevant.  If Liberty disagrees,
but does not provide evidence of law firms it retains in the ordinary course of business in the
defense of similar actions in the community, Roseburg's evidence will govern.  *Grove*, 606
F.3d at 583.  Nor is there any "privacy rights" exception to Liberty's discovery obligations
(even if there were, Liberty did not provide the necessary analysis).  *Vepo*, No. CV 20-04950,
2021 WL 6882161, at *2.  Please confirm Liberty will withdraw these objections or stipulate
that section 2860 does not limit Liberty's rates.

     <u>ROG No. 13</u>.  As noted above, wildfire exclusions are in contention because Ohio
Casualty, Liberty's sister entity, asserted that the wildfire exclusion might limit or negate
coverage under its $20 Million policy.  (Ohio Casualty Ans. ¶¶ 15, 79, 82, 95, 97; Second
Affirmative Defense).  Despite this conflict of interest, Liberty refused to appoint independent
counsel.  *Ellis*, No. SACV 13-00241, 2014 WL 12617353, at *1.  Coverage cases in which
Liberty contested its duty to defend based on a wildfire exclusion are highly relevant to
determining whether Liberty improperly prioritized its own interests over Roseburg's by
determining that the Mill Fire was a "wildfire" based on Liberty's understanding of how
wildfire exclusions work.  For the same reasons, Liberty cannot claim that discovery about
wildfire exclusions used by Liberty is unduly burdensome and oppressive.  *Eisner v.
Prudential Ins. Co. of Am.*, No. 12-cv-01238, 2013 WL 10903701, at *2 (N.D. Cal. May 4,
2013) (history of paying similar claims relevant).

**Request for Admission No. 7:  The Liberty Policy**

     As above, in its responses to Peterman's requests for admission, Liberty included a
number of general objections, which are improper.  *Infanzon v. Allstate Ins. Co.*, 335 F.R.D.
305, 311 (N.D. Cal. 2020).  Roseburg also does not agree that Liberty's objections to
Roseburg's requests for admission are proper.  More importantly, though, Liberty denied that
Exhibit A to the Complaint is a true and correct copy of the Liberty Policy.  Please identify a
true and correct copy of the policy.

     We look forward to receiving Liberty's prompt response to the issues outlined above.
Should you have any questions or wish to discuss this matter further, feel free to contact me.

Sincerely,

Scott P. DeVries          Rachel E. Hudgins

EXHIBIT 49

EXHIBIT 49

EXHIBIT 49

**HUNTON ANDREWS KURTH LLP**
Scott P. DeVries (State Bar No. 88221)
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701

Attorneys for Plaintiffs RLC Industries Co.
and Roseburg Forest Products Co.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RLC INDUSTRIES CO. and ROSEBURG FOREST PRODUCTS CO., | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| LIBERTY INSURANCE CORPORATION, EVEREST NATIONAL INSURANCE COMPANY, and THE OHIO CASUALTY INSURANCE COMPANY | **JURY TRIAL DEMANDED** |
| Defendants. | |

**COMPLAINT**

Plaintiffs RLC Industries Co. ("RLC Industries") and Roseburg Forest Products Co. ("Roseburg Forest") (together, "Roseburg"), file this Complaint for damages and declaratory relief against Defendants Liberty Insurance Corporation ("Liberty"), Everest National Insurance Company ("Everest"), and The Ohio Casualty Insurance Company ("Ohio Casualty"), alleging the following:

*Hunton Andrews Kurth LLP*
*50 California Street, Suite 1700*
*San Francisco, California 94111*

**INTRODUCTION**

1.    This insurance coverage lawsuit relates to the defense and indemnification of claims against Roseburg Forest stemming from the Mill Fire in Weed, California.

2.    Roseburg Forest manufactures a comprehensive lineup of high-quality, sustainably harvested wood products. Roseburg Forest operates a wood veneer manufacturing mill in Siskiyou County, California, near the town of Weed, California. The mill manufactures wood veneer and wood chips.

3.    A fire began inside the mill on September 2, 2022. It engulfed part of the mill, crossed the railroad tracks that border the property, and spread through the town of Weed and the neighboring community of Lake Shastina, causing three fatalities, the loss of 89 homes and businesses, and harm to numerous others. Because it started in a mill, the California Department of Forestry and Fire Protection dubbed it the "Mill Fire."

4.    Thousands of local residents and businesses were affected by the Mill Fire.

5.    Recognizing the hardships that the fire had caused, within days of the fire, Roseburg established a $50 million fund to provide immediate assistance to local residents and businesses in the form of shelter, food, clothing, medical care, and other immediate needs.

6.    Within the next few months, to help the affected residents and businesses start rebuilding their homes and community as quickly as possible, Roseburg Forest settled with the overwhelming majority of the homeowners and businesses without the need for litigation.

7.    Thus far, Roseburg Forest has paid over $110 million in settlements.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

2

Exhibit 49, Page 002

8.      Roseburg Forest hired the law firm of Baker & Hostetler LLP ("Baker Hostetler"), which played a critical role in these efforts as a full-service firm with hundreds of lawyers, dozens of whom have relevant experience.

9.      At the time of the fire in September 2022, a "tower" of six insurers provided commercial general liability coverage to Roseburg Forest for bodily injury and property damage claims arising from its operations at the plant.

10.     As the primary layer insurer in the program, Liberty had a duty to defend these claims and, consistent with its contractual obligation, it initially agreed to pay for the defense being provided by Baker Hostetler.

11.     However, on September 22, 2022, Liberty reversed course and assigned a small law firm, Carlson, Calladine & Peterson LLP ("Carlson"), which primarily defends insurance companies and only has two lawyers with fire experience. Reneging on its prior acceptance of Baker Hostetler as defense counsel, Liberty refused to engage Baker Hostetler or to pay its fees and costs.

12.     Given the magnitude and complexity of the claims, and the critical importance of resolving them expeditiously, Roseburg Forest continued to use Baker Hostetler as its defense counsel. Roseburg Forest treated Carlson as counsel for Liberty and cooperated with Carlson to the extent required by the policies. Because of this limited and defined role, Carlson never made an appearance in any of the suits against Roseburg Forest or otherwise represented Roseburg Forest.

13.     Based on settlement agreements Baker Hostetler negotiated with the insurers' consent, the first four insurers in the insurance program, including Liberty, paid their combined $19 million in policy limits, exhausting their indemnity obligations.

14.     Although the insurers for the four layers of insurance have exhausted their indemnity obligations, the insurers for the fifth and sixth layers of insurance – defendants Everest and Ohio Casualty – have neither accepted Roseburg Forest's

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

3

Exhibit 49, Page 003

1    defense nor agreed to contribute to Roseburg Forest's settlements with local
2    homeowners and businesses.

3        15.    Upon information and belief, Everest and Ohio Casualty's coverage
4    position relies on, among other provisions, a "wildfire exclusion" that plainly does
5    not apply.

6        16.    Roseburg had a reasonable expectation that the Everest and Ohio
7    Casualty policies would, like the other liability policies that it purchased, provide
8    coverage for claims stemming from the Mill Fire.

9        17.    By this action, Roseburg seeks to compel Everest and Ohio Casualty to
10   provide the insurance benefits they committed to when they sold the insurance
11   policies.

12       18.    Roseburg further seeks to compel Liberty to pay for the defense costs
13   that Roseburg Forest incurred related to its defense, which Liberty inappropriately
14   denied.

15                                    **PARTIES**

16       19.    Plaintiff RLC Industries is an Oregon corporation with its principal
17   place of business in Springfield, Oregon. RLC Industries is Roseburg Forest's parent
18   company.

19       20.    Plaintiff Roseburg Forest is an Oregon corporation with its principal
20   place of business in Springfield, Oregon.

21       21.    Defendant Liberty is incorporated in Illinois with its principal place of
22   business in Hoffman Estates, Illinois. Liberty does business in California and may
23   be served care of Corporation Service Company at 2710 Gateway Oaks Drive,
24   Sacramento, California 95833.

25       22.    Defendant Everest is incorporated in Delaware with its principal place
26   of business in Warren, New Jersey. Everest does business in California and may be
27   served at 2710 Gateway Oaks Drive, Sacramento, California 95833.

28

<div style="margin-left:2em; font-size:smaller;">Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111</div>

COMPLAINT AND DEMAND FOR JURY TRIAL

1    23.    Defendant Ohio Casualty is incorporated in New Hampshire with its

2    principal place of business in Dover, New Hampshire. Ohio Casualty does business

3    in California and may be served care of Corporation Service Company at 2710

4    Gateway Oaks Drive, Sacramento, California 95833.

5    24.    Defendants Liberty and Ohio Casualty are related entities. They are part

6    of the Liberty Mutual Insurance companies.

7                              **JURISDICTION AND VENUE**

8    25.    This Court has jurisdiction over this matter pursuant to 28 U.S.C.

9    §1332, because the parties are completely diverse in citizenship and the amount in

10   controversy exceeds $75,000 exclusive of interest and costs.

11   26.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because

12   a substantial portion of the events or omissions giving rise to Plaintiffs' claim

13   occurred in this District, including the Mill Fire and related claims.

14                              **FACTUAL BACKGROUND**

15   **Roseburg Forest's Operations and the Veneer Mill in Weed, California**

16   27.    Roseburg Forest was founded in 1936 in Roseburg, Oregon.

17   28.    Roseburg Forest manufactures a comprehensive lineup of high-quality,

18   sustainably harvested wood products like engineered wood, plywood, lumber,

19   fiberboard, particleboard, thermally-fused laminate, and woodchips.

20   29.    Roseburg Forest's operations include a veneer mill in Weed, California,

21   which it has operated for 40 years.

22

23

24

25

26

27

28

*Hunton Andrews Kurth LLP*
*50 California Street, Suite 1700*
*San Francisco, California 94111*

---

5

COMPLAINT AND DEMAND FOR JURY TRIAL

30.    The mill sits in the middle of the city of Weed. Below is an aerial photo of Weed, California taken before the Mill Fire.



31.    With over 140 employees in a city of 2,862, Roseburg Forest is among Weed's and Siskiyou County's largest employers. In addition to its local workforce, Roseburg Forest contributes to the local economy by hiring regional vendors and suppliers to perform necessary logging and trucking services. Roseburg Forest is also an important donor in the community. Roseburg Forest has donated substantial funds to local schools, sports teams, and community organizations, and has encouraged its employees to do the same while also matching their donations.

**The Mill Fire**

32.    The mill produces its own steam to manufacture veneer and to create its own electric power in a co-generation facility fueled by wood bark, typically consisting of Douglas Fir, White Fir and Pine. This process generates two types of

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

Exhibit 49, Page 006

ash – bottom ash and fly ash, which is wetted before it is stored in a shed on the mill property.

33.     On September 2, 2022 at about 12:49 p.m., a fire started within or near the ash shed.

34.     The resulting Mill Fire crossed the railroad tracks on the northern side of the property, destroying homes on the other side of the tracks in Weed, and from there, through the adjoining community of Lake Shastina, in total, causing three fatalities and the loss of about 89 homes and businesses.

35.     Below is an aerial photograph taken before the Mill Fire. The red dots indicate buildings damaged or destroyed by the Mill Fire. The structure outlined in yellow is the ash shed where the fire began.



COMPLAINT AND DEMAND FOR JURY TRIAL

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

**Roseburg's Response to the Mill Fire**

36.    While investigations of the fire's cause were ongoing, Roseburg organized a multi-faceted team focused on assisting the residents and businesses restore their community.

37.    Less than a week after the Mill Fire broke out, Roseburg established the Weed Community Restoration Fund, committing an initial $50 million to help any member of the community impacted by the Mill Fire obtain payments for immediate needs.

38.    Specifically, the fund provided:

   a.   Temporary shelter, such as hotel or motel rooms or temporary rental housing;

   b.   Clothing, food and water;

   c.   Transportation, for those whose vehicles were destroyed by the fire;

   d.   Medical care and supplies, for immediate needs for care and prescriptions;

   e.   Day care, child care, and adult day care;

   f.   Grief counselors; and

   g.   Lost income/lost business, for those whose jobs are unavailable because of the fire.

39.    Roseburg provided these supplies, services and funds to the residents and businesses as needed; Roseburg did not make any aid or funds contingent on the settlement or release of any claims.

40.    Having provided evacuees with immediate resources, the Fund transitioned to focusing on the long-term recovery needs of homeowners and landowners whose property was destroyed or damaged.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

Exhibit 49, Page 008

41. Throughout this time, Roseburg has reached out to local homeowners and businesses harmed by the fire to compensate them for their losses and to rebuild the community.

42. Many of Roseburg Forest's own employees are survivors of the Mill Fire.

43. From the moment the fire was extinguished, Roseburg has worked quickly and diligently with leaders of the fire-impacted communities, including numerous state and local organizations, to provide relief to individuals and families impacted by the fire.

**Claims Against Roseburg Forest**

44. While these proactive efforts were ongoing, a number of community members brought claims against Roseburg Forest for property losses, personal injuries, and wrongful death arising from the Mill Fire (the "Underlying Claims").

45. Among those Underlying Claims are the following lawsuits:

    a. *Smith v. Roseburg Forest Products Co.*, filed in Siskiyou County Superior Court (No. CV PO 22-951) and now pending in the U.S. District Court for the Eastern District of California, No. 2:22-cv-01767;

    b. *Hammond v. Roseburg Forest Products Co.*, filed in Sacramento County Superior Court (No. 34-2022-00326413-CU-NP-GDS) and now pending in the U.S. District Court for the Eastern District of California, No. 2:22-cv-01767;

    c. *Candasa v. Roseburg Forest Products Co.*, filed in San Francisco County Superior Court (No. CGC-22-601752) and now pending in the U.S. District Court for the Northern District of California, No. 3:22-cv-05778; and

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

9

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

d.  *Davies v. Roseburg Forest Products Co*., filed in San Francisco County Superior Court (No. CGC 22-602896).

46.     Roseburg Forest has settled many of these claims and entered into other pre-suit settlements.

47.     To date, Roseburg Forest has entered into settlement agreements for the civil disputes with five law firms who represent over 700 victims, including each of the decedents' estates, for over $110 million. Together with the settlements with certain unrepresented individuals, Roseburg has settled in principle claims for approximately 90% of the 89 fully destroyed residences, and a significant portion of the affected businesses and residents as well. Roseburg anticipates settlements with remaining parties shortly, including subrogation insurers, at least four more law firm groups, and other unrepresented individuals.

**Roseburg's Insurance Claim**

48.     Roseburg Forest's operations at the veneer mill are covered by a commercial general liability insurance program consisting of six (6) insurance policies, detailed below.

49.     Within days of the fire, Roseburg provided notice to its general liability insurers, thereafter consistently updating them on claims and other material developments.

50.     Liberty, as Roseburg's primary insurer, accepted its duty to defend; however Liberty refused to provide the required defense, much less an adequate defense, leaving Roseburg to provide and pay for its own defense.

51.     Roseburg's first four layers of primary, umbrella, and excess insurers, including Liberty, reimbursed it for a portion of the settlement payments Roseburg made.

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 010

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

52.    In contrast, Everest and Ohio Casualty have refused to reimburse Roseburg for any of its settlements, even though Roseburg has incurred settlement costs well in excess of Everest and Ohio Casualty's limits.

## THE POLICIES

53.    Like most businesses, to protect itself from catastrophic losses, Roseburg Forest's parent company, RLC Industries, purchased six commercial general liability insurance policies, effective November 1, 2021 to November 1, 2022:

    a.  Liberty issued primary policy no. TB7-661-067089-031 (the "Liberty Policy"), which is subject to a $4 million limit for this loss. A copy of the Liberty Policy is attached as Exhibit A and incorporated herein *in haec verba.*

    b.  Markel American Insurance Company ("Markel") issued umbrella policy no. MKLM6MM70000398 (the "Markel Policy"), which is subject to a $5 million limit for this loss in excess of the Liberty Policy. A copy of the Markel Policy is attached as Exhibit B and incorporated herein *in haec verba.*

    c.  Federal Insurance Company ("Federal") issued excess policy no. 7819-50-57 (the "Federal Policy"), which is subject to a $5 million limit for this loss in excess of the Markel Policy. A copy of the Federal Policy is attached as Exhibit C and incorporated herein *in haec verba.*

    d.  Allied World Assurance Company ("AWAC") issued excess policy no. 0311-5913 (the "AWAC Policy"), which is subject to a $5 million limit for this loss in excess of the Federal Policy. A copy of the AWAC Policy is attached as Exhibit D and incorporated herein *in haec verba.*

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 011

e. Everest issued excess policy no. XC2EX00126-211 (the "Everest Policy"), which is subject to a $10 million limit for this loss in excess of the AWAC Policy. A copy of the Everest Policy is attached as Exhibit E and incorporated herein *in haec verba*.

f. Ohio Casualty issued excess policy no. XC2EX00126-211 (the "Ohio Casualty Policy"), which is subject to a $20 million limit for this loss in excess of the Everest Policy. A copy of the Ohio Casualty Policy is attached as Exhibit F and incorporated herein *in haec verba*.

54. As a wholly-owned subsidiary of RLC, Roseburg Forest qualifies as an insured under the policies.

55. Together, the policies provide a total limit of liability of $49,000,000 for the Mill Fire.

56. The Liberty Policy also obligates it to provide a defense of any claims which are potentially covered by the Liberty Policy. If there is a conflict between the interests of Liberty and its insured, Liberty must pay for the counsel of the insured's choosing; to the extent there is no conflict, Liberty must provide defense counsel that is adequate and competent given the context.

57. Liberty's defense obligation terminates prospectively when it has paid, and the policyholder has accepted, payment of its policy limits. The defense obligation then attaches to the next level insurer, here, Markel, until it has paid its limits and so on through the insurance tower.

58. The substantial premium that the insurers charged for the program was based on the nature of RLC Industries and Roseburg Forest's business, which is dedicated to the manufacture of high-quality, sustainably harvested wood products.

59. The insurers drafted their respective insurance policy forms or used forms drafted by the insurance industry.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

COMPLAINT AND DEMAND FOR JURY TRIAL

**The Mill Fire is a Covered Loss under the Policies**

60.    The policies cover sums that Roseburg Forest pays because of "bodily injury" or "property damage" caused by an "occurrence."

61.    Under the policies terms, the Mill Fire was an "occurrence."

62.    The Mill Fire caused bodily injury and property damage.

63.    Roseburg Forest has entered into settlement agreements committing itself to pay damages in settlements because of the bodily injuries and property damage caused by the Mill Fire.

64.    Roseburg Forest neither expected nor intended the Mill Fire or the resulting losses.

65.    As of this filing, Roseburg Forest has paid $110 million in settlements (i.e., damages) because of bodily injuries and property damage caused by the Mill Fire.

**Liberty's Defense Obligations**

66.    Consistent with the requirements of its insurance policy, Liberty accepted Roseburg Forest's defense.

67.    Liberty initially approved Roseburg's request to continue using Baker Hostetler as defense counsel, the law firm that had been handling the defense from "day one."

68.    Weeks later, while Roseburg's response to the Mill Fire was well underway and after ongoing communications with Baker Hostetler in its capacity as Roseburg Forest's defense counsel, Liberty reversed course.

69.    In a "reservation of rights" letter, Liberty expressed various factual and legal arguments why it might not be required to indemnify Roseburg Forest. While recognizing that Roseburg Forest's claims were potentially covered and that it was required to accept Roseburg Forest's tender of defense, it nevertheless rejected

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

COMPLAINT AND DEMAND FOR JURY TRIAL

1    Roseburg Forest's selection of Baker Hostetler as independent counsel and
2    appointed its own lawyers to represent Roseburg Forest – the Carlson firm.

3        70.    According to Carlson's website, it only has nine attorneys and of these,
4    only two of its attorneys practice fire-related litigation. Most of the firm's practice
5    is dedicated to defending insurance companies attempting to avoid their insurance
6    obligations (a practice adverse to Roseburg Forest's position here that its insurers
7    are contractually obligated to defend and indemnify Roseburg).[1] Roseburg has not
8    waived conflicts posed by Carlson's extensive insurance-side representation.

9        71.    By this time, Baker Hostetler had negotiated a streamlined claims
10   process with plaintiffs' counsel; established the Fund response which was essential
11   to assisting the community on a real time basis and reducing the need for time-
12   consuming litigation; coordinated third-party indemnification claims; and led
13   Roseburg Forest's response to government investigations.

14       72.    Whatever the abilities of the two Carlson attorneys with fire-related
15   experience, Carlson was neither equipped nor staffed to adequately defend Roseburg
16   Forest against hundreds of claimants, much less provide a holistic and consistent
17   defense for Roseburg Forest in all the matters it was facing.

18       73.    Materially later, when Liberty purported to dispense with its
19   reservations, core conflicts continued to persist between Roseburg Forest on the one
20   hand and Liberty, and Liberty's associated company Ohio Casualty on the other,
21   conflicts further perpetuating Roseburg Forest's right to its chosen independent
22   counsel, Baker Hostetler. These conflicts continue through the present.

23       74.    While recognizing its obligation to provide Roseburg Forest with a
24   defense, Liberty has not paid for counsel selected by Roseburg Forest or provided

25
26
27   _____
     [1] https://www.ccplaw.com/practice-areas/ (last visited Apr. 6, 2023).
28

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

Exhibit 49, Page 014

an adequate defense, much less the one required under the law in view of the context and scope of the claims against Roseburg Forest.

**Exhaustion of the Liberty, Markel, Federal, and AWAC Policies**

75.     Insurers Liberty, Markel, Federal, and AWAC timely paid Roseburg Forest their respective policies' limits and reimbursed Roseburg Forest for $19 million of the settlements.

a.  Liberty paid, and thereby exhausted, its full policy limits by three checks, the last of which Roseburg Forest received on February 10, 2023;

b.  Markel paid, and thereby exhausted, its full policy limits by a check, which Roseburg Forest received on February 3, 2023;

c.  Federal paid, and thereby exhausted, its full policy limits by a check, which Roseburg Forest received on March 24, 2023; and

d.  AWAC paid, and thereby exhausted, its full policy limits by a check, which Roseburg Forest received on April 6, 2023.

76.     Insurers Liberty, Markel, Federal, and AWAC have paid Roseburg Forest their full policy limits with respect to the Mill Fire, exhausting each of their insurance policies.

77.     As the fifth-level insurer, Everest's contractual obligation to defend and indemnify commenced immediately after AWAC, as the fourth-level insurer, satisfied its obligations by paying its policy limits to Roseburg on April 6, 2023.

78.     Under the express terms of its policy, Everest "follows form" to the underlying insurers – each of whom have paid and exhausted their limits – except to the extent specifically set forth in the Everest Policy.

**No Exclusion in the Everest Policy Excuses Its Non-Payment**

79.     No exclusion in the Everest Policy precludes or limits coverage, in whole or in part, for Roseburg Forest's claimed losses.

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

15

Exhibit 49, Page 015

80.   Nonetheless, Everest reserved rights to deny coverage for the Mill Fire based on the Everest Policy's Wildfire Exclusion Endorsement.

81.   The Wildfire Exclusion Endorsement says this:

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

SECTION I – COVERAGES (B. Exclusions) is amended to include the following Exclusion:

This insurance does not apply to:

Wildfires

Any injury, loss or damage arising out of:

a.   Uncontrolled and widespread wildfire, including, but not limited to injury to, or destruction of, standing timber or timberlands or damage to real or personal property arising out of operations performed by or for any insured;

b.   Landslides, mudslides, floods resulting from any wildfire; or

c.   Firefighting expenses.

All other terms and condition of the policy apply.

(Ex. E, RB00262).

82.   The Wildfire Exclusion Endorsement does not preclude or limit coverage, in whole or in part, for Roseburg Forest's claim related to the Mill Fire.

83.   The Wildfire Exclusion Endorsement does not define "wildfire" nor is it defined anywhere else in the Everest Policy.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

84.     Various dictionaries provide the plain meaning of "wildfire" as follows:

    a.   "a sweeping and destructive conflagration especially in a wilderness or a rural area"[2];

    b.   "a fire that is burning strongly and out of control on an area of grass or bushes in the countryside"[3];

    c.   "a fire that starts, usually by itself, in a wild area such as a forest, and spreads rapidly, causing great damage"[4]; and

    d.   "a fire in a wild area (such as a forest) that is not controlled and that can burn a large area very quickly"[5]

85.     California and Oregon statutes provide additional meanings of "wildfire" as follows:

    a.   California Government Code section 51177 defines wildfire:

> "Wildfire" means an unplanned, unwanted wildland fire, including unauthorized human-caused fires, escaped wildland fire use events, escaped prescribed fire projects, and all other wildland fires where the objective is to extinguish the fire.

---

[2] Merriam-Webster, https://www.merriam-webster.com/dictionary/wildfire (last visited Apr. 6, 2023).

[3] Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/wildfire (last visited Apr. 6, 2023).

[4] Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/wildfire (last visited Apr. 6, 2023).

[5] The Britannica Dictionary, https://www.britannica.com/dictionary/wildfire (last visited Apr. 6, 2023).

COMPLAINT AND DEMAND FOR JURY TRIAL

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

b. Oregon's Fire Protection of Forests & Vegetation section 477.123(1)(b) defines wildfire:

"Wildfire" means a fire burning uncontrolled on private cropland, pasture, rangeland or other private agricultural land or threatening a structure on agricultural land.

c. In an action to recover for economic damages from a wildfire, Oregon statute states that a wildfire means a fire that "Originated on land used or capable of being used for growing forest tree species regardless of the existing use of the land." ORS § 477.092.

86.    Other authoritative resources supply other definitions or context to the word wildfire:

a. The 2021 International Wildland-Urban Interface Code defines "wildfire" as: "An uncontrolled fire spreading through vegetative fuels, exposing and possibly consuming structures."[6]

b. According to the National Interagency Fire Center, a "Wildland fire is a general term describing any non-structure fire that occurs in the wildland. Wildland fires are categorized into two distinct types: a. Wildfires – Unplanned ignitions or prescribed fires that are declared wildfires [and] b. Prescribed Fires – Planned ignitions."[7]  In the glossary to the guidelines, "wildfire" is again defined, meaning an "unplanned ignition of a wildland fire (such

---

[6] https://codes.iccsafe.org/content/IWUIC2021P1/chapter-2-definitions (last visited Apr. 6, 2023).

[7] U.S. Department of Agriculture & U.S. Department of Interior, Guidance for Implementation of Federal Wildland Fire Management Policy at 7, https://www.doi.gov/sites/doi.gov/files/uploads/2009-wfm-guidance-for-implementation.pdf (last visited Apr. 6, 2023).

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 018

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

as a fire caused by lightning, volcanoes, unauthorized and accidental human-caused fires) and escaped prescribed fires." "Wildland fire" is defined in the glossary to mean "a general term describing any non-structure fire that occurs in the wildland."[8]

c.  National Geographic defines "wildfire" as "an uncontrolled fire that burns in wildland vegetation, often in rural areas."[9]

d.  The World Health Organization defines "wildfire" as "an unplanned fire that burns in a natural area such as a forest, grassland, or prairie."[10]

e.  The Federal Emergency Management Agency (FEMA), an agency of the United States Department of Homeland Security, explains a "wildfire is an unplanned, unwanted fire burning in a natural area, such as a forest, grassland, or prairie."[11]

f.  Ready.gov, an emergency preparedness website that is an official site of the U.S. government, defines "wildfires" as "unplanned fires that burn in natural areas like forests, grasslands or prairies."[12]

g.  Climate Hubs, a collaboration across the U.S. Department of Agriculture's agencies, defines "wildfires" as "unplanned fires that occur in wildlands such as forest, rangelands or grasslands."[13]

---

[8] *Id.* at 17.

[9] https://education.nationalgeographic.org/resource/wildfires (last visited Apr. 6, 2023).

[10] https://www.who.int/health-topics/wildfires#tab=tab_1 (last visited Apr. 6, 2023).

[11] https://community.fema.gov/ProtectiveActions/s/article/Wildfire-What (last visited Apr. 6, 2023).

[12] https://www.ready.gov/wildfires (last visited Apr. 6, 2023).

[13] https://www.climatehubs.usda.gov/taxonomy/term/398 (last visited Apr. 6, 2023).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

19

COMPLAINT AND DEMAND FOR JURY TRIAL

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

h.  The University of California, Davis, explains that "[w]ildfires are unplanned burns in any natural environment, like a forest or a grassland."[14]

87.  All of these are reasonable interpretations of the word "wildfire."

88.  None of these interpretations describe the Mill Fire.

89.  The Mill Fire did not ignite in wildlands.

90.  The Mill Fire began in a structure at the mill and spread, consuming structures in Weed and adjoining communities.

91.  As shown by these sources, which are relevant to determining reasonable constructions of "wildfire" and its plain meaning, Roseburg had a reasonable expectation that occurrences like the Mill Fire would be covered and not subject to a Wildfire Exclusion.

92.  Everest drafted the Wildfire Exclusion and could have defined the term "wildfire."

93.  Other insurers have drafted wildfire exclusions. Although none of these exclusions are included in Roseburg's policies, they are evidence of how other insurers have tailored their respective exclusions to preclude coverage for particular types of fires, exclusions that Everest could have used here. Copies of sample exclusions are attached as Exhibit G and incorporated herein *in haec verba*.

94.  At a minimum, Roseburg's construction of "wildfire" is a reasonable one, Everest cannot establish that no reasonable construction supports coverage, and the wildfire exclusion must be construed in favor of coverage.

---

[14] https://climatechange.ucdavis.edu/climate/definitions/wildfire (last visited Apr. 6, 2023).

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 020

**Once the Everest Policy Exhausts, the Ohio Casualty Policy Must Provide Coverage**

95.    No exclusion in the Ohio Casualty Policy precludes or limits coverage, in whole or in part, for Roseburg's claimed losses.

96.    Ohio Casualty has not provided its coverage position, but the Ohio Casualty Policy has this Following Form Endorsement:

> It is agreed that this policy is subject to the exact terms and conditions of the EVEREST INDEMNITY INSURANCE COMPANY Policy Number XC2EX00126-211 [*i.e.*, the Everest Policy], except with respect to the:
>
> Limits of Insurance;
>
> Premium; and
>
> Any exclusions or endorsement attached to this policy.

(Ex. F, RB00292).

97.    To the extent the Ohio Casualty Policy follows form with respect to the Everest Wildfire Exclusion, the exclusion does not apply for those reasons stated in paragraphs 79 to 94.

**Roseburg Fulfilled All Policy Conditions**

98.    Roseburg fulfilled all of the policy conditions for coverage.

99.    Roseburg paid the premiums on each and all of the policies.

100.    Roseburg provided timely notice of the Mill Fire to the insurers.

101.    Roseburg subsequently provided its insurers timely notice of the claims brought against it.

102.    Roseburg has provided regular updates to its insurers regarding the claims against it, including estimated settlement ranges for the claims.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 021

103.    Roseburg's insurers either consented to settlement amounts or ranges, or agreed that they would not object to the settlements as either lacking their consent or constituting voluntary payments.

104.    On December 7, 2022, Roseburg Forest conducted the first of several mediations with lawyers for the underlying claimants.

105.    Carlson attended the mediations and represented Liberty. At all times, Roseburg and Baker Hostetler have cooperated with Carlson.

106.    In the ensuing months, Roseburg Forest settled with a considerable number of claimants, paying $110 million so far.

107.    Throughout, Roseburg has timely apprised its insurers of all settlements, incorporated their input into the settlement agreements, cooperated, and otherwise fulfilled all of the policies' conditions.

## CAUSES OF ACTION
## COUNT I: Breach of Contract (Duty to Defend)
## (Liberty)

108.    Roseburg repeats and realleges the allegations in the preceding paragraphs.

109.    The Liberty Policy is a valid and enforceable contract between Liberty and Roseburg.

110.    Roseburg Forest has sustained a covered loss under the Liberty Policy.

111.    The claim triggered Liberty's duty to defend Roseburg Forest.

112.    No exclusions apply to preclude or limit coverage.

113.    Roseburg has fully complied with all of the terms and conditions of the Liberty Policy and has satisfied any and all conditions precedent to coverage under the Liberty Policy, including, but not limited to: paying premiums and providing timely notice of the claim.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

22

114.    To the extent Roseburg has not complied with a condition in the Liberty Policy, it is because the condition does not apply or has been waived by Liberty.

115.    There is a conflict between the interests of Roseburg Forest and Liberty such that Roseburg Forest had the right to independent counsel, Baker Hostetler.

116.    If there were no conflict (which there is), Liberty owed Roseburg Forest a duty to select adequate, competent, and conflict-free counsel to represent Roseburg Forest for claims stemming from the Mill Fire and Liberty failed to do so for claims stemming from the Mill Fire.

117.    Liberty breached its duty to defend Roseburg Forest.

118.    Because of Liberty's breach of the Liberty Policy, Roseburg Forest has incurred and continues to incur attorneys' fees and costs in its defense.

119.    Roseburg is entitled to damages as a result of Liberty's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

### COUNT II: Breach of the Covenant of Good Faith and Fair Dealing (Liberty)

120.    Roseburg repeats and realleges the allegations in the preceding paragraphs.

121.    Liberty's refusal to pay for Roseburg Forest's choice of counsel despite the plain meaning of the language in its Policy, is without proper cause.

122.    Roseburg is entitled to their attorneys' fees and costs incurred to obtain the Liberty Policy benefits under *Brandt v. Superior Court*, 37 Cal. 3d 813, 817 (1985).

123.    Liberty denied Roseburg Forest's request for its selected defense without proper cause.

124.    Roseburg seeks to recover the attorneys' fees and costs it has incurred, including the fees and costs incurred and to be incurred to pursue this action.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 023

**COUNT III: Declaratory Judgment**
**(Everest and Ohio Casualty)**

125.    Roseburg repeats and realleges the allegations in the preceding paragraphs.

126.    RLC Industries and Roseburg Forest seek a declaration of the parties' rights and duties under the policies pursuant to 28 U.S.C. §2201. A justiciable controversy exists between RLC Industries, Roseburg Forest, Everest, and Ohio Casualty concerning the availability of coverage under the policies for Roseburg Forest's claim.

127.    The parties' controversy is ripe for judicial review.

128.    Accordingly, Roseburg seeks a declaration from the Court that:

    a.    Roseburg Forest's claim triggers the Everest Policy;

    b.    Assuming the Everest Policy exhausts, Roseburg Forest's claim triggers the Ohio Casualty Policy;

    c.    No exclusion in the Everest or Ohio Casualty Policies applies to bar or limit coverage;

    d.    The Everest and Ohio Casualty Policies cover the claim; and

    e.    Any other declaratory relief that would be useful to the resolution of the dispute between the parties.

**COUNT IV: Breach of Contract (Duty to Defend)**
**(Everest)**

129.    Roseburg repeats and realleges the allegations in the preceding paragraphs.

130.    The Everest Policy is a valid and enforceable contract between Everest and Roseburg.

131.    Roseburg Forest has sustained a covered loss under the Everest Policy.

132.    The claim triggered Everest's duty to defend Roseburg Forest.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

24

Exhibit 49, Page 024

1    133.    No exclusions apply to preclude or limit coverage.

2    134.    Roseburg has fully complied with all of the terms and conditions of the

3    Everest Policy and has satisfied any and all conditions precedent to coverage under

4    the Everest Policy, including, but not limited to: paying premiums and providing

5    timely notice of the claim.

6    135.    To the extent Roseburg has not complied with a condition in the Everest

7    Policy, it is because the condition does not apply or has been waived by Everest.

8    136.    Everest breached its duty to defend Roseburg Forest.

9    137.    Because of Everest's breach of the Everest Policy, Roseburg Forest has

10    incurred and continues to incur attorneys' fees and costs in its defense.

11    138.    Roseburg is entitled to damages as a result of Everest's breach of

12    contract in an amount to be determined at trial, including pre- and post-judgment

13    interest and any other costs and relief that this Court deems appropriate.

**COUNT V: Breach of Contract (Duty to Indemnify)**
**(Everest)**

16    139.    Roseburg repeats and realleges the allegations in the preceding

17    paragraphs.

18    140.    The Everest Policy is a valid and enforceable contract between Everest

19    and Roseburg.

20    141.    Roseburg Forest has sustained a covered loss under the Everest Policy.

21    142.    Roseburg Forest submitted a claim for the Mill Fire to Everest.

22    143.    As set forth above, the Everest Policy provides coverage for Roseburg's

23    losses.

24    144.    No exclusions apply to preclude or limit coverage.

25    145.    Roseburg has fully complied with all of the terms and conditions of the

26    Everest Policy and has satisfied any and all conditions precedent to coverage under

27    the Everest Policy, including, but not limited to: paying premiums, providing timely

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 025

1  notice of the claim, taking all reasonable steps to protect the property from further
2  damage, and exhausting the policies under Everest's layer.

3      146.   To the extent Roseburg has not complied with a condition in the Everest
4  Policy, it is because the condition does not apply or has been waived by Everest.

5      147.   Everest has wrongfully refused to indemnify Roseburg Forest's claim
6  in breach of the Everest Policy.

7      148.   Everest has breached its duty to indemnify Roseburg Forest.

8      149.   Because of Everest's breach of the Everest Policy, Roseburg Forest has
9  suffered and continues to suffer significant damages.

10     150.   Roseburg is entitled to coverage up to the Everest Policy's limit of
11  liability.

12     151.   Roseburg is entitled to damages as a result of Everest's breach of
13  contract in an amount to be determined at trial, including pre- and post-judgment
14  interest and any other costs and relief that this Court deems appropriate.

**COUNT VI: Breach of the Covenant of Good Faith and Fair Dealing**
**(Everest)**

15
16     152.   Roseburg repeats and realleges the allegations in the preceding
17  paragraphs.
18
19     153.   Everest's denial of coverage, despite the plain meaning of the language
20  in its Policy, is without proper cause.

21     154.   Roseburg is entitled to their attorneys' fees and costs incurred to obtain
22  the Everest Policy benefits under *Brandt v. Superior Court*, 37 Cal. 3d 813, 817
23  (1985).

24     155.   Everest denied Roseburg Forest's request for defense and indemnity
25  without proper cause.

26     156.   Roseburg seeks to recover the attorneys' fees and costs it has incurred,
27  including the fees and costs incurred and to be incurred to pursue this action.

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit 49, Page 026

**PRAYER FOR RELIEF**

**Wherefore**, Roseburg prays for judgment against Liberty, Everest, and Ohio Casualty as follows:

(1)    A declaration from the Court that:

       (a)    Roseburg Forest's claim triggered Liberty's duty to defend;

       (b)    Where there is a conflict between the interests of the insured and insurer, the insured may select defense counsel; there was such a conflict between the interests of Roseburg Forest on the one hand and Liberty, Ohio Casualty, and other insurers on the other hand.

       (c)    Even where there is no conflict, and the insurer is entitled to select defense counsel, it must select competent defense counsel given the nature and scope of the case to be defended;

       (d)    Liberty failed to appoint competent counsel;

       (e)    Roseburg Forest's claim triggered the Everest Policy;

       (f)    Roseburg Forest's claim will trigger the Ohio Casualty Policy;

       (g)    No exclusion in either the Everest or the Ohio Casualty Policy applies;

       (h)    The Everest and Ohio Casualty Policies cover Roseburg Forest's claim;

       (i)    Once the underlying policies, and each of them, had paid their policy limits, Everest had an obligation to pay for Roseburg Forest's defense;

       (j)    Once Everest pays its policy limits, Ohio Casualty has an obligation to pay for Roseburg's defense;

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

(k)    Any other declaratory relief that would be useful to the resolution of the dispute between the parties;

(2)    For special and consequential damages against Liberty, Everest, and Ohio Casualty in an amount to be proved at trial in excess of $75,000;

(3)    For punitive and exemplary damages as provided by law;

(4)    Pre- and post-judgment interest as provided by law;

(5)    An award of attorney's fees and costs of suit incurred;

(6)    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Roseburg demands trial by jury on all issues so triable.

DATED: April 7, 2023          HUNTON ANDREWS KURTH LLP


By: */s/ Scott P. DeVries*
     Scott P. DeVries

Attorneys for Plaintiffs RLC Industries Co.
and Roseburg Forest Products Co.

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

# EXHIBIT A

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**PARTICIPATING PROVISION**

You may be eligible to participate in the distribution of surplus funds of the company through any dividends that may be declared for this policy.  A declaration or payment of dividends is not guaranteed.  The amount of any dividends that may be declared shall be to the extent, and upon the conditions fixed and determined by the Board of Directors and in compliance with any laws that  apply.

**In witness whereof**, the company has caused this policy to be signed by its President and its Secretary.

**SECRETARY**

**PRESIDENT**

RB00001
Exhibit 49, Page 030

# COMMERCIAL GENERAL LIABILITY DECLARATIONS
## OCCURRENCE

**Liberty Mutual**
INSURANCE

Issued By Liberty Insurance Corp.

| | | | |
|---|---|---|---|
| Policy Number | TB7-661-067089-031 | Issuing Office | PORTLAND, OR-LN |
| Renewal Of | TB7-661-067089-030 | Issue Date | 2021-11-08 |
| Account Number | 6-067089 | Sub Account | 0000 |

Named Insured and Mailing Address
RLC Industries Co.
3660 Gateway St
Springfield OR 97477

Form of Business: Corporation

Policy Period: The policy period is from 11/01/2021 to 11/01/2022 12:01 A.M. standard time at the Insured's mailing address.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $ 2,000,000 | |
| Damage to Premises Rented to You Limit | $ 1,000,000 | Any one premises |
| Medical Expense Limit | $ 5,000 | Any one person |
| Personal & Advertising Injury Limit | $ 2,000,000 | |
| General Aggregate Limit | $ 4,000,000 | |
| Products-Completed Operations Aggregate Limit | $ 4,000,000 | |

## SCHEDULE

The declarations are completed on the accompanying "Declarations Extension Schedule(s)".

| | |
|---|---|
| Commercial General Liability Coverage Part Premium | $ ███ |
| Total Estimated Premium | $ ███ |
| Other Charge(s) | $ |

Policywriting Minimum Premium  $ ███

Forms Applicable: See Attached Inventory

AON RISK 0002005277
AON RISK INS SERVICES WEST INC
PO BOX 19640

IRVINE CA 926239640

© 2012 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Page 1 of 1

RB00002
Exhibit 49, Page 031

**DECLARATIONS EXTENSION SCHEDULE – CLASSIFICATIONDESCRIPTIONS**

Policy Number   TB7-661-067089-031

| Class Code | Description |
|---|---|
| 20350 | Manufacturers - Not Food, Beverage or Drug (Low) |

© 2012 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with
its permission.

RB00003
Exhibit 49, Page 032

**DECLARATIONS EXTENSION SCHEDULE**
**-- COMPOSITE RATED COVERAGES --**

Policy Number   TB7-661-067089-031

| Description | Premium Basis | Rates | Premium |
|---|---|---|---|
| All Operations of the Named Insured | Sales ▓▓▓▓ | Per 1000 ▓▓▓ | ▓▓▓ |
| Variable Expense | | | ▓▓▓ |
| **Adjustment to Liquor Liability minimum** | | | ▓▓ |
| **TOTAL** | | | ▓▓▓ |

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

# Inventory
## Coverage Forms/Parts, Endorsements, Enclosures

COVERAGE FORMS/PARTS, ENDORSEMENTS AND ENCLOSURES FORMING A PART OF THIS POLICY AT INCEPTION:

**Form Number/Edition Date**        **Title**

**COMMON POLICY FORMS**

| Form | Title |
|---|---|
| LIL 90 05 06 13 | PARTICIPATING PROVISION |
| LC 00 04 08 12 | COMMERCIAL GENERAL LIABILITY DECLARATIONS |
| LCS 00 01 05 12 | DECLARATIONS EXTENSION SCHEDULE - CLASSIFICATION DESCRIPTIONS |
| LCS 00 02 05 12 | DECLARATIONS EXTENSION SCHEDULE |
| IC 00 42 07 09 | Inventory Coverage Forms/Parts, Endorsements, Enclosures |
| IC0017 11-93 | Countersignature Endorsement |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 02 79 09 08 | Oregon Changes - Cancellation And Nonrenewal |

**COMMERCIAL GENERAL LIABILITY**

| Form | Title |
|---|---|
| CG 00 01 04 13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |

**Named Insured**

| Form | Title |
|---|---|
| LC 99 40 09 17 | Broad Form Named Insured-Majority Interest |

**Deductible**

| Form | Title |
|---|---|
| LC 03 02 06 05 | Deductible - Damages and Supplementary Payments |

**Composite Rate**

| Form | Title |
|---|---|
| LC 99 12 08 17 | COMPOSITE RATE |

**Coverage Endorsement(s)**

| Form | Title |
|---|---|
| CG 02 24 10 93 | Earlier Notice of Cancellation Provided By Us |
| CG 04 35 12 07 | Employee Benefits Liability Coverage |
| CG 20 01 12 19 | PRIMARY AND NONCONTRIBUTORY - OTHER INSURANCE CONDITION |
| CG 22 64 04 13 | PESTICIDE OR HERBICIDE APPLICATOR - LIMITED POLLUTION COVERAGE |
| CG 24 08 10 93 | Liquor Liability |
| CG 24 12 11 85 | BOATS |
| CG 24 17 10 01 | Contractual Liability - Railroads |
| LC 04 01 06 05 | Reasonable Force |

RB00005
Exhibit 49, Page 034

| Form Number/Edition Date | Title |
|---|---|
| LC 04 02 01 17 | PROFESSIONAL HEALTH CARE SERVICES BY EMPLOYEES OR VOLUNTEER WORKERS COVERAGE |
| LC 04 27 10 11 | BROADENED DAMAGE TO PREMISES RENTED TO YOU COVERAGE |
| LC 04 46 01 17 | COMMERCIAL GENERAL LIABILITY ENHANCEMENT FOR MANUFACTURERS |
| LC 20 61 01 17 | COMMERCIAL GENERAL LIABILITY ADDITIONAL INSURED ENHANCEMENT FOR MANUFACTURERS |
| LC 25 13 08 08 | Non-Cumulation of Liability (Same Occurrence) |
| LC 29 04 08 08 | Personal and Advertising Injury - Definition of Publication |
| LC 29 06 08 08 | Personal and Advertising Injury - Occurrence Redefined |
| LC 29 08 10 11 | Advertisement Redefined |
| LC 29 09 10 11 | BODILY INJURY REDEFINED |
| LC 99 02 01 17 | KNOWLEDGE OF OCCURRENCE OR OFFENSE |
| LC 99 36 02 13 | PREMIUM RESPONSIBILITY ENDORSEMENT |
| LIM 99 01 05 11 | NOTICE OF CANCELLATION TO THIRD PARTIES |
| LC 99 39 10 13 | Joint Venture or Partnership |
| LC 04 48 10 13 | Manufacturers Errors and Omissions |
| LD 04 16 07 11 | Loggers Property Damage Liability Coverage - Manuscript |
| LC 24 18 10 13 | Limited Unintentional Discrimination Coverage |

**Additional Insured(s)**

| | |
|---|---|
| CG 20 26 12 19 | ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION |

**TRIA Exclusion(s)**

| | |
|---|---|
| CG 21 73 01 15 | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| CG 26 88 01 15 | ALASKA EXCLUSION OF CERTIFIED ACTS OF TERRORISM |

**Other Exclusion(s)**

| | |
|---|---|
| CG 21 06 05 14 | EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION |
| CG 21 47 12 07 | Employment-Related Practices Exclusion |
| CG 21 65 12 04 | Total Pollution Exclusion With a Building Heating, Cooling and Dehumidifying Equipment Exception and a Hostile Fire Exception |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| LC 21 01 06 05 | Asbestos Exclusion Endorsement |
| LC 21 02 06 05 | Silica Exclusion Endorsement |
| LC 21 91 09 12 | FUNGI OR BACTERIA EXCLUSION (LEGIONELLA BACTERIUM EXCLUDED) |

**State Mandatory**

| | |
|---|---|
| IL 01 42 09 08 | Oregon Changes - Domestic Partnership |
| IL 01 99 09 08 | Arkansas Changes - Transfer Of Rights Of Recovery Against Others To Us |

RB00006
Exhibit 49, Page 035

| Form Number/Edition Date | Title |
|---|---|

**NOTICE(S) TO POLICYHOLDER**

| | |
|---|---|
| SNI 04 01 12 20 | LIBERTY MUTUAL GROUP CALIFORNIA PRIVACY NOTICE |
| SNI 90 01 12 18 | POLICYHOLDER NOTICE - COMPANY CONTACT INFORMATION |
| SNI 90 02 01 20 | TERRORISM RISK INSURANCE ACT |

RB00007
Exhibit 49, Page 036

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Countersignature Endorsement

This endorsement is effective at the inception of the policy and attaches to and forms a part of this policy.

Type of Insurance                                              State

Commercial General Liability Coverage            Mississippi

Signed by _____
                          Countersigning Agent

RB00008
Exhibit 49, Page 037

## Common Policy Conditions

All Coverage Parts included in this policy are subject to the following conditions:

**A.  CANCELLATION**

**1.**  The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.**  We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    **a.**  10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    **b.**  30 days before the effective date of cancellation if we cancel for any other reason.

**3.**  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.**  Notice of cancellation will state the effective date of cancellation.  The policy period will end on that date.

**5.**  If this policy is canceled, we will send the first Named Insured any premium refund due.  If we cancel, the refund will be pro rata.  If the first Named Insured cancels, the refund may be less than pro rata.  The cancellation will be effective even if we have not made or offered a refund.

**6.**  If notice is mailed, proof of mailing will be sufficient proof of notice.

**B.  CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent.  This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C.  EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D.  INSPECTIONS AND SURVEYS**

**1.**  We have the right to:

    **a.**  Make inspections and surveys at any time;

    **b.**  Give you reports on the conditions we find; and

    **c.**  Recommend changes.

**2.**  We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.  And we do not warrant that conditions:

    **a.**  Are safe or healthful; or

Copyright, Insurance Services Office, Inc.,  1998

RB00009
Exhibit 49, Page 038

    **b.**   Comply with laws, regulations, codes or standards.

   **3.**   Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

   **4.**   Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E.   PREMIUMS

The first Named Insured shown in the Declarations:

   **1.**   Is responsible for the payment of all premiums; and

   **2.**   Will be the payee for any return premiums we pay.

## F.   TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

RB00010
Exhibit 49, Page 039

IL 02 79 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OREGON CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** If this policy has been in effect for:

**a.** Fewer than 60 days and is not a renewal policy, we may cancel for any reason.

**b.** 60 days or more or is a renewal policy, we may cancel only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy or in presenting a claim under the policy;

**(3)** Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision;

**(4)** Failure to comply with reasonable loss control recommendations;

**(5)** Substantial breach of contractual duties, conditions or warranties;

**(6)** Determination by the commissioner that the continuation of a line of insurance or class of business to which the policy belongs will jeopardize our solvency or will place us in violation of the insurance laws of Oregon or any other state; or

**(7)** Loss or decrease in reinsurance covering the risk.

**c.** 60 days or more or is a renewal policy, we may cancel for any other reason approved by the commissioner by rule, but only with respect to insurance provided under the following:

**(1)** A package policy that includes commercial property and commercial liability insurance;

**(2)** Commercial Automobile Coverage Part;

**(3)** Commercial General Liability Coverage Part;

**(4)** Commercial Property Coverage Part – Legal Liability Coverage Form;

**(5)** Commercial Property Coverage Part – Mortgageholders Errors And Omissions Coverage Form;

**(6)** Employment-related Practices Liability Coverage Part;

**(7)** Farm Coverage Part – Farm Liability Coverage Form;

**(8)** Liquor Liability Coverage Part;

**(9)** Products/Completed Operations Liability Coverage Part; or

**(10)** Medical Professional Liability Coverage Part.

RB00011
Exhibit 49, Page 040

**B.** Paragraph **3.** of the **Cancellation** Common Policy Condition is amended by the addition of the following:

   **3.** We will mail or deliver to the first Named Insured written notice of cancellation, stating the reason for cancellation.

**C.** The following is added to the **Cancellation** Common Policy Condition:

   **7. Number Of Days' Notice Of Cancellation:**

     **a.** With respect to insurance provided under **2.c.(1)** through **(10)** above, cancellation will not be effective until at least 10 working days after the first Named Insured receives our notice.

     **b.** With respect to insurance other than that provided under **2.c.(1)** through **(10)** above, cancellation will not be effective until at least:

       **(1)** 10 days after the first Named Insured receives our notice, if we cancel for nonpayment of premium; or

       **(2)** 30 days after the first Named Insured receives our notice, if we cancel for any other reason.

**D.** Paragraph **6.** of the **Cancellation** Common Policy Condition does not apply.

**E.** The following are added and supersede any provision to the contrary:

   **1. Nonrenewal**

   We may elect not to renew this policy by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal before the:

     **a.** Expiration date of the policy; or

     **b.** Anniversary date of the policy if the policy is written for a term of more than one year or without a fixed expiration date.

However, if this policy is issued for a term of more than one year and for additional consideration the premium is guaranteed, we may not refuse to renew the policy at its anniversary date.

Nonrenewal will not be effective until at least 45 days after the first Named Insured receives our notice.

   **2. Mailing Of Notices**

     **a.** If notice of cancellation or nonrenewal is mailed, a post office certificate of mailing will be conclusive proof that the first Named Insured received the notice on the third calendar day after the date of the certificate of mailing.

     **b.** The following provision applies with respect to coverage provided under the Farm Coverage Part:

   If the first Named Insured has affirmatively consented to our use of an electronic record to deliver notice of cancellation or nonrenewal and has not withdrawn such consent, then the electronic record delivering notice of cancellation or nonrenewal satisfies the requirement that the notice of cancellation or nonrenewal be provided, or made available, to the first Named Insured in writing if we send the first Named Insured the electronic record with a request for a return receipt and we receive the return receipt. If we do not receive the return receipt, we may cancel or nonrenew the policy only after providing or delivering the notice of cancellation or nonrenewal to the first Named Insured in writing, subject to Paragraph **2.a.** above.

© ISO Properties, Inc., 2007

**IL 02 79 09 08**

RB00012
Exhibit 49, Page 041

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II – Who Is An Insured**.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V – Definitions**.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III – Limits Of Insurance**; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II – Who Is An Insured** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II – Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II – Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Services Office, Inc., 2012

RB00013
Exhibit 49, Page 042

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012
CG 00 01 04 13

RB00014
Exhibit 49, Page 043

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

---

CG 00 01 04 13 

© Insurance Services Office, Inc., 2012

Page 3 of 16

RB00015
Exhibit 49, Page 044

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

RB00016
Exhibit 49, Page 045

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

---

CG 00 01 04 13

© Insurance Services Office, Inc., 2012

Page 5 of 16

RB00017
Exhibit 49, Page 046

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III – Limits Of Insurance.**

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III – Limits Of Insurance;** and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

RB00018
Exhibit 49, Page 047

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

RB00019
Exhibit 49, Page 048

## COVERAGE C – MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

Page 8  of 16    © Insurance Services Office, Inc., 2012    CG 00 01 04 13

RB00020
Exhibit 49, Page 049

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

RB00021
Exhibit 49, Page 050

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

RB00022
Exhibit 49, Page 051

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

  **a.** Damages under Coverage **A**; and

  **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

  Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

  **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable.

  You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

  **c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

  No person or organization has a right under this Coverage Part:

  **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

  **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

  A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

RB00023
Exhibit 49, Page 052

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I –** Coverage **A –** Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

RB00024
Exhibit 49, Page 053

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

RB00025
Exhibit 49, Page 054

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

RB00026
Exhibit 49, Page 055

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

RB00027
Exhibit 49, Page 056

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

  **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

  **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

  **a.** Means:

    **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      **(a)** You;

      **(b)** Others trading under your name; or

      **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

RB00028
Exhibit 49, Page 057

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**BROAD FORM NAMED INSURED – MAJORITY INTEREST**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The term Named Insured includes: the person or organization  designated in the Declarations  as the first Named Insured; the person(s) or organization(s) shown in the Declarations Extension Schedule (Named Insured); and any other organization (except for a partnership or joint venture) incorporated or organized under the laws of the United States of America or its states, territories or possessions; Puerto Rico; or Canada or its provinces, but only while the first Named Insured or any of the Named Insureds shown in the Declarations Extension Schedule (Named Insured) directly or indirectly owns, during the policy period, an interest therein of more than 50%. But:

None of the persons or organizations described in Paragraph   **A.** is a Named Insured with respect to:

**(1)**  "Bodily injury" or "property damage" that occurred; or

**(2)**  "Personal and advertising injury" caused by an offense or a series of related offenses committed

prior to the ownership interests described above.

**B.**  Paragraph  **3.** of **Section II – Who Is An Insured** is deleted.

**C.**  The final paragraph of  **Section II – Who Is An Insured** is replaced by the following:

A partnership  or joint venture  is not a Named Insured unless it is shown in the Declarations  or in the Declarations Extension Schedule (Named Insured). No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations  or in the Declarations Extension Schedule (Named Insured) or for any limited liability company that is not a Named Insured.

**D.**  The first Named Insured is authorized to act and agrees to act on behalf of all persons or organizations insured under this policy with respect to all matters pertaining to the insurance afforded by the policy.

RB00029
Exhibit 49, Page 058

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Deductible – Damages and Supplementary Payments
## Damages Within the Deductible Erode the Policy Limits

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**DEDUCTIBLE AMOUNT**

Bodily Injury and Property Damage Liability,                          $ 250,000
Personal and Advertising Injury Liability,
Medical Payments and Supplementary Payments

A.  DEDUCTIBLE

DAMAGES AND SUPPLEMENTARY PAYMENTS ERODE DEDUCTIBLE

You are responsible, up to the Deductible Amount shown in the Schedule, for the total of:

1.  All damages, including amounts paid in settlement of a claim or "suit" and medical payments, plus

2.  All SUPPLEMENTARY PAYMENTS

because of all "bodily injury" and "property damage" under Coverage A that results from any one "occurrence", all "personal and advertising injury" under Coverage B sustained by any one person or organization and all "bodily injury" sustained by one person under Coverage C.

We are responsible for those amounts of damages and medical expenses to which this insurance applies (subject to the applicable limits of insurance) and SUPPLEMENTARY PAYMENTS that exceed the Deductible Amount shown in the Schedule.

We have the right but not the duty to advance any part or all of these amounts.  Exercise of our right to advance such amount shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy

B.  EFFECT OF DEDUCTIBLE ON LIMITS OF INSURANCE

1.  The Each Occurrence Limit, the Personal and Advertising Injury Limit, the Medical Expense Limit and any applicable aggregate limits of insurance are reduced by the amount of damages, as referred to in paragraph A. above, paid or payable by you within the deductible.

2.  For purposes of this paragraph B., all damages are deemed to have been paid or to be payable before SUPPLEMENTARY PAYMENTS have been paid or are payable.

C.  CONDITIONS

1.  Recovery from Others

**LC 03 02 06 05**                                                                  Page  1 of  2

RB00030
Exhibit 49, Page 059

In the event we recover any advance or payment made under this policy by exercising our right of subrogation, the amount so recovered shall first be applied to any payments made by us in excess of the Deductible Amount; only then shall the remainder of such recovery, if any, be applied to reduce the Deductible Amount payable or paid by you.

2.   Cancellation

You must (a) promptly pay all amounts for which you are responsible under this endorsement, and (b) reimburse us for any such amounts that we pay or advance upon receipt of a billing from us.

If you fail to do so, we may, at our option and to the extent permitted by law, cancel either this endorsement or this policy by mailing or delivering to you notice of cancellation pursuant to the terms applicable to cancellation for non-payment of premium in the policy or an endorsement thereto.

3.   Your Duties

a.   The first Named Insured shown in the Declarations agrees and is authorized to pay all Deductible Amounts on behalf of all Named Insureds and to reimburse us for any such amounts that we advance.

b.   Each Named Insured is jointly and severally liable for all Deductible Amounts under this policy.

4.   Other Rights and Duties (Ours and Yours)

All other terms of this policy, including those which govern (a) our right and duty to defend any claim, proceeding or "suit" against you, and (b) your duties if injury occurs, apply irrespective of application of this deductible endorsement.

RB00031
Exhibit 49, Page 060

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**COMPOSITE RATE**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK

With regard to composite rated premium for this policy, exposure types are defined as:

A.  **Admissions means**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial  Lines Manual, Premium Basis A. Admissions.

B.  **Area means**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial  Lines Manual, Premium Basis A. Area.  Changes in exposure during each annual rating period shall be determined  by averaging the exposure that is  used as a premium basis at the beginning and end of each annual rating period.

C.  **Each means**:  Shall be calculated based on the sum of the units of exposure noted as the premium basis. Changes in exposure during each policy period shall be determined  by averaging the exposure used as the premium basis at the effective  and expiration dates of each policy period.

D.  **Gross Sales means**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial  Lines Manual, Premium Basis A. Gross Sales.

E.  **General Liability Payroll**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial  Lines Manual, Premium Basis E. Payroll.

F.  **Total Cost**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial  Lines Manual, Premium Basis F. Total Cost.

G.  **Total Operating Expenditures**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial Lines  Manual, Premium Basis G. Total Operating Expenditures.

H.  **Workers Compensation Payroll**:  Shall be calculated in accordance with the NCCI Basic Manual Rule 2.B, or the corresponding rules in the applicable state manual for independent states and the monopolistic states of OH, ND and WY.

For payroll in the monopolistic state of WA, the payroll shall be computed in accordance with the NCCI Basic Manual Rule 2.B. with the exception of the handling of executive officers, sole proprietors and partners. Executive officers, sole proprietors and partners in WA will be included in the audit using the flat payroll amount as indicated in the ISO Commercial Lines Manual,  Rule 24, State Exceptions for WA.

RB00032
Exhibit 49, Page 061

For payroll in the U.S. territories of Puerto Rico, Guam and the U.S. Virgin Islands, the payroll shall be calculated in accordance with the NCCI Basic Manual Rule 2.B. with the exception of the handling of executive officers, sole proprietors and partners.  Executive officers, sole proprietors and partners in Puerto Rico and Guam will be included in the audit using the flat payroll amount as indicated in the ISO Commercial Lines Manual, Rule 24, State Exceptions for the applicable U.S. territory.  Executive officers, sole proprietors and partners in the U.S. Virgin Islands will be included in the audit using the flat payroll as indicated in the ISO Commercial Lines Manual, Rule 24, State Exceptions for Puerto Rico.

I.    **Units means**:  Shall be calculated in accordance with Division 6, Rule 24 of the ISO Commercial Lines Manual, Premium Basis H. Units

J.    **Other means**:

RB00033
Exhibit 49, Page 062

POLICY NUMBER: TB7-661-067089-031                                      **COMMERCIAL GENERAL LIABILITY**
                                                                       **CG 02 24 10 93**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# EARLIER NOTICE OF CANCELLATION PROVIDED BY US

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Number of Days' Notice**      90

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this  endorsement.)

For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of cancellation, as provided in paragraph **2.** of either the CANCELLATION Common Policy Condition or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

**CG 02 24 10 93**              Copyright, Insurance Services Office, Inc.,  1992              **Page  1 of  1**

RB00034
Exhibit 49, Page 063

POLICY NUMBER: TB7-661-067089-031

COMMERCIAL GENERAL LIABILITY
CG 04 35 12 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# EMPLOYEE BENEFITS LIABILITY COVERAGE

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.**
**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Coverage | Limit Of Insurance | | Each Employee Deductible |
|---|---|---|---|
| **Employee Benefits Programs** | $    1,000,000 | **each employee** | Not Applicable |
| | $    2,000,000 | **aggregate** | |
| **Retroactive Date:** | 09/01/1989 | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | |

**A.** The following is added to **Section I – Coverages:**

**COVERAGE – EMPLOYEE BENEFITS LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Paragraph **D.** (Section **III** – Limits Of Insurance); and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to damages only if:

**(1)** The act, error or omission, is negligently committed in the "administration" of your "employee benefit  program";

**(2)** The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

**(3)** A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **F.** of this endorsement.

**c.** A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

RB00035
Exhibit 49, Page 064

**(2)** When we make settlement in accordance with Paragraph **a.** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

**d.** All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

**2. Exclusions**

This insurance does not apply to:

**a. Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**d. Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this endorsement:

**1.** All references to Supplementary Payments - Coverages **A** and **B** are replaced by Supplementary Payments - Coverages **A, B** and **Employee Benefits Liability**.

**2.** Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **3.** of **Section II** - **Who Is An Insured** are replaced by the following:

**2.** Each of the following is also an insured:

**a.** Each of your "employees" who is or was authorized to administer your "employee benefit program".

**b.** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

RB00036
Exhibit 49, Page 065

**c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

    **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

    **b.** Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

  **1. Limits Of Insurance**

    **a.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

      **(1)** Insureds;

      **(2)** "Claims" made or "suits" brought;

      **(3)** Persons or organizations making "claims" or bringing "suits";

      **(4)** Acts, errors or omissions; or

      **(5)** Benefits included in your "employee benefit program".

    **b.** The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

    **c.** Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

      **(1)** An act, error or omission; or

      **(2)** A series of related acts, errors or omissions

    negligently committed in the "administration" of your "employee benefit program".

    However, the amount paid under this endorsement shall not exceed, and will be subject to the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

  **2. Deductible**

    **a.** Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

    **b.** The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

    **c.** The terms of this insurance, including those with respect to:

      **(1)** Our right and duty to defend any "suits" seeking those damages; and

      **(2)** Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

    apply irrespective of the application of the deductible amount.

    **d.** We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**E.** For the purposes of the coverage provided by this endorsement, Conditions **2.** and **4.** of **Section IV - Commercial General Liability Conditions** are replaced by the following:

  **2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

    **a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

      **(1)** What the act, error or omission was and when it occurred; and

---

CG 04 35 12 07             © ISO Properties, Inc., 2006             **Page 3 of 6**

**(2)** The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

**(a)** No Retroactive Date is shown in the Schedule of this insurance; or

**(b)** The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

**(2)** When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

© ISO Properties, Inc., 2006

CG 04 35 12 07

RB00038
Exhibit 49, Page 067

**F.** For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

**1.** You will have the right to purchase an Extended Reporting Period, as described below, if:

    **a.** This endorsement is canceled or not renewed; or

    **b.** We renew or replace this endorsement with insurance that:

        **(1)** Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

        **(2)** Does not apply to an act, error or omission on a claims-made basis.

**2.** The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

**3.** An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

    **a.** The "employee benefit programs" insured;

    **b.** Previous types and amounts of insurance;

    **c.** Limits of insurance available under this endorsement for future payment of damages; and

    **d.** Other related factors.

The additional premium will not exceed 100% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **D.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **D.1.c.**

**G.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

**1.** "Administration" means:

    **a.** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **b.** Handling records in connection with the "employee benefit program"; or

    **c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.** "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

 © ISO Properties, Inc., 2006

RB00039
Exhibit 49, Page 068

**4.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   **a.** Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

   **b.** Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

   **c.** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   **d.** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

   **e.** Any other similar benefits designated in the Schedule or added thereto by endorsement.

**H.** For the purposes of the coverage provided by this endorsement, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

   **5.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   **18.** "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

   **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

© ISO Properties, Inc., 2006

**CG 04 35 12 07**

RB00040
Exhibit 49, Page 069

**COMMERCIAL GENERAL LIABILITY**
**CG 20 01 12 19**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PRIMARY AND NONCONTRIBUTORY – OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the **Other Insurance** Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

(1) The additional insured is a Named Insured under such other insurance; and

(2) You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

© Insurance Services Office, Inc., 2018

RB00041
Exhibit 49, Page 070

POLICY NUMBER: TB7-661-067089-031

**COMMERCIAL GENERAL LIABILITY**
**CG 22 64 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PESTICIDE OR HERBICIDE APPLICATOR - LIMITED POLLUTION COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

With respect to the operations shown in the Schedule, Paragraph **(1)(d)** of Exclusion **f.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** does not apply if the operations meet all standards of any statute, ordinance, regulation or license requirement of any federal, state or local government which apply to those operations.

### SCHEDULE

**Description Of Operations:**

All operations to which this endorsement applies

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

RB00042
Exhibit 49, Page 071

**COMMERCIAL GENERAL LIABILITY**
**CG 24 08 10 93**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# LIQUOR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **c.** – Liquor Liability of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I) – Coverages does not  apply.

Copyright, Insurance Services Office, Inc.,  1992

RB00043
Exhibit 49, Page 072

POLICY NUMBER: TB7-661-067089-031

COMMERCIAL GENERAL LIABILITY
CG 24 12 11 85

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# BOATS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**1.** Exclusion g. of COVERAGE A (Section I) does not apply to any watercraft owned or used by or rented to the insured shown in the Schedule.

**2.** WHO IS AN INSURED (Section II) is amended  to include as an insured any person or organization  legally responsible for the use of any such watercraft you own, provided the actual use is with your permission.

**SCHEDULE**

**Description of Watercraft:**

Any non-owned  watercraft that is less than 50 feet long and not being used to carry persons or property for a charge.

(If no entry appears above, information  required to complete this endorsement  will be shown in the Declarations  as applicable to this endorsement.)

Copyright, Insurance Services Office, Inc.,  1984, 1992

RB00044
Exhibit 49, Page 073

POLICY NUMBER: TB7-661-067089-031                    COMMERCIAL GENERAL LIABILITY
                                                     CG 24 17 10 01

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# CONTRACTUAL LIABILITY – RAILROADS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

With respect to operations performed for, or affecting, a Scheduled Railroad at a Designated Job Site, the definition of "insured contract" in the **Definitions** section is replaced by the following:

**9.** "Insured Contract" means:

  **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

  **b.** A sidetrack agreement;

  **c.** Any easement or license agreement;

  **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

  **e.** An elevator maintenance agreement;

  **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

  **(1)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

  **(2)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(1)** above and supervisory, inspection, architectural or engineering activities.

**SCHEDULE**

**Scheduled Railroad:**

Any railroad for which you are performing operations and for which no Railroad Protective Liability Policy has been purchased for the railroad by you, or any railroad for which "your work" has been completed or put to its intended use.

**Designated Job Site:**

All jobsites.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

RB00045
Exhibit 49, Page 074

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Reasonable Force

This endorsement modifies the insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **a.** of Coverage **A** is replaced by the following:

**a.**   Expected or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**LC 04 01 06 05**

RB00046
Exhibit 49, Page 075

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**PROFESSIONAL HEALTH CARE SERVICES BY EMPLOYEES
OR VOLUNTEER WORKERS COVERAGE**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Schedule**

**Sublimit of Insurance:**       $        2,000,000  **Each Occurrence**

A.  Paragraph 2.a.(1)(d) of Section II – Who Is An Insured is replaced by the following:

(d)  Arising out of his or her providing or failing to provide professional health care services.  However, any "employee" or "volunteer worker" of the Named Insured who is acting as a Good Samaritan in response to a public or medical emergency or who is a "designated health care provider" is an insured with respect to "bodily injury" and "personal and  advertising injury" that:

(i)  Arises out of the providing of or failure to provide professional health care services; and

(ii)  Occurs in the course of and within the scope of such "employee's" or "volunteer worker's" employment by the Named Insured.

B.  **Limits of Insurance**

1.  The insurance provided by this endorsement is subject to the sublimit shown in the Schedule of this endorsement.  This sublimit is subject to the Each Occurrence Limit shown in the Declarations; it is not in addition to the Each Occurrence Limit.  If a sublimit is not shown in the Schedule of this endorsement, the applicable limit is the Each Occurrence Limit  shown in the Declarations.

2.  This insurance is subject to the General Aggregate Limit shown in the Declarations.

C.  With respect to "employees" and "volunteer workers" providing professional health care services, the following exclusions are added to Paragraph  2. Exclusions of Section I – Coverage  A – Bodily Injury And Property Damage  Liability and Paragraph  2. Exclusions of Section I – Coverage  B – Personal And Advertising Injury Liability:

This insurance does not apply to:

(1)  Liability assumed under an "insured contract" or any other contract or agreement;

(2)  Liability arising out of the providing of professional health care services in violation of law;

(3)  Liability arising out of the providing of any professional  health care services while in any degree  under the influence of intoxicants or narcotics;

(4)  Liability arising out of any dishonest, fraudulent, malicious or knowingly wrongful act or failure to act; or

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RB00047
Exhibit 49, Page 076

(5)  Punitive or exemplary damages, fines or penalties.

D.  The following definition is added to the Section V – Definitions:

"Designated health care provider" means any "employee" or "volunteer worker" of the Named Insured whose duties include providing professional health care services, including but not limited to doctors, nurses, emergency medical technicians or designated first aid  personnel.

E.  **Other Insurance**

1.  This provision applies only to the Commercial General Liability Coverage Part.

2.  The insurance provided by this endorsement is excess over any other valid and collectible insurance available to the insured,  whether primary, excess, contingent or on any other basis.

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RB00048
Exhibit 49, Page 077

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

## BROADENED DAMAGE TO PREMISES RENTED TO YOU COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.  The final paragraph  of 2. Exclusions of Section I - Coverage  A - Bodily Injury And Property Damage  Liability is
replaced by the  following:

Exclusions c. through n. do not apply to damage by fire, lightning or explosion or subsequent damages  resulting
from such fire, lightning or explosion including water damage to premises while rented to you or temporarily
occupied  by you with permission of the owner.   A separate limit of insurance applies to this coverage  as
described in Section III - Limits Of Insurance.

B.  Paragraph 6. of Section III – Limits Of Insurance is replaced by the following:

6.  Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay
under Coverage A for damages  because of "property damage" to any one premises, while rented to you, or
in the case of damage by fire, lightning, explosion or subsequent damages resulting from such fire, lightning
or explosion including water damage to premises while rented to you or temporarily occupied by you with
permission of the owner.

C.  Subparagraph 9.a. of the definition of "insured contract" is replaced by the following:

a.  A contract for a lease of premises. However, that portion of the contract for a lease of premises that
indemnifies any person or organization for damage by fire, lightning, explosion or subsequent damages
resulting from such fire, lightning or explosion including water damage to premises while rented to you or
temporarily occupied by you with permission of  the owner is not an "insured contract".

D.  The paragraph  immediately following Paragraph (6) of exclusion j. of Section I – Coverage  A  – Bodily Injury
And Property Damage Liability is replaced by the following:

Paragraphs  (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire,
lightning or explosion or subsequent damages  resulting from such fire, lightning or explosion including water
damage) to premises, including the contents of such premises, rented to you for a period of 7 or fewer
consecutive days.  A separate limit of insurance applies to Damage to Premises Rented To You as described in
Section III – Limits of Insurance.

RB00049
Exhibit 49, Page 078

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**COMMERCIAL GENERAL LIABILITY ENHANCEMENT FOR MANUFACTURERS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Index of modified items:

Item 1.    **Reasonable Force**
Item 2.    **Non-Owned Watercraft Extension**
Item 3.    **Damage To Premises Rented To You – Expanded Coverage**
Item 4.    **Bodily Injury To Co-Employees**
Item 5.    **Health Care Professionals As Insureds**
Item 6.    **Knowledge Of Occurrence Or Offense**
Item 7.    **Notice Of Occurrence Or Offense**
Item 8.    **Unintentional Failure To Disclose**
Item 9.    **Bodily Injury Redefined**
Item 10.    **Supplementary Payments – Increased Limits**
Item 11.    **Aircraft With Chartered Crew**
Item 12.    **Property In Your Care, Custody Or Control**
Item 13.    **Mobile Equipment Redefined**
Item 14.    **Newly Formed Or Acquired Entities**
Item 15.    **Waiver Of Right Of Recovery By Written Contract Or Agreement**

Item 1.    **Reasonable Force**

Exclusion a. of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

a.    Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" or "property damage"  resulting from the use of reasonable  force to protect persons or property.

Item 2.    **Non-Owned Watercraft Extension**

Paragraph  (2) of Exclusion g. of Section I – Coverage  A – Bodily Injury And Property Damage  Liability is replaced by the following:

(2)  A watercraft you do not own that is:

(a)  Less than 55 feet long; and

(b)  Not being used to carry persons or property for a charge;

Item 3.    **Damage To Premises Rented To You – Expanded Coverage**

A.    The final paragraph  of 2. Exclusions of Section I – Coverage  A – Bodily Injury And Property Damage  Liability is replaced by the following:

RB00050
Exhibit 49, Page 079

Exclusions c. through n. do not apply to damage by fire, lightning or explosion or subsequent damages resulting from such fire, lightning or explosion including water damage to premises while rented to you or temporarily occupied by you with permission of the owner.   A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

B.   Paragraph 6. of Section III – Limits Of Insurance is replaced by the following:

6.   Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, lightning, explosion or subsequent damages resulting from such fire, lightning or explosion including water damage to premises while rented to you or temporarily occupied by you with permission of the owner.

The Damage To Premises Rented To You Limit is the greater of:

a.   $300,000; or

b.   The Damage To Premises Rented To You Limit shown on the Declarations.

C.   Paragraph 9.a. of the definition of "insured contract" in Section V – Definitions is replaced by the following:

a.   A contract for a lease of premises.   However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, lightning, explosion or subsequent damages resulting from such fire, lightning or explosion including water damage to premises while rented to you or temporarily occupied by you with permission of  the owner is not an "insured contract";

D.   The paragraph immediately following Paragraph (6) of Exclusion j. of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire, lightning or explosion or subsequent damages resulting from such fire, lightning or explosion including water damage) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days.   A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits of Insurance.

Item 4.    **Bodily Injury To Co-Employees**

A.   Paragraph 2. of Section II – Who Is An Insured is amended to include:

Each of the following is also an insured:

Your "employees" (other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers  (if you are a limited liability company)) or "volunteer workers" are insureds while in the course of their employment  or while performing duties related to the conduct of your business with respect to "bodily  injury":

(1)  To you;

(2)  To your partners or members (if you are a partnership or joint venture);

(3)  To your members (if you are a limited liability company); or

(4)  To a co-"employee"  or "volunteer worker" while that co-"employee" or "volunteer worker" is either in the course of his or her employment  by you or while performing duties related to the conduct of your business (including participation in any  recreational activities sponsored by you).

Paragraph  2.a.(1)(a) of Section II – Who Is An Insured does not apply to "bodily injury" for which insurance is provided by this paragraph.

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RB00051
Exhibit 49, Page 080

B. The insurance provided by this Item 4. for "bodily injury" to a co-"employee" or "volunteer worker" will not apply if the injured co-"employee's" or "volunteer worker's" sole remedy for such injury is provided under a workers' compensation law or any  similar law.

C. Other Insurance

The insurance provided by this Item 4. is excess over any other valid and collectible insurance available to the insured, whether primary, excess, contingent or on any other basis.

Item 5.   **Health Care Professionals As Insureds**

A. Paragraph 2.a.(1)(d) of Section II – Who Is An Insured is replaced by the following:

(d) Arising out of his or her providing or failing to provide professional health care services.  However, any "employee" or "volunteer worker" of the Named Insured who is acting as a Good Samaritan in response to a public or medical emergency or who is a "designated health care provider" is an insured with respect to "bodily injury" and "personal and  advertising injury" that:

(i) Arises out of the providing of or failure to provide professional health care services; and

(ii) Occurs in the course of and within the scope of such "employee's" or "volunteer worker's" employment by the Named Insured.

B. With respect to "employees" and "volunteer workers" providing professional health care services, the following exclusions are added to Paragraph 2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

This insurance does not apply to:

(1) Liability assumed under an "insured contract" or any other contract or agreement;

(2) Liability arising out of the providing of professional health care services in violation of law;

(3) Liability arising out of the providing of any professional health care services while in any degree under the influence of intoxicants or narcotics;

(4) Liability arising out of any dishonest, fraudulent, malicious or knowingly wrongful act or failure to act; or

(5) Punitive or exemplary damages, fines or penalties.

C. The following definition is added to Section V – Definitions:

"Designated health care provider" means any "employee" or "volunteer worker" of the Named Insured whose duties include providing professional health care services, including but not limited to doctors, nurses, emergency medical technicians or  designated first aid personnel.

D. Other Insurance

The insurance provided by this Item 5. is excess over any other valid and collectible insurance available to the insured, whether primary, excess, contingent or on any other basis.

Item 6.   **Knowledge Of Occurrence Or Offense**

Knowledge of an "occurrence" or offense by your agent, servant or "employee"  will not in itself constitute knowledge by you unless your "executive officer" or "employee"  designated by you to notify us of an "occurrence" or offense has knowledge of the  "occurrence" or offense.

RB00052
Exhibit 49, Page 081

Item 7.    **Notice Of Occurrence Or Offense**

For purposes of Paragraph 2.a. of Section IV – Commercial General Liability Conditions, you refers to your "executive officer" or "employee" that you have designated to give us notice.

Item 8.    **Unintentional Failure To Disclose**

Unintentional failure of the Named Insured to disclose all hazards existing at the inception of this policy shall not be a basis for denial of any coverage afforded by this policy. However, you must report such an error or omission to us as soon as practicable after its discovery.

This provision does not affect our right to collect additional premium or exercise our right of cancellation or non-renewal.

Item 9.    **Bodily Injury Redefined**

The definition of "bodily injury" in Section V – Definitions is replaced by the following:

"Bodily injury" means:

a.   Bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; and

b.   Mental anguish, shock or humiliation arising out of injury as defined in Paragraph a. above. Mental anguish means any type of mental or emotional illness or distress.

Item 10.    **Supplementary Payments – Increased Limits**

Paragraphs 1.b. and 1.d. of Section I – Supplementary Payments – Coverages A And B are replaced by the following:

b.   Up to $3,000 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

d.   All reasonable expenses incurred by the insured at our request to assist in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

Item 11.    **Aircraft With Chartered Crew**

The following is added to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability:

This exclusion does not apply to an aircraft that you do not own that is:

(a)  Chartered with a pilot by any insured; and

(b)  Not being used to carry any person or property for a charge collected or received by the insured.

Item 12.    **Property In Your Care, Custody Or Control**

A.   Paragraphs (3) and (4) of Exclusion j. of Section I – Coverage A – Bodily Injury And Property Damage Liability are deleted.

B.   Additional Exclusion

     Coverage provided by this endorsement does not apply to "property damage" to property while in transit.

C.   Limits of Insurance

RB00053
Exhibit 49, Page 082

Subject to Paragraphs 2., 3., and 5. of Section III – Limits Of Insurance, the most we will pay for insurance provided by Paragraph A. above is:

$10,000 Each Occurrence Limit

$75,000 Aggregate Limit

The Each Occurrence Limit for this coverage applies to all damages as a result of any one "occurrence" regardless of the number of persons or organizations who sustain damage because of that "occurrence".

The Aggregate Limit is the most we will pay for the sum of all damages under this Item 12.

D.  Other Insurance

This insurance does not apply to any portion of a loss for which the insured has available any other valid and collectible insurance, whether primary, excess, contingent, or on any other basis, unless such other insurance was specifically purchased by the insured to apply in excess of this policy.

## Item 13.  Mobile Equipment Redefined

The definition of "mobile equipment" in Section V – Definitions is amended to include self-propelled vehicles with permanently attached equipment less than 1000 pounds gross vehicle weight that are primarily designed for:

(1)  Snow removal;

(2)  Road maintenance, but not construction or resurfacing; or

(3)  Street cleaning.

## Item 14.  Newly Formed Or Acquired Entities

A.  Paragraph 3. of Section II – Who Is An Insured is replaced by the following:

3.  Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain majority ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization.  However:

a.  Coverage under this provision is afforded only until:

(1)  The 180th day after you acquire or form the organization;

(2)  Separate coverage is purchased for the organization; or

(3)  The end of the policy period

whichever is earlier;

b.  Section I – Coverage A – Bodily Injury And Property Damage Liability does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c.  Section I – Coverage B – Personal And Advertising Injury Liability does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

B.  The insurance afforded to any organization as a Named Insured under this Item 14. does not apply if a Broad Form Named Insured endorsement attached to this policy applies to that organization.

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RB00054
Exhibit 49, Page 083

Item 15.   **Waiver Of Right Of Recovery By Written Contract Or Agreement**

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV –
Commercial General Liability  Conditions:

We waive any right of recovery because of payments we make under this policy for injury or damage arising out of
your ongoing operations or "your work" included in the "products-completed operations hazard" that we may have
against any person or organization with whom you have agreed in a written contract or agreement to waive your
rights of recovery but only if the "bodily injury" or "property damage" occurs, or offense giving rise to "personal and
advertising injury" is committed subsequent to the execution of the written contract or agreement.

RB00055
Exhibit 49, Page 084

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**COMMERCIAL GENERAL LIABILITY
ADDITIONAL INSURED ENHANCEMENT FOR MANUFACTURERS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Index of modified items:

Item 1.  **Blanket Additional Insured Where Required By Written Agreement**
Lessors of Leased Equipment
Managers or Lessors of Premises
Mortgagees, Assignees or Receivers
Grantor of Franchise
Vendors
Any Person or Organization
Item 2.  **Blanket Additional Insured – Grantor Of Permits**
Item 3.  **Other Insurance Amendment**

Item 1.  **Blanket Additional Insured Where Required By Written Agreement**

Paragraph 2. of Section II – Who Is An Insured is amended to add the following:

Additional Insured by Written Agreement

The following  are insureds under the policy when you have agreed in a written agreement  to provide them coverage as additional  insureds under your policy:

1.  **Lessors of Leased Equipment**:  The person(s) or organization(s) from whom you lease equipment, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

    This insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

2.  **Managers or Lessors of Premises**:  Any manager(s) or lessor(s) of premises leased to you in which the written lease agreement obligates you to procure additional insured coverage.

    The coverage afforded to the additional insured is limited to liability in connection with the ownership, maintenance or use of the premises leased to you and caused, in whole or in part, by some negligent act(s) or omission(s) of you, your "employees", your agents or your subcontractors. There is no coverage for the additional insured for liability arising out of the sole negligence of the additional insured or those acting on behalf of the additional insured, except as provided below.

    If the written agreement  obligates you to procure additional insured coverage for the additional insured's sole negligence, then the coverage for the additional insured shall conform to the agreement, but only if the applicable law would allow you to indemnify the additional insured for liability arising out of the additional insured's sole negligence.

LC 20 61 01 17                       © 2016 Liberty Mutual Insurance                       Page  1 of  4
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

This insurance does not apply to:

a. Any "occurrence" which takes place after you cease to be a tenant in that premises or to lease that land;

b. Structural alterations, new construction or demolition operations performed by or on behalf of that manager or lessor; or

c. Any premises for which coverage is excluded by endorsement.

3. **Mortgagees, Assignees or Receivers**:  Any person(s) or organization(s) with respect to their liability as mortgagee, assignee or receiver and arising out of your ownership, maintenance or use of the premises.

This insurance does not apply to structural alterations, new construction and demolition operations performed by or on behalf of such person(s) or organization(s).

4. **Grantor of Franchise**:  Any person(s) or organization(s) but only with respect to their liability as grantor of a franchise to you.

5. **Vendors**:  Any person(s) or organization(s) that distributes or sells "your products" in the regular course of their business, hereafter referred to as vendors, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

a. The insurance afforded the vendor does not apply to:

(1) "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to the liability for damages that the vendor would have in the absence of the contract or agreement;

(2) Any express warranty unauthorized by you;

(3) Any physical or chemical change in the product made intentionally by the vendor;

(4) Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

(5) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

(6) Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

(7) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

(8) "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf.  However, this exclusion does not apply to:

(a) The exceptions contained in Paragraphs (4) or (6) above; or

(b) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

b. This insurance does not apply to any insured, person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

RB00057
Exhibit 49, Page 086

6. **Any Person or Organization Other Than a Joint Venture**: Any person(s) or organization(s) (other than a joint venture of which you are a member) for whom you are obligated to procure additional insured coverage, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your act(s) or omission(s) or the act(s) or omission(s) of those acting on your behalf:

a. In the performance of your ongoing operations; or

b. In connection with premises owned by or rented to you.

This insurance does not apply to:

a. Any person(s) or organization(s) more specifically covered in Paragraphs 1 through 5 above;

b. Any construction, renovation, demolition or installation operations performed by or on behalf of you, or those operating on your behalf; or

c. Any person(s) or organization(s) whose profession, business or occupation is that of an architect, surveyor or engineer with respect to liability arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including:

(1) The preparing, approving or failing to prepare or approve, maps, drawings, opinions, reports, surveys, field orders, change orders, designs and specifications; or

(2) Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by or on behalf of you, or those operating on your behalf.

The insurance afforded to any person(s) or organization(s) as an insured under this Item 1:

1. Applies to the extent permitted by law;

2. Applies only to the scope of coverage and the minimum limits of insurance required by the written agreement, but in no event exceeds either the scope of coverage or the limits of insurance provided by this policy;

3. Does not apply to any person(s) or organization(s) for any "bodily injury", "property damage" or "personal and advertising injury" if any other additional insured endorsement attached to this policy applies to such person(s) or organization(s) with regard to the "bodily injury", "property damage" or "personal and advertising injury";

4. Applies only if the "bodily injury" or "property damage" occurs, or the offense giving rise to the "personal and advertising injury" is committed, subsequent to the execution of the written agreement; and

5. Applies only if the written agreement is in effect at the time the "bodily injury" or "property damage" occurs, or at the time the offense giving rise to the "personal and advertising injury" is committed.

Item 2.    **Blanket Additional Insured – Grantor Of Permits**

Paragraph 2. of Section II - Who Is An Insured is amended to add the following:

Any state, municipality or political subdivision that has issued you a permit in connection with any operations performed by you or on your behalf, or in connection with premises you own, rent or control, and to which this insurance applies, but only to the extent that you are required to provide additional insured status to the state, municipality or political subdivision as a condition of receiving and maintaining the permit. Such state, municipality or political subdivision that has issued you a permit is an insured only with respect to their liability as grantor of such permit to you.

RB00058
Exhibit 49, Page 087

However, with respect to the state, municipality or political subdivision:

1.  Coverage will be no broader than required; and

2.  Limits of insurance will not exceed the minimum limits of insurance required as a condition for receiving or maintaining the permit;

but neither the scope of coverage nor the limits of insurance will exceed those provided by this policy.

This insurance does not apply to:

1.  "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state, municipality or political subdivision;

2.  Any "bodily injury" or "property damage" included within the "products-completed operations hazard", except when required by written agreement initiated prior to loss; or

3.  "Bodily injury", "property damage" or "personal and advertising injury", unless negligently caused, in whole or in part, by you or those acting on your behalf.

Item 3.    **Other Insurance Amendment**

If you are obligated under a written agreement to provide liability insurance on a primary, excess, contingent, or any other basis for any person(s) or organization(s) that qualifies as an additional insured on this policy, this policy will apply solely on the basis required by such written agreement and Paragraph 4. Other Insurance of Section IV – Commercial General Liability Conditions will not apply.  Where the applicable written agreement does not specify on what basis the liability insurance will apply, the provisions of Paragraph 4. Other Insurance of Section IV – Commercial General Liability Conditions will apply.  However, this insurance is excess over any other insurance available to the additional insured for which it is also covered as an additional insured by attachment of an endorsement to another policy providing  coverage for the same "occurrence", claim or "suit".

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
RB00059
Exhibit 49, Page 088

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**LIMITED UNINTENTIONAL DISCRIMINATION COVERAGE**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Schedule**

**Discrimination Limit:**              $

**Discrimination Aggregate:**         $

**Discrimination Deductible:**        $

A. **Coverage**

The following offense is added to the definition of "personal and advertising injury":

Discrimination based upon race, creed, religion, national origin, age, sex, sexual orientation, marital status, physical capabilities, characteristics or condition, or mental capabilities or condition.

This coverage for discrimination does not apply to any:

1.  Discrimination intentionally committed by the insured;

2.  Discrimination committed by, at the direction of or with the knowledge  or consent of you or any of your executive officers, directors, stockholders, partners or members;

3.  Discrimination directly or indirectly related to the employment,  prospective employment,  refusal to employ or termination  of any person;

4.  Discrimination if insurance for such is prohibited by applicable law or public policy;

5.  Liability for the cost of making accommodations  required by the American with Disabilities Act of 1990, or any amendment  thereto, or any similar federal, state or local law, including but not limited to any facility alterations  or the acquisition or modification  of equipment or devices. However, this exclusion does not apply to liability for the failure to  make reasonable accommodations to a disability.

B.  **Additional Exclusion**

The following  exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A – Bodily Injury and Property Damage  Liability:

This insurance does not apply to:

Damages arising out of unlawful discrimination.

RB00060
Exhibit 49, Page 089

C.  **Limits of Insurance**

1.  This insurance is subject to the Discrimination Limit shown in the schedule of this endorsement.

    This Discrimination Limit is the most we will pay for damages because of all "personal and advertising injury" arising out of any one "occurrence" because of discrimination.

    This Discrimination Limit is subject to the Personal and Advertising Injury Limit shown in the Declarations; it is not in addition to the Personal and Advertising Injury Limit.

    If a Discrimination Limit is not designated in the schedule of this endorsement, the applicable limit is the Personal and Advertising Injury Limit shown in the Declarations.

2.  This insurance is subject to the Discrimination Aggregate shown in the Schedule. If no Discrimination Aggregate is shown in the Schedule, this insurance is subject to the General Aggregate Limit shown in the Declarations.

D.  **Deductible**

1.  You are responsible, up to the Discrimination Deductible shown in the Schedule of this endorsement, for the total of all damages, including amounts paid in settlement of a claim or "suit" and Supplementary Payments because of "personal and advertising injury" arising out of any one "occurrence" because of discrimination. Subject to the applicable limits of insurance, we are responsible for those amounts of damages, including amounts paid in settlement of a claim or "suit" and Supplementary Payments because of discrimination that exceed the Discrimination Deductible shown in the Schedule of this endorsement.

2.  The Personal and Advertising Injury Limit and any applicable aggregate limits of insurance are reduced by the amount of damages paid or payable by you within the deductible.

3.  We have the right but not the duty to advance any part or all of the deductible amount. If we exercise this right, you must promptly reimburse us for any such amounts advanced. All such amounts advanced shall remain your sole and exclusive liability. Exercise of our right to advance such amounts shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy.

4.  In the event we recover any advance or payment made under this policy by exercising our right of subrogation, the amount so recovered shall first be applied to any payments made by us in excess of the deductible amount; only then shall the remainder of such recovery, if any, be applied to reduce the deductible amount payable or paid by you.

5.  Any other deductible endorsement attached to this policy does not apply to the insurance provided by this endorsement.

3.  All other terms of this policy, including those which govern:

    a.  Our right and duty to defend claims or "suits"; and

    b.  The insured's duties in the event of an "occurrence";

    apply irrespective of application of the deductible amount.

E.  **Other Insurance**

This insurance does not apply to any portion of a loss for which the insured has available any other valid and collectible insurance, whether primary, excess, contingent, or on any other basis, unless such other insurance was specifically purchased by the insured to apply in excess of this policy.

RB00061
Exhibit 49, Page 090

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Non-Cumulation of Liability
## (Same Occurrence)

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1.  The following is added to paragraph 4. of the Limits of Insurance Section:

   If one "occurrence" causes "personal and advertising injury" to which this policy applies and to which one or more prior and/or future liability policy(ies) issued to you by us also applies, then this policy's Personal and Advertising Injury Limit will be reduced by the amount of each payment made by us under the other policy(ies) because of such "occurrence".

2.  The following is added to paragraph 5. of the Limits of Insurance Section:

   If one "occurrence" causes "bodily injury" and/or "property damage" during the policy period and during the policy period of one or more prior and/or future liability policy(ies) issued to you by us, then this policy's Each Occurrence Limit will be reduced by the amount of each payment made by us under the other policy(ies) because of such "occurrence".

3.  The final paragraph of the Limits of Insurance Section is replaced with the following:

   The aggregate Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the aggregated Limits of Insurance. However, the Each Occurrence Limit is the most we will pay for damages and Medical Expenses because of all "bodily injury" and "property damage" arising out of any one "occurrence" and the Personal and Advertising Injury Limit is the most we will pay for damage because of all "personal and advertising injury" arising out of any one "occurrence", regardless of the length of the policy period.

**LC 25 13 08 08**

Page   1  of   1

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Personal and Advertising Injury Redefined - Definition of Publication

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraphs **d.** and **e.** of the definition of "personal and advertising injury" are replaced by the following:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**d.**   Oral or written "publication" directly to the public at large of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

**e.**   **(1)**   Oral or written "publication" directly to the public at large of material that violates a person's right of privacy;

   **(2)**   Oral or written "publication" of material that violates a person's right of privacy by misappropriation of that person's name or likeness.

The following definition is added to the Definitions Section:

"Publication" means an insured's act of disseminating or broadcasting material or information.  Publication does not include the wrongful appropriation, interception or retrieval of material or information by a third party or the insured's dissemination or broadcasting of material or information to a person who is the subject of the material or the information.

**LC 29 04 08 08**

Page   1   of   1

RB00063
Exhibit 49, Page 092

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Personal and Advertising Injury - Occurrence Redefined

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.**  Paragraph **4.** of the Limits of Insurance section is replaced by the following:

**4.**  Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" arising out of any one "occurrence".

**B.**  The definition of "occurrence" in the Definitions section is replaced by the following:

"Occurrence" means:

**a.**  With respect to "bodily injury" or "property damage", an accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

**b.**  With respect to "personal and advertising injury", an offense or series of related offenses.

**LC 29 06 08 08**

Page   1  of  1

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ADVERTISEMENT REDEFINED**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART


The definition of "advertisement" in the Definitions Section is replaced by the following:

"Advertisement" means a paid announcement that is broadcast or published in the print, broadcast or electronic media to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

a.  Announcements that are published include material placed on the Internet or on similar electronic means of communication; and

b.  Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**LC 29 08 10 11**          © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1  of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00065
Exhibit 49, Page 094

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**BODILY INJURY REDEFINED**

This endorsement modifies insurance provided under the following:

      COMMERCIAL GENERAL LIABILITY COVERAGE FORM
      EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
      PRODUCTS/COMPLETED OPERATIONS COVERAGE PART

The definition of "bodily injury" in the Definition section is replaced by the following:

"Bodily injury" means:

    a. Bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time;  and

    b. Mental anguish, shock or humiliation arising out of injury as defined in paragraph a. above. Mental anguish means any type of mental or emotional illness or distress.

**LC 29 09 10 11**                © 2011, Liberty Mutual Group of Companies.  All rights reserved.                Page  1  of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00066
Exhibit 49, Page 095

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**KNOWLEDGE OF OCCURRENCE OR OFFENSE**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Knowledge of an "occurrence" or offense by your agent, servant or "employee" will not in itself constitute knowledge by you unless your "executive officer" or "employee" designated by you to notify us of an "occurrence" or offense has knowledge of the "occurrence" or offense.

RB00067
Exhibit 49, Page 096

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PREMIUM RESPONSIBILITY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART
   LIQUOR LIABILITY COVERAGE PART
   PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
   PRODUCT WITHDRAWAL COVERAGE PART

Paragraph E. Premiums of the Common Policy Conditions is replaced by the following:

1.   Each Named Insured is jointly and severally liable for all premiums due under this policy and for any other financial obligations of any Named Insured to us arising out of any agreements contained in this policy.

2.   The first Named Insured will be the payee for any return premiums we pay.

**LC 99 36 02 13**              © 2013 Liberty Mutual Insurance. All rights reserved.              Page  1 of  1
                    Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

> BUSINESS AUTO COVERAGE PART
> MOTOR CARRIER COVERAGE PART
> GARAGE COVERAGE PART
> TRUCKERS COVERAGE PART
> EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
> SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
| --- | --- | --- |
| Weyerhaeuser Company | 63459 Olive Barber Rd Coos Bay OR 97420 | 30 |

**LIM 99 01 05 11**            © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00069
Exhibit 49, Page 098

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE PART
MOTOR CARRIER COVERAGE PART
GARAGE COVERAGE PART
TRUCKERS COVERAGE PART
EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Division of Operations - Coos Bay District Bureau of Land Management | 1300 Airport Lane North Bend OR 97459 | 30 |

**LIM 99 01 05 11**          © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE PART
MOTOR CARRIER COVERAGE PART
GARAGE COVERAGE PART
TRUCKERS COVERAGE PART
EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Bank of America, NA as Agent It's Successors and Assign | 400 4th Street Lake Oswego OR 97034 | 30 |

**LIM 99 01 05 11**        © 2011, Liberty Mutual Group of Companies.  All rights reserved.        Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

     BUSINESS AUTO COVERAGE PART
     MOTOR CARRIER COVERAGE PART
     GARAGE COVERAGE PART
     TRUCKERS COVERAGE PART
     EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
     SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
     COMMERCIAL GENERAL LIABILITY COVERAGE PART
     EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
     PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
     LIQUOR LIABILITY COVERAGE PART
     COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number  of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| SENECA JONES TIMBER COMPANY, LLC AN OREGON LIMITED LIABILITY COMPANY | P.O. BOX 10265 EUGENE, OR 97440 | 30 |

RB00072
Exhibit 49, Page 101

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

> BUSINESS AUTO COVERAGE PART
> MOTOR CARRIER COVERAGE PART
> GARAGE COVERAGE PART
> TRUCKERS COVERAGE PART
> EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
> SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Per Schedule on file with the Company | Per Schedule on file with the Company | 30 |

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

      BUSINESS AUTO COVERAGE PART
      MOTOR CARRIER COVERAGE PART
      GARAGE COVERAGE PART
      TRUCKERS COVERAGE PART
      EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
      SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel  this policy for any reason other than nonpayment of premium,  we will notify the persons or
organizations  shown in the Schedule of this endorsement . We will send notice to the email or mailing  address
listed above at least 10 days, or the number  of days listed above,  if any, before the cancellation  becomes
effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance  notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to
provide  such advance  notification will not extend the policy cancellation  date nor negate cancellation  of the
policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Douglas  County  Land  Department  Douglas County Courthouse | 1036 SE Douglas Roseburg, OR 97470 | 30 |

**LIM 99 01 05 11**        © 2011, Liberty Mutual Group of Companies.  All rights reserved.        Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00074
Exhibit 49, Page 103

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE PART
MOTOR CARRIER COVERAGE PART
GARAGE COVERAGE PART
TRUCKERS COVERAGE PART
EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or
organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address
listed above at least 10 days, or the number  of days listed above,  if any, before the cancellation  becomes
effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to
provide such advance notification will not extend the policy cancellation date nor negate cancellation of the
policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Lone Rock Timberland  Co. Lone Rock Timber Management Company | PO Box 1127 Roseburg, OR 97470 | 30 |

**LIM 99 01 05 11**          © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00075
Exhibit 49, Page 104

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE PART
MOTOR CARRIER COVERAGE PART
GARAGE COVERAGE PART
TRUCKERS COVERAGE PART
EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Fessenden Hall Inc. | 1050 Sherman Ave. Pennsauken, NJ 08110 | 30 |

© 2011, Liberty Mutual Group of Companies.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00076
Exhibit 49, Page 105

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

> BUSINESS AUTO COVERAGE PART
> MOTOR CARRIER COVERAGE PART
> GARAGE COVERAGE PART
> TRUCKERS COVERAGE PART
> EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
> SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

### Schedule

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Keystone Forest Investments, LLC c/o Barnes & Associates, Inc. | 3000 Stewart Parkway, Suite 204 Roseburg, OR 97471 | 30 |

RB00077
Exhibit 49, Page 106

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE PART
MOTOR CARRIER COVERAGE PART
GARAGE COVERAGE PART
TRUCKERS COVERAGE PART
EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM


A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

<div align="center">

**Schedule**

</div>

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Forest Investment Associates c/o Barnes & Associates, Inc. | 3000 Stewart Parkway, Suite 204 Roseburg, OR 97471 | 30 |

**LIM 99 01 05 11**          © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

      BUSINESS AUTO COVERAGE PART
      MOTOR CARRIER COVERAGE PART
      GARAGE COVERAGE PART
      TRUCKERS COVERAGE PART
      EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
      SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Barnes & Associates, Inc. | 3000 Stewart Parkway, Suite 204 Roseburg, OR 97471 | 30 |

**LIM 99 01 05 11**    © 2011, Liberty Mutual Group of Companies.  All rights reserved.    Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

   BUSINESS AUTO COVERAGE PART
   MOTOR CARRIER COVERAGE PART
   GARAGE COVERAGE PART
   TRUCKERS COVERAGE PART
   EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
   SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
   COMMERCIAL GENERAL LIABILITY COVERAGE PART
   EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
   PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
   LIQUOR LIABILITY COVERAGE PART
   COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or
organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address
listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes
effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to
provide such advance notification will not extend the policy cancellation date nor negate cancellation of the
policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Bavarian Olympus Timber, LLC c/o Barnes & Associates, Inc. | 3000 Stewart Parkway, Suite 204 Roseburg, OR 97471 | 30 |

**LIM 99 01 05 11**          © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1  of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00080
Exhibit 49, Page 109

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**NOTICE OF CANCELLATION TO THIRD PARTIES**

This endorsement modifies insurance provided under the following:

      BUSINESS AUTO COVERAGE PART
      MOTOR CARRIER COVERAGE PART
      GARAGE COVERAGE PART
      TRUCKERS COVERAGE PART
      EXCESS AUTOMOBILE LIABILITY INDEMNITY COVERAGE PART
      SELF-INSURED TRUCKER EXCESS LIABILITY COVERAGE PART
      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      COMMERCIAL LIABILITY - UMBRELLA COVERAGE FORM

A.  If we cancel this policy for any reason other than nonpayment of premium, we will notify the persons or organizations shown in the Schedule of this endorsement . We will send notice to the email or mailing address listed above at least 10 days, or the number of days listed above, if any, before the cancellation becomes effective.  In no event does the notice to the third party exceed the notice   to the first named insured.

B.  This advance notification of a pending cancellation  of coverage is intended as a courtesy only. Our failure to provide such advance notification will not extend the policy cancellation date nor negate cancellation of the policy.

All other terms and conditions of this policy remain unchanged.

**Schedule**

| Name of Other Person(s) / Organization(s): | Email Address or mailing address: | Number Days Notice: |
|---|---|---|
| Silver Butte Timber Co. | PO Box 4, Riddle, OR 97469 | 30 |

**LIM 99 01 05 11**          © 2011, Liberty Mutual Group of Companies.  All rights reserved.          Page  1 of  1
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

Policy Number  TB7-661-067089-031
Issued by      LIBERTY INSURANCE CORPORATION

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**JOINT VENTURE OR PARTNERSHIP**

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    EXCESS COMMERCIAL GENERAL LIABILTY COVERAGE PART

**Schedule**

| Joint Venture or Partnership: |
|---|
| Roseburg Renewable Energy, LLC |

The term Named Insured includes in addition to the person or organization designated in the Declarations as the first Named Insured:

Any joint venture or partnership, in which you are a member or partner, provided that:

(1) The joint venture or partnership is controlled by you;

(2) You have an operating interest in the joint venture or partnership;

(3) You are obligated under a written contract or agreement, prior to any loss, to provide insurance coverage; or

(4) The joint venture or partnership is shown in the Schedule.

However:

    a.  Coverage for the joint venture or partnership under this endorsement is excess over any other valid and collectible insurance purchased specifically to cover the joint venture or partnership;

    b.  No person or organization is an insured with respect to the conduct of the joint venture or partnership if no Named Insured is a partner or member during the policy period or which is not engaged in any activities during the policy period;

    c.  This insurance does not apply to any injury or damage that occurred prior to the interest or obligation described above in the joint venture or partnership;

    d.  For scheduled joint ventures or partnerships, this insurance does not apply to any injury or damage that occurred prior to the joint venture or partnership being added to the Schedule; and

    e.  This insurance does not apply to any injury or damage that occurs once you no longer have an interest or obligation, as described above, in the joint venture or partnership.

The final paragraph of Section II – Who Is An Insured does not apply to the extent that it conflicts with coverage provided in this endorsement for joint ventures and partnerships.

RB00082
Exhibit 49, Page 111

Policy Number  TB7-661-067089-031
Issued by        LIBERTY INSURANCE CORPORATION

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**MANUFACTURERS ERRORS AND OMISSIONS COVERAGE
CLAIMS-MADE AND DEFENSE WITHIN LIMITS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE AND REPORTED COVERAGE. THE COVERAGE IS PROVIDED ON A DEFENSE WITHIN THE LIMITS BASIS. COSTS INCURRED BY THE COMPANY IN DEFENDING CLAIMS WILL REDUCE THE LIMITS OF LIABILITY.**

**Schedule**

| Coverage | Limits Of Insurance | | Deductible Amount |
|---|---|---|---|
| **Manufacturers Errors and Omissions** | $ 2,000,000 | **Per Act, Error or Omission Limit** | $ 250,000 |
| | $ 4,000,000 | **Aggregate** | |
| **Retroactive Date:** | N/A | | |
| **Insured Products:** Huber Wood Zip System - wood product not including tape and liquid flash | | | |
| **Information required to complete this Schedule, if not shown above, will be shown in the Declarations** | | | |

A.   The following is added to Section I - Coverages:

**Coverage – Manufacturer's Errors and Omissions**

1.   Insuring Agreement

We will pay on the insured's behalf those sums which the insured becomes legally obligated to pay as "damages" because of any claim or "suit" arising out of a "manufacturer's error or omission" committed by the insured to which this insurance applies. We will have the right and duty to defend any claim or "suit" seeking "damages" to which this insurance applies. However, we will have no duty to defend any claim or "suit" seeking "damages" to which this insurance does not apply.  We may, at our discretion, investigate any "manufacturer's error or omission" and settle any claim or "suit" that may result.  But:

a.   The amount we will pay for "damages" and Supplementary Payments is limited as described in Section III – Limits of Insurance;

b.   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or Supplementary Payments;

LC 04 48 10 13                © 2013 Liberty Mutual Insurance. All rights reserved.                Page 1 of 9
                    Includes copyrighted material of Insurance Services Office, Inc., with its permission.

c.  The "manufacturer's error or omission" must not have been committed before the Retroactive Date, if any, shown in the Schedule, or after the end of the policy period; and

d.  A claim seeking "damages" because of a "manufacturer's error or omission" must first be made or brought against an insured during the policy period or, if applicable, during an Extended Reporting Period we provide.

A claim made or brought against the insured within 60 days after the end of the policy period will be considered to have been made or brought within the policy period if no subsequent policy is available to cover the claim.

A claim seeking "damages" will be deemed to have been first made at the earlier of the following times:

(1)  When notice of such claim is received and recorded by any insured or by us, whichever comes first; or

(2)  When we first make settlement in accordance with this Paragraph 1.

All claims arising out of the same "manufacturer's error or omission" or related "manufacturer's errors or omissions" will be deemed to have been made at the time the first of those claims is made and reported.

2.  Exclusions

For the purposes of this endorsement only, this insurance does not apply to:

a.  Bodily Injury Or Personal And Advertising Injury

"Damages" arising from "bodily injury" or "personal and advertising injury".

b.  Property Damage:

"Property damage" determined to be covered, in whole or in part, under any other part of the policy, including any other endorsements, to which this endorsement is attached.

c.  Dishonest, Fraudulent, Criminal Or Malicious Act

"Damages" arising from any actual or alleged intentional, dishonest, fraudulent, criminal or malicious act, error or omission committed by any insured, including the willful or reckless violation of any statute.

d.  Recording And Distribution Of Material Or Information In Violation Of Law Exclusion

"Damages" arising from any actual or alleged act, error, or omission that violates or is alleged to violate:

(1)  The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2)  The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3)  The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

(4)  Any federal, state or local statute other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating, or distribution of material or information.

RB00084
Exhibit 49, Page 113

e.  Infringement of Copyright, Patent, Trademark or Trade Secret

"Damages" arising from any actual or alleged infringement of copyright, title, slogan, patent, trademark, trade dress, trade secret, trade name, service mark, service name or other designation of origin or authenticity.

f.  Contractual Liability

"Damages" that the insured is obligated to pay by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability that the insured would have in the absence of the contract or agreement.

g.  Pollution

"Damages" arising out of any:

(1)  Actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants";

(2)  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(3)  Claim or "suit" by or on behalf of a governmental authority for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

h.  Nuclear Energy

"Damages" arising out of the hazardous properties" of "nuclear material.

i.  Government Demands or Proceedings

"Damages" arising from any demand made or proceeding brought by or on behalf of any:

(1)  Federal, state, or local government agency or authority; or

(2)  Licensing or regulatory organization.

j.  Insureds Against Insureds

Loss for which a claim or "suit" is made or brought by or on behalf of any current or former insured against any current or former insured.

k.  Breach of Contract, Guarantee or Warranty

"Damages" arising out of any actual or alleged breach of contract, guarantee or express warranty, including but not limited to:

(1)  Cost estimates or cost guarantees being exceeded; or

(2)  Any delay or default by or on behalf of the insured with respect to the performance of any contract or agreement.

l.  Prior Knowledge

© 2013 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

"Damages" arising out of any actual or alleged "manufacturer's error or omission" the insured had knowledge of prior to the effective date from which we have continuously provided this coverage to you.

m.  War

"Damages" arising out of, or in connection with:

(1)  War, including undeclared or civil war;

(2)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3)  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

n.  Microorganisms

"Damages" arising from any type or form of organism of microscopic or ultramicroscopic size including, but not limited to, fungus, wet or dry rot, virus, algae, bacterial or any associated by-product.

o.  Satellite Malfunction

"Damages" arising out of any malfunction of a satellite or failure of a satellite to provide the intended service or fulfill its intended purpose.

p.  Professional Services

"Damages" arising out of the rendering or failure to render any professional services, except the designing, installation or manufacturing of an "insured product".

q.  Cosmetic Defects

"Damages" arising from any cosmetic defects in your "insured product".

r.  Product Recall

"Damages" arising out of the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of any "insured product" if such "insured product" is publicly withdrawn or recalled from the market.

s.  Bankruptcy

"Damages" arising out of the bankruptcy, insolvency or other financial impairment of any insured or any other person or organization providing services, products or work for or on behalf of any insured.

t.  Asbestos

"Damages" arising out of or caused by, or allegedly caused by, asbestos either alone or in combination with other substances or factors.

u.  Auto, Watercraft, Aircraft or Mobile Equipment Loss of Use

"Damages" arising out of the loss of use of any aircraft, "auto", watercraft or "mobile equipment".

RB00086
Exhibit 49, Page 115

v.   Cyber Liability

"Damages" arising out of any actual or alleged failure to prevent identity theft.

w.   Internet Service Interruption

"Damages" arising out of any internet service interruption or failure.

x.   Electronic Data

"Damages" arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, web-sites, hard or floppy disks, CD ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

y.   Lead

"Damages" arising directly or indirectly from lead or the exposure to lead in any form, including the request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize lead.

## B.  Defense Within Limits

1.   With respect to claims or "suits" to which this endorsement applies, Section I - Supplementary Payments – Coverages A and B is replaced by:

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a.   Both:

(1)   Fees, salaries and expenses of attorneys, legal interns and paralegals we retain (including our employees); and

(2)   All other expenses, including but not limited to expenses, fees, and/or any other amounts paid to or for experts and consultants, that we incur;

that are directly allocable to the particular claim or "suit".

b.   The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

c.   All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

d.   All court costs taxed against the insured in the "suit".  However, these payments do not include attorney's fees or attorney's expenses taxed against the insured.

e.   Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

RB00087
Exhibit 49, Page 116

f.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

ALL SUPPLEMENTARY PAYMENTS MADE PURSUANT TO THIS ENDORSEMENT WILL REDUCE THE LIMITS OF INSURANCE AVAILABLE. However, amounts we pay for the salaries, fees and expenses of (1) independent adjusters we might hire and (2) any of our employees other than those described in 1.a. will not reduce the Limits of Insurance.

2.  With respect to claims or "suits" to which this endorsement applies, the following Condition is added to Section IV – Commercial General Liability Conditions:

Transfer of Duties When the Applicable Limit of Insurance Is Used Up.

a.  When a limit of insurance has been used up in the payment of judgments, settlements and/or Supplementary Payments:

(1)  We will notify the first Named Insured and any insured against whom a claim or "suit" is pending, in writing, as soon as practicable, that:

(a)  Such a limit has been used up, and

(b)  Our duty to defend claims and "suits" seeking "damages" subject to that limit has also ended.

(2)  The first Named Insured and any insured against whom a claim or "suit" is pending will, as soon as practicable, arrange for the transfer of control of the defense of all such claims and "suits".

(3)  We will assist in, and all insureds must cooperate in, the transfer of control of the defense of all such claims and "suits" seeking "damages" which are subject to that limit and which are reported to us before that limit is used up.

(4)  We will take steps we deem appropriate to avoid a default in, or continue the defense of, such claims or "suits" until the transfer is completed, provided the appropriate insured is cooperating in completing such transfer. The first Named Insured and any insured against whom a claim or "suit" is pending will reimburse us for any expenses we incur (for which expenses each Named Insured and each insured against whom the claim or "suit" is pending are jointly and severally liable) to take such steps on and after the date on which the applicable limit of insurance is used up.

(5)  We will take no action whatsoever with respect to any claim or "suit" reported to us after the applicable limit of insurance has been used up.

b.  The duty to reimburse us will begin on the date the applicable limit of insurance is used up.  The exhaustion of any limit of insurance by the payments of judgments, settlements and/or Supplementary Payments, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

C.  For the purposes of this endorsement only, Section III – Limits Of Insurance of the policy is replaced by the following:

**Section III – Limits of Insurance**

1.  The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:
a.  Insureds;

b.  Claims made or "suits" brought;

LC 04 48 10 13                © 2013 Liberty Mutual Insurance. All rights reserved.                Page 6 of 9
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RB00088
Exhibit 49, Page 117

c.  Persons or organizations making claims or bringing "suits"; or

d.  **"Manufacturer's errors or omissions".**

2.  The Aggregate Limit is the most we will pay for the sum of "damages" and Supplementary Payments for all claims and "suits" arising out of all "manufacturer's errors or omissions".

3.  The Per Act, Error or Omission Limit is the most we will pay for the sum of "damages" and Supplementary Payments due to claims or "suits" arising out of any one "manufacturer's error or omission" committed by or on behalf of the insured.

4.  Any causally connected series of "manufacturer's errors or omissions" committed by or on behalf of the insured will be considered one "manufacturer's error or omission".

5.  Deductible

We will only pay for the amount of "damages" and Supplementary Payments that are in excess of the deductible amount shown in the Schedule of this endorsement. The deductible applies separately to each "manufacturer's error or omission" or series of causally connected "manufacturer's errors or omissions". The limits of insurance will be reduced by the amount paid or payable by you within this deductible.

We do not have the duty to advance any amount subject to your deductible obligation.  Exercise of our right to advance such amount shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy.  If required by law, we will pay all or any part of any deductible amount, if applicable, to effect settlement of any claim or "suit".  Upon notice of our payment of a deductible amount, you shall promptly reimburse us for the part of the deductible amount we paid.

The Limits of Insurance of Manufacturer's Errors and Omissions Coverage apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

D.  For the purposes of the coverage provided by this endorsement, Conditions 2. of Section IV – Commercial General Liability Conditions is replaced by the following:

2.  Duties In The Event Of "Manufacturer's Error or Omission", or Claim or "Suit"

a.  You must see to it that we are notified as soon as practicable of a "manufacturer's error or omission" which may result in a claim. To the extent possible, notice should include:

(1)  What the "manufacturer's error or omission" was and when it occurred; and

(2)  The names and addresses of anyone who may suffer "damages" as a result of such "manufacturer's error or omission".

b.  If a claim is made or "suit" is brought against any insured, you must:

(1)  Immediately record the specifics of the claim or "suit" and the date received; and

(2)  Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.  You and any other involved insured must:

RB00089
Exhibit 49, Page 118

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

d.  No insured will make a payment, assume any obligation or incur any expense without our consent.

E.  **Extended Reporting Period**

1. You will have the right to purchase an Extended Reporting Period, as described below, if:

a.  This endorsement is canceled or not renewed; or

b.  We renew or replace this endorsement with insurance that:

(1) Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

(2) Does not apply to an act, error or omission on a claims-made basis.

2.  The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to claims for "manufacturer's errors or omissions" that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule of this endorsement. Once in effect, the Extended Reporting Period may not be canceled. The Extended Reporting Period does not apply to claims made or brought within 60 days after the end of the policy period.

3.  An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

The additional premium will be 200% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for claims first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

4.  If the Extended Reporting Period is in effect, we will provide an Extended Reporting Period Aggregate Limit Of Insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The Extended Reporting Period Aggregate Limit Of Insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

F.  **Definitions**

The following definitions are added to Section V – Definitions:

RB00090
Exhibit 49, Page 119

1. "Manufacturer's error or omission":

   a. Means an insured's negligent design, installation or manufacture of an "insured product" resulting in the failure of the "insured product" to perform the function or serve the purpose intended after it has left the possession of any insured.

   b. Does not include:

      (1) Faulty installation of the "insured product" except when installed by you.

      (2) General wear and tear that can be reasonably expected.

      (3) Enhancements of the "insured product" after it has been put to its intended purpose.

2. "Damages":

   a. Means economic loss sustained by your customer because of their loss of use of their tangible property which has not been physically injured or destroyed, provided that such loss of use does not arise from any sudden and accidental physical injury to your "insured product".

   b. Does not include:

      (1) The purchase or contract price for your "insured product".

      (2) Costs and expenses incurred by you or on your behalf to fulfill a warranty, representation, or promise provided with your "insured product".

      (3) Disgorgement of profits, restitution, or any money or credits that represent any gain, profit, or advantage to which you are not legally entitled.

      (4) Costs to restore goodwill of your customer.

      (5) Criminal or civil penalties.

3. "Insured product" means all Insured Products shown in the Schedule of this endorsement.

RB00091
Exhibit 49, Page 120

Policy Number:  TB7-661-067089-031
Issued by:  LIBERTY INSURANCE CORPORATION

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**LOGGER'S PROPERTY DAMAGE LIABILITY ENDORSEMENT**

THIS ENDORSEMENT CONTAINS AN AGREEMENT WHICH MAY RESULT IN SUSPENSION OF THE COVERAGE PROVIDED BY THIS ENDORSEMENT IF BREACHED. MAKE SURE YOU READ IT CAREFULLY AND UNDERSTAND THE CONDITIONS UNDER WHICH THIS INSURANCE COULD BE SUSPENDED. IF YOU HAVE QUESTIONS, CONTACT YOUR LIBERTY MUTUAL REPRESENTATIVE.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Schedule**

| | | | |
|---|---|---|---|
| **Designated Customer**: | | | |
| **Limits of Insurance:** | $ | 2,000,000 | **Logger's Each Occurrence Limit** |
| | $ | 4,000,000 | **Logger's Property Damage Aggregate Limit** |
| **Deductible:** | $ | N/A | |

The following exclusion is added to Paragraph 2. Coverage A (Section I):

This insurance does not apply to "property damage" for which coverage is provided under Logger's Property Damage Liability Coverage.

The following coverage is added to Section I - Coverages:

LOGGER'S PROPERTY DAMAGE LIABILITY COVERAGE

1.  **Insuring Agreement:**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "logger's property damage" to which this insurance applies arising out of "your logging and lumbering operations".  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

        (1)  The amount we will pay for damages is limited as described in Section III -- Limits of Insurance; and

        (2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under the Logger's Property Damage Liability Coverage.

        As used above, damages because of "logger's property damage" includes "fire fighting expenses" resulting from "your logging and lumbering operations" only if no "forester" has suspended these operations.

**LD 04 16 07 11**              © 2011 Liberty Mutual Group of Companies. All rights reserved.              Page 1 of 4
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

RB00092
Exhibit 49, Page 121

Supplementary Payments - Coverages A and B shall apply to the Logger's Property Damage Liability Coverage. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

b.  This insurance applies to "logger's property damage" only if:

(1)  The "logger's property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)  The "logger's property damage" occurs during the policy period; and

(3)  The "logger's property damage" arises out of "your logging and lumbering operations" performed pursuant to a written contract for a Designated Customer listed in the Schedule.

2.  **Exclusions**

This insurance does not apply to:

a.  "Logger's property damage" expected or intended from the standpoint of the insured.

b.  "Logger's property damage" caused by fire which begins or spreads because of any willful or malicious act of the insured.

c.  "Logger's property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants."

d.  Any loss, cost or expense arising out of any:

(1)  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2)  Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

e.  "Logger's property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1)  A watercraft while ashore on premises you own or rent;

(2)  A watercraft you do not own that is:

(a)  Less than 26 feet long; and

(b)  Not being used to carry persons or property for a charge;

(3)  Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(4)  "Logger's property damage" arising out of the operation of any of the equipment listed in Paragraph f. (2) or f. (3) of the definition of "mobile equipment" (Section V).

RB00093
Exhibit 49, Page 122

f.    "Logger's property damage" to:

(1)    Property you own or rent;

(2)    Premises you sell, give away or abandon, if the "logger's property damage" arises out of any part of those premises; or

(3)    Personal property in the care, custody or control of the insured except any "vehicle" or railroad rolling stock.

g.    Punitive damages or exemplary damages, penalties, fees, double or treble damages.

h.    "Logger's property damage" for which you have assumed liability in a contract or agreement.  This does not apply to liability for damages which the insured would have in the absence of the contract or agreement.

3.    The following changes apply to Section III – Limits of Insurance:

a.    The following is added to Paragraph 2.

2.    The General Aggregate Limit is the most we will pay for the sum of:

d.    Damages under the Logger's Property Damage Liability Coverage.

b.    The following paragraphs are added:

8.    The Logger's Property Damage Aggregate Limit shown in the Schedule is the most we will pay for the sum of all damages because of "logger's property damage".

9.    Subject to 2. and 8. above, the Logger's Each Occurrence Limit shown in the Schedule is the most we will pay for all damages because of "logger's property damage" arising out of any one "occurrence".

c.    You are responsible, up to the Deductible Amount shown above, for the total of:

(1)    all damages, including amounts paid in settlement of a claim or "suit", plus

(2)    all "allocated loss adjustment expense";

because of all "property damage" as the result of any one "occurrence".  We are responsible for those amounts of damages to which this insurance applies (subject to the applicable limits of insurance) and "allocated loss adjustment expense" that exceed the applicable deductible amount shown above.

The Logger's Each Occurrence Limit and the Logger's Property Damage Aggregate Limit shown in the Schedule shall be reduced by amounts paid or payable by you within the deductible amount.

We have the right to advance any part or all of the deductible to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible as has been advanced by us. Exercise of our right to advance such amount shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy.

4.    **Additional Definitions**

a.    "Your logging and lumbering operations" means logging, the felling and bucking of timber, log road building, sawmilling, planning, plywood, veneer, pulp or paper milling, and all operations necessary or incidental to logging including railroading or trucking of felled trees or timber, maintenance of logging campsites, and the ownership, management, or reforestation of timberlands by you or on your behalf.

RB00094
Exhibit 49, Page 123

b.  "Logger's property damage" means:

(1)  physical injury to any "vehicle" or railroad rolling stock while being loaded or unloaded including all resulting loss of use; and

(2)  "property damage" due to fire resulting from "your logging and lumbering operations" including physical injury to timberlands, standing timber, felled or bucked timber, owned by others.

c.  "Vehicle," as used in the Logger's Property Damage Liability Coverage means any land motor vehicle, trailer or semi-trailer.

d.  "Fire fighting expenses" means your portion of the actual cost incurred by others in controlling or extinguishing a fire. It does not include your expenses for your "employees", or others you may hire to fulfill your obligation to use a reasonable effort, to control or extinguish a fire.

e.  "Forester" means a federal or state forester, including any of his or her authorized representatives.

f.  "Allocated loss adjustment expense" includes, but is not limited to:

(1)  Attorneys' fees for claims in "suit";

(2)  Court costs and other items of expense such as:

(a)  costs for medical, expert and other witnesses at trials or hearings, stenographic costs and costs of copies of documents and transcripts; and

(b)  medical, expert, or consultant fees and expenses relating to the defense of any claim or "suit"; and

(3)  Any other expense described in Supplementary Payments – Coverages A and B.

5.  **Additional Condition**

The following condition is added to Section IV – Commercial General Liability Conditions:

a.  You agree that:

(1)  slash will be burned only at such times and under such conditions as approved, directed or provided by a "forester"; and

(2)  "logging and lumbering operations" will be completely suspended whenever directed by a "forester".

IF YOU BREACH THIS AGREEMENT, THE INSURANCE AFFORDED UNDER THE LOGGER'S PROPERTY DAMAGE LIABILITY COVERAGE WILL BE SUSPENDED DURING THE ENTIRE PERIOD OF SUCH BREACH OF THIS AGREEMENT AND SHALL NOT APPLY TO "LOGGER'S PROPERTY DAMAGE" ARISING OUT OF "YOUR LOGGING AND LUMBERING OPERATIONS" CONDUCTED DURING THE PERIOD OF SUCH BREACH. However, the exclusion added to Coverage A (Section I) will remain in force. The agreement afforded by this endorsement shall not be prejudiced by your failure to comply with this agreement for reasons or causes over which you have no control.

         © 2011 Liberty Mutual Group of Companies. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with
its permission.

Policy Number  TB7-661-067089-031
Issued by          LIBERTY INSURANCE CORPORATION

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**LIMITED UNINTENTIONAL DISCRIMINATION COVERAGE**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Schedule**

| | |
|---|---|
| **Discrimination Limit:** | $  2,000,000 |
| **Discrimination Aggregate:** | $  4,000,000 |
| **Discrimination Deductible:** | $  250,000 |

A.  **Coverage**

The following offense is added to the definition of "personal and advertising injury":

Discrimination based upon race, creed, religion, national origin, age, sex, sexual orientation, marital status, physical capabilities, characteristics or condition, or mental capabilities or condition.

This coverage for discrimination does not apply to any:

1.  Discrimination intentionally committed by the insured;

2.  Discrimination committed by, at the direction of or with the knowledge or consent of you or any of your executive officers, directors, stockholders, partners or members;

3.  Discrimination directly or indirectly related to the employment, prospective employment, refusal to employ or termination of any person;

4.  Discrimination if insurance for such is prohibited by applicable law or public policy;

5.  Liability for the cost of making accommodations required by the American with Disabilities Act of 1990, or any amendment thereto, or any similar federal, state or local law, including but not limited to any facility alterations or the acquisition or modification of equipment or devices. However, this exclusion does not apply to liability for the failure to make reasonable accommodations to a disability.

B.  **Additional Exclusion**

The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A – Bodily Injury and Property Damage Liability:

This insurance does not apply to:

Damages arising out of unlawful discrimination.

LC 24 18 10 13          © 2013 Liberty Mutual Insurance. All rights reserved. Includes copyrighted material of Insurance Services Office, Inc., with its permission.          Page 1 of 2

C.  **Limits of Insurance**

1.  This insurance is subject to the Discrimination Limit shown in the schedule of this endorsement.

    This Discrimination Limit is the most we will pay for damages because of all "personal and advertising injury" arising out of any one "occurrence" because of discrimination.

    This Discrimination Limit is subject to the Personal and Advertising Injury Limit shown in the Declarations; it is not in addition to the Personal and Advertising Injury Limit.

    If a Discrimination Limit  is not designated in the schedule of this endorsement, the applicable limit is the Personal and Advertising Injury Limit shown in the Declarations.

2.  This insurance is subject to the Discrimination Aggregate shown in the Schedule. If no Discrimination Aggregate is shown in the Schedule, this insurance is subject to the General Aggregate Limit shown in the Declarations.

D.  **Deductible**

1.  You are responsible, up to the Discrimination Deductible shown in the Schedule of this endorsement, for the total of all damages, including amounts paid in settlement of a claim or "suit" and Supplementary Payments because of "personal and advertising injury" arising out of any one "occurrence" because of discrimination.  Subject to the applicable limits of insurance, we are responsible for those amounts of damages, including amounts paid in settlement of a claim or "suit" and Supplementary Payments because of discrimination that exceed the Discrimination Deductible shown in the Schedule of this endorsement.

2.  The Personal and Advertising Injury Limit and any applicable aggregate limits of insurance are reduced by the amount of damages paid or payable by you within the deductible.

3.  We have the right but not the duty to advance any part or all of the deductible amount.  If we exercise this right, you must promptly reimburse us for any such amounts advanced.  All such amounts advanced shall remain your sole and exclusive liability.  Exercise of our right to advance such amounts shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy.

4.  In the event we recover any advance or payment made under this policy by exercising our right of subrogation, the amount so recovered shall first be applied to any payments made by us in excess of the deductible amount; only then shall the remainder of such recovery, if any, be applied to reduce the deductible amount payable or paid by you.

5.  Any other deductible endorsement attached to this policy does not apply to the insurance provided by this endorsement.

6.  All other terms of this policy, including those which govern:

    a.  Our right and duty to defend claims or "suits"; and

    b.  The insured's duties in the event of an "occurrence";

    apply irrespective of application of the deductible amount.

E.  **Other Insurance**

This insurance does not apply to any portion of a loss for which the insured has available any other valid and collectible insurance, whether primary, excess, contingent, or on any other basis, unless such other insurance was specifically purchased by the insured to apply in excess of this policy.

**LC 24 18 10 13**          © 2013 Liberty Mutual Insurance. All rights reserved. Includes copyrighted                Page 2 of 2
material of Insurance Services Office, Inc., with its permission.

POLICY NUMBER: TB7-661-067089-031

**COMMERCIAL GENERAL LIABILITY**
**CG 20 26 12 19**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

**1.** In the performance of your ongoing operations; or

**2.** In connection with your premises owned by or rented to you.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable limits of insurance;

whichever is less.

This endorsement shall not increase the applicable limits of insurance.

## SCHEDULE

**Name Of Additional Insured Person(s) Or Organization(s):**

Drs Emergency Corporation dba Cascade medical Associates TIN 93-0593500

Medical Directors: Dr. Richard Abraham Dr. Marc Schnapper Dr. Luci Kovacevic Dr. Brian Hoyt

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

RB00098
Exhibit 49, Page 127

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

RB00099
Exhibit 49, Page 128

COMMERCIAL GENERAL LIABILITY
CG 26 88 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# ALASKA EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

CG 26 88 01 15

© Insurance Services Office, Inc., 2015

Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

   **2. Exclusions**

      This insurance does not apply to:

      **p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

        Damages arising out of:

        **(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

        **(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

        This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

        However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of  "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically  controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

   **2. Exclusions**

      This insurance does not apply to:

      **Access Or Disclosure Of Confidential Or Personal Information**

      "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

      This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

RB00101
Exhibit 49, Page 130

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

RB00102
Exhibit 49, Page 131

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

© ISO Properties, Inc., 2003

RB00103
Exhibit 49, Page 132

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## Nuclear Energy Liability Exclusion Endorsement (Broad Form)

This endorsement modifies the insurance provided under the following:

> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured;" or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2007

RB00104
Exhibit 49, Page 133

**2.** As used in this endorsement:

"Hazardous properties" include radioactive, toxic or explosive properties.

"Nuclear material" means "source material," "special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

RB00105
Exhibit 49, Page 134

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Asbestos Exclusion Endorsement

This endorsement modifies the insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
> GARAGE COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MOTOR TRUCK CARGO COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRINTERS LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK
> WAREHOUSEMAN'S LEGAL LIABILITY COVERAGE PART

This insurance does not apply to any liability, damages, loss, injury, demand, claim or "suit" arising out of or caused by, or allegedly caused by, asbestos either alone or in combination with other substances or factors.

**LC 21 01 06 05**

Page   1 of   1

Policy Number TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## Silica Exclusion Endorsement

This endorsement modifies the insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART
> GARAGE COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MOTOR TRUCK CARGO COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRINTERS LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK
> WAREHOUSEMEN'S LIABILITY COVERAGE PART

This insurance does not apply to any liability, damages, loss, injury, demand, claim or "suit" any part of which is caused by, or allegedly caused by, silica in any form or any substance containing silica, either alone or in combination with other substances or factors, whether included in a product or otherwise.

**LC 21 02 06 05**

Page    1  of    1

Policy Number  TB7-661-067089-031
Issued by Liberty Insurance Corp.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

**FUNGI OR BACTERIA EXCLUSION**
**(LEGIONELLA BACTERIUM EXCLUDED)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage  A – Bodily Injury and Property Damage Liability:

2. Exclusions

This insurance does not apply to:

Fungi or Bacteria

a. "Bodily injury" or "property damage" which would not have occurred, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such   injury or damage.

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other   person or entity.

With the exception for legionella  bacterium, this exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

B. The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage  B – Personal and Advertising Injury Liability:

2. Exclusions

This insurance does not apply to:

Fungi or Bacteria

a. "Personal and advertising injury" which would not have taken place, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such   injury.

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. The following definition is added to the Definitions  Section:

"Fungi" means  any  type  or  form  of  fungus,  including  mold  or  mildew  and  any  mycotoxins,  spores,  scents  or byproducts produced or released by fungi.

IL 01 42 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# OREGON CHANGES – DOMESTIC PARTNERSHIP

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK COVERAGE PART

**A.** The term "spouse" is replaced by the following:

Spouse or individual who is in a domestic partnership recognized under Oregon law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

**1.** Individual Named Insured by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of such Named Insured's household, including a ward or foster child; or

**2.** Individual named in the Schedule by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage – Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of your household, including a ward or foster child.

© ISO Properties, Inc., 2007

RB00110
Exhibit 49, Page 139

IL 01 99 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE  READ IT CAREFULLY.**

# ARKANSAS CHANGES – TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
FARM LIABILITY COVERAGE FORM
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK COVERAGE PART

The following is added to the **Transfer Of Rights Of Recovery Against Others To Us** Condition:

We will be entitled to recovery only after the insured ("insured") has been fully compensated for the loss or damage sustained, including expenses incurred in obtaining full compensation for the  loss or damage.

RB00111
Exhibit 49, Page 140

**LIBERTY MUTUAL GROUP CALIFORNIA PRIVACY NOTICE**
Commercial Lines (excluding Workers' Compensation)
(Effective December 15, 2020)

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers. This Privacy Notice explains how we gather, use, and share your data. This Privacy Notice applies to you if you are a **Liberty Mutual commercial line insured or are a commercial line claimant residing in California.** It does not apply to covered employees or claimants under Workers' Compensation policies. If this notice does not apply to you, go to libertymutual.com/privacy  to review the applicable Liberty Mutual privacy notice.

## What Data Does Liberty Mutual Gather?

We may collect the following categories of data:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;
- **Personal information described in California Civil Code § 1798.80(e)**, such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial information, medical information, or health insurance information;
- **Protected classification characteristics**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;
- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories and tendencies;
- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;
- **Professional or employment related information**, including current or past job history or performance evaluations;
- **Inferences drawn from other personal information**, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;
- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records and loss history information, health data, or criminal convictions; and
- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data.

For information about the types of personal data we have collected about California consumers in the past twelve (12) months, please go to libertymutual.com/privacy  and click on the link for the California Supplemental Privacy Policy.

## How We Get the Personal Data:

| We gather your personal data **directly from you**. For example, you provide us with data when you: | We also gather your personal data **from other people**. For example: |
|---|---|
| - ask about, buy insurance or file a claim | - your insurance agent or broker |
| - pay your policy | - your employer, association or business  (if you are insured through them) |
| - visit our websites, call us, or visit our office | - our affiliates or other insurance companies about your transactions with them |

RB00112
Exhibit 49, Page 141

| | |
|---|---|
| | • consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value  and condition of your property |
| | • other public directories and sources |
| | • third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government entities, open electoral register, advertising networks, data analytics providers, social networks, data brokers or in the event of a claim, third parties including other parties to the claim witnesses, experts, loss adjustors and claim handlers |
| | • other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

For information about how we have collected personal data in the past twelve (12) months, please go to libertymutual.com/privacy  and click on the link for the California Supplemental Privacy Policy.

**How Does Liberty Mutual Use My Data?**

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice.  Your data may be used to:

| **Business Purpose** | **Data Categories** |
|---|---|
| **Market, sell and provide insurance.** <br> This includes for example: <br> • calculating your premium; <br> • determining your eligibility for a  quote; <br> • confirming your identity and service your policy; | • Identifiers <br> • Personal Information <br> • Protected Classification Characteristics <br> • Commercial Information <br> • Internet or other similar network activity <br> • Professional or employment related information <br> • Inferences drawn from other personal information <br> • Risk data <br> • Claims data |
| **Manage your claim.** <br> This includes, for example: <br> • managing your claim, if any; <br> • conducting claims investigations; <br> • conducting medical examinations; <br> • conducting inspections, appraisals; <br> • providing roadside assistance; <br> • providing rental car replacement or repairs; | • Identifiers <br> • Personal Information <br> • Protected Classification Characteristics <br> • Commercial Information <br> • Internet or other similar network activity <br> • Professional or employment related information <br> • Inferences drawn from other personal information <br> • Risk Data <br> • Claims Data |

RB00113
Exhibit 49, Page 142

| | |
|---|---|
| **Day to Day Business and Insurance Operations.** This includes, for example: <br>• creating, maintaining, customizing and securing accounts; <br>• supporting day-to-day business and insurance related functions; <br>• doing internal research for technology development; <br>• marketing and creating products and services; <br>• conducting audits related to a current contact with a consumer and other transactions; <br>• as described at or before the point of gathering personal data or with your authorization; | • Identifiers <br>• Personal Information <br>• Protected Classification Characteristics <br>• Commercial Information <br>• Internet or other similar network activity <br>• Professional or employment related information <br>• Inferences drawn from other personal information <br>• Risk data <br>• Claims data |
| **Security and Fraud Detection.** This includes for example: <br>• detecting security issues; <br>• protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities; <br>• managing risk and securing our systems, assets, infrastructure and premises; <br>• help to ensure the safety and security of Liberty staff, assets and resources, which may include physical and virtual access controls and access rights management; <br>• supervisory controls and other monitoring and reviews, as permitted by law; and <br>• emergency and business continuity management; | • Identifiers <br>• Personal Information <br>• Protected Classification Characteristics <br>• Commercial Information <br>• Internet or other similar network activity <br>• Professional or employment related information <br>• Inferences drawn from other personal information <br>• Risk data <br>• Claims data |
| **Regulatory and Legal Requirements.** This includes for example: <br>• controls and access rights management; <br>• to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Liberty's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty is among the assets transferred; <br>• exercising and defending our legal rights and positions; <br>• to meet Liberty contract obligations; <br>• to respond to law enforcement requests and as required by applicable law, court order, or governmental regulations; <br>• as otherwise permitted by law. | • Identifiers <br>• Personal Information <br>• Protected Classification Characteristics <br>• Commercial Information <br>• Internet or other similar network activity <br>• Professional or employment related information <br>• Inferences drawn from other personal information <br>• Risk data <br>• Claims data |

RB00114
Exhibit 49, Page 143

| | |
|---|---|
| **Improve Your Customer Experience and Our Products.**<br>This includes for example:<br>• improve your customer experience, our products and service;<br>• to provide, support, personalize and develop our website, products and services;<br>• create and offer new products and services; | • Identifiers<br>• Personal Information<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Analytics to identify, understand and manage our risks and products.**<br>This includes for example:<br>• conducting analytics to better identify, understand and manage risk and our products; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Customer service and technical support.**<br>This includes for example:<br>• answer questions and provide notifications;<br>• provide customer and technical support; | • Identifiers<br>• Personal Information<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |

## How Does Liberty Mutual Share My Data?

Liberty Mutual does not sell your personal data as defined by the California Consumer Privacy Act.

Liberty Mutual shares personal data of California consumers with the following categories of third parties:

- Liberty Mutual affiliates;
- Service Providers;
- Insurance support organizations;
- Brokers and agents;
- Government entities and institutions (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Professional advisors including law firms, accountants, auditors, and tax advisors;
- Advertising networks, data analytics providers and social networks;
- Insurers, re-insurers, policy holders, and claimants; and
- As permitted by law.

Liberty Mutual shares the following categories of personal data regarding California consumers to service providers for business purposes:

| | |
|---|---|
| Identifiers | Personal Data; |
| Protected Classification Characteristics; | Commercial Information; |
| Internet or other similar network activity; | Claims Data; |
| Inferences drawn from other personal information; | Risk Data; |
| Professional, employment, and education information; | |

For information about how we have shared personal information in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

RB00115
Exhibit 49, Page 144

**What Privacy Rights Do I Have?**

The California Consumer Privacy Act provides California residents with specific rights regarding personal information. These rights are subject to certain exceptions. Our response may be limited as permitted under law. For more information on your rights, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

**Will Liberty Mutual Update This Privacy Notice?**

We reserve the right to makes changes to this notice at any time and for any reason. The updated version of this policy will be effective once it is accessible. You are responsible for reviewing this policy to stay informed of any changes or updates.

**Who Do I Contact Regarding Privacy?**

If you have any questions or comments about this Notice or the Supplemental CCPA Notice, your rights, or are requesting the Notice in an alternative format, please do not hesitate to contact Liberty Mutual at:

**Phone:**              800-344-0197

**Email:**              privacy@libertymutual.com

**Postal Address:**     Liberty Mutual Insurance Company
                        Attn Privacy Office
                        175 Berkeley St 6th Floor
                        Boston MA  02116

RB00116
Exhibit 49, Page 145

**POLICYHOLDER NOTICE - COMPANY CONTACT INFORMATION**

In the event you need to contact someone about this policy for any reason, please contact your Sales Representative or Producer of Record as shown on the policy Declarations or Information Page.

If you have additional questions, you may contact the company at the following address:

**Liberty Mutual Insurance**
**175 Berkeley Street**
**Boston, MA 02116**
**+1 (800) 344-0197**

## POLICYHOLDER DISCLOSURE

## TERRORISM RISK INSURANCE ACT

**THIS NOTICE CONTAINS IMPORTANT INFORMATION PURSUANT TO THE TERRORISM RISK INSURANCE ACT.  PLEASE READ IT CAREFULLY.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act.  If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by  endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses from "certified acts of terrorism" exceed a specified deductible amount, the government will generally reimburse the insurer for  a percentage of losses (the "Federal Share") paid in excess of the deductible, but only if aggregate industry losses  from "certified acts of terrorism" exceed the "Program Trigger".

Beginning in calendar year 2020, the Federal Share is 80% and Program Trigger is $200,000,000.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion.  Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion.  In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

# EXHIBIT B

**A STOCK COMPANY**



# MARKEL AMERICAN INSURANCE COMPANY

**4521 Highwoods Parkway**
**Glen Allen, VA 23060**

**(800) 431-1270**

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof** , the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

| | |
|---|---|
| **Secretary** | **President** |

RB00119
Exhibit 49, Page 149

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

## COMMERCIAL UMBRELLA LIABILITY POLICY
## ADVISORY NOTICE TO POLICYHOLDERS

This is a summary of the major changes in your policy. No coverage is provided by this summary nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, **THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

The major areas within the policy that broaden or reduce coverage, and other changes, are highlighted below. This notice does not reference every editorial change made in your policy.

**Not all forms addressed in this notice are included in a particular policy.**

## MULTISTATE ENDORSEMENTS

### A. BROADENING OF COVERAGE

1. **MAUB 1634** Exclusion – Residential Work Or Project With Described Work Following Form was revised as follows:

   - The title of the form was revised to include "Or Project";

   - The defined term "residential project" was changed to "residential work or project";

   - The term apartments was removed from the definition of "residential work or project" as they are considered a commercial exposure; and

   - The definition of "residential work or project" was clarified to refer to single-family types of homes.

2. **MAUB 1649** Exclusion – Municipality was revised to remove the exclusion for public officials' activities and volunteer firefighters' or police officers' activities.

3. **MAUB 1650** Exclusion – New Residential Work Or Products was revised as follows:

   - The term apartments was removed from the definition as they are considered a commercial exposure;

   - The definition was clarified to refer to single-family types of homes; and

   - Other editorial changes.

4. **MAUB 1690 Exclusion – Animals And Firearms** was separated into two endorsements, MAUB 1829 Exclusion – Animals and MAUB 1830 Exclusion – Firearms. This change could represent a broadening of coverage if your policy previously had MAUB 1690 and upon renewal, only one of the forms was attached.

### B. REDUCTION OF COVERAGE

1. **MAUB 1525** Limitation Of Coverage To Designated Premises Or Project was revised by amending Paragraphs 2. and 6. of the Insuring Agreement. These paragraphs separately address bodily injury and property damage versus personal and advertising injury as follows:

   - For bodily injury and property damage, the occurrence must happen during the policy period, and the injury or damage must occur on the premises scheduled, or the grounds or structures appurtenant to those premises, or arise out of the project scheduled. "Ownership, maintenance or use" language and "and operations necessary or incidental to those premises" was removed from this insurance agreement to further clarify that the injury or damage must happen on the premises; and

   - For personal and advertising injury, the offense must be committed during the policy period, and the offense must arise out of business performed on the premise scheduled or in connection with the project scheduled. It further states that if personal and advertising injury is caused by false arrest, detention or imprisonment, or the wrongful eviction from, entry into, or invasion of the right of private occupancy, then such offense must occur on the premises scheduled or on the grounds or structures appurtenant to those premises.

**MAPUB 1012 04 17**                                                                                   **Page 1 of 2**

RB00120
Exhibit 49, Page 150

2. **MAUB 1618** Exclusion – Sublimited Underlying Coverage was revised to remove the exception to the exclusion about coverage not applying if the limits of the underlying insurance are reduced or exhausted by payment of bodily injury, property damage, covered pollution cost or expense, or personal and advertising injury which happens during the policy period.

## C. OTHER CHANGES

1. **MAUB 1222** Adjustable Rate And Minimum Retained Premium was revised as follows:

   - The title of the form was revised from Changes To Conditions – Adjustable Rate;

   - The Schedule was revised to show a minimum retained premium percentage and earned premium computations;

   - The Adjustable Rate condition was replaced by a new Minimum Retained Premium condition which describes how the minimum retained premium and earned premium will be calculated; and

   - A provision regarding the amount of premium retained in the event of cancellation was added.

2. **MAUB 1232** Vendors And Distributors Limitation was revised as follows:

   - The limitation was changed to be added to the Conditions section instead of the Exclusions section; and
   - The limitation was revised to require the insured to obtain a certificate of authority from the manufacturer which includes the insured as an additional insured on their policy prior to selling or distributing any manufacturer's products.

3. **MAUB 1243** Unimpaired Aggregate Limit was revised by adding a paragraph to address how underlying claims made coverage aggregate limits are addressed.

4. **MAUB 1310** Exclusion – Prior Incidents And Prior Construction Defects was revised to add the following statement: "When coverage does not apply for the Named Insured, no coverage or defense will be afforded to any additional insured under this policy."

5. **MAUB 1509** 25% Minimum Earned Premium was revised as follows:

   - In Paragraph A., a statement was added that we will send the first Named Insured any premium refund; and

   - In Paragraph B., the Premium Audit provision was removed as it is not applicable.

6. **MAUB 1668** Exclusion – Total Aircraft Or Watercraft was revised as follows:

   - The title of the form was revised from Amendment Of Aircraft Or Watercraft Exclusion;

   - Aircraft was added to the exclusion; and

   - The negligence paragraph was revised to sync with the exclusion language.

RB00121
Exhibit 49, Page 151



# MARKEL AMERICAN INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                                                                                    Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>● your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>● your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>● your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>● publicly-available information from government records;<br><br>● de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonafiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

RB00122
Exhibit 49, Page 152

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you <br>• complete an application or other form for insurance <br>• perform transactions with Us, Our Affiliates, or others <br>• file an insurance claim or provide account information <br>• use your credit or debit card <br>We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only <br>• sharing for Affiliates' everyday business purposes – information about your creditworthiness <br>• Affiliates from using your information to market to you <br>• sharing for Nonaffiliates to market to you <br>State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

RB00123
Exhibit 49, Page 153

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>● Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>● Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br><br>● Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |

RB00124
Exhibit 49, Page 154



# MARKEL AMERICAN INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS
## CLAIM REPORTING

Please immediately report a new claim under this policy to:

**newclaims@markel.com**

For general claims inquiries after a claim has been reported, please email:

**markelclaims@markel.com**

In order for us to expedite the handling of your claim and quickly refer it to the appropriate party, please have the following information available:

- Claim number (or report as new)
- Your name, contact information and position with the Named Insured
- Date of loss
- Policy number and insured name
- Details of loss

Our address and additional contact information are as follows:

Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone:  800-362-7535 (800) 3MARKEL
Fax:  855-662-7535 (855) 6MARKEL

Markel understands the importance of having knowledgeable claims professionals prepared to answer your questions with personal attention and expertise. With claims professionals located across four times zones, you are sure to find the claims assistance you need -- when you need it.

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS
AND DUTIES IN THE EVENT OF LOSS OR DAMAGE TO COVERED PROPERTY.**

MPIL 1074 02 20                                                                    **Page 1 of 1**

RB00125
Exhibit 49, Page 155

**INTERLINE**



# MARKEL AMERICAN INSURANCE COMPANY

### U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

RB00126
Exhibit 49, Page 156



# MARKEL AMERICAN INSURANCE COMPANY

## CYBER INCIDENT, DATA COMPROMISE, AND VIOLATION OF STATUTES RELATED TO PERSONAL DATA EXCLUSION
## ADVISORY NOTICE TO POLICYHOLDERS

This Notice does not form part of your policy. No coverage is provided by this Notice nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided. If there is any conflict between the Policy and this Notice, **THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

Carefully read your policy, including the endorsements attached to your policy.

This Notice provides information regarding an exclusion which applies to your renewal policy being issued by us.

**EXCLUSION – CYBER INCIDENT, DATA COMPROMISE, AND VIOLATION OF STATUTES RELATED TO PERSONAL DATA**

This new endorsement replaces any other cyber, electronic data compromise, or violation of statutes related to personal data exclusions contained in the policy.

The exclusion precludes coverage for each of the following:

**Cyber Incident**

Excludes loss or damage to your computer system, including breach, virus, human error, system failure, defects, social engineering, and cyber extortion.

**Data Compromise**

Excludes access to or disclosure, theft, or corruption of confidential, intellectual, or proprietary information or data, including personal data.

**Violation Of Statutes Related To Personal Data**

Excludes acts or omissions that violate any federal, state, or local statute, law, rule, ordinance or regulation relating to any type of gathering, maintaining, or dissemination of personal data.

In addition, the exclusions apply to notification costs, credit monitoring or repair expenses, forensic expenses, public relations expenses, costs associated with replacement or reissuance of payment cards, fines, penalties, loss of use of property that has not been physical damaged, and all other related loss, costs, and expenses incurred.

Two exceptions to the exclusions apply:

• Damages because of bodily injury

• Damages because of physical injury to tangible property of others

Additionally, the exclusions do not apply to any similar coverages added by endorsement to the policy, to the extent coverage is provided by such endorsement.

RB00127
Exhibit 49, Page 157

Policy Number: MKLM6MM70000398

# MARKEL AMERICAN INSURANCE COMPANY

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| MJIL 1000 06 10 | POLICY JACKET |
| MAPUB 1012 04 17 | COMMERCIAL UMBRELLA LIABILITY POLICY ADVISORY NOTICE TO POLICYHOLDERS |
| MPIL 1007 01 20 | PRIVACY NOTICE |
| MPIL 1074 02 20 | NOTICE TO POLICYHOLDERS CLAIM REPORTING |
| MPIL 1083 04 15 | U.S. TREASURY DEPT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| MPIL 1136 10 20 | CYBER INCDNT DATA COMPRMSE, AND VIOLTN OF STATUTES RELTD TO PRSNL DATA EXCLN ADVISRY TO POLICYHLDE |
| MDIL 1001 08 11 | FORMS SCHEDULE |
| MADUB 1001 04 17 | COMMERCIAL UMBRELLA LIABILITY POLICY DECLARATIONS |
| MADUB 1003 04 17 | SCHEDULE OF UNDERLYING INSURANCE |
| MAUB 0002 01 15 | COMMERCIAL UMBRELLA LIABILITY POLICY |
| MAUB 1205 04 17 | PESTICIDE OR HERBICIDE APPLICATOR - LIMITED POLLUTION COVERAGE |
| MAUB 1254 01 15 | CONTRACTUAL FOLLOWING FORM |
| MAUB 1268 01 15 | EMPLOYEE BENEFITS LIABILITY LIMITATION |
| MAUB 1279 01 15 | AMENDED NOTICE OF CANCELLATION |
| MAUB 1290 01 15 | CHANGES TO CONDITIONS - MOST FAVORABLE JURISDICTION |
| MAUB 1309 01 15 | EXCLUSION - COMMUNICABLE DISEASE |
| MAUB 1403-OR 01 15 | OREGON AMENDATORY |
| MAUB 1510 04 17 | DESIGNATED COVERAGE FOLLOWING FORM |
| MAUB 1512 04 17 | CHANGES - PRIMARY AND NONCONTRIBUTORY |
| MAUB 1520 04 17 | DISASTER RESPONSE EXPENSE COVERAGE |
| MAUB 1621 01 15 | EXCL - RECORDING AND DISTRIBUTION OF MATERIAL OR INFO IN VIOLATION OF LAW |
| MAUB 1630 01 15 | EXCL - MEDICAL PROFESSIONAL LIABILITY SERVICES FURNISHED BY HEALTH CARE PROVIDERS |
| MAUB 1667 01 15 | AMENDMENT OF WAR EXCLUSION |
| MAUB 1680 01 15 | POLLUTION FOLLOWING FORM |
| MAUB 1696 01 15 | EXCLUSION - CERTIFIED ACTS OF TERRORISM |
| MAUB 1805 01 15 | EXCLUSION - SILICA OR MIXED DUST |
| MAUB 1850 10 17 | EXCLUSION - MARIJUANA |
| MIL 1214 09 17 | TRADE OR ECONOMIC SANCTIONS |
| MAUB 1288 01 15 | NOTICE OF CANCELLATION TO OTHERS |
| MAUB 1503 01 15 | INDUSTRIAL AID AIRCRAFT LIMITATION |

RB00128
Exhibit 49, Page 158



# MARKEL AMERICAN INSURANCE COMPANY

## COMMERCIAL UMBRELLA LIABILITY POLICY DECLARATIONS

POLICY NUMBER: MKLM6MM70000398          RENEWAL POLICY NUMBER: MKLM6MM70000248

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

RLC Industries Co.
3660 Gateway St
Springfield                    OR    97477-6010

Policy Period: From: <u>November 1, 2021</u> to <u>November 1, 2022</u> at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Limits of Insurance | |
|---|---|
| Each Occurrence Limit: | $ 5,000,000 |
| Aggregate Limit: | $ 5,000,000 |
| Retained Limit / Each Occurrence: | $ 10,000 |

| Premium | |
|---|---|
| Policy Premium: | $ ████ |
| Terrorism Premium: | $ ████ |
| Fees (Where Applicable): | $ ████ |
| Total Premium: | $ ████    Payable At Inception |

Audit Period:    ☒ Not Applicable    ☐ Annual    ☐ Semi-Annual    ☐ Quarterly    ☐ Monthly
Rating Basis (If Subject to Audit)    Premium Basis: _____    Rate: _____

### Producer Number, Name and Mailing Address

Alliant Insurance Services Inc.
301 North Lake Avenue, Suite 1001
Pasadena                    CA    91101

### Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
Per Forms Schedule

### Schedule of Underlying Insurance

Per Schedule Of Underlying Insurance

**These declarations, together with the Coverage Form and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____01/25/2022_____        By: _____
                        **DATE**                              **AUTHORIZED REPRESENTATIVE**

MADUB 1001 04 17                                                      **Page 1 of 1**

RB00129
Exhibit 49, Page 159



**EXCESS/UMBRELLA**
POLICY NUMBER: MKLM6MM70000398

# MARKEL AMERICAN INSURANCE COMPANY

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| General Liability<br>Carrier: Liberty Insurance Corporation<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Products and Completed Operations Aggregate | $4,000,000 |
| | General Aggregate | $4,000,000 |
| | Occurrence | $2,000,000 |
| | Personal and Advertising Injury | $2,000,000 |
| Automobile Liability<br>Carrier: Liberty Insurance Corporation<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Combined Single Limit | $2,000,000 |
| Employers Liability<br>Carrier: Liberty Insurance Corporation<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Bodily Injury by Accident - each accident | $1,000,000 |
| | Bodily Injury by Disease - policy limit | $1,000,000 |
| | Bodily Injury by Disease - each employee | $1,000,000 |
| Employee Benefits Liability<br>Carrier: Liberty Mutual Insurance Company<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Each Employee | $1,000,000 |
| | Aggregate | $2,000,000 |

**MADUB 1003 04 17**

**Page 1 of 4**

RB00130
Exhibit 49, Page 160

# SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| Foreign Liability - GL<br>Carrier: Insurance Company of the State of<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Occurrence | $1,000,000 |
| | General Aggregate | $2,000,000 |
| | Products and Completed Operations Aggregate | $2,000,000 |
| | Personal and Advertising Injury | $1,000,000 |
| Foreign Liability - AL<br>Carrier: Insurance Company of the State of<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Combined Single Limit | $1,000,000 |
| Foreign Liability - EL<br>Carrier: Insurance Company of the State of<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Bodily Injury by Accident - each accident | $1,000,000 |
| | Bodily Injury by Disease - policy limit | $1,000,000 |
| | Bodily Injury by Disease - each employee | $1,000,000 |
| Other Liability<br>Carrier: Insurance Company of the State of<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Occurrence | $1,000,000 |
| | Aggregate | $1,000,000 |
| Other Liability<br>Carrier: USAIG<br>Effective Date: 11/01/2021<br>Expiration Date: 11/01/2022 | Occurrence | $300,000,000 |

**MADUB 1003 04 17**

**Page 2 of 4**

RB00131
Exhibit 49, Page 161

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| Other Liability<br>Carrier: Navigators Insurance Company<br>Effective Date:  11/01/2021<br>Expiration Date: 11/01/2022 | Aggregate<br><br>Occurrence | $5,000,000<br><br>$5,000,000 |
| Other Liability<br>Carrier: Liberty Mutual Fire Insurance Comp<br>Effective Date:  11/01/2021<br>Expiration Date: 11/01/2022 | Occurrence<br><br>Aggregate | $2,000,000<br><br>$6,000,000 |
| Employers Liability<br>Carrier: Liberty Insurance Corporation<br>Effective Date:  11/01/2021<br>Expiration Date: 11/01/2022 | Bodily Injury by Disease - each employee<br>Bodily Injury by Disease - policy limit<br>Bodily Injury by Accident - each accident | $1,000,000<br>$1,000,000<br>$1,000,000 |
| Other Liability<br>Carrier: U.S. Aircraft Insurance Group<br>Effective Date:  11/01/2021<br>Expiration Date: 11/01/2022 | Occurrence | $5,000,000 |
| Foreign Liability - GL<br>Carrier: Liberty Mutual Insurance Company C<br>Effective Date:  11/01/2021<br>Expiration Date: 11/01/2022 | General Aggregate<br><br>Occurrence | $2,000,000<br><br>$1,000,000 |

**MADUB 1003 04 17**                                    **Page 3 of 4**

RB00132
Exhibit 49, Page 162

# SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| Foreign Liability - AL | Hired and Non-Owned Liability | $2,000,000 |

Carrier: Liberty Mutual Insurance Company C
Effective Date:  11/01/2021
Expiration Date: 11/01/2022


Other Liability                    Occurrence                       $5,000,000
Carrier: Navigators Insurance Company
Effective Date:  11/01/2021
Expiration Date: 11/01/2022



All Limits Of Insurance are Each Occurrence and Aggregate, if applicable.

**MADUB 1003 04 17**                                                    **Page 4 of 4**

RB00133
Exhibit 49, Page 163

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

## COMMERCIAL UMBRELLA LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout the policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

The word insured means any person or organization qualifying as such under Section **IV.** Who Is An Insured.

Other words and phrases that appear in quotation marks have special meanings. Refer to Section **V.** Definitions.

**SECTION I. INSURING AGREEMENT**

**1.**  We will pay on behalf of the insured those sums in excess of the "retained limit" which the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies.

We will also pay all sums the insured becomes legally obligated to pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "occurrence" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "occurrence".

We will have:

**a.**  The right and duty to defend the insured against any "suit" seeking those damages or "covered pollution cost or expense" when:

**(1)**  The applicable limits of insurance of the "underlying insurance" and other insurance have been used up in the payment of judgments or settlements; or

**(2)**  No other valid and collectible insurance is available to the insured for damages covered by this policy.

**b.**  No duty to defend the insured against any "suit" seeking damages or "covered pollution cost or expense" if there is valid and collectible "underlying insurance" or applicable other insurance. Insurance specifically purchased to apply excess of this insurance policy will not be considered as applicable other insurance.

However, we will have the right to participate with the insured or any provider of "underlying insurance" or other insurance in the investigation, settlement or defense of the insured against any "suit" which is likely to involve us under this policy.

**c.**  No duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage", "personal and advertising injury" or "covered pollution cost or expense" to which this insurance does not apply.

We may, at our discretion, investigate any "occurrence" or offense that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend.

Our right and duty to defend end when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

The amount we will pay for damages and "covered pollution cost or expense" is limited as described in Section **VI.** Limits Of Insurance. If we are prevented by law from paying damages on behalf of the insured, we will indemnify the insured for those sums in excess of the "retained limit" up to the applicable limit of insurance shown in the Declarations.

RB00134
Exhibit 49, Page 164

**2.** This insurance applies to "bodily injury" and "property damage" only if:

   **a.** The "bodily injury" or "property damage" is caused by an "occurrence";

   **b.** The "bodily injury" or "property damage" occurs during the policy period; and

   **c.** Prior to the policy period, no insured listed under Paragraph **1.** of Section **IV.** Who Is An Insured and no "employee" authorized by you to give or to receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" had occurred, then any continuation, change, or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**3.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **IV.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**4.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **IV.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **a.** Reports all, or any part of, the "bodily injury" or "property damage" to us or any other insurer;

   **b.** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **c.** Becomes aware by any other means that the "bodily injury" or "property damage" has occurred or has begun to occur.

**5.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**6.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed during the policy period.

**7.** No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under the Supplementary Payments section of this Coverage Form.

## SECTION II. SUPPLEMENTARY PAYMENTS

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend, when the duty to defend exists:

   **a.** All expenses we incur.

   **b.** Up to $3,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "occurrence" we cover. We do not have to furnish these bonds.

   **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $400 a day because of time off from work.

   **e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   **f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **g.** All interest on that part of any judgment covered by this policy that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

   These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will only defend that indemnitee in the same manner and subject to the same conditions as the "underlying insurance".

**3.** When we have the right to participate in the defense and elect to do so, we will pay our own expenses but will not contribute to the expenses of the insured or the underlying insurer.

RB00135
Exhibit 49, Page 165

**4.** If we are prevented by law from defending a claim or "suit", we will pay any expenses incurred by the insured with our prior, written consent.

## SECTION III. EXCLUSIONS

This policy does not apply to:

**1. Aircraft Or Watercraft**

"Bodily injury", "property damage" or "covered pollution cost or expense" arising out of the ownership, maintenance, operation, use, entrustment to others, or "loading or unloading" of aircraft or watercraft.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury", "property damage" or "covered pollution cost or expense" involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**a.** Any watercraft while ashore on premises you own or rent; or

**b.** Non-owned watercraft less than 51 feet long which is not used to carry persons or property for a charge.

**2. Asbestos**

**a.** The actual, alleged or threatened:

**(1)** Inhalation of, ingestion of, or prolonged physical exposure to asbestos or products or work containing asbestos;

**(2)** Use of asbestos in "your work" or "your product" or the work or product of any person or organization for whom you may be legally responsible; or

**(3)** Exposure to asbestos or products containing asbestos which are at any time removed from a building or a structure, transported, handled, stored, treated, disposed of, processed or manufactured by you or any person or any organization for whom you may be legally responsible.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove or contain, or in any way respond to or assess the effects of asbestos; or

**(2)** Claim or "suit" by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up or removing, containing or in any way responding to, or assessing the effects of asbestos.

**3. Auto No-Fault And Similar Laws**

Any loss, cost or expense payable under or resulting from any no-fault law, personal injury protection, uninsured or underinsured motorists or similar laws or statutes.

**4. Contractual Liability**

"Bodily injury", "property damage", "personal and advertising injury" or "covered pollution cost or expense" for which the insured is obligated to pay damages or "covered pollution cost or expense" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**a.** That the insured would have in the absence of the contract or agreement; or

**b.** Assumed in a contract or agreement that is an "insured contract", provided:

**(1)** The "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party, for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged; or

RB00136
Exhibit 49, Page 166

**(2)** The "personal and advertising injury":

    **(a)** Pertains to your business and the "insured contract" assumes the tort liability of another. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

    **(b)** Occurs subsequent to the execution of the "insured contract"; and

    **(c)** Arises out of the offenses of false arrest, detention or imprisonment.

**5. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

**a.** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**b.** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**6. Damage To Property**

"Property damage" or "covered pollution cost or expense" to:

**a.** Property you use, own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.** Property loaned to you;

**c.** Property in the care, custody or control of any insured;

**d.** Property transported by the insured; or

**e.** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises, and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

**7. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**8. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**9. Discrimination**

"Bodily injury" or "personal and advertising injury" that arises from discrimination on the basis of race, creed, color, sex, age, disability, national origin, sexual orientation, sexual preference, marital status or any other discrimination prohibited by law.

**10. Employer's Liability**

To "bodily injury" to anyone arising out of and in the course of employment by the insured or performing duties related to the conduct of the insured's business. This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply:

**a.** To liability assumed by the insured under an "insured contract"; or

**b.** To the extent that valid "underlying insurance" for the employers liability risks described above is applicable or would have been applicable but for the exhaustion of such policy's limits of liability. To the extent this exclusion does not apply, the insurance provided under this policy for the employer's liability risks described above will

RB00137
Exhibit 49, Page 167

follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**11. Employment-Related Practices**

"Bodily injury" or "personal and advertising injury" to:

**a.** A person arising out of any:

    **(1)** Refusal to employ that person;

    **(2)** Termination of that person's employment; or

    **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(1)**, **(2)** or **(3)** above is directed.

This exclusion applies:

    **(1)** Whether the insured may be liable as an employer or in any other capacity; and

    **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**12. ERISA**

Any obligation of the insured (or which are imputed to an insured) under the Employee Retirement Income Security Act of 1974 (ERISA), and any amendments thereto or any similar federal, state or local statute.

**13. Expected Or Intended Injury**

"Bodily injury", "property damage" or "covered pollution cost or expense" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**14. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**a.** Causing or contributing to the intoxication of any person;

**b.** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**c.** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

    **(1)** The supervision, hiring, employment, training or monitoring of others by that insured; or

    **(2)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage" involved that which is described in Paragraph **a.**, **b.** or **c.** above.

This exclusion does not apply to the extent that valid "underlying insurance" for the liquor liability risks described above is applicable or would have been applicable but for the exhaustion of such policy's limits of liability. To the extent this exclusion does not apply, the insurance provided under this policy for the liquor liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance" unless otherwise directed by this insurance.

**15. Motor Carrier Act And Similar Endorsements**

Any obligations arising from the terms of the Endorsement For Motor Carrier Policies Of Insurance For Public Liability Under Sections 29 And 30 Of The Motor Carrier Act Of 1980 or any similar endorsement required by federal or state statute, unless specifically endorsed to this policy.

RB00138
Exhibit 49, Page 168

**16. Personal And Advertising Injury Liabililty**

**a.** "Personal and advertising injury":

**(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2)** Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3)** Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period;

**(4)** Arising out of a criminal act committed by or at the direction of the insured;

**(5)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(6)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(7)** Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(8)** Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(9)** Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

**(10)** Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control;

**(11)** Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan; or

**(12)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**b.** Any loss, cost or expense arising out of:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**17. Pollution**

**a.** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

RB00139
Exhibit 49, Page 169

(a) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment used to heat that building;

(b) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(c) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(2) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(3) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(a) Any insured; or

(b) Any person or organization for whom you may be legally responsible; or

(4) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured contractor or subcontractor. However, this subparagraph does not apply to:

(a) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(b) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(c) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(5) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

b. Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph b. does not apply to:

(a) Liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority; or

(b) "Covered pollution cost or expense".

c. "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(1) That are, or that are contained in any property that is:

RB00140
Exhibit 49, Page 170

**(a)** Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

**(b)** Otherwise in the course of transit by or on behalf of the insured; or

**(c)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**(2)** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "auto"; or

**(3)** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the insured.

Paragraph **c.(1)** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(a)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(b)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs **f. (2)** and **(3)** of the definition of "mobile equipment".

Paragraphs **c.(2)** and **c.(3)** above of this exclusion do not apply to "occurrences" that take place away from premises owned by or rented to an insured with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

## 18. Racing

"Bodily injury" or "property damage" arising out of the use of covered "autos" or "mobile equipment" while used in, or while practicing for, or while being prepared for, any professional or organized racing, speed, demolition or stunting activity or contest.

## 19. Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**a.** "Your product";

**b.** "Your work"; or

**c.** "Impaired property"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

## 20. War

"Bodily injury", "property damage", "personal and advertising injury" or "covered pollution cost and expense", due to war, whether or not declared, or any act or condition incidental to war. War includes civil war, insurrection, rebellion or revolution. This exclusion also applies to liability assumed under a contract or agreement.

## 21. Workers Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

## 22. Nuclear Energy Liability

**a.** "Bodily injury" or "property damage" under any coverage:

**(1)** With respect to which an insured under this policy is also an insured under a nuclear energy liability policy issued by a Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

            Includes copyrighted material of Insurance Services Office, Inc.
with its permission.

**(2)** Resulting from the "hazardous properties" of nuclear material and with respect to which:

    **(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

    **(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Medical Expense or Medical Payments under any coverage, for expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of nuclear material and arising out of the operation of a "nuclear facility" by any person or organization.

**c.** Liability coverage under any coverage, for "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

    **(1)** The "nuclear material":

        **(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

        **(b)** Has been discharged or dispersed therefrom;

    **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

    **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "by-product material";

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material:

    **(1)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

    **(2)** Resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    **(1)** Any "nuclear reactor",

    **(2)** Any equipment or device designed or used for:

        **(a)** Separating the isotopes of uranium or plutonium;

        **(b)** Processing or utilizing "spent fuel", or

        **(c)** Handling, processing or packaging "waste";

    **(3)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(4)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

RB00142
Exhibit 49, Page 172

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

## SECTION IV.    WHO IS AN INSURED

**1.** Each of the following is an insured:

**a.** Any person or organization shown as the Named Insured in the Declarations, and if as such you are:

**(1)** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**(2)** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**(3)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**(4)** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**(5)** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**b.** Any organization over which the Named Insured maintains ownership of more than 50% and to which more specific insurance does not apply.

**c.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**2.** Any person or organization not included in **1.a.**, **b.** or **c.** above and included in the "underlying insurance" as an insured is also an insured, but this policy is limited to the same coverage provided by the "underlying insurance". However, any such person or organization with whom you have agreed by means of a written contract, written agreement or written permit to provide such insurance as is afforded by this policy is an insured, but only:

**a.** For the minimum limits of liability stipulated in that written contract, written agreement or written permit that are not provided by any "underlying insurance"; or

**b.** The policy limit shown in the Declarations, whichever is less.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION V. DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

RB00143
Exhibit 49, Page 173

**3.** "Bodily injury" means bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and humiliation of a person, including death resulting from any of these at any time.

**4.** "Covered pollution cost or expense" means any cost or expense arising out of:

    **a.** Any request, demand or order or statutory or regulatory requirement that the insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

    **b.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(1)** That are, or that are contained in any property that is:

        **(a)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

        **(b)** Otherwise in the course of transit by or on behalf of the insured;

        **(c)** Being stored, disposed of, treated or processed in or upon the covered "auto"; or

    **(2)** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "auto"; or

    **(3)** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the insured.

Paragraph **(1)** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

    **(i)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

    **(ii)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in **f. 2.** and **3.** of the definition of "mobile equipment".

Paragraphs **(2)** and **(3)** above do not apply to "occurrences" that happen away from premises owned by or rented to an insured with respect to "pollutants" not in or upon a covered "auto" if:

    **(i)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

    **(ii)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**5.** "Employee" includes a "leased worker". Employee does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:

    **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    **a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

    **b.** Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

---

RB00144
Exhibit 49, Page 174

**a.** A contract for a lease of premises;

**b.** A sidetrack agreement;

**c.** Any easement or license agreement;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of a contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

   **(1)** That indemnifies a railroad for "bodily injury", "property damage" or "personal and advertising injury" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

     **(a)** Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, surveys, field orders, change orders, or drawings and specifications; or

     **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

   **(3)** Under which the insured, if an architect, engineer, or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities; or

   **(4)** That indemnifies any person or organization for damage by fire, lightning or explosion to premises rented or loaned to you.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use primarily off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment, such as graders, scrapers or rollers;

**e.** Vehicles not described in subparagraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

RB00145
Exhibit 49, Page 175

**(1)** Air compressors, pumps and generators, including spraying, welding, building, cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in subparagraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance; but not construction or resurfacing; or

    **(c)** Street cleaning;

This section **f. (1)** does not apply to self-propelled vehicles of less than 1,000 pounds gross vehicle weight.

**(2)** Cherry pickers and similar devices mounted on "auto" or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement";

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement"; or

**h.** Discrimination not prohibited by law.

**15.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However "your work" will be deemed to be completed at the earliest of the following times:

    **(a)** When all of the work called for in your contract or agreement has been completed.

RB00146
Exhibit 49, Page 176

    **(b)** When all of the work to be done at the job site has been completed if your contract or agreement calls for work at more than one job site.

    **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **b.** Does not include "bodily injury" or "property damage" arising out of:

    **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

    **(3)** Products or operations, for which the classification listed in the Declarations of the "underlying insurance" or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

  For the purposes of this insurance, electronic data is not tangible property.

  As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CDROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Retained limit" means:

  **a.** With respect to any "occurrence" that is covered by "underlying insurance" or any other insurance, the total of the applicable limits of the "underlying insurance" scheduled in the Declarations plus the applicable limits of any other insurance collectible by the insured; or

  **b.** With respect to any "occurrence" that is not covered by "underlying insurance" or any other insurance, the amount stated in the Declarations as the Retained Limit/Each Occurrence.

**19.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal and advertising injury" or "covered pollution cost or expense" to which this insurance applies are alleged. "Suit" includes:

  **a.** An arbitration proceeding in which such damages or "covered pollution cost or expense" are claimed and to which the insured must submit or does submit with our consent; or

  **b.** Any other alternative dispute resolution proceeding in which such damages or "covered pollution cost or expense" are claimed and to which the insured submits with our consent or the underlying insurer's consent; or

  **c.** An appeal of a civil proceeding.

**20.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**21.** "Underlying insurance" means the policies or self-insurance listed in the Schedule Of Underlying Insurance, any replacement thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued as replacements for policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.

**22.** "Volunteer worker" means a person who is not your "employee" and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

RB00147
Exhibit 49, Page 177

**23.** "Your product":

   **a.** Means:

      **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         **(a)** You;

         **(b)** Others trading under your name; or

         **(c)** A person or organization whose business or assets you have acquired; and

      **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      **(2)** The providing of or failure to provide warnings or instructions.

   **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**24.** "Your work":

   **a.** Means:

      **(1)** Work or operations performed by you or on your behalf; and

      **(2)** Materials, parts or equipment furnished in connection with such work or operations.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      **(2)** The providing of or failure to provide warnings or instructions.

## SECTION VI. LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

**2.** The Limits of Insurance shown in the Declarations as Each Occurrence are the most we will pay for damages because of "bodily injury", "property damage", "personal and advertising injury" and "covered pollution cost or expense" arising out of any one "occurrence" or offense.

**3.** If a Limit of Insurance is shown in the Declarations for the Aggregate Limit, that amount is the most we will pay for all damages separately for each coverage, project or location in the same manner that a separate aggregate limit of insurance is provided by the policies shown in the Schedule of Underlying Insurance.

**4.** If the applicable limits of the "underlying insurance" or other insurance are reduced or exhausted by payment for "bodily injury", "property damage" or "covered pollution cost or expense" which occurs or "personal and advertising injury" which is committed during the policy period of this policy, the limits of this policy will apply in excess of such reduced or exhausted limits.

**5.** The limits of insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding policy period for purposes of determining the limit of insurance.

## SECTION VII. TERRITORY

This insurance applies anywhere.

RB00148
Exhibit 49, Page 178

**SECTION VIII. CONDITIONS**

**1. Appeals**

If the underlying insurer or insured elect not to appeal a judgment that is in excess of the "retained limit", we may elect to make such an appeal. If we elect to do so, we shall be liable, in addition to the applicable limits of insurance, for all defense expenses we incur.

**2. Bankruptcy**

    **a.** Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Policy.

    **b.** Bankruptcy or insolvency of the underlying insurer will not relieve us of our obligations under this policy.

**3. Cancellation**

    **a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

    **b.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

        **(1)** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

        **(2)** 60 days before the effective date of cancellation, if we cancel for any other reason.

    **c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

    **d.** Notice of cancellation will state the effective date of cancellation and will be effective for all insureds. The policy will end on that date.

    **e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata.  If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

    **f.** If notice is mailed, proof of mailing is sufficient proof of notice.

**4. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy, with our consent. This policy's terms and conditions can be amended or waived only by endorsement issued by us and made a part of this policy.

**5. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim or "suit". To the extent possible, notice should include:

        **(1)** How, when and where the "occurrence" or offense took place;

        **(2)** The names and addresses of any injured persons and witnesses; and

        **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.** You must give us or our authorized representative notice as soon as practicable of an "occurrence", offense, claim or loss only when the "occurrence", offense, claim or loss is known to:

        **(1)** You, if you are an individual;

        **(2)** A partner, if you are a partnership;

        **(3)** An "executive officer" or the "employee" designated by you to give such notice, if you are a corporation;

        **(4)** A manager, if you are a limited liability company; or

        **(5)** A trustee, if you are a trust.

    **c.** Your rights afforded under this policy shall not be prejudiced if you fail to give us a notice of an "occurrence", offense,  claim or loss solely due to your reasonable and documented belief that the "occurrence", offense, claim or loss is not covered under this policy.

    **d.** If a claim is made or a "suit" is brought against any insured and such claim or "suit" is reasonably likely to involve this policy, you must:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

RB00149
Exhibit 49, Page 179

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**e.** You and any other involved insureds must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured because of injury or damage to which this insurance may also apply.

**f.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense, other than first aid, without our consent.

**6. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and for up to three years afterward.

**7. Inspection And Surveys**

**a.** We have the right to:

**(1)** Make inspections and surveys at any time;

**(2)** Give you reports on the conditions we find; and

**(3)** Recommend changes.

**b.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions are safe or healthful or comply with laws, regulations, codes or standards.

**c.** Paragraphs **a.** and **b.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**d.** Paragraph **b.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**8. Legal Action Against Us**

No person or organization has a right under this policy:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**9. Loss Payments**

**a.** We will have liability for any one "occurrence" or offense only when the amount of the "retained limit" with respect to such "occurrence" or offense has been paid by:

**(1)** The insured;

**(2)** Us on behalf of the insured (other than under this policy); or

**(3)** The insured's underlying insurer.

RB00150
Exhibit 49, Page 180

**b.** If we are obligated to indemnify the insured for any payment of judgments or settlements, the insured must make a written claim within 12 months of:

**(1)** Actually paying any amount in excess of the "retained limit"; or

**(2)** The insured's liability being made certain by:

**(a)** A final judgment or settlement; or

**(b)** A written agreement among the insured, the claimant or the claimant's legal representative and us.

**c.** If any later payments are made by the insured for the same "occurrence" or offense, written claim for these payments must likewise be made. We will reimburse you for these payments within 30 days of confirming that they are payable by this policy.

**d.** The insured will reimburse us promptly for any amount of judgments and settlements paid on behalf of the insured that is within the "retained limit".

## 10. Maintenance Of Underlying Insurance

**a.** You agree to maintain the "underlying insurance" in full force and effect during the term of this policy with all terms and conditions as originally represented, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. Failure to maintain the "underlying insurance" in full force and effect or to meet all conditions and warranties of such "underlying insurance" will not invalidate insurance provided under this policy, but insurance provided under this policy shall apply as if the "underlying insurance" were available and collectible.

**b.** Reduction or exhaustion of the aggregate limit of any "underlying insurance" by payments of judgments, settlements or any costs or expenses subject to that limit, will not be a failure to maintain "underlying insurance" in full force and effect.

**c.** No statement contained in this condition limits our right to cancel or not renew this policy.

**d.** For purposes of this policy:

**(1)** If any "underlying insurance" is not available or collectible because of:

**(a)** The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

**(b)** The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy; or

**(2)** If the "retained limit" is not available or collectible because of:

**(a)** The bankruptcy or insolvency of the Named Insured; or

**(b)** The inability or failure for any other reason of the Named Insured to comply with the provisions of this policy,

then this policy shall apply (and amounts payable hereunder shall be determined) as if such "underlying insurance" or "retained limit" were available and collectible.

## 11. Other Insurance

This insurance is excess over any other valid and collectible insurance whether primary, excess or contingent. This does not apply to any insurance policy written specifically to apply in excess of this policy.

## 12. Premium Audit

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** If this policy is auditable, the premium shown in this policy is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**MAUB 0002 01 15**          Includes copyrighted material of Insurance Services Office, Inc.          **Page 18 of 19**
with its permission.

RB00151
Exhibit 49, Page 181

**13. Representations Or Fraud**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us;

**c.** We have issued this policy in reliance upon your representations;

**d.** This policy is void in any case of fraud by you as it relates to this policy or any claim under this policy; and

**e.** We will not disclaim coverage under this policy if you fail to disclose all hazards existing as of the inception date of the policy, provided such failure is unintentional. However, we have the right to collect additional premium for any such hazard.

**14. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom a claim is made or "suit" is brought.

**15. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. If the insured has waived those rights before loss, our rights are waived also.

**16. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our prior written consent, except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties, but only with respect to that property.

**17. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**18. Premiums**

The first Named Insured shown in the Declarations:

**a.** Is responsible for the payment of all premiums; and

**b.** Will be the payee for any return premiums we pay.

**MAUB 0002 01 15**          Includes copyrighted material of Insurance Services Office, Inc.          **Page 19 of 19**
with its permission.

RB00152
Exhibit 49, Page 182

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PESTICIDE OR HERBICIDE APPLICATOR –
## LIMITED POLLUTION COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to Paragraph **a.(4)** of Exclusion **17.** Pollution in Section **III.** Exclusions:

However, this exclusion shall not apply to the extent:

**(i)** Pesticide or herbicide mixing or spraying or any other method of application meets all standards of any governmental or other official authority which applies to those operations; and

**(ii)** Coverage is provided by "underlying insurance" shown in the Schedule Of Underlying Insurance and then only to the extent that coverage is provided by such "underlying insurance".

All other terms and conditions remain unchanged.

**MAUB 1205 04 17**                                                                                              **Page 1 of 1**

RB00153
Exhibit 49, Page 183

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTUAL FOLLOWING FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

With respect to "bodily injury", "property damage" or "personal and advertising injury" arising out of liability assumed by any insured under any contract or agreement, this policy is limited to the coverage provided in the "underlying insurance".

If coverage is not provided by "underlying insurance", coverage is excluded from this policy.

All other terms and conditions remain unchanged.

**MAUB 1254 01 15**                                                                                              **Page 1 of 1**

RB00154
Exhibit 49, Page 184

**Excess/Umbrella**

**MARKEL AMERICAN INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EMPLOYEE BENEFITS LIABILITY LIMITATION**

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** This policy applies to acts, errors or omissions of the insured arising out of the "administration" of the Named Insured's "employee benefit program", but only if "underlying insurance" is provided by a policy described in the Schedule Of Underlying Insurance for Employee Benefits Liability.

**B.** As respects this endorsement, the following Exclusions are added:

This policy does not apply to:

**Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission committed by any insured, including the willful or reckless violation of any statute.

**Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any claim based upon:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**Workers' Compensation And Similar Laws**

Any claim arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**MAUB 1268 01 15**              Includes copyrighted material of Insurance Services Office, Inc.              **Page 1 of 2**
                                                with its permission.

**Available Benefits**

Any claim for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**C.** As respects this endorsement, the definition of "employee" in the **COMMERCIAL UMBRELLA LIABILITY POLICY** is replaced by the following:

"Employee" means a person, including officers, actively employed, formerly employed, on leave of absence or disabled or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**D.** As respects this endorsement, the following are added to the Definitions section:

    **1.** "Administration" means:

        **a.** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

        **b.** Handling records in connection with the "employee benefit program"; or

        **c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

    However, "administration" does not include handling payroll deductions.

    **2.** "Cafeteria plans" means plans authorized by applicable law to allow "employees" to elect to pay for certain benefits with pre-tax dollars.

    **3.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise::

        **a.** Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexisble spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

        **b.** Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

        **c.** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

        **d.** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family and civil leave; tuition assistance plans; transportation and health club subsidies; and

        **e.** Any other similar plan added by endorsement.

All other terms and conditions remain unchanged.

RB00156
Exhibit 49, Page 186

EXCESS/UMBRELLA
POLICY NUMBER:  MKLM6MM70000398



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED NOTICE OF CANCELLATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

| SCHEDULE |
| --- |
| **Number Of Days Notice: 90** |

Paragraph **b.(2)** of the Cancellation Condition is replaced by the following:

**(2)**  The Number Of Days Notice shown in the Schedule of this endorsement before the effective date of cancellation, if we cancel for any other reason.

All other terms and conditions remain unchanged.

**MAUB 1279 01 15**

**Page 1 of 1**

RB00157
Exhibit 49, Page 187



**EXCESS/UMBRELLA**
POLICY NUMBER: MKLM6MM70000398

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NOTICE OF CANCELLATION TO OTHERS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

| SCHEDULE |
|---|
| Name:Arkansas Louisiana & Mississippi Railroad Company |
| Address: |
| Number of days advance notice: 90 |

If we cancel this policy for any reason other than non-payment of premium, we will mail advance written notice of cancellation to the person or organization described in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

RB00158
Exhibit 49, Page 188

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES TO CONDITIONS – MOST FAVORABLE JURISDICTION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Conditions section:

**Determination Of Insurability Of Punitive Or Exemplary Damages**

When punitive or exemplary damages are awarded in a judgment against an insured which also awards compensatory damages covered by this policy, the determination of the insurability of the punitive or exemplary damages portion of the judgment under this policy shall be made in accordance with the law of the jurisdiction:

**1.** Most favorable to the insurability of such damages; and

**2.** With substantial contracts with us, the insured or the underlying claim or "suit" brought against the insured.

All other terms and conditions remain unchanged.

**MAUB 1290 01 15**                                                                                     **Page 1 of 1**

RB00159
Exhibit 49, Page 189

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – COMMUNICABLE DISEASE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy does not apply to:

**Communicable Disease**

Liability arising out of the actual or alleged transmission of a communicable disease by any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

All other terms and conditions remain unchanged.

RB00160
Exhibit 49, Page 190

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OREGON AMENDATORY

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the **Cancellation** Condition:

**Cancellation Of Policies In Effect For 60 Days or More**.

If this policy has been in effect for 60 days or more, or is a renewal policy, we may cancel only for one or more of the following reasons:

1. Nonpayment of premium.

2. Fraud or material misrepresentation made by or with the knowledge of the named insured in obtaining the policy, continuing the policy, or in presenting a claim under the policy.

3. Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision.

4. Failure to comply with reasonable loss-control recommendations.

5. Breach of contractual duties, conditions, or warranties.

6. Determination that the continuation of a line of insurance or class of business will jeopardize a company's solvency, or will place the insurer in violation of the insurance laws of Oregon or any other state.

7. Loss or decrease in reinsurance covering the risk.

8. Any other reason approved by the commisioner by rule.

**B.** The term spouse is replaced by the following:

Spouse or individual who is in a domestic partnership recognized under Oregon law.

All other terms and conditions remain unchanged.

**MAUB 1403-OR 01 15**          Includes copyrighted material of Insurance Services Office, Inc.          **Page 1 of 1**
with its permission.



**EXCESS/UMBRELLA**
POLICY NUMBER: MKLM6MM70000398

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DESIGNATED COVERAGE FOLLOWING FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

**SCHEDULE**

Designated Coverage(s):

Loggers Property Damage Liability; Limited Unintentional Discrimination Coverage

This policy applies to the Designated Coverage(s) shown in the Schedule of this endorsement only to the extent that coverage is provided by a policy shown in the Schedule Of Underlying Insurance. When coverage applies, it follows all terms, conditions, limits and exclusions of the "underlying insurance" and any conflicting exclusions are superseded.

All other terms and conditions remain unchanged.

**MAUB 1510 04 17**

**Page 1 of 1**

RB00162
Exhibit 49, Page 192

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – PRIMARY AND NONCONTRIBUTORY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

Paragraph **3.** Other Insurance in Section **IV.** Conditions is replaced by the following:

**3.  Other Insurance**

    **a.  Excess**

        This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis, except if the other insurance is written specifically to be excess over this insurance or if the Primary And Noncontributory Excess Insurance provision below applies.

    **b.  Primary And Noncontributory Excess Insurance**

        This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis; however, this insurance will not seek contribution from any other liability insurance available to an additional insured that has been granted primary and non-contributory status under any "underlying insurance" shown in the Schedule Of Underlying Insurance. This provision applies only if:

        **(1)**  All limits provided by "underlying insurance" have been exhausted by payment of judgments against the additional insured or payment of settlements that the "underlying insurance" has agreed to in writing;

        **(2)**  The additional insured is a Named Insured under such other liability insurance available to the additional insured; and

        **(3)**  You have specifically agreed in writing in a contract or agreement executed prior to the claim that this excess liability insurance would be primary and would not seek contribution from any other liability insurance available to the additional insured.

The insurance provided by this endorsement does not drop down to provide coverage if the "underlying Insurance" does not pay for the claim for any reason whatsoever.

All other terms and conditions remain unchanged.

**MAUB 1512 04 17**                                                                                           **Page 1 of 1**

RB00163
Exhibit 49, Page 193



**EXCESS/UMBRELLA**
POLICY NUMBER: MKLM6MM70000398

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DISASTER RESPONSE EXPENSE COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**SCHEDULE**

| Disaster Response Expense Aggregate Limit: | $ 250,000 |
|---|---|

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to Section **I.** Insuring Agreement:

  **1.** We will reimburse the insured for "disaster response expenses" incurred by the insured resulting from a "disaster event":

  **a.** Which occurs during the policy period;

  **b.** Is reported to us immediately (not more than 24 hours after the "disaster event"); and

  **c.** For which a "disaster response advisor" is hired in connection with the "disaster event".

  The amount we will pay for "disaster response expenses" is limited as described in Paragraph **B.** of this endorsement.

  **2.** A "disaster event" will be deemed to have first commenced when a "key executive" first becomes aware of an "occurrence" covered by this policy that gives rise to a "disaster event".

  If any insured, or manager in your risk management, insurance or legal department, or "employees" who are authorized by you to give or receive notice of an "occurrence", claim or "suit", knew prior to the policy period that an injury or damage occurred or an offense was committed, then the continuation, change or resumption of such, during or after the policy period, will be deemed to have been known prior to the policy period.

  A "disaster event" will be deemed to be at an end at the earliest time when:

  **a.** We determine that any one of the necessary elements listed in the definition of "disaster event" no longer exists; or

  **b.** The Disaster Response Expense Aggregate Limit shown in the Schedule of this endorsement has been exhausted.

  **3.** We have no right or duty to:

  **a.** Investigate, settle or defend an insured against any "suit"; or

  **b.** Participate in the investigation, settlement or defense of claims or "suits" against an insured;

  that may arise from a covered "disaster event".

**MAUB 1520 04 17**                                                                                   **Page 1 of 3**

RB00164
Exhibit 49, Page 194

**B.** As respects coverage provided by this endorsement, the following is added to the Limits Of Insurance section:

The Disaster Response Expense Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for "disaster response expenses" during the policy period for a "disaster event".

The limit of insurance provided by this endorsement is in addition to any other limit of insurance applicable to the policy.

**C.** The following is added to the Conditions section:

**Arbitration**

If you or we disagree on whether or not a "disaster event" has occurred, the right of any reimbursement for "disaster response expense" shall be arbitrated pursuant to the rules of the American Arbitration Association applicable to the state shown in the first Named Insured's address shown in the Declarations.

**Disaster Response Expense Reimbursement**

Any reimbursement of "disaster response expenses" that we make to an insured under the coverage provided by this endorsement will not:

**a.** Determine any other rights or obligations under this policy; or

**b.** Create a duty to defend any "suit" under any other part of this policy.

Any payments made by the insured for which the insured may seek reimbursement under the terms of this endorsement, and any payments made by us to the insured to reimburse for such payments made by the insured, will not constitute an admission of liability by the insured with regard to the "disaster event" or us with regard to the coverage afforded under the policy.

We are not waiving or relinquishing any rights we may have to seek recovery or subrogation against any third party with regard to payments made by us pursuant to this endorsement.

**D.** As respects this endorsement, the following are added to the Definitions section:

"Disaster event" means an "occurrence" that, in the good faith opinion of a "key executive "of the Named Insured, has resulted in or is likely to result in:

**a.** Damages covered by this Commercial Excess Liability Policy that are in excess of the total applicable "underlying insurance"; or

**b.** Damages covered by this Commercial Umbrella Liability Policy that are in excess of the "retained limit"; and

**c.** Significant media coverage; and

**d.** A need for a "disaster response advisor".

"Disaster response advisor" means a public relations firm or crisis management firm that is hired by you to perform "disaster response advisory services" in connection with a "disaster event".

"Disaster response advisory services" means those services performed by a "disaster response advisor" in advising you on minimizing potential harm to you from a covered "disaster event" by maintaining or restoring public confidence in you.

"Disaster response expenses" means the amounts paid for the reasonable and necessary fees and expenses incurred by you or your "disaster response advisor" and pre-approved by us. These expenses include, but are not limited to, the following:

**a.** Medical expenses;

**b.** Funeral expenses;

**c.** Psychological counseling expenses;

**d.** Travel expenses;

**e.** Temporary living expenses;

**f.** Printing and mailing expenses;

**g.** Expenses to secure the scene of a "disaster event", and

**MAUB 1520 04 17**

RB00165
Exhibit 49, Page 195

**h.** Any other expenses pre-approved by us.

"Key executive" means the chief executive officer, chief operating officer, president, general counsel or general partner (if the insured is a partnership) or sole proprietor (if the insured is a sole proprietorship) of the insured. A "key executive" also means any person holding a title designated by you, approved by us, and shown by endorsement to this policy.

All other terms and conditions remain unchanged.

RB00166
Exhibit 49, Page 196

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**c.** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**d.** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions,, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

All other terms and conditions remain unchanged.

RB00167
Exhibit 49, Page 197

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – MEDICAL PROFESSIONAL LIABILITY WITH SERVICES FURNISHED BY HEALTH CARE PROVIDERS FOLLOWING FORM EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

The following are added to Section **III.** Exclusions:

This policy does not apply to:

**Services Furnished By Health Care Providers**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of:

**a.** The rendering of or failure to render:

   **(1)** Medical, surgical, dental, X-ray or nursing service, treatment, advice or instruction, or the related furnishing of food or beverages;

   **(2)** Any health or therapeutic service, treatment, advice or instruction; or

   **(3)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming.

**b.** The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or

**c.** The handling or treatment of dead bodies, including autopsies, organ donation or other procedures,

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph **a., b.** or **c.**

However, this exclusion does not apply if valid and collectible coverage is provided by the "underlying insurance" shown in the Schedule Of Underlying Insurance at the full limits shown and then only to the extent provided by that "underlying insurance".

**Medical Professional Liability**

"Bodily injury", "property damage" or "personal and advertising injury" arising from the rendering of or failure to render professional services by any physician, surgeon, dentist, chiropractor or osteopath.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved any professional service described above.

All other terms, conditions and exclusions remain unchanged.

RB00168
Exhibit 49, Page 198

EXCESS/UMBRELLA



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF WAR EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

Paragraph **20.** War under Section **III.** Exclusions is replaced by the following:

**20. War**

"Bodily injury", "property damage", "covered pollution cost or expense" or "personal and advertising injury" however caused, arising directly or indirectly out of:

**a.** War, including undeclared or civil war; or

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms and conditions remain unchanged.

RB00169
Exhibit 49, Page 199

EXCESS/UMBRELLA



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLLUTION FOLLOWING FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** Paragraphs **a.** and **c.** of Exclusion **17.** Pollution under Section **III.** Exclusions are deleted.

**B.** Except to the extent that coverage is provided in any policy shown in the Schedule Of Underlying Insurance, for the full limits shown therein, this policy does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration release or escape of "pollutants".

All other terms and conditions remain unchanged.

**MAUB 1680 01 15**      Includes copyrighted material of Insurance Services Office, Inc.,      **Page 1 of 1**
with its permission.

RB00170
Exhibit 49, Page 200

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** For the purposes of this endorsement, the following are added to the Definitions section:

"Any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions remain unchanged.

**MAUB 1696 01 15**          Includes copyrighted material of Insurance Services Office, Inc.,          **Page 1 of 1**
with its permission.

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA OR MIXED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to Section **III.** Exclusions:

This policy does not apply to:

**Silica Or Mixed Dust**

**a.** "Bodily injury," "property damage", or "personal and advertising injury" arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation, ingestion or respiration of "mixed dust", "silica", "silica-related dust" or products or substances containing "silica". This includes, but is not limited to any:

   **(1)** Supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

   **(2)** Obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "mixed dust", "silica", "silica-related dust" or products or substances containing "silica", by any insured or by any other person or entity.

This exclusion applies to all such "bodily injury" or "property damage" whether or not the "bodily injury" or "property damage" is included in the "products-completed operations hazard".

**B.** As respects this exclusion, the following are added to Section **V.** Definitions:

"Mixed dust" means inorganic or organic dusts that have harmful effects on human beings.

"Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

"Silica-related dust" means a mixture or combination of silica and other dust or particles.

All other terms and conditions remain unchanged.

RB00172
Exhibit 49, Page 202

**EXCESS/UMBRELLA**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – MARIJUANA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Marijuana**

**a.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by or attributable to, whether in whole or in part, the:

  **(1)** Design, manufacture, distribution, sale, serving, furnishing, use or possession of "marijuana"; or

  **(2)** Actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of "marijuana"; or

**b.** "Property damage" to "marijuana".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, screening, contracting or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph **a.** or **b.** above.

However, this exclusion does not apply to any "marijuana" that is not designed, manufactured, distributed, sold, served, furnished or intended for bodily ingestion, bodily inhalation, bodily absorption or bodily consumption.

**B.** The exclusion in Paragraph **A.** above does not apply to the extent that valid "underlying insurance" for the "marijuana" related liability risks described in Paragraph **A.** above exists or would have existed but for the exhaustion of underlying limits for "bodily injury", "property damage" or "personal and advertising injury". To the extent the exclusion in Paragraph **A.** above does not apply, the insurance provided under this policy for the "marijuana" related liability risks described in Paragraph **A.** above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**C.** The following definition is added to the Definitions section:

"Marijuana" means any good or product that consists of or contains any amount of Tetrahydrocannabinol (THC) or any other cannabinoid, regardless of whether any such THC or cannabinoid is natural or synthetic, including but not limited to, any of the following containing such THC or cannabinoid:

**a.** Any plant of the genus Cannabis L., or any part thereof, such as seeds, stems, flowers, stalks and roots; or

**b.** Any compound, byproduct, extract, derivative, mixture or combination, including but not limited to:

  **(1)** Resin, oil or wax;

**MAUB 1850 10 17**

**Page 1 of 2**

RB00173
Exhibit 49, Page 203

**(2)** Hash or hemp; or

**(3)** Infused liquid or edible marijuana;

whether or not derived from any plant or part of any plant described in Paragraph **a.** above.


All other terms and conditions remain unchanged.

RB00174
Exhibit 49, Page 204



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

**MIL 1214 09 17**                                                                    **Page 1 of 1**

RB00175
Exhibit 49, Page 205

EXCESS/UMBRELLA
POLICY NUMBER: MKLM6MM70000398



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLICY CHANGES

This endorsement forms a part of the policy numbered below:          Policy Change Number:

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| MKLM6MM70000398 | 11/01/2021 | Markel American Insurance Company |
| NAMED INSURED | | AUTHORIZED REPRESENTATIVE |
| RLC Industries Co. | | |

| COVERAGE PARTS AFFECTED |
|---|
| COMMERCIAL UMBRELLA LIABILITY POLICY |

| CHANGES |
|---|

## INDUSTRIAL AID AIRCRAFT LIMITATION

**A.** The Limits Of Insurance in the Commercial Umbrella Liability Policy Declarations are amended to include the following Self-Insured Retention:

Industrial Aid Aircraft Self-Insured Retention: **$5,000,000**          Each Occurrence

**B.** With respect only to this endorsement, any defense provisions in Section **I.** Insuring Agreement are replaced by the following:

We will have no duty to defend any "suit" against the insured. We will, however, have the right, but not the duty to participate in the defense of any "suit" and the investigation of any claim to which this policy may apply. If we exercise this right, we will do so at our own expense.

**C.** With respect only to this endorsement, Section **II.** Supplementary Payments is deleted in its entirety.

**D.** With respect only to this endorsement and solely with respect to any and all references to aircraft, Section **III** Exclusions, Paragraph **1.** Aircraft Or Watercraft is replaced by the following:

This policy does not apply to

**1. Aircraft**

"Bodily injury", "property damage", or "covered pollution cost or expense" arising out of the ownership, maintenance, operation, use, entrustment to others, or "loading and loading" of any aircraft owned or operated by or rented or loaned to any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury", "property damage", or "covered pollution cost or expense" involved the ownership, maintenance, operation, use, entrustment to others, or "loading and loading" of any aircraft that is owned or operated by or rented or loaned to any insured.

**MAUB 1503 01 15**                                                                                    **Page 1 of 2**

This exclusion does not apply to "bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, entrustment to others, or "loading and unloading" of any "industrial aid aircraft" owned or operated by or rented or loaned to any insured.

It is understood that any and all references to watercraft in Section **III.** Exclusions, Paragraph **1.** Aircraft Or Watercraft remain unchanged, unless amended by separate endorsement.

**E.** With respect only to this endorsement, the following definitions are added to Section **V.** Definitions:

"Defense expenses" means any payment allocated to a specific loss, claim, or "suit" for its investigation settlement or defense, including but not limited to:

**a.** Attorney's fees and all other investigation, loss adjustment, and litigation expenses;

**b.** Premiums on bonds to release attachments;

**c.** Premiums on appeal bonds required by law to appeal any claim or "suit";

**d.** Costs taxed against the insured in any claim or "suit";

**e.** Pre-judgment interest awarded against the insured; and

**f.** Interest that accrues after entry of judgment

"Industrial aid aircraft" means aircraft with a maximum passenger capacity of 20 persons (including crew) used solely for business travel of "employees" and their non-fee paying passenger guests.

**F.** With respect only to this endorsement, the following are added to Section **VI.** Limits Of Insurance:

**Industrial Aid Aircraft Self-Insured Retention**

Coverage afforded by this endorsement is subject to the Industrial Aid Aircraft Self-Insured Retention stated in Paragraph **A.** of this endorsement. The Industrial Aid Aircraft Self-Insured Retention applies separately to each "occurrence" arising out of the ownership, maintenance, operation, use, entrustment to others. or "loading and loading" of any "industrial aid aircraft" owned or operated by or rented or loaned to any insured.

The Industrial Aid Aircraft Self-Insured Retention applies whether or not there is any available "underlying insurance" or other insurance. If there is "underlying insurance" or other insurance applicable to the loss amounts received through such "underlying insurance" or other insurance for payment of the loss may be applied to reduce or exhaust the Industrial Aid Aircraft Self-Insured Retention. However, in no event will amounts received through such "underlying insurance" or other insurance for the payment of "defense expenses" reduce the Industrial Aid Aircraft Self-Insured Retention.

The Industrial Aid Aircraft Self-Insured Retention will not be reduced by "defense expenses".

All other terms and conditions remain unchanged.

| ☐ NO CHANGES | ☐ TO BE ADJUSTED AT AUDIT | ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|---|---|
| | | $ | $ |

Authorized Representative Signature

RB00177
Exhibit 49, Page 207

# EXHIBIT C

DEC 0 6 2021

# CHUBB·

**Chubb Group of Insurance Companies**
555 S. FLOWER STREET
3RD FLOOR
LOS ANGELES, CA 90071
(213)612-0880

BRANDON AVERY
AON RISK INSURANCE SERVICES WEST, INC. (OR)
851 SW 6TH AVE,STE 550
PORTLAND, OR 97204-1039

SUBJECT: COMMERCIAL EXCESS
FEDERAL INSURANCE COMPANY
7819-50-57
RLC INDUSTRIES CO

11/12/2021

Dear Brandon,

Attached please find the Chubb Commercial Excess policy for the insured named above. We thank you for the business.

At your earliest convenience, please forward a complete copy of the insured's controlling underlying policy(ies), as designated under controlling underlying insurances of the Declarations, including the policy jacket, declarations page and all endorsements. Since we write an Excess policy, we must have this information to complete our file.

Thanks in advance for your assistance.

Sincerely,

Margie Montez
Underwriting Associate

*Form 07-10-0322 (Rev. 5-05)*

# CHUBB®   *Chubb Commercial Excess Follow-Form Insurance*

## *Premium Bill*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021   *To*   NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |
| *Producer* | AON RISK INSURANCE SERVICES WEST, INC. (OR) |

**THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY**

PLEASE SEND PAYMENT TO AGENT OR BROKER, IF APPLICABLE

| *Coverage* | *Commission Rate* | *Premium* |
|---|---|---|
| | 0.00% | ■■■■■ |
| Commercial Excess | | |
| *Total* | | ■■■■■ |

**Portion of total premium attributable for Terrorism and statutory standard fire where applicable is:**
**$0.00**

RB00179
Exhibit 49, Page 210

# CHUBB°

## *IMPORTANT NOTICE TO POLICYHOLDERS*
## *TERRORISM RISK INSURANCE ACT*

This Important Notice is being provided with your policy to further satisfy the disclosure requirements of the Terrorism Risk Insurance Act.

At the time you received the written offer for this policy, we provided you with an Important Notice to Policyholders indicating that the insurance provided in your policy for losses caused by certain acts of terrorism (as defined in the Terrorism Risk Insurance Act) would be partially reimbursed by the United States of America, pursuant to the formula set forth in the Terrorism Risk Insurance Act. In addition, as required by the Terrorism Risk Insurance Act, we:

- indicated that we would make available insurance for such losses in the same manner as we provide insurance for other types of losses;

- specified the premium we would charge, if any, for providing such insurance; and

- except to the extent prohibited by law, gave you the opportunity to reject such insurance and have a terrorism exclusion, sublimit or other limitation included in your policy.

This Important Notice refers back to that Important Notice and provides information about your decision and the manner in which your policy has been subsequently modified.

If:

- You rejected terrorism insurance under the Terrorism Risk Insurance Act, your policy includes the appropriate amendatory endorsement(s).

- You did not reject terrorism insurance under the Terrorism Risk Insurance Act, the premium charged for your policy, including that portion applicable to terrorism insurance under the Terrorism Risk Insurance Act, is shown in your policy. To the extent your policy includes a limitation on terrorism insurance, it has been modified so that such limitation does not apply to terrorism insurance under the Terrorism Risk Insurance Act.

Please carefully review your policy and the Important Notice previously provided to you for further details. Please remember that only the terms of your policy establish the scope of your insurance protection.

**Please note that if your policy:**

- *provides commercial property insurance in a jurisdiction that has a statutory standard fire policy, the premium we charge for terrorism insurance under the Terrorism Risk Insurance Act, includes an amount attributable to the insurance provided pursuant to that standard fire policy. Rejection of such statutory insurance is legally prohibited.*

- *is a workers compensation policy, rejection of insurance for terrorism is legally prohibited.*

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year , the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

RB00180
Exhibit 49, Page 211

CHUBB®

## *IMPORTANT NOTICE TO POLICYHOLDERS*

**This Important Notice is not your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered. Only the provisions of your policy determine the scope of your insurance protection.**

**THIS IMPORTANT NOTICE PROVIDES INFORMATION CONCERNING POSSIBLE IMPACT ON YOUR INSURANCE COVERAGE DUE TO COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS.**

**PLEASE READ THIS NOTICE CAREFULLY.**

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. For example, the United States Treasury Department's Office of Foreign Asset Control (OFAC) administers and enforces economic and trade sanctions and places restrictions on transactions with foreign agents, front organizations, terrorists, terrorists organizations, and narcotic traffickers. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation, to impose controls on transactions and freeze foreign assets under United States jurisdiction. (To learn more about OFAC, please refer to the United States Treasury's web site at http://www.treas.gov/ofac.)

To the extent that you or any other insured, or any person or entity claiming the benefits of this insurance has violated any applicable sanction laws, this insurance will not apply.

We have added a condition or section that applies to the entire policy called Compliance With Applicable Trade Sanctions, which stipulates that your insurance policy does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

RB00181
Exhibit 49, Page 212

# CHUBB'

## *POLICYHOLDER  NOTICE*

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

---

RB00182
Exhibit 49, Page 213

# CHUBB®    Chubb Commercial Excess Follow-Form Insurance

## Declarations

**Chubb Group of Insurance Companies**
**202B Hall's Mill Road,**
**Whitehouse Station, NJ 08889**

*Named Insured and Mailing Address*

RLC INDUSTRIES CO
3660 GATEWAY STREET
SPRINGFIELD, OR 97477

*Policy Number*    7819-50-57

*Issued by the stock insurance company indicated below, herein called the company.*

**FEDERAL INSURANCE COMPANY**

*Producer No.* Z08582 / 0070943

*Incorporated under the laws of INDIANA*

*Producer*    AON RISK INSURANCE SERVICES WEST, INC. (OR)
851 SW 6TH AVE,STE 550
PORTLAND, OR 97204-1039

## Policy Period

From:   NOVEMBER 1, 2021         To:  NOVEMBER 1, 2022
12:01 A.M. standard time at the Named Insured's mailing address shown above.

## Premium

## Limits Of Insurance

| | |
|---|---|
| Other Aggregate Limit (as applicable) | $5,000,000 |
| Products Completed Operations Aggregate Limit | *SEE BELOW |
| Each Occurrence Limit | $5,000,000 |
| *INCLUDED IN THE OTHER AGGREGATE LIMIT | |

RB00183
Exhibit 49, Page 214

## Underlying Limits Of Insurance
### (Includes Controlling Underlying Limits Of Insurance)

| Description | Limits |
| --- | --- |
| **Total Underlying Limits** | |
| Aggregate Limit (where applicable) | $5,000,000 |
| Products Completed Operations Aggregate Limit | *SEE BELOW |
| Each Occurrence Limit | $5,000,000 |
| *INCLUDED IN THE AGGREGATE LIMIT | |

## Controlling Underlying Insurance(s)

| Description | Limits |
| --- | --- |
| **Commercial Umbrella Liability** | |

| | | |
| --- | --- | --- |
| Company | MARKEL AMERICAN INSURANCE COMPANY | |
| Policy Number | MKLM6MM70000398 | |
| Policy Period | From: 11/01/2021 | To: 11/01/2022 |

Limits of Insurance

| | |
| --- | --- |
| Aggregate Limit (where applicable) | $5,000,000 |
| Products Completed Operations Aggregate Limit | *SEE BELOW |
| Each Occurrence Limit | $5,000,000 |
| *INCLUDED IN THE AGGREGATE LIMIT | |

Occurrence

## Authorization

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

### FEDERAL INSURANCE COMPANY

_Secretary_

_President_

Authorized Representative

Date November 12, 2021

Chubb. Insured.

RB00184
Exhibit 49, Page 215

# CHUBB®  *Chubb Commercial Excess Follow-Form Insurance*

## *Schedule of Forms*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021  *To*  NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

*As of the effective date printed above, this is the Schedule of Forms applicable to this policy:*

| | Form number | |
|---|---|---|
| PREMIUM BILL | 07-10-0542 | (10/06) |
| PREMIUM BILL | 07-10-0542I | (10/06) |
| IMPORTANT NOTICE TO POLICYHOLDERS-TRIPRA | 99-10-0732 | (01/15) |
| IMPORTANT NOTICE - OFAC | 99-10-0792 | (09/04) |
| AOD IMPORTANT POLICYHOLDER NOTICE | 99-10-0872 | (06/07) |
| COMMERCIAL EXCESS FOLLOW-FORM DECLARATIONS | 07-02-2268 | (02/09) |
| CHUBB COMMERCIAL EXCESS FOLLOW-FORM INSURANCE | 07-02-0909 | (05/05) |
| INFORMATION LAWS, INCL UNAUTH OR UNSOL COMMUN | 07-02-2173 | (01/13) |
| EXCL - POLLUTION - HOSTILE FIRE EXCEPTION | 07-02-0931 | (05/05) |
| EXCL - LEAD | 07-02-1157 | (05/05) |
| EXCL - PROFESSIONAL SERVICES | 07-02-1566 | (05/05) |
| EXCL - INTELLECTUAL PROPERTY LAWS OR RIGHTS | 07-02-1568 | (05/10) |
| EXCL - BIOLOGICAL AGENTS | 07-02-1694 | (05/05) |
| EXCL - CERTIFIED ACTS OF TERRORISM | 07-02-1954 | (01/15) |
| ASBESTOS, SILICA, OTHER INCL MIXED DUST EXCL | 07-02-2196 | (03/08) |
| AMENDED LIM OF INS-ONE POL AGG SUBJ TO UNDLY | 07-02-2220 | (03/06) |
| EXCLUSION - WAR | 07-02-2736 | (03/17) |
| EXCLUSIONS – ACCESS OR DISCLOSURE AND ELECTRONIC DATA-RELATED LIABILITY WITH EXCEPTIONS | 07-02-2850 | (03/21) |

RB00185
Exhibit 49, Page 216

# CHUBB® *Chubb Commercial Excess Follow-Form Insurance*

## Table Of Contents

| Section | Page No. |
|---|---|
| Coverage/ Excess Follow -Form | 3 |
| Investigation, Defense And Settlements | 3 |
| Supplementary Payments | 4 |
| Coverage Territory | 4 |
| Who Is An Insured | 4 |
| Limits Of Insurance | 4 |
| When This Excess Follow-Form Insurance Applies | 5 |
| Exclusions | 6 |
| Conditions | 9 |
| Definitions | 14 |

RB00186
Exhibit 49, Page 217

*THIS PAGE INTENTIONALLY LEFT BLANK*

RB00187
Exhibit 49, Page 218

# CHUBB®   *Chubb Commercial Excess Follow-Form Insurance*

## Contract

Please read the entire policy carefully. The terms and conditions of this insurance include the various sections of this contract: Coverage; Investigation, Defense And Settlements; Supplementary Payments; Coverage Territory; Who Is An Insured; Limits Of Insurance; When This Excess Follow-Form Insurance Applies; Exclusions; Conditions and Definitions, as well as the Declarations and any Endorsements made a part of this insurance.

Throughout this contract the words "you" and "your" refer to the named **insured** shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Words and phrases that appear in **bold** print have special meanings and are defined in the Definitions section of this contract.

## Coverage/Excess Follow-Form

Subject to all of the terms and conditions applicable to this insurance, we will pay, on behalf of the **insured,** that part of **loss,** to which this insurance applies, which exceeds the applicable **underlying limits.**

This insurance applies only if the triggering event that must happen during the policy period of the applicable **controlling underlying insurance** happens during the policy period of this insurance.

This insurance will follow the terms and conditions of **controlling underlying insurance,** unless a term or condition contained in this insurance:

* differs from any term or condition contained in the applicable **controlling underlying insurance;** or

* is not contained in the applicable **controlling underlying insurance.**

With respect to such exceptions described above, the terms and conditions contained in this insurance will apply, to the extent that such terms and conditions provide less coverage than the terms and conditions of the applicable **controlling underlying insurance.**

This insurance does not apply to any part of **loss** within **underlying limits,** or any related costs or expenses.

We have no obligation under this insurance with respect to any claim or suit settled without our consent.

The most we will pay hereunder is fixed as set forth in the Limits Of Insurance section of this contract.

Our obligations hereunder end when we have used up the applicable Limits Of Insurance.

Other than as provided under the Investigation, Defense And Settlements and Supplementary Payments sections of this contract, we have no other obligation or liability to pay sums or perform acts or services under this insurance.

## Investigation, Defense And Settlements

We have no duty to defend any person or organization against any claim or suit.

We may at our discretion participate in the defense, investigation and settlement of any occurrence, offense, claim or suit.

If we choose to participate in the defense of any claim or suit, we will not be obligated to participate in the defense of any person or organization when we have used up the applicable Limits Of Insurance.

The most we will pay hereunder is fixed as set forth in the Limits Of Insurance section of this contract.

RB00188
Exhibit 49, Page 219

| | |
|---|---|
| **Supplementary Payments** | Subject to all of the terms and conditions of this insurance, with respect to a claim or suit we investigate or settle, we will pay: |
| | • expenses incurred directly by us and at our sole discretion; |
| | • prejudgment interest awarded against the insured on that part of a judgment we pay. If we make an offer to pay the applicable Limits Of Insurance, we will not pay any prejudgment interest based on that period of time after the offer. |
| | • interest on that part of a judgment, to which this insurance applies, that accrues after entry of the judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limits Of Insurance. |
| | Supplementary Payments does not include any fine or other penalty. |
| | The most we will pay hereunder is fixed as set forth in the Limits Of Insurance section of this contract. |
| | Our obligations hereunder end when we have used up the applicable Limits Of Insurance. |
| **Coverage Territory** | This insurance applies anywhere that the applicable **controlling underlying insurance** applies. |
| **Who Is An Insured** | The following persons or organizations qualify as **insureds**: |
| | • the named **insured** shown in the Declarations; and |
| | • other persons or organizations qualifying as an **insured** in **controlling underlying insurance,** but not beyond the extent of any limitations imposed under any contract or agreement. |
| **Limits Of Insurance** | The Limits Of Insurance shown in the Declarations and the rules below fix the most we will pay, regardless of the number of: |
| | • **insureds;** |
| | • claims made or suits brought; |
| | • persons or organizations making claims or bringing suits; |
| | • vehicles involved; or |
| | • coverages provided in this contract. |
| | The aggregate limits apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months (starting with the beginning of the policy period shown in the Declarations), provided the applicable aggregate limits in all **underlying insurance** apply in such manner. If the aggregate limits in any **underlying insurance** do not so apply, then the applicable aggregate limits of this insurance will apply to the entire policy period and not separately to any portion (whether annual or otherwise) thereof. |
| | If the policy period is extended after issuance, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance. |
| **Other Aggregate Limit** | Subject to the Each Occurrence Limit, the Other Aggregate Limit is the most we will pay for the sum of amounts described as reducing Limits Of Insurance of this insurance (see Payments That Reduce The Limits Of Insurance section), except amounts included in the products-completed operations hazard. |

RB00189
Exhibit 49, Page 220

# CHUBB®    *Chubb Commercial Excess Follow-Form Insurance*

## *Limits Of Insurance*

| | |
|---|---|
| **Other Aggregate Limit** (continued) | However, the Other Aggregate Limit of this policy will: |
| | • not apply when all **underlying insurance** does not apply an aggregate limit; or |
| | • apply in the same manner as the aggregate limit in controlling underlying insurance applies, provided all other **underlying insurance** also applies an aggregate limit in the same manner as **controlling underlying insurance**. |
| **Products-Completed Operations Aggregate Limit** | Subject to the Each Occurrence Limit, the Products-Completed Operations Aggregate Limit is the most we will pay for the sum of amounts described as reducing Limits Of Insurance of this insurance (see Payments That Reduce The Limits Of Insurance section) included in the products-completed operations hazard as defined in **controlling underlying insurance**. |
| **Each Occurrence Limit** | The Each Occurrence Limit is the most we will pay for the sum of amounts described as reducing Limits Of Insurance of this insurance (see Payments That Reduce The Limits Of Insurance section) arising out of any one occurrence, even if such loss is or otherwise would be covered in whole or in part under more than one **underlying insurance** policy. |
| | Any such amounts we pay will reduce the amount of the applicable aggregate limit available for any other payment. |
| | If the applicable aggregate limit has been reduced to an amount that is less than the Each Occurrence Limit, then the remaining amount of such aggregate limit is the most that will be available for any other payment. |
| **Payments That Reduce The Limits Of Insurance** | Any amounts we pay for **loss** will reduce the Limits Of Insurance of this insurance. |
| | Payments that we make under the Supplementary Payments and Investigation, Defense And Settlement sections of this insurance **will not** reduce the Limits Of Insurance, unless payments for investigation, defense and settlement and supplementary payments reduce the limits of insurance of any applicable **underlying insurance**. |
| | If costs or expenses for supplementary payments and investigation, defense and settlement reduce the limits of insurance of any applicable **underlying insurance,** then any such cost or expenses including supplementary payments to which this insurance applies will reduce the applicable Limits Of Insurance of this insurance. |
| **When This Excess Follow-Form Insurance Applies** | Subject to all of the terms and conditions of this insurance, if the applicable **underlying limits** are: |
| | • reduced by payment of judgments, settlements or related costs or expenses (if such costs or expenses reduce such limits) for triggering events that happen during the policy period of this insurance and provided all **underlying limits** also applies to **loss** and also drops down, then this insurance will drop down to apply in excess of the remaining amount of the applicable **underlying limits**. |
| | • exhausted by payment of judgments, settlements or related costs or expenses (if such costs or expenses reduce such limits) for triggering events that happen during the policy period of this insurance, then this insurance will apply in the same manner as the applicable **controlling underlying insurance** would have applied but for such exhaustion. |

RB00190
Exhibit 49, Page 221

| | | |
|---|---|---|
| **Exclusions** | | The use of the words damages, loss, cost or expense in any exclusion does not expand any coverage under this contract. |
| **Asbestos** | A. | This insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of **asbestos**. |
| | B. | This insurance does not apply to any damages, loss, cost or expense arising out of any: |

B.
1. request, demand, order or regulatory or statutory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **asbestos**; or

2. claim or proceeding by or on behalf of a governmental authority or others for any damages, loss, cost or expense because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **asbestos**.

**Controlling Underlying Insurance**

This insurance does not apply to any damages, loss, cost or expense to which the terms and conditions of **controlling underlying insurance** do not apply.

**Coverages/ Laws, Various**

This insurance does not apply to any damages, loss, cost or expense or obligation of any **insured** under any:

- medical expenses or payments coverage or law;

- no-fault coverage or law;

- personal injury protection coverage or law;

- underinsured or uninsured financial responsibility coverage or law;

- workers' compensation, disability benefits or unemployment compensation coverage or law; or

- similar coverage or law.

**Employee Retirement Income Security Laws**

This insurance does not apply to any damages, loss, cost or expense or obligation of any **insured** under the United States of America Employees' Retirement Income Security Act (E.R.I.S.A.) of 1974 or any similar law, as now constituted or hereafter amended.

**Employment-Related Practices**

A. This insurance does not apply to any damages, loss, cost or expense arising out of any injury or damage sustained at any time by any:

1. person, whether or not sustained in the course of employment by any **insured**, arising out of any employment-related act, omission, policy, practice or representation directed at such person, occurring in whole or in part at any time.

2. brother, child, parent, sister or spouse of any person at whom any act, omission, policy, practice or representation is directed, as described in subparagraph A.1. above.

B. As used in this exclusion, such acts, omissions, policies, practices or representations described above include any:

1. arrest, detention or imprisonment;

2. breach of any express or implied covenant;

3. coercion, criticism, humiliation, prosecution or retaliation;

4. defamation or disparagement;

RB00191
Exhibit 49, Page 222

CHUBB®  **Chubb Commercial Excess Follow-Form Insurance**

*Exclusions*

*Employment-Related*
*Practices*
*(continued)*

5.  demotion, discipline, evaluation or reassignment;

6.  discrimination, harassment or segregation;

7.  a.  eviction; or

    b.  invasion or other violation of any right of occupancy;

8.  failure or refusal to advance, compensate, employ or promote;

9.  invasion or other violation of any right of privacy or publicity;

10.  termination of employment; or

11.  other employment-related act, omission, policy, practice, representation or relationship in connection with any **insured** at any time.

C.  This exclusion applies:

1.  regardless of the capacity in which the **insured** may be liable; and

2.  to any obligation to share any damages, loss, cost or expense with or repay someone else who must pay any damages, loss, cost or expense because of any of the foregoing.

*Nuclear Energy*

A.  This insurance does not apply to any damages, loss, cost or expense:

1.  with respect to which any **insured** under this policy also has status as an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would have had status as an insured under any such policy but for its termination upon exhaustion of its limit of insurance; or

2.  arising out of the **nuclear hazardous properties** of **nuclear material** and with respect to which:

    a.  any person or organization is required to maintain financial protection pursuant to the United States of America Atomic Energy Act of 1954, or any law amendatory thereof; or

    b.  the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.  This insurance does not apply to any damages, loss, cost or expense arising out of the **nuclear hazardous properties** of **nuclear material**:

1.  if the **nuclear material**:

    a.  is at any **nuclear facility** owned by, or operated by or on behalf of, any **insured**;

    b.  has been discharged or dispersed there from; or

    c.  is contained in **nuclear spent fuel** or **nuclear waste** at any time transported, handled, stored, disposed of, processed, treated, possessed or used by or on behalf of any **insured**; or

RB00192
Exhibit 49, Page 223

**Exclusions**

**Nuclear Energy**
**(continued)**

2.    in any way related to the furnishing by any **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**. But if such facility is located within the United States of America (including its possessions or territories) or Canada, this subparagraph 2. applies only to **nuclear property damage** to such **nuclear facility** and any property thereat.

**Obligations Of**
**Underlying Insurance**

This insurance does not apply to any damages, loss, cost or expense for which the liability or obligation under **underlying insurance** is by law unlimited.

**Pollution**

A.    1.    This insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**, other than as described in paragraph B. below.

2.    Subparagraph A.1. above does not apply to:

a.    bodily injury or property damage included in the products-completed operations hazard;

b.    bodily injury or property damage:

i.    caused by the escape of operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of mobile equipment or its parts;

ii.    if sustained within a building and caused by the release of gaseous irritants or contaminants from materials brought into that building, in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

iii.    resulting from your other ongoing contracting operations;

c.    bodily injury if sustained within a building and caused by the escape of gaseous irritants or contaminants from equipment used to heat that building;

d.    bodily injury or property damage caused by heat, smoke or fumes from a **hostile fire; or**

e.    bodily injury or property damage resulting from the ownership, maintenance or use of an auto.

B.    This insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**:

1.    which are or were at any time transported, handled, stored, disposed of, processed or treated as waste by or for any:

a.    **insured**; or

b.    person or organization for whom any **insured** may be legally responsible.

2.    at or from any premises, site or location:

a.    which is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing or treatment of waste; or

b.    on which any insured or any contractor or subcontractor working directly or indirectly on any **insured**'s behalf is performing operations, if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

RB00193
Exhibit 49, Page 224

# CHUBB®    *Chubb Commercial Excess Follow-Form Insurance*

## *Exclusions*

| | | |
|---|---|---|
| *Pollution* *(continued)* | C. | This insurance does not apply to any damages, loss, cost or expense arising out of any: |
| | 1. | request, demand, order, or regulatory or statutory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants; or** |
| | 2. | claim or proceeding by or on behalf of any governmental authority or others for any damages, loss, cost or expense because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**. |
| | 3. | Subparagraphs C.1. and C.2. above do not apply to the liability for damages, for property damage, that the **insured** would have in the absence of such request, demand, order or regulatory or statutory requirement, or such claim or proceeding by or on behalf of a governmental authority. |

This exclusion applies regardless of whether or not the pollution was accidental, expected, gradual, intended, preventable or sudden.

With respect to this insurance, the following conditions apply.

## *Conditions*

*Appeals*

We may, at our discretion, initiate or participate in an appeal of a judgment, if such judgment may result in a payment under this insurance.

If we initiate or participate in an appeal, we will pay our costs of the appeal. But in no case will the amount we pay for **loss** exceed the Limits Of Insurance.

*Bankruptcy*

Bankruptcy or insolvency of the **insured** or of the **insured's** estate will not relieve us of our obligations under this insurance.

*Cancellation*

The first named **insured** may cancel this policy at any time by sending us a written request or by returning the policy and stating when thereafter cancellation is to take effect.

We may cancel this policy at any time by sending to the first named **insured** a notice sixty (60) days, twenty (20) days in the event of non-payment of premium, in advance of the cancellation date. Our notice of cancellation will be mailed to the first named **insured's** last known address and will indicate the date on which coverage is terminated. If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

The earned premium will be computed on a pro rata basis. Any unearned premium will be returned as soon as practicable.

*Changes*

This policy can only be changed by a written endorsement that becomes part of this policy. The endorsement must be signed by one of our authorized representatives.

*Compliance By Insureds*

We have no duty to provide coverage under this policy unless you and any other involved **insured** have fully complied with all of the terms and conditions of the policy.

RB00194
Exhibit 49, Page 225

## Conditions
(continued)

**Compliance With Applicable Trade Sanctions**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

**Conformance**

Any terms of this insurance which are in conflict with the applicable statutes of the State or jurisdiction in which this policy is issued are amended to conform to such statutes.

**Disclosures And Representations**

We have issued this insurance:

*   based upon representations you made to us; and

*   in reliance upon your representations.

Unintentional failure of an employee of the **insured** to disclose a hazard or other material information will not violate this condition, unless an officer (whether or not an employee) of any **insured** or an officer's designee knows about such hazard or other material information.

**Duties In The Event Of Occurrence, Offense, Claim Or Suit**

A.  You must see to it that we and any insurers of **underlying insurance** are notified as soon as practicable of any occurrence or offense that may result in a claim, if the claim may involve us or other insurers. To the extent possible, notice should include:

1.  how, when and where the occurrence or offense happened;

2.  the names and addresses of any injured persons and witnesses; and

3.  the nature and location of any injury or damage arising out of the occurrence or offense.

Notice of an occurrence or offense is not notice of a claim.

B.  If a claim is made or suit is brought against any **insured,** you must:

1.  immediately record the specifics of the claim or suit and the date received;

2.  notify us and any other insurers as soon as practicable; and

3.  see to it that we receive written notice of the claim or suit as soon as practicable.

C.  You and any other involved **insured** must:

1.  immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

2.  authorize us to obtain records and other information;

3.  cooperate with us and any other insurers in the:

a.  investigation or settlement of the claim; or

b.  defense against the suit; and

4.  assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the **insured** because of loss to which this insurance may also apply.

D.  No **insured** will, except at the **insured's** own cost, make any payment, assume any obligation or incur any expense without our consent.

RB00195
Exhibit 49, Page 226

**CHUBB®**    ***Chubb Commercial Excess Follow-Form Insurance***

*Conditions*

| | |
|---|---|
| *Duties In The Event Of Occurrence, Offense, Claim Or Suit (continued)* | E.   Notice given by or on behalf of: |

    1.   the **insured;**

    2.   the injured person; or

    3.   any other claimant;

to a licensed agent of ours with particulars sufficient to identify the insured shall be deemed notice to us.

F.   Knowledge of an occurrence or offense by an agent or employee of the insured will not constitute knowledge by the **insured,** unless an officer (whether or not an employee) of any **insured** or an officer's designee knows about such occurrence or offense.

G.   Failure of an agent or employee of the **insured,** other than an officer (whether or not an employee) of any **insured** or an officer's designee, to notify us of an occurrence or offense which such person knows about will not affect the insurance afforded to you.

H.   If a claim or loss does not reasonably appear to involve either this insurance or any **underlying insurance,** but it later develops into a claim or loss to which this insurance applies, the failure to report it to us will not violate this condition, provided the **insured** gives us immediate notice as soon as the **insured** is aware that this insurance may apply to such claim or loss.

**First Named Insured**

The person or organization first named in the Declarations is primarily responsible for payment of all premiums. The first named **insured** will act on behalf of all other named **insureds** for the giving and receiving of notice of cancellation or nonrenewal and the receiving of any return premiums that become payable under this policy.

**Inspections And Surveys**

We may:

•   make inspections and surveys at any time;

•   give you reports on the conditions we find; and

•   recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

•   are safe or healthful; or

•   comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization, which makes insurance inspections, surveys, reports or recommendations for us.

**Legal Action Against Us**

No person or organization has a right under this insurance to:

•   join us as a party or otherwise bring us into a suit seeking damages from an **insured;** or

•   sue us on this insurance unless all of the terms and conditions of this insurance have been fully complied with.

RB00196
Exhibit 49, Page 227

## Conditions

**Legal Action Against Us**
**(continued)**

A person or organization may sue us to recover on an **agreed settlement** or on a final judgment against an **insured** obtained after an actual:

- trial in a civil proceeding; or

- arbitration or other alternative dispute resolution proceeding;

but we will not be liable for any damages, loss, cost or expense that are not payable under the terms and conditions of this insurance, or that are in excess of the applicable Limits Of Insurance.

**Maintenance Of**
**Underlying Insurance**
**And Underlying Limits**

We have issued this insurance in reliance upon representations made by you about **underlying insurance** and **underlying limits**. You must see to it that:

- **underlying insurance** is and remains valid and in full force and effect.

- **underlying insurance** will not be cancelled, non-renewed or rescinded without replacement by coverage to which we agree.

- the terms and conditions of **underlying insurance** will not materially change, unless we agree otherwise.

- the terms and conditions of renewals or replacements of **underlying insurance** will be materially the same as the prior coverage, unless we agree otherwise.

- **underlying limits** are and remain available, regardless of any bankruptcy, insolvency or other financial impairment of any insurer or any other person or organization.

- the **underlying limits** will not be reduced or exhausted, except for the reduction or exhaustion by payment of judgments, settlements or related costs or expenses (if such costs or expenses reduce such limits).

Failure to comply with this condition will not invalidate this insurance. But in the case of any such failure, our obligation or liability will not exceed that which would have applied absent any failure to comply with this condition.

You must notify us as soon as practicable if any **underlying insurance** is no longer valid or in full force or effect.

**Other Insurance**

If other valid and collectible insurance is available to the **insured** for loss that we would otherwise cover under this insurance, our obligations are limited as follows.

A. This insurance is excess over any insurance affording coverage that this insurance would also afford, whether primary, excess, contingent or on any other basis.

B. We will pay only our share of the amount of **loss**, if any, that exceeds the sum of the total of:

1. amounts that all other insurance would pay for loss in the absence of this insurance; and

2. all self insured retentions, self insurance, deductible or other mechanisms (including contractual obligations of any person or organization to the **insured**) arranged for the funding of loss.

The insurance or other mechanisms described in subparagraphs A. or B. above does not include **underlying insurance** or insurance negotiated specifically to apply in excess of this insurance.

RB00197
Exhibit 49, Page 228

# CHUBB®    *Chubb Commercial Excess Follow-Form Insurance*

**Conditions**
(continued)

| | |
|---|---|
| **Titles Of Paragraphs** | The titles of the various paragraphs of this policy and endorsements, if any, attached to this policy are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provisions to which they relate. |
| **Transfer Of Rights And Duties** | Your rights and duties under this insurance may not be transferred without our written consent. However, if you die, then your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative, or to anyone having temporary custody of your property until your legal representative has been appointed. |
| **Transfer Or Waiver Of Rights Of Recovery Against Others** | We will waive the right of recovery we would otherwise have had against another person or organization for loss to which this insurance applies, provided the **insured** has waived their rights of recovery against such person or organization in a contract or agreement that is executed before loss. |
| | To the extent that the **insured**'s rights to recover all or part of any payment made under this insurance have not been waived, those rights are transferred to us. The **insured** must do nothing after **loss** to impair them. At our request, the **insured** will bring suit or transfer those rights to us and help us enforce them. |
| | Any amount recovered will be apportioned as follows: |
| | • first, we shall receive all amounts recovered until we have been fully reimbursed for all amounts we have incurred, including costs or expenses of such recovery proceedings. |
| | • then, you are entitled to claim for any further amount recovered. |
| **When Loss Is Payable** | Our obligation to make payment of **loss**, which is covered under the terms and conditions of this insurance, does not apply unless and until there has been payment of the full amounts of **underlying limits** and other insurance. |
| **When We Do Not Renew** | If we decide not to renew this policy, we will mail or deliver to the first named insured stated in the Declarations written notice of the nonrenewal not less than sixty (60) days before the expiration date. If notice of nonrenewal is mailed, proof of mailing will be sufficient proof of notice. |

RB00198
Exhibit 49, Page 229

| | |
|---|---|
| **Definitions** | **WITH RESPECT TO THIS INSURANCE, WORDS AND PHRASES THAT APPEAR IN BOLD PRINT HAVE THE SPECIAL MEANINGS DESCRIBED BELOW.** |
| *Agreed Settlement* | **Agreed settlement** means a settlement and release of liability signed by us, the **insured** and the claimant or the claimant's legal representative. |
| *Asbestos* | **Asbestos** means asbestos in any form, including its presence or use in any alloy, by-product, compound or other material or waste. Waste includes material to be recycled, reconditioned or reclaimed. |
| *Controlling Underlying Insurance* | **Controlling underlying insurance** means the policy or policies of insurance shown as Controlling Underlying Insurance(s) in the Declarations. |
| *Hostile Fire* | **Hostile fire** means one which becomes uncontrollable or breaks out from where it was intended to be. |
| *Insured* | **Insured** means a person or an organization qualifying as an **insured** in the Who Is An Insured section of this contract. |
| *Loss* | **Loss** means damages that the **insured** becomes legally obligated to pay because of injury or damage. |

| | |
|---|---|
| *Nuclear Facility* | **Nuclear facility** means any: |

A.  **nuclear reactor;**

B.  equipment or device designed or used for:

   1. separating the isotopes of plutonium or uranium;

   2. processing or utilizing **nuclear spent fuel;** or

   3. handling, processing or packaging **nuclear waste;**

C.  equipment or device used for the processing, fabricating or alloying of **nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than:

   1.  twenty-five (25) grams of plutonium or uranium 233, or any combination thereof; or

   2.  two-hundred-fifty (250) grams of uranium 235; or

D.  structure, basin, excavation, premises or place prepared or used for the storage or disposal of **nuclear waste;**

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

| | |
|---|---|
| *Nuclear Hazardous Properties* | **Nuclear hazardous properties** include radioactive, toxic or explosive properties. |

RB00199
Exhibit 49, Page 230

# CHUBB°    *Chubb Commercial Excess Follow-Form Insurance*

| | |
|---|---|
| **Definitions**<br>(continued) | **WITH RESPECT TO THIS INSURANCE, WORDS AND PHRASES THAT APPEAR IN BOLD PRINT HAVE THE SPECIAL MEANINGS DESCRIBED BELOW.** |

**Nuclear Material**

**Nuclear material** means **by-product material**, **source material** or **special nuclear material**.

**By-product material**, **source material** and **special nuclear material** have the meanings given them in the United States of America Atomic Energy Act of 1954 or in any law amendatory thereof.

**Nuclear Property Damage**

**Nuclear property damage** includes all forms of radioactive contamination of property.

**Nuclear Reactor**

**Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**Nuclear Spent Fuel**

**Nuclear spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor**.

**Nuclear Waste**

**Nuclear waste** means any waste material:
- containing **nuclear material**, other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **source material** content; and
- resulting from the operation by any person or organization of any **nuclear facility** described in subparagraphs A. or B. of the definition of **nuclear facility**.

**Pollutants**

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**Underlying Insurance**

**Underlying insurance** means the coverages described in:
- **controlling underlying insurance**; and
- the Underlying Limits Of Insurance shown in the Declarations.

**Underlying Limits**

**Underlying limits** means the sum of amounts:

A.    shown in the Underlying Limits Of Insurance section of the Declarations, consisting of amounts:

    1.    available under applicable **underlying insurance**; and

    2.    any **insured** must pay because **underlying insurance**, as represented by you, is not available, regardless of the reason;

B.    available under any applicable antecedent, renewal or replacement of **underlying insurance**;

C.    of any allocation, deductible, participation, retention or other self-insurance applicable to the insurance described in subparagraphs A. and B. above; and

RB00200
Exhibit 49, Page 231

| | |
|---|---|
| **Definitions** | WITH RESPECT TO THIS INSURANCE, WORDS AND PHRASES THAT APPEAR IN BOLD PRINT HAVE THE SPECIAL MEANINGS DESCRIBED BELOW. |
| *Underlying Limits* *(continued)* | D.    of any reinstatement of limits or supplemental or other limits available under the insurance described in subparagraphs A. and B. above. |

If amounts available under the applicable **underlying insurance**, shown in the Underlying Limits Of Insurance section of the Declarations, are greater or less than the amount shown in the Declarations, then the greater of such amounts shall apply in the computation of **underlying limits**.

RB00201
Exhibit 49, Page 232

# CHUBB®    *Chubb Commercial Excess Follow-Form Insurance*

## *Endorsement*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

Under Exclusions, the following exclusion is added to this policy and replaces any similar exclusion contained therein:

**Exclusions**

*Information Laws, Including Unauthorized Or Unsolicited Communications*

This insurance does not apply to any damages, loss, cost or expense arising out of any actual, alleged or threatened violation of:

- the United States of America CAN – SPAM Act of 2003 (or any law amendatory thereof) or any similar regulatory or statutory law in any other jurisdiction;

- the United States of America Telephone Consumer Protection Act (TCPA) of 1991 (or any law amendatory thereof) or any similar regulatory or statutory law in any other jurisdiction;

- the United States of America Fair Credit Reporting Act (FCRA) (or any law amendatory thereof including the Fair and Accurate Credit Transactions Act (FACTA)) or any similar regulatory or statutory law in any other jurisdiction; or

- any other regulatory or statutory law in any jurisdiction that addresses, limits or prohibits the collecting, communicating, disposal, dissemination, distribution, monitoring, printing, publication, recording, sending or transmitting of content, information or material.

All other terms and conditions remain unchanged.

Authorized Representative

November 12, 2021

Chubb Commercial Excess Follow-Form Insurance
Form 07-02-2173 (Rev. 1-13)

Information Laws, Including Unauthorized Or
Unsolicited Communications Exclusion
Endorsement

Page 1 of 1

RB00202
Exhibit 49, Page 233

CHUBB®    **Chubb Commercial Excess Follow-Form Insurance**

*Endorsement*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

Under Exclusions, the exclusion titled Pollution is deleted and replaced by the following:

**Exclusions**

*Pollution – Hostile Fire Exception*

A.  1.  This insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**, other than as described in paragraph B. below.

2.  Subparagraph A.1. above does not apply to bodily injury or property damage caused by heat, smoke or fumes from a **hostile fire**.

B.  This insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants:**

1.  which are or were at any time transported, handled, stored, disposed of, processed or treated as waste by or for any:

a.  **insured;** or

b.  person or organization for whom any **insured** may be legally responsible.

2.  at or from any premises, site or location:

a.  which is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing or treatment of waste; or

b.  on which any **insured** or any contractor or subcontractor working directly or indirectly on any **insured's** behalf is performing operations, if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**.

C.  This insurance does not apply to any damages, loss, cost or expense arising out of any request, demand, order, or regulatory or statutory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or claim or proceeding by or on behalf of any governmental authority or others for damages, loss, cost or expense because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

RB00203
Exhibit 49, Page 234

## *Exclusions*

*Pollution – Hostile Fire*
*Exception*
*(continued)*

Paragraph C. above does not apply to the liability for damages, loss, cost or expense for property damage, that the **insured** would have in the absence of such request, demand order or regulatory or statutory requirement, or such claim or proceeding by or on behalf of a governmental authority.

This exclusion applies regardless of whether or not the pollution was accidental, expected, gradual, intended, preventable or sudden.

All other terms and conditions remain unchanged.

Authorized Representative

November 12, 2021

RB00204
Exhibit 49, Page 235

**CHUBB®**    **_Chubb Commercial Excess Follow-Form Insurance_**

_Endorsement_

| | |
|---|---|
| _Policy Period_ | NOVEMBER 1, 2021    _To_    NOVEMBER 1, 2022 |
| _Effective Date_ | NOVEMBER 1, 2021 |
| _Policy Number_ | 7819-50-57 |
| _Insured_ | RLC INDUSTRIES CO |
| _Name of Company_ | FEDERAL INSURANCE COMPANY |
| _Date Issued_ | November 12, 2021 |

Under Exclusions, the following exclusion is added.

**_Exclusions_**

_Lead_    This insurance does not apply to any damages, loss, cost or expense arising out of:

A.    the actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of **lead**; or

B.    1.    any request, demand, order or regulatory or statutory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **lead**; or

2.    any claim or proceeding by or on behalf of a governmental authority or others for damages, loss, cost or expense because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **lead**.

Under Definitions, the following definition is added.

**_Definitions_**

_Lead_    **Lead** means the element lead in any form, including its use or presence in any alloy, compound, by- product or other material or waste. Waste includes materials to be disposed of, recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

_Authorized Representative_
November 12, 2021

RB00205
Exhibit 49, Page 236

# CHUBB® Chubb Commercial Excess Follow-Form Insurance

## Endorsement

| | |
|---|---|
| **Policy Period** | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| **Effective Date** | NOVEMBER 1, 2021 |
| **Policy Number** | 7819-50-57 |
| **Insured** | RLC INDUSTRIES CO |
| **Name of Company** | FEDERAL INSURANCE COMPANY |
| **Date Issued** | November 12, 2021 |

Under Exclusions, the following exclusion is added.

## Exclusions

**Professional Services**    This insurance does not apply to any damages, loss, cost or expense arising out of the rendering or failing to render professional service or advice, whether or not that service or advice is ordinary to the **insured**'s profession, regardless of whether a claim or suit is brought by a client or any other person or organization.

All other terms and conditions remain unchanged.

Authorized Representative
November 12, 2021

RB00206
Exhibit 49, Page 237

CHUBB®  **Chubb Commercial Excess Follow-Form Insurance**

*Endorsement*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

---

Under Exclusions, the following exclusion is added.

**Exclusions**

*Intellectual Property Laws Or Rights*

A.   This insurance does not apply to any damages, loss, cost or expense arising out of, giving rise to or in any way related to any actual, alleged or threatened:

1.   assertion; or

2.   infringement or violation;

by any person or organization (including any **insured**) of any **intellectual property law or right.**

B.   Further, this insurance does not apply to the entirety of all allegations in any claim or suit, if such claim or suit includes an allegation of or a reference to an infringement or violation of any **intellectual property law or right,** even if this insurance would otherwise apply to any part of the allegations in the claim or suit.

C.   This exclusion applies unless the only infringement or violation of an **intellectual property law or right** is an offense described in the definition of **advertising injury** to which this insurance applies.

---

Under Definitions, the following definitions are added.

**Definitions**

*Advertisement*

**Advertisement** means an electronic, oral, written or other notice, about goods, products or services, designed for the specific purpose of attracting the general public or a specific market segment to use such goods, products or services.

**Advertisement** does not include any e-mail address, Internet domain name or other electronic address or metalanguage.

RB00207
Exhibit 49, Page 238

### *Definitions*
*(continued)*

*Advertising Injury*

**Advertising injury** means injury, other than bodily injury, property damage or personal injury, sustained by a person or organization and caused by an offense of infringing, in that particular part of your **advertisement** about your goods, products or services, upon their:

- copyrighted **advertisement;** or
- registered collective mark, registered service mark or other registered trademarked name, slogan, symbol or title.

*Intellectual Property Law Or Right*

**Intellectual property law or right** means any:

- certification mark, copyright, patent or trademark (including collective or service marks);
- right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information;
- other right to, or judicial or statutory law recognizing an interest in, any expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade dress or other intellectual property; or
- other judicial or statutory law concerning piracy, passing off or similar practices.

All other terms and conditions remain unchanged.

*Authorized Representative*
November 12, 2021

RB00208
Exhibit 49, Page 239

CHUBB®    **Chubb Commercial Excess Follow-Form Insurance**

**Endorsement**

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

Under Exclusions, the following exclusion is added.

**Exclusions**

**Biological Agents**

A.  This insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of **biological agents**.

B.  This insurance does not apply to any damages, loss, cost or expense arising out of any:

1.  request, demand, order or regulatory or statutory requirement that any **insured** or others test for, monitor clean up, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any **biological agents**; or

2.  claim or proceeding by or on behalf of a governmental authority or others for damages or loss because of testing for, monitoring, clean up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of any **biological agents**.

Under Definitions, the following definition is added.

**Definitions**

**Biological Agents**

**Biological agents** means any:

A.  1.  bacteria;

2.  mildew, mold or other fungi;

3.  other microorganisms; or

4.  mycotoxins, spores or other by-products of any of the foregoing;

B.  viruses or other pathogens (whether or not a microorganism); or

RB00209
Exhibit 49, Page 240

**Definitions**

*Biological Agents*
*(continued)*

C.       colony or group of any of the foregoing.

All other terms and conditions remain unchanged.

*Authorized Representative* _____
November 12, 2021

RB00210
Exhibit 49, Page 241

CHUBB®    **Chubb Commercial Excess Follow-Form Insurance**

*Endorsement*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

---

A new section titled Terrorism Provisions is added to the end of this contract.

**Terrorism Provisions**

**Certified Act Of Terrorism Exclusion**

This insurance does not apply to any damages, loss, cost or expense arising, directly or indirectly, out of a **certified act of terrorism.**

**Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this policy, such as losses excluded by the Nuclear Energy exclusion.

---

A new section titled Terrorism Definitions is added.

**Terrorism Definitions**

**Certified Act Of Terrorism**

**Certified act of terrorism** means any act that is certified by the Secretary of the Treasury of the United States to be an act:

A.    of terrorism, a violent act or an act that is dangerous to human life, property or infrastructure; and

B.    that results in damage:

    1.    within the **United States; or**

    2.    outside of the **United States** in the case of:

        a.    an air carrier or vessel as described in the **terrorism law; or**

        b.    the premises of a mission of the United States of America,

which was committed by an individual or individuals as part of an effort to:

•    coerce the civilian population; or

---

Chubb Commercial Excess Follow-Form Insurance    Exclusion Of Certified Acts Of Terrorism
Form 07-02-1954 (Rev. 1-15)    Endorsement    Page 1 of 2

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

RB00211
Exhibit 49, Page 242

## *Terrorism Definitions*

| | |
|---|---|
| *Certified Act Of Terrorism* *(continued)* | •    influence the policy or affect the conduct of the Government, <br><br> of the **United States.** <br><br> **Certified act of terrorism** does not include an act that: <br><br> •    is committed as part of the course of a war declared by the Congress of the **United States;** or <br><br> •    does not result in property and casualty insurance losses that exceed $5 million in the aggregate and are attributable to all types of insurance subject to the **terrorism law.** |
| *State* | **State** means any state of the United States of America, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam each of the United State Virgin Islands, and nay territory or possession of the United States of America. |
| *Terrorism Law* | **Terrorism law** means the Terrorism Risk Insurance Act of 2002 as amended. |
| *United States* | **United States** means: <br><br> •    a state; and <br><br> •    the territorial sea and the continental shelf of the United States of America, as described in the **terrorism law.** |

All other terms and conditions remain unchanged.

Authorized Representative      _____
November 12, 2021

Chubb Commercial Excess Follow-Form Insurance      Exclusion Of Certified Acts Of Terrorism
Form 07-02-1954 (Rev. 1-15)      Endorsement      Page 2 of 2

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

RB00212
Exhibit 49, Page 243

# CHUBB®    *Chubb Commercial Excess Follow-Form Insurance*

## *Endorsement*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

---

Under Exclusions, the exclusion titled Asbestos is deleted.

## *Exclusions*

### *Asbestos*

---

Under Exclusions, the following exclusion is added.

## *Exclusions*

### *Asbestos, Silica Or Similar Compounds, Including Mixed Dust*

A.  This insurance does not apply to any damages, loss, cost or expense arising, in whole or in part, out of the actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of:

1.  **asbestos;**

2.  **silica;** or

3.  **mixed dust.**

B.  This insurance does not apply to any damages, loss, cost or expense arising, in whole or in part, out of any:

1.  demand, order, request or regulatory or statutory requirements that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess; or

2.  claim or proceeding by or on behalf of a governmental authority or others for any damages, loss, cost or expense because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing:

the effects of:

•  **asbestos;**

•  **silica;** or

RB00213
Exhibit 49, Page 244

## Exclusions

**Asbestos, Silica Or Similar Compounds, Including Mixed Dust** (continued)

• mixed dust.

---

## Definitions

**Asbestos**

Under Definitions, the definition titled asbestos is deleted.

---

## Definitions

Under Definitions, the following definitions are added.

**Asbestos**

**Asbestos** means asbestos in any form, including its presence or use in any alloy, by-product, compound or other material or **waste**.

**Mixed Dust**

**Mixed dust** means any combination or mixture of **asbestos** or **silica** and any other dust, fibers or particles, in any form, including any presence or use in any alloy, by-product, compound or other material or **waste**.

**Silica**

**Silica** means silica in any form (including silicates or other similar silicon compounds), including its presence or use in any alloy, by-product, compound or other material or **waste**.

**Waste**

**Waste** includes material to be recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

Authorized Representative

November 12, 2021

RB00214
Exhibit 49, Page 245

# CHUBB®  Chubb Commercial Excess Follow-Form Insurance

## Endorsement

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

---

**Limits Of Insurance**

**Products–Completed Operations Aggregate Limit**

Under Limits Of Insurance, the provision titled Products–Completed Operations Aggregate Limit is deleted.

---

**Limits Of Insurance**

**Other Aggregate Limit**

Under Limits Of Insurance, the provision titled Other Aggregate Limit is deleted and replaced by the following.

Subject to the Each Occurrence Limit, the Other Aggregate Limit is the most we will pay for the sum of amounts described as reducing Limits Of Insurance of this insurance (see Payments That Reduce The Limits Of Insurance section).

However, the Other Aggregate Limit of this policy will:

- not apply when all **underlying insurance** does not apply an aggregate limit; or

- apply in the same manner as the aggregate limit in **controlling underlying insurance** applies, provided all other **underlying insurance** also applies an aggregate limit in the same manner as **controlling underlying insurance**.

All other terms and conditions remain unchanged.

Authorized Representative
November 12, 2021

---

RB00215
Exhibit 49, Page 246

**CHUBB®**  **Chubb Commercial Excess Follow-Form Insurance**

*Endorsement*

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*   NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

Under Exclusions, the following exclusion is added:

**Exclusions**

*War*

This insurance does not apply to any damages, loss, cost or expense arising, directly or indirectly, out of:

- war, including undeclared or civil war;

- warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

- insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of the foregoing.

All other terms and conditions remain unchanged.

Authorized Representative

Date November 12, 2021

RB00216
Exhibit 49, Page 247

## CHUBB®  Chubb Commercial Excess Follow-Form Insurance

### Endorsement

| | |
|---|---|
| *Policy Period* | NOVEMBER 1, 2021    *To*    NOVEMBER 1, 2022 |
| *Effective Date* | NOVEMBER 1, 2021 |
| *Policy Number* | 7819-50-57 |
| *Insured* | RLC INDUSTRIES CO |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 12, 2021 |

Under Exclusions, the following exclusion is added.

## Exclusions

**Access To Or Disclosure Of Confidential Or Personal Information And Electronic Data-Related Liability With Exceptions**

This insurance does not apply to any damages, loss, cost or expense arising out of:

A.  any access to or disclosure of any person's or organization's confidential or personal information, including any patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information; or

B.  any loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in paragraph A. or B. above.

This exclusion does not apply to:

A.  physical:

1.  injury;

2.  sickness; or

3.  disease;

sustained by a person, including resulting death, humiliation, mental anguish, mental injury or shock at any time. All such loss shall be deemed to occur at the time of the physical injury, sickness or disease that caused it.

B.  physical injury to tangible property, including resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

Chubb Commercial Excess Follow-Form Insurance
Form 07-02-2850 (Ed. 3-21)

Exclusions – Access Or Disclosure And Electronic
Data-Related Liability With Exceptions
Endorsement (313873.2)                                    Page 1 of 2

RB00217
Exhibit 49, Page 248

## Exclusions

*Access To Or Disclosure Of Confidential Or Personal Information And Electronic Data-Related Liability With Exceptions (continued)*

Tangible property does not include any software, data or other information that is in electronic form.

All other terms and conditions remain unchanged.

*Authorized Representative*
*Date* November 12, 2021

RB00218
Exhibit 49, Page 249

# EXHIBIT D



## ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.
199 Water Street, 24 ʰ Floor, New York, NY 10038 • Tel (646) 794-0500 • Fax (646) 794-0611

FOLLOWING FORM EXCESS LIABILITY INSURANCE POLICY

Policy No: 0311-5913          New/Renewal of: 0311-5913

IN RETURN FOR PAYMENT OF THE MINIMUM AND ADVANCE PREMIUM STATED IN ITEM 7. (a) BELOW, IN RELIANCE UPON THE STATEMENTS IN THE DECLARATIONS BELOW, AND SUBJECT TO THE LIMITS OF INSURANCE, EXCLUSIONS, CONDITIONS AND OTHER TERMS OF THIS **POLICY**; THE **COMPANY** AGREES WITH THE NAMED **INSURED** DESIGNATED IN ITEM 1. (a) BELOW TO PROVIDE THE INSURANCE AS STATED IN THIS **POLICY**.

### DECLARATIONS

ITEM 1:      (a)   NAMED **INSURED**:          RLC Industries Co.
             (b)   ADDRESS:              3660 Gateway Street
                                         Springfield, OR 97477

ITEM 2.   POLICY PERIOD:             From: November 1, 2021 To: November 1, 2022
          [12:01 A.M. standard time at the address stated in Item 1. (b) above]

ITEM 3.   RETROACTIVE DATE:          N/A

ITEM 4.   LIMITS OF THIS INSURANCE:

          (a)   US$5,000,000       Each Occurrence Limit
          (b)   US$5,000,000       Products-Completed Operations Aggregate Limit
          (c)   US$5,000,000       Other Aggregate Limit (where applicable)

ITEM 5.   LIMITS OF **UNDERLYING EXCESS INSURANCE:**

          US$10,000,000       Each Occurrence Limit
          US$10,000,000       Products-Completed Operations Aggregate Limit
          US$10,000,000       Other Aggregate Limit (where applicable)

ITEM 6.   FOLLOWED POLICY:

          Company:            Markel American Insurance Company
          Policy Number:      MKLM6MM70000398
          Coverage:           Umbrella
          Policy Period:      From: November 1, 2021 To: November 1, 2022
          Limits of Liability:
          US$5,000,000        Each Occurrence Limit
          US N/A              Products-Completed Operations Aggregate Limit
          US$5,000,000        Other Aggregate Limit (where applicable)

ITEM 7:      (a)   MINIMUM AND ADVANCE PREMIUM:        
             (b)   MINIMUM EARNED PREMIUM:

GL 00139 00 (12/11)

Page 1 of 2

ITEM 8.        NOTICES TO THE **COMPANY**:

| | | |
|---|---|---|
| (a) | All notices of occurrence, claim, suit, or proceeding: | ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.<br>ATTN: CLAIMS DEPARTMENT<br>199 WATER STREET, 29TH FLOOR<br>NEW YORK, NY 10038 |

FACSIMILE:  646-794-0811
E-MAIL: AWACUS.GeneralCasualtyClaims@awac.com

| | | |
|---|---|---|
| (b) | All other notices: | ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.<br>ATTN: GENERAL CASUALTY<br>199 WATER STREET, 24TH FLOOR<br>NEW YORK, NY 10038 |

FACSIMILE:  646-794-0611

| | | | |
|---|---|---|---|
| ITEM 9: | (a) | Representative of **Insured**: | Aon Risk Insurance Services West, Inc. |
| | (b) | Address: | 851 SW 6th Avenue, Suite 550<br>Portland, OR 97204-1309 |

**Date of Issuance: February 3, 2022**

In Witness Whereof, the Insurer has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

President                    Asst. Secretary

_____
     **AUTHORIZED REPRESENTATIVE**

GL 00139 00 (12/11)

RB00220
Exhibit 49, Page 252

**Policy Number: 0311-5913**

**Named Insured: RLC Industries Co.**
Effective Date: November 1, 2021
12:01 A.M., Standard Time

<u>**SCHEDULE OF FORMS AND ENDORSEMENT**</u>

The following forms and endorsements are made a part of this Policy:

| Endorsement Number | Form # / Edition | Title |
|---|---|---|
| | GL 00139 00 (12/11) | **AWAC - U.S. Follow-Form Occurrence - Claims-Made Declarations** |
| 1 | GL 00323 00 (05/09) | **Schedule of Underlying Insurance** |
| 2 | 00136 (11/05) | **U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholders** |
| 3 | 00142 (11/05) | **Exclusion Of Designated Professional Services** |
| 4 | 00158 (11/05) | **Cancellation** |
| 5 | 00241 (11/05) | **Asbestos Exclusion** |
| 6 | 00275 (03/12) | **Service of Suit** |
| 7 | GL 00113 00 (09/07) | **Unimpaired Aggregate** |
| 8 | GL 00267 00 (01/15) | **Exclusion of Certified Acts of Terrorism and Other Acts of Terrorism** |
| 9 | GL 00621 00 (07/20) | **Communicable Disease And Infectious Agent Exclusion** |
| | GL 00126 00 (06/07) | **Policy Form** |

**Endorsement No.: 1**

This Endorsement, effective: November 1, 2021

(at 12:01 A.M. prevailing time at the address stated in Item 1. (b) of the Declarations)

forms a part of Policy No.: 0311-5913

Issued to: RLC Industries Co.

By: Allied World Assurance Company (U.S.) Inc.

# SCHEDULE OF UNDERLYING INSURANCE

| Type of Coverage | Insurer<br>Policy Number<br>Policy Period | Limits of Insurance | |
|---|---|---|---|
| Excess Follow Form | Federal Insurance Company<br>7819-50-57<br>November 1, 2021 -<br>November 1, 2022 | US$5,000,000<br>US$5,000,000 | Each Occurrence<br>Aggregate (Where Applicable) |

Defense costs:

☐ Erode  ☐ Do Not Erode

Follows Schedule of Underlying Insurance.

| | | | |
|---|---|---|---|
| Umbrella | Markel American Insurance Company<br>MKLM6MM70000398<br>November 1, 2021 -<br>November 1, 2022 | US$5,000,000<br>US$5,000,000 | Each Occurrence<br>Aggregate |

Defense costs:

☐ Erode  ☒ Do Not Erode

The Limits of Insurance listed in the policy above.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:**

**Joseph Cellura**

**Title:  President, North American Casualty Division**

**Date of Issuance: February 3, 2022**

RB00222
Exhibit 49, Page 254

**Endorsement No.: 2**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of this **policy**.

This Notice provides information concerning the possible impact on this **policy's** coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that the Named **Insured** or any other **insured**, or any person or entity claiming the benefits of this **policy** has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this **policy** will be considered a blocked or frozen contract and all provisions of this **policy** are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**Allied World Assurance Company (U.S.) Inc.**

**By:**

_____
**Joseph Cellura**

Title: **President, North American Casualty Division**

**Date of Issuance: February 3, 2022**

RB00223
Exhibit 49, Page 255

**Endorsement No.: 3**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.


# EXCLUSION OF COVERAGE FOR DESIGNATED PROFESSIONAL SERVICES


It is agreed that this **policy** does not provide coverage for any liability, **loss**, cost or expense resulting directly, or indirectly, from or arising in whole, or in part, out of any breach of duty or negligent act, error, omission, malpractice or mistake in the rendering of, or failure to render, any professional services designated below:

Excluded Professional Services

Manufactures Errors and Omissions – Huber Wood Zip System


All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:**

_____
     **Joseph Cellura**

**Title:** **President, North American Casualty Division**

**Date of Issuance: February 3, 2022**

RB00224
Exhibit 49, Page 256

**Endorsement No.: 4**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# CANCELLATION

It is agreed that under Section V – Conditions, paragraph 2. of Condition B. Cancellation is deleted in its entirety and replaced by the following:

2.    The **company** may cancel this **policy** by delivering to the first Named **Insured,** or by mailing to the first Named **Insured** (by registered, certified, or other first class mail), at the address stated in Item 1. (b) of the Declarations, written notice, not less than Thirty (30) days [or Ten (10) days in the event any premium is not paid when due], in advance of the cancellation date. Proof of mailing of such notice to the first Named **Insured** at the address stated in Item 1. (b) of the Declarations will be sufficient proof of notice.


All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:**

_____

**Joseph Cellura**

**Title:  President, North American Casualty Division_____**

**Date of Issuance: February 3, 2022**

RB00225
Exhibit 49, Page 257

**Endorsement No.: 5**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# ASBESTOS EXCLUSION

It is agreed that this **policy** does not provide coverage for:

A.  Any liability, **loss**, cost or expense based upon, resulting directly, or indirectly, from, arising in whole, or in part, out of or in any way involving the mining, manufacture, distribution, sale, installation, removal, utilization, ingestion, inhalation or existence of, or exposure to, asbestos in any form or any products or materials containing asbestos; or

B.  Any **loss**, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, asbestos in any form or any products or materials containing asbestos, by any **insured** or by any other person or organization.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:** _____

**Joseph Cellura**

**Title:  President, North American Casualty Division**

**Date of Issuance: February 3, 2022**

RB00226
Exhibit 49, Page 258

**Endorsement No.: 6**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# SERVICE OF SUIT

It is agreed that the following condition is added to Section V – Conditions of this **policy**:

Service Of Suit
In the event of failure of the **company** to pay any amount claimed to be due hereunder, the **company**, at the request of the **insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the **company's** rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon counsel, Legal Department, Allied World Assurance Company, 199 Water Street, 24 [h] Floor, New York, NY 10038 or his or her representative, and that in any suit instituted against the **company** upon this **policy**, the **company** will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the **company** hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office, as its true and lawful agent upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the **insured** or any beneficiary hereunder arising out of this **policy** of insurance and hereby designates the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:** _____

**Joseph Cellura**

Title: **President, North American Casualty Division**

**Date of Issuance: February 3, 2022**

00275 (03/12)

Page 1 of 1

RB00227
Exhibit 49, Page 259

**Endorsement No.: 7**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# UNIMPAIRED AGGREGATE

It is agreed that the **underlying limits**, where applicable, shall not be impaired at the attachment date of this **policy**, and for the purpose of this insurance only **losses** taking place during the term of this **policy** shall be considered in determining the extent of any exhaustion of the **underlying limits**.

It is further agreed that this **policy** will not become excess of any reduced or exhausted **underlying limits** to the extent such reduction or exhaustion is the result of claims, damage or to **loss** excluded by this **policy**.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:** _____
        **Joseph Cellura**

**Title:  President, North American Casualty**
         **Division**
         _____

**Date of Issuance: February 3, 2022**

RB00228
Exhibit 49, Page 260

**Endorsement No.: 8**
This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM

It is agreed that this **policy** does not provide coverage for any liability, **loss**, cost or expense resulting directly, or indirectly, from or arising in whole, or in part, out of a **certified act of terrorism** or an **other act of terrorism**.

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

a.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed  by an  individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**Other act of terrorism** means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals outside of the United States (including its territories and possessions and Puerto Rico) that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act, as now constituted or hereafter amended.

With respect to an **other act of terrorism**, this exclusion applies only when one or more of the following are attributed to such act:

a.   The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, the **company** will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions;

b.   Fifty (50) or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

1.   Physical injury that involves a substantial risk of death;

2.   Protracted and obvious physical disfigurement; or

3.   Protracted loss of or impairment of the function of a bodily member or organ;

GL 00267 00 (01/15)

Page 1 of 2

RB00229
Exhibit 49, Page 261

c.  The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination;

d.  The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

e.  Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs a. and b. describe the thresholds used to measure the magnitude of an incident of an **other act of terrorism** and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:**

**Joseph Cellura**

**Title:  President, North American Casualty Division**

**Date of Issuance: February 3, 2022**

GL 00267 00 (01/15)

RB00230
Exhibit 49, Page 262

**Endorsement No.: 9**

This Endorsement, effective: November 1, 2021
(at 12:01 A.M. prevailing  time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.: 0311-5913
Issued to: RLC Industries Co.
By: Allied World Assurance Company (U.S.) Inc.

# COMMUNICABLE DISEASE AND INFECTIOUS AGENT EXCLUSION

Notwithstanding any other provision of this **policy**, it is agreed that this **policy** does not provide coverage for any liability, **loss**, injury, damage, cost or expense resulting directly, or indirectly, from or arising in whole, or in part, out of, or relating in any way to:

1. any **Communicable Disease** or **Infectious Agent**; or

2.  any loss, cost or expense relating to the testing, monitoring, sanitizing, clean-up, removal, containment, treatment, disposal, replacement, rehabilitation of, or responding in any way to, real or personal property due to actual or suspected contamination by a **Communicable Disease** or **Infectious Agent**.

This exclusion applies even if the claims against any **insured** allege negligence or other wrongdoing, breach of duty or violation of law in:

a.  supervising, hiring, employing, training or monitoring of others that may be a host or carrier of an **Infectious Agent** or infected with a **Communicable Disease**;

b.  testing or failure to test for an **Infectious Agent** or **Communicable Disease**;

c.  failure to prevent or limit the spread of an **Infectious Agent** or **Communicable Disease**;

d.  failure to warn or inadequacy of any warnings or instructions related to the actual or potential presence of an **Infectious Agent** or **Communicable Disease**;

e.  failure to report the presence of a known or suspected **Infectious Agent** or **Communicable Disease** to a governing authority or organization; or

f.  any other measures taken in response to the actual or suspected presence of an **Infectious Agent** or **Communicable Disease**.

Solely for the purpose of this endorsement, SECTION VI - DEFINITIONS is amended to include the following additional definitions:

**Communicable Disease** means any disease, illness or bodily condition caused by the direct or indirect transmission by any means of or exposure to an **Infectious Agent**.

**Infectious Agent** means any bacteria, virus, toxin, parasite or other organism or biological entity capable of causing a **Communicable Disease** or exacerbating or accelerating an existing bodily condition or illness.

It is understood that to the extent any coverage may otherwise be provided under this **policy** and its endorsements, the provisions of this exclusion shall be applicable and shall supersede any such other provisions.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

RB00231
Exhibit 49, Page 263

By:

_____

**Joseph Cellura**

Title:  **President, North American Casualty
Division**

_____

**Date of Issuance: February 3, 2022**

RB00232
Exhibit 49, Page 264

## POLICYHOLDER DISCLOSURE STATEMENT
### UNDER THE
### TERRORISM RISK INSURANCE ACT

The **insured** is hereby notified that under the federal Terrorism Risk Insurance Act, as amended, (the "Act"), the **insured** has a right to purchase insurance coverage for **losses** arising out of an Act of Terrorism, as defined in Section 102(1) of the Act.  The term "act of terrorism" means any act certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside of the United States in case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The **insured** should read the Act for a complete description of its coverage.  The Secretary's decision to certify or not to certify an event as an Act of Terrorism covered by the Act is final and not subject to review.

Coverage provided by this **policy** for **losses** caused by a Certified Act of Terrorism may be partially reimbursed by the United States Government under a formula established by federal law.  However, the **insured's policy** may contain other exclusions that might affect coverage, such as an exclusion for nuclear events.  Under the formula, the United States Government will generally reimburse 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism **losses** exceeding a statutorily established deductible that must be met by the **company**, and which deductible is based on a percentage of the **company's** direct earned premiums for the year preceding the Certified Act of Terrorism.

Be advised that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap on all losses resulting from Certified Acts of Terrorism.  If aggregate insured losses attributable to Certified Acts of Terrorism exceed $100 billion in a calendar year, the United States Government shall not make any payment for any portion of the amount of such loss that exceeds $100 billion. If aggregate insured losses attributable to Certified Acts of Terrorism exceed $100 billion in a calendar year and the **company** has met its deductible under the Act, the **company** shall not be liable for payment of any portion of the losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Coverage for "insured losses" as defined in the Act is subject to the coverage terms, conditions, amounts and limits in this **policy** applicable to **losses** arising from events other than Certified Acts of Terrorism.

The **insured** should know that under federal law, the **insured** is not required to purchase coverage for **losses** caused by Certified Acts of Terrorism.

Please indicate the selection of the **insured** below.

___The **insured** hereby elects to purchase coverage in accordance with the Act for a premium of $2,100.00.

___The **insured** hereby rejects coverage and accepts reinstatement of the exclusion in accordance with the Act.

| | |
|---|---|
| _____ | RLC Industries Co. |
| **Signature of insured** | |
| | |
| _____ | 0311-5913 |
| **Print/Title** | |
| | |
| _____ | |
| **Date** | |

RB00233
Exhibit 49, Page 265

**ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.**

# FOLLOWING FORM EXCESS LIABILITY INSURANCE POLICY

Words and phrases that appear in **bold** print have special meanings that are defined under Section VI – Definitions of this **policy**. If the Followed Policy listed in Item 6. of the Declarations has defined a word or phrase, this **policy** will follow that definition unless this **policy** expressly defines such word or phrase, in which case the meaning given to such word or phrase in this **policy** will apply. Please read the entire **policy** and the Followed Policy listed in Item 6. of the Declarations carefully.

SECTION I - INSURING AGREEMENT

A. Subject to all the warranties, terms, conditions, exclusions and limitations applicable to this **policy**, the **company** shall pay, on behalf of the **insured**, that part of **loss**, to which this **policy** applies, which exceeds the applicable **underlying limits**. This **policy** does not provide coverage for any part of **loss** within **underlying limits**, or any related cost or expenses.

B. This **policy** only applies if the **triggering event** that must happen during the policy period of the Followed Policy happens during the Policy Period, as stated in Item 2. of the Declarations, of this **policy**.

C. This **policy** does not provide coverage for any:
   1. Injury or damage that occurs;
   2. Accident that occurs;
   3. Offense that was committed; or
   4. Act, error or omission that occurs;

   Before the Retroactive Date, if any, stated in Item 3. of the Declarations of this **policy**.

D. This **policy** will follow the warranties, terms, conditions, exclusions and limitations that are contained in the Followed Policy listed in Item 6. of the Declarations unless a warranty, term, condition, exclusion or limitation contained in this **policy**:

   1. Differs from a warranty, term, condition, exclusion or limitation of the Followed Policy; or
   2. Is not contained in the Followed Policy;
   In which case, such warranty, term, condition, exclusion or limitation of this **policy** will apply, to the extent that it provides less coverage than the Followed Policy.

E. Regardless of any other warranties, terms, conditions, exclusions or limitations of this **policy**, if any policy of **underlying excess insurance** does not cover **loss** for reasons other than exhaustion of its applicable limit of liability by payment of claims, then this **policy** will not cover such **loss**.

F. The **company** has no obligation under this **policy** with respect to any claim, suit or proceeding settled without its prior written consent.

G. If the **company** is prevented by law from paying on behalf of the **insured** for coverage provided under this **policy**, then the **company** will indemnify the **insured**.

H. Other than as provided under Section II - Defense And Supplementary Payments of this **policy**, the **company** will have no other obligation or liability to pay sums or perform acts or services under this **policy**.

SECTION II - DEFENSE AND SUPPLEMENTARY PAYMENTS

Subject to all the warranties, terms, conditions, exclusions and limitations applicable to this **policy**:

A. The **company** shall have the right, but not the duty, to assume charge of the investigation, settlement or defense of any claim made, suit brought, or proceeding instituted against any **insured** upon exhaustion of the applicable **underlying limits**. If the **company** has exercised such

RB00234
Exhibit 49, Page 266

right, it will not investigate, settle or defend any claim, suit or proceeding after it has exhausted the applicable Limit Of Insurance of this **policy** as stated in Item 4. of the Declarations. If the **company** does not exercise such right, or if the applicable **underlying limits** are not exhausted, the **company** will have the right, and will be given the opportunity, to associate effectively with the **insured** or any underlying insurer, or both, in the investigation, settlement or defense of any claim, suit or proceeding that is likely to involve this **policy**. In such event, the **insured**, the underlying insurer, and the **company** shall cooperate in the investigation, settlement or defense of such claim, suit or proceeding.

B.  The company will only pay the following defense and supplementary expenses:

    1.  Interest that accrues on a judgment after entry of the judgment and before the company has paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit Of Insurance of this policy;

    2.  Reasonable attorney fees and other reasonable investigation, loss-adjustment or litigation expenses incurred directly by the company or by the insured, with the company's consent;

    3.  The cost of bonds required to:
       i.  Appeal judgments (in connection with the initiation and continuation of any appeal agreed to by the company); or
       ii.  Release attachments;
    But only for bond amounts within the applicable Limit Of Insurance of this **policy**; and

    4.  Pre-judgment interest on that part of a judgment within the applicable Limit Of Insurance of this **policy**; however, if the **company** makes an offer to pay the applicable Limit Of Insurance prior to judgment, it will not pay any pre-judgment interest that accrues after its offer.

B.  When defense or supplementary payments do not reduce any of the **underlying limits** provided by **underlying excess insurance**, then any such expense payment made

under this **policy** will not reduce the Limits Of Insurance provided by this **policy**.

**SECTION III -** WHO IS AN INSURED

The following persons and organizations qualify as **insureds**:

A.  The Named **Insured** designated in Item 1. (a) of the Declarations;

B.  Any person or organization (other than a person or organization included in C. below) qualifying as an insured in every policy of **underlying excess insurance** and every applicable policy of **underlying primary insurance**; and

C.  Any person or organization to whom any person or organization included in paragraph A. or B. above is obligated by virtue of a written contract or written agreement (other than a contract or policy of insurance) to provide insurance such as is afforded by this **policy**, but:

    1.  Only if such person or organization qualifies as an insured in every policy of **underlying excess insurance** and every applicable policy of **underlying primary insurance**; and

    2.  Only to the extent of such obligation and no further.

SECTION IV - LIMITS OF INSURANCE

A.  The Limits Of Insurance of this **policy** stated in Item 4. of the Declarations and the rules below determine the most the **company** will pay for **loss**, regardless of the number of:

    1.  **Insureds**;
    2.  Claims made, suits brought, or proceedings instituted;
    3.  Persons or organizations making claims, bringing suits, or instituting proceedings;
    4.  Vehicles involved; or
    5.  Coverages provided under this **policy**.

B.  The Limits Of Insurance of this **policy** will apply only in excess of the **underlying limits.**

C.  The Each Occurrence Limit stated in Item 4. (a) of the Declarations is the most the

RB00235
Exhibit 49, Page 267

company will pay for **loss** arising out of any one occurrence. Any amount paid for **loss** will reduce the amount of the applicable aggregate Limit Of Insurance of this **policy** available for any other payment. If the applicable aggregate Limit Of Insurance of this **policy** has been reduced to an amount that is less than the Each Occurrence Limit stated in Item 4. (a) of the Declarations, the remaining amount of such aggregate Limit Of Insurance is the most that will be available for any other payment.

D. Subject to the Each Occurrence Limit stated in Item 4. (a) of the Declarations, the Products-Completed Operations Aggregate Limit stated in Item 4. (b) of the Declarations is the most the **company** will pay for **loss** under the products-completed operations hazard, as that hazard is defined in the Followed Policy.

E. Subject to the Each Occurrence Limit stated in Item 4. (a) of the Declarations, the Other Aggregate Limit stated in Item 4. (c) of the Declarations is the most the **company** will pay for **loss** under this **policy**, except **loss**:

   1. Included in the products-completed operations hazard, as that hazard is defined in the Followed Policy; or
   2. Otherwise covered by the Folloed Policy but to which no aggregate limit in the Followed Policy applies, but only if all other underlying excess insurance also does not apply an aggregate limit to such loss.

F. Subject to paragraphs C., D., and E. above, if the **underlying limits** have been reduced by payment of **loss** to which this **policy** would also apply (but for the existence of such **underlying limits**), then this **policy** will drop down to become immediately excess of the reduced **underlying limits**, but only if all **underlying excess insurance** applies to such **loss** and also drops down.

G. **Underlying limits** will not be reduced by:

   1. The insolvency of, or unwillingness to pay by, any insurer;
   2. The uncollectibility of any self-insured retention, deductible or other alternative risk-financing mechanism;

3. Any **insured's** failure to pay any allocation, deductible, participation, retention, or other self-insurance;
4. The existence of a sub-limit of liability in any **underlying excess insurance**;
5. Cancellation, expiration or recision of any **underlying primary insurance** or **underlying excess insurance**;
6. Defense or supplementary expense payments, unless the Schedule Of Underlying Insurance of this **policy** specifies that the applicable limits of **underlying excess insurance** are reduced by such payments; or
7. Any **underlying excess insurance** containing a warranty, term, condition, exclusion or limitation different from the Followed Policy or this **policy**.

H. If after issuance, the Policy Period of this **policy**, stated in Item 2. of the Declarations, is extended, then the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance of this **policy**.

SECTION V - CONDITIONS

A. Appeals
   The **company** may, at its option, initiate or continue an appeal of a judgment against any **insured** if the judgment is for more than the **underlying limits.** If the **company** initiates or continues an appeal, it will pay its costs of the appeal subject to Section II – Defense And Supplementary Payments. In no event will the amount the **company** pays for **loss** exceed the Limits Of Insurance of this **policy**.

B. Cancellation
   1. The first Named **Insured** designated in item 1. (a) of the Declarations may cancel this **policy** by mailing or delivering to the **company,** at the address stated in Item 8. (b) of the Declarations, advance written notice stating when such cancellation is to take effect.

   2. The **company** may cancel this **policy** by delivering to the first Named **Insured,** or by mailing to the first Named **Insured** (by registered, certified, or other first class mail), at the address stated in Item 1. (b) of the Declarations, written notice,

RB00236
Exhibit 49, Page 268

not less than thirty (30) days [or ten (10) days in the event any premium is not paid when due], in advance of the cancellation date. Proof of mailing of such notice to the first Named **Insured** at the address stated in Item 1. (b) of the Declarations will be sufficient proof of notice.

3. The Policy Period of this **policy** will end on the date and hour specified in the cancellation notice.

4. If the **insured** cancels this **policy**, the **company** will be due the greater of either;

    a) The sum of:
       i. The earned amount of the Minimum And Advance Premium stated in Item 7. (a) of the Declarations; plus
       ii. 10% of the unearned amount of the Minimum And Advance Premium stated in Item 7. (a) of the Declarations; or
    b) The Minimum Earned Premium, if any, stated in Item 7. (b) of the Declarations

After deduction of the amount due the **company** as determined above, the remaining amount of any unearned premium previously paid to the **company** will be returned to the first Named **Insured**.

5. If this **policy** is cancelled by the **company**, then the **company** shall return the pro rata portion of any unearned premium, previously paid to the **company**, to the first Named **Insured**.

6. Payment or tender of any unearned premium by the **company** will not be a condition precedent to the effectiveness of cancellation, but the **company** shall make such payment as soon as practicable. The **company's** check or its representative's check, mailed or delivered to the first Named **Insured**, will be sufficient tender of any refund due any **insured**.

7. Any of these provisions that conflict with a law that controls the cancellation of this

**policy** is changed by this paragraph to comply with that law.

C. Changes
Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver or change in any part of this **policy**. This **policy** can be changed only by a written Endorsement that becomes part of this **policy**. The Endorsement must be signed by one of the **company's** authorized representatives.

D. Changes In Followed Policy
If during the Policy Period of this **policy**, the warranties, terms, conditions, exclusions or limitations of the Followed Policy are changed in any manner from those in effect on the inception date of this **policy**, the **insured** shall, as a condition precedent to its rights under this **policy**, give to the **company** at the address stated in Item 8. (b) of the Declarations written notice of the full particulars of such changes as soon as practicable.

This **policy** will follow such changes upon the effective date of the changes in the Followed Policy, but only if:

1. The **company** agrees to follow such changes by written Endorsement that becomes a part of this **policy;**
2. The **insured** agrees to any amendment of the warranties, terms, conditions, exclusions or limitations of this **policy** required by the **company** relating to such changes; and
3. The **insured** pays when due any additional premium required by the **company** relating to such changes.

E. Compliance
The **company** has no duty to provide coverage under this **policy** unless the Named **Insured** and any other involved **insured** have fully complied with all the warranties, terms and conditions of this **policy.**

F. Duties In The Event Of Occurrence, Claim Or Suit
1. The **insured** shall, as a condition precedent to the obligations of the **company** under this **policy**, give written notice as soon as practicable to the

RB00237
Exhibit 49, Page 269

**company** at the address stated in Item 8. (a) of the Declarations of any occurrence, claim, suit or proceeding that involves or is likely to involve **underlying excess insurance**. Notice to an underlying insurer shall not constitute notice to the **company**.

2. Without limiting the requirements of paragraph 1. above, the Named **Insured** shall separately and as soon as practicable give written notice to the **company** when a payment is made or reserve established for any occurrence, claim, suit or proceeding that has brought the total of all payments and reserves by the **insured** or any underlying insurers to a level of twenty-five (25%) or more of any of the **underlying limits**.

3. In the event the **underlying limits** are exhausted, no **insured** will, except at that **insured's** own cost, make any payment, assume any obligation, or incur any expense without the **company's** consent.

4. If applicable **underlying excess insurance** imposes any duties, responsibilities, or obligations on any **insured** in the event of "injury," "damage," "offense," "accident," "disease," "act, error or omission," or such similar event, then the duties specified in this condition will also apply in the event of "injury," "damage," "offense," "accident," "disease," "act, error or omission," or such similar event.

With respect to the duties specified in this condition, the word or phrase "injury," "damage," "offense," "accident," "disease," "act, error or omission," or such similar event will have the same meaning that it has with respect to such applicable **underlying excess insurance.**

G. First Named **Insured**
The person or organization first named in Item 1. (a) of the Declarations is responsible for payment of all premiums due under this **policy**. The first Named **Insured** will act on behalf of all other **insureds** for the giving and receiving of any notice of cancellation or nonrenewal and the receiving of any return premiums that become payable under this **policy**.

H. Maintenance Of Underlying Insurance And **Underlying Limits**
The **company** has issued this **policy** in reliance upon representations made by the Named **Insured** about **underlying excess insurance**, **underlying primary insurance**, and the **underlying limits**. The Named **Insured** must see to it that:

1. **Underlying excess insurance** and **underlying primary insurance** are and remain valid and in full force and effect;

2. **Underlying excess insurance** and **underlying primary insurance** will not be cancelled, non-renewed, or rescinded without replacement of coverage to which the **company** agrees in writing;

3.The warranties, terms, conditions, exclusions and limitations of **underlying excess insurance** and **underlying primary insurance** will not materially change unless the **company** agrees in writing otherwise;

4.The warranties, terms, conditions, exclusions and limitations of renewals or replacements of **underlying excess insurance** will be materially the same as the prior coverage, unless the **company** agrees in writing otherwise;

5. The **underlying limits** are and remain available, regardless of any bankruptcy, insolvency or other financial impairment of any insurer or any other person or organization;

6. The **underlying limits** will not be reduced, except for the reduction by payment of **loss** to which this **policy** also would apply but for the existence of such **underlying limits**.

Failure to comply with this condition will not invalidate this **policy**, but in the case of any such failure, the **company's** obligation or liability will not exceed that which would have applied absent any failure to comply with this condition.

RB00238
Exhibit 49, Page 270

The Named **Insured** must notify the **company** as soon as possible if any **underlying excess insurance** or **underlying primary insurance** is no longer valid or no longer in full force and effect.

I.  Other Insurance
    This **policy** will apply in excess of all **other insurance.**

J.  Premium

    1.  At the beginning of the Policy Period, stated in Item 2. of the Declarations, of this **policy**, the first Named **Insured** must pay the **company** the Minimum And Advance Premium stated in Item 7. (a) of the Declarations for this **policy.**

    2.  The Minimum Earned Premium, if any, stated in Item 7. (b) will be deemed to be 100% earned from the inception date of the Policy Period of this **policy**.

    3.  The Minimum And Advance Premium is subject to adjustment if:
        a)  The premium of the Followed Policy is adjusted; or
        b)  An Endorsement describing such adjustment is attached to this **policy**.

    4.  In no event, however, will the adjusted premium be less than the greater of:

        a)  The Minimum And Advance Premium for this **policy** stated in Item 7. (a) of the Declarations; or
        b)  The Minimum Earned Premium, if any, stated in Item 7. (b) of the Declarations.

K.  Representations
    The **company** has issued this **policy** based, and in reliance, upon representations made by the **insured** and by the **insured's** representatives to the **company**. Unintentional failure of an employee of the **insured** to disclose a hazard or other material information will not violate this condition, unless an officer (whether or not an employee) of any **insured** or an officer's designee knows about such hazard or other material information.

SECTION VI – DEFINITIONS

**Company** means the company shown in the Declarations that is providing this **policy**.

**Insured** means a person or an organization qualifying as an insured in Section III – Who Is An Insured of this **policy**.

**Loss** means damages that the **insured** becomes legally obligated to pay because of injury or damage, after making proper deductions for all recoveries and salvage. If defense or supplementary payments reduce any of the **underlying limits** provided by **underlying excess insurance,** then any defense or supplementary payments made under Section II - Defense And Supplementary Payments of this **policy** will be included within the meaning of **loss** and will reduce the Limits Of Insurance of this **policy**.

**Other insurance** means valid and collectible insurance providing coverage for **loss** that is covered in whole or in part by this **policy** (or that would be covered in whole or in part by this **policy,** but for the existence of the **underlying limits**). However**, other insurance** does not include **underlying excess insurance**, **underlying primary insurance**, or any policy of insurance specifically purchased to be excess of this **policy** affording coverage that this **policy** also affords.

**Policy** means the various sections of this contract as well as the Declarations and any Endorsements and Schedules made a part of this contract by reference.

**Triggering event** means:
1.  With respect to any coverage provided by the Followed Policy on an occurrence basis, when:
    a)  The injury or damage occurs; or
    b)  The offense is committed;
    As determined by the provisions of such coverage under the Followed Policy;
2.  With respect to any coverage provided by the Followed Policy on a claims-made basis, when the claim is first made as determined by the provisions of such coverage under the Followed Policy.

**Underlying excess insurance** means the insurance described in the Schedule Of Underlying Insurance of this **policy** as well as the next applicable renewal or replacement, or

RB00239
Exhibit 49, Page 271

any applicable antecedent, of the described insurance.

**Underlying primary insurance** means any insurance (including the next applicable renewal or replacement, or any applicable antecedent, thereof) that underlies the **underlying excess insurance**. **Underlying primary insurance** does not include insurance that is described in the Schedule Of Underlying Insurance of this **policy**.

**Underlying limits** mean the sum of:

1.  The remaining amount of **underlying excess insurance**, including the remaining amount of any allocation, deductible, participation, retention, or other self-insurance that is included within the limits of **underlying excess insurance**;
2.  The remaining amount of any applicable **underlying primary insurance,** including the remaining amount of any allocation, deductible, participation, retention, or other self-insurance that is included within the limits of any applicable **underlying primary insurance**;

3.  Any reinstatement of limits or supplemental or other limits available under the insurance described in items 1. and 2. above;
4.  Any amounts that any **insured** must pay because **underlying excess insurance** or **underlying primary insurance**, as represented by the **insured**, is not available for any reason other than reduction or exhaustion of such insurance as specified under paragraph F. of Section III – Limits Of Insurance;
5.  Any applicable **other insurance**;
6.  The remaining amount of any applicable self-insured retention, deductible or other alternative risk-financing mechanism, which immediately underlies the **underlying excess insurance** and which is not included within the limits of **underlying excess insurance** or **underlying primary insurance**; and
7.  The remaining amount of any applicable self-insured retention, deductible or other alternative risk-financing mechanism, which underlies the **underlying primary insurance** and which is not included within the limits of **underlying primary insurance**.

RB00240
Exhibit 49, Page 272

# EXHIBIT E

# COMMERCIAL EXCESS LIABILITY DECLARATIONS

Everest National Insurance Company
Warren Corporate Center
100 Everest Way, Warren, NJ 07059
1-800-438-4375

**POLICY NUMBER:** XC2EX00126-211                    **RENEWAL OF:** New

**PRODUCER NAME:** Aon Risk Services Companies, Inc
**ADDRESS:** 707 Wilshire Boulevard
Suite 2600
Los Angeles, CA  90017

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**ITEM 1.** **NAMED INSURED:** RLC Industries Co.

**ADDRESS:** 3660 Gateway St.

Springfield, OR 97477

**ITEM 2.** **POLICY PERIOD:** **FROM** 11/1/2021 **TO** 11/1/2022
12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3.** **COVERAGE:** Commercial Excess Liability

**ITEM 4.** **LIMITS OF INSURANCE:**
The Limits of Insurance, subject to all the terms of this Policy are:
$        10,000,000  Each "Occurrence"
$        10,000,000  Annual Aggregate(s), Where Applicable (as defined in the "First Underlying Insurance" Policy(ies) Excess of Underlying

**ITEM 5.** **"UNDERLYING INSURANCE"**

**A. First Underlying Insurance Policy(ies) Insurer**          **Policy No.**          **Policy Period**

As per attached Schedule of Underlying Insurance

**B. Other Underlying Insurance Policy(ies) Insurer**          **Policy No.**          **Policy Period**

As per attached Schedule of Underlying Insurance

**ITEM 6.** **POLICY PREMIUM:**
Advanced Premium                    Minimum Premium                    Minimum Earned Premium
███████                             ███████                            ███████

Estimated Exposure                  Rate Per                           Audit Period
N/A                                 N/A                                N/A

ECVS EX DEC 001 02 07                                                  Page 1 of 3

RB00241
Exhibit 49, Page 274

**ITEM 7.**  **NOTICES**                            Everest National Insurance Company
In the event of an "Occurrence", claim or    Warren Corporate Center
"Suit", send all pertinent facts to:         100 Everest Way, Warren, NJ 07059
                                             1-800-438-4375

**ITEM 8.**  **FORMS AND ENDORSEMENTS APPLICABLE TO THIS POLICY ON THE ORIGINAL DATE OF ISSUE:**

| Title | Form No. |
|---|---|
| Exclusion of Certified Acts of Terrorism | CU 21 33 01 15 |
| Commercial Excess Liability Declarations (Everest National Insurance Company) | ECVS EX DEC 001 02 07 |
| Commercial Excess Liability Schedule Of Underlying Insurance | ECVS EX DEC 003 05 06 |
| Company Signature Page (Everest National Insurance Company) | EIL 00 515 03 07 |
| Common Policy Conditions | IL 00 17 11 98 |
| Exclusion- Violation of Statutes that Govern E-mails, Fax, Phone Call or Methods of Sending Material or Information | EUM 00 513 05 09 |
| Commercial Excess Liability Coverage Form | EUM 00 522 02 07 |
| Exclusion - Organic Pathogen, Mold Or Fungus | EUM 21 601 04 06 |
| Exclusion - Designated Professional Services | EUM 21 749 05 06 |
| Exclusion - Coverage Provided By Underlying Insurance At Sub-Limits | EUM 21 874 04 09 |
| Exclusion - Access Or Disclosure Of Confidential Or Personal Information | EUM 21 902 05 14 |
| Exclusion - Continuing Or Progressive Injury or Damage | EUM 22 528 05 06 |
| Wildfire Exclusion | EUM 24 644 02 19 |
| Non Follow Form Over First Underlying Insurance Coverage Part | EUM 22 1002 06 20 |
| Communicable Disease Exclusion | EUM 03 316 03 20 |

ECVS EX DEC 001 02 07                                              Page 2 of 3

RB00242
Exhibit 49, Page 275

Industrial Aid Aircraft--$315M SIR                                    EUM 24 635 02 19


Designated Products Exclusion-Formaldehyde                            EUM 21 574 05 06


Exclusion - Lead                                                     EUM 21 609 04 06


**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S) COMPLETE THE ABOVE NUMBERED POLICY.**


The foregoing discloses all hazards insured hereunder known to exist at the inception date of this Policy, unless otherwise stated herein by endorsement on this Policy


COUNTERSIGNED            November 22, 2021        BY   _____
                            DATE                          AUTHORIZED REPRESENTATIVE

RB00243
Exhibit 49, Page 276

**COMMERCIAL EXCESS LIABILITY POLICY**
**SCHEDULE OF UNDERLYING INSURANCE**

| | | | |
|---|---|---|---|
| **Named Insured:** | **RLC Industries Co.** | **Effective Date:** | **11/1/2021** |
| **Policy Number:** | **XC2EX00126-211** | **Issuing Company:** | **Everest National Insurance Company** |

The declarations, schedule(s), and all terms and conditions complete this insurance Policy.

**Type of Policy or Coverage
and
Insurer, Policy Number and Policy Period**                         **Limits of Insurance**

**A. "First Underlying Insurance" Policy(ies)**

| | | | | |
|---|---|---|---|---|
| Coverage: | Umbrella Liability | | | |
| Carrier | Markel American Insurance Company | $ | 5,000,000 | Each Occurrence/Annual |
| Policy # | MKLM6MM70000398 | $ | 5,000,000 | Aggregate, Where Applicable |
| Policy Period: | 11/01/2021-11/01/2022 | | | |

**B. Other "Underlying Insurance" Policy(ies)**

| | | | | |
|---|---|---|---|---|
| Coverage: | Second Excess | | | |
| Carrier | Allied World Assurance Company (U.S.), Inc. | $ | 5,000,000 | Each Occurrence/Annual |
| Policy # | 0311-5913 | $ | 5,000,000 | Aggregate, Where Applicable |
| Policy Period: | 11/01/2021-11/01/2022 | | | |
| | | | | |
| Coverage: | First Excess | | | |
| Carrier | Federal Insurance Company | $ | 5,000,000 | Each Occurrence/Annual |
| Policy # | 7819-50-57 | $ | 5,000,000 | Aggregate, Where Applicable |
| Policy Period: | 11/01/2021-11/01/2022 | | | |

| | | |
|---|---|---|
| Date of Issue: | November 22, 2021 | Authorized Representative: |

RB00244
Exhibit 49, Page 277

# COMMERCIAL EXCESS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V –DEFINITIONS** or the Definitions of the "first underlying insurance".

## SECTION I - COVERAGES

### A. Insuring Agreement

#### 1. Excess Liability

We will pay on behalf of the insured the amount of the "ultimate net loss" in excess of the "underlying limits of insurance" to which this insurance applies.  The coverage provided by this policy will:

**a.** Follow the terms, definitions, conditions and exclusions that are contained in the "first underlying insurance", unless otherwise directed by this policy, including any attached endorsements; and

**b.** Not be broader than that provided by the "first underlying insurance".

#### 2. Defense

We will have the right, but not the duty to defend or associate in the defense of the insured against any suit seeking damages to which this insurance may apply. If we exercise such right, any expense related to such right will be "defense expenses" under this policy.  After the limits of this policy are used up in the payment of:

**a.** Judgments;

**b.** Settlements; or

**c.** "Defense expenses", if "defense expenses" are included within and erode the limits of insurance of the "first underlying insurance",

we will not provide any defense under this policy.

### B. Exclusions

This insurance does not apply to:

#### 1. Asbestos

**a.** Any liability arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of asbestos.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of or in any way responding to or assessing the effects of asbestos by any insured or by any other person or entity.

RB00245
Exhibit 49, Page 278

**2.    Nuclear**

    **a.**  Any liability:

       **(1)**  With respect to which the insured is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability-Property Insurance Assoc., Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

       **(2)**  Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, **(b)** the insured is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

    **b.**  Any liability resulting from the hazardous properties of "nuclear material", if:

       **(1)**  The "nuclear material" **(1)** is at any "nuclear facility" owned by the insured or operated by the insured or on the Insured's behalf, or **(2)** has been discharged or dispensed therefrom;

       **(2)**  The "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by the insured or on the insured's behalf; or

       **(3)**  The liability arises out of the furnishing by the insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to property damage to such "nuclear facility" and any property thereat.

For the purposes of this exclusion, liability for property damage includes all forms of radioactive contamination of property.

**3.    First Party Auto**

Any loss, cost or expense payable under or resulting from any first party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.

**4.    Pollution**

    **a.**  Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

    **b.**  "Pollution cost or expense".

This exclusion does not apply if valid "underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits. Coverage provided will follow the provisions, exclusions and limitations of the "first underlying insurance".

RB00246
Exhibit 49, Page 279

**SECTION II - WHO IS AN INSURED**

The following persons and organizations are insured under this insurance:

**1.** Any person or organization qualifying as such under the "first underlying insurance".

**2.** Any additional insured qualifying as such under the "first underlying insurance", but only:

    **a.** To the extent of the insurance provided the additional insured under the "first underlying insurance", and not otherwise excluded by this policy; and

    **b.** Where coverage is required to be provided to an additional insured under a contract or agreement. However, the Limits of Insurance afforded the additional insured in this paragraph shall be the lesser of the following:

        **i.** The minimum limits of insurance required in the contract or agreement between you and the additional insured; or

        **ii.** The Limits of Insurance shown in the Declarations of this policy.

**3.** Newly acquired or formed organizations, if:

    **a.** The organization is acquired by you during the policy period through consolidation, purchase of assets, merger, or assumption of control and active management;

    **b.** The "first underlying insurance" and all other "underlying insurance" have added the organization as an insured;

    **c.** You provide notice to us; and

    **d.** We endorse the organization as an insured onto this policy.

Any newly acquired or formed organizations endorsed onto this policy may be subject to an additional premium and to a premium audit.

**SECTION III - LIMITS OF INSURANCE**

**A.** The Limits of Insurance shown under this policy's Declarations and the rules below fix the most we will pay regardless of the number of:

    **1.** Insureds;

    **2.** Claims made, "suits" brought, or number of vehicles involved; or

    **3.** Persons or organizations making claims or bringing "suits".

**B.** The Limits of Insurance of this policy will apply as follows:

    **1.** This policy only applies in excess of the "underlying limits of insurance".

    **2.** The Aggregate Limit is the most we will pay for the "ultimate net loss" that is subject to an aggregate limit provided by the "first underlying insurance". The Aggregate Limit applies separately and in the same manner as the aggregate limits provided by the "first underlying insurance".

    **3.** Subject to Paragraph **B. 2.** above, the Each Occurrence limit is the most we will pay for the sum of all "ultimate net loss" arising out of any one "occurrence" to which this policy applies.

**C.** If "defense expenses" are included within and erode the limits of insurance of the "first underlying insurance" then "defense expenses" are included within and erode the Limits of Insurance of this policy on the same basis as the "first underlying insurance". If "defense expenses" do not reduce the limits of insurance of the "first underlying insurance" then they do not reduce the Limits of Insurance of this policy.

**D.** If, after this policy is issued, we extend the policy period, we will consider the additional period as part of the original policy period to determine how to apply the Aggregate Limit, as described in Paragraph **B. 2.** above.

RB00247
Exhibit 49, Page 280

**E.**  If a limit of insurance of the "underlying insurance" applies on an aggregate basis, and;

 **1.**  When such limit has been exhausted by payment of "suits", claims or "defense expenses" arising solely out of "occurrences" which took place during this policy period, this insurance applies excess of such exhausted limit; or

 **2.**  When such limit has been reduced or exhausted by payment of "suits", claims or "defense expenses" arising out of "occurrences" which took place before or after this policy period, this insurance applies as if such payments had not been made.

## SECTION IV – CONDITIONS

**1. Appeals**

 **a.**  If the "underlying insurer" or insured elects not to appeal a judgment in excess of the amount of the "underlying limits of insurance", we may do so at our own expense.

 **b.**  We will be liable for taxable costs, pre- and post- judgment interest and disbursements associated with such appeal.  Such payments will not reduce the Limits of Insurance.

**2. Bankruptcy**

 **a. Bankruptcy or Insolvency of Insured (Or Inability To Pay)**

  Bankruptcy or insolvency of the insured or the insured's estate does not relieve us of our duties**.**

 **b. Bankruptcy or Insolvency of Underlying Insurer**

  If any "underlying insurer" becomes bankrupt or insolvent, this insurance:

  **(1)**  Does not replace such "underlying insurance"; and

  **(2)**  Applies as though such "underlying insurance" was available and collectible.

**3. Duties In The Event of Occurrence, Claim or Suit**

 **a.**  You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a claim under this policy.  To the extent possible, notice should include:

  **(1)**  How, when and where the "occurrence" took place;

  **(2)**  The names and addresses of any injured persons and witnesses;

  **(3)**  The nature and location of any injury or damage arising out of the "occurrence"; and

  **(4)**  All information available to identify this policy, including the name of any "insured".

 **b.**  If a claim is made or "suit" is brought against any insured which may result in a claim under this policy, you must:

  **(1)**  Immediately record the specifics of the claim or "suit" and the date received; and

  **(2)**  Notify us as soon as practicable.

 **c.**  For any claim or "suit" which may result in a claim under this policy, you and any other involved insured or their representative must:

  **(1)**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

  **(2)**  Authorize us to obtain records and other information;

  **(3)**  Cooperate with us in the investigation or settlement of the claim or defense against the "suit";

  **(4)**  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply;

  **(5)**  Take all necessary steps to protect any insured's and our interests;

  **(6)**  Cooperate with "underlying insurers", as required by their terms and conditions;

RB00248
Exhibit 49, Page 281

**(7)** Not at any time make or authorize an admission of liability or attempt to settle or otherwise dispose of any claim or "suit" without our written consent;

**(8)** If any "underlying insurer" denies coverage for any reason, see to it that we receive written notice of such denial as soon as practicable. Such notice will contain the reason for such denial as stated by the "underlying insurer".

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**4. Legal Action Against Us**

No person or organization has a right under this policy:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for "ultimate net loss" that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**5. Other Insurance**

**a.** This insurance is excess over, and will not contribute with any "other insurance", whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this insurance.

**b.** When this insurance is excess over "other insurance", we will pay only our share of the loss that exceeds the sum of:

**(1)** The total amount that all such "other insurance" would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self insured amounts under all that "other insurance".

**6. Premium Audit**

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** The Premium for this policy, as stated in 6. of the Declarations is not subject to an adjustment unless a rate is stated in the Declarations or an endorsement is attached to this policy.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**7. Representations Or Fraud**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us;

**c.** We have issued this policy in reliance upon your representations; and

**d.** This policy is void in any case of fraud by you as it relates to this policy or any claim under this policy.

**8. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first named insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

RB00249
Exhibit 49, Page 282

**9.  Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us.  The insured must do nothing after loss to impair them.  At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

Any recoveries will be distributed as follows:

**a.**  First, we will be entitled to recover to the extent of our payment; and

**b.**  Next, any remaining amounts will be paid to the "underlying insurers" or any other party to the extent of their payment.

The expenses of the recovery will be distributed in proportion to the share of each party's recovery.  But, if we conduct the recovery proceedings by ourselves:

**i.**  We will pay all expenses; and

**ii.**  If we make a recovery, we will be reimbursed in full from the recovery for our expenses before the recovery is distributed.

**10. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.  If notice is mailed, proof of mailing will be sufficient proof of notice.

**11. Unintentional Errors or Omissions**

Your failure to disclose all hazards existing as of the inception date of this policy will not prejudice you with respect to the coverage afforded by this policy provided such failure or any omission is not intentional.  However, you must report such failure or any omission to us as soon as practicable after its discovery.

**12. Maintenance of Underlying Insurance**

**a.**  You will maintain all of the "underlying insurance" listed in the schedule of "underlying insurance" in the Declarations in full force and effect throughout this policy period, except for reduction of aggregate limits due to payment of claims, settlements or judgments.

**b.**  Failure to maintain "underlying insurance" will not invalidate this insurance.  However, this insurance will apply as if the "underlying insurance" were in full effect.

**c.**  You will notify us as soon as practicable when any "underlying insurance" is changed or no longer in effect.

**d.**  The first Named Insured will furnish us, a complete copy of the "underlying insurance" and any subsequently issued endorsements.

**13. Endorsements To This Policy**

Reference to Commercial Liability Umbrella or Commercial Excess Liability Coverage Part in any endorsement that is attached to or made a part of this policy will mean this policy.

**14. Minimum Premium And Minimum Earned Premium**

Earned premium will be subject to the Minimum Premium and the Minimum Earned Premium as stated in the Declarations.  In the event of cancellation by you, there will be no return of any portion of the Minimum Earned Premium.

**15. Office of Foreign Assets Control**

Payments of loss under this insurance will only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

RB00250
Exhibit 49, Page 283

**SECTION V – DEFINITIONS**

1. "Defense expenses" mean payments allocated to a specific claim or "suit" for its investigation, settlement, or defense, including:

   a. Attorney fees and all other litigation expenses;

   b. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance;

   c. The approved Claims Organization service expenses or fees;

   d. All court costs taxed against the insured in the claim or "suit".  However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured;

   e. Prejudgment interest awarded against the insured on that part of the judgment you pay within the applicable self insured retention;

   f. All interest on the full amount of any judgment that accrues after entry of the judgment and before you have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable self-insured retention; and

   g. Any amount under Paragraph **A. 2**. of **SECTION I-COVERAGES**.

   "Defense expenses" do not include normal operating expenses, salaries or expenses of our employees or your employees.

2. "Hazardous properties" includes radioactive, toxic or explosive properties.

3. "First underlying insurance" means the policy listed in the Declarations under the schedule  of "underlying insurance" as the "first underlying insurance".

4. "Occurrence" as defined in the "first underlying insurance" applies to this insurance, whether described as an "occurrence", injury, accident, offense, act, incident, error, omission, event or wrongful act.

5. "Other insurance" means insurance which is available to any insured and covers injury or damage to which this insurance applies, other than:

   a. "Underlying insurance"; or

   b. Insurance which is specifically purchased by you to be excess of the insurance afforded by this insurance.

6. "Nuclear facility" means:

   a. Any nuclear reactor;

   b. Any equipment or device designed or used for **(i)** separating the isotopes of uranium or plutonium, **(ii)** processing or utilizing "spent fuel", or **(iii)** handling, processing or packaging "nuclear waste";

   c. Any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the total amount of such material in the Insured's custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   d. Any structure, basin, excavation, premises or place prepared or used for storage or disposal of "nuclear waste", and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations,

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

7. "Nuclear material" means "source material", "special nuclear material" or "by-product material".

8. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

RB00251
Exhibit 49, Page 284

9. "Nuclear waste" means any waste material **(a)** containing "by-product material" and **(b)** resulting from the operation by any person or organization of a "nuclear facility" included within the definition of "nuclear facility".

10. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

11.  "Pollution cost or expense" means any loss, cost or expense arising out of any:

    **a.**  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

    **b.**  Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

12. "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof.

13.  "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

14. "Suit" as defined in the "first underlying insurance" applies to this insurance.  If the term "suit" is not defined in the "first underlying insurance":

    **a.**  "Suit" means a civil proceeding in which damages to which this insurance applies are alleged; and

    **b.**  "Suit" includes **(1)** an arbitration proceeding in which such damages are claimed and to which any insured must submit or does submit with our consent; and **(2)** any other alternative dispute resolution proceeding in which such damages are claimed and to which any insured submits with our consent.

15. "Underlying insurance" means the "first underlying insurance", any self-insured retention and any policies of insurance listed in the Declarations under the schedule of "underlying insurance". "Underlying insurance" will include any renewal or replacement of such policies and any "other insurance" available to you.

16. "Underlying limits of insurance" means the total sum of the limits of all applicable "underlying insurance" listed under this policy's Declarations.

17.  "Underlying insurer" means any insurer who provides any policy of insurance listed in the schedule of "underlying insurance".

18. "Ultimate net loss" means the total sum, after reduction for recoveries, salvages collectible and "other insurance", that the insured becomes legally obligated to pay as damages under this policy by reason of settlements, judgments, arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

RB00252
Exhibit 49, Page 285

**IL 00 17 11 98**

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

RB00253
Exhibit 49, Page 286

This policy is signed by officers of the Company shown on the Declarations page of this policy.

For:       Everest National Insurance Company

_____       _____
President                                                    Secretary

EIL 00 515 03 07                © Everest Reinsurance Company, 1997

RB00254
Exhibit 49, Page 287

**COMMERCIAL LIABILITY UMBRELLA**
**CU 21 33 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part or underlying insurance to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or underlying insurance.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

RB00255
Exhibit 49, Page 288

**COMMERCIAL EXCESS LIABILITY**
**EUM 00 513 05 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Section **I.B.**, **Exclusions:**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.**  The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.**  The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**c.**  The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**d.**  Any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003 or FCRA, and their amendments and additions, that addresses, prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**EUM 00 513 05 09**          Includes copyrighted material of ISO Properties, Inc.,          **Page 1 of 1**
with its permission.

**COMMERCIAL EXCESS LIABILITY**
**EUM 21 601 04 06**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ORGANIC PATHOGEN, MOLD OR FUNGUS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Section **I.B., Exclusions**:

This insurance does not apply to:

**1.** Injury or damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, growth, release or escape of any "organic pathogen, mold or fungus" at any time.

**2.** Any loss, cost or expense arising out of any:

    **a.** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any "organic pathogen, mold or fungus"; or

    **b.** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any "organic pathogen, mold or fungus".

**B.** For the purposes of this endorsement, "organic pathogen, mold or fungus" means any bacteria, virus, fungi, mold, mildew or mycotoxin, or their spores, scent or byproducts.

**EUM 21 601 04 06**          Includes copyrighted material of ISO Properties, Inc.,          **Page 1 of 1**    ☐
                                                with its permission.

RB00257
Exhibit 49, Page 290

POLICY NUMBER: XC2EX00126-211  **COMMERCIAL EXCESS LIABILITY**
**EUM 21 749 05 06**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**SCHEDULE**



| Description Of Professional Services: |
| --- |
| **1.** Any and all professional services |
| **2.** Manufacturers E&O - Huber Wood Zip System |
| **3.** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, the following exclusion is added to paragraph **B. Exclusions** of **Section I – Coverage:**

This insurance does not apply to any liability due to the rendering of or failure to render any professional service.

**EUM 21 749 05 06**    Copyright, Insurance Services Office, Inc.,  1997    **Page 1 of 1**    ☐

**EUM 21 874 04 09**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COVERAGE PROVIDED BY UNDERLYING INSURANCE AT SUB-LIMITS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **B. Exclusions** of **SECTION I – COVERAGES**:

This insurance does not apply to any claims for damages that are subject to a sub-limit or to any limit of insurance that is less than the Each Occurrence Limit, Per Claim, Per Offense, Per Wrongful Act or other similar limit of insurance in "underlying insurance".

RB00259
Exhibit 49, Page 292

POLICY NUMBER: XC2EX00126-211                    **COMMERCIAL EXCESS LIABILITY**
**EUM 21 902 05 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following is added to **Section I. B. Exclusions**:

This insurance does not apply to:

Any liability arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

RB00260
Exhibit 49, Page 293

**COMMERCIAL EXCESS LIABILITY**
**EUM 22 528 05 06**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTINUOUS OR PROGRESSIVE INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to **Section I.B. Exclusions**:

This insurance does not apply to the "continuation" of injury or damage which "manifests" prior to the beginning of the policy period.

**B.** As used in this endorsement:

    **1.** "Continuation" includes any progression, change or resumption.

    **2.** "Manifests" means:

        **a.** For "bodily injury", when such injury, sickness or disease is first diagnosed; and

        **b.** For "property damage", the earlier of when such damage is known to an insured or is first discovered by any person or organization whose property suffered such damage.

RB00261
Exhibit 49, Page 294

**EUM 24 644 02 19**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WILDFIRE EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

**SECTION I – COVERAGES (B. Exclusions)** is amended to include the following Exclusion:

This insurance does not apply to:

**Wildfires**

Any injury, loss or damage arising out of:

**a.** Uncontrolled and widespread wildfire, including, but not limited to injury to, or destruction of, standing timber or timberlands or damage to real or personal property arising out of operations performed by or for any insured;

**b.** Landslides, mudslides, floods resulting from any wildfire; or

**c.** Firefighting expenses.

All other terms and condition of the policy apply.

EUM 22 1002 06 20

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NON-FOLLOW FORM OVER FIRST UNDERLYING INSURANCE'S SPECIFIED COVERAGE PARTS
## (NON-RECOGNITION OF EROSION OF UNDERLYING LIMITS OF INSURANCE)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

**SCHEDULE**

| |
|---|
| **Coverage Part(s):** Designated Coverage Follow Form MAUB 1510 04 17 |

With respect to the Coverage Part described in the Schedule above, this policy shall not follow the terms, definitions, conditions and exclusions that are contained in the "first underlying insurance".

Payment under the "first underlying insurance" or any other "underlying insurance" of loss covered thereunder by reason of such listed Coverage Part described in the Schedule above will not be recognized by us and shall not be treated as reducing or exhausting the "underlying limits of insurance".

All other terms and conditions of the policy apply

.

Copyright, Everest Reinsurance Company, 2020
Includes copyrighted material of ISO Properties, Inc. with its permission.

RB00263
Exhibit 49, Page 296

EUM 03 316 03 20

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

FOLLOWING FORM EXCESS LIABILITY POLICY (CLAIMS-MADE)

FOLLOWING FORM EXCESS LIABILITY POLICY (OCCURRENCE)

U.S. SHORT EXCESS FORM

The following exclusion is added to the policy and supersedes any exclusion relating to Communicable Disease:

This insurance does not apply to:

**Communicable Disease**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the actual or alleged trans-mission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.**  Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a com-municable disease;

**b.**  Testing for a communicable disease;

**c.**  Failure to prevent the spread of the disease; or

**d.**  Failure to report the disease to authorities.

Words in quotations marks as shown in this endorsement will have the defined terms contained in the applicable "first underlying insurance", "followed policy" and lead underlying policy.

RB00264
Exhibit 49, Page 297

EUM 24 635 02 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INDUSTRIAL AID AIRCRAFT COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

**A.** The Declarations page is amended to include the following Self-Insured Retention:

$315,000,000 Industrial Aid Aircraft Self-Insured Retention

The Industrial Aid Aircraft Self-Insured Retention amount shown above is applicable to each "occurrence" with respect to any claim or "suit" seeking damages for injury or damage arising out of the ownership, maintenance use, or entrustment to others of any "industrial aid aircraft" owned by or rented to or loaned to any insured. Use includes operation and "loading and unloading".

**B. SECTION I – COVERAGES (B. Exclusions)** is amended to include the following Exclusion:

**Aircraft**

This insurance does not apply to injury or damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading and unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the injury or damage involved the ownership, maintenance, use or entrustment to others of any aircraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to injury or damage arising out of the ownership, maintenance use, or entrustment to others of any "industrial aid aircraft" owned or operated by or rented or loaned to any insured. Use includes operation and "loading and unloading".

**C. SECTION III – LIMITS OF INSURANCE** is amended to include the following:

The Industrial Aid Aircraft Self-Insured Retention shown above applies whether or not there is any available scheduled "underlying insurance" or "other insurance".

The Industrial Aid Aircraft Self-Insured Retention will not be reduced by "defense expenses".

**D. SECTION V – DEFINITIONS** is amended to include the following:

   **1.** "Auto" means:
      **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
      **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.
      However, "auto" does not include "mobile equipment.

   **2.** "Industrial aid aircraft" means aircraft with a maximum passenger capacity of twenty (20) persons (including crew) used solely for business travel of employees and their non-fee-paying passenger guests.

   **3.** "Loading and unloading" means the handling of property:
      **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";
      **b.** While it is in or on aircraft, watercraft or "auto"; or

EUM 24 635 02 19          Copyright, Everest Reinsurance Company, 2019          **Page 1 of 2**
Includes copyrighted material of Insurance Services Office, Inc.,
used with permission

RB00265
Exhibit 49, Page 298

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**4.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

 **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

 **b.** Vehicles maintained for use solely on or next to premises you own or rent;

 **c.** Vehicles that travel on crawler treads;

 **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

  **(1)** Power cranes, shovels, loaders, diggers or drills; or

  **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

 **e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

  **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

  **(2)** Cherry pickers and similar devices used to raise or lower workers;

 **f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

 However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

  **(1)** Equipment designed primarily for:

   **(a)** Snow removal;

   **(b)** Road maintenance, but not construction or resurfacing; or

   **(c)** Street cleaning;

  **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

  **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

 However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

All other terms and conditions of the policy apply.

RB00266
Exhibit 49, Page 299

**COMMERCIAL EXCESS LIABILITY**
**EUM 21 574 05 06**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| Designated Product(s): Formaldehyde |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

This insurance does not apply to any liability arising out of any of "your products" shown in the Schedule.

**EUM 21 574 05 06**            Includes copyrighted material of ISO Properties, Inc.,            **Page 1 of 1**      ◻
used with its permission.

RB00267
Exhibit 49, Page 300

POLICY NUMBER: XC2EX00126-211                   **COMMERCIAL UMBRELLA AND EXCESS LIABILITY**
                                                              **EUM 21 609 04 06**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - LEAD

This endorsement modifies insurance provided under the following:

   COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following is added to Paragraph **B. Exclusions** of **Section I. Coverage:**

This insurance does not apply to any liability arising out of the existence or "control" of the hazardous properties of lead, irrespective of the "form" or source of such lead**.**

This exclusion applies, but is not limited to the following:

1.  To liability assumed under any contract or agreement;

2.  To any obligation to pay or indemnify any person, organization, or governmental agency for any portion of the injury, damage, or expense; and

3.  To any supervision, instructions, recommendations, requests, warranties or representations (expressed or implied), warnings or advice given or which should have been given regarding the existence or "control" of the lead.

When used in this exclusion:

I. "Control" includes, but is not limited to testing, monitoring, abatement, clean-up, removal, containment, treatment, or disposal.

II. "Form" means anything containing lead, including, but not limited to air, water, earth, dust, paint, plumbing solder, and pipes and fixtures.

**EUM 21 609 04 06**          Copyright, Everest Reinsurance Company, 2006              **Page 1 of 1**        ☐
                        Includes copyrighted material of ISO Properties, Inc. with its
                                            permission.

# EXHIBIT F



**Policyholder    Information**

| **Named Insured & Mailing Address** | **Agent Mailing Address & Phone No.** |
|---|---|
| RLC INDUSTRIES CO.<br>3660 GATEWAY ST<br>SPRINGFIELD,  OR 97477-6010 | (503) 224-9700<br>AON RISK INS SERVICES WEST INC<br>PO BOX 19640<br>IRVINE, CA 92623-9640 |



### *Dear Policyholder:*

We know you work hard to build your business. We work together with your agent,
**AON RISK INS SERVICES WEST INC      (503) 224-9700**
to help protect the things you care about. Thank you for selecting us.

Enclosed are your insurance documents consisting of:



**Your Commercial Documents**



**THIS IS NOT A BILL**

- Excess Liability

To find your limits of insurance and premium please refer to your Declarations
page(s). Please refer to your policy for specific coverages.

If you have any questions or changes that may affect your insurance needs, please
contact your Agent at (503) 224-9700

**Reminders**

- Verify that all information is correct
- If you have any changes, please contact your
  Agent at (503) 224-9700
- In case of a claim, call your Agent or  1-844-325-2467

## You Need  To Know

- **CONTINUED ON NEXT PAGE**

*To report a claim,  call  your Agent or 1-844-325-2467*

DS 70 20 01 08

RB00269
Exhibit 49, Page 303

**You Need To Know - continued**

- **NOTICE(S) TO POLICYHOLDER(S)**
  The Important Notice(s) to Policyholder(s) provide a general explanation of changes in coverage to your policy. The Important Notice(s) to Policyholder(s) is not a part of your insurance policy and it does not alter policy provisions or conditions. Only the provisions of your policy determine the scope of your insurance protection. It is important that you read your policy carefully to determine your rights, duties and what is and is not covered.

| FORM NUMBER | TITLE |
| --- | --- |
| CNI90 11 07 18 | Reporting A Commercial Claim 24 Hours A Day |
| NP 74 44 09 06 | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| NP 93 98 10 13 | Notice to Policyholder - Important Notice Your Action Required |
| SNI04 01 12 20 | Liberty Mutual Group California Privacy Notice |
| SNU36 02 05 20 | Oregon - Terrorism Insurance Premium Disclosure And Opportunity To Elect Coverage |

2      of   34

CNI 90 11 07 18

# REPORTING  A COMMERCIAL  CLAIM  24 HOURS  A DAY

**Liberty Mutual Insurance claims professionals across the United States are ready to resolve your claim quickly and fairly, so you and your team can focus on your business. Our claims teams are specialized, experienced and dedicated to a high standard of service.**

**We're Just a Call Away - One Phone Number to Report All Commercial Insurance Claims**

Reporting a new claim has never been easier. A Liberty Mutual customer service representative is available to you 24/7 at `1(800)362-0000` for reporting new property, auto, liability and workers' compensation claims. With contact centers strategically located throughout the country for continuity and accessibility, we're there when we're needed!

**Additional Resource for Workers' Compensation Customers**

In many states, employers are required by law to use state-specific workers compensation claims forms and posting notices. This type of information can be found in the Policyholders Toolkit section of our website along with other helpful resources such as:

● Direct links to state workers compensation websites where you can find state-specific claim forms

● Assistance finding local medical providers

● First Fill pharmacy forms - part of our managed care pharmacy program committed to helping injured workers recover and return to work

Our Policyholder Toolkit can be accessed at **www.libertymutualgroup.com/toolkit.**

For all claims inquiries please call us at `1(800)362-0000` **.**

© 2018 Liberty Mutual Insurance

RB00271
Exhibit 49, Page 305

NP 74 44 09 06

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

Please refer any questions you may have to your insurance agent.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© 2011 Liberty Mutual Insurance. All rights reserved.

NP 74 44 09 06        Includes copyrighted material of Insurance Services Office, Inc., with its permission.        Page 1 of 1

RB00272
Exhibit 49, Page 306

NP 93 98 10 13

# IMPORTANT  NOTICE

## YOUR  ACTION  REQUIRED

THANK YOU FOR PLACING THIS EXCESS POLICY WITH US. WE TRUST THAT THIS POLICY WAS ISSUED ACCORDING TO YOUR INSTRUCTIONS.



AS A REMINDER, WITHIN 45 DAYS OF THE EFFECTIVE DATE, PLEASE FORWARD A COMPLETE COPY OF THE LEAD UMBRELLA. THIS COPY MUST INCLUDE THE FOLLOWING:

- DECLARATIONS PAGE
- INSURING AGREEMENT
- COPIES OF ALL FORMS AND ENDORSEMENTS

© 2013 Liberty Mutual Insurance. All rights reserved.

**NP 93 98 10 13**    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    **Page 1 of 1**

RB00273
Exhibit 49, Page 307

## LIBERTY MUTUAL GROUP CALIFORNIA PRIVACY NOTICE
### Commercial Lines (excluding Workers' Compensation)
### (Effective December 15, 2020)

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers. This Privacy Notice explains how we gather, use, and share your data. This Privacy Notice applies to you if you are a **Liberty Mutual commercial line insured or are a commercial line claimant residing in California**. It does not apply to covered employees or claimants under Workers' Compensation policies. If this notice does not apply to you, go to libertymutual.com/privacy   to review the applicable Liberty Mutual privacy notice.

### What Data Does Liberty Mutual Gather?

We may collect the following categories of data:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;

- **Personal information described in California Civil Code § 1798.80(e)**, such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial information, medical information, or health insurance information;

- **Protected classification characteristics**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;

- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories and tendencies;

- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;

- **Professional or employment related information**, including current or past job history or performance evaluations;

- **Inferences drawn from other personal information**, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;

- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records and loss history information, health data, or criminal convictions; and

- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data.

For information about the types of personal data we have collected about California consumers in the past twelve (12) months, please go to libertymutual.com/privacy   and click on the link for the California Supplemental Privacy Policy.

### How We Get the Personal Data:

| We gather your personal data **directly from you**. For example, you provide us with data when you: | We also gather your personal data **from other people**. For example: |
|---|---|
| ● ask about, buy insurance or file a claim | ● your insurance agent or broker |
| ● pay your policy | ● your employer, association or business (if you are insured through them) |

RB00274
Exhibit 49, Page 308

| | |
|---|---|
| ● visit our websites, call us, or visit our office | ● our affiliates or other insurance companies about your transactions with them |
| | ● consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value and condition of your property |
| | ● other public directories and sources |
| | ● third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government entities, open electoral register, advertising networks, data analytics providers, social networks, data brokers or in the event of a claim, third parties including other parties to the claim witnesses, experts, loss adjustors and claim handlers |
| | ● other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

For information about how we have collected personal data in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

**How Does Liberty Mutual Use My Data?**

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice. Your data may be used to:

| Business Purpose | Data Categories |
|---|---|
| **Market, sell and provide insurance.** This includes for example:<br>● calculating your premium;<br>● determining your eligibility for a quote;<br>● confirming your identity and service your policy; | ● Identifiers<br>● Personal Information<br>● Protected Classification Characteristics<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information<br>● Risk data<br>● Claims data |
| **Manage your claim.** This includes, for example:<br>● managing your claim, if any;<br>● conducting claims investigations;<br>● conducting medical examinations;<br>● conducting inspections, appraisals;<br>● providing roadside assistance;<br>● providing rental car replacement or repairs; | ● Identifiers<br>● Personal Information<br>● Protected Classification Characteristics<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information |

© 2020 Liberty Mutual Insurance    SNI 04 01 12 20

RB00275
Exhibit 49, Page 309

| | |
|---|---|
| | • Risk data<br>• Claims data |
| **Day to Day Business and Insurance Operations.**<br>This includes, for example:<br>• creating, maintaining, customizing and securing accounts;<br>• supporting day-to-day business and insurance related functions;<br>• doing internal research for technology development;<br>• marketing and creating products and services;<br>• conducting audits related to a current contact with a consumer and other transactions;<br>• as described at or before the point of gathering personal data or with your authorization; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Security and Fraud Detection.** This includes for example:<br>• detecting security issues;<br>• protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities;<br>• managing risk and securing our systems, help to ensure the safety and security of Liberty staff, assets and resources, which may include physical and virtual access controls and access rights management;<br>• supervisory controls and other monitoring and reviews, as permitted by law; and<br>• emergency and business continuity management; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Regulatory and Legal Requirements.** This includes for example:<br>• controls and access rights management;<br>• to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Liberty's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty is among the assets transferred;<br>• exercising and defending our legal rights and positions;<br>• to meet Liberty contract obligations;<br>• to respond to law enforcement requests and as required by applicable law, court order, or governmental regulations;<br>• as otherwise permitted by law. | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |

RB00276
Exhibit 49, Page 310



| | |
|---|---|
| **Improve Your Customer Experience and Our Products.** This includes for example:<br>• improve your customer experience, our products and service;<br>• to provide, support, personalize and develop our website, products and services;<br>• create and offer new products and services; | • Identifiers<br>• Personal Information<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Analytics to identify, understand and manage our risks and products.** This includes for example:<br>• conducting analytics to better identify, understand and manage risk and our products; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Customer service and technical support.** This includes for example:<br>• answer questions and provide notifications;<br>• provide customer and technical support; | • Identifiers<br>• Personal Information<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |

**How Does Liberty Mutual Share My Data?**

Liberty Mutual does not sell your personal data as defined by the California Consumer Privacy Act.

Liberty Mutual shares personal data of California consumers with the following categories of third parties:

- Liberty Mutual affiliates;
- Service Providers;
- Insurance support organizations;
- Brokers and agents;
- Government entities and institutions (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Professional advisors including law firms, accountants, auditors, and tax advisors;
- Advertising networks, data analytics providers and social networks;
- Insurers, re-insurers, policy holders, and claimants; and
- As permitted by law.

Liberty Mutual shares the following categories of personal data regarding California consumers to service providers for business purposes:

| | |
|---|---|
| Identifiers | Personal Data; |
| Protected Classification Characteristics; | Commercial Information; |
| Internet or other similar network activity; | Claims Data; |
| Inferences drawn from other personal information; | Risk Data; |
| Professional, employment, and education information; | |

© 2020 Liberty Mutual Insurance    SNI 04 01 12 20

RB00277
Exhibit 49, Page 311

For information about how we have shared personal information in the past twelve (12) months, please go to libertymutual.com/privacy   and click on the link for the California Supplemental Privacy Policy.

### What Privacy Rights Do I Have?

The California Consumer Privacy Act provides California residents with specific rights regarding personal information. These rights are subject to certain exceptions. Our response may be limited as permitted under law. For more information on your rights, please go to libertymutual.com/privacy   and click on the link for the California Supplemental Privacy Policy.

### Will Liberty Mutual Update This Privacy Notice?

We reserve the right to makes changes to this notice at any time and for any reason. The updated version of this policy will be effective once it is accessible. You are responsible for reviewing this policy to stay informed of any changes or updates.

### Who Do I Contact Regarding Privacy?

If you have any questions or comments about this Notice or the Supplemental CCPA Notice, your rights, or are requesting the Notice in an alternative format, please do not hesitate to contact Liberty Mutual at:

**Phone:**                  800-344-0197

**Email:**                  privacy@libertymutual.com

**Postal Address:**    Liberty Mutual Insurance Company
Attn Privacy Office
175 Berkeley St 6th Floor
Boston MA 02116

SNU 36 02 05 20

# OREGON - TERRORISM INSURANCE PREMIUM DISCLOSURE AND OPPORTUNITY TO ELECT COVERAGE

WE ARE SENDING YOU THIS NOTICE BECAUSE YOU PREVIOUSLY REJECTED COVERAGE FOR LOSSES RESULTING FROM A "CERTIFIED ACT OF TERRORISM" AS DEFINED BELOW.

THIS NOTICE PROVIDES YOU WITH A LIMITED PERIOD OF TIME WITHIN WHICH YOU MAY PURCHASE THIS COVERAGE FOR YOUR RENEWAL POLICY.

This notice contains important information about the Terrorism Risk Insurance Act and your option to elect terrorism insurance coverage. Please read it carefully.



## THE TERRORISM RISK INSURANCE ACT

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government. If an individual insurer's losses from "certified acts of terrorism" exceed a specified deductible amount, the government will generally reimburse the insurer for a percentage of losses (the "Federal Share") paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger". An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per calendar year. Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount. If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-rated, as determined by the Secretary of the Treasury.

Beginning in calendar year 2020, the Federal Share is 80% and the Program Trigger is $200,000,000.

## MANDATORY AVAILABILITY OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM"

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism"   AND that is otherwise covered under your policy.

A "certified act of terrorism" means:

Any act that is certified by the Secretary, of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States

(i)    to be an act of terrorism;

(ii)   to be a violent act or an act that is dangerous to

    (I)    human life;

    (II)   property; or

    (III)  infrastructure;

(iii)  to have resulted in damage within the United States, or outside of the United States in the case of

    (I)    an air carrier (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or

    (II)   the premises of a United States mission; and

(iv)   to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

RB00279
Exhibit 49, Page 313

**WHAT YOU MUST DO TO ELECT TERRORISM INSURANCE COVERAGE**

We are offering you the opportunity to add coverage to your renewal policy for losses resulting from a "certified act of terrorism" as defined above. THE PREMIUM CHARGE FOR THIS COVERAGE APPEARS BELOW ON THIS DISCLOSURE AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT. If you elect to add this coverage, the coverage will be subject to all of the terms, definitions, exclusions and conditions contained in the policy.

To add this coverage you must contact your agent before the date your policy renews. If the date we first get this offer to you is after the date of renewal or within fourteen (14) days of the date of renewal, you will have fourteen (14) days from the date we get this offer to you to add the coverage. By contacting your agent, the coverage will be added and your renewal policy will be endorsed and billed accordingly.

Note: if you elect coverage for "certified acts of terrorism" in a Commercial Umbrella Liability Policy with us, you must also elect coverage for "certified acts of terrorism" in your underlying liability insurance.

Terrorism Risk Insurance Act Premium: ████████

| Line of Business | Premium Determination |
|---|---|
|  |  |
| Commercial Umbrella | The premium for this Certified Acts of Terrorism Coverage is _____ . |

Please contact your agent to elect coverage.

**The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy.**

If you have any questions regarding this notice, please contact your agent.

SNU 36 02 05 20          © 2020 Liberty Mutual Insurance          **Page 2 of 2**



**Coverage Is Provided In:**

The Ohio Casualty Insurance  Company

Policy Number:
**ECO  (22)  60 07 79 06**

**Excess  Liability**
**Policy  Declarations**
Basis: Occurrence



**(ITEM 1) NAMED INSURED & MAILING ADDRESS**

RLC INDUSTRIES CO.
3660 GATEWAY ST
SPRINGFIELD, OR 97477-6010

**AGENT MAILING ADDRESS & PHONE NO.**

(503) 224-9700
AON RISK INS SERVICES WEST INC
PO BOX 19640
IRVINE, CA 92623-9640

**Named Insured Is:**  CORPORATION

**Named Insured Business Is:**  WOOD PRODUCTS  COMPANY

**(ITEM 2) POLICY PERIOD**

From 11/01/2021  TO 11/01/2022  12:01 AM Standard Time at Insured  Mailing Location

**(ITEM 3) PREMIUM CHARGES**

| Explanation of Charges | DESCRIPTION | PREMIUM |
|---|---|---|
| | Excess Liability | ████ |
| | ████████ | ██ |
| | *Total Advance Charges* | ████ |

*Note: This is not a bill*

BASIS OF PREMIUM:          NON-AUDITABLE( X )          AUDITABLE(  )

**(ITEM 4) LIMITS OF INSURANCE**

| DESCRIPTION | LIMIT |
|---|---|
| EACH OCCURRENCE | $20,000,000 |
| AGGREGATE (WHERE APPLICABLE) | $20,000,000 |

THESE LIMITS OF INSURANCE APPLY IN EXCESS OF THE UNDERLYING LIMITS OF INSURANCE
INDICATED IN (ITEM 5) OF THE DECLARATIONS.

Issue Date          11/29/2021          Authorized  Representative

*To report a claim,  call your Agent or 1-844-325-2467*

DS 70 22 01 08

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/29/2021 | 60077906 | POLSVCS | 221 | | INSURED COPY | 001581 | PAGE  13  OF  34 |

RB00281

Exhibit 49, Page 315

**Liberty Mutual** INSURANCE

Coverage Is Provided In:
The Ohio Casualty Insurance Company

Policy Number:
**ECO   (22)   60 07 79 06**

---

**(ITEM 5) UNDERLYING INSURANCE**

| CARRIER, POLICY NUMBER AND PERIOD | TYPE OF COVERAGE | LIMITS OF INSURANCE | |
|---|---|---|---|
| FIRST UNDERLYING INSURANCE MARKEL INSURANCE COMPANY | LEAD UMBRELLA | *$5,000,000* | EACH OCCURRENCE |
| | | *$5,000,000* | AGGREGATE |
| | | *$5,000,000* | PRODUCTS - COMPLETED OPERATIONS AGGREGATE |
| MKLM6MM70000398 11/01/2021 - 11/01/2022 | | | |
| OTHER UNDERLYING INSURANCE FEDERAL INSURANCE COMPANY | EXCESS LIABILITY | *$5,000,000* | EACH OCCURRENCE |
| | | *$5,000,000* | AGGREGATE |
| | | | EXCESS OF |
| 7819-50-57 11/01/2021 - 11/01/2022 | | *$5,000,000* | EACH OCCURRENCE |
| | | *$5,000,000* | AGGREGATE |

---

*To report a claim, call your Agent or 1-844-325-2467*

**DS 70 23 01 08**

RB00282
Exhibit 49, Page 316

**Liberty Mutual** INSURANCE

*Coverage Is Provided In:*

The Ohio Casualty Insurance Company

Policy Number:
**ECO    (22)   60 07 79 06**

**(ITEM 5) UNDERLYING INSURANCE        - CONTINUED**

| CARRIER, POLICY NUMBER AND PERIOD | TYPE OF COVERAGE | LIMITS OF INSURANCE | |
|---|---|---|---|
| OTHER UNDERLYING INSURANCE ALLIED WORLD ASSURANCE (US) INC. | EXCESS LIABILITY | *$5,000,000* | EACH OCCURRENCE |
| | | *$5,000,000* | AGGREGATE |
| | | | EXCESS OF |
| 0311-5913 11/01/2021  - 11/01/2022 | | *$10,000,000* | EACH OCCURRENCE |
| | | *$10,000,000* | AGGREGATE |
| OTHER UNDERLYING INSURANCE EVEREST INDEMNITY INSURANCE COMPANY | EXCESS LIABILITY | *$10,000,000* | EACH OCCURRENCE |
| | | *$10,000,000* | AGGREGATE |
| | | | EXCESS OF |
| XC2EX00126-211 11/01/2021  - 11/01/2022 | | *$15,000,000* | EACH OCCURRENCE |
| | | *$15,000,000* | AGGREGATE |

*To report a claim,  call  your Agent or 1-844-325-2467*

**DS 70 23 01 08**

**Liberty Mutual** INSURANCE

*Coverage Is Provided In:*

The Ohio Casualty Insurance Company

Policy Number:
**ECO** **(22)** **60 07 79 06**

## POLICY FORMS AND ENDORSEMENTS

This section lists all the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| CE 65 24 06 97 | Excess Liability Coverage Form |
| CE 65 27 05 16 | Following Form Endorsement |
| CE 65 29 01 15 | Certified Acts Of Terrorism Exclusion |
| CE 66 54 05 09 | Recording And Distribution Of Material Or Information In Violation Of The Law Exclusion |
| CE 88 62 05 16 | Manufacturers Errors and Omissions Exclusion |
| CE 88 64 10 14 | Access or Disclosure Of Confidential Or Personal Information And Data-Related - Liability with Limited Bodily Injury Exception Exclusion |
| CNI90 11 07 18 | Reporting A Commercial Claim 24 Hours A Day |
| CU 60 05 06 97 | Named Insured |
| CU 60 53 06 97 | Cancellation Amendment |
| CU 61 69 09 08 | Oregon Changes - Cancellation |
| CU 64 87 10 05 | Economic or Trade Sanctions Condition Endorsement |
| SN U3 60 20 52 | Oregon - Terrorism Insurance Premium Disclosure And Opportunity To Elect Coverage |

In witness whereof, we have caused this policy to be signed by our authorized officers.

Mark Touhey
Secretary

David Long
President

**To report a claim, call your Agent or 1-844-325-2467**
**DS 70 23 01 08**

RB00284
Exhibit 49, Page 318

Case 2:23-cv-00649-TLN-SCR    Document 103-8    Filed 12/12/24    Page 539 of 1107
Case 2:23-cv-00649-TLN-DB    Document 1-6    Filed 04/07/23    Page 18 of 35

CE 65 24 06 97

# EXCESS LIABILITY COVERAGE FORM

There are provisions in this policy that restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured. The words "we," "us" and "our" refer to the Company providing this insurance. The word Insured means any person or organization qualifying as such in the "first underlying insurance." Other words and phrases that appear in quotation marks have special meaning and can be found in the **DEFINITIONS** Section or the specific policy provision where they appear.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations we agree with you to provide the coverage as follows:

## INSURING AGREEMENTS

### I. COVERAGE

We will pay on behalf of the Insured the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance" shown in Item **5.** of the Declarations, subject to **INSURING AGREEMENT** Section **II., Limits of Insurance.** Except for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the "first underlying insurance."

### II. LIMITS OF INSURANCE

**A.** The Limits of Insurance shown in the Declarations and the rules below describe the most we will pay under the terms of this insurance regardless of the number of:

    **1.** Insureds;

    **2.** claims made or suits brought;

    **3.** persons or organizations making claims or bringing suits.

**B.** The Limits of Insurance of this policy will apply as follows:

    **1.** This policy applies only in excess of the "Underlying Limits of Insurance" shown in Item **5.** of the Declarations.

    **2.** The aggregate limit shown in Item **4.** of the Declarations is the most we will pay for all "loss" that is subject to an aggregate limit provided by the "first underlying insurance." The aggregate limit applies separately and in the same manner as the aggregate limits provided by the "first underlying insurance," provided that all "underlying insurance" applies their aggregate limit in the same manner as the "first underlying insurance."

    **3.** Subject to **B.2.,** the occurrence limit stated in Item **4.** of the Declarations is the most we will pay for all "loss" arising out of any one occurrence to which this policy applies.

    **4.** Subject to Paragraphs **B.2.** and **B.3.** above, if the "Underlying Limits of Insurance" described in Item **5.** of the Declarations are either reduced or exhausted solely by payment of "loss," such insurance provided by this policy will apply in excess of the reduced underlying limit or, if all underlying limits are exhausted, will apply as "underlying insurance" subject to the same terms, conditions, definitions and exclusions of the "first underlying insurance," except for the terms, conditions, definitions and exclusions of this policy.

RB00285
Exhibit 49, Page 319

However, we will not pay that portion of a "loss" that is within the "Underlying Limits of Insurance" which the Insured has agreed to fund by self-insurance or means other than insurance.

5. The limits of this policy apply separately to each consecutive annual period, and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations unless the policy period is extended after issuance for an additional period of less than 12 months. In that case the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**III. DEFENSE**

A. We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

B. We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss." If we exercise such right, we will do so at our own expense, but not after the limits of this policy are exhausted.

**IV. EXCLUSIONS**

This policy does not apply to:

A. Any liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or related in any way, either directly or indirectly, to:

1. asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust, including, but not limited to, manufacture, mining, use, sale, installation, removal, or distribution activities;

2. exposure to testing for, monitoring of, cleaning up, removing, containing or treating of asbestos, asbestos pro-

ducts, asbestos-containing materials or products, asbestos fibers or asbestos dust; or

3. any obligation to investigate, settle or defend, or indemnify any person against any claim or suit arising out of or related in any way, either directly or indirectly, to asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust.

B. Any liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or in any way related to:

1. the actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of "pollutants," however caused;

2. any request, demand, or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants." This includes demands, directives, complaints, suits, orders or requests brought by any governmental entity or by any person or group of persons;

3. steps taken or amounts incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or assess the effects of "pollutants."

This exclusion will apply to any liability, costs, charges or expenses, or any judgments or settlements, arising directly or indirectly out of pollution whether or not the pollution was sudden, accidental, gradual, intended, expected, unexpected, preventable or not preventable.

As used in this exclusion "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material.

RB00286
Exhibit 49, Page 320

Waste material includes materials which are intended to be or have been to be recycled, reconditioned or reclaimed.

**C.** Any liability excluded by the Nuclear Energy Liability Exclusion attached to this policy.

## V. DEFINITIONS

**A.** "First underlying insurance" means the policy or policies of insurance stated as such in Item **5.** of the Declarations.

**B.** "Loss" means those sums actually paid in the settlement or satisfaction of a claim which you are legally obligated to pay as damages after making proper deductions for all recoveries and salvage.

**C.** "Underlying insurance" means "first underlying insurance" and all policies of insurance listed in Item **5.** of the Declarations.

**D.** "Underlying Limits of Insurance" means the total sum of the limits of all applicable "underlying insurance" stated in Item **5.** of the Declarations, including self-insurance, or means other than insurance.

## VI. CONDITIONS

### A. Appeals

In the event you or any underlying insurer elects not to appeal a judgment in excess of the amount of the "Underlying Limits of Insurance," we may elect to appeal at our expense. If we do so elect, we will be liable for the costs and interest incidental to this appeal. In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **II.** of this policy.

### B. Bankruptcy or Insolvency

The bankruptcy, insolvency or inability to pay of any Insured or the bankruptcy, insolvency or inability to pay of any of the underlying insurers will not relieve us from the payment of any claim or suit covered by this policy.

In the event of bankruptcy or insolvency of any underlying Insurer, the insurance afforded by this policy will not replace

such "underlying insurance," but will apply as if the "underlying insurance" was available and collectible.

### C. Changes

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver or change in any part of this policy. This policy can only be changed by a written endorsement that becomes a part of this policy and that is signed by one of our authorized representatives.

### D. Cancellation

**1.** You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

**2.** We may cancel this policy. If we cancel because of nonpayment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than thirty (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item **1.** of the Declarations will be sufficient to prove notice.

**3.** The policy period will end on the day and hour stated in the cancellation notice.

**4.** If we cancel, final premium will be calculated pro rata based on the time this policy is in force.

**5.** If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure.

**6.** Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's

RB00287
Exhibit 49, Page 321

check, mailed or delivered, will be suf-
ficient tender of any refund due you.

**7.** The first Named Insured in Item **1.** of
the Declarations will act on behalf of
all other Insureds with respect to the
giving and receiving of notice of can-
cellation and the receipt of any refund
that may become payable under this
policy.

**8.** Any of these provisions that conflict
with a law that controls the cancella-
tion of the insurance in this policy is
changed by this statement to comply
with the law.

### E. First Named Insured Duties

The person or organization first named in
Item **1.** of the Declarations is responsible
for the payment of all premiums. The first
Named Insured will act on behalf of all
other Named Insureds for the giving and
receiving of notice of cancellation or the
receipt of any return premium that may
become payable.

We will be furnished a complete copy of
the "first underlying insurance" described
in Item **5.** of the Declarations and any
subsequently issued endorsements which
may in any way affect this insurance.

### F. Legal Actions Against Us

There will be no right of action against us
under this insurance unless:

**1.** you have complied with all the terms
of this policy; and

**2.** the amount you owe has been deter-
mined by settlement with our consent
or by actual trial and final judgment.

This insurance does not give anyone the
right to add us as a party in an action
against you to determine your liability.

### G. Maintenance of Underlying Insurance

During the period of this policy, you agree:

**1.** to keep the policies listed in Item **5.** of
the Declarations in full force and ef-
fect;

**2.** that the Limits of Insurance of the "un-
derlying insurance" policies listed in
Item **5.** of the Declarations will be
maintained except for any reduction or
exhaustion of aggregate limits by pay-
ment of claims or suits for "losses"
covered by "underlying insurance."

If you fail to comply with these require-
ments, we will only be liable to the same
extent that we would have been had you
fully complied with these requirements.

### H. Notice of Occurrence

**1.** You must see to it that we are notified
as soon as practicable of an occur-
rence which may result in a claim or
suit which may involve this policy. To
the extent possible, notice will include:

**a.** how, when and where the occur-
rence took place;

**b.** the names and addresses of any
injured persons and witnesses;

**c.** the nature and location of any in-
jury or damage arising out of the
occurrence.

**2.** If a claim or suit against any Insured is
reasonably likely to involve this policy
you must notify us in writing as soon
as practicable.

**3.** You and any other involved Insured
must:

**a.** immediately send us copies of
any demands, notices, summons-
es or legal papers received in con-
nection with the claim or suit;

**b.** authorize us to obtain records and
other information;

**c.** cooperate with us in the inves-
tigation, settlement or defense of
the claim or suit; and

**d.** assist us, upon our request, in the
enforcement of any right against
any person or organization which

CE 65 24 06 97    (Page 4 of 7)

RB00288
Exhibit 49, Page 322

may be liable to the Insured be-cause of injury or damage to which this insurance may also ap-ply.

**4.** If the "Underlying Limits of Insurance" are exhausted solely by payment of "loss," no Insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, with-out our consent.

### I. Other Insurance

If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

Other insurance includes any type of self-insurance or other mechanism by which an Insured arranges for funding of legal liabilities.

### J. Premium

Unless otherwise provided, the premium for this policy is a flat premium and is not subject to adjustment except as provided herein or amended by endorsement. If any

additional premium charge is made to the "underlying insurance" during the policy period or if there is an increase in the risk assumed by us, our premium may be ad-justed accordingly.

### K. Terms Conformed to Statute

The terms of this policy which are in con-flict with the statutes of the state where this policy is issued are amended to con-form to such statutes.

If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by law or statute, indemnify the Insured.

### L. When "Loss" is Payable

Coverage under this policy will not apply unless and until the Insured or the In-sured's "underlying insurance" is obligat-ed to pay the full amount of the "Under-lying Limits of Insurance."

When the amount of "loss" has finally been determined, we will promptly pay on behalf of the Insured the amount of "loss" falling within the terms of this policy.

### NUCLEAR ENERGY LIABILITY EXCLUSION

This policy does not apply to:

**A.** Any liability, injury or damage:

**1.** with respect to which any Insured under the policy is also an Insured under a nu-clear energy liability policy issued by Nu-clear Energy Liability Insurance Associ-ation, Mutual Atomic, Energy Liability Un-derwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an Insured under any such policy but for its termination upon exhaustion of its Limits of Insurance; or

**2.** resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** a person or organization is re-quired to maintain financial protection pur-suant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** any Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement en-tered into by the United States of America, or any agency thereof, with any person or organization.

RB00289
Exhibit 49, Page 323

**B.** Any injury or "nuclear property damage" resulting from the "hazardous properties" of "nuclear material," if:

**1.** the "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, any Insured or **(b)** has been discharged or dispersed therefrom;

**2.** the "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

**3.** the injury or "nuclear property damage" arises out of the furnishing by any Insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **B.3.** applies only to "nuclear property damage" to such "nuclear facility" and any property therein.

**C.** As used in this exclusion:

**1.** "Hazardous properties" includes radioactive, toxic or explosive properties.

**2.** "Nuclear facility" means:

**a.** any "nuclear reactor";

**b.** any equipment or device designed or used for

**(1)** separating the isotopes of uranium or plutonium,

**(2)** processing or utilizing "spent fuel" or

**(3)** handling, processing or packaging "nuclear waste";

**c.** any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of any Insured at the premises where such equipment or device is located

consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** any structure, basin, excavation, premises or place prepared or used for the storage or disposal of, "nuclear waste," and includes the site on which any of the foregoing is located, all operations considered on such site and all premises used for such operations.

**3.** "Nuclear material" means "source material," "special nuclear material" or by-product material.

**4.** "Nuclear property damage" includes all forms of radioactive contamination of property.

**5.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**6.** "Nuclear waste" means any "nuclear waste" material **(a)** containing "by-product material" other than the tailings of "nuclear waste" produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" under Paragraph **C.2.a.** or **C.2.b.**

**7.** "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**8.** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

This endorsement does not change any other provision of the policy.

RB00290
Exhibit 49, Page 324

**In Witness Whereof,** we have caused this policy to be executed and attested, but this policy will not be valid unless countersigned by one of our duly authorized representatives, where required by law.



CE 65 24 06 97                                (Page 7 of 7)

RB00291
Exhibit 49, Page 325

**EXCESS LIABILITY**
**CE 65 27 05 16**

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FOLLOWING  FORM  ENDORSEMENT

This endorsement  modifies  insurance  provided  under the following:

EXCESS LIABILITY  COVERAGE FORM

It is agreed that  this policy  is subject  to the exact  terms  and conditions  of the
EVEREST INDEMNITY INSURANCE COMPANY
Policy Number  XC2EX00126-211                     , except  with respect  to the:

Limits  of Insurance;

Premium;  and

Any  exclusions  or endorsements   attached  to this policy.

All  preprinted  terms  and conditions  of Form  CE 6524 0697 are deleted  to the extent  that  they vary from
or are inconsistent  with the terms and conditions  of the
EVEREST INDEMNITY INSURANCE COMPANY
Policy Number  XC2EX00126-211                     , except  for Condition  **L., When "Loss" is Payable.**

Nothing  in this endorsement   will obligate  us to pay a "loss"  or assume  charge of the investigation  of
any claim  or defense  of any  suit against  you before  the Limits  of Insurance  shown  in Item  **5.** of the
Declarations,  Underlying  Insurance,  are exhausted  by payment  of "loss"  or "losses"  by the Insured  or
the Insured's  "underlying   insurance."

This endorsement   does not  change  any other  provision  of the policy.

**CE 65 27 05 16**     Includes copyrighted  material of Insurance Services Office, Inc., with  its permission.     **Page 1 of 1**

©  2016 Liberty Mutual Insurance

RB00292
Exhibit 49, Page 326

COMMERCIAL  EXCESS LIABILITY
CE 65 29 01 15

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM  EXCLUSION

This endorsement  modifies  insurance  provided  under the following:

EXCESS LIABILITY  COVERAGE FORM



The following  exclusion  is added to Section  **IV - EXCLUSIONS:**

"Any  injury  or damage"  arising,  directly  or indirectly,  out of a "certified  act of terrorism".

As used in this  exclusion:

"Any  injury  or damage"  means any injury  or damage  covered  by this insurance  in excess of the "underlying  insurance,"  and includes but is not limited to "bodily  injury",  "property  damage",  "personal injury"  or "advertising  injury"  as may be defined  in any applicable  coverage  part or "underlying insurance."

"Certified  act of terrorism"  means an act that is certified  by the Secretary  of the Treasury,  in accordance with  the provisions  of the federal  Terrorism  Risk Insurance  Act, to be an act of terrorism  pursuant  to such Act. The criteria  contained  in the Terrorism  Risk Insurance  Act for a "certified  act of terrorism" include  the following:

1.  The act resulted  in insured  losses in excess of $5 million  in the aggregate,  attributable  to all types of insurance  subject  to the Terrorism  Risk Insurance  Act; and

2.  The act is a violent  act or an act that is dangerous  to human  life, property  or infrastructure  and is committed  by an individual  or individuals  as part of an effort to coerce the civilian  population  of the United  States or to influence  the policy  or affect  the conduct  of the United  States Government  by coercion.

The terms and conditions  of any terrorism  exclusion,  or the inapplicability  or omission  of a terrorism exclusion,  do not serve to create  coverage  for injury  or damage  that is otherwise  excluded  under this policy.

This endorsement  does not change any other provision  of the policy.

**CE 65 29 01 15**    © 2015 Liberty Mutual Insurance
Includes copyrighted  material of Insurance Services Office, with its permission.    **Page 1 of 1**

**EXCESS LIABILITY**
**CE 66 54 05 09**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF THE LAW EXCLUSION

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Section IV - Exclusions:

This insurance does not apply to:

Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:

1.  The Telephone Consumer Protection Act (TCPA) including any amendment of or addition to such law;

2.  The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

3.  The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

4.  Any federal, state or local statute, ordinance or regulation, other than TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

This endorsement does not change any other provision of the policy.

©2010 Liberty Mutual Insurance Company. All rights reserved.

**CE 66 54 05 09**    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    **Page 1 of 1**

RB00294
Exhibit 49, Page 328

**EXCESS LIABILITY**
**CE 88 62 05 16**

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MANUFACTURERS  ERRORS OR OMISSIONS  EXCLUSION

This endorsement  modifies  insurance  provided  under the following:

EXCESS LIABILITY  COVERAGE FORM



**A.** The following  exclusion  is added to Section **IV - EXCLUSIONS:**

This policy  does not apply to:

"Damages"  arising  out of any "manufacturer's   error or omission."

This exclusion  applies  even if the claims against  any insured  allege negligence  or other wrongdoing  in the supervision,  hiring, employment,  training  or monitoring  of others by that insured.

**B.** For the purposes  of this endorsement  the following  definitions  are added to Section **V. DEFINITIONS:**

"Damages":

**a.** Means economic  loss sustained  by your customer  because of their loss of use of their tangible  property  which  has not been physically  injured  or destroyed,  provided  that such loss of use does not arise from any sudden and accidental  physical  injury  to "your  product."

**b.** "Damages"  includes  but is not limited  to:

**(1)** The purchase  or contract  price for "your product."

**(2)** Costs and expenses  incurred  by you or on your behalf to fulfill  a warranty,  representation,  or promise  provided  with "your product."

**(3)** Disgorgement  of profits,  restitution,  or any money  or credits  that represent  any gain, profit,  or advantage  to which  you are not legally  entitled.

**(4)** Costs to restore  goodwill  of your customer.

**(5)** Criminal  or civil penalties.

"Manufacturer's   error or omission":

Means an Insured's  negligent  design, installation  or manufacture  of "your  product"  resulting  in the failure  of "your  product"  to perform  the function  or serve the purpose  intended  after it has left the possession  of any Insured.

"Your product"  means your product  as it is defined  by the "first  underlying  insurance."

This endorsement  does not change any other provisions  of the policy.

© 2016 Liberty Mutual Insurance.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RB00295
Exhibit 49, Page 329

**EXCESS LIABILITY**
**CE 88 64 10 14**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION EXCLUSION

**A.** The following exclusion is added to Section **IV - EXCLUSIONS:**

This policy does not apply to:

Any liability, damages, loss, injury, demand, "claim" or "suit" arising out of:

**1.** Any access to or disclosure of any person's or organization's confidential or personal information, including but not limited to patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**2.** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses, fines, penalties (including but not limited to, fees or surcharges from affected financial institutions) or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **1** or **2** above.

However, unless Paragraph **1** above applies, this exclusion does not apply to damages because of "bodily injury".

**B.** For the purposes of this endorsement the following definition is added:

"Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including but not limited to systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

This endorsement does not change any other provisions of the policy.

©  2014 Liberty Mutual Insurance.

**CE 88 64 10 14**    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    **Page 1 of 1**

RB00296
Exhibit 49, Page 330

CU 60 05 06 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NAMED INSURED

The Named Insured listed in Item **1** of the Declarations is changed to the following:



RLC INDUSTRIES CO.                                                                    , as per the scheduled
"first underlying insurance".

This endorsement does not change any other provision of the policy.

CU 60 05 06 97                              (Page 1 of 1)

RB00297
Exhibit 49, Page 331

CU 60 53 06 97

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CANCELLATION  AMENDMENT

Condition  **VI.D.2. (Cancellation)**  is amended  to read as shown  below:

We may cancel this policy.  If we cancel because of nonpayment  of premium,  we must  mail or deliver  to you not less than ten (10) days' advance  written notice stating  when the cancellation  is to take effect. If we cancel for any other reason, we must  mail or deliver  to you not less than  90  days' advance written  notice stating  when the cancellation  is to take effect. Mailing  that notice to you at your mailing  address shown  in Item  **1.** of the Declarations will  be sufficient  to prove notice.

This endorsement  does not change any other provision  of the policy.

CU 60 53 06 97                                   (Page 1 of 1)

RB00298
Exhibit 49, Page 332

COMMERCIAL UMBRELLA
CU 61 69 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OREGON CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE PART



**A.** Provision **2.** of Condition **D. Cancellation** under **Section VI - Conditions** is replaced by the following:

**2.** If this policy has been in effect for:

    **a.** Fewer than 60 days and is not a renewal policy, we may cancel for any reason.

    **b.** 60 days or more or is a renewal policy, we may cancel policy only for one or more of the following reasons:

        **(1)** Nonpayment of premium;

        **(2)** Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy or in presenting a claim under the policy;

        **(3)** Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision;

        **(4)** Failure to comply with reasonable loss control recommendations;

        **(5)** Substantial breach of contractual duties, conditions or warranties;

        **(6)** Determination by the commissioner that the continuation of a line of insurance or class of business to which the policy belongs will jeopardize our solvency or will place us in violation of insurance laws of Oregon or any other state;

        **(7)** Loss or decrease in reinsurance covering the risk; or

        **(8)** Any other reason approved by the commissioner by rule.

    We will mail or deliver to the first Named Insured written notice of cancellation, stating the reason for the cancellation and when the cancellation is to take effect. This notice will be mailed or delivered to the first Named Insured's last mailing address known to us.

    With respect to insurance provided under paragraph **2.b.(8)** above, the cancellation will not be effective until at least 10 working days after the first Named Insured receives our notice.

    With respect to insurance other than that provided under paragraph **2.b.(8)** above, cancellation will not be effective until at least:

RB00299
Exhibit 49, Page 333

    **a.** 10 days after the first Named Insured receives our notice, if we cancel for nonpayment of premium;  or

    **b.** 30 days after the first Named Insured receives our notice, if we cancel for any other reason.

**B.** The following  are added and supersede any provision  to the contrary:

    **1.** **Nonrenewal**

    We may elect not to renew this policy by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal before the:

    **a.** Expiration  date of the policy;  or

    **b.** Anniversary  date of the policy if the policy is written for a term of more than one year or without  a fixed expiration  date.

    However, if this policy is issued for a term or more than one year and for additional consideration the premium is guaranteed, we may not refuse to renew the policy at its anniversary  date.

    Nonrenewal  will not be effective  until at least 45 days after the first Named Insured receives our notice.

    **2.** **Mailing  Of Notices**

    If a notice of cancellation  or nonrenewal  is mailed, a post office certificate  of mailing will be conclusive  proof that the first Named Insured received the notice on the third calendar day after the date of the certificate  of mailing.

**CU 64 87 10 05**

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ECONOMIC  OR TRADE SANCTIONS  CONDITION  ENDORSEMENT



The following   is added to Section **VI - CONDITIONS:**

**Economic or Trade Sanctions**

If coverage  for a claim  or suit under this policy  is in violation  of any United  States of America  economic  or trade sanctions,  including  but not limited  to, sanctions  administered   and enforced   by the United  States Treasury Department's   Office of Foreign  Assets Control  ("OFAC"),  then coverage  for that claim  or suit will be null and void.

This endorsement   does not change  any other provision  of the policy.

**CU 64 87 10 05**

This page intentionally left blank.

RB00302

# EXHIBIT G



# WILDFIRE EXCLUSION AND DROP DOWN EXCLUSION ENDORSEMENT M001

This endorsement modifies insurance provided under the following:

**HIGH EXCESS LIABILITY FORM**

This policy is amended as follows:

**SECTION IV – EXCLUSIONS** is amended to include the following additional exclusions:

[This policy does not apply:]

**WILDFIRE –** To any liability arising out of **Wildfire**.

**DROP DOWN –** In excess of or recognize any reduced or exhausted limits of insurance of **Underlying Insurance** or self-insured retention to the extent that such reduction or exhaustion is the result of any liability, demand, claim, **Suit**, action, judgment, settlement, defense, damage, loss, cost or expense arising out of or in any way related to **Wildfire**.

**SECTION VI – DEFINITIONS** is amended to include the following additional definition:

**Wildfire** means any uncontrolled, uncontrollable, unplanned fire or any other fire(s) that breaks out from where it was intended to be, including, but not limited to, wild fire, wildland fire, rural fire, forest fire, brush fire, vegetation fire, grass fire, peat fire, bush fire, hill fire, desert fire, veld fire, escaped prescribed fire or escaped wild fire. **Wildfire** includes all exposures associated with or resulting directly or indirectly from such fire(s), including, but not limited to, smoke, heat, soot, char, fumes or any consumption of buildings, structures or agricultural resources by such fire(s).

THE PROVISIONS OF THIS ENDORSEMENT APPLY NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS POLICY AND SUPERSEDE ANY OTHER TERMS, CONDITIONS AND PROVISIONS CONTAINED IN THIS POLICY OR ITS ENDORSEMENTS.

All other terms and conditions remain unchanged.


Copyright ©2019 Allianz Global Risks US Insurance Company. All rights reserved.

**Endorsement No.:**
This Endorsement, effective:
(at 12:01 A.M. prevailing time at the address stated in Item 1. (b) of the Declarations)
forms a part of Policy No.:
Issued to:
By: Allied World Assurance Company (U.S.) Inc.

# WILDFIRE LIABILITY EXCLUSION

It is agreed that this **policy** does not provide coverage for any bodily injury, property damage, personal injury and advertising injury, liability, **loss**, injury, damage, cost or expense arising out of, either directly or indirectly or in whole or in part, **wildfire liability**.

Solely for the purposes of this endorsement, SECTION VI - DEFINITIONS is amended to include the following additional definitions:

**Wildfire liability** means bodily injury, property damage, personal injury and advertising injury, which arises out of a **wild fire**, including any cost the **insured** becomes legally obligated to pay as reimbursement for fighting, suppressing or bringing under control any **wild fire**.

**Wild fire** means any wild fire, wildland fire, forest fire, brush fire, vegetation fire, grass fire, peat fire, bushfire, hill fire, desert fire, veldfire, escaped prescribed fires, escaped wildland fire or any other uncontrolled or unplanned fire, which may (but not required to) also consume houses, buildings or other structures and agricultural resources.  **Wild fire** includes all risk associated with or resulting from such fire(s), such as smoke, heat, soot or fumes.

It is understood that to the extent any coverage may otherwise be provided under this policy or any of its endorsements, the provisions of this exclusion will supersede.

All other terms and conditions of this **policy** remain unchanged.

**Allied World Assurance Company (U.S.) Inc.**

**By:**

Joseph Cellura

**Title:  President, North American Casualty Division**

**Date of Issuance:**

GL 00589 00 (06/19)

Page 1 of 1

## Excess Insurance Policy

 

## LIBERTY SURPLUS INSURANCE CORPORATION

(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 10

| | |
|---|---|
| **Named Insured:** | |
| **Policy Number:** | |
| **Effective Date:** | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### WILDFIRE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY – UMBRELLA COVERAGE FORM

EXCESS LIABILITY COVERAGE FORM

The following exclusion is added to the policy.

Any liability arising out of any "wildfire," whether the damage or injury occurs concurrently or in any sequence with any other cause or event.

As used in this endorsement, "wildfire" means a planned or unplanned fire that:

**1.** Grows out of control and damages an acre or more of vegetation and may, but is not required to, consume houses, buildings or other structures; and

**2.** Includes all risk associated with or resulting from the fire such as smoke, heat, soot, or fumes.

"Wildfire" includes, but is not limited to, a hostile fire, wildland fire, forest fire, brush fire, vegetation fire, grass fire, peat fire, bushfire, hill fire, desert fire, veldfire, escaped prescribed fire, and escaped wildland fire.

This endorsement does not change any other provision of the policy.

This endorsement does not change any other provision of the policy.

| 1 | 1 |
|---|---|

187-XS (Ed. 03 00)

EXHIBIT 50

EXHIBIT 50

EXHIBIT 50

| | |
|---|---|
| **From:** | caed_cmecf_helpdesk@caed.uscourts.gov |
| **To:** | CourtMail@caed.uscourts.gov |
| **Subject:** | Activity in Case 2:23-cv-00649-TLN-DB RLC Industries Co. et al v. Liberty Ins. Co., et al Minute Order. |
| **Date:** | Monday, August 7, 2023 8:06:48 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of California - Live System

## Notice of Electronic Filing

The following transaction was entered on 8/7/2023 at 8:04 AM PDT and filed on 8/7/2023
**Case Name:**          RLC Industries Co. et al v. Liberty Ins. Co., et al
**Case Number:**       2:23-cv-00649-TLN-DB
**Filer:**
**Document Number:** 28(No document attached)

**Docket Text:**
**MINUTE ORDER issued by Courtroom Deputy M. Krueger for District Judge Troy L. Nunley on 8/7/2023: Pursuant to the parties' Stipulation (ECF No. [27]), Defendant Ohio Casualty Insurance Company ONLY is hereby DISMISSED with prejudice, with each party bearing its own attorneys' fees and costs. The Court shall retain jurisdiction to enforce the terms of the Parties' Confidential Settlement Agreement and Mutual Release to resolve any disputes regarding the Settlement Agreement, and to order any appropriate remedy, if a Party fails to comply with the terms of the Settlement Agreement. (TEXT ONLY ENTRY) (Krueger, M)**

**2:23-cv-00649-TLN-DB Notice has been electronically mailed to:**

Andrew Richard McCloskey      amccloskey@mwwdlaw.com, nteichert@mwwdlaw.com, nwright@mwwdlaw.com

Charlotte Elizabeth Leszinske      cleszinske@huntonak.com

David Gregory Hackett      dhackett@mwwdlaw.com, nwright@mwwdlaw.com

Frank Falzetta      ffalzetta@sheppardmullin.com, vibarra@sheppardmullin.com

Jeffrey S. Crowe     jcrowe@sheppardmullin.com, lpalmer@sheppardmullin.com

Mary E. Gregory     mgregory@sheppardmullin.com, vcastro@sheppardmullin.com

Rachel E. Hudgins , PHV     rhudgins@HuntonAK.com

Richard Edward Decker     rdecker@mwwdlaw.com

Scott P. DeVries     sdevries@hunton.com, reloriaga@hunton.com, RHudgins@hunton.com

**2:23-cv-00649-TLN-DB Electronically filed documents must be served conventionally by the filer to:**

EXHIBIT 51

EXHIBIT 51

EXHIBIT 51

1  FRANK FALZETTA, Cal. Bar No. 125146
   MARY E. GREGORY, Cal. Bar No. 210247
2  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   333 South Hope Street, 43rd Floor
3  Los Angeles, California 90071-1422
   Telephone:   213.620.1780
4  Facsimile:    213.620.1398
   Email:        ffalzetta@sheppardmullin.com
5                mgregory@sheppardmullin.com

6  JEFFREY S. CROWE, Cal. Bar No. 216055
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
7  650 Town Center Drive, 10th Floor
   Costa Mesa, California 92626
8  Telephone:   714.513.5100
   Facsimile:    714.513.5130
9  Email:        jcrowe@sheppardmullin.com

10 Attorneys for Defendants
   LIBERTY INSURANCE CORPORATION
11 and THE OHIO CASUALTY INSURANCE
   COMPANY

12

13              **UNITED STATES DISTRICT COURT**

14    **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

15

16 RLC INDUSTRIES CO. and ROSEBURG         Case No. 2:23-cv-00649-TLN-DB
   FOREST PRODUCTS CO.,
17                                         Assigned to the Hon. Troy L. Nunley and
                Plaintiffs,                Magistrate Judge Deborah Barnes
18
        v.
19                                         **DEFENDANT LIBERTY INSURANCE**
   LIBERTY INSURANCE                       **CORPORATION'S REQUESTS FOR**
20 CORPORATION, EVEREST NATIONAL           **PRODUCTION OF DOCUMENTS TO**
   INSURANCE COMPANY, and THE              **PLAINTIFF ROSEBURG FOREST**
21 OHIO CASUALTY INSURANCE                 **PRODUCTS CO.**
   COMPANY,
22                                         **[SET ONE]**
                Defendants.
23

24

25 PROPOUNDING PARTY:        Defendant Liberty Insurance Corporation

26 RESPONDING PARTY:         Plaintiff Roseburg Forest Products Co.

27 SET NUMBER:               One (1)

28
                                    -1-
   SMRH:4860-3884-4520.3         LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
                                 TO ROSEBURG FOREST PRODUCTS CO. [SET ONE]

1   Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendant Liberty

2 Insurance Corporation ("Liberty") requests that plaintiff Roseburg Forest Products Co.

3 ("Roseburg") produce for inspection and copying the documents or other tangible things

4 described below that are in Roseburg's possession, custody or control.  Liberty requests

5 that the production, inspection and copying of such documents or other tangible things take

6 place on August 17, 2023, at 10:00 a.m. at the law offices of Sheppard, Mullin, Richter &

7 Hampton LLP, 333 South Hope Street, 43rd Floor, Los Angeles, California 90071.

8 Roseburg may comply with these requests by delivering, on or before thirty (30) days after

9 service of these requests, its responses and copies of responsive documents to counsel for

10 Liberty at the aforementioned address, with the understanding that Liberty reserves the

11 right to inspect the originals upon request.

12            **I.**

13       **INSTRUCTIONS AND DEFINITIONS**

14   The following instructions and definitions shall apply to each request set forth in

15 this First Set of Requests for Production of Documents ("Requests"):

16 **A.**  **INSTRUCTIONS**

17   1.  These Requests require the production of documents in Roseburg's

18 possession, custody or control, including documents in the possession of Roseburg's

19 employees, agents, representatives, attorneys and any other person or entity acting or

20 purporting to act on Roseburg's behalf.

21   2.  Roseburg is under a duty to supplement its responses to these Requests as set

22 forth in Rule 26(e) of the Federal Rules of Civil Procedure.

23   3.  Production of documents in response to these Requests shall be made in

24 accordance with each specified demand.  The documents produced shall be separately

25 identified to correspond to the demand to which they are responsive.

26   4.  If Roseburg refuses to produce any documents based on a claim of privilege,

27 please provide a written privilege log which includes the following information with

28 respect to each document claimed to be privileged:

SMRH:4860-3884-4520.3         LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
                    TO ROSEBURG FOREST PRODUCTS CO. [SET ONE]

|    |    |                                                                                      |
|----|----|--------------------------------------------------------------------------------------|
| 1  | a. | The title or type of document (*e.g.*, letter, memorandum, telegraph,                |
| 2  |    | etc.);                                                                               |
| 3  | b. | The date of the document;                                                            |
| 4  | c. | The identity of each individual or entity that created, authored or                  |
| 5  |    | originated the document;                                                             |
| 6  | d. | The identity of each individual or entity to whom the document was                   |
| 7  |    | addressed, disclosed or sent;                                                        |
| 8  | e. | The subject matter of the document in sufficient detail to allow the                 |
| 9  |    | Court and attorneys for the propounding party to ascertain whether the               |
| 10 |    | document is privileged;                                                              |
| 11 | f. | The nature of, and grounds for, the privilege(s) asserted.                           |

**B.**    **DEFINITIONS**

1.     The terms "YOU" and "YOUR" means plaintiff Roseburg Forest Products Co., any persons acting on its behalf, including its owners, shareholders, managers, employees, agents, attorneys, representatives, inspectors, investigators, accountants, or partners, or any other entity or individual acting on its behalf.

2.     The term "LIBERTY" means defendant Liberty Insurance Corporation and each of its agents, employees or representatives.

3.     The term "COMPLAINT" means the Complaint YOU filed in this lawsuit on or about April 7, 2023 in the United Stated District Court, Eastern District of California, Case No. 2:23-CV-00649-TLN-DB.

4.     The term "POLICY" means LIBERTY general liability policy no. TB7-661-067089-031, as referenced in Paragraph 53.a of the COMPLAINT.

5.     The term "MILL FIRE" means the fire YOU allege began inside YOUR manufacturing mill located in Weed, California, and that YOU contend spread through the town of Weed and the neighboring community of Lake Shastina, as referenced in Paragraph 3 of the COMPLAINT.

6.     The term "MILL FIRE CLAIMS" means the claims made and lawsuits filed

LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
TO ROSEBURG FOREST PRODUCTS CO. [SET ONE]

against YOU for alleged losses arising from the MILL FIRE for which YOU sought a defense from LIBERTY under the POLICY, as referenced in Paragraphs 44 and 45 of the COMPLAINT.

7.    The term "DOCUMENT(S)" is used in the broadest sense possible and shall mean and include, without limitation, any and all "writings" and "recordings" as the term is defined by Federal Rule of Evidence, Rule 1001, papers, correspondence, notes, letters, electronic mail, facsimiles, transmittals, bulletins, instructions, rulings, decisions, policies, binders, books, printed matter, memoranda, checks, contracts or any other types of agreement, notes of meetings or interviews or telephone conversations, and any other form of communication or representation including letters, records, pictures, film, videotape, sounds, symbols or communications thereof.

8.    The terms "RELATED TO" and "RELATING TO" shall mean relating to, referring to, containing, identifying, evidencing, reflecting, embodying, comprising, stating, dealing with, commenting on, responding to, analyzing, describing, mentioning, pertaining to or bearing any logical or factual connection with the matter discussed.

9.    The term "LIBERTY MUTUAL" means Liberty Mutual Insurance Company and its related or affiliated entities.

10.    The conjunctives "and" and "or" shall be construed conjunctively or disjunctively, as necessary to bring within the scope of the Requests any documents that would otherwise not be brought within its scope.

11.    The singular form shall include the plural and vice versa, wherever such dual construction will serve to bring within the scope of this Request any document that would otherwise not be brought within its scope.

## II.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Please produce all DOCUMENTS that support the first count for Breach of Contract asserted against LIBERTY in YOUR COMPLAINT.

-4-

**REQUEST FOR PRODUCTION NO. 2:**

Please produce all DOCUMENTS that support the second count for Breach of the Covenant of Good Faith and Fair Dealing asserted against LIBERTY in YOUR COMPLAINT.

**REQUEST FOR PRODUCTION NO. 3:**

Please produce all DOCUMENTS that support YOUR contention at Paragraph 67 of YOUR COMPLAINT that "Liberty initially approved Roseburg's request to continue using Baker Hostetler as defense counsel . . . ."

**REQUEST FOR PRODUCTION NO. 4:**

Please produce all DOCUMENTS that support YOUR contention that YOU are entitled to independent counsel to defend YOU for the MILL FIRE CLAIMS, pursuant to California Civil Code section 2860.

**REQUEST FOR PRODUCTION NO. 5:**

Please produce all DOCUMENTS that support YOUR contention that LIBERTY'S retained defense counsel, Carlson, Calladine & Peterson, was not competent to defend YOU against the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 6:**

Please produce all DOCUMENTS RELATING TO any coverage advice that Baker Hostetler provided to YOU for the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 7:**

Please produce any conflict waiver entered into between YOU and Baker Hostetler RELATING to MILL FIRE CLAIMS, given Baker Hostetler's former and existing client relationship with LIBERTY MUTUAL.

**REQUEST FOR PRODUCTION NO. 8:**

Please produce all invoices for defense fees and costs submitted or sent by Baker Hostetler to YOU for legal services rendered between September 2, 2022 and February 16, 2023, for the MILL FIRE CLAIMS that YOU claim LIBERTY is obligated to pay under the POLICY.

**REQUEST FOR PRODUCTION NO. 9:**

Please produce all DOCUMENTS RELATING TO any and all payments that YOU have made to Baker Hostetler in connection with the MILL FIRE CLAIMS that YOU claim LIBERTY is obligated to pay under the POLICY.

**REQUEST FOR PRODUCTION NO. 10:**

Please produce all invoices for defense fees and costs submitted or sent by Baker Hostetler to YOU RELATING TO any and all insurance coverage advice it provided to YOU between September 2, 2022 and February 16, 2023 for the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 11:**

Please produce all DOCUMENTS RELATING TO any and all payments that YOU have made to Baker Hostetler in connection any and all insurance coverage advice it provided to YOU for the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 12:**

Please produce all invoices YOU received for expert, consultant, investigative or any other third-party services rendered in connection with YOUR defense of the MILL FIRE CLAIMS that YOU claim LIBERTY is obligated to pay under the POLICY.

**REQUEST FOR PRODUCTION NO. 13:**

Please produce all DOCUMENTS RELATING TO any and all payments that YOU have made to experts, consultants, investigators or any other third-party vendors in connection with the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 14:**

Please produce all DOCUMENTS RELATING TO YOUR investigation of the cause, origin, and progression of the MILL FIRE including, but not limited to, all DOCUMENTS prepared by or provided to YOU by Alix Partners.

**REQUEST FOR PRODUCTION NO. 15:**

Please produce any and all agreements you entered into with Baker Hostetler RELATING TO their representation of YOU for the MILL FIRE CLAIMS including, but not limited to, retainer and engagement agreements.

-6-

**REQUEST FOR PRODUCTION NO. 16:**

Please produce all DOCUMENTS supporting YOUR claim for attorneys' fees as alleged in Paragraphs 122 and 124 of YOUR COMPLAINT including, but not limited to, retainer agreements and fee statements.

**REQUEST FOR PRODUCTION NO. 17:**

Please produce all DOCUMENTS supporting YOUR claim for punitive damages.

Dated:  July 18, 2023

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

*Mary E. Gregory*

FRANK FALZETTA
JEFFREY S. CROWE
MARY E. GREGORY

Attorneys for Defendants
LIBERTY INSURANCE CORPORATION and
THE OHIO CASUALTY INSURANCE
COMPANY

-7-

SMRH:4860-3884-4520.3

LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
TO ROSEBURG FOREST PRODUCTS CO. [SET ONE]

EXHIBIT 52

EXHIBIT 52

EXHIBIT 52

1 | FRANK FALZETTA, Cal. Bar No. 125146
MARY E. GREGORY, Cal. Bar No. 210247
2 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
333 South Hope Street, 43rd Floor
3 | Los Angeles, California 90071-1422
Telephone:   213.620.1780
4 | Facsimile:   213.620.1398
Email:       ffalzetta@sheppardmullin.com
5 |             mgregory@sheppardmullin.com

6 | JEFFREY S. CROWE, Cal. Bar No. 216055
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
7 | 650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
8 | Telephone:   714.513.5100
Facsimile:   714.513.5130
9 | Email:       jcrowe@sheppardmullin.com

10 | Attorneys for Defendants
LIBERTY INSURANCE CORPORATION
11 | and THE OHIO CASUALTY INSURANCE
COMPANY

12

13 | **UNITED STATES DISTRICT COURT**

14 | **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

15

16 | RLC INDUSTRIES CO. and ROSEBURG | Case No. 2:23-cv-00649-TLN-DB
FOREST PRODUCTS CO.,
17 |                                  | Assigned to the Hon. Troy L. Nunley and
Plaintiffs,                        | Magistrate Judge Deborah Barnes
18 |
v.
19 |                                  | **DEFENDANT LIBERTY INSURANCE**
LIBERTY INSURANCE                   | **CORPORATION'S REQUESTS FOR**
20 | CORPORATION, EVEREST NATIONAL   | **PRODUCTION OF DOCUMENTS TO**
INSURANCE COMPANY, and THE          | **PLAINTIFF RLC INDUSTRIES CO.**
21 | OHIO CASUALTY INSURANCE
COMPANY,                            | **[SET ONE]**
22 |
Defendants.
23

24

25 | PROPOUNDING PARTY:    Defendant Liberty Insurance Corporation

26 | RESPONDING PARTY:     Plaintiff Roseburg Forest Products Co.

27 | SET NUMBER:           One (1)

28

-1-

LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
TO RLC INDUSTRIES CO. [SET ONE]

Exhibit 52, Page 001

1  Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendant Liberty

2  Insurance Corporation ("Liberty") requests that plaintiff RLC Industries Co. ("RLC")

3  produce for inspection and copying the documents or other tangible things described below

4  that are in RLC's possession, custody or control.  Liberty requests that the production,

5  inspection and copying of such documents or other tangible things take place on August

6  17, 2023, at 10:00 a.m. at the law offices of Sheppard, Mullin, Richter & Hampton LLP,

7  333 South Hope Street, 43rd Floor, Los Angeles, California 90071.  RLC may comply

8  with these requests by delivering, on or before thirty (30) days after service of these

9  requests, its responses and copies of responsive documents to counsel for Liberty at the

10  aforementioned address, with the understanding that Liberty reserves the right to inspect

11  the originals upon request.

**I.**

**INSTRUCTIONS AND DEFINITIONS**

14  The following instructions and definitions shall apply to each request set forth in

15  this First Set of Requests for Production of Documents ("Requests"):

16  **A.    INSTRUCTIONS**

17  1.    These Requests require the production of documents in RLC's possession,

18  custody or control, including documents in the possession of RLC's employees, agents,

19  representatives, attorneys and any other person or entity acting or purporting to act on

20  RLC's behalf.

21  2.    RLC is under a duty to supplement its responses to these Requests as set

22  forth in Rule 26(e) of the Federal Rules of Civil Procedure.

23  3.    Production of documents in response to these Requests shall be made in

24  accordance with each specified demand.  The documents produced shall be separately

25  identified to correspond to the demand to which they are responsive.

26  4.    If RLC refuses to produce any documents based on a claim of privilege,

27  please provide a written privilege log which includes the following information with

28  respect to each document claimed to be privileged:

-2-

SMRH:4871-7734-0017.1

LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
TO RLC INDUSTRIES CO. [SET ONE]

1            a.      The title or type of document (*e.g.*, letter, memorandum, telegraph,

2                    etc.);

3            b.      The date of the document;

4            c.      The identity of each individual or entity that created, authored or

5                    originated the document;

6            d.      The identity of each individual or entity to whom the document was

7                    addressed, disclosed or sent;

8            e.      The subject matter of the document in sufficient detail to allow the

9                    Court and attorneys for the propounding party to ascertain whether the

10                 document is privileged;

11            f.      The nature of, and grounds for, the privilege(s) asserted.

12  **B.**    **DEFINITIONS**

13      1.      The terms "YOU" and "YOUR" means plaintiff RLC Industries Co., any

14  persons acting on its behalf, including its owners, shareholders, managers, employees,

15  agents, attorneys, representatives, inspectors, investigators, accountants, or partners, or any

16  other entity or individual acting on its behalf.

17      2.      The term "LIBERTY" means defendant Liberty Insurance Corporation and

18  each of its agents, employees or representatives.

19      3.      The term "COMPLAINT" means the Complaint YOU filed in this lawsuit on

20  or about April 7, 2023 in the United Stated District Court, Eastern District of California,

21  Case No. 2:23-CV-00649-TLN-DB.

22      4.      The term "POLICY" means LIBERTY general liability policy no. TB7-661-

23  067089-031, as referenced in Paragraph 53.a of the COMPLAINT.

24      5.      The term "MILL FIRE" means the fire YOU allege began inside the

25  manufacturing mill located in Weed, California, and that YOU contend spread through the

26  town of Weed and the neighboring community of Lake Shastina, as referenced in

27  Paragraph 3 of the COMPLAINT.

28      6.      The term "MILL FIRE CLAIMS" means the claims made and lawsuits filed

-3-

against YOU for alleged losses arising from the MILL FIRE for which YOU sought a defense from LIBERTY under the POLICY, as referenced in Paragraphs 44 and 45 of the COMPLAINT.

7.     The term "DOCUMENT(S)" is used in the broadest sense possible and shall mean and include, without limitation, any and all "writings" and "recordings" as the term is defined by Federal Rule of Evidence, Rule 1001, papers, correspondence, notes, letters, electronic mail, facsimiles, transmittals, bulletins, instructions, rulings, decisions, policies, binders, books, printed matter, memoranda, checks, contracts or any other types of agreement, notes of meetings or interviews or telephone conversations, and any other form of communication or representation including letters, records, pictures, film, videotape, sounds, symbols or communications thereof.

8.     The terms "RELATED TO" and "RELATING TO" shall mean relating to, referring to, containing, identifying, evidencing, reflecting, embodying, comprising, stating, dealing with, commenting on, responding to, analyzing, describing, mentioning, pertaining to or bearing any logical or factual connection with the matter discussed.

9.     The term "LIBERTY MUTUAL" means Liberty Mutual Insurance Company and its related or affiliated entities.

10.     The conjunctives "and" and "or" shall be construed conjunctively or disjunctively, as necessary to bring within the scope of the Requests any documents that would otherwise not be brought within its scope.

11.     The singular form shall include the plural and vice versa, wherever such dual construction will serve to bring within the scope of this Request any document that would otherwise not be brought within its scope.

## II.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Please produce all DOCUMENTS that support the first count for Breach of Contract asserted against LIBERTY in YOUR COMPLAINT.

-4-

1 **REQUEST FOR PRODUCTION NO. 2:**

2        Please produce all DOCUMENTS that support the second count for Breach of the

3 Covenant of Good Faith and Fair Dealing asserted against LIBERTY in YOUR

4 COMPLAINT.

5 **REQUEST FOR PRODUCTION NO. 3:**

6        Please produce all DOCUMENTS that support YOUR contention at Paragraph 67

7 of YOUR COMPLAINT that "Liberty initially approved Roseburg's request to continue

8 using Baker Hostetler as defense counsel . . . ."

9 **REQUEST FOR PRODUCTION NO. 4:**

10       Please produce all DOCUMENTS that support YOUR contention that YOU are

11 entitled to independent counsel to defend YOU for the MILL FIRE CLAIMS, pursuant to

12 California Civil Code section 2860.

13 **REQUEST FOR PRODUCTION NO. 5:**

14       Please produce all DOCUMENTS that support YOUR contention that LIBERTY'S

15 retained defense counsel, Carlson, Calladine & Peterson, was not competent to defend

16 YOU against the MILL FIRE CLAIMS.

17 **REQUEST FOR PRODUCTION NO. 6:**

18       Please produce all DOCUMENTS RELATING TO any coverage advice that Baker

19 Hostetler provided to YOU for the MILL FIRE CLAIMS.

20 **REQUEST FOR PRODUCTION NO. 7:**

21       Please produce any conflict waiver entered into between YOU and Baker Hostetler

22 RELATING to MILL FIRE CLAIMS, given Baker Hostetler's former and existing client

23 relationship with LIBERTY MUTUAL.

24 **REQUEST FOR PRODUCTION NO. 8:**

25       Please produce all invoices for defense fees and costs submitted or sent by Baker

26 Hostetler to YOU for legal services rendered between September 2, 2022 and February 16,

27 2023, for the MILL FIRE CLAIMS that YOU claim LIBERTY is obligated to pay under

28 the POLICY.

-5-

**REQUEST FOR PRODUCTION NO. 9:**

Please produce all DOCUMENTS RELATING TO any and all payments that YOU have made to Baker Hostetler in connection with the MILL FIRE CLAIMS that YOU claim LIBERTY is obligated to pay under the POLICY.

**REQUEST FOR PRODUCTION NO. 10:**

Please produce all invoices for defense fees and costs submitted or sent by Baker Hostetler to YOU RELATING TO any and all insurance coverage advice it provided to YOU between September 2, 2022 and February 16, 2023 for the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 11:**

Please produce all DOCUMENTS RELATING TO any and all payments that YOU have made to Baker Hostetler in connection any and all insurance coverage advice it provided to YOU for the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 12:**

Please produce all invoices YOU received for expert, consultant, investigative or any other third-party services rendered in connection with YOUR defense of the MILL FIRE CLAIMS that YOU claim LIBERTY is obligated to pay under the POLICY.

**REQUEST FOR PRODUCTION NO. 13:**

Please produce all DOCUMENTS RELATING TO any and all payments that YOU have made to experts, consultants, investigators or any other third-party vendors in connection with the MILL FIRE CLAIMS.

**REQUEST FOR PRODUCTION NO. 14:**

Please produce all DOCUMENTS RELATING TO YOUR investigation of the cause, origin, and progression of the MILL FIRE including, but not limited to, all DOCUMENTS prepared by or provided to YOU by Alix Partners.

**REQUEST FOR PRODUCTION NO. 15:**

Please produce any and all agreements you entered into with Baker Hostetler RELATING TO their representation of YOU for the MILL FIRE CLAIMS including, but not limited to, retainer and engagement agreements.

-6-

1 | **REQUEST FOR PRODUCTION NO. 16:**

2 |     Please produce all DOCUMENTS supporting YOUR claim for attorneys' fees as

3 | alleged in Paragraphs 122 and 124 of YOUR COMPLAINT including, but not limited to,

4 | retainer agreements and fee statements.

5 | **REQUEST FOR PRODUCTION NO. 17:**

6 |     Please produce all DOCUMENTS supporting YOUR claim for punitive damages.

7 |

8 | Dated:  July 18, 2023

9 |                   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

10 |

11 |           By

12 |                   FRANK FALZETTA

                  JEFFREY S. CROWE

13 |                   MARY E. GREGORY

14 |

15 |                   Attorneys for Defendants

                  LIBERTY INSURANCE CORPORATION and

16 |                   THE OHIO CASUALTY INSURANCE

                  COMPANY

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

SMRH:4871-7734-0017.1            LIBERTY'S REQUESTS FOR PRODUCTION OF DOCUMENTS
                        TO RLC INDUSTRIES CO. [SET ONE]

EXHIBIT 53

EXHIBIT 53

EXHIBIT 53

1

**HUNTON ANDREWS KURTH LLP**
Scott P. DeVries (State Bar No. 88221)
50 California Street, Suite 1700
San Francisco, CA  94111
Telephone:  (415) 975-3700
Facsimile:  (415) 975-3701

Rachel E. Hudgins (admitted *pro hac vice*)
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190

2

3

4

5

Charlotte E. Leszinske (State Bar No. 346382)
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone:  (202) 955-1500
Facsimile:  (202) 788-2201

6

7

8

*Attorneys for Plaintiffs RLC Industries Co. and*
*Roseburg Forest Products Co.*

9

10

**UNITED STATES DISTRICT COURT**

11

**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

12

13

RLC INDUSTRIES CO. and ROSEBURG
FOREST PRODUCTS CO.,

Case No. 2:23-cv-00649-TLN-DB

14

Plaintiffs,

**PLAINTIFF ROSEBURG FOREST
PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET
ONE)**

15

16

v.

17

LIBERTY INSURANCE CORPORATION and
EVEREST NATIONAL INSURANCE
COMPANY,

18

19

Defendants.

20

21

22

PROPOUNDING PARTY:                LIBERTY INSURANCE CORPORATION

23

RESPONDING PARTY:                 ROSEBURG FOREST PRODUCTS CO.

24

SET NO.:                          ONE

25

**DUE DATE:**                     **SEPTEMBER 20, 2023**

26

27

28

*(left margin vertical text)* Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1    Roseburg Forest Products Co. ("Roseburg Forest") hereby responds and objects to the

2    Interrogatories (Set One) propounded by Liberty Insurance Corporation ("Liberty") as follows:

3                          **PRELIMINARY STATEMENT**

4    These responses are made solely for the purpose of, and in relation to, this action. Each

5    response is given subject to all appropriate objections (including but not limited to objections

6    concerning competency, relevancy, materiality, propriety and admissibility).

7    Roseburg Forest's answers to these interrogatories are based upon a reasonable review and

8    diligent investigation conducted to date of those information sources within its control where Roseburg

9    Forest reasonably believes responsive information may exist. The answers and objections set forth

10    below do not preclude Roseburg Forest from later relying on information, discovered pursuant to

11    subsequent investigation or discovery, which, if known at this time, would have been included in said

12    objections and responses. Roseburg Forest reserves the right to supplement these objections and

13    responses at any time prior to the commencement of trial in this action.

14    Except for explicit facts admitted herein, no incidental or implied admissions of any nature

15    whatsoever are intended, are implied, or should be inferred. The fact that an Interrogatory has been

16    responded should not be taken as an admission, or a concession of the existence of any facts set forth

17    or assumed by Liberty, or that such response constitutes evidence of any fact. In addition, the fact that

18    Roseburg Forest has responded to part or all of any Interrogatory is not intended and shall not be

19    construed to be a waiver by Roseburg Forest of all or any part of any objection to any Interrogatory.

20                          **OBJECTIONS TO DEFINITIONS**

21    1.    Roseburg Forest objects to Liberty's definition of "RELATED TO" and "RELATING

22    TO" to the extent that it requires production of documents merely "containing" or "mentioning" the

23    requested information. Due to the overbroad nature of this definition, Roseburg Forest cannot

24    represent that it has searched for all documents that merely contain or mention responsive terms and

25    thus cannot identify any relevant responsive materials that would not be produced under this definition.

26    2.    Roseburg Forest understands Liberty's definition of "YOU" and "YOUR" to not

27    encompass attorneys for Roseburg Forest to the extent that doing so would violate attorney-client

28    privilege or the work-product doctrine; otherwise, Roseburg Forest objects to the definition as overly

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

2

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

1    broad, or as seeking information that is privileged or subject to the work-product doctrine.

2    **RESPONSES AND OBJECTIONS TO INTERROGATORIES**

3    **INTERROGATORY NO. 1:**

4        Please state all facts that support your first count for Breach of Contract asserted against

5    LIBERTY in YOUR COMPLAINT.

6    **RESPONSE TO INTERROGATORY NO. 1:**

7        Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is

8    attorney-client privileged and/or subject to the work-product doctrine.  Subject to and without waiving

9    its objections, Roseburg Forest understands this Interrogatory to ask for a reasonable statement of facts

10   that support Roseburg Forest's first count for Breach of Contract asserted against Liberty in its

11   Complaint.  These facts include the following:

12       • Liberty issued primary policy no. TB7-661-067089-031 to RLC Industries Co.

13          ("RLC"), Roseburg Forest's parent company.

14       • The Liberty Policy obligates it to provide a defense of any claims which are potentially

15          covered by the Liberty Policy.  If there is a conflict between the interests of Liberty and

16          its insured, Liberty must pay for the counsel of the insured's choosing; to the extent

17          there is no conflict, Liberty must provide defense counsel that is adequate and

18          competent given the context.

19       • Following the Mill Fire, a number of community members brought claims against

20          Roseburg Forest for property losses, personal injuries, and wrongful death arising from

21          the Mill Fire.

22       • Since Liberty was the primary layer insurer in Roseburg Forest's liability insurance

23          program, Roseburg Forest's claim triggered Liberty's duty to defend Roseburg Forest.

24       • Within days of the fire, Roseburg Forest provided notice to Liberty, thereafter,

25          consistently updating it on claims and other material developments.

26       • Liberty accepted its duty to defend Roseburg Forest with respect to the Mill Fire Claims

27          under the Liberty Policy.

28       • Liberty initially approved Roseburg Forest's request to continue using Baker Hostetler

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

3

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

as defense counsel, the law firm that had been handling the defense from "day one." (*See* Email from Jamie Sroczynski to Dustin Dow dated September 7, 2022.)

- Roseburg Forest relied upon that representation and instructed Baker Hostetler to continue its response to the Mill Fire. On this basis, Baker Hostetler undertook the following workstreams:

  o Civil Defense: Preparing for and defending against civil litigation brought against Roseburg Forest arising from Mill Fire, including general defense work, litigation holds, legal research, coordination of inspections, fact analysis, expert coordination, etc.

  o Community Fund & Settlement Payment Processing: Coordinating the receipt and processing of emergency relief fund claims pursuant to $50 million community relief fund; coordinating funding for temporary relief items for fire victims.

  o Damage Analysis: As part of the civil defense and community relief fund work, Baker Hostetler analyzed the scope of potential damage throughout the community, relying on analysis of destroyed homes and the pre-fire property values.

  o Manufacturer Claims: Focusing on developing third-party liability claims against equipment/component manufacturers.

  o Internal Investigation: Focusing on origin and cause investigation, witness interviews, document and data collection, site safety and security, and coordination with government investigations, including Cal Fire's investigation.

  o Criminal Matters: Coordinating response to Cal Fire/Siskiyou County Sheriff's investigation and potential criminal defense issues if necessary. Involves witness interviews, assisting Roseburg Forest in responding to Cal Fire requests and investigations, and analysis and resolution of criminal defense issues.

- Weeks later, while Roseburg Forest's response to the Mill Fire was well underway and

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

after ongoing communications with Baker Hostetler in its capacity as Roseburg Forest's defense counsel, in a letter from Sarah Kaufman to Joseph Chairez dated September 22, 2022, Liberty reversed course and rejected Roseburg Forest's choice of Baker Hostetler as defense counsel.

- Reneging on its prior acceptance of Baker Hostetler as defense counsel, Liberty refused to engage Baker Hostetler or to pay its fees and costs.

- In a "reservation of rights" letter, Liberty expressed various factual and legal arguments why it might not be required to indemnify Roseburg Forest. While recognizing that Roseburg Forest's claims were potentially covered and that it was required to accept Roseburg Forest's tender of defense, it nevertheless rejected Roseburg Forest's selection of Baker Hostetler as independent counsel.

- Liberty assigned a small law firm, Carlson, Calladine & Peterson LLP ("Carlson"), which primarily defends insurance companies and only has two lawyers with fire experience, to represent Roseburg Forest regarding the Mill Fire Claims.

- According to Carlson's website, it has only seven attorneys. (This is two fewer than alleged in the Complaint. It appears one attorney has left the firm and another retired.) Only two of its attorneys practice fire-related litigation. Most of the firm's practice is dedicated to defending insurance companies attempting to avoid their insurance obligations (a practice adverse to Roseburg Forest's position here that its insurers are contractually obligated to defend and indemnify Roseburg Forest). Roseburg Forest did not waive conflicts posed by Carlson's extensive insurance-side representation.

- By this time, Baker Hostetler had negotiated a streamlined claims process with plaintiffs' counsel; established the Fund response, which was essential to assisting the community on a real time basis and reducing the need for time-consuming litigation; coordinated third-party indemnification claims; and led Roseburg Forest's response to government investigations.

- Whatever the abilities of the two Carlson attorneys with fire-related experience, Carlson was neither equipped nor staffed to adequately defend Roseburg Forest against

5

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1  hundreds of claimants, much less provide a holistic and consistent defense for Roseburg

2  Forest in all the matters it was facing.

3  • Materially later, when Liberty purported to dispense with its reservations in an updated

4  reservation of rights letter dated November 9, 2022, core conflicts continued to persist

5  between Roseburg Forest on the one hand and Liberty on the other, which created a

6  right to independent counsel as discussed in Roseburg Forest's response to

7  Interrogatory No. 4 (incorporated herein).

8  • While recognizing its obligation to provide Roseburg Forest with a defense, Liberty

9  has not paid for counsel selected by Roseburg Forest or provided an adequate defense,

10  much less the one required under the Liberty Policy or the law in view of the context

11  and scope of the claims against Roseburg Forest.

12  • Even if there were no conflict (which there is), Liberty owed Roseburg Forest a duty

13  to select adequate, competent, and conflict-free counsel to represent Roseburg Forest

14  for claims stemming from the Mill Fire and Liberty failed to do so for claims stemming

15  from the Mill Fire.

16  • Roseburg Forest has fully complied with all of the terms and conditions of the Liberty

17  Policy and has satisfied any and all conditions precedent to coverage under the Liberty

18  Policy, including, but not limited to, paying premiums and providing timely notice of

19  the claim.  To the extent Roseburg Forest has not complied with a condition in the

20  Liberty Policy, it is because the condition does not apply or has been waived by Liberty.

21  • Liberty breached its duty to defend Roseburg Forest by failing to appoint independent

22  and/or adequate counsel to defend Roseburg Forest with regards to the Mill Fire

23  Claims.

24  • Because of Liberty's breach of the Liberty Policy, Roseburg Forest has incurred and

25  continues to incur attorneys' fees and costs in its defense as described in documents

26  that Roseburg Forest has produced and is continuing to produce.

27  Roseburg Forest also refers Liberty to the allegations in its Complaint.  As additional support

28  for those allegations, pursuant to Rule 33(d)(1), Roseburg Forest refers Liberty to the documents that

6

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

1  have been or will be produced in this case related to the Liberty Policy and Liberty's handling of the

2  claims against Roseburg Forest, including correspondence between Roseburg Forest and its attorneys

3  and Liberty.  Roseburg Forest also refers Liberty to its responses to Interrogatory Nos. 2-5, 7, and 9,

4  which it incorporates by reference.

5       To the extent this Interrogatory asks for something more or different than Roseburg Forest's

6  understanding of the Interrogatory, Roseburg Forest objects to it as vague and ambiguous.

7  **INTERROGATORY NO. 2:**

8       Please state all facts that support the second count for Breach of the Covenant of Good Faith

9  and Fair Dealing asserted against LIBERTY in YOUR COMPLAINT.

10  **RESPONSE TO INTERROGATORY NO. 2:**

11       Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is

12  attorney-client privileged and/or subject to the work-product doctrine.  Subject to and without waiving

13  its objections, Roseburg Forest understands this Interrogatory to ask for a reasonable statement of facts

14  that support Roseburg Forest's second count for Breach of the Covenant of Good Faith and Fair

15  Dealing asserted against Liberty in its Complaint.  Roseburg Forest incorporates by reference the facts

16  described in its response to Interrogatory No. 1 and provides the following additional facts:

17  - Liberty denied Roseburg Forest's request for its selected defense without proper cause.

18  - Liberty refused to pay for Roseburg Forest's choice of counsel without proper cause.

19  - Liberty changed its position with regard to Roseburg's retention of Baker Hostetler.  It

20      initially approved Baker Hostetler's retention, but then, without explanation, reversed

21      its position.  Liberty then retained counsel that was not competent given the nature and

22      scope of the Mill Fire Claims.  The firm did not have adequate resources to defend the

23      Mill Fire Claims nor could it provide Roseburg Forest a conflict-free representation.

24  - Liberty failed to undertake its own independent investigation of the Mill Fire and the

25      Mill Fire Claims.  To Roseburg Forest's knowledge:

26        - Liberty did not send a representative to the site of the Mill Fire;

27        - Liberty did not send a representative or any investigator to assess damages from

28         the Mill Fire;

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

7

- Liberty did not retain any experts related to the Mill Fire;
- Liberty did not interview any witnesses or Roseburg Forest employees;
- Liberty did not request documents from California Department of Forestry and Fire Protection or any other party other than Roseburg Forest and its counsel; or
- Liberty (or its counsel) never made an appearance on behalf of Roseburg Forest or on its own behalf.

Instead, Liberty ceded its duty to investigate to Baker Hostetler, relying on Baker Hostetler to retain experts, defend the litigation, negotiate claims, and provide Liberty regular updates on its efforts on behalf of Roseburg Forest. Liberty received the benefits of Baker Hostetler's work without contributing anything to their costs.

- Liberty and the counsel it retained inaccurately characterized the Mill Fire as a "wildfire," which jeopardized Roseburg Forest's position with respect to other insurers within its liability tower, including The Ohio Casualty Insurance Company, a Liberty sister company. Liberty assigned the same adjuster to the claim for Liberty and Ohio Casualty. Therefore, it is evident that Liberty was aware that the mischaracterization, had it been accurate (and it is not), could have supported a coverage denial under the Ohio Casualty policy.

- Liberty non-renewed the Liberty Policy after receiving notice of the Mill Fire Claims.

Roseburg Forest also refers Liberty to the allegations in its Complaint. As additional support for those allegations, pursuant to Rule 33(d)(1), Roseburg Forest refers Liberty to the documents that have been or will be produced in this case related to the Liberty Policy and Liberty's handling of the claims against Roseburg Forest, including correspondence between Roseburg Forest and its attorneys and Liberty.

To the extent this Interrogatory asks for something more or different than Roseburg Forest's understanding of the Interrogatory, Roseburg Forest objects to it as vague and ambiguous.

## INTERROGATORY NO. 3:

Please state all facts that support YOUR contention at Paragraph 67 of YOUR COMPLAINT

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

8

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

1    that "Liberty initially approved Roseburg's request to continue using Baker Hostetler as defense

2    counsel. . ."

3    **RESPONSE TO INTERROGATORY NO. 3:**

4         Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is

5    attorney-client privileged and/or subject to the work-product doctrine.  Subject to and without waiving

6    its objections, Roseburg Forest understands this Interrogatory to ask for a reasonable statement of facts

7    that support Roseburg Forest's contention that "Liberty initially approved Roseburg Forest's request

8    to continue using Baker Hostetler as defense counsel. . ."  These facts include the following:

9        •   Liberty initially approved Roseburg Forest's request to continue using Baker Hostetler

10           as defense counsel, the law firm that had been handling the defense from "day one," in

11           an email dated Wednesday, September 7, 2022 from Jamie Sroczynski, an attorney at

12           Liberty Mutual within its Legal Strategic Services group, to Dustin Dow, a partner at

13           Baker Hostetler.

14       •   In that email, Sroczynski requested Baker Hostetler's "proposed rates for handling this

15           case," including "all timekeepers you expect will assist on the file."

16       •   Sroczynski also requested that, "[i]n connection with your work with on this matter,"

17           "your firm abide by Liberty's Guidelines and Litigation Protocols (attached) and

18           submit your bills to us electronically using our vendor Lexis Nexis/CounselLink, which

19           is simply a conduit to our Legal Billing Unit which is comprised of Liberty

20           employees/litigation auditors who will pull your bills for review and payment."

21       •   Sroczynski noted that "[g]iven your firm's ongoing relationship with Liberty Mutual,

22           I would not anticipate the guidelines or ebilling to be an issue; however, I would be

23           happy to address any concerns."

24       •   Finally, Sroczynski said "I appreciate your anticipated cooperation."

25       •   Liberty's "Guidelines for Law Firms" and "Litigation Management Protocols" were

26           attached to the email.  Liberty's "Guidelines for Law Firms" contain the following

27           statements:

28           •   By accepting cases, your law firm is expressly agreeing to abide by the policies set

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

9

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1    forth in these Guidelines.

2    • **Philosophy:** The Firm is expected to work with **Liberty Mutual Insurance** including

3    its Strategic Business Units **Global Risk Solutions** ("GRS" includes legacy

4    Commercial Insurance [CI], Ironshore [IS], and Liberty International Underwriters

5    [LIU], and presently National Insurance [NI] and North American Specialty [NAS])

6    and **Global Retail Markets** ("GRM" includes legacy U.S. Consumer Markets

7    [USCM], Personal Insurance [PI], Safeco, and Business Insurance [BI], and presently

8    GRM U.S.), its **Home Office Legal Department** ("HO Legal"), and **Liberty Mutual**

9    **Helmsman Management Services LLC** ("HMS") (all **collectively "Liberty"**), and

10    the insured/customer to achieve the best result for the insured/customer in a timely,

11    efficient, and cost-conscious manner consistent with the clients' interests and the

12    Firm's ethical obligations, and to resist non-meritorious, suspicious or frivolous claims.

13    • An effective and strategically sound legal defense is the responsibility of defense

14    counsel in direct consultation with the Liberty case handler/primary Liberty contact for

15    the case. . .

16    • Counsel should collaborate with the Liberty case handler/primary Liberty contact for

17    the case initially and as the case progresses to ensure appropriate staffing to meet the

18    needs of the case.

19    • Between September 7, 2022 and September 22, 2022, Roseburg's defense counsel, Baker

20    Hostetler, exchanged correspondence with representatives of Liberty and provided

21    documents and information about the Mill Fire and Roseburg Forest's operations at the

22    Weed facility.  At no time did Liberty object to Baker Hostetler's representation of Roseburg

23    Forest or otherwise imply that it intended to withdraw its approval of Baker Hostetler's

24    representation and/or to assign alternative defense counsel.

25    • Between September 7, 2022 and September 22, 2022, Liberty participated in calls led by

26    Baker Hostetler, which provided updates regarding the claim status.  At no time did Liberty

27    object to Baker Hostetler's representation of Roseburg Forest or otherwise imply that it

28    intended to withdraw its approval of Baker Hostetler's representation and/or to assign

10

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

1    alternative defense counsel.

2    Roseburg Forest interpreted the email, litigation guidelines, and subsequent communications

3    without objection as approval of Roseburg Forest's request to continue using Baker Hostetler as

4    defense counsel. Roseburg Forest substantially relied upon Liberty's communications and its lack of

5    objections in the critical early days of its response to the Mill Fire and the Mill Fire Claims.

6    Roseburg Forest also refers Liberty to the allegations in its Complaint. As additional support

7    for those allegations, pursuant to Rule 33(d)(1), Roseburg Forest refers Liberty to the documents that

8    have been or will be produced in this case related to the Liberty Policy and Liberty's handling of the

9    claims against Roseburg Forest, including correspondence between Roseburg Forest and its attorneys

10   and Liberty between September 7, 2022 and September 22, 2022.

11   To the extent this Interrogatory asks for something more or different than Roseburg Forest's

12   understanding of the Interrogatory, Roseburg Forest objects to it as vague and ambiguous.

13   **INTERROGATORY NO. 4:**

14   Please state all facts that support YOUR contention that YOU are entitled to independent

15   counsel to defend YOU for the MILL FIRE CLAIMS, pursuant to California Civil Code section 2860.

16   **RESPONSE TO INTERROGATORY NO. 4:**

17   Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is

18   attorney-client privileged and/or subject to the work-product doctrine. Subject to and without waiving

19   its objections, Roseburg Forest understands this Interrogatory to ask for a reasonable statement of facts

20   that support Roseburg Forest's contention that it is entitled to independent counsel to defend against

21   the Mill Fire Claims pursuant to California Civil Code section 2860. These facts include the following:

22   • In its September 22, 2022 "reservation of rights" letter, Liberty expressed various

23       factual and legal arguments why it might not be required to indemnify Roseburg Forest.

24       After listing numerous specific allegations in the complaints and quoting five pages'

25       worth of policy provisions (in a nine-page letter), Liberty reserved its right to withdraw

26       from Roseburg Forest's defense for any reason.

27   • In the September 22, 2022 letter, Liberty cited the "occurrence" definition in its

28       reservation of rights. The policy defines an "occurrence," in part, as an "accident."

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

11

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1    The policy provides coverage if the bodily injury and property damage claims were

2    caused by an accident or an occurrence. But if Roseburg's actions were not accidental,

3    then Liberty might maintain that it did not owe Roseburg Forest a duty to defend.

4    Liberty-appointed counsel could be tempted to litigate the action in a way that shifts

5    Roseburg's liability toward intentional acts rather than liability premised on

6    negligence, benefiting Liberty but at the expense of Roseburg's best interests.

7    • Liberty also reserved its right to "not pay for legal fees and costs unrelated to

8    Roseburg's defense of the claims/and/or the current lawsuits and/or future lawsuits

9    arising from the fire," which runs afoul of two California Supreme Court cases.

10   • Another conflict consists of Roseburg Forest and Liberty's contrasting approaches to

11   claims resolution. Roseburg Forest is committed to doing right by its community,

12   including developing a claims resolution process—on both an emergency and longer

13   term basis—by which affected individuals and businesses can be compensated and can

14   focus on the arduous process of putting their lives and businesses back together. When

15   Liberty was briefed on this strategy during a September 9 call, it agreed. Yet days later,

16   it backtracked to say that they were still "evaluating."

17   • In a letter from counsel dated November 22, 2022, Liberty touted David Bona's "over

18   20 years of experience in defending clients in high exposure, complex, wildfire cases."

19   Bona, in an email to Roseburg Forest's counsel dated December 5, 2022 also described

20   his firm as having "represented clients in large, multiparty wildland fire litigation,"

21   defending "numerous wildland fire cases," and having a "long history of defending

22   wildfire cases." Besides ignoring the facts surrounding the Mill Fire itself, Liberty and

23   Mr. Bona's continued mischaracterization of the Mill Fire as a "wildfire case" caused

24   a conflict between Roseburg Forest and its insurers.

25   • Defendant Everest National Insurance Company's ("Everest") policy contains a

26   Wildfire Exclusion Endorsement. Roseburg Forest does not agree that the Wildfire

27   Exclusion Endorsement applies to the Mill Fire on a factual or legal basis, but Everest

28   reserved its rights on the issue and asserted the endorsement as an affirmative defense

12

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

1  in its answer in this matter.

2  - Liberty's sister company, The Ohio Casualty Insurance Company ("Ohio Casualty"),

3  issued RLC Industries, Inc. an excess policy with a Following Form Endorsement that

4  purported to adopt "the exact terms and conditions" of the Everest policy.  Ohio

5  Casualty raised the Wildfire Exclusion Endorsement as an affirmative defense in its

6  answer in this matter.  Ohio Casualty alleged that Roseburg Forest's claims are barred,

7  in whole or in part, due to the exclusion's application.

8  - Liberty and Ohio Casualty's interests conflicted as to the particulars of the source of

9  the Mill Fire (e.g., source, how and where it spread) as well as its characterization.

10  These facts and this characterization are intrinsic to the defense of the claims against

11  Roseburg Forest and to Liberty's coverage position.  Liberty and Bona's reference to

12  the Mill Fire as a wildfire, besides being incorrect as a matter of fact, could affect

13  coverage as a matter of law.  Thus, a conflict of interest existed such that Roseburg

14  Forest was entitled to independent counsel.

15  - Upon information and belief, Liberty Mutual assigned the same adjuster to both the

16  Liberty and Ohio Casualty claims.

17  - Liberty Mutual retained the same coverage counsel for both Liberty and Ohio Casualty.

18  Roseburg Forest also refers Liberty to the allegations in its Complaint.  As additional support

19  for those allegations, pursuant to Rule 33(d)(1), Roseburg Forest refers Liberty to the documents that

20  have been or will be produced in this case related to the Liberty Policy and Liberty's handling of the

21  claims against Roseburg Forest, including correspondence with Roseburg Forest and its attorneys and

22  Carlson, Calladine & Peterson.

23  To the extent this Interrogatory asks for something more or different, Roseburg Forest objects

24  to it as vague and ambiguous.

25  **INTERROGATORY NO. 5:**

26  Please state all facts that support YOUR contention that LIBERTY'S retained defense counsel,

27  Carlson, Calladine & Peterson, was not competent to defend YOU against the MILL FIRE CLAIMS.

28

13

**RESPONSE TO INTERROGATORY NO. 5:**

Roseburg Forest objects to Liberty's characterization of the Carlson, Calladine & Peterson firm ("Carlson") as "Liberty's retained defense counsel" to the extent this is meant to imply that Carlson represented Roseburg Forest or RLC at any time.  Roseburg Forest objects to the characterization of its contentions related to Carlson as being solely "not competent," as this alone does not fully state Roseburg Forest's position towards Carlson.  Roseburg Forest contends that Carlson was not competent given the nature and scope of the Mill Fire Claims.  Carlson did not have adequate resources to defend the Mill Fire Claims nor could it provide Roseburg Forest a conflict-free representation, since most of Carlson's practice is dedicated to defending insurance companies attempting to avoid their insurance obligations (a practice adverse to Roseburg Forest's position here that its insurers are contractually obligated to defend and indemnify Roseburg Forest).  Finally, Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is attorney-client privileged and/or subject to the work-product doctrine.

Subject to and without waiving its objections, Roseburg Forest understands this Interrogatory to ask for a reasonable statement of facts that support Roseburg Forest's contention that Carlson, was not competent to defend Roseburg Forest against the Mill Fire Claims given the nature and scope of the Mill Fire Claims.  These facts include the following:

- Given the nature of the Mill Fire and Mill Fire Claims, Roseburg Forest needed and continues to need counsel with the workforce capacity and experience to handle a complex, high-profile, and fast-moving crisis.

- According to Carlson's website, it only has seven attorneys.  (This is two fewer than alleged in the Complaint.  It appears one attorney has left the firm and another retired.)  Only two of its attorneys practice fire-related litigation.  Most of the firm's practice is dedicated to defending insurance companies attempting to avoid their insurance obligations (a practice adverse to Roseburg Forest's position here that its insurers are contractually obligated to defend and indemnify it).  Roseburg Forest did not waive conflicts posed by Carlson's extensive insurance-side representation.

- By contrast, Baker Hostetler is at the forefront of legal practice anywhere in the country

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

14

1   with fire-response experience.  That is why Roseburg Forest chose them.  For instance,

2   • Baker Hostetler represented the Tort Claimants Committee in the PG&E

3   bankruptcy, which turned on the 2017 North Bay Fires and the 2018 Camp Fire.

4   • Baker Hostetler represents fire victims, including Roseburg Forest, in the

5   Oregon 2020 Labor Day Fire litigation, a complex case involving issues like

6   causation, damages, and liability arising from multiple fire ignitions.

7   • Baker Hostetler represents parties involved in government and civil litigation

8   in the 2019 Kincade Fire.

9   • Baker Hostetler mobilized a multidisciplinary team of 31 attorneys the day after the

10   Mill Fire began.  In less than a month, Baker Hostetler:

11   • Negotiated with plaintiffs' counsel about claims that may be filed in litigation

12   or asserted as part of a streamlined claims process;

13   • Established the community and emergency fund response, essential to assisting

14   the community on a real time basis and reducing the need for time-consuming

15   litigation;

16   • Coordinated third-party indemnification claims;

17   • Led Roseburg's response to government investigations; and

18   • Supervised Roseburg's privileged internal investigation.

19   • Baker Hostetler established these critical workstreams before Liberty even assigned

20   alternate defense counsel.  Had Roseburg Forest waited 20 days for Liberty to identify

21   and retain defense counsel, Roseburg Forest would have been left defenseless during a

22   critical, time-sensitive response window.

23   • Whatever the abilities of the two Carlson attorneys with fire-related experience,

24   Carlson was neither equipped nor staffed to adequately defend Roseburg Forest against

25   hundreds of claimants and at least five lawsuits, much less provide a holistic and

26   consistent defense for Roseburg Forest in all the matters it was facing.  After all, the

27   Carlson firm would have concluded its representation in February 2023, when Liberty

28   exhausted its limits and no longer owed a duty to defend.  Roseburg Forest would have

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

15

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

1    been in the position of retaining a new firm and getting them up-to-speed in the midst

2    of ongoing claims and litigation, plus a government investigation.

3    • Even if Carlson had enough conflict-free attorneys with the needed experience to

4    handle the Mill Fire Claims (not just the two that are advertised on its website), adding

5    them to the defense team would have been inefficient at best. At worst (and more

6    likely), it invited inconsistent positions detrimental to Roseburg Forest's defense.

7    Roseburg Forest also refers Liberty to the allegations in its Complaint. As additional support

8  for those allegations, pursuant to Rule 33(d)(1), Roseburg Forest refers Liberty to the documents that

9  have been or will be produced in this case.

10    To the extent this Interrogatory asks for something more or different, Roseburg Forest objects

11  to it as vague and ambiguous.

12  **INTERROGATORY NO. 6:**

13    Please state all facts RELATING TO any conflict waiver entered into between YOU and Baker

14  Hostetler regarding MILL FIRE CLAIMS, given LIBERTY MUTUAL's former and current client

15  relationship with Baker Hostetler.

16  **RESPONSE TO INTERROGATORY NO. 6:**

17    Roseburg Forest objects to this Interrogatory as not relevant to any party's claim or defense in

18  this case. To the extent the Interrogatory implies that a conflict waiver between Roseburg Forest and

19  Baker Hostetler would be necessary or even appropriate under the circumstances, Roseburg Forest

20  objects to that implication. Subject to and without waiving its objections, Roseburg Forest states that

21  there is no conflict waiver entered into between Roseburg Forest and Baker Hostetler regarding the

22  Mill Fire Claims.

23  **INTERROGATORY NO. 7:**

24    Please state the total amount of defense fees and costs RELATING TO the MILL FIRE

25  CLAIMS for which you seek reimbursement from LIBERTY under the POLICY.

26  **RESPONSE TO INTERROGATORY NO. 7:**

27    Roseburg Forest also objects to this Interrogatory to the extent that it seeks information that is

28  protected by the common interest doctrine, attorney-client privilege and/or work-product doctrine.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

16

1    Subject to and without waiving these objections, pursuant to Rule 33(d)(1), Roseburg Forest refers

2    Liberty to invoices it previously produced from Baker Hostetler and other vendors that provided

3    defense-related services.

4    **INTERROGATORY NO. 8:**

5        Please state the total amount of fees and costs Baker Hostetler charged YOU to provide

6    coverage advice RELATING TO the MILL FIRE CLAIMS from September 6, 2022 to February 16,

7    2023.

8    **RESPONSE TO INTERROGATORY NO. 8:**

9        Roseburg Forest objects to the term "coverage advice" as vague and ambiguous in this context.

10   Roseburg Forest has and is seeking insurance coverage under various policies for the Mill Fire and the

11   Mill Fire Claims, but this Interrogatory does not specify any policy type or insurer.  Moreover, the

12   Interrogatory does not list or define what acts constitute "coverage advice."  Roseburg Forest also

13   objects to this Interrogatory to the extent that it seeks information that is protected by the common

14   interest doctrine, attorney-client privilege and/or work-product doctrine.  To the extent the Request

15   implies that Baker Hostetler should not or could not provide coverage advice to Roseburg Forest,

16   Roseburg Forest objects to that implication.  Roseburg Forest had no reason to believe that it position

17   was adversarial to Liberty, since Liberty had agreed to retain Baker Hostetler as Roseburg Forest's

18   defense counsel, accepted coverage, and was a party to update communications and calls with Baker

19   Hostetler attorneys without any objection to Baker Hostetler's representation.  Once Liberty issued its

20   reservation of rights letter on September 22, 2022, Roseburg retained alternate coverage counsel

21   (Hunton Andrews Kurth LLP).  Subject to and without waiving these objections, Roseburg Forest

22   responds as follows:

23       To the extent "coverage advice" includes providing Liberty notice of the Mill Fire Claims or

24   imparting to Roseburg Forest information about any policy of insurance through which Roseburg

25   Forest might be insured consistent with Cal. Form Judicial Interrogatory 4.1 (*e.g.*, policy limits and

26   insurer positions), whether and in what amount Baker Hostetler charged Roseburg Forest for this type

27   of "coverage advice" is not relevant to any party's claim or defense in this case, because Roseburg

28   Forest is not seeking reimbursement of any fees or costs Baker Hostetler charged it to provide this

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

17

1    type of "coverage advice" relating to the Mill Fire Claims.  Nor has Liberty raised any affirmative

2    defenses related to Baker Hostetler's "coverage advice" to Liberty.

3         Subject to and without waiving these objections and to the extent "coverage advice" applies to

4    Baker Hostetler's work in securing insurance coverage for Roseburg Forest under Roseburg Forest's

5    directors and officers and/or property insurance policies, this Interrogatory is still not relevant to any

6    party's claim or defense in this case.  Roseburg Forest is not seeking reimbursement of any fees or

7    costs Baker Hostetler charged it to provide this type of "coverage advice" relating to the Mill Fire

8    Claims.  Nor is Roseburg Forest seeking any coverage for defense or indemnity amounts paid under

9    any directors and officers and/or property policy also under the Liberty Policy.

10        To the extent this Interrogatory asks for something more or different, Roseburg Forest objects

11   to it as vague and ambiguous.

12   **INTERROGATORY NO. 9:**

13        Please state the total amount of fees and costs Baker Hostetler charged YOU RELATING TO

14   the MILL FIRE CLAIMS from September 6, 2022 to February 16, 2023.

15   **RESPONSE TO INTERROGATORY NO. 9:**

16        Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is

17   protected by the common interest doctrine, attorney-client privilege and/or work-product doctrine.

18   Roseburg Forest also objects to this Interrogatory to the extent it seeks fees and costs Baker Hostetler

19   charged Roseburg Forest for which Roseburg Forest is not seeking reimbursement from Liberty under

20   the Policy.  Those amounts are not relevant to any party's claim or defense in this case.

21        Subject to and without waiving its objections, Roseburg Forest understands this Interrogatory

22   to ask for a statement of the total amount of defense fees and costs that Baker Hostetler charged

23   Roseburg Forest relating to the Mill Fire Claims from September 6, 2022 to February 16, 2023, for

24   which Roseburg Forest is seeking reimbursement from Liberty under the Policy.  Pursuant to Rule

25   33(d)(1), Roseburg Forest refers Liberty to the invoices from Baker Hostetler that it previously

26   produced.

27   **INTERROGATORY NO. 10:**

28        Please state all facts that support YOUR contention that YOU are entitled to punitive damages.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

18

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

**RESPONSE TO INTERROGATORY NO. 10:**

Roseburg Forest objects to this Interrogatory to the extent that it seeks information that is confidential, privileged, or otherwise protected by the attorney-client privilege and/or work-product doctrine.  Subject to and without waiving its objections, Roseburg Forest refers Liberty to its response to Interrogatory No. 2 and to the allegations in its Complaint.


DATED:  September 20, 2023                    HUNTON ANDREWS KURTH LLP


                                        By:    /s/ Scott P. DeVries
                                               Scott P. DeVries
                                               Rachel E. Hudgins
                                               Charlotte E. Leszinske

                                               Attorneys for Plaintiffs RLC Industries Co.
                                               and Roseburg Forest Products Co.

DocuSign Envelope ID: 9AD099E0-9C3E-458E-8CA1-52F840358BA7

1

**<u>VERIFICATION</u>**

2    I, Lisa Fairchild, am the Director of Treasury for RLC Industries Co.  I am the agent of

3    Roseburg Forest Products Co. for the purpose of answering Liberty Insurance Corporation's

4    Interrogatories (Set One).  I have read the foregoing Interrogatories and the answers to those

5    Interrogatories, which are true according to the best of my knowledge, information, and belief.  I

6    declare under penalty of perjury that the foregoing is true and correct.

7    Executed on September 20, 2023.



8

9    Lisa Fairchild

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

VERIFICATION

Exhibit 53, Page 020

**CERTIFICATE OF SERVICE**

I am over the age of 18 years and not a party to this action. My business address is 550 S. Hope Street, Suite 2000, Los Angeles, California 90071.

On September 20, 2023 I served the document(s) described as **PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S ANSWERS TO LIBERTY INSURANCE CORPORATION'S INTERROGATORIES (SET ONE)** on the interested parties in this action:

| SHEPPARD, MULLIN, RICHTER & HAMPTON LLP | McCLOSKEY, WARING, WAISMAN & DRURY LLP |
|---|---|
| Frank Falzetta (State Bar No. 125146) | Andrew R. McCloskey (State Bar No. 179511) |
| Mary E. Gregory (State Bar No. 210247) | David G. Hackett (State Bar No. 259775) |
| 333 South Hope Street, 43rd Floor | Richard E. Decker (State Bar No. 299729) |
| Los Angeles, California 90071 | 4445 Eastgate Mall, Suite 200 |
| ffalzetta@sheppardmullin.com | San Diego, California 92121 |
| mgregory@sheppardmullin.com | amccloskey@mwwdlaw.com |
| Tel: (213) 620-1780 | rdecker@mwwdlaw.com |
| Fax: (213) 620-1398 | dhackett@mwwdlaw.com |
| | Tel: (619) 237-3095 |
| Jeffrey S. Crowe (State Bar No. 216055) | Fax: (619) 237-3789 |
| 650 Town Center Drive, 10th Floor | |
| Costa Mesa, California 92626 | *Attorneys for Defendant Everest National Insurance Company* |
| jcrowe@sheppardmullin.com | |
| Tel: (714) 513-5100 | |
| Fax: (714) 513-5130 | |
| | |
| *Attorneys for Defendants Liberty Insurance Corporation* | |

☒ **By MAIL:** by placing true and correct copy(ies) thereof in an envelope addressed to the attorney(s) of record, addressed as stated above.

☐ **By OVERNIGHT MAIL:** by overnight courier, I arranged for the above-referenced document(s) to be delivered to an authorized overnight courier service for delivery to the addressee(s) above, in an envelope or package designated by the overnight courier service with delivery fees paid or provided for.

☒ **By ELECTRONIC MAIL:** by causing a true and correct copy thereof to be transmitted electronically to the attorney(s) of record at the e-mail address(es) indicated above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 20, 2023 at Los Angeles, California.

_____
*Bree Anderson*
Bree Anderson

*Hunton Andrews Kurth LLP*
*50 California Street, Suite 1700*
*San Francisco, California 94111*

CERTIFICATE OF SERVICE

EXHIBIT 54

EXHIBIT 54

EXHIBIT 54

**HUNTON ANDREWS KURTH LLP**
Scott P. DeVries (State Bar No. 88221)
50 California Street, Suite 1700
San Francisco, CA  94111
Telephone:  (415) 975-3700
Facsimile:  (415) 975-3701

Charlotte E. Leszinske (State Bar No. 346382)
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone:  (202) 955-1500
Facsimile:  (202) 788-2201

Rachel E. Hudgins (admitted *pro hac vice*)
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190

*Attorneys for Plaintiffs RLC Industries Co. and
Roseburg Forest Products Co.*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

| | |
|---|---|
| RLC INDUSTRIES CO. and ROSEBURG FOREST PRODUCTS CO.,<br><br>       Plaintiffs,<br><br>       v.<br><br>LIBERTY INSURANCE CORPORATION and EVEREST NATIONAL INSURANCE COMPANY,<br><br>       Defendants. | Case No. 2:23-cv-00649-TLN-DB<br><br>**PLAINTIFF RLC INDUSTRIES CO.'S ANSWERS TO DEFENDANT'S INTERROGATORIES (SET ONE)** |

PROPOUNDING PARTY:            LIBERTY INSURANCE CORPORATION

RESPONDING PARTY:            RLC INDUSTRIES CO.

SET NO.:            ONE

**DUE DATE:**            **SEPTEMBER 20, 2023**

1    RLC Industries Co. ("RLC") hereby responds and objects to the Interrogatories (Set One)

2    propounded by Liberty Insurance Corporation ("Liberty") as follows:

3                                    **PRELIMINARY STATEMENT**

4    These responses are made solely for the purpose of, and in relation to, this action.  Each

5    response is given subject to all appropriate objections (including but not limited to objections

6    concerning competency, relevancy, materiality, propriety and admissibility).

7    RLC's answers to these interrogatories are based upon a reasonable review and diligent

8    investigation conducted to date of those information sources within its control where RLC reasonably

9    believes responsive information may exist.  The answers and objections set forth below do not preclude

10   RLC from later relying on information, discovered pursuant to subsequent investigation or discovery,

11   which, if known at this time, would have been included in said objections and responses.  RLC reserves

12   the right to supplement these objections and responses at any time prior to the commencement of trial

13   in this action.

14   Except for explicit facts admitted herein, no incidental or implied admissions of any nature

15   whatsoever are intended, are implied, or should be inferred.  The fact that an Interrogatory has been

16   responded should not be taken as an admission, or a concession of the existence of any facts set forth

17   or assumed by Liberty, or that such response constitutes evidence of any fact.  In addition, the fact that

18   RLC has responded to part or all of any Interrogatory is not intended and shall not be construed to be

19   a waiver by RLC of all or any part of any objection to any Interrogatory.

20                                  **OBJECTIONS TO DEFINITIONS**

21   1.    RLC objects to Liberty's definition of "RELATED TO" and "RELATING TO" to the

22   extent that it requires production of documents merely "containing" or "mentioning" the requested

23   information.  Due to the overbroad nature of this definition, RLC cannot represent that it has searched

24   for all documents that merely contain or mention responsive terms and thus cannot identify any

25   relevant responsive materials that would not be produced under this definition.

26   2.    RLC understands Liberty's definition of "YOU" and "YOUR" to not encompass

27   attorneys for RLC to the extent that doing so would violate attorney-client privilege or the work-

28   product doctrine; otherwise, RLC objects to the definition as overly broad, or as seeking information

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

2

PLAINTIFF RLC INDUSTRIES CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

that is privileged or subject to the work-product doctrine.

**RESPONSES AND OBJECTIONS TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state all facts that support your first count for Breach of Contract asserted against LIBERTY in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 1:**

RLC objects to this Interrogatory to the extent that it seeks information that is attorney-client privileged and/or subject to the work-product doctrine. Subject to and without waiving its objections, RLC understands this Interrogatory to ask for a reasonable statement of facts that support RLC's first count for Breach of Contract asserted against Liberty in its Complaint. These facts include the following:

- Liberty issued primary policy no. TB7-661-067089-031 to RLC.
- The Liberty Policy obligates it to provide a defense of any claims which are potentially covered by the Liberty Policy. If there is a conflict between the interests of Liberty and its insured, Liberty must pay for the counsel of the insured's choosing; to the extent there is no conflict, Liberty must provide defense counsel that is adequate and competent given the context.
- Following the Mill Fire, a number of community members brought claims against Roseburg Forest Products Co. ("Roseburg Forest") for property losses, personal injuries, and wrongful death arising from the Mill Fire.
- Since Liberty was the primary layer insurer in Roseburg's liability insurance program, Roseburg Forest's claim triggered Liberty's duty to defend Roseburg Forest.
- Within days of the fire, Roseburg Forest and RLC (together, "Roseburg") provided notice to Liberty, thereafter, consistently updating it on claims and other material developments.
- Liberty accepted its duty to defend Roseburg Forest with respect to the Mill Fire Claims under the Liberty Policy.
- Liberty initially approved Roseburg's request to continue using Baker Hostetler as

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

3

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

defense counsel, the law firm that had been handling the defense from "day one." (*See* Email from Jamie Sroczynski to Dustin Dow dated September 7, 2022.)

- Roseburg relied upon that representation and instructed Baker Hostetler to continue its response to the Mill Fire. On this basis, Baker Hostetler undertook the following workstreams:

  o Civil Defense: Preparing for and defending against civil litigation brought against Roseburg Forest arising from Mill Fire, including general defense work, litigation holds, legal research, coordination of inspections, fact analysis, expert coordination, etc.

  o Community Fund & Settlement Payment Processing: Coordinating the receipt and processing of emergency relief fund claims pursuant to $50 million community relief fund; coordinating funding for temporary relief items for fire victims.

  o Damage Analysis: As part of the civil defense and community relief fund work, Baker Hostetler analyzed the scope of potential damage throughout the community, relying on analysis of destroyed homes and the pre-fire property values.

  o Manufacturer Claims: Focusing on developing third-party liability claims against equipment/component manufacturers.

  o Internal Investigation: Focusing on origin and cause investigation, witness interviews, document and data collection, site safety and security, and coordination with government investigations, including Cal Fire's investigation.

  o Criminal Matters: Coordinating response to Cal Fire/Siskiyou County Sheriff's investigation and potential criminal defense issues if necessary. Involves witness interviews, assisting Roseburg Forest in responding to Cal Fire requests and investigations, and analysis and resolution of criminal defense issues.

- Weeks later, while Roseburg's response to the Mill Fire was well underway and after

4

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1  ongoing communications with Baker Hostetler in its capacity as Roseburg Forest's

2  defense counsel, in a letter from Sarah Kaufman to Joseph Chairez dated September

3  22, 2022, Liberty reversed course and rejected Roseburg's choice of Baker Hostetler

4  as defense counsel.

5  • Reneging on its prior acceptance of Baker Hostetler as defense counsel, Liberty refused

6  to engage Baker Hostetler or to pay its fees and costs.

7  • In a "reservation of rights" letter, Liberty expressed various factual and legal arguments

8  why it might not be required to indemnify Roseburg Forest. While recognizing that

9  Roseburg Forest's claims were potentially covered and that it was required to accept

10  Roseburg Forest's tender of defense, it nevertheless rejected Roseburg's selection of

11  Baker Hostetler as independent counsel.

12  • Liberty assigned a small law firm, Carlson, Calladine & Peterson LLP ("Carlson"),

13  which primarily defends insurance companies and only has two lawyers with fire

14  experience, to represent Roseburg Forest regarding the Mill Fire Claims.

15  • According to Carlson's website, it has only seven attorneys. (This is two fewer than

16  alleged in the Complaint. It appears one attorney has left the firm and another retired.)

17  Only two of its attorneys practice fire-related litigation. Most of the firm's practice is

18  dedicated to defending insurance companies attempting to avoid their insurance

19  obligations (a practice adverse to RLC's position here that its insurers are contractually

20  obligated to defend and indemnify Roseburg). Roseburg did not waive conflicts posed

21  by Carlson's extensive insurance-side representation.

22  • By this time, Baker Hostetler had negotiated a streamlined claims process with

23  plaintiffs' counsel; established the Fund response, which was essential to assisting the

24  community on a real time basis and reducing the need for time-consuming litigation;

25  coordinated third-party indemnification claims; and led Roseburg Forest's response to

26  government investigations.

27  • Whatever the abilities of the two Carlson attorneys with fire-related experience,

28  Carlson was neither equipped nor staffed to adequately defend Roseburg Forest against

5

Exhibit 54, Page 005

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

hundreds of claimants, much less provide a holistic and consistent defense for Roseburg Forest in all the matters it was facing.

- Materially later, when Liberty purported to dispense with its reservations in an updated reservation of rights letter dated November 9, 2022, core conflicts continued to persist between Roseburg Forest on the one hand and Liberty on the other, which created a right to independent counsel as discussed in RLC's response to Interrogatory No. 4 (incorporated herein).

- While recognizing its obligation to provide Roseburg Forest with a defense, Liberty has not paid for counsel selected by Roseburg Forest or provided an adequate defense, much less the one required under the Liberty Policy or the law in view of the context and scope of the claims against Roseburg Forest.

- Even if there were no conflict (which there is), Liberty owed Roseburg Forest a duty to select adequate, competent, and conflict-free counsel to represent Roseburg Forest for claims stemming from the Mill Fire and Liberty failed to do so for claims stemming from the Mill Fire.

- Roseburg has fully complied with all of the terms and conditions of the Liberty Policy and has satisfied any and all conditions precedent to coverage under the Liberty Policy, including, but not limited to, paying premiums and providing timely notice of the claim. To the extent Roseburg has not complied with a condition in the Liberty Policy, it is because the condition does not apply or has been waived by Liberty.

- Liberty breached its duty to defend Roseburg Forest by failing to appoint independent and/or adequate counsel to defend Roseburg Forest with regards to the Mill Fire Claims.

- Because of Liberty's breach of the Liberty Policy, Roseburg has incurred and continues to incur attorneys' fees and costs in its defense as described in documents that Roseburg has produced and is continuing to produce.

RLC also refers Liberty to the allegations in its Complaint. As additional support for those allegations, pursuant to Rule 33(d)(1), RLC refers Liberty to the documents that have been or will be

6

produced in this case related to the Liberty Policy and Liberty's handling of the claims against RLC, including correspondence between Roseburg and its attorneys and Liberty. RLC also refers Liberty to its responses to Interrogatory Nos. 2-5, 7, and 9, which it incorporates by reference.

To the extent this Interrogatory asks for something more or different than RLC's understanding of the Interrogatory, RLC objects to it as vague and ambiguous.

**INTERROGATORY NO. 2:**

Please state all facts that support the second count for Breach of the Covenant of Good Faith and Fair Dealing asserted against LIBERTY in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 2:**

RLC objects to this Interrogatory to the extent that it seeks information that is attorney-client privileged and/or subject to the work-product doctrine. Subject to and without waiving its objections, RLC understands this Interrogatory to ask for a reasonable statement of facts that support RLC's second count for Breach of the Covenant of Good Faith and Fair Dealing asserted against Liberty in its Complaint. RLC incorporates by reference the facts described in its response to Interrogatory No. 1 and provides the following additional facts:

- Liberty denied Roseburg Forest's request for its selected defense without proper cause.

- Liberty refused to pay for Roseburg Forest's choice of counsel without proper cause.

- Liberty changed its position with regard to Roseburg's retention of Baker Hostetler. It initially approved Baker Hostetler's retention, but then, without explanation, reversed its position. Liberty then retained counsel that was not competent given the nature and scope of the Mill Fire Claims. The firm did not have adequate resources to defend the Mill Fire Claims nor could it provide Roseburg Forest a conflict-free representation.

- Liberty failed to undertake its own independent investigation of the Mill Fire and the Mill Fire Claims. To Roseburg's knowledge:

  - Liberty did not send a representative to the site of the Mill Fire;

  - Liberty did not send a representative or any investigator to assess damages from the Mill Fire;

  - Liberty did not retain any experts related to the Mill Fire;

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

7

- Liberty did not interview any witnesses or Roseburg employees;
- Liberty did not request documents from California Department of Forestry and Fire Protection or any other party other than Roseburg and its counsel; or
- Liberty (or its counsel) never made an appearance on behalf of Roseburg Forest or on its own behalf.

Instead, Liberty ceded its duty to investigate to Baker Hostetler, relying on Baker Hostetler to retain experts, defend the litigation, negotiate claims, and provide Liberty regular updates on its efforts on behalf of Roseburg Forest. Liberty received the benefits of Baker Hostetler's work without contributing anything to their costs.

- Liberty and the counsel it retained inaccurately characterized the Mill Fire as a "wildfire," which jeopardized Roseburg's position with respect to other insurers within its liability tower, including The Ohio Casualty Insurance Company, a Liberty sister company. Liberty assigned the same adjuster to the claim for Liberty and Ohio Casualty. Therefore, it is evident that Liberty was aware that the mischaracterization, had it been accurate (and it is not), could have supported a coverage denial under the Ohio Casualty policy.

- Liberty non-renewed the Liberty Policy after receiving notice of the Mill Fire Claims.

RLC also refers Liberty to the allegations in its Complaint. As additional support for those allegations, pursuant to Rule 33(d)(1), RLC refers Liberty to the documents that have been or will be produced in this case related to the Liberty Policy and Liberty's handling of the claims against RLC, including correspondence between Roseburg and its attorneys and Liberty.

To the extent this Interrogatory asks for something more or different than RLC's understanding of the Interrogatory, RLC objects to it as vague and ambiguous.

**<u>INTERROGATORY NO. 3:</u>**

Please state all facts that support YOUR contention at Paragraph 67 of YOUR COMPLAINT that "Liberty initially approved Roseburg's request to continue using Baker Hostetler as defense counsel. . ."

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

PLAINTIFF RLC INDUSTRIES CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

**RESPONSE TO INTERROGATORY NO. 3:**

RLC objects to this Interrogatory to the extent that it seeks information that is attorney-client privileged and/or subject to the work-product doctrine. Subject to and without waiving its objections, RLC understands this Interrogatory to ask for a reasonable statement of facts that support RLC's contention that "Liberty initially approved Roseburg's request to continue using Baker Hostetler as defense counsel. . ." These facts include the following:

- Liberty initially approved Roseburg's request to continue using Baker Hostetler as defense counsel, the law firm that had been handling the defense from "day one," in an email dated Wednesday, September 7, 2022 from Jamie Sroczynski, an attorney at Liberty Mutual within its Legal Strategic Services group, to Dustin Dow, a partner at Baker Hostetler.

- In that email, Sroczynski requested Baker Hostetler's "proposed rates for handling this case," including "all timekeepers you expect will assist on the file."

- Sroczynski also requested that, "[i]n connection with your work with on this matter," "your firm abide by Liberty's Guidelines and Litigation Protocols (attached) and submit your bills to us electronically using our vendor Lexis Nexis/CounselLink, which is simply a conduit to our Legal Billing Unit which is comprised of Liberty employees/litigation auditors who will pull your bills for review and payment."

- Sroczynski noted that "[g]iven your firm's ongoing relationship with Liberty Mutual, I would not anticipate the guidelines or ebilling to be an issue; however, I would be happy to address any concerns."

- Finally, Sroczynski said "I appreciate your anticipated cooperation."

- Liberty's "Guidelines for Law Firms" and "Litigation Management Protocols" were attached to the email. Liberty's "Guidelines for Law Firms" contain the following statements:

  - By accepting cases, your law firm is expressly agreeing to abide by the policies set forth in these Guidelines.

  - **Philosophy:** The Firm is expected to work with **Liberty Mutual Insurance** including

9

its Strategic Business Units **Global Risk Solutions** ("GRS" includes legacy Commercial Insurance [CI], Ironshore [IS], and Liberty International Underwriters [LIU], and presently National Insurance [NI] and North American Specialty [NAS]) and **Global Retail Markets** ("GRM" includes legacy U.S. Consumer Markets [USCM], Personal Insurance [PI], Safeco, and Business Insurance [BI], and presently GRM U.S.), its **Home Office Legal Department** ("HO Legal"), and **Liberty Mutual Helmsman Management Services LLC** ("HMS") (all **collectively "Liberty"**), and the insured/customer to achieve the best result for the insured/customer in a timely, efficient, and cost-conscious manner consistent with the clients' interests and the Firm's ethical obligations, and to resist non-meritorious, suspicious or frivolous claims.

- An effective and strategically sound legal defense is the responsibility of defense counsel in direct consultation with the Liberty case handler/primary Liberty contact for the case. . .

- Counsel should collaborate with the Liberty case handler/primary Liberty contact for the case initially and as the case progresses to ensure appropriate staffing to meet the needs of the case.

- Between September 7, 2022 and September 22, 2022, Roseburg Forest's defense counsel, Baker Hostetler, exchanged correspondence with representatives of Liberty and provided documents and information about the Mill Fire and Roseburg Forest's operations at the Weed facility. At no time did Liberty object to Baker Hostetler's representation of Roseburg Forest or otherwise imply that it intended to withdraw its approval of Baker Hostetler's representation and/or to assign alternative defense counsel.

- Between September 7, 2022 and September 22, 2022, Liberty participated in calls led by Baker Hostetler, which provided updates regarding the claim status. At no time did Liberty object to Baker Hostetler's representation of Roseburg Forest or otherwise imply that it intended to withdraw its approval of Baker Hostetler's representation and/or to assign alternative defense counsel.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1    Roseburg interpreted the email, litigation guidelines, and subsequent communications without

2    objection as approval of Roseburg's request to continue using Baker Hostetler as defense counsel.

3    Roseburg substantially relied upon Liberty's communications and its lack of objections in the critical

4    early days of its response to the Mill Fire and the Mill Fire Claims.

5    RLC also refers Liberty to the allegations in its Complaint.  As additional support for those

6    allegations, pursuant to Rule 33(d)(1), RLC refers Liberty to the documents that have been or will be

7    produced in this case related to the Liberty Policy and Liberty's handling of the claims against RLC,

8    including correspondence between Roseburg and its attorneys and Liberty between September 7, 2022

9    and September 22, 2022.

10    To the extent this Interrogatory asks for something more or different than RLC's understanding

11    of the Interrogatory, RLC objects to it as vague and ambiguous.

12    **INTERROGATORY NO. 4:**

13    Please state all facts that support YOUR contention that YOU are entitled to independent

14    counsel to defend YOU for the MILL FIRE CLAIMS, pursuant to California Civil Code section 2860.

15    **RESPONSE TO INTERROGATORY NO. 4:**

16    RLC objects to this Interrogatory to the extent that it seeks information that is attorney-client

17    privileged and/or subject to the work-product doctrine.  Subject to and without waiving its objections,

18    RLC understands this Interrogatory to ask for a reasonable statement of facts that support RLC's

19    contention that it is entitled to independent counsel to defend against the Mill Fire Claims pursuant to

20    California Civil Code section 2860.  These facts include the following:

21    • In its September 22, 2022 "reservation of rights" letter, Liberty expressed various

22    factual and legal arguments why it might not be required to indemnify Roseburg Forest.

23    After listing numerous specific allegations in the complaints and quoting five pages'

24    worth of policy provisions (in a nine-page letter), Liberty reserved its right to withdraw

25    from Roseburg Forest's defense for any reason.

26    • In the September 22, 2022 letter, Liberty cited the "occurrence" definition in its

27    reservation of rights.  The policy defines an "occurrence," in part, as an "accident."

28    The policy provides coverage if the bodily injury and property damage claims were

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

11

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1    caused by an accident or an occurrence. But if Roseburg's actions were not accidental,

2    then Liberty might maintain that it did not owe Roseburg Forest a duty to defend.

3    Liberty-appointed counsel could be tempted to litigate the action in a way that shifts

4    Roseburg's liability toward intentional acts rather than liability premised on

5    negligence, benefiting Liberty but at the expense of Roseburg's best interests.

6    • Liberty also reserved its right to "not pay for legal fees and costs unrelated to

7    Roseburg's defense of the claims/and/or the current lawsuits and/or future lawsuits

8    arising from the fire," which runs afoul of two California Supreme Court cases.

9    • Another conflict consists of Roseburg and Liberty's contrasting approaches to claims

10    resolution. Roseburg is committed to doing right by its community, including

11    developing a claims resolution process—on both an emergency and longer term basis—

12    by which affected individuals and businesses can be compensated and can focus on the

13    arduous process of putting their lives and businesses back together. When Liberty was

14    briefed on this strategy during a September 9 call, it agreed. Yet days later, it

15    backtracked to say that they were still "evaluating."

16    • In a letter from counsel dated November 22, 2022, Liberty touted David Bona's "over

17    20 years of experience in defending clients in high exposure, complex, wildfire cases."

18    Bona, in an email to Roseburg Forest's counsel dated December 5, 2022 also described

19    his firm as having "represented clients in large, multiparty wildland fire litigation,"

20    defending "numerous wildland fire cases," and having a "long history of defending

21    wildfire cases." Besides ignoring the facts surrounding the Mill Fire itself, Liberty and

22    Mr. Bona's continued mischaracterization of the Mill Fire as a "wildfire case" caused

23    a conflict between Roseburg and its insurers.

24    • Defendant Everest National Insurance Company's ("Everest") policy contains a

25    Wildfire Exclusion Endorsement. Roseburg does not agree that the Wildfire Exclusion

26    Endorsement applies to the Mill Fire on a factual or legal basis, but Everest reserved

27    its rights on the issue and asserted the endorsement as an affirmative defense in its

28    answer in this matter.

PLAINTIFF RLC INDUSTRIES CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

- Liberty's sister company, The Ohio Casualty Insurance Company ("Ohio Casualty"), issued RLC Industries, Inc. an excess policy with a Following Form Endorsement that purported to adopt "the exact terms and conditions" of the Everest policy. Ohio Casualty raised the Wildfire Exclusion Endorsement as an affirmative defense in its answer in this matter. Ohio Casualty alleged that Roseburg's claims are barred, in whole or in part, due to the exclusion's application.

- Liberty and Ohio Casualty's interests conflicted as to the particulars of the source of the Mill Fire (e.g., source, how and where it spread) as well as its characterization. These facts and this characterization are intrinsic to the defense of the claims against Roseburg Forest and to Liberty's coverage position. Liberty and Bona's reference to the Mill Fire as a wildfire, besides being incorrect as a matter of fact, could affect coverage as a matter of law. Thus, a conflict of interest existed such that Roseburg Forest was entitled to independent counsel.

- Upon information and belief, Liberty Mutual assigned the same adjuster to both the Liberty and Ohio Casualty claims.

- Liberty Mutual retained the same coverage counsel for both Liberty and Ohio Casualty.

RLC also refers Liberty to the allegations in its Complaint. As additional support for those allegations, pursuant to Rule 33(d)(1), RLC refers Liberty to the documents that have been or will be produced in this case related to the Liberty Policy and Liberty's handling of the claims against RLC, including correspondence with Roseburg and its attorneys and Carlson, Calladine & Peterson.

To the extent this Interrogatory asks for something more or different, RLC objects to it as vague and ambiguous.

**INTERROGATORY NO. 5:**

Please state all facts that support YOUR contention that LIBERTY'S retained defense counsel, Carlson, Calladine & Peterson, was not competent to defend YOU against the MILL FIRE CLAIMS.

**RESPONSE TO INTERROGATORY NO. 5:**

RLC objects to Liberty's characterization of the Carlson, Calladine & Peterson firm ("Carlson") as "Liberty's retained defense counsel" to the extent this is meant to imply that Carlson

13

Exhibit 54, Page 013

represented Roseburg Forest or RLC at any time.  RLC objects to the characterization of its contentions related to Carlson as being solely "not competent," as this alone does not fully state RLC's position towards Carlson.  RLC contends that Carlson was not competent given the nature and scope of the Mill Fire Claims.  Carlson did not have adequate resources to defend the Mill Fire Claims nor could it provide Roseburg Forest a conflict-free representation, since most of Carlson's practice is dedicated to defending insurance companies attempting to avoid their insurance obligations (a practice adverse to RLC's position here that its insurers are contractually obligated to defend and indemnify Roseburg).  Finally, RLC objects to this Interrogatory to the extent that it seeks information that is attorney-client privileged and/or subject to the work-product doctrine.

Subject to and without waiving its objections, RLC understands this Interrogatory to ask for a reasonable statement of facts that support RLC's contention that Carlson, was not competent to defend RLC against the Mill Fire Claims given the nature and scope of the Mill Fire Claims.  These facts include the following:

- Given the nature of the Mill Fire and Mill Fire Claims, Roseburg Forest needed and continues to need counsel with the workforce capacity and experience to handle a complex, high-profile, and fast-moving crisis.

- According to Carlson's website, it only has seven attorneys.  (This is two fewer than alleged in the Complaint.  It appears one attorney has left the firm and another retired.)  Only two of its attorneys practice fire-related litigation.  Most of the firm's practice is dedicated to defending insurance companies attempting to avoid their insurance obligations (a practice adverse to RLC's position here that its insurers are contractually obligated to defend and indemnify it).  Roseburg did not waive conflicts posed by Carlson's extensive insurance-side representation.

- By contrast, Baker Hostetler is at the forefront of legal practice anywhere in the country with fire-response experience.  That is why Roseburg chose them.  For instance,

  - Baker Hostetler represented the Tort Claimants Committee in the PG&E bankruptcy, which turned on the 2017 North Bay Fires and the 2018 Camp Fire.

  - Baker Hostetler represents fire victims, including Roseburg Forest, in the

14

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

Oregon 2020 Labor Day Fire litigation, a complex case involving issues like causation, damages, and liability arising from multiple fire ignitions.

- Baker Hostetler represents parties involved in government and civil litigation in the 2019 Kincade Fire.

- Baker Hostetler mobilized a multidisciplinary team of 31 attorneys the day after the Mill Fire began.  In less than a month, Baker Hostetler:

  - Negotiated with plaintiffs' counsel about claims that may be filed in litigation or asserted as part of a streamlined claims process;

  - Established the community and emergency fund response, essential to assisting the community on a real time basis and reducing the need for time-consuming litigation;

  - Coordinated third-party indemnification claims;

  - Led Roseburg's response to government investigations; and

  - Supervised Roseburg's privileged internal investigation.

- Baker Hostetler established these critical workstreams before Liberty even assigned alternate defense counsel.  Had Roseburg waited 20 days for Liberty to identify and retain defense counsel, Roseburg Forest would have been left defenseless during a critical, time-sensitive response window.

- Whatever the abilities of the two Carlson attorneys with fire-related experience, Carlson was neither equipped nor staffed to adequately defend Roseburg Forest against hundreds of claimants and at least five lawsuits, much less provide a holistic and consistent defense for Roseburg Forest in all the matters it was facing.  After all, the Carlson firm would have concluded its representation in February 2023, when Liberty exhausted its limits and no longer owed a duty to defend.  Roseburg would have been in the position of retaining a new firm and getting them up-to-speed in the midst of ongoing claims and litigation, plus a government investigation.

- Even if Carlson had enough conflict-free attorneys with the needed experience to handle the Mill Fire Claims (not just the two that are advertised on its website), adding

15

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

1     them to the defense team would have been inefficient at best.  At worst (and more

2     likely), it invited inconsistent positions detrimental to Roseburg Forest's defense.

3     RLC also refers Liberty to the allegations in its Complaint.  As additional support for those

4     allegations, pursuant to Rule 33(d)(1), RLC refers Liberty to the documents that have been or will be

5     produced in this case.

6     To the extent this Interrogatory asks for something more or different, RLC objects to it as

7     vague and ambiguous.

8     **INTERROGATORY NO. 6:**

9     Please state all facts RELATING TO any conflict waiver entered into between YOU and Baker

10    Hostetler regarding MILL FIRE CLAIMS, given LIBERTY MUTUAL's former and current client

11    relationship with Baker Hostetler.

12    **RESPONSE TO INTERROGATORY NO. 6:**

13    RLC objects to this Interrogatory as not relevant to any party's claim or defense in this case.

14    To the extent the Interrogatory implies that a conflict waiver between RLC and Baker Hostetler would

15    be necessary or even appropriate under the circumstances, RLC objects to that implication.  Subject

16    to and without waiving its objections, RLC states that there is no conflict waiver entered into between

17    RLC and Baker Hostetler regarding the Mill Fire Claims.

18    **INTERROGATORY NO. 7:**

19    Please state the total amount of defense fees and costs RELATING TO the MILL FIRE

20    CLAIMS for which you seek reimbursement from LIBERTY under the POLICY.

21    **RESPONSE TO INTERROGATORY NO. 7:**

22    RLC also objects to this Interrogatory to the extent that it seeks information that is protected

23    by the common interest doctrine, attorney-client privilege and/or work-product doctrine.  Subject to

24    and without waiving these objections, pursuant to Rule 33(d)(1), RLC refers Liberty to invoices it

25    previously produced from Baker Hostetler and other vendors that provided defense-related services.

26    **INTERROGATORY NO. 8:**

27    Please state the total amount of fees and costs Baker Hostetler charged YOU to provide

28    coverage advice RELATING TO the MILL FIRE CLAIMS from September 6, 2022 to February 16,

16

Exhibit 54, Page 016

1  2023.

2  **RESPONSE TO INTERROGATORY NO. 8:**

3         RLC objects to the term "coverage advice" as vague and ambiguous in this context.  RLC has

4  and is seeking insurance coverage under various policies for the Mill Fire and the Mill Fire Claims,

5  but this Interrogatory does not specify any policy type or insurer.  Moreover, the Interrogatory does

6  not list or define what acts constitute "coverage advice."  RLC also objects to this Interrogatory to the

7  extent that it seeks information that is protected by the common interest doctrine, attorney-client

8  privilege and/or work-product doctrine.  To the extent the Request implies that Baker Hostetler should

9  not or could not provide coverage advice to Roseburg, RLC objects to that implication.  Roseburg had

10  no reason to believe that it position was adversarial to Liberty, since Liberty had agreed to retain Baker

11  Hostetler as Roseburg Forest's defense counsel, accepted coverage, and was a party to update

12  communications and calls with Baker Hostetler attorneys without any objection to Baker Hostetler's

13  representation.  Once Liberty issued its reservation of rights letter on September 22, 2022, Roseburg

14  retained alternate coverage counsel (Hunton Andrews Kurth LLP).  Subject to and without waiving

15  these objections, RLC responds as follows:

16         To the extent "coverage advice" includes providing Liberty notice of the Mill Fire Claims or

17  imparting to Roseburg information about any policy of insurance through which Roseburg might be

18  insured consistent with Cal. Form Judicial Interrogatory 4.1 (*e.g.*, policy limits and insurer positions),

19  whether and in what amount Baker Hostetler charged Roseburg for this type of "coverage advice" is

20  not relevant to any party's claim or defense in this case, because Roseburg is not seeking

21  reimbursement of any fees or costs Baker Hostetler charged it to provide this type of "coverage advice"

22  relating to the Mill Fire Claims.  Nor has Liberty raised any affirmative defenses related to Baker

23  Hostetler's "coverage advice" to Liberty.

24         Subject to and without waiving these objections and to the extent "coverage advice" applies to

25  Baker Hostetler's work in securing insurance coverage for Roseburg under Roseburg's directors and

26  officers and/or property insurance policies, this Interrogatory is still not relevant to any party's claim

27  or defense in this case.  Roseburg is not seeking reimbursement of any fees or costs Baker Hostetler

28  charged it to provide this type of "coverage advice" relating to the Mill Fire Claims.  Nor is Roseburg

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

17

seeking any coverage for defense or indemnity amounts paid under any directors and officers and/or property policy also under the Liberty Policy.

To the extent this Interrogatory asks for something more or different, RLC objects to it as vague and ambiguous.

**INTERROGATORY NO. 9:**

Please state the total amount of fees and costs Baker Hostetler charged YOU RELATING TO the MILL FIRE CLAIMS from September 6, 2022 to February 16, 2023.

**RESPONSE TO INTERROGATORY NO. 9:**

RLC objects to this Interrogatory to the extent that it seeks information that is protected by the common interest doctrine, attorney-client privilege and/or work-product doctrine. RLC also objects to this Interrogatory to the extent it seeks fees and costs Baker Hostetler charged Roseburg for which Roseburg is not seeking reimbursement from Liberty under the Policy. Those amounts are not relevant to any party's claim or defense in this case.

Subject to and without waiving its objections, RLC understands this Interrogatory to ask for a statement of the total amount of defense fees and costs that Baker Hostetler charged Roseburg relating to the Mill Fire Claims from September 6, 2022 to February 16, 2023, for which Roseburg is seeking reimbursement from Liberty under the Policy. Pursuant to Rule 33(d)(1), RLC refers Liberty to the invoices from Baker Hostetler that it previously produced.

**INTERROGATORY NO. 10:**

Please state all facts that support YOUR contention that YOU are entitled to punitive damages.

**RESPONSE TO INTERROGATORY NO. 10:**

RLC objects to this Interrogatory to the extent that it seeks information that is confidential, privileged, or otherwise protected by the attorney-client privilege and/or work-product doctrine. Subject to and without waiving its objections, RLC refers Liberty to its response to Interrogatory No. 2 and to the allegations in its Complaint.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

18

1

2   DATED:  September 20, 2023                    HUNTON ANDREWS KURTH LLP

3

4                                        By:    /s/ Scott P. DeVries
                                                Scott P. DeVries
5                                               Rachel E. Hudgins
                                                Charlotte E. Leszinske
6

7                                               Attorneys for Plaintiffs RLC Industries
                                                Co. and Roseburg Forest Products Co.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="text-align:left"><strong>Hunton Andrews Kurth LLP</strong><br>50 California Street, Suite 1700<br>San Francisco, California 94111</div>

19

PLAINTIFF RLC INDUSTRIES CO.'S ANSWERS TO
DEFENDANT'S INTERROGATORIES (SET ONE)

DocuSign Envelope ID: 9AD099E0-9C3E-458E-8CA1-52F840358BA7

1

## **VERIFICATION**

2   I, Lisa Fairchild, am the Director of Treasury for RLC Industries Co.  I am the agent of RLC

3 Industries Co. for the purpose of answering Liberty Insurance Corporation's Interrogatories (Set One).

4 I have read the foregoing Interrogatories and the answers to those Interrogatories, which are true

5 according to the best of my knowledge, information, and belief.  I declare under penalty of perjury

6 that the foregoing is true and correct.

7   Executed on September 20, 2023.



8

9            Lisa Fairchild

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Hunton Andrews Kurth LLP**
**50 California Street, Suite 1700**
**San Francisco, California 94111**

VERIFICATION

Exhibit 54, Page 020

## CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is 550 South Hope Street, Suite 2000, Los Angeles, California 90071.

On September 20, 2023 I served the document(s) described as **PLAINTIFF RLC INDUSTRIES CO.'S ANSWERS TO LIBERTY INSURANCE CORPORATION'S INTERROGATORIES (SET ONE)** on the interested parties in this action:

| SHEPPARD, MULLIN, RICHTER & HAMPTON LLP | MCCLOSKEY, WARING, WAISMAN & DRURY LLP |
|---|---|
| Frank Falzetta (State Bar No. 125146)<br>Mary E. Gregory (State Bar No. 210247)<br>333 South Hope Street, 43rd Floor<br>Los Angeles, California 90071<br>ffalzetta@sheppardmullin.com<br>mgregory@sheppardmullin.com<br>Tel: (213) 620-1780<br>Fax: (213) 620-1398<br><br>Jeffrey S. Crowe (State Bar No. 216055)<br>650 Town Center Drive, 10th Floor<br>Costa Mesa, California 92626<br>jcrowe@sheppardmullin.com<br>Tel: (714) 513-5100<br>Fax: (714) 513-5130<br><br>*Attorneys for Defendants Liberty Insurance Corporation* | Andrew R. McCloskey (State Bar No. 179511)<br>David G. Hackett (State Bar No. 259775)<br>Richard E. Decker (State Bar No. 299729)<br>4445 Eastgate Mall, Suite 200<br>San Diego, California 92121<br>amccloskey@mwwdlaw.com<br>rdecker@mwwdlaw.com<br>dhackett@mwwdlaw.com<br>Tel: (619) 237-3095<br>Fax: (619) 237-3789<br><br>*Attorneys for Defendant Everest National Insurance Company* |

☒ **By MAIL:** by placing true and correct copy(ies) thereof in an envelope addressed to the attorney(s) of record, addressed as stated above.

☐ **By OVERNIGHT MAIL:** by overnight courier, I arranged for the above-referenced document(s) to be delivered to an authorized overnight courier service for delivery to the addressee(s) above, in an envelope or package designated by the overnight courier service with delivery fees paid or provided for.

☒ **By ELECTRONIC MAIL:** by causing a true and correct copy thereof to be transmitted electronically to the attorney(s) of record at the e-mail address(es) indicated above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 20, 2023 at Los Angeles, California.

*Bree Anderson*
_____
Bree Anderson

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

CERTIFICATE OF SERVICE

EXHIBIT 55

EXHIBIT 55

EXHIBIT 55

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Eastern District of California

| | |
|---|---|
| RLC INDUSTRIES CO. and ROSEBURG FOREST PRODUCTS CO., | ) |
| _Plaintiff_ | ) |
| v. | )     Civil Action No. 2:23-cv-00649-TLN-DB |
| | ) |
| LIBERTY INSURANCE CORPORATION, et al. | ) |
| _Defendant_ | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Baker & Hostetler LLP
Key Tower, 127 Public Square, Suite 2000, Cleveland, Ohio 44114; (216) 861-7610
*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See Attachment A

| | |
|---|---|
| Place: First Legal Records c/o Cleveland Service Agency<br>2301 Hamilton Avenue, Suite 108<br>Cleveland, OH  44114; (877) 591-9979 | Date and Time:<br>February 21, 2024 - 10:00 a.m. |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: January 24, 2024

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Mary E. Gregory |
| _Signature of Clerk or Deputy Clerk_ | _Attorney's signature_ |
| | Attorney for Liberty Insurance Corporation |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendant Liberty Insurance Corporation_____, who issues or requests this subpoena, are:
Mary E. Gregory, Sheppard, Mullin, Richter & Hampton LLP, 333 S. Hope St., 43rd Flr. Los Angeles, CA 90071
mgregory@sheppardmullin.com; (213) 617-5426

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

I declare under penalty of perjury that this information is true.

Date: _____                    _____

                                                        *Server's signature*

                                              _____

                                                        *Printed name and title*

                                              _____

                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## <u>ATTACHMENT A TO SUBPOENA DIRECTED TO</u>

## <u>BAKER & HOSTETLER LLP</u>

### I.

### <u>DEFINITIONS</u>

1.     The terms "BAKER" or "YOU," shall mean and refer to Baker & Hostetler LLP and shall include its employees, attorneys, and partners, and any other person or entity acting or purporting to act on Baker's behalf and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the demand that which might otherwise be construed to be outside of its scope.

2.     The term "ROSEBURG" shall mean and refer to Plaintiffs RLC Industries, Inc. and/or Roseburg Forest Products Co., and shall include any officers, directors, employees, agents, representatives, attorneys, and any other person or entity acting or purporting to act on Roseburg's behalf, and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the demand that which might otherwise be construed to be outside of its scope.

3.     The term "LIBERTY" shall mean and refer to defendant Liberty Insurance Corporation and shall include any officers, directors, employees, agents, representatives, attorneys, and any other person or entity acting or purporting to act on Liberty's behalf and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the demand that which might otherwise be construed to be outside of its scope.

      4.      The term "MILL FIRE" shall mean and refer to the fire that began inside ROSEBURG'S manufacturing mill located in Weed, California, on September 2, 2022.

      5.      The term "MILL FIRE CLAIMS" shall mean the claims made and lawsuits filed against ROSEBURG for alleged losses arising from the MILL FIRE.

      6.      The term "CARLSON" shall mean and refer to Carlson, Calladine & Peterson LLP and shall include its employees, attorneys, and partners, and any other person or entity acting or purporting to act on Carlson's behalf and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the demand that which might otherwise be construed to be outside of its scope.

      7.      The term "LIBERTY MUTUAL" means Liberty Mutual Insurance Company and its related or affiliated entities.

      8.      The term "DOCUMENT(S)" is used in the broadest sense possible and shall mean and include, without limitation, any and all "writings" and "recordings" as the term is defined by Federal Rule of Evidence, Rule 1001, papers, correspondence, notes, letters, telegrams, mailgrams, cables, telex messages, facsimiles, transmittals, bulletins, instructions, rulings, decisions, policies, binders, books, file folders, printed matter, notebooks, minutes, agenda, memoranda, intra- or inter-office communications of any type or nature, workbooks, worksheets, stenographers' notebooks, reports, records, diaries, calendars, calendar entries, files, studies, forecasts, projects, surveys, appraisals, analyses, financial statements of every type, budgets, projects, quotations, calculations, logs, job logs, timesheets, bills, invoices, statements, purchase orders, checks, check registers, journals, schedules, ledger books, log books, book of account, accounts, work

-2-

papers, summaries, contracts or any other types of agreement, proposals, working papers, payrolls, charts, notes of meetings or interviews or telephone conversations, requests for authorization, requests for quotation, press releases, schedules, maps, drawings, designs, diagrams, blueprints, plans, schematics, manuals, accountants' statements or summaries, graphs, charts, photographs, motion pictures, slides, microfilm, microfiche, recordings of meetings or conversations or interviews either in writing or made upon any mechanical, electronic or electrical recording device, data compilations from which information can be obtained or can be translated through detection devices into a reasonably usable form, computer inputs or outputs, or any other written, graphic or recorded representations or communications whatsoever, whether in lithograph, or in any other tangible form or intangible form which can be reduced to tangible form, and any other form of communication or representation including letters, records, pictures, film, videotape, sounds, symbols or communications thereof.

9.    The term "DOCUMENT(S)" shall also mean and include, without limitation, any and all originals, duplicate originals, facsimiles and extra copies or reproductions of all such written, printed, typed, reported, recorded or graphic matter included above, upon which notations and writing, print or otherwise, have been made or to which such notations have been appended.

10.    The terms "RELATING TO" or "RELATE TO" shall mean discussing, describing, constituting, evidencing, memorializing, concerning, mentioning, summarizing, listing, reflecting, analyzing, supporting, negating, referring to or relating to the subject matter of the demand.

11.     The conjunctives "and" and "or" shall be construed conjunctively or disjunctively, as necessary to bring within the scope of this Subpoena any documents that would otherwise not be brought within its scope.

12.     The singular form shall include the plural and vice versa, wherever such dual construction will serve to bring within the scope of this Subpoena any document that would otherwise not be brought within its scope.

## II.
## <u>CATEGORIES OF DOCUMENTS REQUESTED</u>

### <u>DOCUMENT CATEGORY NO. 1</u>:

All non-privileged DOCUMENTS RELATING TO the MILL FIRE.  YOU do not need to produce any documents previously provided to LIBERTY bearing the bates prefixes RFPC_INS_PROD or RFP_CALFIRE.

### <u>DOCUMENT CATEGORY NO. 2</u>:

All non-privileged DOCUMENTS RELATING TO the MILL FIRE CLAIMS.  YOU do not need to produce any documents previously provided to LIBERTY bearing the bates prefixes RFPC_INS_PROD or RFP_CALFIRE.

### <u>DOCUMENT CATEGORY NO. 3</u>:

All DOCUMENTS memorializing, referencing or reflecting communications between YOU and LIBERTY RELATED TO the MILL FIRE.

**DOCUMENT CATEGORY NO. 4:**

   All DOCUMENTS memorializing, referencing or reflecting communications between YOU and LIBERTY RELATED TO the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 5:**

   All DOCUMENTS memorializing, referencing or reflecting communications between YOU and CARLSON RELATED TO the MILL FIRE.

**DOCUMENT CATEGORY NO. 6:**

   All DOCUMENTS memorializing, referencing or reflecting communications between YOU and CARLSON RELATED TO the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 7:**

   All DOCUMENTS memorializing, referencing or reflecting communications between YOU and any third party RELATED TO the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 8:**

   All invoices YOU sent to ROSEBURG for the defense of the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 9:**

   All DOCUMENTS RELATING TO defense fees and costs that YOU sent to ROSEBURG for payment of legal services rendered between September 2, 2022 and February 10, 2023, for the MILL FIRE CLAIMS, including, but not limited to, prebills and final invoices.

**DOCUMENT CATEGORY NO. 10:**

      All DOCUMENTS RELATING TO any and all payments that

ROSEBURG made to YOU in connection with the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 11:**

      All DOCUMENTS RELATING TO YOUR discussions with LIBERTY, if

any, regarding the hourly rates YOU intended to charge to defend ROSEBURG for the

MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 12:**

      All DOCUMENTS RELATING TO ROSEBURG's claim that LIBERTY

agreed that it would pay YOU to defend ROSEBURG for the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 13:**

      All DOCUMENTS memorializing, referencing or reflecting any agreement

between YOU and LIBERTY that YOU would defend ROSEBURG for the MILL FIRE

CLAIMS.

**DOCUMENT CATEGORY NO. 14:**

      A list of all cases in which YOU have defended or represented clients for

building fire or wildfire claims alleged against them between 2010 and the present.  This

list shall include the title of the case, the court in which the case was filed, the case

number, the BAKER file number or designation, and the names/titles of the BAKER

attorneys who worked on the cases.

**DOCUMENT CATEGORY NO. 15:**

      A list of all cases in which YOU defended or represented a LIBERTY

MUTUAL insured and LIBERTY MUTUAL paid YOUR invoices between 2010 and the

present.  This list shall include the title of the case, court in which the case was filed, and

the case number, the BAKER file number or designation, and the names/titles of the

BAKER attorneys who worked on the cases.

**DOCUMENT CATEGORY NO. 16:**

   A list of all cases in which YOU defended or represented LIBERTY

MUTUAL between 2010 and the present.  This list shall include the title of the case, and

court in which the case was filed, and the case number, the BAKER file number or

designation, and the names/titles of the BAKER attorneys who worked on the cases.

**DOCUMENT CATEGORY NO. 17:**

   ALL DOCUMENTS, including, but not limited to, manuals, handbooks,

and training materials, maintained by BAKER from 2010 to the present concerning

ethical obligations of BAKER attorneys, including ethical obligations regarding conflicts

of interest or potential conflicts of interest.

**DOCUMENT CATEGORY NO. 18:**

   A list of matters in which YOU have sought a conflict waiver from

LIBERTY MUTUAL between 2010 and the present, including in that list the name of the

matter, claim number, if applicable, the BAKER file number or designation, and the

names/titles of the BAKER attorneys who worked on the cases.

**DOCUMENT CATEGORY NO. 19:**

   All DOCUMENTS memorializing, referencing or reflecting any conflict

waiver between YOU and LIBERTY MUTUAL for the period from 2010 to the present.

Exhibit 55, Page 010

**DOCUMENT CATEGORY NO. 20:**

All DOCUMENTS memorializing, referencing or reflecting the dates of any coverage advice that YOU provided to ROSEBURG RELATING TO the MILL FIRE.

**DOCUMENT CATEGORY NO. 21:**

All DOCUMENTS memorializing, referencing or reflecting the dates of any coverage advice that YOU provided to ROSEBURG RELATING TO the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 22:**

All pleadings that YOU filed on behalf of ROSEBURG RELATING TO the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 23:**

All discovery that YOU served or received RELATING TO the MILL FIRE CLAIMS.

**DOCUMENT CATEGORY NO. 24:**

All prebills RELATING TO YOUR defense of ROSEBURG against the MILL FIRE CLAIMS that memorialize or reflect write-ups or write-offs.

**DOCUMENT CATEGORY NO. 25:**

DOCUMENTS sufficient to memorialize or reflect ROSEBURG's payment to YOU for defense fees and expenses RELATING TO the MILL FIRE CLAIMS.

Exhibit 55, Page 011

**DOCUMENT CATEGORY NO. 26:**

        DOCUMENTS sufficient to demonstrate the amount of fees paid to YOU by LIBERTY MUTUAL for matters active between September 6, 2022 and February 10, 2023, where YOU defended LIBERTY MUTUAL.

**DOCUMENT CATEGORY NO. 27:**

        DOCUMENTS sufficient to demonstrate the amount of fees paid to YOU by LIBERTY MUTUAL for matters active between September 6, 2022 and February 10, 2023, where YOU defended a LIBERTY MUTUAL insured.

EXHIBIT 56

EXHIBIT 56

EXHIBIT 56

**HUNTON ANDREWS KURTH LLP**
Scott P. DeVries (State Bar No. 88221)
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701

Rachel E. Hudgins (admitted *pro hac vice*)
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA 30308
Telephone: (404) 888-4000
Facsimile: (404) 888-4190

*Attorneys for Plaintiffs RLC Industries Co. and*
*Roseburg Forest Products Co.*

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

RLC INDUSTRIES CO. and
ROSEBURG FOREST PRODUCTS CO.,

                    Plaintiffs,

         v.

LIBERTY INSURANCE CORPORATION,
EVEREST NATIONAL INSURANCE
COMPANY, and THE OHIO CASUALTY
INSURANCE COMPANY

                    Defendants.

Case No. 2:23-CV-00649-TLN-DB

**PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S OBJECTIONS AND RESPONSES TO DEFENDANT LIBERTY INSURANCE CORPORATION'S REQUESTS FOR ADMISSION, SET TWO**

| | |
|---|---|
| **PROPOUNDING PARTY:** | Defendant LIBERTY INSURANCE CORPORATION |
| **RESPONDING PARTY:** | Plaintiff ROSEBURG FOREST PRODUCTS CO. |
| **SET NO.:** | TWO |

*(margin text, left side:)* Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1    Roseburg Forest Products Co. ("Roseburg Forest") hereby responds and objects to the

2    Requests for Admission (Set Two) propounded by Liberty Insurance Corporation ("Liberty") as

3    follows:

**PRELIMINARY STATEMENT**

5    Roseburg Forest's following responses and objections to Liberty's Requests are made to the

6    best of Roseburg Forest's present knowledge, information, and belief.  Roseburg Forest reserves the

7    right to amend, modify, supplement, clarify or further explain its responses at any time in the future,

8    and to make use of, or to introduce at any hearing, or trial, additional responsive information or

9    amended responses to the Requests, but is under no obligation to do so unless specifically requested

10   to do so at a future date in accordance with applicable law.

11   Roseburg Forest does not concede the relevancy, materiality, or admissibility of any

12   information sought by any of the Requests or any of the responses thereto.  Roseburg Forest's

13   responses are made without waiver of any objections as to the relevancy, materiality, privilege, or

14   admissibility as evidence or for any other purpose, of any of the documents or information referred to,

15   or of the responses given herein, or of the subject matter thereof, in any proceeding, or any other

16   subsequent proceeding.

**OBJECTIONS TO DEFINITIONS**

18   1.    Roseburg Forest objects to the extent that the exclusion of RLC Industries Co. from the

19   terms "ROSEBURG," "YOU," and "YOUR" is meant to imply that these two entities have different

20   rights under the POLICY.  Both Roseburg entities are entitled to full coverage under the POLICY.

21   Liberty has not alleged otherwise.  Also, Roseburg Forest understands Liberty's definition of "YOU"

22   and "YOUR" to not encompass attorneys for Roseburg Forest to the extent that doing so would violate

23   attorney-client privilege or the work-product doctrine; otherwise, Roseburg Forest objects to the

24   definition as overly broad or as seeking information that is privileged or subject to the work-product

25   doctrine.

**RESPONSES AND OBJECTIONS TO REQUESTS**

27   **REQUEST FOR ADMISSION NO. 9:**

28   Admit that YOU were named as a defendant in the SMITH LAWSUIT.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

---

2

PLAINTIFF ROSEBURG FOREST PRODUCTS CO.'S RESPONSES TO LIBERTY'S
REQUESTS FOR ADMISSION, SET TWO

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admitted.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Plaintiff(s) did not serve YOU with a Summons and Complaint in the SMITH LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Roseburg objects to "serve" as vague and ambiguous in this context. To the extent "serve" means receipt of a Summons and a Complaint by a process server, admitted. To the extent "serve" means receipt of a Summons and a Complaint by some other means, denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YOU did not file an Answer or other response to the Complaint in the SMITH LAWSUIT except to remove the matter to Federal Court.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Roseburg objects to the phrase "other response" as vague and ambiguous in this context. Roseburg cannot reasonably discern what is an "other response" and whether "filings" modifies "other response." To the extent "other response" means investigation of the facts alleged in the SMITH LAWSUIT, denied. To the extent "other response" means investigation of the damages alleged in the SMITH LAWSUIT, denied. To the extent "other response" means engaging in settlement discussions and mediation, denied. To the extent "other response" means resolution of the claim, denied.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Baker did not propound any WRITTEN DISCOVERY on YOUR behalf in the SMITH LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Roseburg Forest objects to the definition of "WRITTEN DISCOVERY" as vague, ambiguous, and misleading in this context. To the extent WRITTEN DISCOVERY means an exchange of information between parties that are involved in litigation, denied; Baker engaged in WRITTEN DISCOVERY related to the SMITH LAWSUIT, as well as other actual and potential claimants, by exchanging information with plaintiff's counsel, gathering facts and damages information via the

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

3

1  community center, deploying the services of a skilled claims handler, Alix Partners, and otherwise, all

2  with the goal of accurately, proactively, and efficiently assessing and resolving the SMITH

3  LAWSUIT. To the extent WRITTEN DISCOVERY means a formal exchange of documents and

4  information subject to the federal or local rules of civil procedure, admitted.

5  **REQUEST FOR ADMISSION NO. 13:**

6      Admit that Baker did not take any depositions on YOUR behalf in the SMITH LAWSUIT.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

8      Admitted.

9  **REQUEST FOR ADMISSION NO. 14:**

10     Admit that YOU were named as a defendant in the HAMMOND LAWSUIT.

11 **RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

12     Admitted.

13 **REQUEST FOR ADMISSION NO. 15:**

14     Admit that Plaintiff(s) did not serve YOU with a Summons and Complaint in the HAMMOND

15 LAWSUIT.

16 **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

17     Roseburg objects to "serve" as vague and ambiguous in this context. To the extent "serve"

18 means receipt of a Summons and a Complaint by a process server, admitted. To the extent "serve"

19 means receipt of a Summons and a Complaint by some other means, denied.

20 **REQUEST FOR ADMISSION NO. 16:**

21     Admit that YOU did not file an Answer or other response to the Complaint in the HAMMOND

22 LAWSUIT except to remove the matter to Federal Court.

23 **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

24     Roseburg objects to the phrase "other response" as vague and ambiguous in this context.

25 Roseburg cannot reasonably discern what is an "other response" and whether "filings" modifies "other

26 response."  To the extent "other response" means investigation of the facts alleged in the HAMMOND

27 LAWSUIT, denied. To the extent "other response" means investigation of the damages alleged in the

28 HAMMOND LAWSUIT, denied. To the extent "other response" means engaging in settlement

1  discussions and mediation, denied. To the extent "other response" means resolution of the claim,

2  denied.

3  **REQUEST FOR ADMISSION NO. 17:**

4      Admit that Baker did not propound any WRITTEN DISCOVERY on YOUR behalf in the

5  HAMMOND LAWSUIT.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

7      Roseburg Forest objects to the definition of "WRITTEN DISCOVERY" as vague, ambiguous,

8  and misleading in this context. To the extent WRITTEN DISCOVERY means an exchange of

9  information between parties that are involved in litigation, denied; Baker engaged in WRITTEN

10  DISCOVERY related to the HAMMOND LAWSUIT, as well as other actual and potential claimants,

11  by exchanging information with plaintiff's counsel, gathering facts and damages information via the

12  community center, deploying the services of a skilled claims handler, Alix Partners, and otherwise,

13  all with the goal of accurately, proactively, and efficiently assessing and resolving the HAMMOND

14  LAWSUIT. To the extent WRITTEN DISCOVERY means a formal exchange of documents and

15  information subject to the federal or local rules of civil procedure, admitted.

16  **REQUEST FOR ADMISSION NO. 18:**

17      Admit that Baker did not take any depositions on YOUR behalf in the HAMMOND

18  LAWSUIT.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

20      Admitted.

21  **REQUEST FOR ADMISSION NO. 19:**

22      Admit that YOU were named as a defendant in the CANDASA LAWSUIT.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

24      Admitted.

25  **REQUEST FOR ADMISSION NO. 20:**

26      Admit that Plaintiff(s) did not serve YOU with a Summons and Complaint in the CANDASA

27  LAWSUIT.

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Roseburg objects to "serve" as vague and ambiguous in this context. To the extent "serve" means receipt of a Summons and a Complaint by a process server, admitted. To the extent "serve" means receipt of a Summons and a Complaint by some other means, denied.

**REQUEST FOR ADMISSION NO. 21:**

Admit that YOU did not file an Answer or other response to the Complaint in the CANDASA LAWSUIT except to remove the matter to Federal Court.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Roseburg objects to the phrase "other response" as vague and ambiguous in this context. Roseburg cannot reasonably discern what is an "other response" and whether "filings" modifies "other response." To the extent "other response" means investigation of the facts alleged in the CANDASA LAWSUIT, denied. To the extent "other response" means investigation of the damages alleged in the CANDASA LAWSUIT, denied. To the extent "other response" means engaging in settlement discussions and mediation, denied. To the extent "other response" means resolution of the claim, denied.

**REQUEST FOR ADMISSION NO. 22:**

Admit that Baker did not propound any WRITTEN DISCOVERY on YOUR behalf in the CANDASA LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Roseburg Forest objects to the definition of "WRITTEN DISCOVERY" as vague, ambiguous, and misleading in this context. To the extent WRITTEN DISCOVERY means an exchange of information between parties that are involved in litigation, denied; Baker engaged in WRITTEN DISCOVERY related to the CANDASA LAWSUIT, as well as other actual and potential claimants, by exchanging information with plaintiff's counsel, gathering facts and damages information via the community center, deploying the services of a skilled claims handler, Alix Partners, and otherwise, all with the goal of accurately, proactively, and efficiently assessing and resolving the CANDASA LAWSUIT. To the extent WRITTEN DISCOVERY means a formal exchange of documents and information subject to the federal or local rules of civil procedure, admitted.

1    **REQUEST FOR ADMISSION NO. 23:**

2      Admit that Baker did not take any depositions on YOUR behalf in the CANDASA LAWSUIT.

3    **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

4      Admitted.

5    **REQUEST FOR ADMISSION NO. 24:**

6      Admit that YOU were named as a defendant in the DAVIES LAWSUIT.

7    **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

8      Admitted.

9    **REQUEST FOR ADMISSION NO. 25:**

10      Admit that Plaintiff(s) did not serve YOU with a Summons and Complaint in the DAVIES

11 LAWSUIT.

12    **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

13      Roseburg objects to "serve" as vague and ambiguous in this context. To the extent "serve"

14 means receipt of a Summons and a Complaint by a process server, admitted. To the extent "serve"

15 means receipt of a Summons and a Complaint by some other means, denied.

16    **REQUEST FOR ADMISSION NO. 26:**

17      Admit that YOU did not file an Answer or other response to the Complaint in the DAVIES

18 LAWSUIT except to remove the matter to Federal Court.

19    **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

20      Roseburg objects to the phrase "other response" as vague and ambiguous in this context.

21 Roseburg cannot reasonably discern what is an "other response" and whether "filings" modifies "other

22 response."  To the extent "other response" means investigation of the facts alleged in the DAVIES

23 LAWSUIT, denied. To the extent "other response" means investigation of the damages alleged in the

24 DAVIES LAWSUIT, denied. To the extent "other response" means engaging in settlement discussions

25 and mediation, denied. To the extent "other response" means resolution of the claim, denied.

26    **REQUEST FOR ADMISSION NO. 27:**

27      Admit that Baker did not propound any WRITTEN DISCOVERY on YOUR behalf in the

28 DAVIES LAWSUIT.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

<div align="center">7</div>

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Roseburg Forest objects to the definition of "WRITTEN DISCOVERY" as vague, ambiguous, and misleading in this context. To the extent WRITTEN DISCOVERY means an exchange of information between parties that are involved in litigation, denied; Baker engaged in WRITTEN DISCOVERY related to the DAVIES LAWSUIT, as well as other actual and potential claimants, by exchanging information with plaintiff's counsel, gathering facts and damages information via the community center, deploying the services of a skilled claims handler, Alix Partners, and otherwise, all with the goal of accurately, proactively, and efficiently assessing and resolving the DAVIES LAWSUIT. To the extent WRITTEN DISCOVERY means a formal exchange of documents and information subject to the federal or local rules of civil procedure, admitted.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Baker did not take any depositions on YOUR behalf in the DAVIES LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Admitted.

**REQUEST FOR ADMISSION NO. 29:**

Admit that YOU were named as a defendant in the DIXON LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Admitted.

**REQUEST FOR ADMISSION NO. 30:**

Admit that Plaintiff(s) did not serve YOU with a Summons and Complaint in the DIXON LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Roseburg objects to "serve" as vague and ambiguous in this context. To the extent "serve" means receipt of a Summons and a Complaint by a process server, admitted. To the extent "serve" means receipt of a Summons and a Complaint by some other means, denied.

**REQUEST FOR ADMISSION NO. 31:**

Admit that YOU did not file an Answer or other response to the Complaint in the DIXON LAWSUIT.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Roseburg objects to the phrase "other response" as vague and ambiguous in this context. Roseburg cannot reasonably discern what is an "other response" and whether "filings" modifies "other response." To the extent "other response" means investigation of the facts alleged in the DIXON LAWSUIT, denied. To the extent "other response" means investigation of the damages alleged in the DIXON LAWSUIT, denied. To the extent "other response" means engaging in settlement discussions and mediation, denied. To the extent "other response" means resolution of the claim, denied.

**REQUEST FOR ADMISSION NO. 32:**

Admit that Baker did not propound any WRITTEN DISCOVERY on YOUR behalf in the DIXON LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Roseburg Forest objects to the definition of "WRITTEN DISCOVERY" as vague, ambiguous, and misleading in this context. To the extent WRITTEN DISCOVERY means an exchange of information between parties that are involved in litigation, denied; Baker engaged in WRITTEN DISCOVERY related to the DIXON LAWSUIT, as well as other actual and potential claimants, by exchanging information with plaintiff's counsel, gathering facts and damages information via the community center, deploying the services of a skilled claims handler, Alix Partners, and otherwise, all with the goal of accurately, proactively, and efficiently assessing and resolving the DIXON LAWSUIT. To the extent WRITTEN DISCOVERY means a formal exchange of documents and information subject to the federal or local rules of civil procedure, admitted.

**REQUEST FOR ADMISSION NO. 33:**

Admit that Baker did not take any depositions on YOUR behalf in the DIXON LAWSUIT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Admitted.

**REQUEST FOR ADMISSION NO. 34:**

Admit that YOU have not been named as a defendant in any subrogation lawsuits filed by insurers of MILL FIRE claimants.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

9

Exhibit 56, Page 009

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

Admitted.

DATED: April 22, 2024                    HUNTON ANDREWS KURTH LLP


By:  */s/ Scott P. DeVries*
     Scott P. DeVries

Attorneys for Plaintiffs RLC Industries Co. and
Roseburg Forest Products Co.

*Hunton Andrews Kurth LLP*
*50 California Street, Suite 1700*
*San Francisco, CA 94111*

10

1

## CERTIFICATE OF SERVICE

2    *RLC Industries Co., et al. v. Liberty Insurance Corporation, et al.,* No. 2:23-cv-00649-TLN-DB

3        I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4    years and not a party to this action.  My business address is Hunton Andrews Kurth LLP, 550 South

5    Hope Street, Suite 2000, Los Angeles, California 90071-2627.

6        On April 22, 2024 I served the foregoing document(s) described as **PLAINTIFF**

7    **ROSEBURG FOREST PRODUCTS CO.'S OBJECTIONS AND RESPONSES TO**

8    **DEFENDANT LIBERTY INSURANCE CORPORATION'S REQUESTS FOR ADMISSION,**

9    **SET TWO** on the interested parties in this action, as follows:

10   Jeffrey S. Crowe                          *Attorneys for Defendant*
     SHEPPARD, MULLIN, RICHTER &              *LIBERTY INSURANCE CORPORATION*
11   HAMPTON LLP
     650 Town Center Drive, 10th Floor
12   Costa Mesa, California 92626
     Telephone: 714.513.5100
13   Facsimile: 714.513.5130

14
     Email: jcrowe@sheppardmullin.com
15

16   Scott Sveslosky
     Mary E. Gregory
17   SHEPPARD, MULLIN, RICHTER &
     HAMPTON LLP
18   333 South Hope Street, 43rd Floor
     Los Angeles, California 90071-1422
19   Telephone: 213.620.1780
     Facsimile: 213.620.1398
20

21   Email:  ssvelosky@sheppardmullin.com;
     mgregory@sheppardmullin.com
22

23

24   ☒    **By E-MAIL:**  I caused a true and correct copy of each document to be transmitted

25        electronically to the attorney(s) of record at the e-mail address(es) indicated on the attached

26        Service List.

27

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

---

CERTIFICATE OF SERVICE

☒   **BY FIRST CLASS MAIL:** I directed an employee of my firm to enclose the documents in a sealed envelope(s) addressed as shown above, and to deposit them with the United States Postal Service the same day, with postage thereon fully prepaid.

I declare under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on April 22, 2024 at Los Angeles, California.

<div align="right">

*Bree Anderson*
Bree Anderson

</div>

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

- 2 -
CERTIFICATE OF SERVICE

EXHIBIT 57

EXHIBIT 57

EXHIBIT 57

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| RLC INDUSTRIES CO. and ROSEBURG FOREST PRODUCTS CO. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 2:23-cv-00649-TLN-SCR |
| | ) | |
| LIBERTY INSURANCE CORP., et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Robert McEvoy, AlixPartners LLC
555 S. Flower St., Suite 4200, Los Angeles, CA 90071

*(Name of person to whom this subpoena is directed)*

☒ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Remote via Veritext Legal Solutions | Date and Time: October 21, 2024 (10:00 a.m. Eastern Time) |
|---|---|

The deposition will be recorded by this method: Stenographically and by Videotape

☒ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attachment A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/9/24

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Mary E. Gregory |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendant Liberty Insurance Corporation _____, who issues or requests this subpoena, are:

Scott Sveslosky (SBN 217660)/Mary E. Gregory (SBN 210247) Sheppard Mullin Richter & Hampton LLP
333 S. Hope St., 43rd Floor Los Angeles, CA 90071 Phone: (213) 617-5426   Email:   mgregory@sheppardmullin.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:23-cv-00649-TLN-SCR

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ;or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

*RLC Industries Co., et al. v. Liberty Insurance Corporation,*
United States District Court, Eastern District of California
Case No. 2:23-cv-00649-TLN-SCR

## ATTACHMENT A

## DEFINITIONS

1.      The term "DOCUMENT(S)" means any "writings" (defined as "letters, words, or numbers, or their equivalent, set down in any form"), "recordings" (defined as "letters, words, numbers or their equivalent recorded in any manner"), or "photographs" (defined as "a photographic image or its equivalent stored in any form") as set forth in Rule 1001 of the Federal Rules of Evidence.

2.      The terms "YOU" and "YOUR" refer to Robert McEvoy and/or any employee, representative or agent of AlixPartners, LLP.

3.      The term "ROSEBURG" means Plaintiffs RLC Industries, Inc. and/or Roseburg Forest Products Co., and shall include any officers, directors, employees, agents, representatives, attorneys, and any other person or entity acting or purporting to act on Roseburg's behalf, and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the demand that which might otherwise be construed to be outside of its scope.

4.      The term "MILL FIRE" means the fire that began inside ROSEBURG'S manufacturing mill located in Weed, California, on September 2, 2022.

5.      The term "MILL FIRE CLAIMS" means the claims made and lawsuits filed against ROSEBURG for alleged losses arising from the MILL FIRE.

6.      The terms "RELATING TO", "RELATE TO" or "RELATED TO" mean discussing, describing, constituting, evidencing, memorializing, concerning, mentioning, summarizing, listing, reflecting, analyzing, supporting, negating, referring to or relating to the subject matter of the demand.

## DOCUMENTS REQUESTED

1.      A copy of YOUR current curriculum vitae or resume.

2.      All DOCUMENTS YOU reviewed to prepare for YOUR deposition.

3.      All DOCUMENTS RELATING TO ROSEBURG'S retention of AlixPartners to perform work RELATED TO the MILL FIRE CLAIMS, including, but not limited to any retention or retainer agreements between ROSEBURG and AlixPartners.

4.      All final PowerPoint presentations YOU prepared as part of AlixPartners' work on the MILL FIRE CLAIMS.

5.      All final Excel Spreadsheets YOU prepared as part of AlixPartners' work on the MILL FIRE CLAIMS.

Exhibit 57, Page 004

*__RLC Industries Co., et al. v. Liberty Insurance Corporation__*,
United States District Court, Eastern District of California
Case No. 2:23-cv-00649-TLN-SCR

6.      All DOCUMENTS that YOU relied upon in forming any opinion as a non-retained expert witness in this case, including, but not limited to YOUR opinion(s) that:

a.      The work AlixPartners performed related to the MILL FIRE was reasonable and necessary to respond to the MILL FIRE; and

b.      The costs AlixPartners incurred were reasonable and necessary.

7.      All DOCUMENTS, including but not limited to billing files, invoices, time sheets and ledgers, which evidence or reflect the time spent and the amounts charged by YOU, and/or amounts paid to YOU, for YOUR work as a non-retained expert witness in this case.

8.      All transcripts of depositions or trial testimony in which YOU testified as a retained or non-retained expert within the last 4 years.

Exhibit 57, Page 005

EXHIBIT 58

EXHIBIT 58

EXHIBIT 58

CONFIDENTIAL

```
 1                    UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

 3                           ---o0o---

 4     RLC INDUSTRIES CO., and

       ROSEBURG FOREST PRODUCTS CO.,

 5

            Plaintiffs,

 6     vs.                                  No. 2:23-cv-00649-

                                                 TLN-DB

 7     LIBERTY INSURANCE CORPORATION,

       EVEREST NATIONAL INSURANCE

 8     COMPANY, and THE OHIO CASUALTY

       INSURANCE COMPANY,

 9

            Defendants.

10            _____/

11

12

13

14

15                       (CONFIDENTIAL)

16          VIDEOTAPED DEPOSITION OF ROBERT JULIAN, ESQ.

17            (Individually and PMK - BakerHostetler)

18                    Thursday, May 30, 2024

19

20

21

22

23     Reported by:  Kimberly L. Avery, CSR No. 5074

24     Job No. 6719259

25     Pages:  1 - 303
```

Page 1

Exhibit 58, Page 001

CONFIDENTIAL

```
 1                       I N D E X
 2                                              PAGE
 3    EXAMINATION BY MR. CROWE                   9
 4
 5
 6
 7
 8
 9                     E X H I B I T S
10    EXHIBIT                                    PAGE
11    Exhibit 157   United States District Court  12
                    Subpoena to Testify at a
12                  Deposition in Civil Action
13    Exhibit 158   Robert A. Julian Curriculum   35
                    Vitae
14
      Exhibit 159   BakerHostetler document       44
15                  entitled "Class Action
                    Defense - Insurance"
16
      Exhibit 160   Email chain ending with email  56
17                  dated September 8, 2022 from
                    Scott DeVries to Robert
18                  Julian, et al.
                    BH_00079575
19
      Exhibit 161   Email chain ending with email  68
20                  dated October 6, 2022 from
                    Dustin Dow to Robert Julian,
21                  et al.
                    BH_00085002 - 85008
22
      Exhibit 162   Email chain ending with email  143
23                  dated October 31, 2022 from
                    Robert Julian to James Frantz,
24                  et al.
                    BH_00024631 - 24644
25
                                           Page 2
```

CONFIDENTIAL

```
1            VIDEOTAPED DEPOSITION OF ROBERT JULIAN, ESQ.

2

3        BE IT REMEMBERED, that pursuant to Notice, and on

4    the 30th day of May 2024, commencing at the hour of

5    9:23 a.m., in the offices of Sheppard Mullin Richter &

6    Hampton, LLP, 4 Embarcadero Center, 17th Floor, San

7    Francisco, California, before me, Kimberly L. Avery, a

8    Certified Shorthand Reporter, personally appeared

9    ROBERT JULIAN, ESQ. Produced as a witness in said

10   action, and being by me first duly sworn, was thereupon

11   examined as a witness in said cause.

12

13                         ---o0o---

14

15   APPEARANCES:

16   The Plaintiffs RLC Industries Co.; and Roseburg Forest
     Products Co.:

17
             SCOTT P. DeVRIES, ESQ.
18           Hunton Andrews Kurth, LLP
             50 California Street, Suite 1700
19           San Francisco, California 94111
             (415) 975-3700
20           Sdevries@hunton.com
21           RACHEL E. HUDGINS, ESQ. (VIA ZOOM)
             Hunton Andrews Kurth, LLP
22           Bank of America Plaza, Suite 4100
             600 Peachtree Street, NE
23           Atlanta, Georgia 30308
             (404) 888-4000
24           Rhudgins@huntonak.com
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 58, Page 003

CONFIDENTIAL

```
 1    For the Defendant Liberty Insurance Corporation:
 2            JEFFREY S. CROWE, ESQ.
              Sheppard Mullin Richter & Hampton, LLP
 3            650 Town Center Drive, 10th Floor
              Costa Mesa, California 02626
 4            (714) 513-5100
              Jcrowe@sheppardmullin.com
 5

 6    For BakerHostetler; and Robert Julian, Esq.:
 7            JOHN D. PARKER, ESQ.
              BakerHostetler
 8            Key Tower, 127 Public Square
              Suite 2000
 9            Cleveland, Ohio 44114
              (216) 621-0200
10            Jparker@bakerlaw.com
11
      Also Present:
12
              Reilly Leet, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

CONFIDENTIAL

```
 1                        ---o0o---

 2              THE VIDEOGRAPHER:  Good morning.  We are

 3      going on the record at 9:23 a.m. on May 30th,

 4      2024.

 5              Please note that the microphones are        09:23:31

 6      sensitive and may pick up whispering and private

 7      conversations.

 8              Please mute your phones at this time.

 9              Audio and video recording will continue to

10      take place unless all parties agree to go off the   09:23:43

11      record.

12              This is Media Unit 1 of the video-recorded

13      deposition of person most knowledgeable for Baker

14      & Hostetler, Robert Julian, taken by counsel for

15      defendant in the matter of RLC Industries Co., et   09:24:02

16      al., vs. Liberty Insurance Corporation, et al.,

17      filed in the United States District Court, Eastern

18      District of California, Sacramento Division, case

19      No. 2:23-cv-00649-TLN-DB.

20              The location of the deposition is           09:24:32

21      4 Embarcadero Center, 17th floor, San Francisco,

22      California 94111.

23              My name is Reilly Leet, representing

24      Veritext Legal Solutions, and I am the

25      videographer.  The court reporter is Kimberly       09:24:50
```

Page 8

Exhibit 58, Page 005

CONFIDENTIAL

```
 1    Avery, from the firm Veritext Legal Solutions.

 2          I am not related to any party in this

 3    action, nor am I financially interested in the

 4    outcome.

 5          Counsel and all present will now state    09:25:03

 6    their appearances and affiliations for the record,

 7    beginning with the noticing attorney.

 8          MR. CROWE:  Good morning.  Jeffrey Crowe

 9    with Sheppard Mullin Richter & Hampton for

10    defendant Liberty Insurance Corporation.        09:25:15

11          MR. PARKER:  John Parker of Baker &

12    Hostetler on behalf of Baker & Hostetler and the

13    witness.

14          MR. DeVRIES:  Scott DeVries of Hunton

15    Andrews Kurth on behalf of plaintiffs.          09:25:25

16          THE VIDEOGRAPHER:  Thank you.

17          Will the court reporter please swear in

18    the witness and then counsel may proceed.

19          THE REPORTER:  Could you raise your right

20    hand, please.                                   09:25:32

21                    ROBERT JULIAN, ESQ.

22                  sworn as a witness,

23                testified as follows:

24                      EXAMINATION

25    BY MR. CROWE:                                   09:25:42
```

Page 9

Exhibit 58, Page 006

```
 1    said, kept them out of bankruptcy.  So it was

 2    really a complex litigation working with a mass

 3    number of lawyers attending some depositions,

 4    coming up with a way to save everyone a bunch of

 5    money, really.                              10:11:45

 6         Q.  You were co-counsel with who in that

 7    matter?

 8         A.  Brown McCarroll in Austin, Texas, and

 9    Bruce Bennett in -- he's now with Jones Day.  I

10    don't know who he was with back then.        10:11:59

11            And the third mass tort case was the PG&E

12    case, where I represented the official tort

13    claimants committee, comprised of 11 victims of

14    PG&E's fires, which were the 2015 Butte Fire, the

15    2017 North Bay Fires, the 2018 Camp Fire, and the  10:12:30

16    Ghost Ship building fire in Oakland.  And in that

17    case I was the lead on litigation and -- and

18    bankruptcy strategy and how to resolve it in the

19    shortest time possible being 17 months.

20            And the fourth --                   10:12:54

21         Q.  I'm sorry, just before you move on to the

22    fourth, in connection with the PG&E case, you

23    represented the tort claimants or the fire victims

24    against PG&E; is that correct?

25         A.  Yes.                               10:13:11
```

Page 38

CONFIDENTIAL

```
1          Q.  Right.  Mr. -- Mr. Gray or Mr. Lawless?

2          A.  Stuart Gray, general counsel and chief

3     operating officer for most of the time, and then

4     he was succeeded as general counsel by Matthew

5     Lawless.                                    10:14:53

6          Q.  Other than your representation of -- of

7     Roseburg Resources or an affiliate in the Archie

8     Creek Fire and in connection with the Mill Fire,

9     has Baker represented Roseburg or any of its

10    affiliated entities in any other matters?       10:15:07

11         A.  Yes.

12         Q.  What other matters?
```

## Redacted Per Sealing Order

```
22         Q.  Then would you also include the Mill Fire

23    as a mass tort claim that you have experience --

24         A.  Yes.

25         Q.  -- in obviously defending Roseburg       10:16:26
```

Page 40

CONFIDENTIAL

1    against?

2        A.  Defending Roseburg and preparing as part

3    # Redacted Per Sealing Order

4

5

6

7        Q.  Moving from your experience with mass

8    torts, which you've just described for the record,

9    to your experience with fire litigation, either

10   mass fire litigation or, you know, individual        10:16:59

11   structure fires, can you explain what experience

12   you have in that regard?

13       A.  PG&E representation involved our teams'

14   evaluation and estimation of the 2015 Butte fire,

15   the 2017 North Bay Fires, and the 2018 Camp Fire     10:17:19

16   and the Oakland Ghost Ship building fire.

17            And then you wanted the other fire

18   litigation?  I mentioned ---

19       Q.  Right.  Other than the ones you've already

20   mentioned.                                           10:17:46

21       A.  No other fire litigation other than ones I

22   mentioned.

23       Q.  Is it true that other than the Mill Fire,

24   Baker's involvement in fire claims has been to

25   prosecute those claims rather than defend against    10:17:59

Page  41

CONFIDENTIAL

1    them?

2         A.  If you are talking about fire claims and

3    plaintiff versus defendant, the answer is yes.  If

4    you are talking about the PG&E representation,

5    there were plaintiffs -- it depends on your view      10:18:19

6    of plaintiffs and defendant.  There were plaintiff

7    representations and defense representations.

8         Q.  In what way were there -- strike that.

9             In what way were you involved in defense

10   representation with respect to the PG&E matter?       10:18:32

11        A.  Well, for example, the shareholders had

12   filed claims, security fraud claims, and we joined

13   with the debtor, PG&E, in asserting defenses to

14   those claims both in the --

15            THE VIDEOGRAPHER:  Your microphone.           10:18:56

16   Sorry.

17            THE WITNESS:  Yeah, I was talking about in

18   the PG&E case, it's a bankruptcy case, so the

19   moving parties and responding parties.  So Baker

20   represented the tort claimants committee on the       10:19:12

21   response side with respect to lots of issues, one

22   of which would have been opposing the shareholder

23   plaintiffs' claims against PG&E.

24            The second was responding to PG&E's motion

25   to establish an emergency fund for Camp Fire          10:19:39

                                              Page 42

Exhibit 58, Page 010

CONFIDENTIAL

```
 1    victims.

 2            I'm not going to get all of them, but I'll

 3    give you some examples.

 4            Another one would be trying to defeat the

 5    claims of Adventist Health, who asserted a claim    10:19:53

 6    that was competing, according to the committee,

 7    unfairly with the committee's claims, so that was

 8    defense oriented.  That was a fire claim.

 9            And then responding to the U.S. Forest

10    Service and Federal Government's claims against     10:20:17

11    PG&E in an attempt to denude them or defeat them,

12    which we successfully did by having them

13    subordinated, and then also responding in a

14    defensive way to the Cal OES fire claims against

15    PG&E.                                               10:20:36

16            And last, though I don't think it's a fire

17    claim, addressing PG&E's and the subrogation

18    insurers' attempts to get the Camp Fire criminal

19    fines or the PUC civil fines in a position where

20    they would share in the $13.5 billion that was      10:21:12

21    paid out in the case.

22            And then there were lots of other, you

23    know, Chapter 11 things that would come up where

24    we would some days appear in court.

25            Oh, I would oppose subrogation insurers'    10:21:24
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 58, Page 011

CONFIDENTIAL

1    settlement for their fire claims.  I opposed that,

2    too.  Things like that.

3            There probably are others, but those are

4    the major ones I remember right now.

5            But I think your question might have been,  10:21:35

6    you know, as plaintiff, defendant, defending the

7    fire claim like I did in the Roseburg case in the

8    Mill Fire, nothing like that specifically.

9    BY MR. CROWE:

10       Q.  Thank you.                              10:21:50

11            Baker currently has a class action

12   defense, insurance class action defense practice,

13   correct?

14       A.  I don't know.

15       Q.  Let me show you what we'll mark for     10:21:59

16   identification as Exhibit 159, it's titled "Class

17   Action Defense - Insurance" from the

18   BakerHostetler website.

19            Mr. Julian, just let me know if you are

20   familiar with this portion of Baker's website.    10:22:15

21            (Deposition Exhibit No. 159 Marked for

22             Identification.)

23            THE WITNESS:  I'm looking at Exhibit 159.

24            It's the first time I've seen it.

25   BY MR. CROWE:                                   10:22:42

                                            Page 44

1    is a Baker client?

2         A.   No.   Let me -- let me go back here.

3              On September 7, I learned that Liberty was

4    a Baker client in this sense: current or former.

5    I didn't know whether there were open matters.      10:31:28

6    But all I knew was they are a Baker client in some

7    way.  I didn't know if it was current, meaning I

8    didn't know if there was a file open and work

9    wasn't being done but just hadn't been closed, but

10   it was enough for me to say, you know, the way I    10:31:42

11   practice law is, if anyone is involved in the case

12   at all, I do informed consent.  I tell everybody.

13             And let's face it, Liberty was going to be

14   on the tower of a coverage chart that I was going

15   to walk into a mediation on, and I'm going to be    10:31:59

16   asking them to come and -- and put up money,

17   right?  I'm a defense lawyer.  You want the chart

18   with you and you talk to them.

19             And so I didn't know what was going to

20   happen with them.  I was told:  They weren't going  10:32:11

21   to be a problem.  Liberty is our favorite insurer.

22   They love us.  We can do whatever we want.  Don't

23   worry, Bob.  They are going to hire you -- all

24   that stuff -- from Lisa Fairchild.

25             And the way I am, a careful lawyer, I      10:32:24

Exhibit 58, Page 013

CONFIDENTIAL

```
 1    called up Scott DeVries and said, "If something

 2    happens, can you be the independent counsel?"

 3             In our -- in our bankruptcy world, we do

 4    this all the time.  Conflicts counsel.  Stuff

 5    comes up, we stay in the case.  We get other        10:32:38

 6    lawyers to come in and handle the matter.

 7        Q.   And by "conflicts counsel," you mean a

 8    lawyer or a law firm that does not have an ethical

 9    conflict of interest being adverse to a client?

10        A.   Yes, if one -- if one were to happen.  If  10:32:55

11    an adverse were to happen, I wanted Scott DeVries

12    waiting in the wings.

13        Q.   Right.  You are referring to your email to

14    Mr. DeVries in that regard?

15        A.   Yes.                                        10:33:06

16        Q.   So -- so the record is clear, on

17    September 7, 2022, you understood from Mr. Chairez

18    that Liberty was either a past or possibly a

19    current client of the Baker firm, and acting out

20    of an abundance of caution, not knowing whether     10:33:22

21    they were a current client, you sent the September

22    email to Mr. DeVries?

23        A.   Yes, with one clarification:  They were a

24    current open file.  I didn't know whether it was

25    currently being done work or not.  But the word --  10:33:39
```

Page 52

Exhibit 58, Page 014

CONFIDENTIAL

```
 1    I would say "current" is in my mind, but I didn't

 2    know if it was a relationship that was current or

 3    whether someone was actually working on a file.

 4            I didn't know that.

 5        Q.  So whether it was a current relationship   10:33:53

 6    or a current open file that was active, you at

 7    least understood Liberty was -- had some sort of

 8    current relationship with the Baker firm?

 9        A.  Bingo.  Yes.

10        Q.  What did Mr. Chairez tell you with regard   10:34:03

11    to Baker's relationship with Liberty?

12        A.  Whatever he said is in an email that I've

13    seen in the last two months.  I don't recall.

14            I think it was in an email.  Pretty sure.

15        Q.  Okay.  So his communication to you about   10:34:19

16    Baker's relationship with Liberty was contained in

17    an email from him?

18        A.  It was a communication to somebody.

19    Whether it was to me or somebody else and I was

20    copied, I can't remember.                          10:34:32

21        Q.  All right.

22        A.  Oh, now I know what happened.  I called

23    John Parker, general counsel, and asked if there

24    was some sort of relationship.  Doesn't change my

25    answer.  I didn't know if it was open work or open   10:34:59
```

Page 53

Exhibit 58, Page 015

1    file, but he confirmed that there was a

2    relationship with Liberty, and so I immediately

3    emailed Scott DeVries.

4        Q.   Okay.  You consulted with Mr. Parker when

5    you discovered on or about September 7, 2022 that    10:35:14

6    there was some sort of current relationship

7    between Baker and Liberty?

8        A.   Yes and no.  I called him to see if there

9    was one.

10       Q.   All right.  And you learned that there was    10:35:25

11   in fact a current relationship?

12       A.   Of some sort, yes.

13       Q.   Right.

14            We're going to get into more of this in a

15   minute, so -- but I appreciate touching on it now.    10:35:35

16            When you learned of Baker's relationship

17   with Liberty Mutual Insurance on or about

18   September 7, 2022, did that prompt you to have any

19   communications with Mr. Eckelberry?

20       A.   No.  I didn't know Mr. Eckelberry.    10:36:13

21       Q.   Did you ever learn -- did you ever come to

22   understand that Mr. Eckelberry is the firm's

23   relationship partner to or with Liberty Mutual

24   Insurance?

25       A.   No.    10:36:26

                                                 Page 54

CONFIDENTIAL

1          Q.  At the time of Baker's retention by

2     Roseburg in response to the Mill Fire, what did

3     Baker do to evaluate whether any of Roseburg's

4     liability insurers were also Baker clients?

5               THE WITNESS:  Read that one back to me.   10:36:54

6               (Record read.)

7               THE WITNESS:  I did not approach the

8     representation that way.

9     BY MR. CROWE:

10          Q.  Okay.  Meaning -- meaning at the time of   10:37:27

11     Baker's retention by Roseburg in response to the

12     Mill Fire, you did not do anything at that time to

13     evaluate whether any of Roseburg's liability

14     insurers were also Baker clients?

15          A.  Correct, I ran the conflicts that were in   10:37:47

16     my engagement agreement.

17          Q.  Right.  We're going to get to that

18     shortly, too.

19               I'm just going to mark -- I suppose it's a

20     good point in time -- the email that you are        10:37:55

21     referencing.

22               Bear with me one second.

23               We'll mark for identification as

24     Exhibit 160, it's two emails between -- as I

25     understand it, between Mr. Julian and Mr. DeVries,  10:38:27

                                                    Page 55

```
 1    with -- with copies to some others.  And this is

 2    from the Baker production.  It's Bates number

 3    BH_00079575.

 4            (Deposition Exhibit No. 160 Marked for

 5            Identification.)                      10:39:32

 6            THE WITNESS:  Okay.  I have 160 in front

 7    of me.

 8    BY MR. CROWE:

 9        Q.  Okay.  Mr. Julian, do you recognize

10    Exhibit 160 to be a true and correct copy of an    10:39:38

11    email exchange between you and Mr. DeVries on

12    September 7, 2022, being your email to Mr. DeVries

13    and his response to you on September 8, 2022?

14        A.  Yes, in the sense I recognize my email to

15    Mr. DeVries.  I don't recall his response, but if   10:39:55

16    we produced it, it is what it is.

17        Q.  And your email is dated September --

18    strike that.

19            Your email to Mr. DeVries dated

20    September 7, 2022 is five days after the start of   10:40:08

21    the Mill Fire, correct?

22        A.  Correct.

23        Q.  Did you have a professional relationship

24    with Mr. DeVries before September 7, 2022?

25        A.  Yes.                                        10:40:25
```

CONFIDENTIAL

```
1          Q.  You knew him to be a very well respected
2     lawyer who represents policyholders in insurance
3     coverage matters?
4          A.  Yes.
5          Q.  And had you referred other matters to him  10:40:36
6     from time to time?
7          A.  Probably.
8          Q.  Okay.  And in your email, as you've
9     described on the record before, you were noting,
10    or you did note that the tower of insurance with  10:40:57
11    respect to Roseburg relating to the Mill Fire
12    including -- included Liberty that held the
13    primary layer, and another Liberty entity that
14    held the fifth or top excess layer; is that
15    correct?                                          10:41:24
16         A.  Well, my email says it's the same Liberty,
17    but...
18         Q.  Right.  So you understood Liberty had the
19    primary policy for Roseburg and a fifth layer
20    excess policy, correct?                           10:41:36
21         A.  Yes.  On September 7, I understood that.
22         Q.  And by the time you sent this email to
23    Mr. DeVries, you came to learn from some
24    communication from Mr. Chairez that there was an
25    existing client relationship as between Baker and  10:41:58
```

Page 57

CONFIDENTIAL

```
1    Liberty Mutual Insurance?

2         A.   From Mr. Chairez and Mr. Parker, yes.

3         Q.   Now, you wrote in your email that, quote,

4    "Liberty has said they will approve Baker as

5    defense counsel...," close quote.              10:42:14

6              Did I read that portion of the email

7    correctly?

8         A.   Yes.

9         Q.   And then you write, quote, "then I found

10   out that Baker also represents Liberty...," close  10:42:23

11   quote.

12             Did I read that correctly?

13        A.   Yes.

14        Q.   And so the first quote -- by the time of

15   your email on September 7, 2022, Liberty had not   10:42:35

16   approved of Baker's selection as Roseburg's

17   defense counsel in relation to the Mill Fire,

18   correct?

19        A.   No, they had.

20        Q.   And what leads you to believe that Liberty 10:42:47

21   had approved of Roseburg's selection of Baker as

22   its defense counsel in relation to the Mill Fire?

23        A.   That's what Dustin Dow, Lisa Fairchild

24   told me, and that's what Jamie Sroczynski wrote in

25   her September 7, 2022 email.                  10:43:04
```

Page 58

1        Q.  What is it that Ms. Sroczynski sent or

2    said in her email that leads you to believe that

3    Liberty had approved of Roseburg's selection of

4    Baker as its counsel?

5        A.  She says:  "I am reaching out on behalf of   10:43:18

6    RLC Industries, who I understand have retained you

7    to represent them in the above-referenced matter.

8    In connection with your work on this matter, we,"

9    meaning Liberty, "would request your firm abide by

10   Liberty's guidelines and litigation protocols       10:43:36

11   attached and submit your bills to us

12   electronically using our vendor LexisNexis,

13   CounselLink, which is simply a conduit to our

14   legal billing unit which is comprised of Liberty

15   employees, litigation auditors who will pool your   10:43:50

16   bills for review and pay" -- "payment.  Given your

17   firm's ongoing relationship with Liberty Mutual, I

18   would not anticipate the guidelines or e-billing

19   to be an issue.  However, I would be happy to

20   address any concerns.  I appreciate your           10:44:05

21   anticipated cooperation.  Please feel free to

22   contact me if you have any questions or should you

23   need additional information.  Thank you, Jamie

24   Magnani Sroczynski, Counsel, Legal Client Services

25   Liberty Mutual Insurance, Boston, Massachusetts."   10:44:20

CONFIDENTIAL

1          Q.  And so you read that to mean that Liberty

2     had approved of Roseburg's selection of Baker as

3     its defense counsel?

4          A.  Yes.

5          Q.  At this time, there had been no agreement   10:44:29

6     as between Baker and Liberty or Roseburg and

7     Liberty about Baker's rates, correct?

8          A.  Correct, they approved us as counsel so

9     long as we complied with their guidelines, and

10    asked us to provide their proposed rates for       10:44:48

11    handling the case.

12         Q.  And there was never an agreement on

13    proposed rates, correct?

14         A.  Not that I'm aware of.  But Dustin and

15    Lisa Fairchild would know.  I didn't get involved  10:45:01

16    in that.

17         Q.  And then when you -- when you -- in your

18    email when you are describing that --

19         A.  Wait.  Wait.  Wait.

20              Lisa Fairchild did tell me that they     10:45:11

21    had -- they either weren't going to have a problem

22    or they didn't have a problem with the rates.

23         Q.  Do you recall which -- what she said

24    specifically?

25         A.  No.                                       10:45:24

Page 60

CONFIDENTIAL

1    had told me that in the past, Liberty had agreed

2    to the rates of the Cleveland guys, and so Scott

3    DeVries should not have a problem negotiating that

4    rate.

5              That's what I remember.                    11:08:19

6         Q.  Now, when you -- when you wrote to

7    Ms. Shand, did you -- strike that.

8              Do you know what tripartite counsel means?

9         A.  It came up in this case.  I know what

10    Liberty means it means -- says it means, and I      11:08:42

11    don't refer to it as "tripartite counsel," but I

12    understand the concept.  It's the insurer, the

13    insured and the hand-picked counsel by the

14    insurance company.

15        Q.  Right.  And in that tripartite            11:08:55

16    relationship, the lawyer selected and appointed by

17    the insurer has two clients, the ensured and the

18    insurer; do you understand that to be true?

19        A.  Yes.

20        Q.  Right.                                      11:09:09

21              And so at the time of Baker's retention by

22    Roseburg, did you understand that Roseburg was

23    seeking Liberty's approval as counsel in the

24    tripartite context?

25        A.  No.                                        11:09:25

                                              Page 73

CONFIDENTIAL

```
1          Q.  Did you have any understanding -- or

2     strike that.

3               Did you understand that, at the time of

4     Baker's retention by Roseburg, that Roseburg was

5     seeking Baker's approval as Roseburg's independent   11:09:35

6     defense counsel?

7          A.  I think you misspoke there, but let me --

8     let me answer your question.

9          Q.  I'm going to restate it, and let me lay a

10    foundation here.                                      11:09:51

11              Do you know what Cumis counsel means?

12         A.  Yes.

13         Q.  Cumis counsel is a situation where the

14    insured may be entitled to select counsel of its

15    choice rather than having the insurer appoint its    11:10:01

16    own selected counsel.

17              Do you understand that?

18         A.  Yes.  It's more involved than that, but,

19    yes, that's a shorthand summary.

20         Q.  Between Roseburg's retention of Baker and   11:10:16

21    your email to Ms. Shand on October 6, 2022, did

22    you understand it to be Roseburg's position that

23    it was entitled to Cumis counsel, and therefore

24    entitled to select Baker as its counsel?

25         A.  That was not my understanding on           11:10:37
```

Page 74

CONFIDENTIAL

```
1    September 3 when I was hired.  That was my

2    understanding on October 6.

3        Q.  When you were hired on September 3, was it

4    your understanding that Roseburg intended to

5    obtain Liberty's approval of Baker as its counsel    11:10:58

6    in the tripartite context?

7        A.  No, I didn't even know Liberty was

8    involved.

9        Q.  At any point in time after September 3,

10   2022, did you --                                     11:11:10

11       A.  No.

12       Q.  -- learn that Roseburg was seeking

13   Liberty's approval of Baker as tripartite defense

14   counsel?

15       A.  No.                                          11:11:20

16       Q.  And at some point, though, you said you

17   understood that Roseburg was taking the position

18   that it was entitled to Cumis counsel; do I have

19   that correct?

20       A.  Yes.                                         11:11:34

21       Q.  When did you discover that Roseburg was

22   taking the position that it was entitled to Cumis

23   counsel in relation to the Mill Fire?

24       A.  When -- when Liberty sent Roseburg or the

25   broker a letter saying that they would defend       11:11:56
```

Page 75

CONFIDENTIAL

```
1    was a Baker lawyer who was representing or had

2    represented Liberty entities?

3         A.  I don't recall that.

4         Q.  Right.  But as a custom and practice, you

5    are reading emails that you receive?          11:21:23

6         A.  No.

7         Q.  No.  You ignore emails?

8         A.  I think at this -- Jeff, at this time,

9    it's a -- it's a fire going on in Weed.  I got so

10   many people working.  Here's my focus in this    11:21:37

11   email chain:  Did I make a mistake in setting the

12   rates in my engagement agreement?  If so, I'm

13   going to set it out.

14        A bunch of people started writing emails,

15   and I bet I didn't read it, because my view was   11:21:50

16   Scott DeVries is the guy who is going to negotiate

17   this, not me.  I'm going to get back to defending

18   the client and get the case solved.

19        Q.  Just go to the -- the first page of

20   Exhibit 161, it's now an email from Mr. Dow to you  11:22:02

21   and others.

22        Do you see that?

23        A.  Yes, two of them.

24        Q.  And I'm referring to the top one, sent at

25   3:05 p.m. on October 6, 2022.                11:22:11
```

Page 83

Exhibit 58, Page 026

CONFIDENTIAL

```
1        A.  Yes, I may have -- I may have read this

2    one.

3            Let me look.

4            Okay.  I've read it.

5        Q.  Right.  You recognize this to be a true    11:22:38

6    and correct copy of an email that you received

7    from Mr. Dow on October 6, 2022?

8        A.  I would bet that I received it.

9        Q.  No reason to believe that you did not

10   receive --                                         11:22:53

11       A.  Correct.

12       Q.  -- or review it, correct?

13       A.  Correct.

14       Q.  And Mr. -- apparently, there was an issue

15   about who should Baker sent its invoices to you;   11:22:58

16   would you agree, that's the content of this email?

17       A.  Let me read it.

18           Yes.

19       Q.  Mr. Dow is indicating that the invoices

20   need to go to Roseburg, and he identifies two      11:23:16

21   reasons, one being that, quote, "Baker hasn't been

22   retained yet," close quote.

23           Did I read that correctly?

24       A.  Yes.

25       Q.  And you understood him to mean that Baker   11:23:25
```

Page 84

Exhibit 58, Page 027

```
1    had not been retained or approved by Liberty at

2    that point in time, correct?

3         A.  I think what he's saying is Baker --

4    Liberty has not yet approved Baker as counsel on

5    October 6.                                    11:23:46

6         Q.  Right.  So whereas earlier in September,

7    you understood from Ms. Sroczynski's email and

8    conversations or communications that you may have

9    had with Lisa Fairchild and others that Liberty

10   had approved of Baker's selection as defense    11:24:01

11   counsel; by October 6, 2022, you understood from

12   Mr. Dow that Liberty had not yet approved or

13   retained of Baker's selection, correct?

14        A.  I think that's correct, yeah.

15        Q.  Do you recall, Mr. Julian, ever getting  11:24:18

16   information about what rates Baker was charging

17   for Liberty -- for matters where they represented

18   Liberty Mutual Insurance?

19        A.  Yes, I recall hearing from Dustin Dow of a

20   lawyer whose rates were paid by Liberty.        11:25:10

21        Q.  Do you recall the name of that lawyer?

22        A.  No.

23        Q.  Do you recall the rate that lawyer charged

24   and was paid for by Liberty for that lawyer's work

25   on Liberty matters?                             11:25:26
```

Page 85

CONFIDENTIAL

1    Fire?

2          A.  September 3rd, 2022, some time around

3    7:00 a.m.

4          Q.  And how did you learn about it?

5          A.  On some Internet news item.              11:30:27

6          Q.  And when were you first -- strike that.

7               When did you first have contact with

8    anybody at Roseburg in connection with the Mill

9    Fire?

10          A.  About 10 minutes later.                 11:30:42

11          Q.  And who did you have contact with in that

12    regard?

13          A.  Stuart Gray.

14          Q.  Did you call -- was that a telephone call?

15          A.  I texted him and he called me.          11:30:56

16          Q.  And as I understand your testimony and

17    from the documents, Roseburg retained Baker to

18    represent it in response to the Mill Fire

19    either -- on September 3rd, 2022?

20          A.  Yes.  Asked me to jump in my car and drive 11:31:20

21    up there.

22          Q.  And that was before there was a formal

23    engagement or retention letter, correct?

24          A.  Yes.  He asked me to jump in my car and

25    represent them, and I confirmed the representation  11:31:34

Page 90

```
1    in an email and then an engagement agreement.

2         Q.  And Roseburg's retention of Baker in

3    response to the Mill Fire occurred before there

4    was any notice of Mill Fire claims for defense and

5    indemnification to Roseburg's liability insurers,   11:31:58

6    correct?

7         A.  Yes.  Roseburg hired me prior to its

8    broker tendering claims to insurance companies, if

9    that's what you mean.

10        Q.  Mr. Julian, I'm going to show you what's   11:32:19

11   been previously marked as Exhibit 31.  It's the

12   September 6, 2022 engagement letter as between

13   Baker and Roseburg.

14            (Deposition Exhibit No. 31 Previously

15            Marked for Identification.)              11:33:33

16            THE WITNESS:  Okay.  I have Exhibit 31,

17   which is the Baker engagement agreement with

18   Roseburg Forest Products.

19   BY MR. CROWE:

20        Q.  Right.  That was my question.  You       11:33:39

21   understand this document to be the engagement

22   agreement as between Baker on the one hand and

23   Roseburg on the other hand with respect to Baker's

24   representation of Roseburg in response to the Mill

25   Fire?                                             11:33:52
```

Page 91

Exhibit 58, Page 030

CONFIDENTIAL

```
 1            A.  Yes.

 2            Q.  And did you prepare this engagement letter

 3       or agreement?

 4            A.  I asked someone to prepare it for me, and

 5       I told them what to put in it.              11:34:16

 6            Q.  Okay.  So somebody else may have prepared

 7       it for you, but you reviewed it and approved it,

 8       correct?

 9            A.  Yes.  I drafted the third paragraph of the

10       letter.                                     11:34:27

11            Q.  The scope-of-engagement paragraph?

12            A.  And the fourth paragraph.

13            Q.  That's the conflict checks paragraph,

14       correct?

15            A.  Yes.                               11:34:36

16            Q.  So you recall preparing the third

17       paragraph on the first page of the letter dealing

18       with the scope of the engagement, then the fourth

19       paragraph, which appears on the top of page 2,

20       with respect to the conflicts check, correct?    11:34:47

21            A.  Yes.

22            Q.  Do you recall preparing any other portion

23       of the letter yourself?

24            A.  The names of the attorneys on page 2, that

25       was my decision; the advance of $100,000, that was  11:35:03
```

Page 92

```
1    my decision; and the rest of it followed the Baker

2    engagement agreement format for this type of case.

3         Q.  Great.  And on page 4 appears your

4    signature, correct?

5         A.  Yes.                                11:35:29

6         Q.  And page 5 contains the signatures of

7    Mr. Gray on behalf of Roseburg Forest Products

8    Company and RLC Industries Company, correct?

9         A.  Yes.

10        Q.  I want to focus on the third paragraph,   11:35:42

11   the scope-of-engagement paragraph on page 1, which

12   you have testified was the paragraph that you

13   prepared yourself.

14            And you would agree with me that

15   paragraph three sets forth generally the scope of   11:36:03

16   Roseburg's retention of Baker in response to the

17   Mill Fire?

18        A.  Yes, subject to -- or the discussion as to

19   the scope.

20        Q.  Was the engagement letter ever modified,   11:36:17

21   revised, or otherwise changed in writing?

22        A.  Not that I know.  I would doubt it.

23        Q.  Was there any other document that set

24   forth a different scope of engagement other than

25   what's reflected in Exhibit 31, the September 6,     11:36:36
```

Page 93

CONFIDENTIAL

```
 1    part of any indemnity claim?

 2         A.  Not against non-insurers.  The only thing

 3    I know about is a D and O insurer has paid

 4    somebody --

 5            THE REPORTER:  A...                    12:12:58

 6            THE WITNESS:  A D and O, director and

 7    officer liability insurer has paid money on -- and

 8    form to independent counsel, I think.

 9            I don't know if they've paid it to

10    Roseburg.                                      12:13:13

11         Q.  Roseburg's directors and officers insurer,

12    correct?

13         A.  Yes.
```

14 # Redacted Per Sealing Order

```
15

16

17

18

19         Q.  Who was the Baker lead attorney or

20    attorneys responsible for setting up a claims     12:13:39

21    processing protocol for the fire claim?

22         A.  Lauren Attard, under my supervision.

23         Q.  And what does it mean -- strike that.

24            When the engagement letter is describing

25    the scope of the retention to include setting up a  12:13:54
```

Page 121

1    claims processing protocol, what was it

2    anticipating to be done in that regard?

3        A.  As I discussed it with Stuart Gray, we

4    believe liability was reasonably certain in a

5    trial, and so he wanted a quick way to resolve a    12:14:11

6    massive number of claims.

7            So I had Lauren Attard, who did that for

8    CIPC and for Baker in the Bernie Madoff case, and

9    for me and PG&E and for me in the Archie Creek

10   litigation in Oregon, head up a team to do that,    12:14:29

11   and she did it in two or three different ways:

12   One is to set up the community fund, where they

13   got the data from the victims that helped them

14   create the claims analysis for AlixPartners.  And

15   she hired AlixPartners, with my approval and    12:14:46

16   Roseburg's approval, to get the data to set up the

17   claims processing from two methods:  One was the

18   independent GPS satellite imaging and the like;

19   and number two was the information they got from

20   the community fund about each victim, both orally    12:15:09

21   and in writing, that informed them of the

22   emotional distress, nuisance and property damage

23   values of the victims who participated in the

24   community fund.

25           And then last, AlixPartners and Lauren    12:15:23

                                            Page 122

Exhibit 58, Page 034

1    used the data from the Dixie Fire, the Mosquito

2    Fire, and the PG&E Fire Victim Trust to analyze

3    values that might support a mediation one way or

4    the other.

5        Q.  Okay.  So is it fair to say that in        12:15:41

6    reference to setting up a claims processing

7    protocol, that included setting up the community

8    fund in which to gather data from claimants, and

9    also setting up a protocol for claims processing

10   and settlement?                                    12:15:56

11       A.  Yes, but I don't know if when I wrote this

12   and Stuart agreed to it, whether or not we had

13   thought of the community fund yet.  It was like

14   September 6, 7, 8 -- I don't know when it was, but

15   it certainly was in the scope of what he and I     12:16:14

16   discussed.

17       Q.  Okay.  And I'm going to get into more

18   detail on those issues later.

19           Who was the lead Baker attorney

20   responsible for tax matters?                       12:16:28

21       A.  Margaret Holtman from the DC office.

22       Q.  How do you spell Margaret's last name?

23       A.  H-O-L-T-M-A-N.

24       Q.  And were you the lead attorney for Baker

25   in advising the board, Roseburg's board and        12:16:51

Page 123

Exhibit 58, Page 035

1      "Community Fund & Settlement Payment Processing,"

2      and it identifies Lauren Attard with Baker and

3      Ryan Fischbach with Baker, correct?

4           A.  Yes.

5           Q.  As the team leads, the Baker team leads?  12:38:17

6           A.  Yes.

7           Q.  And Bob McEvoy is with AlixPartners?

8           A.  Yes.

9           Q.  And so this team, as you were describing

10     earlier, was responsible for developing the          12:38:28

11     community fund to gather data, and then also the

12     settlement payment processing protocol with

13     respect to the settlement of claims?

14          A.  Yes, and to develop the data and damage

15     analysis to respond to plaintiffs' demands in a     12:38:52

16     mediation.

17          Q.  The community fund portion of this team,

18     as you've described, included developing data, and

19     that data was then available to Baker and Roseburg

20     for purposes of settling claims either in           12:39:21

21     mediation or outside mediation, correct?

22          A.  Yes.

23          Q.  But the community fund was also developed

24     by Roseburg for purposes of issuing what I've

25     heard described as emergency relief funds --        12:39:38

                                            Page 134

CONFIDENTIAL

```
 1          A.  Yes.

 2          Q.  -- to victims of the fire?

 3          A.  Yes.

 4          Q.  And the emergency relief funds were paid

 5     for things like temporary shelter, food expenses,  12:39:47

 6     transportation, clothing for those that had

 7     suffered fire losses?

 8          A.  Exactly.

 9          Q.  And those were payments made to alleged

10     fire victims that did not require any sort of       12:40:01

11     release of claims against Roseburg, correct?

12          A.  Correct.

13          Q.  Okay.  And then to the extent -- I thought

14     I heard you say earlier, to the extent, then, a

15     claimant was paid additional money in exchange for  12:40:19

16     a release, if they had also received emergency

17     relief, that would be discounted from the

18     settlement -- settlement amount, or do I have that

19     wrong?

20          A.  The plaintiff lawyers objected to release. 12:40:32

21     So -- well, that's not true.  They objected to a

22     draft release that we had, and the -- I determined

23     that the process to negotiate that would impair

24     the timing of the community fund and we'd lose the

25     story and the opportunity.                          12:41:00
```

                                        Page 135

Exhibit 58, Page 037

CONFIDENTIAL

```
 1              So I told everyone, just get everyone to

 2      agree that if we pay them, you know, 200 bucks or

 3      300 bucks, whatever it is, that that reduces their

 4      claim by that amount somehow, and the lawyers

 5      agreed to all that.                        12:41:18

 6              It wasn't a controversial thing.

 7          Q.  Right.  So you are describing that

 8      initially, Roseburg and you on behalf of Roseburg

 9      were suggesting that there would be a release

10      associated with the payment of emergency relief    12:41:28

11      funds, and there were objections by one or more

12      plaintiff lawyers?

13          A.  Yeah.

14          Q.  And so then there was no release taken in

15      exchange for the payment of emergency relief    12:41:38

16      funds, but rather, to the extent the claim was

17      ultimately settled against Roseburg for the

18      payment of additional money, there would be a

19      release that would be required?

20          A.  Yeah, and the lawyers agreed they wouldn't 12:41:51

21      put forth a request for damages of the type that

22      had been paid, and no one ever did that.

23              There was a repay for transportation and

24      whatever, and when the lawyers made the demand in

25      the mediation, it was only for the real property    12:42:07
```

Page 136

Exhibit 58, Page 038

CONFIDENTIAL

1    Redacted Per Sealing Order

2

3

4

5

6    BY MR. CROWE:

7        Q.  Mr. Julian, did you ask one or more

8    plaintiffs' lawyers representing fire victims to

9    make settlement demands as a means to develop

10   facts to support a bad faith claim against          12:50:04

11   Roseburg's insurers, including Liberty?

12       A.  Never entered my mind.  We always

13   anticipated that the claims would exceed the

14   coverage.

15       Q.  Okay.  I'd like to mark for identification 12:50:18

16   as Exhibit 162.  It's a document that contains a

17   series of emails and it's BakerHostetler number

18   00024641 through 00024644.

19           Take a moment to review this, please.

20           (Deposition Exhibit No. 162 Marked for      12:50:57

21           Identification.)

22           THE WITNESS:  I've reviewed it.

23   BY MR. CROWE:

24       Q.  Okay.  You recognize Exhibit 162 to be a

25   true and correct copy of an email exchange between  12:51:25

Page 143

1    you and some of the plaintiffs' lawyers or

2    claimants' lawyers involved in the Mill Fire?

3         A.  I remember this one, James Frantz.

4         Q.  Right.  And if we start with the email on

5    page 643, the bottom email appears to be an email    12:51:43

6    from you to Russ Reiner?

7         A.  Hold on.  Yes.

8         Q.  And Russ Reiner represented one or more

9    victims of the Mill Fire, correct?

10        A.  Yes.                                         12:52:05

11        Q.  Did he also represent parties who had

12   filed lawsuits against Roseburg, if you recall?

13        A.  He -- October 24.  He had filed two

14   lawsuits by this point in time.

15        Q.  Okay.                                        12:52:20

16        A.  One for property damage and one for

17   wrongful death.

18        Q.  And then if you turn to page 24642, the

19   bottom email on that page that runs to the top of

20   the next page is an email from you to James          12:52:35

21   Frantz, correct?

22        A.  Yes.

23        Q.  And that one was sent on October 24, 2022,

24   correct?

25        A.  Yes.                                         12:52:49

                                                   Page 144

CONFIDENTIAL

```
 1          A.   Right.

 2          Q.   -- who had communicated to Baker that they

 3    may be relevant to a coverage position,

 4    specifically a wildfire exclusion.

 5          A.   Correct.                              01:50:25

 6          Q.   That could be important or raised as part

 7    of Liberty's coverage position vis-a-vis Roseburg.

 8          A.   Right.

 9          Q.   Right.

10               And so my question is, did Baker do    01:50:34

11    anything to evaluate the accuracy of Mr. DeVries'

12    representation of the issue?

13          A.   Not to my knowledge.  I certainly did not.

14          Q.   So, in other words, Baker didn't do

15    anything to evaluate whether Liberty was in fact    01:50:49

16    taking a coverage position that would be or could

17    potentially eliminate coverage to Roseburg?

18               MR. PARKER:  Objection.

19               THE WITNESS:  Not as phrased, but I heard

20    Liberty's counsel take that position in the     01:51:14

21    mediation.

22    BY MR. CROWE:

23          Q.   What mediation are you referring to?

24          A.   December 7 mediation.

25          Q.   Okay.  Of what year?               01:51:21
```

Page 167

Exhibit 58, Page 041

CONFIDENTIAL

1          A.   2022.

2          Q.   A mediation in the underlying Mill Fire

3    claims and suits?

4          A.   Yeah, the first day of the mediation.

5          Q.   Who was it at Liberty that you contend      01:51:33

6    took that position?

7          A.   David Bona said he was experienced to

8    handle this wildfire case.

9          Q.   So because Mr. Bona described it as a

10   wildfire case, that led you to believe that       01:51:49

11   Liberty was taking a coverage position vis-a-vis a

12   wildfire exclusion?

13         A.   Yes, based on some other facts.

14         Q.   What other facts?

15         A.   Scott DeVries told me that at first      01:52:01

16   Everett -- some carrier had raised the wildfire

17   exclusion, asked me what I knew about the facts,

18   and I told him, told me Liberty was being coy

19   about whether they were going to raise it, and he

20   expected that they would raise it.          01:52:22

21              The night before the mediation, David Bona

22   wrote an email to Liberty and to me and Scott

23   DeVries that referred to the case as "wildfire

24   litigation."  I didn't know what he meant.  When

25   he came to the mediation, and he said that he was   01:52:37

                                        Page 168

Exhibit 58, Page 042

CONFIDENTIAL

```
1    experienced to handle this because it was

2    "wildfire litigation," and it was Liberty's

3    counsel calling it "wildfire litigation" while he

4    was supposedly Roseburg's counsel.

5            And I immediately told him in a firm and    01:52:49

6    terse voice that -- the facts I just repeated,

7    just told you about, and that only Liberty's

8    counsel would take the position that it was

9    wildfire litigation, a wildfire case, because --

10   that it was a wildfire, because it was a building   01:53:09

11   fire, and why I believe that, and that because he

12   was operating supposedly as Roseburg's counsel, it

13   was malpractice.

14       Q.  Have you ever described the Mill Fire as a

15   "wildfire"?                                          01:53:21

16       A.  I've described parts of it as "wildfire,"

17   yeah.

18       Q.  Okay.

19       A.  As I said, part of it was wildfire

20   litigation and part of it was building fire.         01:53:27

21           And after Scott told me what he told me,

22   I -- it was part of my interview of all my team

23   leaders to tell me what are the issues so I can

24   use the proper words.  I, as a reasonable lawyer,

25   chose the correct words, like "ash handling," "fly   01:53:44
```

Page 169

CONFIDENTIAL

```
 1    ash."

 2            There were criminal matters; same thing.

 3    And the phrase "wildfire litigation" by December 7

 4    was a term of art that everyone knew of, and any

 5    lawyer who was purporting to represent Roseburg     01:53:59

 6    under the standard of care in my opinion should

 7    have known that because he had to talk all the

 8    other lawyers to find out what was at issue.

 9            And he did it, and I called him on the

10    carpet and said it was malpractice, and I still     01:54:09

11    believe that.

12        Q.  That was during the mediation,

13    December 7 --

14        A.  At the start of the mediation.  Before I

15    could even -- my plan, Jeff, was to talk to him.    01:54:14

16            Once I saw the email the night before, to

17    Liberty's counsel using that phrase, was to talk

18    to him, but before I could do it, he walked in the

19    door and he started talking about his experience

20    and what it was and that this was a "wildfire       01:54:27

21    case," and it wasn't.

22        Q.  Are you referring to an email from

23    Mr. Bona?

24        A.  Yes.

25        Q.  To?                                         01:54:38
```

Page 170

Exhibit 58, Page 044

```
 1        A.   Liberty, someone in your firm, Scott
 2   DeVries, me, someone else.
 3        Q.   And it -- and it's your recollection that
 4   Mr. Bona in his email was describing the Mill Fire
 5   as a "wildfire" rather than explaining his        01:54:56
 6   experience with wildfire litigation?
 7        A.   In the email, it was "wildfire
 8   litigation."  In the meeting, he referred to this
 9   as a "wildfire case."
10        The claims being litigated that day were   01:55:12
11   wildfire claims.  And the claims being litigated
12   that day were within the tower.  That was the
13   whole point.
14        Q.   When you say "meeting," you are referring
15   to the mediation?                                 01:55:23
16        A.   Yeah, the claims being litigated that day
17   were within the tower.  They -- Jeff, they were
18   Lincoln Heights claims.  They were obviously
19   building fire claims.
20        Anyway, you know, think about a bad start. 01:55:33
21   But I corrected it.
22        Q.   Did Baker do anything to evaluate whether
23   any wildfire exclusion could or could not negate
24   coverage, liability coverage to Roseburg in
25   response to the fire?                             01:55:56
```

                                              Page 171

CONFIDENTIAL

```
 1        Q.  There was a communication by Roseburg that
 2   the vast majority of Mill Fire claims against it
 3   were resolved by the end of December 2022; is that
 4   correct?
 5        A.  Did you say Roseburg said that to someone? 02:02:43
 6            I said that.
 7        Q.  There was a written communication, a press
 8   release by Roseburg.
 9        A.  Yes.
10        Q.  Right.  And that press release said that   02:02:52
11   the vast majority, or words to that effect, of
12   Mill Fire claims had been successfully resolved
13   and paid by the end of December 2022.
14        A.  I don't know paid.  Resolved.
15        Q.  All right.  But that's -- that's a true   02:03:03
16   statement, that there was a press release issued
17   by Roseburg --
18        A.  That, I don't know.  I'm taking your word
19   for it.  I'm telling you if -- if it was out
20   there, it's true because in our mind, the universe 02:03:14
21   of claims that we knew about -- things change,
22   right?
```

23   **Redacted Per Sealing Order**

24

25

<div align="right">Page 177</div>

CONFIDENTIAL

# Redacted Per Sealing Order

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 178

CONFIDENTIAL

Redacted Per Sealing Order

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 179

CONFIDENTIAL

1          A.  I don't know.

2          Q.  You don't recall?

3          A.  Don't recall.

4    Redacted Per Sealing Order

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 204

CONFIDENTIAL

# Redacted Per Sealing Order

Page 205

Exhibit 58, Page 050

CONFIDENTIAL

# Redacted Per Sealing Order

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 218

CONFIDENTIAL

# Redacted Per Sealing Order

Page 258

CONFIDENTIAL

# Redacted Per Sealing Order

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 259

CONFIDENTIAL

1  Redacted Per Sealing Order
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 261

CONFIDENTIAL

# Redacted Per Sealing Order

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17      Q.  And what was the amount of the

18   not-to-exceed budget that you recall?

19      A.  That's confidential.

20      Q.  Was that a budget that was in writing?    04:14:56

21      A.  Well, it's in writing in emails between me

22   and -- no, I don't know.  Matt Walsh [phonetic]

23   went to the board.

24      Here's what happened:  Had three sources

25   to value everything.  I needed a budget to shoot    04:15:25

Page 262

```
 1              And I ran it by Lauren Attard, and she

 2     came up with a budget range, gave it to Matt and

 3     he went to the board and got a specific approval

 4     of the dollars we had to work with.  And as of

 5     today, we're within the budget, but it's, you      04:17:14

 6     know, tight.

 7          Q.   Yeah, it's what I believe Mr. Lawless

 8     testified to being the all-in budget inclusive of

 9     attorney's fees, costs, settlement amounts, as it

10     related to all of the anticipated Mill Fire        04:17:29

11     claims.

12              Is that what you are describing?

13          A.   Yes.

14          Q.   And as part of that all-in budget, was

15     there a budget for attorney's fees and costs?      04:17:40

16          A.   I don't know what budget he got from the

17     board.  I know what budget he gave me to settle

18     cases, not including attorney's fees.

19          Q.   Right.  I'm focusing on -- on budgets for

20     attorney's fees and costs, and so let me ask it a  04:18:02

21     different way.

22          A.   No.  No.  He may have got that from the

23     board, but I -- he didn't give it to me.

24          Q.   Did -- did Baker ever prepare a budget for

25     estimated attorney's fees and costs associated     04:18:12
```

Page 264

Exhibit 58, Page 056

CONFIDENTIAL

```
 1    with Baker's work on the Mill Fire matter?
 2         A.  Only in one sense.  I gave Matt a budget
 3    for chasing the third-party claimants -- the
 4    third-party defendants: the consultant, the
 5    manufacturers, and the product suppliers.  I did    04:18:44
 6    not give him a budget for the settlements up
 7    through, you know, February, or a budget for the
 8    claims that we didn't know about that could happen
 9    thereafter.
10         Q.  Did Baker ever provide Roseburg with a     04:19:09
11    budget for attorney's fees and costs associated
12    with defending Roseburg against suits or claims
13    arising from the Mill Fire?
14         A.  No.
15         Q.  Did Baker -- strike that.                  04:19:24
16         Did Roseburg ever ask Baker to provide a
17    budget for attorney's fees and costs associated
18    with defending against Mill Fire claims or suits?
19         A.  No.  That would have been impossible.
20
21
22
23
24
25
```

Redacted Per Sealing Order

Page  265

CONFIDENTIAL

# Redacted Per Sealing Order

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 266

CONFIDENTIAL

Redacted Per Sealing Order

4     Q.  Okay.  So at no point in time did Baker

5    give Roseburg for whatever reason an estimated    04:21:08

6    budget for attorney's fees and costs associated

7    with settling or seeking to settle Mill Fire

8    claims and suits, correct?

9     A.  I would phrase it this way:  At no time

10   did Baker give a budget for resolving the four    04:21:26

11   lawsuits on file, the 700 claims I found out about

12   on December 7, the subrogation claims I found out

13   about in February, January and February, or for

14   the claims I didn't know would happen after

15   February of 2023.    04:21:49

Redacted Per Sealing Order

Page 267

```
 1    filed against Roseburg arising from the Mill Fire,

 2    correct?

 3         A.  Yes.

 4         Q.  And -- and the purpose of -- of the

 5    preparation of this document was to assist you in   04:40:33

 6    recalling the names of those lawsuits and the

 7    plaintiff lawyers associated with them, correct?

 8         A.  Yes.

 9         Q.  In any of the four lawsuits -- strike

10    that.                                               04:40:43

11         Were any of the five lawsuits, the Smith

12    lawsuit, the Hammond lawsuit, the Candasa lawsuit,

13    the Davies lawsuit, and the Dixon lawsuit, were

14    any of them actually served on Roseburg as you

15    understand it?                                      04:40:59

16         A.  I don't remember.

17         Q.  But it is your recollection that all five

18    lawsuits were removed by Baker to federal court?

19         A.  Yes.

20         Q.  Was there any -- strike that.              04:41:08

21         Other than removing the five lawsuits to

22    federal court, were there any other responsive

23    pleadings filed by Roseburg in those matters?

24         A.  No.  There may have been something filed,

25    like a letter saying, you know, we're not doing    04:41:27
```

                                                    Page 276

Exhibit 58, Page 060

```
 1    anything, but no answers, no motions to dismiss,

 2    nothing.

 3        Q.  And same answer with respect to discovery,

 4    there was no discovery taken in any of the five

 5    lawsuits; is that correct?                        04:41:37

 6        A.  Correct.

 7        Q.  Were there any depositions taken in the

 8    five lawsuits?

 9        A.  No depositions taken in the whole case at

10    all.                                              04:41:49

11        Q.  And am I correct in my understanding that

12    all five lawsuits were settled by the end of

13    January 2023?

14        A.  All the lawsuits but the Frantz case, the

15    Hammond lawsuit, were settled.  The Hammond       04:42:38

16    lawsuit may have been settled.  Let me see here.

17            Yeah, I think the Frantz lawsuit was not

18    settled in January.  I think he was being

19    difficult, but it was eventually settled.

20        Q.  And the "Frantz lawsuit," you mean the    04:43:01

21    Hammond lawsuit?

22        A.  Yes.

23        Q.  Whether or not it settled by the end of

24    January 2023, is it your recollection that it did

25    settle?                                           04:43:10
```

Page 277

Exhibit 58, Page 061

CONFIDENTIAL

1          A.   Oh, yeah, all this is settled.

2          Q.   All right.  The Smith lawsuit was a single

3     plaintiff case, correct?

4          A.   That, I don't remember.

5          Q.   Your -- your -- your email from Ms. Attard 04:43:19

6     identifies Tim Smith as -- as having lost his home

7     and no other plaintiff.

8               Does that help refresh your recollection

9     that the Smith lawsuit was a single plaintiff

10    case?                                               04:43:31

11         A.   No.

12         Q.   Do you know whether or not the Hammond

13    lawsuit was a single plaintiff case?

14         A.   No.

15         Q.   Was the Candasa lawsuit a single plaintiff 04:43:36

16    case?

17         A.   Don't know.

18         Q.   Do you know how many plaintiffs were in

19    the Davies lawsuit?

20         A.   No.                                       04:43:43

21         Q.   Do you know how many plaintiffs were in

22    the Dixon lawsuit?

23         A.   No.

24    Redacted Per Sealing Order

25

                                        Page  278

Exhibit 58, Page 062

CONFIDENTIAL

# Redacted Per Sealing Order

```
1

2

3

4

5

6

7

8

9

10

11          Who hired AlixPartners, Baker or Roseburg?

12     A.   Roseburg.

13     Q.   Baker retained AlixPartners based on your

14   recommendation; is that correct?

15     A.   Yes.                                    04:45:11

16     Q.   And with respect to fees and costs billed

17   by AlixPartners, did they bill Roseburg directly

18   or did they bill Roseburg through Baker?

19     A.   They billed Roseburg directly.

20     Q.   And who paid AlixPartners for their -- for 04:45:30

21   their work in response to the Mill Fire, Baker or

22   Roseburg?

23     A.   Well, I assume it was Roseburg.  It wasn't

24   Baker.

25     Q.   Do you know how much money Roseburg paid   04:45:39
```

Page 279

1          Q.   Was he present, as you understand it, at

2     the site -- at one of the site inspections?

3          A.   Yes.

4          Q.   Were you present there during that same

5     inspection?                              05:05:36

6          A.   No.

7          Q.   Did you or Baker ever interview Mr. Bona

8     to evaluate his skill and experience in defending

9     against mass tort fire claims or suits?

10         A.   No.                            05:05:51

11         Q.   Did you ever ask or did Baker ever ask to

12    interview Mr. Bona to determine or evaluate his

13    skill and experience in defending Roseburg against

14    Mill Fire lawsuits?

15         A.   No, that was not our responsibility.   05:06:02

16         Q.   Do you agree -- strike that.

17              Do you have an understanding today as it

18    relates to Mr. Bona's experience in defending

19    against mass tort fire suits and claims?

20         A.   I have an understanding.           05:06:20

21         Q.   Right.  Do you understand that he's been

22    involved in at least three jury trials on mass

23    fire claims and suits?

24         A.   I don't know about his jury trial

25    experience.  I only know what the lawyers and PG&E   05:06:39

                                              Page 294

Exhibit 58, Page 064

CONFIDENTIAL

1    he could come to.

2        Q.  Did Baker ever consult with Mr. Bona about

3    discovery and litigation strategy in relation to

4    suits filed against Roseburg?

5        A.  What are the two areas?                    05:10:11

6    # Redacted Per Sealing Order

7

8

9

10

11

12        Q.  Did Baker fail to produce or delay its

13    production of documents and information that

14    Mr. Bona requested?

15        A.  That's impossible.                         05:10:44

16        Q.  And when Baker did produce documents to

17    Mr. Bona, did it do so in an effort to hold him

18    off from participating in the matter?

19        A.  I don't know that we produced documents to

20    him.  Again, the instruction was whatever he        05:11:01

21    wanted, he should get a copy of.

22        Q.  Do you recall that Mr. Bona did in fact

23    request documents?

24        A.  No, I don't recall.  I didn't have the

25    conversations with him.                             05:11:12

                                                   Page 297

CONFIDENTIAL

1                          REPORTER CERTIFICATE

2

3          I, KIMBERLY L. AVERY, do hereby certify:

4          That ROBERT JULIAN, ESQ., in the foregoing

5    deposition named, was present and by me sworn as a

6    witness in the above-entitled action at the time and

7    place therein specified;

8          That said deposition was taken before me at said

9    time and place, and was taken down in shorthand by me,

10   a Certified Shorthand Reporter of the State of

11   California, and was thereafter transcribed into

12   typewriting, and that the foregoing transcript

13   constitutes a full, true and correct report of said

14   deposition and of the proceedings that took place;

15         That before completion of the proceedings, review

16   of the transcript was not requested.

17         IN WITNESS WHEREOF, I have hereunder subscribed my

18   hand this 10th of June 2024.

19

20

21

22

23

                  KIMBERLY L. AVERY, CSR No. 5074

24                     State of California

25

                                               Page 301

EXHIBIT 59

EXHIBIT 59

EXHIBIT 59

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3                  SACRAMENTO DIVISION

 4

 5   RLC INDUSTIES CO. and ROSEBURG   Case No. 2:23-cv-00649-TLN-DB

     FOREST PRODCTS CO,

 6                  Plaintiffs,

     vs.

 7   LIBERTY INSURANCE CORPORATION;

     EVEREST NATIONAL INSURANCE

 8   COMPANY, and THE OHIO CASUALTY

 9   INSURANCE COMPANY,

10                  Defendants.

11   _____/

12

13       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14          REMOTE VIDEOTAPED DEPOSITION OF

15    ROSEBURG FOREST PRODCTS, CO. BY AND THROUGH ITS

16        30(B)(6) WITNESS, MATTHEW M. LAWLESS

17             Friday, April 26, 2024

18          9:30 a.m. - 4:47 p.m. (PST)

19                   VOLUME 1

20

21    Stenographically Reported By:

22    Kimberly Fontalvo, Realtime Reporter

23    Realtime Systems Administrator

24    National Court Reporters Association

25    Colorado Court Reporters Association
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 001

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     APPEARANCES:
 2
 3     On behalf of Plaintiffs:
            HUNTON ANDREWS KURTH
 4          50 California Street, Suite 1700
            San Francisco, CA  94111
 5          BY:  SCOTT P. DEVRIES, ESQ., ESQ.
            sdevries@hunton.com
 6
 7          HUNTON ANDREWS KURTH
            600 Peachtree Street, NE, Suite 4100
 8          Atlanta, GA  30308
            BY:  RACHEL E. HUDGINS, ESQ.
 9
10     On behalf of Defendants:
11          SHEPPARD MULLIN RICHTER & HAMPTON LLP
            650 Town Center Drive, 10th Floor
12          Costa Mesa, CA  92626
            BY:  JEFFREY S. CROWE, ESQ.
13          jcrowe@sheppardmullin.com
14
15
16     ALSO PRESENT:  Jeff Nichols, Videographer
17
18
19
20
21
22
23
24
25
```

Page 2

Exhibit 59, Page 002

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1                     I N D E X
2
3    Examination                              Page
4    MATTHEW M. LAWLESS
     Direct              By Mr. Crowe            5
5
     Certificate of Oath                       246
6    Certificate of Reporter                   247
7
8                     EXHIBITS
9
     No.                                       Page
10
     Exhibit 22    Liberty Insurance            10
11                 Corporation's Amended
                   30(b)(6) Deposition
12                 Notice to Roseburg Forest
                   Products Company
13
     Exhibit 23    LinkedIn profile             23
14
     Exhibit 24    Commercial general          124
15                 liability policy
16   Exhibit 25    September 7, 2022           139
                   Roseburg press release
17
     Exhibit 26    September 14, 2022          163
18                 Roseburg press release
19   Exhibit 27    September 19, 2022          177
                   Roseburg press release
20
     Exhibit 28    October 3, 2022 Roseburg   180
21                 press release
22
23
24
25
```

Page 3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1              VIDEOGRAPHER:  Good morning.  We are going      9:35:46AM

2       on the record at 9:35 a.m. on April 26, 2024.

3              This is Media Unit 1 of the video-recorded      9:35:52AM

4       deposition of Matthew Lawless as a 30(b)(6)

5       witness for Roseburg Forest Products Company,

6       taken by counsel for Defendant in the matter of

7       RLC Industries Company, et al., versus

8       Liberty Insurance Corporation, et al., filed in

9       the United States District Court for the

10      Eastern District of California, Sacramento

11      Division.  The case number is

12      2:23cv-00649-TLN-DB.

13             This deposition is being conducted           9:36:28AM

14      remotely using virtual technology.

15             My name is Jeff Nichols representing          9:36:33AM

16      Veritext Legal Solutions, and I am the

17      videographer.  The court reporter is Kimberly

18      Fontalvo from the firm Veritext Legal

19      Solutions.

20             Counsel will now please state their           9:36:45AM

21      appearances and affiliations for the record,

22      starting with the noticing attorney.

23             MR. CROWE:  Good morning.  Jeffrey Crowe      9:36:51AM

24      with Sheppard, Mullin, Richter & Hampton for

25      Defendant Liberty Insurance Corporation.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 004

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | MR. DEVRIES:  Scott DeVries and | 9:37:00AM |
| 2 | Rachel Hudgins from Hunton, Andrews & Kurth | |
| 3 | representing Plaintiff Roseburg. | |
| 4 | I am in the room with the 30(b)(6) | 9:37:09AM |
| 5 | witness.  Ms. Hudgins is participating | |
| 6 | remotely. | |
| 7 | VIDEOGRAPHER:  Thank you. | 9:37:18AM |
| 8 | Will the court reporter please swear in | 9:37:18AM |
| 9 | the witness and then counsel may proceed. | |
| 10 | THE COURT REPORTER:  Please raise your | 9:37:18AM |
| 11 | right hand. | |
| 12 | Do you swear that the testimony you are | 9:37:18AM |
| 13 | about to give will be the truth, the whole | |
| 14 | truth, and nothing but the truth? | |
| 15 | THE WITNESS:  Yes. | 9:37:18AM |
| 16 | DIRECT EXAMINATION | 9:37:34AM |
| 17 | BY MR. CROWE: | 9:37:34AM |
| 18 | Q.   Good morning, Mr. Lawless. | 9:37:34AM |
| 19 | A.   Morning. | 9:37:37AM |
| 20 | Q.   Could you please state and spell your full | 9:37:38AM |
| 21 | legal name? | |
| 22 | A.   Sure.  Matthew McLain Lawless. | 9:37:41AM |
| 23 | M-A-T-T-H-E-W, Matthew, then McLain, M-C-L-A-I-N, | |
| 24 | McLain, and Lawless, L-A-W-L-E-S-S. | |
| 25 | Q.   Thank you, Mr. Lawless. | 9:38:07AM |

Page 6

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    time when he was promoted.

 2              I used to report to him when he was the      10:16:23AM

 3    general counsel, and then when he was promoted, I

 4    began to report directly to the CEO.

 5         Q.   And who was that?                            10:16:32AM

 6         A.   Grady Mulbery.                               10:16:33AM

 7         Q.   Grady with a "G" or Brady with a "B"?        10:16:37AM

 8         A.   Good question.  Grady with a G, as in        10:16:40AM

 9    golf.

10         Q.   And for how long was Mr. Mulbery the CEO     10:16:47AM

11    of Roseburg?

12         A.   I think his tenure began in 2015 or '16.     10:16:55AM

13    I'm not sure about that.  But he retired as CEO --

14    when did he actually step -- in the fall of '23.

15         Q.   And is that when Mr. Gray was promoted to    10:17:21AM

16    CEO, in the fall of 2023, approximately?

17         A.   Yes.                                         10:17:28AM

18         Q.   So back to my original question.  At the     10:17:28AM

19    time of Mill Fire, your title was assistant general

20    counsel, but you had mentioned you were running

21    Roseburg's entire legal department at the time; is

22    that correct?

23         A.   That's correct.                              10:17:37AM

24         Q.   And is that true of -- let me back up for    10:17:38AM

25    a second.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1        A.   Yes.  It's Ms. Everhart, and she was not      10:25:24AM

2    working at the time.

3        Q.   Thank you.                                    10:25:29AM

4        A.   Yeah, sure thing.                             10:25:29AM

5        Q.   Okay.  Great.                                 10:25:33AM

6             And then you mentioned a contract             10:25:33AM

7    specialist.  Who is that currently?

8        A.   Jen Bowden.                                   10:25:40AM

9        Q.   And what are Ms. Bowden's                     10:25:43AM

10   responsibilities, generally?

11       A.   Ms. Bowden helps -- well, she manages our     10:25:47AM

12   contract life cycle management system.  That is

13   about 80 percent of her role.  And then she assists

14   with contract flow management related to that.

15       Q.   Have you ever -- strike that.                 10:26:13AM

16            Mr. Lawless, have you ever practiced in       10:26:14AM

17   the area of insurance coverage?

18       A.   No.                                           10:26:19AM

19       Q.   Would you consider yourself to be a           10:26:23AM

20   subject matter expert in the area of general

21   liability insurance coverage?

22       A.   No.                                           10:26:32AM

23       Q.   Do you know of anybody within Roseburg or     10:26:33AM

24   RLC that would have that subject matter expertise in

25   the area of general liability insurance coverage

                                                    Page 37

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    matters?

 2         A.   No.                                    10:26:42AM

 3         Q.   Are you or do you consider yourself to be   10:26:45AM

 4    a subject matter expert involving a general

 5    liability insurer's duties to defend and indemnify

 6    Roseburg?

 7         A.   No.                                    10:26:58AM

 8         Q.   Is there anybody or has there been anybody   10:27:00AM

 9    within Roseburg or RLC from the Mill Fire to the

10    present that you believe would have the subject

11    matter expertise in that area?

12         A.   For clarity, you mean an employee of    10:27:12AM

13    Roseburg?

14         Q.   Correct.                              10:27:17AM

15         A.   Then my answer is no.                 10:27:18AM

16         Q.   I would like to turn -- you covered some   10:27:25AM

17    of this already, but I would like to turn to sort of

18    the organizational structure of the enterprise, the

19    Roseburg enterprise.

20              But as an initial matter, can you describe   10:27:33AM

21    for me the nature of Roseburg's business?

22         A.   Yes.  We make lives better from the ground   10:27:37AM

23    up.  And the way that we do that is we grow -- it

24    starts with sustainable forestry.  We grow Douglas

25    fir trees and southern yellow pine trees, and then
```

Page 38

Exhibit 59, Page 008

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1          Q.   Does Roseburg and RLC presently share the    10:36:18AM

2     same officers and directors or are they different or

3     disparate in any way?

4          A.   No difference.                               10:36:28AM

5          Q.   Was that true back at the time of the Mill   10:36:30AM

6     Fire, that Roseburg and RLC shared the same officers

7     and directors?

8          A.   Yes, that's true.                            10:36:37AM

9               No, sorry.  Excuse me.  Same officers,       10:36:38AM

10    different directors.

11         Q.   Can you explain the difference in the        10:36:47AM

12    directors as between Roseburg and RLC at the time of

13    the Mill Fire?

14         A.   Certainly.  So RLC, which is the holding     10:36:53AM

15    company, that's got an independent board of

16    directors.  Allyn Ford, the Ford family, owns the

17    company.  Allyn is the chair.  And there are --

18    there are independent and related directors on that,

19    majority independent directors.

20              And the directors of RFP, or what we're      10:37:16AM

21    calling Roseburg here -- just to be super clear,

22    Roseburg Forest Products Co., at the time of the

23    Mill Fire, the directors of that company were

24    Grady Mulbery, Stuart Gray, and I believe

25    Scott Folk, who is the president of Roseburg
```

Page 45

Exhibit 59, Page 009

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Redacted Per Sealing Order

Page 59

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

19           because the company was aware of

20    previous fire incidents in this ash, in the ash

21    holding shed, and the company was of the opinion

22    that regardless of -- unless we could review

23    security footage and find an arsonist, like, the

24    company would lose a negligence case related to the

25    fire.  And that the damage profile was so

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

Page 61

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 013

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 014

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Redacted Per Sealing Order

```
 7        Q.   Okay.  I want to switch gears for a      11:35:33AM
 8   second.
 9        A.   Sure.                                     11:35:37AM
10        Q.   I want to talk about monitoring of        11:35:38AM
11   litigation against the enterprise.
12        A.   Okay.                                     11:35:44AM
13        Q.   So Mr. Lawless, you have been the head of 11:35:45AM
14   Roseburg and RLC's legal department and were the
15   head of the legal department at the time of the Mill
16   Fire, correct?
17        A.   Yes.                                      11:36:00AM
18        Q.   As just a general matter, for suits or    11:36:01AM
19   claims against Roseburg or RLC, who within the
20   company is responsible for monitoring and
21   supervising litigation?
22        A.   Me.  And in conjunction with -- as far as 11:36:20AM
23   litigation goes, prior to the Mill Fire, virtually
24   all of our litigation was covered by our insurance
25   policy with Liberty.  And so in reality, it would be
```

Page 78

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    sure that I was aligned with whoever the business

2    owner was.  Like where the money was coming from in

3    the internal accounting structure.

4            Now, as the GC, it's still about -- the       11:47:14AM

5    thing about the authority is, you know, it's not

6    like I tell them, "Hey, we've got this," and then

7    they gave me express permission.  I tell them, "This

8    is what the case looks like.  This is where we are.

9    I think we can get here, but maybe we can't.  Maybe

10   we'll go there.  What do you think?  Is that okay?"

11           "That sounds fine."                           11:47:42AM

12           So maybe that actually is traditionally       11:47:43AM

13   how you get authority.  As I'm saying it out loud,

14   that's how you get authority from a client as a

15   lawyer.
```

## Redacted Per Sealing Order

```
16

17

18

19

20

21

22

23

24

25
```

Page 86

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Redacted Per Sealing Order

Page 96

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    lawsuits?

2        A.   I don't think so.                    12:03:00PM



Page 97

Exhibit 59, Page 018

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Page 98

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Page 99

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 021

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    the head of litigation and Roseburg and RLC were

2    using Legal Tracker, would you review invoices for

3    further auditing or analysis before paying them once

4    you received the invoice through the portal?

5         A.   I think only extremely rarely.          12:18:07PM

6         Q.   Is that because you relied essentially or   12:18:16PM

7    deferred to the Legal Tracker auditing system to

8    make corrections or reduce amounts billed such that

9    you didn't feel it was necessary to do so?

10        A.   A mix.  There's part of that, and then    12:18:31PM

11   also I trusted my folks that I worked with on the

12   outside, outside counsel, to submit bills that were

13   appropriate and accurately reflected the work that

14   they were doing for us.

15        Q.   So in other words, your expectation, both   12:18:46PM

16   now and historically, has been that Roseburg and

17   RLC's outside retained counsel would only charge for

18   and bill for tasks that were reasonably necessary

19   for Roseburg's representation -- strike that.

20             Poor question.  I'm going to ask it again.   12:19:09PM

21             Do you agree, Mr. Lawless, that you and    12:19:12PM

22   Roseburg and RLC had the expectation now and even

23   historically that outside retained counsel would

24   only charge for and bill in its invoices for legal

25   services that were reasonable and necessary to the
```

                                                    Page 107

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     representation of Roseburg and RLC?

 2          A.   Yes, I agree.                          12:19:38PM

 3          Q.   In other words, Roseburg and RLC are not    12:19:41PM

 4     prepared to pay for unreasonable and unnecessary

 5     legal work, correct?

 6          A.   That's right.  I don't think anything that   12:19:55PM

 7     is unreasonable or unnecessary would be appropriate.

 8               But at the same time --                 12:20:06PM

 9          Q.   Does -- strike that.                    12:20:09PM

10               Now that Roseburg is no longer using Legal   12:20:09PM

11     Tracker, has your review of attorney fee invoices

12     changed in any way?

13          A.   Very little.  So to let me answer the   12:20:20PM

14     question, if I say "very little," then the answer is

15     yes.

16               The procedure changed.  So it comes -- the   12:20:28PM

17     invoices come to my email, and I look at the, I

18     think, Essential PDFs of the bills again.

19               But from a material standpoint, are we   12:20:39PM

20     doing anything -- has anything changed?  No.  We

21     have the same expectations of our outside counsel

22     to, you know, do honest work for us.

23          Q.   And if it appeared to you that outside   12:20:55PM

24     retained counsel is billing and invoicing Roseburg

25     and RLC for matters that don't require legal skills,
```

Page 108

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1          Q.   And was Ms. Fairchild responsible to      1:25:21PM

2     select and purchase and maintain insurance that

3     covered the operations at the Weed facility?

4          A.   Yes, with the -- I'll describe it a little  1:25:32PM

5     bit differently from that in that especially when

6     you are talking about the -- on a

7     facility-by-facility basis, we didn't have a policy

8     that covered each facility individually.  It was a

9     blanket policy for all of the operations.

10         Q.   Appreciate that clarification.  Thank you.  1:25:54PM

11              MR. CROWE:  I would like to mark for        1:25:57PM

12         identification as Exhibit 24 a certified copy

13         of the commercial general liability policy

14         issued to RLC Industries Company and Roseburg.

15              If you can just take a minute to pull that  1:26:12PM

16         up out of the Marked Exhibits folder and let me

17         know when you are ready.

18              (Thereupon, marked as Exhibit 24.)          1:26:18PM

19              THE WITNESS:  Sure thing.  The circle is    1:26:20PM

20         spooling on the screen.

21              Now I have a message that says,             1:26:24PM

22         "Generating file preview.  May take a while."

23              MR. CROWE:  Okay.  We'll just give it a     1:26:35PM

24         second.

25              MR. DEVRIES:  While we're waiting for it    1:26:42PM

                                                   Page 125
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1              to come up, is the representation that this is

2              a true and correct copy of the policy?

3                   MR. CROWE:  The representation is that      1:26:50PM

4              it's a certified copy of the policy.  That's

5              stated on the first page.  And my understanding

6              to be a complete copy of the policy in force in

7              2022.

8                   MR. DEVRIES:  Thank you.                    1:27:06PM

9              A.   I did as instructed, and you were exactly   1:27:35PM

10        right.  Now I see, starting on Page 1 of 127, I see

11        the policy certification form here on Page 1.

12          BY MR. CROWE:                                       1:27:47PM

13             Q.   All right.  Mr. Lawless, this a lengthy     1:27:47PM

14        document, so I want you to take as much time as you

15        need to review it.  But my question essentially is

16        prior to today, have you had an opportunity to

17        review the policy that we've marked as Exhibit 24,

18        or something that you understood to be the general

19        liability policy in effect covering the Weed

20        facility in 2022?

21             A.   I'm going to take a look at it right now.    1:28:15PM

22             Q.   Great.                                       1:28:17PM

23             A.   I don't believe that I have ever reviewed    1:29:10PM

24        this document in full.

25             Q.   Was there a point in time following the     1:29:16PM
```

Page 126

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1        Mill Fire, and prior to today, where you felt like

2        it was necessary to review, if not the full policy,

3        parts of the commercial general liability policy

4        that Liberty Insurance Corporation issued to RLC

5        Industries Company?

6             A.   For clarity, this is the first -- this is    1:29:40PM

7        the first layer policy in what I will refer to as

8        the liability tower.  Is that right?

9             Q.   That's correct, that's my understanding.    1:29:53PM

10       This is the first layer policy issued to RLC in

11       effect in 2022.

12            A.   So, no, I don't think there's been a time    1:30:01PM

13       where I thought that I personally needed to review

14       this.

15            Q.   Any portion of it at all?                    1:30:08PM

16            A.   I don't believe so.                          1:30:11PM

17            Q.   Okay.  Do you have an understanding,         1:30:12PM

18       either independently or based on information from

19       Ms. Fairchild or others, that the general liability

20       policy that Liberty issued to RLC in 2022 restricted

21       its obligation to defend RLC including Roseburg to

22       suits alleging bodily injury, property damage, or

23       loggers property damage?

24                 MR. DEVRIES:  Objection.  Privilege to the   1:30:51PM

25            extent it's referring to communications between
```

Page 127

Exhibit 59, Page 026

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1     example to where I can't completely agree with you

2     there.

3       BY MR. CROWE:                               1:35:26PM

4       Q.   Well, you would agree with me, sir, that    1:35:26PM

5     the commercial general liability policy that Liberty

6     Insurance Corporation issued to RLC does not include

7     an exclusion for injury, loss or damage arising out

8     of wild fire, correct?

9       A.   For the first layer Liberty policy, I      1:35:47PM

10    agree that that's correct.

11      Q.   And at no point in time did Liberty        1:35:54PM

12    Insurance Corporation ever communicate to Roseburg

13    or RLC that its commercial general liability policy,

14    or the first layer as you've described it, excludes

15    injury, loss or damage arising out of or caused by

16    wild fire, correct?

17      A.   I hate to do this, but I got lost in the    1:36:18PM

18    question.  Could you say it one more time?

19           MR. CROWE:  Reporter, could you please     1:36:22PM

20        read it back?

21           (Requested portion read back.)            1:36:53PM

22      A.   Yes, that's correct.  I don't believe that  1:36:54PM

23    Liberty sent us a communication saying that their

24    first layer had a wild fire exclusion.

25
```

Page 131

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      BY MR. CROWE:                                    1:37:01PM

2         Q.   Or in fact you agree that there was no   1:37:01PM

3      Liberty Mutual entity or affiliate that ever

4      communicated to Roseburg or RLC that any of the

5      Liberty policies included an exclusion for loss,

6      damage or injury caused by wild fire, correct?

7              MR. DEVRIES:  Objection.  Overly broad.  1:37:25PM

8         A.   So talking about the Liberty policies    1:37:27PM

9      themselves, which you and I, Mr. Crowe, referred to

10     as the first layer, that's helpful for me.  Roseburg

11     never received any communication from Liberty or any

12     of its affiliates that said that the first layer

13     policy had a wild fire exclusion in it.  Correct, I

14     agree.

15     BY MR. CROWE:                                    1:37:50PM

16        Q.   My question isn't limited to the first   1:37:50PM

17     layer policy, I'm talking about any policy issued to

18     RLC or Roseburg by Liberty Insurance Corporation or

19     affiliate, or an affiliate.  You would agree that

20     there was never a communication that any of

21     Liberty's policies contained an exclusion for loss,

22     damage or injury caused by wild fire, correct?

23             MR. DEVRIES:  Objection.  Overly broad.  1:38:12PM

24        Outside the scope of the 30(b)(6).

25        A.   I'm getting confused a little bit on the 1:38:17PM

                                              Page 132
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    affiliate.  Because I know that Ohio Casualty is an

 2    affiliate of Liberty.  And so if we're talking about

 3    the Liberty policies, to me, the Liberty policies

 4    are the first layer.  And so if we're talking about

 5    something different, we may need to use different

 6    terms so my primitive mind can keep up.

 7      BY MR. CROWE:                                1:38:40PM

 8         Q.   Fair enough.  Fair enough.           1:38:40PM

 9         A.   Sorry.                               1:38:43PM

10         Q.   That's okay.  I appreciate that request  1:38:44PM

11    and I'm going to ask it differently.

12         A.   Okay.  Thanks.                       1:38:48PM

13         Q.   The Ohio Casualty policy, you understand  1:38:49PM

14    Ohio Casualty is an affiliate of Liberty Insurance

15    Corporation, correct?

16         A.   Yes.                                 1:38:59PM

17         Q.   And Ohio Casualty issued an excess policy  1:39:00PM

18    to Roseburg and RLC for 2022 as well, correct?

19         A.   Correct.                             1:39:09PM

20         Q.   Did Ohio Casualty or any other Liberty  1:39:10PM

21    affiliate communicate to Roseburg or RLC at any

22    point in time that the Ohio Casualty excess policy

23    contained an exclusion for loss, injury or damage

24    caused by wild fire?

25              MR. DEVRIES:  Objection.  Overly broad.  1:39:30PM
```

Page 133

Exhibit 59, Page 029

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1        A.   I don't think so because what we were        1:39:31PM

 2   constantly asking Ohio Casualty to do was to give us

 3   a coverage position, if I recall correctly, is that

 4   our counsel would be asking them weekly, "What is

 5   your coverage position, what is your coverage

 6   position, what is your coverage position?" and we

 7   would never get a response.

 8     BY MR. CROWE:                                         1:39:54PM

 9        Q.   Did Ohio Casualty Insurance Company ever      1:39:54PM

10   communicate to Roseburg in any way that they were

11   reserving the right to deny or exclude coverage

12   under its excess policy for claims arising out of

13   the Mill Fire based on an exclusion for wild fire?

14        A.   No, I don't think they ever issued us any     1:40:16PM

15   coverage position of any kind.

16        Q.   Mr. Lawless, back to the general liability    1:40:23PM

17   policy issued by Liberty Insurance Corporation.

18   Does Roseburg agree that the policy allows Liberty

19   Insurance Corporation to select counsel to defend

20   Roseburg and RLC against potentially covered claims?

21           MR. DEVRIES:  Objection.  Calls for legal       1:40:42PM

22        conclusion.

23        A.   In some cases, yes, they're subject to        1:40:45PM

24   requirements.

25
```

Exhibit 59, Page 030

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1      BY MR. CROWE:                                      1:40:47PM

 2          Q.   Is there anything in Liberty Insurance    1:40:47PM

 3      Corporation's policy, which we've marked as

 4      Exhibit 24, that allows -- explicitly allows

 5      Roseburg or RLC to select its own defense counsel?

 6          A.   I'm going to answer that in a way that I  1:41:10PM

 7      think may come across as somewhat flip, but I don't

 8      mean it that way.  It's 127 pages, and I have never

 9      reviewed it.  I can do that right now if you would

10      like.  But I don't know otherwise.

11          Q.   I want you to take the time to review it  1:41:29PM

12      if you need to to answer the question.

13             Let me ask it a different way.  Maybe we    1:41:32PM

14      can speed this up.

15          A.   Okay.                                     1:41:36PM

16          Q.   Are you aware from any source other than  1:41:37PM

17      your lawyers that the Liberty Insurance Corporation

18      primary policy contains any language that would

19      allow Roseburg or RLC to select counsel of its

20      choice to defend it against suits or civil

21      proceedings?

22          A.   Outside of communication with my lawyers, 1:41:58PM

23      I am not aware of any language in the what I call

24      the first layer of the Liberty policy that expressly

25      allows Roseburg to select its own lawyers related to
```

Page 135

Exhibit 59, Page 031

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    a claim, with, you know, the previous caveat that I

2    have not read this whole document.

3        Q.   Roseburg would agree that outside of the      1:42:19PM

4    insurance policy, there is no agreement between

5    Liberty Insurance Corporation on the one hand and

6    Roseburg or RLC on the other hand that would allow

7    Roseburg or RLC to select its counsel of choice to

8    defend it against suits, correct?

9            MR. DEVRIES:  Objection.  Legal opinion.      1:42:43PM

10       A.   I don't think so.                            1:42:46PM

11     BY MR. CROWE:                                       1:42:49PM

12       Q.   You don't think -- there is no such          1:42:49PM

13   agreement, is that your testimony?

14       A.   No, I don't think so.  I would be            1:42:53PM

15   surprised if there was.

16       Q.   Are you familiar with the concept of there   1:43:06PM

17   being a choice of counsel agreement between an

18   insured and its general liability insurer?

19       A.   I don't think so.                            1:43:21PM

20       Q.   It's not something that's familiar to you?   1:43:22PM

21       A.   Maybe describe it a little bit more, and     1:43:25PM

22   then I can give a better answer, if you don't mind.

23       Q.   Sure.  Sure.  Are you familiar or do you     1:43:29PM

24   have experience with circumstances where an insured

25   on the one hand and a liability insurer on the other

Page 136

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

```
21          MR. CROWE:  I'm going to mark for          1:47:22PM

22     identification as Exhibit 25 a press release

23     dated September 7, 2022.

24          Let me know when that's available for your   1:47:30PM

25     review.
```

                                            Page 139

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              (Thereupon, marked as Exhibit 25.)        1:47:33PM

 2       A.   I see Exhibit 25, a press release.  I am    1:47:40PM

 3    opening it now.  I will let you know when it pulls

 4    up.

 5     BY MR. CROWE:                                       1:47:52PM

 6       Q.   Great.                                       1:47:52PM

 7       A.   It is now -- it's pulled up.                 1:47:53PM

 8       Q.   Do you want to take a minute to review it    1:47:55PM

 9    before I ask questions?

10       A.   Yes, please.                                 1:47:58PM

11       Q.   Are you familiar with this document,         1:49:02PM

12    Mr. Lawless?

13       A.   Yes.                                         1:49:04PM

14       Q.   This was a press release issued by           1:49:05PM

15    Roseburg on September 7, 2022, in relation to the

16    Mill Fire, correct?

17       A.   Yes.                                         1:49:10PM

18       Q.   Who prepared it?                             1:49:11PM

19       A.   Pete Hillan, who is our outside PR person,   1:49:16PM

20    public relations person, with input from me, input

21    from Bob Julian.  I think we were the three with the

22    most input on this.

23       Q.   Do you believe there are drafts of this      1:49:36PM

24    press release that are different than what was

25    ultimately published by Roseburg?
```

Page 140

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Redacted Per Sealing Order

```
19      Q.   Okay.  Now, back to the press release,      2:01:39PM
20   Exhibit 25.  I want to focus on paragraphs 4, 5 and
21   6.
22      A.   Let me scroll.                              2:01:49PM
23      Q.   Sure.                                       2:01:52PM
24      A.   Okay.                                       2:01:56PM
25      Q.   In the first sentence in paragraph 4, it    2:01:56PM
```

Page 148

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1     notes that Roseburg was "proactively" providing up

2     to $50 million for a community restoration fund.

3            Do you see that?                        2:02:06PM

4     A.   Yes.                                       2:02:07PM

5     Q.   And the 50 million referenced in this      2:02:08PM

6     press release was self-funded by Roseburg for that

7     purpose?

8     A.   Yes.                                       2:02:15PM

9     Q.   And that was --                            2:02:18PM

10    A.   I'm sorry.  Go ahead.                       2:02:20PM

11    Q.   And that was before any insurer had agreed  2:02:20PM

12    to waive the no voluntary payments provisions of

13    their policy; is that correct?

14    A.    Well, we certainly issued this release     2:02:30PM

15    before that.  We didn't pay $50 million as part of

16    the community fund at all.  I think by the end of

17    the day, after we stood it up, I think we paid --

18    I'm going to give very rough numbers -- probably

19    $2.5 million out of that community fund.  But we

20    were prepared to pay 50 if it was necessary out of

21    that, which is why that's the number that we used in

22    the press release.
```

## Redacted Per Sealing Order

```
23

24

25
```

Page 149

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Redacted Per Sealing Order

Page 150

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

1

2

3

4

5

6

7

8

9

10

11

12

13

14     Q.   The following two paragraphs under "How     2:05:27PM

15   the Community Fund Will Work," the last two

16   paragraphs of Page 1 of the press release, do you

17   see that?

18     A.   Yes, I do.                                  2:05:36PM

19     Q.   And Roseburg is referencing that it has     2:05:37PM

20   organized a team.  Can you describe what team had

21   been organized by that time?

22     A.   So the team was -- the team consisted of    2:05:44PM

23   lawyers from BakerHostetler, AlixPartners,

24   consultants, those were the primary folks that were

25   on the ground in Weed on that.  We also had some

                                            Page 151

Exhibit 59, Page 038

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    folks helped out from the mill facility.  Obviously,

 2    it wasn't running right after the fire.

 3            But if you want to know who was material     2:06:09PM

 4    on the team, it was those people, and then me

 5    coordinating it from headquarters.

 6        Q.   And that first paragraph under "How the     2:06:20PM

 7    Community Fund Will Work" actually describes that

 8    Roseburg has already hired Mr. Julian with the

 9    BakerHostetler firm, correct?

10        A.   Yes, yeah, absolutely.                      2:06:32PM

11        Q.   And the press release continues to          2:06:34PM

12    describe Mr. Julian as a lawyer who represented the

13    70,000 fire victims' interests in the PG&E

14    bankruptcy, correct?

15        A.   Yes.                                        2:06:46PM

16        Q.   And the PG&E bankruptcy related to fires    2:06:46PM

17    that occurred in California for a period of years in

18    which PG&E as the utility was suspected to be at

19    fault for those fires, correct?

20        A.   I'm not entirely sure.  Just -- I don't     2:07:01PM

21    want to quibble too much, but I don't know about the

22    series of fires or if it came from Paradise where

23    there was the big, like, horrible fire there.  I

24    don't know in general.  But the ...

25        Q.   So my question is:  What was the purpose    2:07:24PM
```

Page 152

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    professional adjusters.

 2          Do you see that portion of the press        2:19:19PM

 3    release?

 4       A.   Yes.                                       2:19:22PM

 5       Q.   Meaning that Roseburg contemplated a       2:19:23PM

 6    scenario where fire victims could make claims for

 7    losses arising from the Mill Fire through

 8    professional insurance adjusters, correct?

 9       A.   That's correct.                            2:19:41PM

10       Q.   And did Roseburg ever request of any of    2:19:43PM

11    its insurers that it staff the community center with

12    respect to the Community Relief Fund with adjusters

13    to process claims?

14       A.   I know that we asked, and I wish I could   2:20:06PM

15    remember what day this was, but pretty sure it was

16    before this release came out, there was a conference

17    call, I was on it, Bob Julian was on it, we had

18    representatives from Liberty and all of the other

19    insurers on the tower, where we outlined a plan to

20    them.  We asked them to participate and be our

21    partners in that plan.

22          Or, if they were unwilling to participate,   2:20:32PM

23    at least waive voluntary payments, let us do this,

24    because, one, the damages are so catastrophic, we're

25    so far above the insurance tower that at the end of
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 040

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    the day, if we make some voluntary payments here,

2    it's not going to make a lick of difference.

3        But there was never a -- was never a          2:21:01PM

4    response to that.  They didn't respond yes or no.

5        Q.  So it's your testimony that the request    2:21:11PM

6    that the insurers consider staffing a claims

7    processing center with professional adjusters was

8    made on a telephone conference call with members of

9    Roseburg, Baker, and the insurers?

10       A.  No, we did not make a detailed request,    2:21:32PM

11   please -- I don't think so.  I don't remember

12   saying, "Please give us professional insurance

13   adjusters."

14       I think we said we want to set up the          2:21:43PM

15   community fund, and I'm pretty sure we said we'd

16   like you to partner with us on that.  And I don't

17   remember the details of what we specifically asked

18   them to do or not to do.

19       Q.  Well, when you say to partner with         2:22:01PM

20   Roseburg in the Community Relief Fund, you mean to

21   ask the insurers to waive the no voluntary payments

22   provision or something else?

23       A.  No, I don't think so.  Again, this is a    2:22:14PM

24   couple years ago now.  But I think what we asked was

25   to help us implement the Community Relief Fund.

Exhibit 59, Page 041

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              Because, you know, these guys, insurance    2:22:23PM

 2     companies, they've got the skill to do this.  But we

 3     needed to do it right away.  That was the thing.

 4     And I'm sure insurance companies are -- we needed to

 5     do it right away, and we wanted them involved.  But

 6     if they weren't going to be involved, we still

 7     needed to do it right away.

 8         Q.   Did Roseburg ever specifically request    2:22:51PM

 9     that Liberty Insurance Corporation or any of the

10     insurers in the tower of insurance staff a community

11     processing center to process Mill Fire claims

12     against Roseburg?

13         A.   I think we did ask them to -- again, all I    2:23:07PM

14     can say that I remember is that we asked them to

15     partner in the community center plan.  And I don't

16     know what details, what grain of details we got to

17     on that.

18         Q.   What did Roseburg or RLC do, if anything,    2:23:25PM

19     to investigate or research the retention of

20     third-party administrators or third-party adjusters

21     to staff the claims processing center in order to

22     process Mill Fire claims against Roseburg?

23         A.    Not much.  I think we talked on the    2:23:53PM

24     recommendation of BakerHostetler, who had worked

25     with AlixPartners before, I think on the Madoff
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    settlements, and I think also on the PG&E fire

2    cases.

3            And we knew that they could do it and that    2:24:13PM

4    they could do it fast and that they were available

5    and they had the experience with fire cases.  And

6    so, again, speed being the ultimate consideration

7    here, that's what we went with.

8        Q.   Right.  So speed was really the primary    2:24:32PM

9    factor in deciding who would staff the community

10   relief center rather than costs of staffing for that

11   purpose, correct?

12       A.   That's correct.  Because we were thinking    2:24:47PM

13   of -- the ultimate cost that matters is the big

14   gross outlay.  That's the cost that we're trying to

15   limit as much as possible.

16           And the strategy was and is, and I still    2:24:59PM

17   think is the right strategy, the faster we go on the

18   front end, the smaller that ultimate larger payout

19   is.

20       Q.   True.  Okay.  Gotcha.  But that doesn't    2:25:11PM

21   mean that other claims administrators or third-party

22   adjusters could not have acted just as quickly as

23   AlixPartners or other individuals who staffed the

24   community center to try to meet that goal; is that

25   fair?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 043

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              MR. DEVRIES:  Objection.  Lack of        2:25:38PM

 2        foundation.

 3        A.   I don't know, and my inclination is to say   2:25:41PM

 4   no.  The people who I thought would have been ready,

 5   willing and able to help us were our insurance tower

 6   group, and we didn't get anything from them.

 7     BY MR. CROWE:                                     2:25:55PM

 8        Q.   But Roseburg and RLC did not interview any   2:25:55PM

 9   third-party administrator or third-party insurance

10   adjuster for purposes of evaluating the speed in

11   which they could staff the community relief center;

12   is that correct?

13        A.   That's right.  We wanted to -- at this      2:26:12PM

14   time for us, hours, hours matter in a big way.  So

15   again, speed, speed, speed.  That's what we were

16   focused on.

17        Q.   I don't think I asked this question, and I   2:26:28PM

18   apologize.  But who ultimately staffed the community

19   relief center and the other methods in which claims

20   could be made and processed on behalf of Roseburg?

21        A.   So the community relief center was staffed   2:26:49PM

22   by attorneys from BakerHostetler and consultants

23   from AlixPartners with some support from local

24   Roseburg team members.

25        Q.   I'm sorry, what was the last category?       2:27:07PM
```

Page 162

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1        A.   With some support from local Roseburg team    2:27:09PM

 2   members.

 3        Q.   And it was BakerHostetler that recommended    2:27:14PM

 4   AlixPartners for that purpose?

 5        A.   Yes.                                           2:27:20PM

 6        Q.   To the extent Roseburg knows, did             2:27:23PM

 7   BakerHostetler interview any consulting firms,

 8   third-party administrators, third-party insurance

 9   adjusters, independent insurance adjusters, for

10   purposes of staffing the community relief center or

11   the other mechanisms in which claims could be made

12   and processed against Roseburg?

13        A.   I don't know.                                 2:27:46PM

14        Q.   Did you ask them to do that?                  2:27:49PM

15        A.   I don't recall asking them to do that.        2:27:53PM

16        Q.   The next page of the press release, it's      2:28:00PM

17   the third full paragraph on Page 2, starting with

18   "While Roseburg is not admitting liability by

19   setting up this community fund," do you see that?

20        A.   Yes.                                          2:28:13PM

21        Q.   What was the purpose of -- strike that.       2:28:15PM

22             The purpose of this paragraph in the          2:28:18PM

23   release was to communicate to the community and the

24   public that Roseburg had not admitted liability --

25   by setting up the community fund, Roseburg was not
```

Page 163

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    here to try to help the community recover, and we're

 2    just beginning, we're at the beginning stages,

 3    correct?

 4         A.   And the other thing that we wanted to --     2:34:29PM

 5         Q.   I'm sorry, I didn't catch the first part     2:34:32PM

 6    of your answer.

 7         A.   I said, "And the other thing" --            2:34:35PM

 8              MR. DEVRIES:  He said, "Yes, and the other   2:34:41PM

 9         thing."

10         A.   No.  I didn't say "yes."  I'm sorry.  I      2:34:42PM

11    don't think I followed the rules in answering the

12    question.  If you ask it again, I will do a better

13    job of following the rules.

14      BY MR. CROWE:                                        2:34:51PM

15         Q.   For purposes of clarity, let me ask the      2:34:51PM

16    question again, because it sounded like we didn't

17    catch the beginning of your answer.

18              When Roseburg communicated in this press     2:34:57PM

19    release to the public that it was only starting its

20    efforts to assist people in recovering from the Mill

21    Fire, it meant to communicate and was meaning to

22    communicate that this was only the beginning of that

23    effort and Roseburg was in it for the long haul to

24    assist the community in recovering; is that correct?

25         A.   Yes.  In particular, another thing that we   2:35:19PM
```

Page 167

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    reasonable for Liberty Insurance Corporation to

2    require the release of claims as part of its

3    obligation, if any, to indemnify its insured against

4    covered claims?

5         A.   No.                                    2:43:13PM

6         Q.   Why not?                               2:43:14PM

7         A.   Well, the context here, what we're trying   2:43:15PM

8    to do is -- again, context is essential.  We are

9    trying to limit the overall maximum exposure to

10   Roseburg.  And one of the strategies for what we're

11   doing is we want people to come into the community

12   center, as many people as possible, so we can get as

13   much detail as possible about who they are, where

14   they live, get what they've experienced in writing

15   there, just a couple days after the fire.

16         And if we've got to pay them $600 for a       2:43:46PM

17   hotel room -- you know, we're paying immediate needs

18   right here.  Before we could even get checks up, we

19   had gift cards, because we could get those faster.

20         But the data collection is essential, and     2:43:59PM

21   with that data, then we would be able to drive down

22   the ultimate settlement amounts.

23         If we had required people to sign a            2:44:12PM

24   release of all their claims in order to get $600 for

25   two nights at a hotel, no one would have come to the
```

Page 173

Exhibit 59, Page 047

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      center and we wouldn't have been able to execute on

2      the plan.

3           Q.   At some point, Roseburg required that        2:44:24PM

4      claimants sign releases, correct?

5           A.   Sure.                                        2:44:29PM

6           Q.   So what changed from payments made early     2:44:30PM

7      on from the community fund to that point in time

8      when Roseburg required claimants to sign releases?

9           A.   It was the difference between the            2:44:42PM

10     community fund and settling claims.  The community

11     fund was set up for what are your immediate needs to

12     help keep you and your family alive?  If you've got

13     claims, if your house was burned down, then we'll

14     enter into a settlement agreement with you.  If your

15     car was destroyed in the fire, give us evidence

16     about the car.

17          So it's really two different things.  The         2:45:02PM

18     community fund truly is and truly was a there's no

19     place to go.  There's only -- there's no place to

20     go.  Our house has been destroyed.  We don't have

21     any food.  Here is some money tide you over.

22          And then we would use the information from        2:45:22PM

23     that to enter into formal settlement agreements

24     where of course we'd get releases.

25          Q.   The press release that's Exhibit 26, and I   2:45:33PM
```

Page 174

Exhibit 59, Page 048

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      think all of the press releases that I'm going to

2      show you and have showed you, identify Pete Hillan

3      and an email address and a phone number for contact,

4      right?  It's at the bottom of Page 2 of this

5      exhibit.

6           A.   Yes.                                    2:45:55PM

7           Q.   Was there any tracking either by Roseburg    2:45:56PM

8      or Mr. Hillan or his company of contacts made to him

9      by email or by phone regarding the Mill Fire?

10          A.   I don't think so for Pete.              2:46:11PM

11               So these press releases, they would go to    2:46:13PM

12     reporters, to the press, and then they would run a

13     story.

14               So where we've got the contact Pete Hillan    2:46:25PM

15     down at the bottom, like I think the way this works

16     is this here -- you know, this where we've got news

17     provided by Roseburg Forest Products, this probably

18     came, this copy here probably came off of, like,

19     Presswire or one of those -- you are probably

20     familiar with them, the third-party press release

21     services where Pete Hillan would be the contact

22     there.

23               So it wasn't like -- Pete was not our,     2:46:55PM

24     like, a face of, like, contact for community folks

25     to talk to, he was the contact for journalists and,
```

Page 175

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    like, the Weed city people and things like that.

2        Q.   Was there a designated person or email or     2:47:14PM

3    hotline that was used for community members to

4    contact Roseburg as it related to the Mill Fire and

5    their claims against Roseburg?

6        A.   I know there's the website.  We had, like,     2:47:29PM

7    weedrelieffund.com was a website.  I don't recall

8    the exact stuff that we put in there.  But I know --

9    well, "know" is maybe too strong of a word.  But I

10   strongly suspect that we had a claims number on the

11   website that would head towards the community fund

12   operation.

13           Now, who that number actually went to,     2:47:56PM

14   whether that was a Baker team member, an

15   AlixPartners team member, that's my expectation.

16           That's pretty far --                          2:48:07PM

17       Q.   As between the press release issued on     2:48:09PM

18   September 7, 2022, that included that sentence about

19   no admission of liability, do you remember looking

20   at that?

21       A.   Yes, I do.  Sorry.  I was nodding.     2:48:23PM

22       Q.   That's okay.                                 2:48:26PM

23           In the September 14, 2022 press release,     2:48:26PM

24   the latter press release does not include that same

25   or similar "no admission of liability" language.  Do

                                                  Page 176

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    you agree?

2         A.   Yes.                                        2:48:41PM

3         Q.   Is there a reason as to why the press       2:48:43PM

4    release subsequent to the September 7, 2022 press

5    release no longer contained language that said there

6    was no admission of liability by Roseburg?

7         A.   I don't remember.  Again, I'll totally      2:49:02PM

8    ignore the advice of my lawyer and speculate here.

9         Q.   I don't want you to speculate because it's  2:49:12PM

10   not helpful.

11        A.   Oh, okay.  Well, then I won't.              2:49:16PM

12        Q.   So please don't speculate or guess because  2:49:17PM

13   it's not anything that anybody can rely on.

14        A.   Okay.                                       2:49:22PM

15        Q.   So if you don't know, you don't know.       2:49:23PM

16   That's fine.  So let me ask the question again.

17        A.   Sure.                                       2:49:27PM

18        Q.   Is there a reason as to why the "no         2:49:28PM

19   admission of liability" language that was contained

20   in the September 7, 2022 press release was removed

21   from subsequent press releases to the community?

22        A.   I don't know.                               2:49:44PM

23        Q.   Isn't it true that it was removed because   2:49:47PM

24   Roseburg, following the September 7, 2022 press

25   release, knew and acknowledged at least internally

Page 177

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    2022?

2         A.   I would say but for occasional downtime      3:03:57PM

3    that you will find with, you know, manufacturing

4    facilities of like kind.

5         Q.   But nothing out of the ordinary in terms     3:04:07PM

6    of shutdowns, as far as you recall?

7         A.   You know, I think -- don't think so.  We     3:04:13PM

8    may have had to take it down for further

9    investigation-related -- I don't think we had to

10   take downtime when the district attorney came out

11   and their team came out to look at it later.

12        But again, nothing material.  I think          3:04:34PM

13   I'm -- I'm answering the question at least I think

14   you're asking.

15        Q.   Fair enough.                               3:04:44PM

16        MR. CROWE:  I'm going to mark for               3:04:44PM

17        identification Exhibit 30, which is a

18        December 13, 2022 press release, and the last

19        one I'm going to show you.

20        (Thereupon, marked as Exhibit 30.)             3:04:52PM

21        A.   Okay.  I'm pulling it up.                  3:04:54PM

22        I will read it quick here.                     3:05:03PM

23   BY MR. CROWE:                                       3:05:06PM

24        Q.   Thank you.                                3:05:06PM

25        A.   Okay.  I'm ready.                          3:05:49PM

Page 187

Exhibit 59, Page 052

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          Q.   Mr. Lawless, is Exhibit 30 another press      3:05:52PM

 2     release issued by Roseburg in connection with the

 3     Mill Fire?

 4          A.   Yes.                                           3:05:59PM

 5          Q.   And this press release was also reviewed       3:06:00PM

 6     and approved by you, Mr. Julian, and Mr. Hillan?

 7          A.   Yes.                                           3:06:08PM

 8          Q.   And the first paragraph represents to the      3:06:09PM

 9     community that a majority of the claims arising from

10     the Mill Fire had been settled; is that correct?

11          A.   That we agree in principle to settlement,      3:06:27PM

12     yes.

13          Q.   Did the claims, the settled claims in          3:06:30PM

14     principle that this press release is referring to,

15     did they, in fact, settle shortly after?

16          A.   It depends how you define "shortly."  Some     3:06:39PM

17     sooner than later.

18          Q.   But essentially, I had a case that settled     3:06:49PM

19     in principle recently and did not settle because

20     nobody signed an agreement.

21               My question is this:  The release, the         3:06:57PM

22     press release, is identifying the majority of Mill

23     Fire claims -- or communicating that the majority of

24     Mill Fire claims had settled in principle, and most

25     of those, if not all of those claims eventually did
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 053

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1      (Recess was held from 3:08 p.m. until 3:16 p.m.)    3:08:07PM

 2           VIDEOGRAPHER:  We are back on the record.       3:16:24PM

 3      The time is 3:16.

 4    BY MR. CROWE:                                          3:16:28PM

 5      Q.   Mr. Lawless.  Roseburg retained Mr. Julian     3:16:35PM

 6    and the BakerHostetler firm almost immediately after

 7    the Mill Fire; is that correct?

 8      A.   Yes.                                            3:16:46PM

 9      Q.   Essentially within a day or two; is that       3:16:47PM

10    fair?

11      A.   Less.                                           3:16:51PM

12      Q.   Did Roseburg and RLC retain Mr. Julian and     3:16:51PM

13    BakerHostetler on the day of the fire, September 2?

14      A.   I think so.  I know that Stuart Gray           3:17:03PM

15    called Bob Julian the day of the fire, and I don't

16    know the substance of their conversation, but it was

17    the day of the fire or the day after the fire.

18      Q.   Was it Mr. Gray's decision to retain           3:17:20PM

19    Mr. Julian and BakerHostetler in response to the

20    Mill Fire?

21      A.   It was ours together.                          3:17:30PM

22      Q.   Okay.  So we have a copy of the engagement     3:17:31PM

23    letter between Roseburg and RLC and BakerHostetler.

24    I'm going to show that to you in a minute.  It's

25    dated September 6, 2022.  But I have seen some
```

Page 190

Exhibit 59, Page 054

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    invoices that show Mr. Julian billing for work on

2    September 3, 2022.

3             So is it fair to say that Roseburg and RLC    3:17:56PM

4    retained Mr. Julian and -- strike that.

5             Is it fair to say that Roseburg and RLC    3:18:01PM

6    retained Mr. Julian and BakerHostetler essentially,

7    if not the day of, the day after the fire, even

8    though they had not executed an engagement letter

9    until September 6, 2022?

10        A.   That's right.  Because Mr. Julian already   3:18:21PM

11   had a relationship with us.

12        Q.   Right.  You are referring to              3:18:29PM

13   BakerHostetler's representation of Roseburg in

14   connection with the Archie Creek matter?

15        A.   Yes.                                       3:18:38PM

16        Q.   Is that the only existing relationship     3:18:46PM

17   that predated the Mill Fire?

18        A.   Yes.                                       3:18:52PM

19        Q.   Prior to retaining Mr. Julian and          3:19:07PM

20   BakerHostetler, did Roseburg or RLC interview any

21   other lawyers or law firms for purposes of

22   representing the enterprise against the anticipated

23   Mill Fire claims and suits?

24        A.   No.                                        3:19:25PM

25        Q.   When Mr. Julian was first contacted about  3:19:32PM
```

Page 191

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| 1 | representing the companies in connection with the |
| 2 | Mill Fire, what was the discussion about the rates |
| 3 | that BakerHostetler and Mr. Julian would be billing |
| 4 | Roseburg for their work? |
| 5 |     A.  I don't think we discussed rates at the    3:19:54PM |
| 6 | beginning. |
| 7 |     Q.  When did -- I'm sorry.  I didn't mean to    3:20:00PM |
| 8 | interrupt.  Go ahead. |
| 9 |     A.  I was going to say the same thing I said    3:20:02PM |
| 10 | before, is we were focused on speed. |
| 11 |     Q.  Prior to the Mill Fire, there had not been    3:20:07PM |
| 12 | any sort of agreement between BakerHostetler and |
| 13 | Roseburg or RLC about hourly rates for legal work, |
| 14 | correct? |
| 15 |     A.  That's right.  They hadn't worked for us    3:20:18PM |
| 16 | on an hourly basis before. |
| 17 |     Q.  Right.  And so when did BakerHostetler on    3:20:23PM |
| 18 | the one hand and Roseburg/RLC on the other hand have |
| 19 | any communications about acceptable rates for legal |
| 20 | work performed by BakerHostetler? |
| 21 |     A.  I don't recall.  I expect that it would be    3:20:40PM |
| 22 | in the first two weeks of our work together on this, |
| 23 | but I don't recall specifically. |
| 24 |     Q.  Were there any negotiations as to the    3:20:52PM |
| 25 | rates that BakerHostetler would charge? |

Page 192

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1        A.   I don't believe so.                    3:20:58PM

2        Q.   So in other words, Roseburg agreed to the   3:20:59PM

3   rates that Mr. Julian and BakerHostetler essentially

4   communicated they wanted to charge for their work in

5   relation to the Mill Fire?

6        A.   We agreed with the rates that they      3:21:14PM

7   proposed.

8        Q.   Did Roseburg or RLC do anything to compare   3:21:17PM

9   whether the rates that BakerHostetler and Mr. Julian

10  charged were reasonable in the local market area for

11  the same or similar type of work?

12           MR. DEVRIES:  Objection.  Ambiguous.     3:21:34PM

13       A.   Well, we saw that -- we saw the rates that   3:21:36PM

14  Liberty pays for BakerHostetler at some point during

15  this process, and so ultimately we figured we were

16  probably going to shake out with Liberty paying that

17  amount, and we were going to kind of end up doing a

18  top-up on some amount over that, which I understand

19  happens not infrequently in situations like this.

20  So that's the one bit of comparison that we had.

21    BY MR. CROWE:                                   3:22:12PM

22       Q.   I want to focus on the time period before   3:22:12PM

23  you had any inclination as to what any insurer might

24  pay for the defense of Roseburg against Mill Fire

25  claims.  I want to focus at the time Roseburg and
```

Page 193

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    RLC agreed to rates that BakerHostetler would charge

 2    for work associated with the Mill Fire.

 3              Did Roseburg or RLC do anything to compare    3:22:36PM

 4    the Baker rates with market rates for the same type

 5    or similar work that you expected BakerHostetler to

 6    perform?

 7              MR. DEVRIES:  Objection.  Ambiguous.          3:22:53PM

 8         A.   You mean so did we compare their rates        3:22:55PM

 9    with, you know, what Cravath would charge or with

10    what another big firm would charge on the defense of

11    the fire case?  No.

12      BY MR. CROWE:                                         3:23:10PM

13         Q.   Well, in fact, there was no comparison        3:23:10PM

14    with any other firm in terms of rates those firms

15    would charge for the same or similar type of work

16    that you expected BakerHostetler to perform,

17    correct?

18         A.   Well, sure, we certainly didn't compare it    3:23:23PM

19    with, like, a local Siskiyou County solo

20    practitioner.  That's not someone who can handle or

21    has the capacity to handle a case like this.

22         Q.   I don't want to limit the question to a       3:23:36PM

23    type of firm.  I just want to confirm for the record

24    that there was nothing done by Roseburg or RLC at

25    the time they agreed to the Baker rates in comparing
```

Exhibit 59, Page 058

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    those rates to any other law firm for the same or

 2    similar work, correct?

 3         A.   That's right.  We didn't shop around       3:23:53PM

 4    because we were focused on speed and the mission,

 5    and we knew we had a relationship of trust with

 6    Mr. Julian and his colleagues.

 7         Q.   What was the scope of BakerHostetler's      3:24:15PM

 8    retention at the time Roseburg retained them in

 9    relation to the Mill Fire?

10         A.   Sorry.  I'm going to have to ask you kind   3:24:28PM

11    of a kindergarten clarifying question.  By "scope,"

12    you mean what were the kind of things we wanted them

13    to do for us?

14         Q.   Yes, right.                                 3:24:39PM

15         A.   Is that correct?  Okay.                     3:24:40PM

16         Q.   So you're familiar with engagement         3:24:40PM

17    letters, retention of law firms.

18              So the question is:  When Roseburg and RLC  3:24:45PM

19    first retained BakerHostetler in relation to the

20    Mill Fire, what was the scope of that retention at

21    least as it concerned Roseburg and RLC?

22         A.   As we understood it, for Roseburg, we       3:25:01PM

23    wanted them to defend us from potential civil

24    claims.  We wanted them to defend us from potential

25    government criminal claims.  We wanted them to help
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    us with potential environmental remediation or

2    environmental impacts related from the fire.  We

3    wanted them to investigate potential third-party

4    claims related to -- third-party indemnity claims

5    related to the fire.

6           Let's see.  Did I cover everything?  I      3:25:38PM

7    think that's it.  It's a long list.

8       Q.   Did that scope of retention ever change?   3:25:48PM

9       A.   I don't think so.                          3:25:54PM

10          One thing that -- I don't know if this      3:25:55PM

11   answers -- changes the answer to that -- we brought

12   in pool counsel from Taft Stettinius in order to

13   assist on the criminal side, to serve as pool

14   counsel for our team members while they were being

15   interviewed by governmental authorities.

16          So maybe that changed their scope or took    3:26:19PM

17   away some of the scope for them a little bit.

18   That's probably splitting hairs.

19      Q.   And has Baker's retention in relation to    3:26:30PM

20   the Mill Fire, has it concluded or does it remain?

21      A.   It remains.                                 3:26:43PM

22      Q.   Strike that.  Let me ask the question       3:26:44PM

23   better.

24          Does BakerHostetler still represent          3:26:46PM

25   Roseburg and RLC in relation to the scope that you
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 060

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

20          MR. CROWE:  I would like to mark for          3:29:13PM

21      identification Exhibit 31, which is the

22      September 6, 2022 engagement of BakerHostetler

23      letter.  And just for the record, it's Roseburg

24      production Bates Number 94 through 103.

25          (Thereupon, marked as Exhibit 31.)          3:29:38PM

Page 198

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          A.   Okay.  I have it up.                    3:29:50PM

 2       BY MR. CROWE:                                    3:29:51PM

 3          Q.   Do you want to take a minute to review it?  3:29:51PM

 4          A.   Yes, please.                             3:29:53PM

 5               Okay.  I have read the letter and the    3:34:53PM

 6       attachment.

 7          Q.   Okay.  Great.                            3:34:57PM

 8               Exhibit 31 is the engagement letter as   3:34:58PM

 9       between BakerHostetler as counsel and Roseburg and

10       RLC as the clients in connection with the Mill Fire,

11       correct?

12          A.   Yes.                                     3:35:11PM

13          Q.   The letter is signed by Mr. Julian at    3:35:12PM

14       BakerHostetler and then agreed and accepted and

15       signed by Mr. Gray on behalf of the Roseburg

16       entities?

17          A.   That's correct.                          3:35:25PM

18          Q.   Other than this engagement letter, are   3:35:27PM

19       there any other written engagement letters between

20       BakerHostetler and Roseburg or RLC in connection

21       with the Mill Fire?

22          A.   No, nothing that I'm aware of.           3:35:41PM

23          Q.   So in other words, this agreement was not  3:35:43PM

24       modified in writing in any way; is that correct?

25          A.   I don't believe so.                      3:35:49PM
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 062

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    limited to.

2         So I would agree with your testimony that    3:37:13PM

3    there could be other -- the scope of the engagement

4    could include other things that aren't necessarily

5    reflected in the document itself, correct?

6         A.   So we've reached common ground after all    3:37:32PM

7    today.  So that's great.

8         Q.   So my follow-up question is:  You are not    3:37:35PM

9    aware of any other writing that is more specific in

10    adding or removing the scope of Baker's retention by

11    Roseburg and RLC; is that fair to say?

12         A.   That's correct.    3:37:58PM

13         Q.   Was there any level of negotiation between    3:37:59PM

14    Roseburg and RLC on the one hand and BakerHostetler

15    on the other hand with respect to the September 6,

16    2022 terms of the engagement?

17         A.   I don't believe so.    3:38:13PM

18         Q.   And Mr. Julian or members at    3:38:21PM

19    BakerHostetler were the ones who prepared the

20    engagement letter, correct?

21         A.   That's correct.    3:38:32PM

22         Q.   Focusing on the third paragraph of Page 1    3:38:38PM

23    of the September 6, 2022 letter, does it accurately

24    describe the scope of Baker's retention insofar as

25    Roseburg and RLC were concerned?

                                              Page 201

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          A.   I would say it's mostly true, with the        3:39:16PM

 2     caveat that I see here it says "insurance recovery."

 3          And to the extent that -- actually, no,            3:39:25PM

 4     I'm going to just go ahead and say that that's fair.

 5     Yeah.  I think that nails the scope pretty well.

 6          Q.   Is there anything in that paragraph that       3:39:39PM

 7     describes the scope of Baker's retention that

 8     sitting here today you know to be inaccurate, that

 9     it didn't -- that it did not include that scope of

10     retention?

11          A.   Do you mean at the time of the letter or      3:39:51PM

12     as we sit today?

13          Q.   As you sit today.                             3:39:56PM

14          A.   As we sit today, yes, Baker is not            3:39:57PM

15     representing us related to insurance recovery.

16          Q.   But at some point in time, they were          3:40:06PM

17     retained for that purpose, correct?

18          A.   Potentially, yes.                             3:40:09PM

19          Q.   And they were retained for that purpose       3:40:10PM

20     potentially in September of 2022, correct?

21          A.   Yeah.  I think one of the things that was     3:40:17PM

22     nice about Baker is they're bringing the full meal

23     deal.

24          Q.   Did Baker, in fact, perform legal work or     3:40:25PM

25     the scope of the retention that's reflected in the
```

                                                Page 202

Exhibit 59, Page 064

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    engagement letter?

2        A.   I will say yes, but that question feels to        3:40:42PM

3    me really vague.  So could you ask it a little

4    bit -- like they did work that falls into some of

5    the buckets of the engagement letter.

6        Q.   Did they do work that falls into all of        3:40:54PM

7    the buckets that are set forth in the engagement

8    letter?

9        A.   Yes.                                             3:41:15PM

10       Q.   And with respect to the scope of the            3:41:16PM

11   retention relating to insurance recovery, that

12   includes tendering to Roseburg and RLC's insurers

13   for the defense and potential indemnity against Mill

14   Fire claims and lawsuits; is that correct?

15       A.   I believe so.  Let me -- let me restate         3:41:42PM

16   that to make sure I'm saying it the right way.

17            Yes.  One of the things we wanted them to       3:41:49PM

18   do was -- as I said earlier, I'm no expert in

19   insurance law -- we wanted them to write the notice

20   of claim, or I don't remember the right terminology,

21   to our insurers about this event that has happened

22   to make sure that we didn't have any kind of foot

23   fault by -- you know, you don't want me to write

24   this letter, you need someone who really knows what

25   they're doing because so much rides on it.

<div align="right">Page 203</div>

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1          Q.   And you would agree that initially, when     3:42:20PM

2    BakerHostetler was retained in September of 2022,

3    the retention also included legal work associated

4    with any coverage disputes that might arise between

5    Roseburg and RLC on the one hand and its liability

6    insurers on the other hand; is that correct?

7          A.   I think so.  That wasn't in our minds at     3:42:44PM

8    all at that time.  Maybe we weren't sophisticated

9    enough about insurance law.

10          But I thought that's a no-brainer.  You          3:42:53PM

11    know, we've got general liability coverage.  There's

12    an enormous fire.  Let's just -- we'll go through

13    the process.  We've got 49 million in indemnity,

14    which we've got at least 3X that in damages I

15    thought on day two.  Obviously, there's more than

16    that.

17          So I didn't think that -- the idea of            3:43:16PM

18    there being a coverage dispute wasn't at all on my

19    mind.

20          Q.   Did it ever cross your mind or did          3:43:24PM

21    Roseburg ever conclude that there was a coverage

22    dispute as it relates to the Mill Fire and Roseburg

23    and RLC's liability insurers?

24          A.   Yes.                                        3:43:39PM

25          Q.   What developed in that regard as far as     3:43:40PM
```

                                                  Page 204

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

 1    Roseburg was concerned?

 2         A.   Well, when -- I think -- I don't remember     3:43:47PM

 3    exactly when, but I know the result of it is when we

 4    told Baker to stop working on the coverage dispute

 5    and we hired Mr. DeVries's firm.

 6              Or we told Baker to -- I said that wrong.     3:44:02PM

 7    We told Baker to stop working on insurance issues

 8    and we hired Mr. DeVries's firm to represent us.

 9         Q.   What prompted that change in lawyers?     3:44:13PM

10         A.   Because I believe, I believe Baker heard     3:44:17PM

11    from Liberty that Liberty said we've got -- "You've

12    got a conflict, and we won't waive it, and you can't

13    work for Roseburg."  That's the Cliff notes version

14    that I understand.

15         Q.   And before Liberty raised that objection,     3:44:38PM

16    it was Roseburg's expectation that BakerHostetler

17    would assist the company in coverage disputes,

18    correct?

19         A.   No.  We didn't expect there could be a     3:44:50PM

20    coverage dispute at all.  That was the furthest

21    thing from our mind.

22         Q.   So then why retain new counsel on coverage     3:45:01PM

23    matters, as you've just described?

24         A.   Well, I guess let's get our -- let's be     3:45:09PM

25    sure we're clear about timing:  At the time of this

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 067

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              MR. CROWE:  Yes.                    3:53:00PM

 2       A.   Yes, that's my understanding.         3:53:07PM

 3     BY MR. CROWE:                                3:53:17PM

 4       Q.   Okay.  Back to the retention or engagement  3:53:17PM

 5     letter, Exhibit 31, please, Page 2.

 6       A.   I still have it up.  I'm going to Page 2.  3:53:24PM

 7              I'm on it.                           3:53:27PM

 8       Q.   The top of Page 2 essentially communicates  3:53:28PM

 9     that BakerHostetler is running a conflicts check,

10     and then has a bullet point list of entities or

11     agencies in which it is running a conflicts check

12     for purposes of its retention with regard to the

13     Mill Fire, correct?

14       A.   Yes, that's correct.                  3:53:53PM

15       Q.   And you would agree with me the list that  3:53:54PM

16     Baker identifies in its conflict list does not

17     include any of Roseburg's or RLC's liability

18     insurers?

19       A.   That's correct.                       3:54:07PM

20       Q.   Was there ever a point in time, following  3:54:08PM

21     the September 6, 2022 letter, where Roseburg or RLC

22     asked Baker to run a conflicts check against any of

23     the liability insurers including Liberty Insurance

24     Corporation?

25       A.   I don't believe so.                   3:54:27PM
```

Page 211

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          Q.   Did you ever believe it was necessary to      3:54:29PM

 2     do so?

 3          A.   No.  I think going back to our discussion      3:54:34PM

 4     earlier today, my expectation is that lawyers will

 5     run the appropriate conflicts check all the time,

 6     and if they see new information, they run the check.

 7     That's at least how I always practiced.

 8          Q.   In other words, you would have expected        3:54:59PM

 9     that BakerHostetler would have taken action to run

10     any additional conflict checks against any other

11     entities including liability insurers if they felt

12     it was necessary?

13          A.   Absolutely.                                    3:55:10PM

14          Q.   With respect to the scope of retention,        3:55:11PM

15     when it describes the scope as including an

16     insurance recovery, what does that mean, as you

17     understand it?

18          A.   Well, as I understand it, it's recovering      3:55:25PM

19     the amounts owed to us under our insurance

20     contracts.

21          Q.   Including the Liberty Insurance                3:55:35PM

22     Corporation general liability policy?

23          A.   Yes.                                           3:55:39PM

24          Q.   Page 2 of the engagement letter lists, I       3:55:43PM

25     believe it's 11 timekeepers and their position,
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 069

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    where in order to get paid on -- to get the invoices

 2    paid, you had to have the lawyers entered in there

 3    along with their billing rates.

 4            And then also more than one time -- at       3:59:42PM

 5    least more than one time, there was communication

 6    between me and BakerHostetler about additional

 7    lawyers and their respective rates.

 8            Or at least and on top of that, there's      3:59:57PM

 9    also, like, re-upping the rate chart at the end of

10    the year, things like that.

11            But did Baker rigorously stick to their      4:00:10PM

12    obligation in this agreement here to consistently

13    notify us of every additional lawyer and their

14    hourly rates, no.

15        Q.   And that's not something that Roseburg or   4:00:22PM

16    RLC required Baker to do, notwithstanding the

17    engagement letter, correct?

18        A.   But that's so far down in the weeds from    4:00:35PM

19    what we were dealing with in the fall of 2022, that

20    no.

21        Q.   With respect to the rates that are          4:00:45PM

22    identified in the table on Page 2, was there any

23    negotiation of those rates in any way?

24        A.   No.                                         4:00:52PM

25        Q.   Were the rates -- strike that.              4:00:56PM
```

Page 216

Exhibit 59, Page 070

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | When Baker identified these rates in the | 4:00:57PM |
| 2 | engagement letter of September 6, 2022, did Roseburg | |
| 3 | or RLC understand those rates to be BakerHostetler's | |
| 4 | standard billing rates or were they in any way a | |
| 5 | discounted rate? | |
| 6 | A.   I don't know. | 4:01:19PM |
| 7 | Q.   Okay.  You agree with me that insofar as | 4:01:33PM |
| 8 | the engagement letter is concerned, it identifies | |
| 9 | 11 partners, counsel, and senior partner, correct? | |
| 10 | A.   I agree that the engagement letter | 4:01:44PM |
| 11 | identifies 11 counsel and senior partners.  Two, | |
| 12 | four, six, eight -- wait a minute.  Two, four, six, | |
| 13 | eight, ten.  Oh, but also Bob Julian.  Sorry.  11. | |
| 14 | Thanks again.  Law school.  Numbers are | 4:02:00PM |
| 15 | not my main thing. | |
| 16 | Q.   I didn't mean to mislead you.  You're | 4:02:06PM |
| 17 | right.  Bob Julian is the 11th lawyer who is not | |
| 18 | listed in the table. | |
| 19 | A.   Right. | 4:02:11PM |
| 20 | Q.   Was his -- just to make sure we have a | 4:02:15PM |
| 21 | clear record, because I asked you about the rates in | |
| 22 | the table, was Mr. Julian's rate ever negotiated? | |
| 23 | A.   No. | 4:02:26PM |
| 24 | Q.   Do you know whether that rate was | 4:02:27PM |
| 25 | BakerHostetler's standard rate for Mr. Julian or a | |

Page 217

Exhibit 59, Page 071

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    discounted rate?

2        A.   I don't know.                         4:02:33PM

3        Q.   Did the rates for BakerHostetler increase   4:02:33PM

4    or decrease following the September 6, 2022 letter

5    at least as it relates to their engagement on the

6    Mill Fire?

7        A.   I believe at least some of the lawyers   4:02:48PM

8    that are named here in the chart, and also maybe

9    Mr. Julian, I'm not sure, rates have increased since

10   this time.

11       Q.   In looking at invoices sent by         4:03:07PM

12   BakerHostetler to Roseburg and RLC for legal

13   services associated with the Mill Fire, those

14   invoices identify approximately 60, six-zero,

15   timekeepers from BakerHostetler who billed on the

16   matter.  Does that sound to be an accurate

17   approximation?

18       A.   Sounds reasonable.                     4:03:34PM

19       Q.   Do you find that, as you sit here now, do   4:03:36PM

20   you find it to be surprising that there were 60

21   timekeepers from BakerHostetler billing Roseburg and

22   RLC for work associated with the Mill Fire?

23       A.   No.                                    4:03:45PM

24       Q.   Was there ever a point in time where   4:03:47PM

25   BakerHostetler asked for your express approval to

                                          Page 218

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1     have that many timekeepers bill toward the matter?

2          A.   No.                                      4:03:59PM

3          Q.   Is it fair to say that Roseburg and RLC   4:04:04PM

4     essentially deferred to BakerHostetler and

5     Mr. Julian as to the number of timekeepers that were

6     reasonable and necessary to work and represent

7     Roseburg and RLC in relation to the Mill Fire?

8          A.   Yes.  I did not micromanage how they were  4:04:29PM

9     out to accomplish the mission.

10         Q.   So in other words, and I just want to make  4:04:37PM

11    sure I understand this, as I understand your

12    testimony, Mr. Lawless, there was no procedure in

13    place where BakerHostetler would have to seek your

14    approval to add a timekeeper to the Mill Fire

15    matter.  Is that fair to say?

16         A.   No official procedure, no.               4:04:58PM

17         Q.   And as Mr. Julian and BakerHostetler are  4:05:02PM

18    adding lawyers to the matter, was there a formal

19    policy or procedure that was followed to get your

20    approval not only as to the timekeeper, but the rate

21    that that timekeeper would be charging Roseburg and

22    RLC?

23         A.   No.                                      4:05:21PM

24         Q.   So is it accurate to say that you        4:05:25PM

25    deferred -- essentially you and Roseburg and RLC
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1     deferred to BakerHostetler in terms of setting the
2     hourly rate for timekeepers that were added to the
3     matter?
4          A.   We, as my expectation, was that they were     4:05:39PM
5     giving us standard rates.  So -- but I did not go
6     back and -- I did not ask and double-check.  Again,
7     that was pretty far down in the weeds for me on this
8     in coordinating the response to this catastrophe.
9          Q.   When you say "standard rates," are you        4:06:04PM
10    referring to Baker's standard rates or some other
11    measure of --
12         A.   Baker's.  Good question.  Baker's.            4:06:10PM
13         Q.   Who was responsible for selecting the         4:06:18PM
14    lawyers from BakerHostetler to work on the matter?
15         A.   I don't know.                                 4:06:30PM
16         Q.   Was it anybody at Roseburg or RLC's           4:06:30PM
17    responsibility to identify the lawyers and staff
18    that would be working on the Mill Fire matter?
19         A.   Certainly not.                                4:06:38PM
20         Q.   So is it fair to say that again it was        4:06:39PM
21    left up to Mr. Julian and others at BakerHostetler
22    to select those lawyers and staff to work on the
23    matter?
24         A.   That's right.  As an executive, my job is     4:06:51PM
25    to outline the mission that needs to be
```

Page 220

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    accomplished, and then they need to work to

2    accomplish the mission.

3        Q.   Do you know if there was any sort of        4:07:01PM

4    criteria that Mr. Julian or others at BakerHostetler

5    followed for purposes of selecting lawyers and staff

6    to work on the Mill Fire matter?

7        A.   No.  I don't know.  My expectation would      4:07:13PM

8    be the best possible people to achieve the mission.

9    That's my expectation.

10        Q.   And what do you mean by "the best possible     4:07:24PM

11    people to achieve the mission"?  Like what is the

12    criteria that you consider would be appropriate for

13    that mission?

14        A.   Talent, drive, initiative, subject matter     4:07:41PM

15    expertise.  Not necessarily in that order.

16    Responsiveness.  Availability.  Those are the

17    primary ones.

18        Q.   And what subject expertise did you believe     4:07:56PM

19    was appropriate or necessary to have for purposes of

20    those selected to work on the Mill Fire matter?

21        A.   On the facet.  So, for example, looking --     4:08:09PM

22        Q.   I missed that whole first part of your       4:08:27PM

23    answer.  So apologies for interrupting.  So let me

24    ask the question again.

25            With respect to subject matter expertise,     4:08:28PM

                                                    Page 221

Exhibit 59, Page 075

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    what area of expertise did Roseburg or RLC believe

2    was necessary or appropriate for purposes of

3    selecting Baker lawyers and staff to work on the

4    Mill Fire matter?

5        A.    And my answer is the same as before, at        4:08:45PM

6    least what I started.  It depends on the context for

7    what they're being asked to do.

8            For example, there's -- as we investigate        4:08:53PM

9    the products liability -- or the third-party

10   indemnity claims, we need subject matter experts in

11   products liability.

12           We also need, as we're defending on             4:09:03PM

13   criminal claims, we need subject matter experts in

14   defending those kind of claims, taking those kind of

15   interviews.

16           As we're defending on a potential, you          4:09:16PM

17   know, mass -- almost mass tort scale at the company

18   level of litigation, we need experienced civil

19   litigators.

20           As we're thinking about handling the            4:09:29PM

21   environmental remediation, we need experts in that

22   area.

23           Most importantly, we need an expert in          4:09:35PM

24   handling -- an expert that knows the fire litigation

25   process inside and out in California who can be what

Page 222

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      I will call the ringleader to help me drive this

2      supertanker of an operation.

3             We need -- not only do we need the subject      4:10:07PM

4      matter expertise, we also need the capacity of all

5      of these people in order to be able to get on the

6      ground, to have enough people to fill the claim

7      center.  We need people with expertise in community

8      relations.  And by that I mean people who can

9      interface with potential plaintiffs at the community

10     center.

11            I mean that's just me extemporaneously          4:10:40PM

12     thinking about the things that we needed for this.

13     I could probably go on for a long time about all the

14     different skill sets that we needed and deployed in

15     this operation.

16        Q.   Mr. Lawless, do you agree that Roseburg        4:11:03PM

17     and RLC retained BakerHostetler before Roseburg and

18     RLC ever contacted Liberty Insurance Corporation

19     about the Mill Fire?

20        A.   I think that that's true.                      4:11:19PM

21        Q.   And our records indicate that Liberty          4:11:25PM

22     received first notice of loss in the tender on

23     September 6, 2022.  Does that sound to be accurate

24     to you?

25        A.   That doesn't surprise me.                      4:11:36PM
```

Page 223

Exhibit 59, Page 077

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   And we've already established that | 4:11:38PM |
| 2 | BakerHostetler was retained either on the day of the | |
| 3 | fire or the following day, correct? | |
| 4 | A.   Correct. | 4:11:47PM |
| 5 | Q.   So when Roseburg and RLC retained | 4:11:49PM |
| 6 | BakerHostetler either on September 2 or 3, 2022, did | |
| 7 | it -- | |
| 8 | MR. DEVRIES:  I'm sorry.  Did you say 2 or | 4:12:03PM |
| 9 | 3 or 3 or 4? | |
| 10 | MR. CROWE:  I said 2 or 3.  Let me start | 4:12:06PM |
| 11 | over so we have complete question. | |
| 12 | BY MR. CROWE: | 4:12:11PM |
| 13 | Q.   When Roseburg and RLC first retained | 4:12:11PM |
| 14 | BakerHostetler on either September 2 or 3, 2022, did | |
| 15 | Roseburg and RLC assume that Liberty Insurance | |
| 16 | Corporation would approve of Baker's retention? | |
| 17 | A.   I don't know.  To be honest, that wasn't | 4:12:41PM |
| 18 | our primary concern. | |
| 19 | Q.   So at least at the time of Baker's | 4:12:51PM |
| 20 | retention, there was -- Roseburg and RLC did not | |
| 21 | know one way or the other and had no expectation one | |
| 22 | way or the other whether Liberty would approve of | |
| 23 | Baker's retention; is that correct? | |
| 24 | A.   I wouldn't know one way or the other. | 4:13:07PM |
| 25 | Q.   At or near the time of Baker's retention, | 4:13:20PM |

Page 224

Exhibit 59, Page 078

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     did Mr. Julian or anybody at BakerHostetler make any

 2     assurances or representations that Liberty Insurance

 3     Corporation would approve of their selection and

 4     retention for purposes of representing Roseburg and

 5     RLC in response to the Mill Fire?

 6          A.   I don't believe so.                    4:13:44PM

 7          Q.   Was that "I don't believe so"?         4:13:48PM

 8          A.   Correct.  I don't believe so.          4:13:49PM

 9          Q.   It's also true, then, that at the time of   4:14:02PM

10     Roseburg and RLC's retention of BakerHostetler,

11     there was no communication in any way from Liberty

12     Insurance Corporation that they would approve or

13     approved of Baker's retention, correct?

14          A.   At the time of retention, no.          4:14:19PM

15          Q.   And so it's fair to say that Roseburg and   4:14:28PM

16     RLC voluntarily selected and retained BakerHostetler

17     without any commitment or approval by Liberty

18     Insurance Corporation, correct?

19          A.   We took -- facing the significant tragedy   4:14:42PM

20     from the fire, we took immediate action to best

21     protect the company, all things considered.  We

22     hired the best lawyers that we thought could do that

23     for us.

24               We didn't expect there to be an issue with  4:15:00PM

25     Liberty at the time, but that was not something that
```

Page 225

Exhibit 59, Page 079

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    was factored into our decision-making process.

2        Q.   So I am correct in saying that Roseburg        4:15:12PM

3    and RLC voluntarily retained and selected

4    BakerHostetler as its counsel without any commitment

5    or approval by Liberty Insurance Corporation,

6    correct?

7            MR. DEVRIES:  Asked and answered.        4:15:28PM

8        A.   Yes.  At the time we hired BakerHostetler        4:15:32PM

9    to represent us on the Mill Fire, we had no

10   communication from Liberty one way or the other

11   about Baker as our counsel.

12    BY MR. CROWE:        4:15:46PM

13        Q.   Now, at some point after Roseburg and RLC        4:15:46PM

14   tendered the Mill Fire claim to Liberty Insurance

15   Corporation, there was a request that Liberty

16   approve of BakerHostetler's retention, correct?

17        A.   That's how I understand it.        4:16:17PM

18        Q.   I'm sorry, could you please repeat your        4:16:20PM

19   answer?

20        A.   Yes, that's how I understand it.        4:16:23PM

21        Q.   And when Roseburg and RLC requested that        4:16:29PM

22   Liberty Insurance Corporation approve

23   BakerHostetler's selection and retention as defense

24   counsel, was it Roseburg and RLC's expectation and

25   understanding that BakerHostetler would then be

                                          Page 226

Exhibit 59, Page 080

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    representing the interests of both Roseburg and RLC

2    as well as Liberty Insurance Corporation?

3        A.   If you're referring to the usual          4:17:02PM

4    tripartite relationship in an insurance defense

5    case, then yes.

6        Q.   So that was one of my questions.  You      4:17:11PM

7    understand what the "tripartite relationship" means?

8        A.   I have a nonexpert, but also above a       4:17:16PM

9    layperson's understanding of the tripartite

10   relationship.

11       Q.   And that understanding includes or         4:17:24PM

12   consists of the appreciation that in a

13   tripartite-type relationship, the lawyer who is

14   retained to represent the insured represents both

15   the insured's interest and the liability insurer's

16   interest, correct?

17           MR. DEVRIES:  Objection.  Mischaracterizes   4:17:40PM

18       California law.

19       A.   Well, that's awkward.  I guess I would      4:17:44PM

20   have to say I don't know then.

21     BY MR. CROWE:                                      4:17:50PM

22       Q.   Well, I think you said yes, but I'm just    4:17:50PM

23   asking for your understanding.

24           Let me put it differently.  You understand   4:17:55PM

25   that in the tripartite relationship, the lawyers

Page 227

Exhibit 59, Page 081

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    have two clients, the liability insurer and the

 2    insured?

 3         A.   My understanding, again, maybe not        4:18:07PM

 4    sophisticated enough, is that it is certainly more

 5    complicated than when it's just your own counsel.

 6    Right?  So counsel's obligation in the tripartite

 7    relationship is more complicated than it is when

 8    they're just in the traditional attorney-client

 9    relationship.

10         Q.   Okay.  Let me just make sure the record is   4:18:30PM

11    clear.  You had mentioned that when Roseburg --

12    strike that.

13              Mr. Lawless, is it your testimony on       4:18:36PM

14    behalf of Roseburg and RLC that when they made the

15    request that Liberty Insurance Corporation approve

16    of BakerHostetler's selection and retention as

17    defense counsel, that it would be in the context of

18    a tripartite relationship between BakerHostetler,

19    Roseburg and RLC, and Liberty Insurance Corporation?

20         A.   Yes, but it would be just the same as any   4:18:59PM

21    other time where they have appointed counsel on the

22    smaller matters that we dealt with them.

23         Q.   Right.  And it was not an expectation,     4:19:09PM

24    again, when making the request that Liberty

25    Insurance Corporation approve of BakerHostetler's
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 082

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    selection retention, it was not the company's

2    expectation, Roseburg and RLC's expectation, that

3    BakerHostetler would be serving as Roseburg's

4    independent defense counsel, correct?

5         A.  I don't know if I fully understand what    4:19:35PM

6    you mean --

7         Q.  Sure.                                       4:19:37PM

8         A.  -- there.                                   4:19:38PM

9         Q.  Let me back up.  It was a poor question.    4:19:39PM

10        A.  Okay.                                        4:19:42PM

11        Q.  Are you familiar with circumstances where   4:19:47PM

12   because of a potential conflict in dispute as to

13   coverage, that in certain circumstances the insured

14   is entitled to select their own independent defense

15   counsel and not allow the insurer to appoint defense

16   counsel?

17        A.  I have become aware of that, yes.           4:20:06PM

18        Q.  All right.  And that's -- when I say        4:20:09PM

19   "independent defense counsel," I'm speaking of that

20   context where there's a coverage dispute that

21   allows --

22        A.  I see.                                       4:20:18PM

23        Q.  -- allows the insured to select their own   4:20:18PM

24   independent defense counsel rather than accepting

25   insurer-appointed defense counsel.
```

                                            Page 229

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              Do you understand the distinction?        4:20:26PM

 2       A.   I do.  Thanks for that clarification.       4:20:28PM

 3   It's very helpful.

 4       Q.   Sure.  So I just want to make sure the      4:20:32PM

 5   record is clear.  At the time Roseburg and RLC

 6   requested Liberty Insurance Corporation's approval

 7   for the selection and retention of BakerHostetler as

 8   defense counsel, it was not in the context of

 9   seeking their appointment as independent defense

10   counsel, correct?

11       A.   That's correct.                             4:20:54PM

12       Q.   Are you familiar -- have you ever read      4:21:25PM

13   what we call the Cumis statute in California, Civil

14   Code Section 2860?

15       A.   I've heard the name, but I have not read    4:21:32PM

16   the statute.

17       Q.   And I'm not asking if you -- I'm not        4:21:36PM

18   asking for the results of any analysis, but did you

19   as assistant general counsel or as general counsel

20   for Roseburg and RLC ever conduct an independent

21   analysis as to whether Roseburg and RLC were

22   entitled to independent defense counsel under the

23   Cumis statute with regard to the Mill Fire?

24       A.   Myself, no.                                 4:22:02PM

25       Q.   Anybody -- strike that.                     4:22:04PM
```

                                                 Page 230

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     advising that Liberty's understanding that

 2     BakerHostetler had been or was retained to provide

 3     coverage advice was inaccurate or incorrect?

 4          A.   No, I am not aware of any communication of    4:30:16PM

 5     that nature.

 6               MR. CROWE:  I will mark for identification    4:31:10PM

 7          Exhibit 32, which is a September 6, 2022 email

 8          from Steven Hurley of Alliant to Phil Meagher

 9          at Liberty Mutual.

10          Let me know when that document is                 4:31:30PM

11          available to you, sir.

12               (Thereupon, marked as Exhibit 32.)           4:31:33PM

13          A.   I've got it up on the screen and I am        4:31:35PM

14     reviewing it right now.

15      BY MR. CROWE:                                         4:31:39PM

16          Q.   Okay.  Great.                                4:31:39PM

17          A.   Okay.                                        4:31:53PM

18          Q.   Mr. Hurley is with Alliant Specialty, as     4:31:53PM

19     you understand it from this email, correct?

20          A.   Yes.                                         4:32:00PM

21          Q.   Alliant is Roseburg's -- or strike that.     4:32:00PM

22               Alliant at the time of this email,           4:32:04PM

23     September of 2022, was Roseburg and RLC's insurance

24     broker; is that correct?

25          A.   Yes.                                         4:32:11PM
```

Page 236

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          Q.   Is Alliant still the insurance broker for    4:32:15PM

 2     Roseburg and RLC?

 3          A.   95 percent sure, yes.                         4:32:23PM

 4          Q.   At any point in time, did Roseburg or RLC     4:32:25PM

 5     have direct communications with personnel at Liberty

 6     Insurance Corporation regarding the Mill Fire?

 7          A.   Yes.                                          4:32:41PM

 8          Q.   And can you explain who was involved in       4:32:43PM

 9     those communications and the number of

10     communications, to the extent you can?

11          A.   The ones that I know or I am aware of were    4:32:52PM

12     exchanged between Lisa Fairchild and Sarah Kaufman,

13     Kaufman, at Liberty.  Those -- I know that there

14     were at least some of those.  I don't recall the

15     nature of those communications.

16               Lisa and Sarah had a very long working       4:33:09PM

17     relationship together and were -- I don't know if

18     they still are -- but at least were quite

19     professionally close.

20          Q.   Did you as the assistant general counsel     4:33:23PM

21     at the time have any in-person meetings or telephone

22     calls or virtual meetings with any personnel at

23     Liberty Insurance Corporation regarding the Mill

24     Fire?

25          A.   I was on one, maybe two Zoom calls,          4:33:47PM
```

Page 237

Exhibit 59, Page 086

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    similar to -- I referenced it earlier, where

 2    Bob Julian was also there when we -- this is very

 3    early where we were explaining the plan of what we

 4    wanted to do to try to address this.

 5            I can't recall the date.  It would have      4:33:58PM

 6    been in the first week after the fire.  And there

 7    was one, maybe two.

 8        Q.   Okay.  Back to Exhibit 32, the              4:34:15PM

 9    September 6, 2022 email.  Having read it, is it

10    consistent with your recollection that Roseburg

11    first tendered its claim to Liberty Insurance

12    Company through Alliant, the broker, on September 6,

13    2022?

14        A.   Short answer, I don't know.  I'm looking    4:34:54PM

15    where Dustin Dow says, "I just did the notice of

16    incident online, and it's under claim," et cetera,

17    et cetera.  Are you referring to that?

18        Q.   I think that's Mr. Hurley who is saying     4:35:10PM

19    that, and Dustin Dow -- he is including Dustin Dow's

20    information when he identifies --

21        A.   Oh.                                         4:35:19PM

22            MR. DEVRIES:  Thanks for clarifying that.    4:35:22PM

23        A.   Yeah, thanks for clarifying that.  That     4:35:23PM

24    was not -- I see now, this is a copy and paste of

25    his -- thanks for that clarity, because I did not
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 087

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    read it that way at first and I was confused.

 2            So you're right, this is from Hurley to      4:35:36PM

 3    Meagher.  Hi Phil.  They did this, dot dot dot.

 4      BY MR. DEVRIES:                                    4:35:47PM

 5      Q.   Let me just ask a clear question.             4:35:47PM

 6      A.   Okay.  Thanks.                                4:35:50PM

 7      Q.   From reading this email, does it appear to    4:35:51PM

 8    you to be Mr. Hurley's notice to Liberty Insurance

 9    Corporation, one, of the claim relating to the Mill

10    Fire; and two, to identify BakerHostetler as the law

11    firm already retained by Roseburg and RLC?

12            MR. DEVRIES:  If you could just restate.     4:36:12PM

13            He seems to be saying that this isn't the

14            notice, but the notice was filed online.  So

15            they're two different things.

16            THE WITNESS:  To be fair, Scott, that's      4:36:25PM

17            what I herd Jeff asking.  Sorry to throw you

18            under the bus.

19            MR. DEVRIES:  Oh, okay.                       4:36:30PM

20      A.   Yeah.                                          4:36:33PM

21            So the second part of his question is a       4:36:33PM

22    clear agree on the (as read):  "As I mentioned, RLC

23    has retained the firm.  Please let me know if

24    Liberty can approve them," I agree that you

25    characterized that accurately.
```

                                                    Page 239

Exhibit 59, Page 088

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1              I'm not familiar enough with what the        4:36:51PM

2      notice of incident and insurance claim process is in

3      order to give you an answer to the first part of

4      your question.  It's beyond my ...

5        BY MR. CROWE:                                      4:37:08PM

6        Q.   Mr. Hurley is writing that -- strike that.   4:37:12PM

7              In the email when Mr. Hurley is asking       4:37:15PM

8      Liberty to let him know if Liberty approved of

9      BakerHostetler's retention, you understand that to

10     mean that Roseburg and RLC was asking for Liberty's

11     response to -- strike that.

12             Poor question.  I'm going to start over.     4:37:37PM

13     It's getting late.

14             When Mr. Hurley is asking Liberty to let     4:37:41PM

15     him know if Liberty approved of BakerHostetler's

16     retention, that's consistent with Roseburg and RLC's

17     understanding that Liberty -- that Liberty was

18     required to approve of BakerHostetler's retention

19     for purposes of the Mill Fire claim; is that

20     correct?

21             MR. DEVRIES:  Objection.  Lacks              4:38:08PM

22        foundation.  Calls for a legal conclusion.

23        A.   I disagree.  I think if we were going to     4:38:13PM

24     use -- if we were going to use Baker in the

25     traditional tripartite insurance defense
```

Page 240

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    relationship, which is what we wanted, then yes, I

2    agree that Liberty would have to approve that for

3    that to take place.

4      BY MR. CROWE:                                    4:38:35PM

5         Q.  I appreciate that.  You said it better    4:38:35PM

6    than I did.

7             And you would agree with me that          4:38:39PM

8    Mr. Hurley's email is intended for that purpose, to

9    ask Liberty to approve of BakerHostetler as

10   essentially insurer-appointed counsel in the

11   tripartite relationship?

12        A.  Yes.                                       4:38:54PM

13        Q.  Okay.  Thank you.                          4:38:56PM

14            MR. DEVRIES:  Are there any other          4:39:11PM

15        questions on this document?

16            MR. CROWE:  No.  We're done with           4:39:13PM

17        Exhibit 32.

18            MR. DEVRIES:  I would like to revert to my 4:39:15PM

19        timing request from earlier.  If you think you

20        can get done by 5:00, cool.  Because Matt has a

21        hard stop at 5:00.  If you can't get it done at

22        5:00, then I would request that we break at

23        4:45.

24            We can look at the transcript and figure   4:39:32PM

25        out how much time is available, so that way we
```

Page 241

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              CERTIFICATE OF OATH

 2

 3         I, the undersigned authority, certify

 4    that ROSEBURG FOREST PRODCTS, CO. BY AND THROUGH

 5    ITS 30(B)(6) WITNESS, MATTHEW LAWLESS, REMOTELY

 6    appeared before me and was sworn on the 26th day

 7    of April, 2024.

 8              Signed this 5th day of May, 2024.

 9

10

11

12              KIMBERLY FONTALVO, RPR

13              Notary Public, State of Colorado

14              My Commission No. 20214007135

15              Expires: 2/23/2025

16

17

18

19

20

21

22

23

24

25

                                        Page 246
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    CERTIFICATE OF REPORTER

2

3      STATE OF COLORADO

4

5                    I, KIMBERLY FONTALVO, Registered

6          Professional Reporter, do hereby certify that I

7          was authorized to and did stenographically report

8          the foregoing remote videotaped deposition of

9          ROSEBURG FOREST PRODCTS, CO. BY AND THROUGH ITS

10         30(B)(6) WITNESS, MATTHEW LAWLESS; that a review

11         of the transcript was requested; and that the

12         transcript is a true record of my stenographic

13         notes.

14                    I FURTHER CERTIFY that I am not a

15         relative, employee, attorney, or counsel of any

16         of the parties, nor am I a relative or employee

17         of any of the parties' attorneys or counsel

18         connected with the action, nor am I financially

19         interested in the action.

20                    Dated this 5th day of May, 2024.

21

22                         _KH_

23

24               KIMBERLY FONTALVO, RPR, CLR

25

                                         Page  247

Exhibit 59, Page 092

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2                  SACRAMENTO DIVISION
3              Case No. 2:23-cv-00649-TLN-DB
4
5     RLC INDUSTIES CO. and ROSEBURG
      FOREST PRODCTS CO,
6
                       Plaintiffs,
7     vs.
8     LIBERTY INSURANCE CORPORATION;
      EVEREST NATIONAL INSURANCE
9     COMPANY, and THE OHIO CASUALTY
      INSURANCE COMPANY,
10
                       Defendants.
11    _____/
12
13                    VOLUME 2
14        REMOTE VIDEOTAPED CONTINUED DEPOSITION OF
15      ROSEBURG FOREST PRODCTS, CO. BY AND THROUGH ITS
                30(B)(6) WITNESS, MATTHEW LAWLESS
16
                   Monday, April 29, 2024
17              1:30 p.m. - 3:47 p.m. (PST)
18
             CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
19
20    Stenographically Reported By:
21
22    Kimberly Fontalvo, Realtime Reporter
23    Realtime Systems Administrator
24    National Court Reporters Association
25    Colorado Court Reporters Association

                                    Page 250

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      APPEARANCES:
2
       On behalf of Plaintiffs:
3
            HUNTON ANDREWS KURTH
4           50 California Street, Suite 1700
            San Francisco, CA  94111
5           BY:  SCOTT P. DEVRIES, ESQ., ESQ.
            sdevries@hunton.com
6
7           HUNTON ANDREWS KURTH
            600 Peachtree Street, NE, Suite 4100
8           Atlanta, GA  30308
            BY:  RACHEL E. HUDGINS, ESQ.
9
10
11     On behalf of Defendants:
12
            SHEPPARD MULLIN RICHTER & HAMPTON LLP
13          650 Town Center Drive, 10th Floor
            Costa Mesa, CA  92626
14          BY:  JEFFREY S. CROWE, ESQ.
            jcrowe@sheppardmullin.com
15
16
17
18     ALSO PRESENT:  Connie Lamas, Videographer
19     0
20
21
22
23
24
25
```

Page 251

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                    I N D E X
 2
        Examination                              Page
 3
 4    MATTHEW LAWLESS
 5    Direct (continued)  By Mr. Crowe           255
 6    Certificate of Oath                        332
      Certificate of Reporter                    333
 7    Read and Sign Letter to Witness            334
      Errata Sheet (forwarded upon execution)    335
 8
 9                     EXHIBITS
10    No.                                        Page
11    Exhibit 32    September 6, 2022 email      288
                    from Steven Hurley -
12                  Previously Marked)
13    Exhibit 33    September 7, 2022 email      290
                    from Jamie Sroczynski
14
      Exhibit 34    September 9, 2022 email      294
15                  from Mr. Hurley
16    Exhibit 35    September 9, 2022 email      302
                    from Dustin Dow
17
      Exhibit 36    Engagement Agreement         306
18
      Exhibit 37    September 22, 2022 letter    308
19                  from Liberty Insurance
                    Corporation to Joseph
20                  Chairez
21
22
23
24
25
```

                                        Page  252

Exhibit 59, Page 095

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Redacted Per Sealing Order

13          Do you remember testifying to that effect?    2:10:56PM

14     A.    Yes, I do.                                   2:11:00PM

15     Q.    And by that, did you mean that prior to      2:11:01PM

16   the Mill Fire, Roseburg and RLC had limited

17   experience in, let's say, managing and supervising

18   day-to-day litigation against it?

19     A.    I think that's true.                         2:11:18PM

20     Q.    Like, in other words, can you think of any   2:11:19PM

21   matters, prior to the Mill Fire, that required

22   Roseburg and its legal department that you were

23   heading to manage and supervise, you know, the

24   day-to-day defense of claims or suits filed against

25   it?

Page 273

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1        A.   No, certainly nothing of that scale.        2:11:39PM

2        Q.   Yeah, that was my next point.  Certainly    2:11:42PM

3    nothing like defending against or responding to, you

4    know, claims on the scale of the Mill Fire; is that

5    fair?

6        A.   That's fair, certainly.                     2:11:53PM

7        Q.   And anything since the Mill Fire, anything  2:11:55PM

8    that would compare in scale to what Roseburg was

9    facing in responding to the Mill Fire incident?

10       A.   No.  Fortunately not.                        2:12:04PM

11       Q.   Right.  Absolutely.                          2:12:06PM

12            On Friday, I also understood your            2:12:10PM

13   testimony and Roseburg's testimony to suggest that

14   Liberty Insurance Corporation delayed in responding

15   to Roseburg's request that Liberty waive the no

16   voluntary payments provision.

17            Do you recall testimony to that effect?      2:12:32PM

18       A.   Yes, I do.                                   2:12:33PM

19       Q.   When did Roseburg or RLC first ask Liberty   2:12:37PM

20   Insurance Corporation to waive the no voluntary

21   payments provision of its general liability policy?

22       A.   It was during the first Zoom call that we    2:12:52PM

23   had after the fire, I was there, Bob Julian from

24   BakerHostetler was there, and we had representatives

25   from each insurance company in our tower.  And this
```

Page 274

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1       was -- I believe it was the first week after the

2       fire where we outlined the plan of attack; what we

3       wanted to do.

4            Q.  Are you referring to the September 9, 2022    2:13:20PM

5       phone call?

6            A.  That sounds like the right one, yes.         2:13:24PM

7            Q.  Who do you recall making that request as     2:13:28PM

8       part of that Zoom conference call?

9            A.  Bob Julian.                                  2:13:33PM

10           Q.  Was Mr. Julian very specific in asking the   2:13:34PM

11      carriers to waive what's referred to as the no

12      voluntary payments provisions of their policy?

13           A.  (Inaudible.)                                 2:13:44PM

14           Q.  You cut out, sir.                            2:13:44PM

15           A.  I don't remember the specific language       2:13:47PM

16      that he used, no.
```

# Redacted Per Sealing Order

```
17

18

19

20

21

22

23

24

25
```

Page 275

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Redacted Per Sealing Order

```
10              And I think it was presented as an          2:15:18PM

11     in-the-alternative, which is in the alternative if

12     you can't get behind us on this, at least waive the

13     voluntary payments provision, because the scale of

14     these damages is so far above the policy limits

15     anyway, you know, we can get in here and do this and

16     then we can settle up how we're going to handle it

17     going forward later.  Something to that general

18     effect.

19         Q.  Was Mr. Julian not only requesting           2:15:56PM

20     the waiver of the -- strike that.

21              Was Mr. Julian also demanding that the      2:15:59PM

22     insurers waive the no voluntary payments provisions

23     as an alternative to the first plan that you were

24     describing?

25         A.  Can you tell me the difference between a     2:16:14PM
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 099

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    request and a demand?

2         Q.   Well, request, in my view, would be can      2:16:18PM

3    you -- will you consider doing this rather than we

4    think you have to waive the no voluntary payments

5    provision and we're demanding that you do so.

6         A.   Oh, I don't know.                            2:16:30PM

7         Q.   Do you see a distinction whether it was a    2:16:31PM

8    request or a demand?

9         A.   I mean kind of.  But not enough to be able   2:16:35PM

10   to say, oh, yeah, Bob was -- Mr. Julian was saying

11   it one way or the other at the time.

12        Q.   Okay.  Thank you for that clarification.     2:16:44PM

13             This Zoom phone call was the first           2:16:47PM

14   substantive communication between Roseburg on the

15   one hand and the liability insurers on the other

16   hand; is that fair?

17        A.   I think so.  I don't know if you count       2:16:59PM

18   our, like, written communication to them, which I

19   believe would have been before that, counts as

20   substantive.  But this was the first call where we

21   talked strategy.

22        Q.   Great.  And then other than yourself, who    2:17:16PM

23   else from Roseburg or RLC participated in that first

24   Zoom call with Mr. Julian and the liability insurers

25   and others?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 100

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1         A.   I don't know if anyone else was there.  If    2:17:30PM

2    someone else was there, it would have been

3    Lisa Fairchild, but, again -- I don't think she was

4    there.

5         Q.   Okay.  So sitting here today, you don't       2:17:41PM

6    recall one way or the other, whether Ms. Fairchild

7    was a participant in that call; is that fair?

8         A.   I think it is unlikely that she was there,    2:17:49PM

9    actually, as I recall.

10        Q.   Following the Zoom conference call, was        2:17:54PM

11   there a follow-up request in writing by either

12   BakerHostetler, Roseburg, or RLC, to the liability

13   insurers requesting or demanding waiver of the no

14   voluntary payments provision?

15        A.   I don't know.                                  2:18:12PM

16        Q.   You cut out.  Was that, I don't know?          2:18:14PM

17        A.   I don't know.                                  2:18:16PM

18        Q.   Following that Zoom call did Roseburg or       2:18:17PM

19   RLC ever send a written demand to its liability

20   insurers requesting or demanding that they waive the

21   no voluntary payments provision?

22        A.   I don't know.                                  2:18:32PM

23        Q.   At some point you understood that Liberty      2:18:41PM

24   Insurance Corporation had agreed to tender the

25   $4 million in limits available under its general
```

Page 278

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| 1 | liability policy toward the settlement of Mill Fire |
| 2 | claims and suits against Roseburg and RLC; is that |
| 3 | correct? |
| 4 | A.   Yes, that's correct.                    2:19:01PM |
| 5 | Q.   Approximately when did Roseburg and RLC   2:19:04PM |
| 6 | understand that Liberty had tendered its $4 million |
| 7 | in limits towards settlements of Mill Fire claims |
| 8 | and suits? |
| 9 | A.   What sticks in my mind is February.  But I   2:19:16PM |
| 10 | don't know if that's right. |
| 11 | Q.   February of 2023?                    2:19:21PM |
| 12 | A.   Yes, thanks for that.  Yes.            2:19:23PM |
| 13 | Q.   And maybe it's helpful in relation to this   2:19:26PM |
| 14 | Zoom call, which you believe was on or around |
| 15 | September 9, 2022, how long after that call did you |
| 16 | understand that Liberty Insurance Corporation had |
| 17 | agreed to tender its $4 million in limits under its |
| 18 | general liability policy toward the settlement of |
| 19 | Mill Fire claims and any lawsuits arising out of the |
| 20 | Mill Fire? |
| 21 | MR. DEVRIES:  Objection.  Asked and     2:20:02PM |
| 22 | answered. |
| 23 | A.   I'm thinking -- I'm going to reflect part   2:20:02PM |
| 24 | of the question back to make sure I'm understanding |
| 25 | it. |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 59, Page 102

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1      had already retained the BakerHostetler firm in

 2      response to the Mill Fire?

 3           A.   I'm not aware of anything earlier than      2:34:23PM

 4      this.

 5           Q.   And it is true that at the time of          2:34:29PM

 6      Mr. Hurley's email, BakerHostetler had already been

 7      retained by Roseburg and RLC, correct?

 8           A.   Yes, that's true.                           2:34:38PM

 9           Q.   And in this email, Mr. Hurley is on behalf  2:34:44PM

10      of Roseburg and RLC is asking Liberty Insurance

11      Corporation to approve BakerHostetler's retention;

12      would you agree?

13           A.   Yes, I agree with that.                     2:35:03PM

14                MR. CROWE:  Thank you.  We're done with     2:35:04PM

15           that exhibit.

16                THE WITNESS:  Okay.                         2:35:06PM

17                (Thereupon, marked as Exhibit 33.)          9:18:08AM

18                MR. CROWE:  I'm going to mark for           2:35:26PM

19           identification Exhibit 33, which is a

20           September 7, 2022 email from Jamie Sroczynski,

21           S-R-O-C-Z-Y-N-S-K-I, to Dustin -- of Liberty

22           Mutual -- to Dustin Dow at BakerHostetler.

23        BY MR. CROWE:                                       2:35:46PM

24           Q.   Take a minute to review this email please  2:35:46PM

25      when it's available.
```

Page 290

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1         A.    It's loading.  Okay, I've read it.        2:35:49PM

2         Q.    It Roseburg familiar with this email sent  2:36:40PM

3    by Ms. Sroczynski to Mr. Dow?

4         A.    Generally.  I understand -- we understood  2:36:48PM

5    that Liberty had asked for -- had shared their

6    guidelines with Baker and had asked for their rates.

7         Q.    Did you understand Mr. Dow at            2:37:02PM

8    BakerHostetler to be the liaison between

9    BakerHostetler on the one hand, and the liability

10   insurers, including Liberty Insurance Corporation,

11   on the other hand?

12        A.    I don't know.                            2:37:23PM

13        Q.    You understood that Mr. Dow of           2:37:23PM

14   BakerHostetler was involved in the Mill Fire matter,

15   correct?

16        A.    Absolutely, yes.                         2:37:32PM

17              And just to not -- I'm not trying to hide  2:37:33PM

18   the ball, is I don't know if he was the official

19   liaison.  If that's what you are asking, I don't

20   know that.  I certainly know Mr. Dow was involved

21   and communicated with them.

22        Q.    Fair enough.                             2:37:51PM

23              Did Roseburg or RLC ever have any        2:37:51PM

24   communications with Jamie Sroczynski at Liberty

25   Mutual?
```

Page 291

Exhibit 59, Page 104

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1        A.   Not that I'm aware of.                   2:37:59PM

 2        Q.   But you understood from this email that  2:38:01PM

 3   Liberty Mutual was asking BakerHostetler to provide

 4   the insurer with proposed rates for handling the

 5   matter, correct?

 6             MR. DEVRIES:  Objection.  Mischaracterizes 2:38:18PM

 7        the document.

 8        A.   Yes.                                      2:38:20PM

 9             MR. DEVRIES:  I'm not seeing the document  2:38:20PM

10        up right now.  What should I be doing to see

11        that?

12             MR. CROWE:  Can we go off the record,      2:38:30PM

13        Mr. DeVries, to troubleshoot this?

14             MR. DEVRIES:  Yes.                         2:38:33PM

15             MR. CROWE:  Go off the record, please.     2:38:33PM

16             VIDEOGRAPHER:  Going off the record.  The  2:38:38PM

17        time is 2:38 p.m.

18    (Recess was held from 2:38 p.m. until 2:41 p.m.)    2:41:10PM

19             VIDEOGRAPHER:  Ready to go back on the     2:41:16PM

20        record, Counsel?

21             MR. CROWE:  Yes.                           2:41:19PM

22             VIDEOGRAPHER:  We're back on the record.   2:41:21PM

23        The time is 2:41 p.m.

24    BY MR. CROWE:  Okay.                                2:41:25PM

25        Q.   Mr. Lawless, back to what should be marked 2:41:26PM

                                                Page 292
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    for identification as Exhibit 33.  It is the
 2    September 7, 2022 email from Jamie Sroczynski to
 3    Dustin Dow.
 4            I'm not sure I got an answer to my last      2:41:39PM
 5    question which was, you agree that in the email
 6    Ms. Sroczynski is asking Mr. Dow to provide
 7    BakerHostetler's proposed rates for handling
 8    Roseburg and RLC's representation against Mill Fire
 9    claims and anticipated suits, correct?
10        A.   Yes.                                        2:42:09PM
11        Q.   And in the email, Liberty is also asking    2:42:10PM
12    Baker -- start over.
13            In the email, Liberty Insurance             2:42:19PM
14    Corporation is also asking BakerHostetler to include
15    all timekeepers that it expects would work on the
16    matter, correct?
17        A.   Yes, I see that.                           2:42:32PM
18        Q.   Do you know whether Baker provided its     2:42:33PM
19    proposed rates and all anticipated timekeepers to
20    Liberty Insurance Corporation in response to this
21    email?
22        A.   My understanding, and I don't know if it's 2:42:47PM
23    directly in response to this email, my understanding
24    is that Baker provided proposed rates and bios of
25    lawyers that they expected to be involved in this
```

Page 293

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      matter.  But, again, I don't know if it's directly

2      responsive to this email.

3           Q.   Would you agree with me, sir, that as of      2:43:08PM

4      this email, September 7, 2022, there was no

5      agreement in place as between Liberty Insurance

6      Corporation on the one hand, and BakerHostetler on

7      the other hand, as to the rates that would be

8      approved for the work in relation to the Mill Fire?

9           A.   Yes, I agree there's no agreement about      2:43:28PM

10     rates that are approved.

11          Q.   Would you agree with me subsequent to this   2:43:32PM

12     email there was never an agreement in place as

13     between Liberty Insurance Corporation on the one

14     hand and BakerHostetler on the other hand, as to

15     approved rates for work, legal work, conducted in

16     connection with the Mill Fire?

17          A.   Yes, my understanding is that Liberty       2:43:50PM

18     nixed Baker before any approved rates happened.

19               (Thereupon, marked as Exhibit 34.)          9:18:08AM

20               MR. DEVRIES:  I'm going to mark for          2:44:31PM

21          identification as Exhibit 34 a September 9,

22          2022 email from Mr. Hurley of Alliant to

23          Sarah Kaufman of Liberty Mutual.  It's Bates,

24          Liberty Insurance Bates Number 27280.

25
```

Page 294

Exhibit 59, Page 107

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1       BY MR. CROWE:                                    2:44:50PM

2           Q.   Let me know when you've had a chance to   2:44:50PM

3       review that exhibit.

4           A.   Okay, I have reviewed it.                 2:45:08PM

5           Q.   Mr. Lawless, are you familiar with this   2:45:10PM

6       document, this email?

7           A.   No, I have not seen it before.            2:45:12PM

8           Q.   Does it appear though to reflect the phone 2:45:14PM

9       call or the Zoom conference call that was held

10      between Roseburg, BakerHostetler, Alliant, and the

11      insurance carriers sort of at first -- sort of

12      strategy call that you referred to earlier?

13          A.   I think so.                               2:45:37PM

14          Q.   You see in the "to" section of the email  2:45:40PM

15      it identifies several people from BakerHostetler,

16      Joseph Chairez being one of them, correct?

17          A.   Uh-huh.                                   2:45:53PM

18          Q.   Is that a yes?                            2:45:53PM

19          A.   Sorry, I apologize, yes.                  2:45:54PM

20          Q.   Robert Julian being another Baker         2:45:56PM

21      participant, correct?

22          A.   Yes.                                      2:46:00PM

23          Q.   Dustin Dow as being another Baker         2:46:01PM

24      participant?

25          A.   Yes.                                      2:46:07PM
```

Page 295

Exhibit 59, Page 108

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1       Q.   Is that consistent with your memory of the      2:46:07PM

2   Baker lawyers that participated in that initial

3   strategy call that you attended?

4       A.   I don't remember them being on the call,        2:46:13PM

5   but it wouldn't surprise me if they were on the call

6   either.

7       Q.   But it is your recollection that as to          2:46:21PM

8   Roseburg's participation, you were the only Roseburg

9   representative that participated in that first

10  strategy Zoom meeting, correct?

11      A.   Yes.                                             2:46:33PM

12      Q.   What was the purpose, generally, of that        2:46:33PM

13  first strategy call?

14      A.   It was to talk to our insurers about what       2:46:40PM

15  we call, "the plan," which is how we're going to

16  address and respond to the Mill Fire.

17      Q.   Was there a particular person that sort of      2:46:57PM

18  moderated or led the discussion during that phone

19  call, that Zoom call?

20      A.   Mr. Julian.                                     2:47:04PM

21      Q.   Mr. Julian or anybody at BakerHostetler         2:47:08PM

22  circulate an agenda for that Zoom call?

23      A.   I believe -- I don't know.  I would assume      2:47:19PM

24  there were emails that coordinated the call, and if

25  there was an agenda, it would have been in there.

Page 296

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    But I don't remember anything.

 2         Q.   You previously described Mr. Julian as        2:47:30PM

 3    asking the insurers to participate in some way with

 4    the community relief fund, and in the alternative,

 5    as you described it, waiving the no voluntary

 6    payments provision.  Is that fair in terms of

 7    summarizing what you've already testified to in

 8    relation to that Zoom call?

 9         A.   Yes.                                          2:47:54PM

10         Q.   As specifically as can you, what else was     2:47:55PM

11    said during that call?

12         A.   I think there were introductions.  I'm        2:48:04PM

13    trying to remember.  I can visualize I was standing

14    at the desk in the office.

15         I don't remember -- I don't remember any          2:48:23PM

16    other subject of conversation at the call.

17         Q.   Who was Mr. Chairez at BakerHostetler?        2:48:31PM

18         A.   He's a lawyer -- Dustin is in Ohio.  I        2:48:35PM

19    don't know where Joe sits.  He's a partner and he

20    does insurance work.

21         Q.   What did you understand Mr. Chairez's role    2:48:50PM

22    to be in relation to the Mill Fire?

23         A.   To help make sure that we at Roseburg         2:48:59PM

24    check the right boxes under our insurance

25    obligations in order to get the recovery that we're
```

Page 297

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1         Q.   Subsequent to the September 9, 2022 Zoom      2:50:30PM

2    call, did Mr. Chairez disclose to Roseburg and RLC

3    that BakerHostetler had a conflict of interest in

4    representing Roseburg and RLC in relation to the

5    Mill Fire?

6         A.   I don't know.  I don't know who it was       2:50:47PM

7    from Baker who ultimately let us know about the

8    conflict.

9         Q.   What did BakerHostetler tell Roseburg        2:51:00PM

10   about the conflict of interest, as you are

11   describing it?

12        A.   My recollection is that Baker -- let me      2:51:11PM

13   try to say this as accurately as possible.

14             My recollection is that Baker told           2:51:26PM

15   Roseburg that Liberty had informed Baker that there

16   was a conflict.  And that while Baker didn't think

17   that there was a conflict, but, you know, when the

18   client thinks there's a conflict you've got to

19   withdraw from that on -- from representing us on

20   anything related to liability insurance.

21             And so that's when we hired Mr. DeVries.     2:51:57PM

22        Q.   Who was it at Baker that had this -- who      2:52:06PM

23   was it at BakerHostetler that had this communication

24   with Roseburg?

25        A.   I expect it was Mr. Julian and I             2:52:15PM
```

Exhibit 59, Page 111

 1    discussing this over the phone.

 2         Q.   Do you remember having a conversation over    2:52:20PM

 3    the phone with Mr. Julian where he explained to you

 4    that Liberty had raised a conflict of interest with

 5    BakerHostetler's representation of Roseburg?

 6              MR. DEVRIES:  That mischaracterizes the       2:52:35PM

 7         witness's testimony.

 8         A.   I don't remember, like a specific -- like     2:52:43PM

 9    I couldn't say, oh, on this day, there was a

10    specific conversation.

11              But generally, yes, it was a conversation     2:52:52PM

12    between Mr. Julian and I, I believe is how Roseburg

13    found out about the conflict situation.

14      BY MR. CROWE:                                         2:53:02PM

15         Q.   Did anybody else participate in that          2:53:02PM

16    telephone call, other than you Mr. and Mr. Julian?

17         A.   I doubt it.                                   2:53:08PM

18         Q.   Did -- well, I don't want --                  2:53:10PM

19         A.   I'm sorry.                                    2:53:13PM

20         Q.   I don't want you to speculate or guess.       2:53:13PM

21    But that sounded like --

22              Do you have any recollection of anybody       2:53:17PM

23    else participating in that phone call that you had

24    with Mr. Julian?

25         A.   No.                                           2:53:24PM

                                                        Page 300

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              I apologize, Mr. Crowe.              2:53:24PM

 2         Q.   That's okay.                         2:53:26PM

 3         A.   No, no, I do not.                    2:53:27PM

 4         Q.   Did Mr. Julian or anybody else at    2:53:28PM

 5    BakerHostetler acknowledge that there was a conflict

 6    of interest in BakerHostetler's representation of

 7    Roseburg or RLC arising from the Mill Fire?

 8              MR. DEVRIES:  Mischaracterizes the    2:53:41PM

 9         witness's testimony.

10         A.   I don't think so.  Because I think that   2:53:43PM

11    Baker's position was that there wasn't a conflict.

12    Or at least that the Baker lawyers that I talked --

13    that were working for us, their position was, well,

14    you know, was that there wasn't a conflict because

15    Roseburg and Liberty should be aligned.

16      BY MR. CROWE:                                2:54:06PM

17         Q.   Is that -- was that -- strike that.  2:54:06PM

18              Is that what you recall of their     2:54:09PM

19    explanation?  Was that BakerHostetler lawyers did

20    not believe there was a conflict of interest because

21    they believed the interest between Roseburg and

22    Liberty Insurance Corporation were aligned?

23         A.   Or at least ought to be aligned, that   2:54:23PM

24    might be a more accurate way of saying it.

25         Q.   Did they explain in any other way or any   2:54:28PM

                                                     Page 301
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    other detail why they did not believe there was a

2    conflict of interest in their retention and

3    representation of Roseburg?

4        A.   I don't remember.                        2:54:37PM

5        Q.   Are you aware of any written             2:54:38PM

6    communications between BakerHostetler and Roseburg

7    or RLC as it relates to the conflict of interest

8    that was raised by Liberty Insurance Corporation?

9            MR. DEVRIES:  Assumes facts not in        2:54:49PM

10       evidence.  Lacks foundation.

11       A.   No.                                       2:54:53PM

12           (Thereupon, marked as Exhibit 35.)        9:18:08AM

13           MR. CROWE:  I'm going to introduce and    2:55:15PM

14       mark for identification as Exhibit 35 a

15       September -- another September 9, 2022 email,

16       this one from Dustin Dow at BakerHostetler to

17       Sarah Kaufman at Liberty, along with others.

18    BY MR. CROWE:                                     2:55:32PM

19       Q.   Take a moment to review this document,   2:55:32PM

20    please.

21       A.   It's spinning up.  Okay, it is up and I  2:55:35PM

22    will review.  Okay, I've read the email.

23    BY MR. CROWE:                                     2:56:38PM

24       Q.   Great.  Mr. Lawless, are you familiar with  2:56:38PM

25    this email?
```

Page 302

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    believed there was a fourth lawsuit that was filed

 2    against Roseburg; is that correct?

 3         A.   Yes.                                    3:18:08PM

 4         Q.   Do you recall the name of that fourth   3:18:08PM

 5    case?

 6         A.   Unfortunately, I don't.                 3:18:11PM

 7         Q.   There was a case called Davies, and then 3:18:13PM

 8    another actually fifth case called Dixon.  Does that

 9    refresh your memory as to two additional lawsuits

10    that were filed against Roseburg?

11         A.   Yes, both of those sound familiar.      3:18:26PM

12         Q.   All right.  Now of the -- that's a total 3:18:28PM

13    of five lawsuits that you are aware of filed by

14    Roseburg arising out of the Mill Fire?

15         A.   One more that was filed much more recently 3:18:36PM

16    by AT&T.

17         Q.   Okay.  Putting aside the AT&T case, so  3:18:40PM

18    referring to the Smith, Hammond, Candasa, Davies and

19    Dixon cases, were any of those formally served on

20    Roseburg or RLC?

21         A.   I don't think they were served.         3:18:57PM

22         Q.   Did you understand or -- strike that.   3:19:00PM

23              So there was no formal service of process 3:19:01PM

24    of a summons and Complaint on Roseburg or RLC

25    relating to those five cases; is that correct?
```

Page 310

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1          A.   That's -- I believe that's right, sort of        3:19:13PM

2    a strange -- at least I'm not a California lawyer --

3    but my understanding is you can keep your lawsuit

4    alive in California for much longer than I'm

5    familiar anywhere else without serving it.

6          Q.   Do you understand that notwithstanding         3:19:27PM

7    that the lack of formal service of process of the

8    summons and Complaints in those matters,

9    BakerHostetler voluntarily removed those cases on

10   Roseburg's behalf to federal court?

11         A.   Yes.                                             3:19:42PM

12              MR. DEVRIES:  Objection.  Argumentative.        3:19:43PM

13     BY MR. CROWE:                                            3:19:48PM

14         Q.   Did Roseburg make that decision to remove       3:19:48PM

15   those cases in the absence of formal service of

16   process or was that BakerHostetler's decision?

17         A.   We made that decision together.                3:19:59PM

18         Q.   Okay.                                            3:20:00PM

19              MR. DEVRIES:  I'm objecting to the term          3:20:04PM

20         voluntary as argumentative and calling for

21         conclusion of law.

22     BY MR. CROWE:                                            3:20:09PM

23         Q.   Can Roseburg explain why it and                 3:20:09PM

24   BakerHostetler decided to remove the five lawsuits

25   filed against Roseburg, in the absence of formal
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    service of process?

2         A.   Is the question why we wanted to remove or    3:20:26PM

3    why we wanted to -- or why remove before process was

4    served?

5         Q.   I'll ask the question again.  Good point    3:20:35PM

6    of clarification.

7         A.   Okay.                                         3:20:39PM

8         Q.   Why did Roseburg and BakerHostetler decide   3:20:40PM

9    to respond to those five lawsuits by way of a court

10   filing, in the absence of formal service of process?

11        A.   I don't remember.                             3:21:16PM

12        Q.   Did BakerHostetler take any depositions in   3:21:26PM

13   those five cases?

14        A.   No.                                           3:21:30PM

15        Q.   Did they file any motions in any of those    3:21:30PM

16   cases?

17        A.   Other than -- I don't know if removing       3:21:34PM

18   counts is a motion.  But other than that, I don't

19   believe so.

20        Q.   Did BakerHostetler file any answers on       3:21:41PM

21   Roseburg or RLC's behalf in response to those five

22   lawsuits?

23        A.   No.                                           3:21:46PM

24        Q.   Did they take any discovery in those         3:21:47PM

25   cases?
```

Page 312

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1         A.   No.                                    3:21:50PM

2              MR. CROWE:  I've marked for identification   3:22:00PM

3         as Exhibit 38, a November 9, 2022 letter from

4         Mary Gregory of my office to Mr. DeVries and

5         Ms. Hudgins at the Hunton Andrews Kurth firm.

6         Let me know when that's available to you.

7         A.   It is loading up now.  The letter is up.   3:22:22PM

8              (Thereupon, marked as Exhibit 38.)         3:22:25PM

9      BY MR. CROWE:                                      3:22:26PM

10        Q.   Have you seen this letter before today?    3:22:27PM

11        A.   I'll take a quick look.  Yes, I've seen    3:22:29PM

12   this letter before.

13        Q.   It is one that you have reviewed before    3:23:06PM

14   today?

15        A.   Yes, although quite a while ago.           3:23:08PM

16        Q.   Did you read it contemporaneously upon     3:23:11PM

17   receiving it on or about the date of the letter?

18        A.   Yes.                                       3:23:17PM

19             MR. CROWE:  I've marked for identification  3:24:03PM

20        Exhibit 39, another exhibit here, let me know

21        when you've got access to Exhibit 39,

22        Mr. Lawless.

23             (Thereupon, marked as Exhibit 39.)         3:24:13PM

24        A.   It is loading and it is labeled as         3:24:14PM

25   "Photo."  So I can't see it yet.  All right, I see a
```

                                                    Page 313

Exhibit 59, Page 118

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1     And that Mr. Bona was most definitely a passenger on

2     the bus.  That's my own metaphor.

3          Q.   Have you discovered or garnered any         3:33:15PM

4     information that causes you to question Mr. Julian's

5     description of Mr. Bona as a bit player?

6          A.   No.                                          3:33:25PM

7          Q.   Did Roseburg conduct any independent        3:33:26PM

8     research regarding Mr. Bona or his firm, other than

9     looking at his online bio?

10         A.   I don't believe so.                          3:33:36PM

11         Q.   Did Roseburg ever interview Mr. Bona to     3:33:37PM

12    inquire about his qualifications to serve as

13    Roseburg's counsel in response to the Mill Fire?

14         A.   No.                                          3:33:49PM

15         Q.   Any reason why Roseburg decided not to      3:33:51PM

16    interview Mr. Bona about his experience and

17    qualifications to represent Roseburg?

18         A.   Because it was evident on the face that he  3:34:01PM

19    didn't have the capacity to do what we needed.

20         Q.   Capacity again meaning the size of the      3:34:07PM

21    firm was a concern to Roseburg?

22         A.   Yes.                                         3:34:12PM

23         Q.   Was there anything though that Roseburg     3:34:13PM

24    did independently to evaluate Mr. Bona or his firm's

25    experience in handling matters similar to the Mill
```

Page 320

Exhibit 59, Page 119

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    Fire?

 2         A.   No.                                      3:34:30PM

 3         Q.   Did Roseburg ever ask Mr. Bona given the 3:34:32PM

 4    size of his firm, how he planned to staff the matter

 5    in a way that might have satisfied Roseburg's

 6    concern about his capacity?

 7         A.   No, at this time we were so far -- so far 3:34:48PM

 8    in it, that it seemed like -- we were so far into

 9    executing our plan that it seemed like -- we were

10    just so shocked that this was who Liberty would

11    appoint for us.  It felt like they were trying to --

12    I don't know.

13         Q.   Did Roseburg ever ask Mr. Bona about his 3:35:18PM

14    proposed strategy for defending or settling Mill

15    Fire claims or suits?

16         A.   No.                                      3:35:26PM

17         Q.   Did Roseburg ever ask Mr. Bona or his firm 3:35:27PM

18    to provide a written proposal with respect to how he

19    would staff the matter?

20         A.   No.                                      3:35:38PM

21         Q.   Did Roseburg ever ask Mr. Bona or his firm 3:35:40PM

22    to explain verbally or in writing about how they

23    would go about settling Mill Fire claims and suits

24    against Roseburg or RLC?

25         A.   I don't believe Mr. Bona ever contacted  3:35:55PM
```

Page 321

Exhibit 59, Page 120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    me.

2         Q.   Well, you mentioned you met him twice at      3:35:58PM

3    mediation, correct?

4         A.   That's correct.                               3:36:02PM

5         Q.   Did you have any of these types of            3:36:03PM

6    discussions with him during the mediation?

7         A.   No.                                           3:36:06PM

8         Q.   Is that a no?                                 3:36:08PM

9         A.   No.                                           3:36:09PM

10        Q.   And then outside of the mediation, did you    3:36:10PM

11   have any discussions with Mr. Bona to ask him to

12   explain his litigation strategy, his settlement

13   strategy, how he would staff the matter in a way

14   that would satisfy Roseburg's concern about his

15   firm's capacity to handle the case?

16        A.   No.                                           3:36:29PM

17        Q.   Did Roseburg or RLC ever ask Mr. Bona or      3:36:29PM

18   his firm to provide a litigation budget for the

19   matter?

20        A.   No.                                           3:36:37PM

21        Q.   Did Roseburg ever ask Mr. Bona about his      3:36:44PM

22   experience in defending against mass tort actions

23   like the Mill Fire?

24        A.   No.                                           3:36:50PM

25        Q.   I want to make sure I understand that --      3:37:03PM
```

                                                    Page 322

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Roseburg's testimony.  And I'm drawing a distinction

2    between concerns about capacity versus concerns

3    about experience in competency to handle Roseburg's

4    defense.

5         Is it Roseburg's testimony that Mr. Bona    3:37:15PM

6    and his firm lacked both the capacity to defend

7    Roseburg and the competency to defend Roseburg, or

8    one or the other?

9        A.   I think both.  You probably can't separate    3:37:28PM

10   them entirely.  So, I think capacity is clear on its

11   face.  Like no possible way that he and his firm

12   could have defended us in this case.

13        Now, I think experience and skill, you    3:37:46PM

14   know, if you don't have the capacity can you really

15   apply whatever skill you have.  I think that's

16   questionable.

17        And then at the same time I do have    3:38:01PM

18   reservations about his skill for a very nearly

19   bet-the-company-level-of-litigation like we're

20   facing here.  Without any information of his bona

21   fides representing large companies with this much

22   money on the line.

23        Q.   I'm going to move to a different area    3:38:28PM

24   because I'm trying to be efficient, given the time

25   constraints I'm going to move on.

Exhibit 59, Page 122

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    neighborhood?

 2        A.    Correct.                                1:44:53PM

 3        Q.    And my understanding is that the fire   1:44:54PM

 4    burned just under 4,000 acres.  Is that consistent

 5    with your understanding?

 6        A.    That sounds about right.  I don't know   1:45:00PM

 7    exactly.

 8        Q.    Do you recall about how many homes were  1:45:04PM

 9    destroyed as a result of the fire?

10        A.    99.                                      1:45:09PM

11        Q.    I'm sorry, how many?                     1:45:14PM

12        A.    I think it's 99.                         1:45:14PM

13        Q.    Was there a certain amount of homes that 1:45:16PM

14    weren't destroyed but were damaged by either fire or

15    smoke?

16        A.    Yes.                                     1:45:22PM

17        Q.    Do you recall the number of homes that   1:45:24PM

18    suffered either fire or smoke damage but were not

19    total losses or destroyed?

20        A.    I think as far as those that suffered what  1:45:30PM

21    I will call significant damage, and they might have

22    been from the fire or from smoke, probably roughly

23    30ish.  And as far as who suffered smoke damage, I

24    think that's something that's still pretty

25    contested.
```

                                                    Page 138

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2

3                        CERTIFICATE OF OATH

4

5

6

7              I, the undersigned authority, certify

8     that ROSEBURG FOREST PRODCTS, CO. BY AND THROUGH

9     ITS 30(B)(6) WITNESS, MATTHEW LAWLESS, REMOTELY

10    appeared before me and was sworn on the 29th day

11    of April, 2024.

12              Signed this 5th day of May, 2024.

13

14

15

16              KIMBERLY FONTALVO, RPR
                Notary Public, State of Colorado
17              My Commission No. 20214007135
                Expires: 2/23/2025

18

19

20

21

22

23

24

25

                                              Page 332

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                CERTIFICATE OF REPORTER

 2

 3     STATE OF COLORADO

 4

 5              I, KIMBERLY FONTALVO, Registered

 6       Professional Reporter, do hereby certify that I

 7       was authorized to and did stenographically report

 8       the foregoing remote videotaped deposition of

 9       ROSEBURG FOREST PRODCTS, CO. BY AND THROUGH ITS

10       30(B)(6) WITNESS, MATTHEW LAWLESS; that a review

11       of the transcript was requested; and that the

12       transcript is a true record of my stenographic

13       notes.

14              I FURTHER CERTIFY that I am not a

15       relative, employee, attorney, or counsel of any

16       of the parties, nor am I a relative or employee

17       of any of the parties' attorneys or counsel

18       connected with the action, nor am I financially

19       interested in the action.

20              Dated this 5th day of May, 2024.

21

22              KIMBERLY FONTALVO, RPR, CLR

23

24

25
```

Page 333

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

EXHIBIT 60

EXHIBIT 60

EXHIBIT 60

1              UNITED STATES DISTRICT COURT

2     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3

4    RLC INDUSTRIES CO. and      )
     ROSEBURG FOREST PRODUCTS     )
5    CO.,                         )
              Plaintiffs,         )        Case No.
6                                 )    2:23:cv-00649-TLN-DB
          vs.                     )
7                                 )
     LIBERTY INSURANCE            )
8    CORPORATION, EVEREST         )
     NATIONAL INSURANCE COMPANY,)
9    and THE OHIO CASUALTY        )
     INSURANCE COMPANY,           )
10                                )
              Defendants.         )
11   _____)

12

13

14      VIDEOTAPED DEPOSITION OF DAVID H. FRANGIAMORE

15               San Diego, California

16             Thursday, October 10, 2024

17                   Volume I

18

19

20

21

22   Reported By:
     CATHERINE A-M GAUTEREAUX
23   CSR No. 3122
     Job No. 6949334

24

     PAGES 1 - 252

25

                                            Page 1

Exhibit 60, Page 001

1              UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3

4   RLC INDUSTRIES CO. and      )
    ROSEBURG FOREST PRODUCTS     )
5   CO.,                        )
              Plaintiffs,        )       Case No.
6                               )   2:23:cv-00649-TLN-DB
         vs.                    )
7                               )
    LIBERTY INSURANCE            )
8   CORPORATION, EVEREST         )
    NATIONAL INSURANCE COMPANY,)
9   and THE OHIO CASUALTY       )
    INSURANCE COMPANY,          )
10                              )
              Defendants.        )
11   _____)

12

13

14          Videotaped deposition of DAVID H.

15   FRANGIAMORE, Volume I, taken on behalf of Defendant

16   Liberty Insurance Corporation at 12275 El Camino

17   Real, Suite 100, San Diego, California, beginning at

18   9:04 a.m., on Thursday, October 10, 2024, before

19   CATHERINE A-M GAUTEREAUX, Certified Shorthand

20   Reporter No. 3122.

21

22

23

24

25

                                            Page  2

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4        HUNTON ANDREWS KURTH LLP

 5        BY:  SCOTT P. DeVRIES, ESQ.

 6             RACHEL E. HUDGINS, ESQ. (via Zoom)

 7        50 California Street, Suite 1700

 8        San Francisco, California  94111

 9        415-975-3700

10        sdevries@huntonak.com

11        rhudgins@huntonak.com

12

13

14   For Defendant Liberty Insurance Corporation:

15        SHEPARD, MULLIN, RICHTER & HAMPTON, LLP

16        BY:  JEFFREY S. CROWE, ESQ.

17        650 Town Center Drive, 10th Floor

18        Costa Mesa, California  92626

19        714-513-5100

20        jcrowe@sheppardmullin.com

21

22   Videographer:

23        Gregg Eisman

24

25
```

                                        Page 3

Exhibit 60, Page 003

1          San Diego, California, Thursday, October 10, 2024

2                              9:04 a.m.

3                                * * *

4          THE VIDEOGRAPHER:  Good morning.  We are          09:04:51

5     going on the record at 9:04 a.m. on Thursday,          09:04:52

6     October 10, 2024.                                      09:04:55

7          Audio and videorecording will continue to         09:04:59

8     take place unless all parties agree to go off the      09:05:02

9     record.  This is media Unit 1 of the videorecorded     09:05:04

10    deposition of David H. Frangiamore testifying in the   09:05:06

11    matter of RLC Industries Company, et al., versus       09:05:11

12    Liberty Insurance Corporation, et al., filed in the    09:05:16

13    United District Court, Eastern District of             09:05:19

14    California, Sacramento Division; case 2:23-cv-00649.   09:05:22

15    This deposition is being held at Sheppard Mullin,      09:05:29

16    12275 El Camino Real, Suite 100, San Diego,            09:05:32

17    California.                                            09:05:37

18          My name is Gregg Eisman.  I am the               09:05:37

19    videographer representing Veritext, and the court      09:05:40

20    reporter today is Kathy Gautereaux, also from the      09:05:42

21    firm Veritext.  I am not related to any party in       09:05:45

22    this action nor am I financially interested in the     09:05:48

23    outcome.  If there are any objections to proceeding,   09:05:50

24    please state them at the time of your appearance.      09:05:53

25          Counsel will now state their appearances         09:05:56

                                              Page 6

1    and affiliations for the record, beginning with the        09:05:57

2    noticing attorney.                                          09:05:59

3            MR. CROWE:  Good morning.  Jeffrey Crowe            09:06:01

4    with Sheppard, Mullin, Richter & Hampton for the           09:06:02

5    Defendant Liberty Insurance Corporation.                   09:06:05

6            MR. DeVRIES:  Scott DeVries, Hunton                 09:06:08

7    Andrews & Kurth, for Plaintiff Roseburg.                   09:06:08

8            THE VIDEOGRAPHER:  And counsel on remote.           09:06:14

9            MS. HUDGINS:  Rachel Hudgins On behalf of           09:06:14

10   Roseburg.                                                   09:06:19

11           THE VIDEOGRAPHER:  Thank you.                       09:06:21

12           Will the court reporter please swear in            09:06:21

13   the witness.                                                09:06:23

14                                                               09:06:24

15              DAVID H. FRANGIAMORE,                            09:06:24

16   having been administered an oath, was examined and         09:06:24

17   testified as follows:                                      09:06:24

18                                                               09:06:24

19                   EXAMINATION                                 09:06:24

20   BY MR. CROWE:                                               09:06:34

21       Q    Good morning, sir.                                09:06:35

22       A    Good morning.                                     09:06:36

23       Q    I introduced myself to you off the record.        09:06:37

24   My name is Jeff Crowe.  I'm one of the lawyers who         09:06:39

25   represents the defendant in this action, Liberty           09:06:42

Page 7

Exhibit 60, Page 005

```
1    Insurance Corporation, who I will refer to as        09:06:45

2    "Liberty" throughout this deposition proceeding.       09:06:48

3    Okay?                                                  09:06:51

4         A    Okay.                                        09:06:51

5         Q    Could you please state and spell your        09:06:53

6    name.                                                  09:06:55

7         A    Sure.  David Frangiamore,                    09:06:56

8    F-r-a-n-g-i-a-m-o-r-e.                                 09:06:57

9         Q    Mr. Frangiamore, you understand that your    09:07:04

10   deposition is being taken here today because the       09:07:06

11   Roseburg plaintiffs in this action have designated     09:07:09

12   you as a retained expert, correct?                     09:07:12

13        A    That's correct.                              09:07:15

14        Q    And as a general matter, your expertise in   09:07:15

15   this case can be best described as a claims handling   09:07:19

16   expert, correct?                                       09:07:23

17        A    Yes.                                         09:07:24

18        Q    I'm gonna show you a number of exhibits      09:07:24

19   throughout the day.  Some of them are new exhibits,    09:07:31

20   some of them are previously-marked exhibits.           09:07:32

21             To begin with, I'd like to show you what I   09:07:34

22   will mark as Exhibit 173, the plaintiffs' expert       09:07:37

23   disclosure pursuant to Federal Rule of Civil           09:07:40

24   Procedure 26 that was served and filed by              09:07:41

25   Mr. DeVries and his office.                            09:07:46
```

Page 8

Exhibit 60, Page 006

```
1              (Exhibit 173 marked for identification.)    09:07:49

2    BY MR. CROWE:                                         09:07:58

3        Q    Let me know when you've had a chance to      09:07:58

4    review Exhibit 173.                                   09:08:00

5        A    I'm assuming you want me to review the       09:08:02

6    portion beginning with 3, with my name, as opposed    09:08:04

7    to the other portions?                                09:08:08

8        Q    That's correct.                              09:08:14

9        A    Okay.  Okay.  I've read it, sir.             09:08:15

10        Q    Mr. Frangiamore, are you familiar with      09:09:38

11    plaintiffs' expert disclosure insofar as it relates  09:09:41

12    to the description of your designation on pages 3     09:09:45

13    and 4?                                                09:09:49

14        A    I don't recall that I've seen this before.  09:09:51

15    This is the first time I've seen it.                  09:09:53

16        Q    Okay.  So you did not review and approve    09:09:55

17    this designation before it was served by Roseburg's  09:09:59

18    counsel; is that correct?                             09:10:04

19        A    That's correct.                              09:10:04

20        Q    Reading it today, is there -- do you agree  09:10:05

21    that it's accurate with respect to its description   09:10:08

22    relative to the scope of your assignment and expert  09:10:12

23    opinions in this matter?                              09:10:15

24        A    Well, I have a couple things that I'd like  09:10:16

25    to correct.                                           09:10:18
```

                                                    Page 9

```
 1      Q    Sure.  Please do.                        09:10:18

 2      A    Okay.  So I actually have -- in terms of 09:10:20

 3  dealing with insurance policies and insurance      09:10:22

 4  issues, I have about 40 years of experience, not 30 09:10:25

 5  years, 'cause it began around 1983, so -- so it's   09:10:29

 6  just -- just over 40.                               09:10:34

 7           In terms of private practice, I was --     09:10:42

 8  it's -- it's slightly different than this.  I was in 09:10:50

 9  private practice initially in Washington State in    09:10:54

10  1988.  I then was in private practice in the         09:10:58

11  beginning of 1991.  And then from 1999 to 2015 I was 09:11:04

12  engaged in private practice, mainly dealing with     09:11:13

13  insurance-related issues, insurance defense, things  09:11:19

14  like that.  And since -- since 2015, my work has     09:11:21

15  been pretty much exclusively as an expert witness in 09:11:26

16  insurance coverage disputes.  So I would just        09:11:32

17  correct the timeline on that a bit.                  09:11:35

18           Other than that, I think it's an accurate  09:11:40

19  description.                                         09:11:47

20      Q    Okay.  So no other clarifications or       09:11:48

21  corrections to the designation other than what you   09:11:51

22  just testified to?                                   09:11:53

23      A    Yeah.  That pretty -- I think reading      09:11:54

24  through, the other stuff makes -- makes sense.       09:11:56

25      Q    Okay.  And when you say private practice,  09:11:59
```

Page 10

Exhibit 60, Page 008

```
1        A    Yes.                                      09:13:17

2        Q    Thank you.  You've issued two written     09:13:19

3    expert reports in this matter, correct?            09:13:22

4        A    Yes, an initial and a rebuttal.           09:13:26

5        Q    Okay.  Just for ease of reference I'm      09:13:28

6    gonna describe it as exactly that, an initial expert  09:13:30

7    report and a rebuttal expert report, if that's okay   09:13:34

8    with you.                                          09:13:37

9        A    Yes, that's fine.                         09:13:38

10       Q    Prior to issuing your initial expert      09:13:40

11   report, did you know that Ohio Casualty Insurance   09:13:42

12   Company had been dismissed from this action with    09:13:47

13   prejudice following a settlement with the Roseburg  09:13:51

14   plaintiffs?                                        09:13:54

15       A    I'm not sure.                             09:14:00

16       Q    You don't know one way or the other       09:14:01

17   whether you knew that fact at the time you prepared  09:14:03

18   your initial expert report; is that correct?        09:14:05

19       A    Yeah, I don't recall one way or the other.  09:14:08

20       Q    Did you ever review the settlement        09:14:11

21   agreement as between Ohio Casualty Insurance Company  09:14:12

22   and the Roseburg plaintiffs?                       09:14:16

23       A    I'm not sure that's in the -- I mean, I   09:14:20

24   provided in my reports the documents that I         09:14:23

25   reviewed, and I don't -- I don't recall that being  09:14:26
```

Page 12

Exhibit 60, Page 009

1    part of the documents.                              09:14:31

2        Q    Did you ever ask anybody for a copy of the   09:14:33

3    written settlement agreement as between the Roseburg   09:14:37

4    plaintiffs and Ohio Casualty Insurance Company?      09:14:38

5        A    Well, my mantra to all counsel that retain   09:14:42

6    me is, I want to see all documents related to the    09:14:45

7    case, whether they -- in other words, if there's not   09:14:48

8    a protective order or privilege, I want to see them.   09:14:51

9    So I rely on counsel for that.                       09:14:56

10       Q    And you made that request in this case to    09:14:58

11   Mr. DeVries and his firm for all documents relevant   09:15:00

12   to the case?                                         09:15:03

13       A    Yes.                                        09:15:04

14       Q    And you did not receive a copy of the        09:15:04

15   settlement agreement as between the Roseburg         09:15:06

16   plaintiffs and Ohio Casualty; is that correct?       09:15:09

17       A    I don't recall that I did.                  09:15:12

18       Q    All right.  Did you make a specific          09:15:13

19   request to obtain a copy of the settlement agreement   09:15:14

20   as between the Roseburg plaintiffs and Ohio Casualty   09:15:16

21   Insurance Company?                                   09:15:19

22       A    No, because what I do -- and I do this      09:15:20

23   with every counsel who retains me -- I say, "Give me   09:15:23

24   all the relevant documents," because I don't know    09:15:26

25   the universe of documents, so I rely on counsel for   09:15:29

Page 13

Exhibit 60, Page 010

```
 1   that.                                          09:15:32

 2        Q    Do you have an understanding as to the    09:15:32

 3   scope of the release as between the Roseburg     09:15:34

 4   plaintiffs and Ohio Casualty contained in their  09:15:36

 5   settlement agreement?                            09:15:40

 6        A    I would need to see it to answer that    09:15:41

 7   question.                                        09:15:43

 8        Q    So your answer then is no, you don't know  09:15:44

 9   the scope of the release as between the Roseburg  09:15:47

10   plaintiffs and Ohio Casualty?                   09:15:50

11        A    Yeah, I wouldn't know it unless I saw the  09:15:51

12   document.                                        09:15:54

13        Q    Prior to issuing your initial expert    09:15:55

14   report, did you know or have an understanding that  09:15:57

15   Everest Insurance Company had been dismissed from  09:16:02

16   the action with prejudice following a settlement  09:16:06

17   with the Roseburg plaintiffs?                    09:16:10

18        A    I'm not sure one way or the other whether  09:16:11

19   I saw that.                                      09:16:14

20        Q    Did you ever receive and review a copy of  09:16:15

21   the settlement agreement as between the Roseburg  09:16:16

22   plaintiffs and Everest?                          09:16:19

23        A    I don't recall that being in the documents  09:16:21

24   that I was provided with.                        09:16:26

25        Q    And your report has an appendix of all of  09:16:28
```

Page 14

Exhibit 60, Page 011

1        A    Well, you're making a presumption that I        09:23:16

2    know who all the retained and non-retained experts        09:23:18

3    are in the case, and I don't have a -- I wasn't        09:23:21

4    given copies of all the expert designations in the        09:23:24

5    case, so I'm not sure how to answer that question        09:23:29

6    without knowing the names of those individuals that        09:23:32

7    would be any other retained experts or non-retained        09:23:35

8    experts.        09:23:38

9        Q    Well, you certainly understand what you        09:23:40

10    did or did not rely on in forming your rebuttal        09:23:43

11    opinions, correct?        09:23:46

12        A    That is correct.        09:23:47

13        Q    Did you rely -- other than Mr. Pierce,        09:23:48

14    Ms. Molander, and Mr. Hirschfeld, did you rely on        09:23:50

15    the opinions of anybody else, regardless of their        09:23:53

16    name, regardless of their designation, in forming        09:23:56

17    your rebuttal opinions?        09:24:00

18        A    Okay.  When you say "anybody else," you        09:24:01

19    mean some -- any person other than -- not just        09:24:03

20    experts but any person, right?        09:24:07

21        Q    Sure.        09:24:09

22        A    Okay.  Like, I had a conference with        09:24:10

23    Mr. -- I think it's McEvoy, AlixPartners and his        09:24:13

24    boss, and that was something I incorporated into my        09:24:19

25    opinions.        09:24:25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 60, Page 012

```
 1      Q    That's Bob McEvoy; is that correct?        09:24:26

 2      A    Yes.                                       09:24:28

 3      Q    And he is with AlixPartners?               09:24:29

 4      A    Yes.                                       09:24:31

 5      Q    And you mentioned his boss.  Do you know   09:24:31

 6   his boss's name?                                   09:24:33

 7      A    You know, a name just slipped out of my    09:24:34

 8   mind.  I see his face, but I can't recall.  He     09:24:37

 9   didn't say too much at the conference, but he was  09:24:40

10   there.                                             09:24:42

11      Q    And that was a discussion that you had     09:24:42

12   after your initial expert report but before your   09:24:45

13   rebuttal report?                                   09:24:48

14      A    That's a good question.  I don't recall    09:24:49

15   the timeline exactly, but I did have -- it was     09:24:51

16   before the rebuttal report, I'm pretty sure.  I'm  09:24:53

17   not sure if it was before the original report.     09:24:56

18      Q    Was that a phone call, a Zoom conference,  09:24:58

19   an in-person meeting or --                         09:25:01

20      A    It was a Zoom conference.                  09:25:04

21      Q    And how many Zoom -- how many meetings did 09:25:05

22   you have with Mr. McEvoy and his boss?             09:25:07

23      A    One.                                       09:25:09

24      Q    Just the one?                              09:25:10

25      A    Yeah.                                      09:25:11
```

Page 21

```
1       Q    And do you recall how long that conference    09:25:11

2   took?                                                  09:25:13

3       A    I don't recall.  It's in my billing           09:25:14

4   records, I think.                                      09:25:16

5       Q    I think it is and, yeah, we'll get to         09:25:16

6   that.  Was that meeting scheduled at your request?     09:25:18

7       A    Yes.                                          09:25:26

8       Q    And what was the purpose of meeting and       09:25:26

9   speaking with Mr. McEvoy and his boss?                 09:25:29

10       A    I wanted to know what they did.              09:25:32

11       Q    Okay.  Any other reason?                     09:25:34

12       A    No.                                          09:25:37

13       Q    Okay.  So back -- I want to make sure I      09:25:42

14   understand who you may have -- what opinions of       09:25:44

15   others you may have relied on in forming your         09:25:52

16   rebuttal opinions.                                    09:25:54

17           Other than Mr. Hirschfeld, Ms. Molander,      09:25:56

18   Mr. Pierce, Mr. McEvoy and his boss, did you rely on  09:26:00

19   the opinions of anybody else to form your rebuttal    09:26:03

20   opinions in this matter?                              09:26:07

21       A    I'm not aware of reviewing any other         09:26:09

22   opinions other than what's reflected in the           09:26:11

23   documents I reviewed --                               09:26:14

24       Q    Okay.  So --                                 09:26:15

25       A    -- and that are attached to my original      09:26:15
```

Page 22

Exhibit 60, Page 014

1      Q    Did you have any communications, whether      09:47:10

2  written or oral, whatsoever with Baker Hostetler      09:47:13

3  with regard to this matter?      09:47:16

4      A    No, I had no communications, written or      09:47:17

5  oral, with them.      09:47:19

6      Q    And I believe you said the same is true      09:47:24

7  with respect to the Roseburg plaintiffs:  No written      09:47:26

8  or oral communications with anybody at Roseburg?      09:47:29

9      A    That is correct.      09:47:33

10      Q    Just as a general matter, as you reviewed      09:47:41

11  your initial expert report and rebuttal expert      09:47:44

12  report for purposes of preparing for today's      09:47:47

13  deposition, did you see anything in your reports      09:47:49

14  that needs clarification or correction?      09:47:52

15      A    No.      09:47:57

16      Q    And all of the facts and data that you      09:48:03

17  relied on in forming those opinions are identified      09:48:05

18  in your initial expert report, the appendices, and      09:48:09

19  the rebuttal report, correct?      09:48:11

20      A    That is correct.      09:48:13

21      Q    Are there any other opinions that you plan      09:48:15

22  to offer at trial in this matter that are not in      09:48:17

23  your expert reports?      09:48:19

24      A    Well, in my review of -- in preparing for      09:48:26

25  this deposition -- and I'm not sure it's in the      09:48:30

Page 39

| | | |
|---|---|---|
| 1 | initial or -- or rebuttal expert report -- I | 09:48:33 |
| 2 | realized that all of Liberty Mutual's experts were | 09:48:37 |
| 3 | focused on just one -- one aspect of the claim, | 09:48:44 |
| 4 | which was the minimization of defense and adjustment | 09:48:52 |
| 5 | costs related to this mass casualty loss and that | 09:48:57 |
| 6 | none -- none of the experts opined on or talked | 09:49:04 |
| 7 | about or -- or had any opinion on the minimization | 09:49:12 |
| 8 | of the liability of the insured. | 09:49:19 |
| 9 | In other words, all the experts seemed to | 09:49:22 |
| 10 | be concerned about was the costs and expenses to | 09:49:25 |
| 11 | Liberty related to the adjustment in defense of the | 09:49:30 |
| 12 | claim without taking into account what -- the | 09:49:34 |
| 13 | insured's liability exposure in the case. | 09:49:42 |
| 14 | So when I saw that, I realized that the | 09:49:47 |
| 15 | expert reports were focusing on just the financial | 09:49:50 |
| 16 | interests of Liberty in minimizing defense and -- | 09:49:56 |
| 17 | and adjustment costs without taking into account the | 09:50:02 |
| 18 | financial concerns of Roseburg, which had a huge | 09:50:06 |
| 19 | uninsured liability. | 09:50:11 |
| 20 | And I realized, which I didn't quite | 09:50:12 |
| 21 | realize when I was writing the reports, that that | 09:50:15 |
| 22 | would be a violation of insurance industry custom | 09:50:19 |
| 23 | and practice as confirmed by -- in California we | 09:50:22 |
| 24 | call that -- we refer to that as the Eagan | 09:50:27 |
| 25 | (phonetic) standard, which is putting the insurance | 09:50:30 |

Page 40

Exhibit 60, Page 016

```
1    company's interests, financial interests, ahead of        09:50:34
2    those of the insured.  And there is no regard in          09:50:36
3    the -- in the -- in the rebuttal reports, the             09:50:41
4    Liberty expert reports, as to what they did to            09:50:45
5    minimize the huge uninsured exposure of Roseburg so       09:50:53
6    that that's what -- after reading these reports           09:51:00
7    again, it just occurred to me that that was               09:51:03
8    something that -- you know, that needs to be              09:51:05
9    addressed.                                                09:51:09
10       Q    Is it your testimony, sir, that you             09:51:12
11   reviewed the Liberty expert reports for purposes of       09:51:13
12   preparing for today's deposition?                         09:51:18
13       A    Well, I re-reviewed them.                       09:51:20
14       Q    Okay.  And when did you re-review them?         09:51:22
15       A    In the last couple days.                        09:51:25
16       Q    Okay.  And the opinions you just               09:51:25
17   expressed, would you characterize that as a new           09:51:28
18   opinion?                                                  09:51:31
19       A    To the ex- -- I would say that I'm just --      09:51:35
20   I realized that it was some- -- I think it's              09:51:39
21   mentioned probably tangentially in my reports, but        09:51:44
22   it doesn't specifically refer to, you know, the           09:51:49
23   Eagan standard and the fact that that's a very well       09:51:53
24   established industry custom and practice:  You never      09:51:57
25   put your financial interests ahead of those of the        09:52:00
```

Page 41

1      A    Well, they certainly -- I think that's          09:53:31

2    explained in my -- I think I explain that in my        09:53:37

3    report.  And the problem with Liberty's conduct is     09:53:41

4    that what they did is, they didn't -- and I explain    09:53:48

5    it in my report -- you know, they didn't take any      09:53:54

6    action to actually adjust the claim; meaning it's a    09:53:57

7    mass casualty event, you have to send boots on the     09:54:02

8    ground to adjust the -- to adjust the claims, adjust   09:54:05

9    the immediate concerns of the many residents who had   09:54:09

10    been made homeless.                                    09:54:12

11          And they didn't do any of that.  And so         09:54:14

12    they left it all to Roseburg.  And then they come      09:54:20

13    back and Monday-morning-quarterback Roseburg because   09:54:24

14    they said, "Well, Roseburg's" -- you know, "they had   09:54:28

15    too many people and they spent too much money."        09:54:30

16          Well, you know, if you don't -- you know,        09:54:34

17    one of the key things in -- in adjustment of a claim   09:54:37

18    is what we call the processing of the claim.  You      09:54:43

19    have to actually get your boots on the ground and      09:54:46

20    process the claim.  If you don't do that, there is     09:54:49

21    no benefit to the insured, so -- and in a mass         09:54:53

22    casualty event like that, that's one of the first      09:55:00

23    things you need to do.                                 09:55:04

24          And for some reason it didn't occur to           09:55:04

25    Ms. Kaufman or her supervisor, Ms. Keahey or the       09:55:07

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 60, Page 018

1    manager above that this is a catastrophic instance       09:55:10

2    and you should have a catastrophic team, boots on         09:55:18

3    the ground as soon as possible.  Instead, they let        09:55:22

4    Roseburg adjust their own claim and then they're          09:55:27

5    criticizing Roseburg for --                               09:55:30

6            Remember, industry custom and practice is,        09:55:34

7    an insured is not supposed to pay for the adjustment      09:55:37

8    of their own claim.  That's part of the service,          09:55:40

9    okay?  And so what they do, they don't adjust the         09:55:43

10   claim and they let Roseburg adjust the claim, and         09:55:47

11   then they criticize Roseburg for the costs and           09:55:50

12   expenses of adjusting their own claim.                    09:55:53

13           Well, the way you address that problem is,        09:55:55

14   you -- you adjust the claim.  You're the expert,          09:55:58

15   you're the insurance company.  But that                   09:56:02

16   unfortunately didn't happen in this case, so --           09:56:03

17       Q    I'm gonna move to strike as nonresponsive.       09:56:06

18           Mr. Frangiamore, my question is as                09:56:07

19   follows:  Is it your opinion that Liberty gave no         09:56:10

20   consideration to minimizing Roseburg's liability          09:56:13

21   arising from the Mill Fire?                               09:56:19

22       A    They gave very little consideration             09:56:24

23   because they didn't do what they were supposed to         09:56:27

24   do, which is start to adjust the claim and limit the      09:56:29

25   insured's liability.                                      09:56:33

Page 44

Exhibit 60, Page 019

1    The only thing they did do is, they did          09:56:34

2    eventually pay their limits out, but -- but much   09:56:37

3    more was needed initially to help Roseburg, which  09:56:40

4    was -- for what was -- what was known by all -- by 09:56:45

5    Liberty and the other carriers as a huge uninsured 09:56:48

6    liability.                                         09:56:51

7    Q    You characterized what Liberty did do in     09:56:52

8    that regard as being "very little."  What did they 09:56:55

9    do in considering and taking efforts to minimize   09:56:59

10   Roseburg's liability against -- or arising from the 09:57:05

11   Mill Fire?                                         09:57:09

12   A    Well, I think it's in my report.  They        09:57:10

13   appointed an adjuster.  They had a supervisor.  The 09:57:12

14   desk adjuster back East said she looked up          09:57:16

15   information on the internet on the loss.            09:57:20

16   Q    Anything else?                                09:57:23

17   A    They -- within -- within two weeks they        09:57:26

18   appointed Mr. Bona -- and this is all in my report, 09:57:30

19   by the way -- they appointed Mr. Bona to defend the 09:57:34

20   pending wrongful death cases.  I think there was    09:57:38

21   three filed and one in the wings.  So they appointed 09:57:42

22   Mr. Bona.  That's what I recall they did initially.  09:57:48

23   Q    And within six days of the request by          09:57:54

24   Roseburg's coverage counsel, Liberty tendered its   09:57:57

25   full policy limits toward the settlement of claims  09:58:00

Page 45

Exhibit 60, Page 020

1  and suits arising out of the Mill Fire, correct?          09:58:03

2      A    Yeah.  I'm not -- I don't have the exact          09:58:07

3  timing, but I don't dispute that.                          09:58:08

4      Q    And would you agree that that is an effort        09:58:11

5  in consideration to reduce Roseburg's liability            09:58:13

6  arising out of the Mill Fire?                              09:58:15

7      A    Not really, because what they had is --           09:58:20

8  you know, it was -- first of all, it was obvious           09:58:22

9  that this was a policy limits --                           09:58:25

10  way-beyond-policy-limits case.  So what they had to       09:58:27

11  do --                                                     09:58:32

12          Remember, there's two aspects of the              09:58:33

13  claim:  There is defense and indemnity.  So I'm not       09:58:35

14  questioning that Liberty was going to put up its          09:58:38

15  indemnity limits.  That was -- there's no question        09:58:42

16  about that, and they did.  I'm not criticizing them       09:58:45

17  for putting up their indemnity limits.  That's, of        09:58:48

18  course, what they needed to do in this case.              09:58:52

19          The question is, and the most important           09:58:54

20  thing is, when you have a defense obligation, the         09:58:56

21  key thing is what are you doing in this instance to       09:59:00

22  minimize the liability of the insured, okay,              09:59:04

23  especially when you know your insured's liability         09:59:08

24  not only exceeds your limits but exceeds the              09:59:12

25  insurance coverage tower.  That was apparent at           09:59:16

Page 46

Exhibit 60, Page 021

| | | |
|---|---|---|
| 1 | information and compensate insureds, deal with the | 10:00:55 |
| 2 | claims as they came in, okay? | 10:01:01 |
| 3 | Now, that's -- that's what they did. | 10:01:05 |
| 4 | There was no -- I didn't see any -- when I look at | 10:01:10 |
| 5 | the -- when I look at the deposition testimony of -- | 10:01:15 |
| 6 | of Kaufman and her -- and her boss, they said -- I | 10:01:23 |
| 7 | think her boss said something along the lines of, | 10:01:27 |
| 8 | you know, "Did you ask for" -- "Did you call in a | 10:01:30 |
| 9 | TPA or a CAT team?" | 10:01:33 |
| 10 | "No.  That wasn't needed.  We don't | 10:01:34 |
| 11 | generally" -- "we only do that," I think, "as a last | 10:01:37 |
| 12 | resort" or something, she said.  They didn't call in | 10:01:40 |
| 13 | a -- they could have called -- like I, you know, saw | 10:01:43 |
| 14 | on the website, they could have called McLarens, | 10:01:45 |
| 15 | they could have called Crawford. | 10:01:47 |
| 16 | I mean, I used to -- as a claim adjuster I | 10:01:50 |
| 17 | used to hire TPAs for tasks.  You call 'em and you | 10:01:52 |
| 18 | get 'em up there.  They didn't do that. | 10:01:56 |
| 19 | So, you know, you're asking a question | 10:01:59 |
| 20 | that, "What did they prevent?" | 10:02:00 |
| 21 | Well, they didn't do anything.  So I don't | 10:02:02 |
| 22 | know how -- you know, you say, "What did they" -- | 10:02:04 |
| 23 | "What did Roseburg do?"  Roseburg was trying to | 10:02:07 |
| 24 | adjust its own claim, 'cause Liberty wasn't. | 10:02:12 |
| 25 | Q    Mr. Frangiamore, did you see anything in | 10:02:15 |

Page 48

Exhibit 60, Page 022

1   the material that you reviewed that suggested to you    10:02:17

2   or led you to conclude that Roseburg in any way    10:02:18

3   prevented Liberty -- Roseburg's counsel prevented    10:02:23

4   Liberty from investigating and settling claims    10:02:25

5   against Roseburg arising out of the Mill Fire?    10:02:29

6        A    I don't recall any specifics.  I know    10:02:38

7   that -- I know, with respect to Bona, I don't    10:02:40

8   think -- although Bona was appointed by Liberty,    10:02:44

9   they didn't -- Bona didn't actually substitute in as    10:02:47

10  defense counsel.  And, you know, as far as my    10:02:52

11  understanding was, you know, we had that, but I    10:02:57

12  don't recall anything -- anything else off the top    10:03:03

13  of my head.    10:03:08

14       Q    Have you formed any criticisms whatsoever    10:03:09

15  as to Roseburg's conduct in relation to its failure    10:03:12

16  to cooperate with Liberty in Liberty's investigation    10:03:19

17  and settlement of claims arising from the Mill Fire?    10:03:24

18            MR. DeVRIES:  Objection.  Foundation.    10:03:28

19            THE WITNESS:  Sure.  I don't think there    10:03:31

20  was a failure to -- you're implying that there was a    10:03:32

21  failure to cooperate.  I don't -- I don't see    10:03:34

22  that -- I didn't see that in the materials I    10:03:37

23  reviewed.    10:03:42

24  BY MR. CROWE:    10:03:42

25       Q    Have you formed any criticisms -- or    10:03:42

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 60, Page 023

```
 1   strike that.  Have you -- have you reached a              10:03:45

 2   conclusion that is critical in any way of Roseburg's      10:03:47

 3   conduct in relation to Liberty's ability and right        10:03:53

 4   to investigate and settle claims arising from the         10:03:58

 5   Mill Fire?                                                10:04:01

 6       A    No.  I don't -- I don't think -- I'm not         10:04:03

 7   critical of Roseburg.  I think Roseburg did what          10:04:07

 8   they needed to do because Liberty abandoned the           10:04:11

 9   processing and adjustment of the claim.                   10:04:14

10       Q    Do you have any criticisms of Roseburg           10:04:16

11   whatsoever?                                               10:04:18

12       A    No.  No, I don't.                                10:04:22

13       Q    You mentioned that Roseburg hired Baker          10:04:24

14   Hostetler, which is a law firm, correct?                  10:04:27

15       A    Yes.                                             10:04:30

16       Q    And they hired AlixPartners, which is a          10:04:30

17   consulting company, correct?                              10:04:33

18       A    Yes.                                             10:04:34

19       Q    And they hired Baker Hostetler and               10:04:35

20   AlixPartners before Roseburg ever gave Liberty            10:04:36

21   notice of the Mill Fire, correct?                         10:04:41

22       A    That is correct.                                 10:04:43

23       Q    Right.  And so they made the decision to         10:04:43

24   hire Baker Hostetler and AlixPartners to do the           10:04:46

25   things that those two firms did in relation to the        10:04:50
```

Page 50

```
 1        A    I have not been asked to and I have no         10:06:08

 2   intention as I sit here today.                           10:06:12

 3        Q    We've been going for about an hour.  Would     10:06:15

 4   you like to take a break, or continue?                   10:06:18

 5             MR. DeVRIES:  Yeah, whatever you'd like to      10:06:20

 6   do.                                                      10:06:21

 7             THE WITNESS:  You want to go another           10:06:22

 8   half-hour or so?                                         10:06:24

 9             MR. CROWE:  Sure.  It's up to you.             10:06:25

10             MR. DeVRIES:  No.  We have a negative          10:06:29

11   coming from the court reporter.                          10:06:32

12             THE WITNESS:  Oh, okay.                        10:06:34

13             MR. CROWE:  That controls.                     10:06:34

14             THE WITNESS:  Yeah, that controls.  Okay.      10:06:34

15             THE VIDEOGRAPHER:  Off the record at           10:06:34

16   10:06 a.m.                                               10:06:38

17             (Recess.)                                      10:06:44

18             THE VIDEOGRAPHER:  Back on the record,         10:10:19

19   beginning media Unit 2 at 10:18 a.m.                     10:18:08

20   BY MR. CROWE:                                            10:18:11

21        Q    Mr. Frangiamore, Liberty did not request       10:18:14

22   that Roseburg hire the Baker Hostetler firm,             10:18:17

23   correct?                                                 10:18:27

24        A    I don't think it went down that way.           10:18:29

25        Q    And Liberty did not request that Roseburg      10:18:31
```

Page 52

| | | |
|---|---|---|
| 1 | hire AlixPartners, correct? | 10:18:35 |
| 2 | A    Right. | 10:18:38 |
| 3 | Q    I'd like to invite your attention back to | 10:18:40 |
| 4 | Exhibit 177, and specifically Appendix A. | 10:18:43 |
| 5 | A    Okay. | 10:18:53 |
| 6 | Q    Appendix A is a true and correct copy of | 10:18:57 |
| 7 | your current résumé or curriculum vitae; is that | 10:18:59 |
| 8 | correct? | 10:19:02 |
| 9 | A    It's been updated since then. | 10:19:04 |
| 10 | Q    All right.  In any significant or material | 10:19:06 |
| 11 | way? | 10:19:08 |
| 12 | A    No.  Just additional cases I've been | 10:19:09 |
| 13 | retained on. | 10:19:11 |
| 14 | Q    About how many? | 10:19:12 |
| 15 | A    Let's see.  This was -- I think, around | 10:19:15 |
| 16 | three cases.  I'd have to double-check. | 10:19:18 |
| 17 | Q    Approximately three cases in which -- | 10:19:23 |
| 18 | A    Yeah, approximately three additional | 10:19:26 |
| 19 | cases. | 10:19:27 |
| 20 | Q    Okay.  Where you've been hired as a claims | 10:19:27 |
| 21 | handling expert? | 10:19:30 |
| 22 | A    Yes. | 10:19:31 |
| 23 | Q    By policyholders or their counsel? | 10:19:32 |
| 24 | A    No. | 10:19:35 |
| 25 | Q    By whom? | 10:19:36 |

Page 53

1    of what I was provided with.                    10:30:50

2    Redacted Per Sealing Order

3

4

5

6        Q    Right.  Did you do any investigation into    10:31:03

7    why the decision was made -- or strike that.    10:31:08

8    Redacted Per Sealing Order

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        A    No, I did not.                    10:31:57

24        Q    You reviewed Mr. Lawless's deposition,    10:32:02

25    correct?                                  10:32:05

                                            Page 63

```
 1    firm?  Let me strike that.  Poor question.          10:40:50

 2          Prior to your involvement in this case,       10:40:53

 3    did you have any professional experience or         10:40:55

 4    relationship with the Baker Hostetler firm?         10:40:59

 5        A    No.  I had heard of them.  I knew they      10:41:04

 6    were a big firm, but I didn't -- I can't recall --  10:41:06

 7    off the top of my head I can't recall any specific  10:41:09

 8    interaction with them.                              10:41:13

 9        Q    Of the matters list in your curriculum     10:41:15

10    vitae, did any of them involve an allegation or an  10:41:17

11    opinion by you that the insurer owed and breached a 10:41:25

12    duty to allow its insured to select independent or  10:41:31

13    cumis defense counsel?                              10:41:35

14        A    Yes, there have been cases like that.      10:41:39

15        Q    Can you -- as best as you can, can you     10:41:42

16    identify for me the matters on this list in         10:41:43

17    Exhibit 177 that involved allegations or an opinion 10:41:46

18    by you that the insurer owed and breached a duty to 10:41:51

19    allow its insured to select independent or cumis    10:41:56

20    defense counsel?                                    10:41:59

21        A    It's gonna take me a lot of time to go     10:42:01

22    through this because I just don't have a memory off 10:42:03

23    the top of my head.  So if you want me to take a    10:42:06

24    break, it's gonna take me ten minutes or more to go 10:42:09

25    through this list and see if I can think of -- think 10:42:13
```

Page 71

Exhibit 60, Page 028

| | | |
|---|---|---|
| 1 | of cases where that issue came up. | 10:42:15 |
| 2 | MR. CROWE:  Yeah, why don't we do that if | 10:42:17 |
| 3 | that's okay. | 10:42:20 |
| 4 | THE WITNESS:  Okay.  That's fine. | 10:42:21 |
| 5 | MR. CROWE:  Off the record. | 10:42:22 |
| 6 | THE VIDEOGRAPHER:  Off the record at | 10:42:25 |
| 7 | 10:43 a.m. | 10:42:26 |
| 8 | (Recess.) | 10:46:42 |
| 9 | THE VIDEOGRAPHER:  Back on the record, | 10:48:43 |
| 10 | beginning media Unit 3 at 10:49 a.m. | 10:48:43 |
| 11 | BY MR. CROWE: | 10:48:48 |
| 12 | Q    Okay, Mr. Frangiamore.  Do you have the | 10:48:55 |
| 13 | question in mind or would you like me to restate it? | 10:48:56 |
| 14 | A    I think I can answer it.  I looked at my | 10:48:59 |
| 15 | list.  I don't recall anything specifically on the | 10:49:01 |
| 16 | cumis issue.  I may -- I've dealt with it | 10:49:06 |
| 17 | extensively as a claim manager and claim handler and | 10:49:09 |
| 18 | I've also acted as cumis counsel on cases, as | 10:49:13 |
| 19 | defense counsel.  It may -- maybe it came up in one | 10:49:17 |
| 20 | of these cases, but going through my list, I just | 10:49:20 |
| 21 | can't recall as I sit here today.  Nothing rings a | 10:49:22 |
| 22 | bell. | 10:49:25 |
| 23 | Q    Okay.  But you have had a chance to look | 10:49:26 |
| 24 | at the list in your curriculum vitae of those | 10:49:29 |
| 25 | matters in which you either testified or were | 10:49:33 |

Page 72

Exhibit 60, Page 029

```
1    retained as an expert, correct?                    10:49:34

2        A    Yes.                                      10:49:36

3        Q    And as you sit here today, you cannot     10:49:37

4    identify a single case in which there was an       10:49:39

5    allegation or an opinion by you that the insurer   10:49:43

6    owed and breached a duty to allow the insured to   10:49:49

7    seek or select independent or cumis defense counsel; 10:49:52

8    is that correct?                                   10:49:56

9        A    I can't recall one way or the other.  In  10:49:56

10   reading through my list, I can't recall a specific 10:49:58

11   case.  It's possible that it came up, but, like I   10:50:01

12   said, I may be misrecalling it because I've dealt   10:50:03

13   with the cumis issue both as a claim manager and as 10:50:08

14   a -- as a practicing lawyer.                       10:50:13

15       Q    Right.                                    10:50:14

16       A    So --                                     10:50:15

17       Q    And from now on I'm being specific to your 10:50:15

18   retention as an expert witness.                    10:50:17

19       A    Right.  But I can't recall.  It's possible 10:50:20

20   that it is in one of my opinions, but as I look at  10:50:22

21   my list, I just don't recall.  It's been 25 years of 10:50:25

22   cases and I have a decent memory of some cases and I 10:50:28

23   have a not-so-great memory of some, given the       10:50:33

24   decades I've been doing this.                      10:50:37

25       Q    Is it reasonable to assume that this      10:50:39
```

Page 73

1    matter filed by Roseburg is the first instance in        10:50:41

2    which you've been retained to opine on whether the        10:50:45

3    insurer owed and breached a duty to allow the            10:50:48

4    insured to select independent or cumis defense           10:50:52

5    counsel?                                                 10:50:56

6        A    I think it came up before.  I just don't        10:50:58

7    recall the specific case.  I think it has come up        10:51:00

8    before.  But looking at my list, I just don't            10:51:03

9    recall.                                                  10:51:05

10       Q    Can you give an approximation as to how          10:51:06

11   many other times that issue has come up in the scope      10:51:08

12   of your expert work and retention?                       10:51:10

13       A    No.                                             10:51:13

14       Q    Can you say that it was more than five           10:51:14

15   times or less than five times?                           10:51:16

16       A    I couldn't tell you.                            10:51:18

17       Q    Of the list contained within your               10:51:22

18   curriculum vitae regarding those matters in which        10:51:24

19   you either testified or were retained as a claims        10:51:27

20   handling expert, did any of those matters include an     10:51:30

21   opinion by you that the primary liability insurer        10:51:35

22   owed independent or cumis defense counsel to its         10:51:42

23   insured because a related or affiliated excess or        10:51:46

24   umbrella insurer had an exclusion in that excess or      10:51:53

25   umbrella policy that could negate coverage under         10:51:57

<div align="right">Page 74</div>

Exhibit 60, Page 031

1    those policies?                                    10:52:02

2        A    Again, you're asking -- I think I already    10:52:03

3    answered the question.  You're asking me even though    10:52:06

4    I can't recall any specific issues coming up in a    10:52:09

5    specific case and the answer is no to your question    10:52:13

6    because that would be considered a subcategory of    10:52:15

7    the question you just asked, which I already    10:52:19

8    answered.                                           10:52:21

9        Q    Well, it's slightly different.  And I    10:52:22

10    don't mean to argue with you.  Your recollection was    10:52:23

11    this issue of cumis came up, so my next question is    10:52:26

12    being -- is more specific as to whether you recall,    10:52:29

13    in those other matters where the cumis issue may    10:52:32

14    have been asserted or alleged, the question is as    10:52:36

15    follows:                                           10:52:38

16            Did any of those matters include an    10:52:38

17    opinion by you that the primary insurer owed    10:52:41

18    independent or cumis defense counsel to its insured    10:52:47

19    because a related or affiliated excess or umbrella    10:52:51

20    insurer may have had an exclusion in their policy    10:52:55

21    that could have negated coverage?                  10:53:01

22        A    Yeah, I don't recall that arising.        10:53:02

23        Q    And in fact this is the very first case,    10:53:05

24    is it not, in which you've rendered an opinion that    10:53:08

25    a cumis obligation is owed to an insured because an    10:53:12

Page 75

1    affiliate or related excess or umbrella entity to          10:53:18

2    the primary insurer had an exclusion in the excess         10:53:22

3    or umbrella policy, correct?                                10:53:25

4         A    That's part of my opinion, yes.                   10:53:28

5         Q    First time you've ever rendered it,               10:53:30

6    correct?                                                    10:53:31

7         A    It's the first time I've ever encountered         10:53:32

8    that situation, as most of my cases are unique fact        10:53:34

9    situations.                                                 10:53:39

10        Q    And so if it's the first time that it's           10:53:39

11   ever come up in a situation in which you've been           10:53:41

12   retained as an expert, what did you do, if anything,      10:53:44

13   to research, to evaluate, to consider the merit of        10:53:46

14   that argument in your opinion?                             10:53:52

15        A    Well, I think I describe it in my report.        10:53:55

16   What you do when you evaluate whether there is --          10:53:57

17   under industry custom and practice, whether there is      10:54:00

18   a conflict of interest necessitating the appointment     10:54:03

19   of cumis counsel, is, you look at whether there is        10:54:07

20   an overlap between a liability issue and a coverage       10:54:10

21   issue.  And if you have a situation where an insurer      10:54:15

22   is reserving rights and you see an overlap between        10:54:20

23   the coverage and liability issue, then there is a         10:54:23

24   probability that the appointment of cumis counsel         10:54:27

25   will be necessary in most situations because of that      10:54:30

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 60, Page 033

1    conflict of interest.                              10:54:34

2         Q    Did you consult with any treatises or   10:54:36

3    industry sources in reaching that opinion?        10:54:39

4         A    No.  It's based on my experience        10:54:42

5    handling -- dealing with insurance claims over 40 10:54:44

6    years and making those calls as -- remember that I 10:54:46

7    had to make duty-to-defend and hiring decisions on 10:54:50

8    counsel when I was a claims manager and as a claims 10:54:56

9    adjuster.                                          10:55:00

10        And so you have to look -- you look at the    10:55:01

11   allegations of the complaint.  You look at the     10:55:04

12   available facts you have.  You look at the positions 10:55:08

13   of the insurance company and the -- and their      10:55:11

14   reservation of rights, and you make a determination 10:55:15

15   of whether an insured is entitled to independent   10:55:17

16   counsel or not.                                    10:55:21

17        Q    Did you speak with anybody, consult with 10:55:23

18   anybody in reaching the conclusion that you just   10:55:26

19   described as relates to this circumstance?         10:55:30

20        A    Other than discussing it with Mr. DeVries 10:55:33

21   and Ms. Hudgins, those are the only people I talked 10:55:36

22   to about my opinions.                              10:55:38

23        Q    Are you aware of any case statute,       10:55:41

24   Department of Insurance opinion, industry source,  10:55:43

25   treatise that explains that a primary insurer owes 10:55:45

Page 77

Exhibit 60, Page 034

1    its insured cumis counsel in a circumstance where        10:55:51

2    there is an affiliated or related excess or umbrella     10:55:55

3    insurer that has an exclusion in that excess or          10:55:58

4    umbrella policy that might negate coverage under         10:56:02

5    that excess or umbrella policy?                          10:56:05

6        A    Yeah, I didn't -- I wasn't -- I'm not           10:56:08

7    rendering legal opinions in this case and I didn't       10:56:10

8    do legal research in conjunction with my opinions.       10:56:12

9        Q    When you were a claims manager, you             10:56:16

10   mentioned very often you were involved in decisions      10:56:18

11   as to whether an insured was entitled to cumis           10:56:21

12   counsel, correct?                                        10:56:24

13       A    That is correct.                                10:56:25

14       Q    Approximately how many times were you           10:56:26

15   involved in making a decision as a claims manager as     10:56:27

16   to whether an insured was entitled to cumis or           10:56:31

17   independent counsel?                                     10:56:34

18       A    Probably in the thousands of times.             10:56:36

19       Q    Right.  And in those thousands of times,        10:56:39

20   did you ever conclude as a claims manager that your      10:56:43

21   insured was entitled to cumis counsel because there      10:56:48

22   was an excess or umbrella insurer that was related       10:56:52

23   to your primary insurer that had an exclusion in its     10:56:57

24   policy that might negate coverage for the excess or      10:57:00

25   umbrella insurer?                                        10:57:02

Page 78

Exhibit 60, Page 035

| | | |
|---|---|---|
| 1 | A    I don't recall that specific instance | 10:57:04 |
| 2 | coming up. | 10:57:05 |
| 3 | Q    Does it matter to your opinion whether the | 10:57:10 |
| 4 | excess or umbrella insurer is related or not related | 10:57:12 |
| 5 | to the primary insurer? | 10:57:15 |
| 6 | A    Well, that would be something I would take | 10:57:19 |
| 7 | into account, yes. | 10:57:21 |
| 8 | Q    Right.  So you think that's a material | 10:57:21 |
| 9 | distinction, that if it's an excess or umbrella | 10:57:23 |
| 10 | insurer that has an exclusion that might negate | 10:57:25 |
| 11 | coverage under their policy but they are not related | 10:57:29 |
| 12 | to the primary insurer that owes the duty to defend, | 10:57:31 |
| 13 | that's a material distinction that changes your | 10:57:35 |
| 14 | opinion? | 10:57:37 |
| 15 | A    That could affect my opinion, yes. | 10:57:39 |
| 16 | Q    And so in the circumstance where there is | 10:57:40 |
| 17 | an excess or umbrella insurer that's not related to | 10:57:43 |
| 18 | the primary insurer, is it your opinion that the | 10:57:46 |
| 19 | primary insurer would not owe a cumis obligation | 10:57:50 |
| 20 | solely because that excess or umbrella insurer might | 10:57:53 |
| 21 | have an exclusion in their policy that could negate | 10:57:57 |
| 22 | coverage? | 10:58:01 |
| 23 | A    That's a possibility. | 10:58:01 |
| 24 | Q    Do you have an opinion one way or the | 10:58:03 |
| 25 | other? | 10:58:04 |

Page 79

Exhibit 60, Page 036

```
1        A    No.                                    10:58:05

2        Q    Did you consider that scenario in reaching    10:58:05

3   your opinions in this case?                        10:58:07

4        A    No, that wasn't the scenario in this case.    10:58:09

5        Q    Did you consider that scenario in reaching    10:58:12

6   your opinions in this case?                        10:58:15

7        A    No.                                    10:58:17

8        Q    In any of the matters listed in your     10:58:29

9   curriculum vitae where you were either retained or    10:58:32

10  testified as a claims handling expert, did any of    10:58:36

11  those matters involve an opinion by you that the    10:58:38

12  lawyer appointed by the liability insurer was     10:58:43

13  incompetent or not competent to handle the defense    10:58:47

14  of the insured?                                10:58:51

15       A    I can recall -- I can recall one case.    10:59:01

16       Q    And what case is that, sir?              10:59:07

17       A    It's called Infinity Insurance.          10:59:09

18       Q    Is that on your list here?              10:59:11

19       A    Yes.                                 10:59:13

20       Q    Can you tell me what page, please?        10:59:13

21       A    Let's see.  That's the hard part.  Okay.    10:59:15

22  I found it.  Amazing.  Page 4, about a third of the    10:59:22

23  way up, you'll see it says "Infinity Insurance     10:59:26

24  versus Parkers and Sommers."  Do you see that?     10:59:30

25       Q    I don't.                              10:59:36
```

Page 80

Exhibit 60, Page 037

```
1      Q    Okay.  I'm gonna turn to another area and      11:56:54
2  we might as well get started.  Lunch is not here        11:56:58
3  yet.                                                    11:57:01
4          So, Mr. Frangiamore, what I'm gonna do now      11:57:01
5  is, I'm gonna ask you a series of questions --          11:57:04
6          MR. DeVRIES:  Tell you what, let me go to       11:57:06
7  the bathroom for just a moment.                         11:57:09
8          MR. CROWE:  That's fine.                        11:57:11
9          Let's go off the record.                        11:57:12
10         THE VIDEOGRAPHER:  Off the record at            11:57:14
11 11:57 a.m.                                              11:57:15
12         (Recess.)                                       11:57:26
13         THE VIDEOGRAPHER:  Back on the record,          12:03:41
14 beginning media Unit 6 at 12:04 p.m.                    12:03:42
15 BY MR. CROWE:                                           12:03:47
16     Q    Mr. Frangiamore, I'm gonna ask you a          12:03:49
17 series of questions in the context of your              12:03:51
18 evaluation of the reasonableness of a liability        12:03:55
19 insurer's conduct relative to the duty to defend,      12:03:59
20 and particularly the liability insurer's complaints    12:04:02
21 with industry -- insurance industry custom and         12:04:08
22 practice, okay?                                         12:04:10
23     A    Okay.                                          12:04:11
24     Q    Do you agree that absent an obligation to     12:04:13
25 allow the insurer to select independent or cumis        12:04:15
```

Page 115

1  defense counsel, in most liability policies the        12:04:20

2  insurer reserves control over the insured's defense      12:04:24

3  including the selection of defense counsel for the      12:04:28

4  insured?                                              12:04:30

5      A    Yes, provided they acknowledge and provide     12:04:35

6  a full defense.                                       12:04:38

7      Q    And here, absent an obligation to allow        12:04:41

8  Roseburg to select independent or cumis defense       12:04:46

9  counsel, Liberty -- and the Liberty policy that it     12:04:49

10 issued to Roseburg allowed it to control the          12:04:55

11 insured's defense, including Liberty's right to        12:04:57

12 select counsel to defend Roseburg, correct?           12:05:01

13     A    I would say initially that would be the       12:05:18

14 position of the insurance company, except that this    12:05:22

15 is a -- this is a unique situation because the         12:05:26

16 insurer in this case only provided $4 million in       12:05:33

17 primary coverage when it was evident from the outset   12:05:38

18 of the claim that in fact the -- the exposure of the   12:05:42

19 insured was well in excess of that and there was no    12:05:48

20 commitment by the insurer to pay anything more than    12:05:55

21 the initial $4 million that was in their primary       12:05:59

22 policy limits.                                        12:06:05

23     Q    You've written that the duty to defend is     12:06:07

24 a contractual duty, correct?                          12:06:09

25     A    I don't know if I've written that, but I      12:06:15

Page 116

Exhibit 60, Page 039

1    would agree with you that that's part of the            12:06:16

2    insurance policy, the duty to defend in a standard      12:06:19

3    form policy in most -- not most policies but            12:06:24

4    certainly in commercial liability policies such as      12:06:29

5    the one issued by Liberty in this case.                 12:06:30

6        Q    And you would agree with me, sir, that         12:06:33

7    absent a cumis obligation, Liberty's policy to          12:06:36

8    Roseburg allowed Liberty to control the defense,        12:06:40

9    including Liberty's right to select and appoint         12:06:44

10   competent defense counsel?                              12:06:47

11       A    To the extent that they were willing to --     12:06:53

12   to pay their -- their defense without a reservation     12:07:03

13   of rights, they would have -- they would have the       12:07:08

14   right to control the defense.  But, of course, we       12:07:11

15   know that in this case Liberty issued a reservation     12:07:17

16   of rights.                                              12:07:20

17       Q    So is it your position that if an insurer      12:07:22

18   issues a reservation of rights, regardless of what      12:07:27

19   that reservation of rights letter says, that            12:07:31

20   triggers the liability insurer's obligation to give     12:07:36

21   the insured independent or cumis defense counsel?       12:07:39

22       A    That's not what I said.                        12:07:43

23       Q    Right.  That's not your -- that's not your     12:07:44

24   opinion, is it?                                         12:07:46

25       A    No.                                            12:07:47

Page 117

Exhibit 60, Page 040

| | | |
|---|---|---|
| 1 | Q    All right.  Mr. Frangiamore, do you agree | 12:07:48 |
| 2 | that it is appropriate and reasonable for a | 12:07:55 |
| 3 | liability insurer to choose to not reserve rights | 12:07:58 |
| 4 | concerning a particular coverage defense to avoid | 12:08:04 |
| 5 | any obligation to provide the insured with the right | 12:08:07 |
| 6 | to select independent or cumis defense counsel? | 12:08:10 |
| 7 | A    Yes. | 12:08:15 |
| 8 | Q    That's consistent with industry standards, | 12:08:20 |
| 9 | correct? | 12:08:22 |
| 10 | A    Yeah.  If the insurance company wants to | 12:08:22 |
| 11 | control the defense and appoint counsel, then the | 12:08:26 |
| 12 | best way to do that is to agree to provide coverage, | 12:08:30 |
| 13 | full coverage to the extent of the policy limits. | 12:08:34 |
| 14 | Q    Didn't Liberty do that here? | 12:08:38 |
| 15 | A    No.  They -- they ultimately did pay out | 12:08:40 |
| 16 | limits, but they issued a reservation of rights, and | 12:08:46 |
| 17 | I discuss that in my report. | 12:08:53 |
| 18 | Q    Do you agree that not every conflict of | 12:08:55 |
| 19 | interest between an insured and an insurer requires | 12:08:58 |
| 20 | the insurer to provide independent counsel for the | 12:09:03 |
| 21 | insured? | 12:09:07 |
| 22 | A    I'm not sure what conflict of interest | 12:09:08 |
| 23 | you're referring to.  In this case, as someone who | 12:09:10 |
| 24 | has evaluated these instances thousands of times, | 12:09:16 |
| 25 | the reservation of rights issued by Liberty did | 12:09:19 |

Page 118

Exhibit 60, Page 041

```
 1   create a conflict of interest because, as I've        12:09:22

 2   testified before, there was an overlap between the     12:09:25

 3   liability and the coverage issue here that was not     12:09:28

 4   remedied; that Liberty took the position of, it's      12:09:33

 5   not a conflict, and then later they modified the       12:09:37

 6   reservation of rights to withdraw their occurrence     12:09:41

 7   definition, which meant they understood initially      12:09:45

 8   that the occurrence definition created a               12:09:47

 9   reservation -- that it created a conflict.  So         12:09:49

10   that's -- and I expand on that in my report.           12:09:53

11        Q    Do you agree that not every reservation of   12:09:57

12   rights requires the insurer to provide independent     12:09:59

13   counsel for the insured?                               12:10:02

14        A    It depends on what -- what the reservation   12:10:05

15   of rights is about, as I've testified already.         12:10:08

16        Q    So you agree that there could be             12:10:11

17   circumstances where a reservation of rights issued     12:10:12

18   by a liability insurer does not trigger the            12:10:14

19   insured's right to cumis or independent defense        12:10:18

20   counsel, correct?                                      12:10:21

21        A    Yes.                                         12:10:22

22        Q    And do you agree that a conflict of          12:10:23

23   interest entitling the insured to independent          12:10:24

24   defense counsel must be significant, not merely        12:10:28

25   theoretical, actual, not merely potential?             12:10:32
```

Page 119

Redacted Per Sealing Order

```
 4          So, you know, I'm not sure why they        12:12:11
 5   reserved rights, but they did reserve rights.  And  12:12:14
 6   by modifying it later it was very clear that they    12:12:18
 7   understood that the initial reservation of rights    12:12:21
 8   would have created conflict, especially on the basis 12:12:23
 9   of the occurrence definition.  So that's what I      12:12:27
10   observed and that's what I commented on in my        12:12:31
11   reports.                                             12:12:34
12      Q    So, Mr. Frangiamore, is it your opinion      12:12:35
13   and testimony that the overlap on liability issues   12:12:36
14   in the underlying case and coverage under the        12:12:41
15   Liberty policy involved whether or not Roseburg's    12:12:44
16   conduct was accidental or not accidental?            12:12:48
17      A    Yes, that's part of it.  Yes.                12:12:51
18      Q    Is there another part to it?                 12:12:53
19      A    I think that's the primary concern, that     12:12:56
```

Redacted Per Sealing Order

```
                                         Page 121
```

| | | |
|---|---|---|
| 1 | affects the coverage issues of the case. | 12:14:48 |
| 2 | Q    When Liberty issued its reservation of | 12:14:50 |
| 3 | rights, Redacted Per Sealing Order | 12:14:52 |
| 4 | Redacted Per Sealing Order | 12:14:54 |
| 5 | A    I'm not sure what knowledge they had. | 12:14:57 |
| 6 | They issued a general reservation of rights letter. | 12:15:00 |
| 7 | I don't have it in front of me, but they asserted -- | 12:15:03 |
| 8 | and they -- and they said, "We're reserving all | 12:15:05 |
| 9 | of" -- you know, "even to the extent we're not | 12:15:07 |
| 10 | specifying, we're reserving all of our rights under | 12:15:10 |
| 11 | the policy," okay? | 12:15:13 |
| 12 | So that means everything's on the table. | 12:15:14 |
| 13 | If you want -- if you want to issue a limited | 12:15:17 |
| 14 | reservation, why don't you issue that and say, | 12:15:20 |
| 15 | "Here's our" -- "the only thing we're reserving are | 12:15:21 |
| 16 | A, B or C." | 12:15:23 |
| 17 | That's not what they did.  They issued a | 12:15:24 |
| 18 | comprehensive reservation of rights saying, "All | 12:15:28 |
| 19 | options are on the table for us." | 12:15:30 |
| 20 | Q    Sir, you're equating a general reservation | 12:15:33 |
| 21 | of rights with a comprehensive reservation of | 12:15:35 |
| 22 | rights? | 12:15:38 |
| 23 | A    Yes, because what you'll have is, under | 12:15:41 |
| 24 | industry custom and practice it's not unusual and | 12:15:43 |
| 25 | there is nothing wrong, okay, with when an insurer | 12:15:47 |

Page 123

```
1    gets a claim and they may not know all the facts or        12:15:52

2    they may not know many facts about the claim, but          12:15:56

3    based on what they look at, they go, you know,             12:16:00

4    "We're not sure what position to take, but we want         12:16:04

5    to preserve our" -- you know, "potentially preserve        12:16:07

6    our coverage defense, and so we're gonna issue a           12:16:08

7    general reservation of rights."                            12:16:11

8             Now, as the case progresses, as they gain         12:16:13

9    information, they should be issuing more specific          12:16:18

10   reservations of rights because this is for the            12:16:21

11   benefit of the policyholder so the policyholder           12:16:24

12   knows where the insurance company stands on their         12:16:28

13   coverage positions, okay?  So there is really no          12:16:30

14   conflict there.  It's just, generally that's the way      12:16:36

15   it works when you have, you know, a case like this.       12:16:39

16        Q    So you're characterizing Liberty's initial     12:16:42

17   reservation of rights as a general reservation of         12:16:45

18   rights as you've just described it, correct?              12:16:48

19        A    Yeah.  That's what it would be                  12:16:50

20   considered -- it would be considered that based on        12:16:51

21   what they said, yes.                                      12:16:54

22        Q    And it's your opinion that a general            12:16:55

23   reservation of rights triggers the insured's right        12:16:57

24   to cumis counsel?                                         12:17:00

25        A    Well, what you do is, you look at --            12:17:02
```

Page 124

Exhibit 60, Page 045

```
 1    situation under industry custom and practice, any        12:19:45
 2    reasonable insurer would say, "Okay.  We don't want      12:19:49
 3    to give up our policy defenses here.  So then we         12:19:53
 4    have to give the insured an opportunity to appoint       12:19:56
 5    their own counsel."                                      12:19:58
 6        Q    Did you see anything in the documents that      12:20:00
 7    you reviewed that demonstrated any knowledge by          12:20:02
 8    Liberty, at the time that it issued its initial          12:20:08
 9
10
11        A    That, I don't know.  I'm not sure.              12:20:25
12        Q    When you were a claims manager, you             12:20:28
13    authored and approved many general reservation of        12:20:31
14    rights letters, correct?                                 12:20:34
15        A    Yes, sir.                                       12:20:36
16        Q    And in each of those circumstances, did         12:20:36
17    you always allow the insurer to select independent       12:20:38
18    or cumis defense counsel?                                12:20:43
19        A    It depended -- it depended.  I always took      12:20:47
20    the position that I -- if possible, I wanted the         12:20:55
21    insured to be happy with their counsel.  If they had     12:21:00
22    counsel that was representing them and I didn't have     12:21:03
23    a problem with their qualifications, knowledge,          12:21:07
24    experience, and training, I would make every effort      12:21:11
25    to allow them to use their personal counsel.             12:21:14
```

**Redacted Per Sealing Order**

Page 127

```
1            I had cases where I had counsel -- I had      12:23:11

2    appointed panel counsel where -- and they retained    12:23:14

3    their counsel and we agreed to disagree on fees; you   12:23:18

4    know, we would pay.  And we had two sets of counsel.   12:23:22

5            But I'm trying to think of an instance         12:23:28

6    when -- I can't think of an instance right now where   12:23:31

7    I told a policyholder, you know, "Your counsel is      12:23:35

8    fired and you have to take our counsel."               12:23:41

9            Normally we try to negotiate and work          12:23:46

10   something out with retained counsel, except there      12:23:49

11   were a couple -- I can think of one instance where I   12:23:54

12   fired a counsel, but it wasn't because of a cumis      12:23:59

13   issue, it was because of a different issue.            12:24:02

14   BY MR. CROWE:                                           12:24:04

15      Q    All right, Mr. Frangiamore.  Let me ask it     12:24:04

16   in a different way.  When you either authored or       12:24:06

17   approved a general reservation of rights letter in     12:24:11

18   your capacity as a claims manager --                   12:24:13

19      A    Yeah.                                           12:24:15

20      Q    -- you agreed that there were                  12:24:16

21   circumstances where you appointed carrier-retained     12:24:18

22   counsel to defend the insured, correct?               12:24:20

23      A    Yes.                                            12:24:23

24      Q    Right.  And so if that's true, how do you      12:24:24

25   reconcile your experience in that regard with the      12:24:28
```

                                             Page 129

Exhibit 60, Page 047

1    conflict and therefore I tried to work with them.    12:25:51

2         If they didn't have counsel -- I mean, if    12:25:55

3    they didn't have counsel, I appointed counsel for    12:25:59

4    them.  Usually that worked out quite well 'cause I    12:26:01

5    knew a lot of very excellent, competent counsel.    12:26:04

6         But if they -- if they had their own    12:26:08

7    counsel, I would try to work with their counsel to    12:26:10

8    use them because -- in other words, several -- you    12:26:14

9    know, there are a number of reasons for that, but    12:26:18

10   that's what I tried to do and I was mostly    12:26:20

11   successful.    12:26:24

12   Q    But there were certainly circumstances    12:26:24

13   where even though the insured had its own counsel,    12:26:27

14   you either authored or approved a general    12:26:31

15   reservation of rights letter and still, under those    12:26:34

16   circumstances, appointed carrier defense counsel,    12:26:37

17   correct?    12:26:40

18   A    There were some instances when I appointed    12:26:41

19   counsel, not -- not very many because I didn't like    12:26:43

20   to pay for two sets of lawyers.  But sometimes I did    12:26:46

21   just because I wanted to make sure I was getting all    12:26:50

22   the information necessary to evaluate the case and    12:26:54

23   evaluate the insured's liability.    12:26:57

24   Q    So in circumstances where you were a    12:27:00

25   claims manager and had issued a general reservation    12:27:02

Page 131

Exhibit 60, Page 048

| | | |
|---|---|---|
| 1 | defense," saying it's not an occurrence -- it's not | 12:30:37 |
| 2 | an occurrence or accident, because that would be a | 12:30:40 |
| 3 | way of an insurance company denying coverage, | 12:30:43 |
| 4 | saying, "We're only paying for accidents," you know, | 12:30:45 |
| 5 | occurrences, which include accidents.  "And this | 12:30:48 |
| 6 | wasn't an accident 'cause you intended this to | 12:30:51 |
| 7 | happen" or "You knew this was gonna happen, and we | 12:30:53 |
| 8 | don't pay for this part of the policy.  That's not | 12:30:56 |
| 9 | part of the coverage amount.  We pay only for | 12:30:58 |
| 10 | accidental or occurrence-based," you know, "exposure | 12:31:01 |
| 11 | to conditions under the occurrence definition." | 12:31:04 |
| 12 | So it's a standard way insurance companies | 12:31:08 |
| 13 | try to hedge their bets and say, you know, "We're | 12:31:12 |
| 14 | not gonna promise you we're gonna pay this claim | 12:31:15 |
| 15 | because if we find out that you were" -- "you knew | 12:31:19 |
| 16 | about this all along, we're not gonna pay any of the | 12:31:21 |
| 17 | claim." | 12:31:24 |
| 18 | And that's what they did initially, okay? | 12:31:24 |
| 19 | I know they changed their mind, but the problem is, | 12:31:27 |
| 20 | you know, the insured had already retained counsel. | 12:31:30 |
| 21 | And Liberty, unfortunately, dug its heels in and | 12:31:32 |
| 22 | said, "No, no, no.  You have to use our counsel." | 12:31:38 |
| 23 | And that's why we're here today and -- partially why | 12:31:40 |
| 24 | we're here today. | 12:31:43 |
| 25 | Q    So let me make sure I understand your | 12:31:45 |

Page 135

Exhibit 60, Page 049

```
 1    testimony in this regard.  I understand it's your      12:31:46

 2    view of -- and your characterization of Liberty's      12:31:49

 3    reservation of rights letter, but in your view         12:31:52

 4    Liberty's second -- subsequent reservation of rights   12:31:54

 5    letter removed the occurrence defense that you         12:31:57

 6    believe was asserted in the initial reservation of     12:32:03

 7    rights letter, correct?                                12:32:05

 8       A    Not that I believed.  They wouldn't have       12:32:07

 9    had to withdraw it if it wasn't asserted to begin      12:32:09

10    with.                                                  12:32:13

11       Q    All right.                                     12:32:13

12       A    But they did -- they knew it was asserted.     12:32:13

13    Otherwise, they wouldn't have had to withdraw it.      12:32:16

14       Q    And it's not -- it's consistent with          12:32:19

15    industry standards and practices and reasonable for    12:32:21

16    insurers, in your view, to modify reservation of       12:32:25

17    rights letters in that way, correct?                   12:32:29

18       A    Certainly.                                     12:32:31

19       Q    And so is it your opinion that when           12:32:32

20    Liberty issued their second reservation of rights      12:32:34

21    letter, it no longer owed a cumis obligation to        12:32:37

22    Roseburg?                                              12:32:40

23       A    That's a good question.  I'd have to, you     12:32:42

24    know, re-look at the letter to see if there's any      12:32:48

25    other issues with it.  That was the major issue, but   12:32:52
```

Page 136

1    these people who have been working hard and you're        12:35:16

2    gonna throw 'em out the door and tell them to send        12:35:19

3    their files to a brand-new firm who's gonna spend a       12:35:23

4    lot of time and effort to get up to speed."               12:35:26

5          And the question is, okay, maybe that will          12:35:28

6    save you a little money, but then the question is,        12:35:30

7    is that in the best interest of the insured.  Are        12:35:33

8    you doing what you can to minimize the liability of       12:35:35

9    the insured.                                              12:35:38

10         And so I always worried about that                 12:35:39

11   tremendously because I don't want to -- I don't want      12:35:42

12   to be accused of saying, "Well," you know,               12:35:45

13   "Mr. Frangiamore, you threw out our law firm just so      12:35:48

14   you could save a hundred bucks an hour on hourly          12:35:54

15   rates, but now we're in a worse position than we          12:35:57

16   were before."                                             12:36:00

17         So, I mean, you have to -- that's a                 12:36:01

18   practical problem you have to deal with if you're         12:36:03

19   engaging in this kind of change in position on            12:36:08

20   coverage.                                                 12:36:12

21   BY MR. CROWE:                                             12:36:12

22      Q    You've described it as a "practical               12:36:13

23   problem."  Here is just my last follow-up question:       12:36:14

24   Is it consistent with the insurance industry custom       12:36:16

25   and practice for a liability insurer to withdraw          12:36:21

Page 139

Exhibit 60, Page 051

```
 1   coverage defenses that otherwise triggered a cumis    12:36:26

 2   obligation to avoid any further obligation to pay     12:36:30

 3   for or provide the insured with independent defense   12:36:33

 4   counsel?                                              12:36:36

 5          MR. DeVRIES:  Asked and answered.              12:36:38

 6          THE WITNESS:  Yeah, and I've answered          12:36:38

 7   that.  I said you can -- you can withdraw your        12:36:39

 8   reservation of rights, but then you have to take      12:36:43

 9   into account whether by forcing the insured to        12:36:46

10   change defense counsel you are -- you are inhibiting  12:36:50

11   or jeopardizing the defense of the insured.           12:36:56

12          MR. CROWE:  All right.  Why don't we take      12:36:59

13   a break.                                              12:37:00

14          THE VIDEOGRAPHER:  Off the record at           12:37:02

15   12:37 p.m.                                            12:37:06

16          (At 12:37 p.m., the luncheon recess was

17          taken until 1:36 p.m.)

18

19

20

21

22

23

24

25
```

Page 140

1            Under a general liability policy, isn't it          01:41:38

2    true that the fact that damages claimed in the          01:41:42

3    underlying lawsuit against the insured, if those          01:41:45

4    damages are only partially covered by the policy,          01:41:49

5    that in and of itself does not trigger a right to          01:41:52

6    independent or cumis counsel?          01:41:56

7            MR. DeVRIES:  Objection.  Ambiguous,          01:41:59

8    "partially."          01:42:00

9            THE WITNESS:  And I think I already          01:42:03

10   answered that question, which is it depends on the          01:42:04

11   facts, the liability facts and the damage facts.          01:42:07

12   But in this case it depends on the policy terms and          01:42:10

13   exclusions and provisions of the policy.          01:42:13

14   BY MR. CROWE:          01:42:16

15       Q    Would you agree that within the insurance          01:42:17

16   industry standards and practices, that there is a          01:42:19

17   general proposition that the facts that damages in a          01:42:23

18   lawsuit against the insured may be both covered or          01:42:27

19   partially covered or not covered does not in and of          01:42:31

20   itself automatically entitle the insured to          01:42:33

21   independent or cumis defense counsel?          01:42:38

22       A    It depends on the individual facts of the          01:42:40

23   case and the policy terms, the liability issues, and          01:42:43

24   the damage issues.          01:42:47

25       Q    The fact that a complaint contains both          01:42:49

Page 145

Exhibit 60, Page 053

1    covered and non-covered claims does not                  01:42:52

2    automatically entitle the insured to appointment of      01:42:55

3    independent counsel, correct?                            01:42:58

4            MR. DeVRIES:  Asked and answered.                01:43:00

5            THE WITNESS:  To the extent it depends on        01:43:02

6    whether the -- the same answer as before but also        01:43:04

7    depends on whether there is a duty to defend claims       01:43:07

8    in the policy where the duty to defend is limited to      01:43:12

9    lawsuits.                                                01:43:17

10   BY MR. CROWE:                                            01:43:19

11       Q    Yeah.  And in connection with this matter       01:43:20

12   and Liberty's policy, Liberty's right and duty to        01:43:21

13   defend was to the defense of suits, correct?             01:43:25

14       A    Yes, I believe so.                              01:43:27

15       Q    And suits is a defined term to include          01:43:29

16   civil proceedings, correct?                              01:43:31

17       A    Yes.  I haven't it memorized, but I think       01:43:33

18   that's part of what's covered, yes.                      01:43:36

19       Q    So you would agree with me that Liberty's       01:43:38

20   policy did not obligate it to defend Roseburg            01:43:40

21   against claims arising out of the Mill Fire?             01:43:43

22       A    I would disagree with that because it           01:43:47

23   meant that you did not have an obligation to appoint     01:43:51

24   counsel until there was a lawsuit, okay?                 01:43:54

25           But it is up to the adjuster, if a claim         01:43:59

Page 146

Exhibit 60, Page 054

1    is made, to protect the insured pre-suit related to        01:44:02

2    the claim, but there is no obligation to retain        01:44:06

3    counsel until -- until either -- you know, under the        01:44:10

4    definition of either a lawsuit or it could be        01:44:15

5    sometimes defined as an arbitration proceeding, but        01:44:18

6    however it's defined in the policy.        01:44:21

7        Q    Do you agree that the duty to defend or        01:44:26

8    the benefit of defense coverage against suits that        01:44:29

9    would require the insurer to pay attorneys' fees        01:44:35

10   under liability insurance is usually triggered when        01:44:39

11   an insurer is served with the underlying complaint?        01:44:43

12       A    That's usually the case.  And sometimes it        01:44:55

13   will happen before service, when plaintiff will        01:44:58

14   notify them that in fact they filed the complaint        01:45:02

15   but haven't served it yet.  But I would say majority        01:45:05

16   of time it's because of service, but there is        01:45:09

17   exceptions to that.        01:45:11

18       Q    But the standard in the industry you would        01:45:13

19   agree, sir, as it relates to when there is an        01:45:15

20   obligation to pay attorneys' fees in defending        01:45:19

21   suits, is triggered when the suit is actually served        01:45:24

22   on the insurer?        01:45:27

23       A    I wouldn't believe -- I don't believe        01:45:29

24   that's a standard.  If -- for instance, if you        01:45:30

25   have -- if an insured gets a letter from plaintiff's        01:45:34

Page 147

Exhibit 60, Page 055

```
1    it was four and may have been five claims related to    01:46:57

2    wrongful death.                                         01:47:00

3        Q    Were any of those four or five lawsuits        01:47:01

4    that you're aware of ever served on Roseburg?          01:47:03

5        A    I'm not sure.                                  01:47:07

6        Q    Does it matter to you as to whether -- or      01:47:09

7    when Roseburg was entitled to a defense from Liberty    01:47:14

8    as to when service of process was made?                01:47:21

9        A    No, it doesn't -- it doesn't make a            01:47:25

10   difference because I think once you -- once you know    01:47:28

11   that your insured has a filed suit against them,        01:47:32

12   you're aware that you should be taking -- you know,     01:47:36

13   if you have duties to defend, then you should be        01:47:40

14   taking the initiative to help resolve that suit if      01:47:44

15   it's either imminent or likely that they are going      01:47:49

16   to be served.                                           01:47:54

17       Q    Do you have any understanding or knowledge     01:47:56

18   that Roseburg decided to remove to federal court the    01:48:01

19   lawsuits filed against it even though they had not      01:48:08

20   been served with official -- official service of the    01:48:10

21   summons and complaint?                                  01:48:14

22       A    Do I have an opinion about that?               01:48:16

23       Q    No.  That was a poor question.  Let me ask     01:48:18

24   it again.  Do you understand or did you learn or        01:48:19

25   discover that Roseburg, without being officially        01:48:24
```

Page 149

Exhibit 60, Page 056

1    communication to the insured that all or a portion          01:51:38

2    of the coverage that it promised under the policy          01:51:43

3    may not be available.  That's the only way I can --          01:51:48

4    I don't know how else to answer that.          01:51:55

5    BY MR. CROWE:          01:51:57

6         Q    Do you agree that an insured is not          01:51:59

7    entitled to independent or cumis defense counsel          01:52:02

8    merely because the insured has been sued for an          01:52:05

9    amount in excess of its liability insurance?          01:52:09

10        A    I agree with that.          01:52:16

11        Q    Do you also agree that an insured is not          01:52:18

12   entitled to independent or cumis defense counsel          01:52:20

13   merely because the underlying complaint against the          01:52:24

14   insured alleges a right to punitive damages?          01:52:27

15        A    I would agree with that.          01:52:31

16        Q    And so would you agree that a reservation          01:52:32

17   of rights indicating that the insurer will not          01:52:34

18   indemnify the insured against a punitive damages          01:52:38

19   award does not trigger a right to independent or          01:52:41

20   cumis defense counsel?          01:52:46

21        A    I would agree with that.          01:52:47

22        Q    Sir, do you agree that a reservation of          01:52:54

23   the right to seek reimbursement of defense costs          01:52:57

24   solely allocable to non-covered claims does not          01:53:01

25   automatically trigger the insured's right to          01:53:06

Page 152

Exhibit 60, Page 057

1    independent or cumis defense counsel?                01:53:09

2        A    I would need to know the specific          01:53:21

3    reservation of rights in light of the allegations of 01:53:26

4    the complaint and in light of the policy, the scope  01:53:30

5    of coverage provided by the policy before I could -- 01:53:35

6    that's an individual case-by-case basis that I would 01:53:38

7    need to look at the facts more specifically before I 01:53:43

8    could reach any conclusions on it.                   01:53:46

9        Q    Do you have a conclusion or opinion in     01:53:49

10   this case that any reservation that Liberty made to  01:53:50

11   seek reimbursement of defense fees solely allocable  01:53:55

12   to the defense of non-covered claims trigger a cumis 01:53:59

13   obligation?                                          01:54:10

14       A    You know what?  I don't recall that        01:54:10

15   specific issue coming up, so I don't -- so I don't   01:54:12

16   have an opinion on it 'cause I didn't specifically   01:54:15

17   think about that issue.                              01:54:18

18       Q    You would agree that under most general    01:54:22

19   liability insurance policies, if not all of them,    01:54:24

20   the insured has a duty to cooperate with the         01:54:26

21   insurer's claims investigation and defense of either 01:54:28

22   claims or suits?                                     01:54:32

23       A    Yeah, there is a general duty to cooperate 01:54:34

24   under the standard form language.                    01:54:36

25       Q    And the Liberty policy issued to Roseburg  01:54:39

Page 153

Exhibit 60, Page 058

```
 1   has the standard cooperation clause?                01:54:50

 2        A    Yes, I believe so.                         01:54:52

 3        Q    And, of course, I know you're familiar     01:54:53

 4   with the no voluntary payments clause of most        01:54:55

 5   general liability policies, correct?                 01:54:58

 6        A    I am.                                       01:55:01

 7        Q    And you would agree with me that Liberty's 01:55:03

 8   policy to Roseburg contained a no voluntary payments 01:55:05

 9   provision?                                           01:55:10

10        A    It did.  It's -- it contained the          01:55:11

11   standardized ISO form language.                      01:55:13

12        Q    And do you agree, sir, that the no         01:55:16

13   voluntary payments clause is usually applied         01:55:17

14   strictly?                                            01:55:21

15        A    I'm not sure what you mean by "strictly."  01:55:27

16   It's -- it's applied as it's intended to be looking  01:55:30

17   at -- you know, with the carrier looking at the      01:55:36

18   facts and circumstances of the case, so I'm not sure 01:55:39

19   what you mean by "strictly."                         01:55:42

20             You look at it as a claims handler or a    01:55:45

21   claims manager and you decide whether there is       01:55:48

22   anything that the insured is submitting to you that  01:55:53

23   you believe may be precluded by any policy condition 01:55:55

24   or provision, including the voluntary payments       01:55:59

25   clause.                                              01:56:02
```

Page 154

Exhibit 60, Page 059

1    determination in that regard.  I'm asking you to          02:00:13

2    confirm your understanding and opinion that the no        02:00:15

3    voluntary payments provision can apply even after         02:00:18

4    notice of tender to the insurer, true?                    02:00:23

5         A    I know that some insurance companies have       02:00:27

6    taken that position in particular cases.  I don't         02:00:29

7    have a specific recollection of that, but I think         02:00:32

8    hypothetically that's possible.                           02:00:35

9         Q    Do you have an opinion as to whether the        02:00:38

10   no voluntary payments provision applies post-notice       02:00:39

11   or tender to the insurer?                                 02:00:44

12        A    It depends on the individual circumstances      02:00:46

13   of the case.                                              02:00:47

14        Q    So it can or cannot apply, correct?             02:00:48

15        A    Yeah.  It depends on the circumstances of       02:00:51

16   the case and the facts of the case.                       02:00:53

17        Q    Right.  But it's not your view that the no      02:00:55

18   voluntary payments provision can never apply              02:00:56

19   post-tender or post-notice to the insurer?                02:00:59

20        A    Yeah.  It all depends on the individual         02:01:03

21   facts of the case.                                        02:01:05

22        Q    Great.  Do you agree, sir, that in              02:01:06

23   California liability insurers comply with industry        02:01:09

24   standards and regulations when they respond within        02:01:14

25   40 days from the date of the insured's tender of a        02:01:18

Page 158

```
1   claim for defense with the insurer's coverage        02:01:21

2   decision or position?                                 02:01:25

3       A    Well, I think you're referring to the       02:01:31

4   California Code of Regulations and Unfair Claim       02:01:33

5   Practices regulations, which I'm familiar with.      02:01:37

6            I mean, regulations, in essence, say        02:01:39

7   within 40 days of proof of claim an insurance        02:01:42

8   company should provide its insured with a coverage   02:01:44

9   determination unless it has essentially good cause   02:01:49

10  and request additional time, which "for good cause"  02:01:52

11  means they can ask for additional time.  That's      02:01:56

12  generally the way it works.                          02:01:59

13      Q    Did Liberty comply with that regulation in  02:02:01

14  relation to the Mill Fire and Roseburg?              02:02:03

15           MR. DeVRIES:  You're referring to the       02:02:06

16  Liberty primary policy?                              02:02:07

17           THE WITNESS:  Well, I think what Liberty    02:02:09

18  did is, they ultimately agreed to pay their policy   02:02:11

19  limits.  That's part -- that's part of their         02:02:15

20  obligation, not -- not their whole obligation.       02:02:17

21  BY MR. CROWE:                                         02:02:19

22      Q    Did Liberty timely respond to Roseburg's    02:02:19

23  tender of defense consistent with the regulation?    02:02:22

24      A    With respect to the defense of the          02:02:38

25  personal injury actions, yes, because they responded 02:02:43
```

Page 159

Exhibit 60, Page 061

1    within -- within less than 40 days.  With respect to          02:02:49

2    the claims, no.                                                 02:02:54

3        Q    What's the distinction you're drawing                 02:02:57

4    between the personal injury matters and the claims?             02:02:58

5        A    Because they -- they appointed David Bona              02:03:03

6    as defense counsel for the personal injury actions.            02:03:06

7             They did not -- they did not do any                    02:03:10

8    functional adjusting of the claim other than assign            02:03:13

9    a desk adjuster back East to purportedly investigate           02:03:17

10   the claim, with zero adjusters with boots on the               02:03:22

11   ground either from Liberty, from any Liberty CAT               02:03:27

12   team, from any hired independent adjuster.                     02:03:32

13            Zero people were sent to Weed, California,            02:03:37

14   from either the Liberty claim department or from any           02:03:42

15   designated, available adjusting agency department              02:03:46

16   that Liberty could have hired to start investigating           02:03:49

17   and adjusting the hundreds of claims that were being           02:03:54

18   made in Weed.                                                   02:03:58

19       Q    You saw the letters from Baker Hostetler              02:04:00

20   to Liberty tendering the lawsuits that had been                02:04:02

21   filed against Roseburg arising from the Mill Fire,             02:04:06

22   correct?                                                        02:04:09

23       A    Yes, I believe so.  That's part of what              02:04:11

24   I -- what is in the exhibits to my reports.                    02:04:12

25       Q    And is it your testimony that those                  02:04:15

                                                       Page 160

Exhibit 60, Page 062

1   lawsuits only involved personal injury claims and          02:04:16

2   not property damage claims?                                02:04:20

3       A    I don't -- I don't have those lawsuits          02:04:26

4   memorized.  I presume they would have also included       02:04:28

5   property damage claims.                                    02:04:31

6       Q    And you would agree with me, sir, that          02:04:33

7   Liberty timely responded to those tenders indicating      02:04:35

8   that they would defend Roseburg in those matters          02:04:38

9   with Mr. Bona?                                             02:04:40

10      A    They -- they gave a timely response to          02:04:45

11  those matters, as I stated earlier.                        02:04:48

12      Q    Mr. Frangiamore, is it your opinion and         02:04:57

13  position that independent or cumis defense counsel's      02:05:01

14  sole role is to defend the insured in the underlying      02:05:05

15  liability action or actions and not to provide the        02:05:09

16  insured with insurance coverage advice?                    02:05:12

17      A    (To the reporter)  Can you read that           02:05:14

18  question back, please.                                     02:05:23

19          (Record read as follows:                         02:05:46

20          "Q.  Mr. Frangiamore, is it your opinion         02:05:46

21          and position that independent or cumis           02:05:46

22          defense counsel's sole role is to defend         02:05:46

23          the insured in the underlying liability          02:05:46

24          action or actions and not to provide the         02:05:46

25          insured with insurance coverage advice?")        02:05:46

                                                Page 161

1           THE WITNESS:  I've never heard of that          02:05:48

2   scenario, Counsel.                                      02:05:49

3   BY MR. CROWE:                                           02:05:50

4        Q    It's not asking you if you've heard about    02:05:52

5   the scenario.  The question is as follows:             02:05:54

6           Is it your opinion that independent or         02:05:57

7   cumis defense counsel's sole role is to defend the     02:05:59

8   insured in the underlying liability action or          02:06:03

9   actions and not to provide the insured with            02:06:06

10  insurance coverage advice?                             02:06:09

11       A    Well, the problem with your question is      02:06:12

12  somehow -- independent counsel somehow would be        02:06:17

13  ignorant of the coverage issues in the case.           02:06:21

14          And the whole purpose of having                02:06:25

15  independent counsel is to make sure that the           02:06:27

16  insured's interest vis-à-vis reservation of rights     02:06:30

17  are not prejudiced so that independent counsel has     02:06:35

18  to be aware of the coverage issues to protect its      02:06:39

19  insured to make sure its insured is not put in a       02:06:44

20  position where its coverage is eliminated or           02:06:48

21  minimized.                                             02:06:51

22          And I don't -- and I've been cumis             02:06:52

23  counsel, so I don't know how you would do that.        02:06:54

24  Your question implies that the cumis counsel would     02:06:56

25  have to be ignorant of the insurance issues.  And      02:07:00

                                        Page 162

Exhibit 60, Page 064

```
 1    it's just the opposite.  The insurance cumis has to      02:07:03

 2    be aware of the insurance issues to protect the          02:07:06

 3    interest of his or her client.                           02:07:08

 4        Q    My question isn't asking about whether          02:07:11

 5    cumis counsel should know about insurance issues.        02:07:13

 6             My question is:  Is it your position that       02:07:16

 7    cumis counsel's sole role is to defend the insured       02:07:21

 8    in the underlying liability action but not to            02:07:24

 9    provide coverage advice to the insured?                  02:07:27

10             Can you answer it any differently than you      02:07:31

11    already have?                                            02:07:33

12        A    No, I can't.  I really can't, because           02:07:33

13    you're asking for something that doesn't exist in        02:07:35

14    reality.                                                 02:07:37

15        Q    Is it true that in the context of               02:07:38

16    insurer-appointed counsel, or tripartite counsel,        02:07:40

17    that they should not involve themselves in coverage      02:07:45

18    issues or give coverage advice to the insured?           02:07:49

19        A    I have to say the same answer.  And the         02:07:56

20    reason for that is, as someone who is in a               02:07:59

21    tripartite relationship, any counsel representing an     02:08:02

22    insured needs to be aware of protecting the              02:08:08

23    interests of the insured and, if there is a              02:08:13

24    conflict, that the -- or anything comes up, that the     02:08:15

25    interests of the insured are protected under the         02:08:20
```

Page 163

Exhibit 60, Page 065

1    lawyers' ethics rules.                              02:08:24

2          So you can't -- in either situation you       02:08:26

3    can't have blinders on, you have to be -- at least  02:08:30

4    be aware of any potential issues that could impact  02:08:33

5    your client if you're the lawyer.                   02:08:38

6          Q    Let me ask it a little bit more          02:08:41

7    specifically:  In your opinion, is it acceptable for 02:08:43

8    independent or cumis defense counsel to advise their 02:08:47

9    client, the insured, on whether claims are or are    02:08:52

10   not covered under their liability insurance policy?  02:08:55

11         A    That is an issue that independent counsel 02:09:02

12   may need to take into consideration in defending an  02:09:05

13   insured.                                             02:09:09

14         Q    Same question with respect to            02:09:11

15   insurer-appointed or tripartite counsel.  Is it your 02:09:14

16   opinion that it's acceptable for insurer-appointed   02:09:18

17   counsel or tripartite defense counsel to give advice 02:09:22

18   to their insured client about what damages or claims 02:09:25

19   may or may not be covered under their liability      02:09:28

20   insurance?                                           02:09:30

21         A    The same answer I would give.  You have to 02:09:31

22   be aware of those issues to make sure your client   02:09:34

23   isn't prejudiced.                                    02:09:36

24         Q    So if Baker Hostetler were to have given  02:09:38

25   insurance coverage advice to Roseburg in relation to 02:09:41

                                            Page 164

Exhibit 60, Page 066

1    the Mill Fire, in your view that would be acceptable    02:09:45

2    and consistent with industry practices, or does it    02:09:49

3    depend?    02:09:57

4        A    Well, I'm not sure what you mean by    02:09:59

5    "insurance coverage advice."  You mean if they    02:10:00

6    give -- a lawyer can give their client insurance    02:10:07

7    coverage advice, so what's -- in a vacuum lawyers    02:10:11

8    can gave their clients insurance coverage advice, so    02:10:16

9    I don't understand the context of your question.    02:10:19

10        MR. CROWE:  Okay.  What's our next    02:10:21

11    exhibit?    02:10:32

12        THE REPORTER:  "182."    02:10:32

13        MR. CROWE:  "182."    02:10:33

14        Mr. Frangiamore, I'm gonna mark for    02:10:40

15    identification as Exhibit 182 what I'll represent to    02:10:43

16    you to be excerpts of what I understand is your    02:10:45

17    publication, titled "How Insurance Companies Settle    02:10:48

18    Cases."  It's obviously not the entire publication,    02:10:51

19    it's excerpts of it.    02:10:54

20        Take a minute to review it and then let me    02:10:56

21    know when you are ready for some questions.    02:10:58

22        (Exhibit 182 marked for identification.)    02:11:04

23        THE WITNESS:  Okay.  I've flipped through    02:11:33

24    it.  It looks like it's excerpts.  It's not in the    02:11:35

25    same formatting I would have on my -- in my book,    02:11:39

Page 165

```
1    That's correct.                                      02:18:52

2        Q    In this case, have you opined or reached     02:18:58

3    any opinions or conclusions as to whether Ohio --     02:19:02

4    strike that.  Let me back up for a second.            02:19:04

5            Other than your opinion that Liberty          02:19:07

6    waived the occurrence requirement or term, have you   02:19:10

7    reached any other opinions that Liberty waived other  02:19:18

8    defenses to coverage as part of your expert work in   02:19:21

9    this matter?                                          02:19:25

10       A    Yes.                                         02:19:28

11       Q    What other coverage defenses in your view    02:19:29

12   did Liberty waive?                                    02:19:32

13       A    Any wildfire exclusion under the Ohio        02:19:34

14   Casualty policy.                                      02:19:39

15       Q    And in fact Liberty never asserted a         02:19:42

16   wildfire exclusion to -- as a defense to its          02:19:44

17   coverage under the primary policy, correct?           02:19:48

18       A    You're absolutely right.                     02:19:49

19       Q    And Ohio Casualty never asserted a           02:19:51

20   wildfire exclusion as a defense to coverage,          02:19:53

21   correct?                                              02:19:58

22           MR. DeVRIES:  That -- that question           02:20:00

23   violates counsel's fundamental obligations under the  02:20:03

24   Rules of Court, and I object.  That's a frivolous      02:20:08

25   question, no basis.                                   02:20:14
```

Page 172

1    BY MR. CROWE:                                      02:20:15

2        Q    Let me ask it differently:  Are you --   02:20:15

3    strike that.  You would agree with me, sir, that  02:20:18

4    Ohio Casualty never issued a coverage position     02:20:21

5    letter to Roseburg as relates to the coverages under 02:20:25

6    their excess policy?                               02:20:28

7        A    Right, they did -- they did not.  And     02:20:31

8    although they had an obligation to 'cause they      02:20:34

9    received notice of the claim, they never reached a  02:20:38

10   coverage decision or determination prior to the time 02:20:41

11   they were sued.  So I think the record is clear on  02:20:44

12   that.                                              02:20:46

13       Q    And you would agree with me, sir, there   02:20:47

14   was never a coverage position letter issued by Ohio 02:20:48

15   Casualty to Roseburg asserting a wildfire exclusion 02:20:52

16   under its excess or umbrella policy, correct?       02:20:57

17       A    That's right, but there should have been  02:21:02

18   because they discussed applying the wildfire        02:21:03

19   exclusion in their -- in their communications with  02:21:06

20   claims and underwriting and never informed the      02:21:10

21   insured that they were contemplating denying        02:21:13

22   coverage on that basis.                            02:21:19

23       Q    Did Ohio Casualty ever deny coverage on   02:21:20

24   the basis of a wildfire exclusion in its policy?    02:21:22

25            MR. DeVRIES:  Same objection that I made a 02:21:27

                                            Page 173

1    asked.  I'm gonna move to strike your response as        02:23:50

2    being nonresponsive, and I'm doing that for a number     02:23:53

3    of reasons, including trying to get through today's      02:23:56

4    examination.                                             02:24:00

5            The question is about waiver.  Is it your        02:24:00

6    opinion, and have you drawn the opinion, that Ohio       02:24:02

7    Casualty waived defenses to coverage as it relates       02:24:04

8    to the Mill Fire?                                        02:24:09

9            MR. DeVRIES:  Objection.  Asked and              02:24:11

10   answered in the prior ques- -- object.  The motion       02:24:12

11   to strike was not properly taken because he was          02:24:15

12   answering the question that has now been asked           02:24:19

13   several times.                                           02:24:22

14           THE WITNESS:  I believe that they waived         02:24:23

15   the right to assert the wildfire exclusion by their      02:24:24

16   failure to investigate and respond and process the       02:24:29

17   claim.                                                   02:24:35

18           And that failure to process is one of the        02:24:37

19   most fundamental violations of -- of adjusting           02:24:40

20   requirements that you can imagine, 'cause the            02:24:45

21   insured is at least entitled to a coverage               02:24:48

22   determination.  And Ohio Casualty didn't even extend     02:24:51

23   the courtesy of that to Roseburg.                        02:24:55

24   BY MR. CROWE:                                            02:24:58

25       Q    And at what point in time did Ohio              02:24:59

                                                    Page 176

Exhibit 60, Page 070

```
1    Casualty waive the wildfire exclusion as a defense      02:25:02

2    to coverage in relation to the Mill Fire?               02:25:06

3        A    Well, I know it was when they refused --       02:25:11

4    when they ignored the claim and failed to process       02:25:14

5    the claim.  And so what that meant was, when you        02:25:17

6    fail -- when you fail to process a claim, that's        02:25:20

7    what we call in the industry a de facto denial of       02:25:23

8    coverage.                                               02:25:26

9            And a de facto denial of coverage is            02:25:27

10   actually worse than a regular denial of coverage,       02:25:29

11   'cause at least under a denial of coverage, under       02:25:32

12   the regulations you are entitled to a factual --        02:25:35

13   you're entitled to a factual basis and policy           02:25:37

14   language basis as to why the claim coverage is not      02:25:42

15   extended.  Ohio Casualty did not even provide that      02:25:45

16   minimum requirement to Roseburg.                        02:25:49

17       Q    When should they have provided that            02:25:53

18   minimal coverage (sic) to Roseburg, in your view?       02:25:55

19       A    Well, you mean coverage determination?         02:25:58

20       Q    Yes.  Thank you.                               02:26:01

21       A    Okay.  Well, they should have -- when they     02:26:01

22   received the claim, they had 40 days to -- to make a    02:26:03

23   determination.  If they wanted additional time and      02:26:09

24   they had a good cause to do that, they could ask,       02:26:12

25   "Hey, we need additional time because of X, Y, and      02:26:14
```

Page 177

Exhibit 60, Page 071

```
 1   Z."  They didn't do that.                        02:26:16

 2        And so there is no explanation that I can   02:26:19

 3   tell in the file or even recognition in the file 02:26:22

 4   that they did something wrong.  I mean, this is like 02:26:27

 5   a fundamental -- you know, I underwrote thousands of 02:26:30

 6   claim files.                                      02:26:35

 7        To have a major -- you know, a mass          02:26:36

 8   casualty claim where you provide millions --      02:26:40

 9   $20 million in coverage, and you don't answer the 02:26:43

10   claim?  I mean, it's -- you know, I mean, I'm still 02:26:47

11   confused to this day how -- how that could have   02:26:54

12   taken place.                                      02:26:57

13        Q    The Ohio Casualty policy issued to      02:26:59

14   Roseburg did not include a duty to defend Roseburg 02:27:02

15   against claims or suits, correct?                 02:27:07

16        A    Yes, I agree with you.                  02:27:10

17        Q    And so its only obligation was to       02:27:12

18   indemnify Roseburg against actually-covered claims, 02:27:15

19   correct?                                          02:27:20

20        A    You know, I have to double-check whether 02:27:21

21   it also included reimbursement of defense costs.  I 02:27:23

22   know it wasn't a duty -- separate duty to defend,  02:27:26

23   but whatever was covered would be -- would spend   02:27:28

24   down the limit.  So there wasn't a separate duty to 02:27:31

25   defend like there was under the Liberty policy and, 02:27:34
```

Page 178

Exhibit 60, Page 072

```
1    I believe, the Markel policy, so that was different.    02:27:37

2         Q    Did the Ohio Casualty policy have a          02:27:41

3    reimbursement of defense fees provision?               02:27:43

4         A    I can't recall one way or the other.         02:27:45

5         Q    Ohio Casualty did not deny coverage --       02:27:49

6    indemnity coverage to Roseburg, correct?  Let me ask   02:27:52

7    it this way.  Strike that and I'll ask it              02:27:57

8    differently.                                           02:28:00

9              You understand that Ohio Casualty did not    02:28:00

10   deny indemnity coverage and in fact paid its           02:28:03

11   $20 million in policy limits to Roseburg in            02:28:07

12   reimbursement of Roseburg's settlements of covered     02:28:10

13   claims, correct?                                       02:28:15

14        A    I know they did pay -- ultimately, after     02:28:18

15   they were sued, they paid their $20 million in         02:28:21

16   limits.  And to the extent you said for covered        02:28:24

17   claims, I don't know -- I know they paid their         02:28:26

18   $20 million in limits.  I don't know if there was an   02:28:30

19   analysis of what was covered and not covered.          02:28:34

20        Q    Could you turn to the -- it's the            02:29:28

21   second-to-last page of the excerpts of your            02:29:30

22   publication.                                           02:29:38

23        A    Okay.                                        02:29:40

24        Q    And right before the demarcation of          02:29:47

25   page 4-72, above it -- the paragraph above it or the   02:29:51
```

Page 179

Exhibit 60, Page 073

1  experience related to defending against claims        02:40:04

2  rather than pursuing claims?                          02:40:11

3      A    Well, I think their claims related to        02:40:14

4  adjusting claims.  They were -- AlixPartners is not   02:40:18

5  a law firm.  They were there to adjust --             02:40:22

6  essentially act as adjusters of the claim.            02:40:24

7          What do I mean by that?  It means in           02:40:27

8  general terms what's an adjustment of a claim, it's   02:40:29

9  what makes a claim.  You value it and you pay it,     02:40:32

10  okay?                                                02:40:34

11          Defending a claim involves -- it could       02:40:35

12  be -- involve two aspects:  Defense and indemnity.   02:40:40

13  And here, they weren't hired to conduct defense.  I  02:40:44

14  think everyone understood that even though there was 02:40:49

15  some discussion of subrogation possibilities, which  02:40:53

16  we can get into if you want, but -- is that everyone 02:40:58

17  knew this was a mass casualty event and that         02:41:02

18  Roseburg was gonna be responsible for it.            02:41:05

19          And so the question was, how do you -- and   02:41:07

20  there's thousands of people affected, hundreds of    02:41:10

21  homes and businesses included.  What are you gonna   02:41:14

22  do to address these claims quickly to minimize your  02:41:17

23  financial exposure?                                  02:41:23

24          And so they came in, just like they did      02:41:25

25  with Bernie Madoff -- people were cheated out of     02:41:28

                                                  Page 187

Exhibit 60, Page 074

1    their money -- they came in to try to help get these    02:41:31

2    people compensated.    02:41:35

3            PG&E, same thing.  There is victims that    02:41:36

4    need to be compensated.  How do we administer that    02:41:41

5    in an efficient way to make sure people get what    02:41:46

6    they're entitled to and, you know -- and that's what    02:41:49

7    they do.    02:41:54

8            And that's a big -- 'cause, as we know,    02:41:54

9    this is a big undertaking, right, when you're -- you    02:41:57

10   want to dole out millions of dollars and you have    02:42:01

11   thousands of people and how do you keep control of    02:42:05

12   that and administer that in a fair and efficient way    02:42:08

13   so people are adequately compensated for their    02:42:13

14   losses.    02:42:16

15       Q    Do you have an understanding as to whether    02:42:16

16   AlixPartners, at the time they were doing work on    02:42:18

17   the Mill Fire, were or were not licensed as    02:42:21

18   insurance adjusters or insurance claims adjusters?    02:42:25

19       A    I don't know one way or the other.  I    02:42:27

20   didn't look into that.    02:42:28

21       Q    Have you drawn any conclusions as to    02:42:30

22   whether Alix's work in adjusting claims, if they    02:42:32

23   were unlicensed to do so, would or would not be    02:42:38

24   compliant with governing regulations?    02:42:41

25       A    You know, I didn't look into that.  I know    02:42:47

                                            Page 188

```
 1    that they were -- I believe they were working for      02:42:50
 2    Roseburg, who hired them, okay?  So as a -- as an      02:42:50
 3    agent of Roseburg, I think a private company can --    02:42:57
 4    you know, they can hire people to help them with       02:43:01
 5    administering claims.                                  02:43:07
 6            Remember that -- you have to keep in mind       02:43:12
 7    that most of this money was Roseburg's money, it       02:43:14
 8    wasn't gonna be reimbursed by insurance companies.     02:43:17
 9    So the question becomes, do they have a right to       02:43:20
10    hire a company to distribute money to minimize their   02:43:23
11    liability that's their own money?                      02:43:26
12            Now, ultimately maybe some of it gets          02:43:29
13    reimbursed by the insurance company, but my            02:43:31
14    understanding is, they hired them because they         02:43:34
15    needed -- and they did need somebody right away to     02:43:37
16    address these claims to minimize their liability,      02:43:40
17    which was -- and most of their liability was           02:43:42
18    uninsured based on the scope of the -- you know, the   02:43:44
19    extent of this mass casualty loss.                     02:43:47
20    Q    Is it your understanding that California          02:43:50
21    regulations require insurers to use licensed           02:43:55
22    adjusters when adjusting claims?                       02:44:01
23    A    My familiarity -- I'm not an expert on            02:44:06
24    adjuster licensing, but I know that -- but under the   02:44:09
25    claim handling regulations all insurance companies     02:44:13
```

Page 189

Exhibit 60, Page 076

1    and any adjusting agencies they hire need to be          02:44:17

2    familiar with and receive annual training on the         02:44:20

3    claims practices and regulations.                        02:44:24

4           So that's the extent to -- you know, that          02:44:26

5    I know about licensing.  I am not an expert on            02:44:28

6    public adjuster licenses or other -- other type           02:44:31

7    stuff, but that's the extent of what I know.              02:44:34

8        Q    So you have not drawn an opinion or a            02:44:37

9    conclusion as to whether Liberty was required to use      02:44:39

10   licensed adjusters with respect to investigating and     02:44:42

11   adjusting Mill Fire claims; is that correct?             02:44:44

12       A    Yeah, I didn't -- that wasn't what I was         02:44:49

13   asked to do.                                              02:44:51

14       Q    Did -- did AlixPartners undergo training        02:44:52

15   of the unfair settlement practices in California?        02:44:56

16       A    I don't know.                                    02:44:59

17       Q    Did you ask them?                                02:45:00

18       A    I didn't ask them.                               02:45:01

19       Q    What is the second question, again?             02:45:04

20       A    "What is background and experience of your      02:45:06

21   people that worked on this project."                      02:45:10

22       Q    And their response?  Was it the same as --      02:45:13

23       A    Well, it's just -- it was general -- it          02:45:16

24   was kind of a general answer.  They had people who        02:45:20

25   had knowledge about accounting; they had people who       02:45:23

                                            Page 190

Exhibit 60, Page 077

```
1    had knowledge who were like computer database        02:45:27

2    experts; they had -- they had people who had         02:45:30

3    experience, I guess, going out in the field.         02:45:37

4            So it was -- it was a wide variety of         02:45:40

5    people, not necessarily all people who were          02:45:44

6    insurance adjusters, per se, but people who had had  02:45:49

7    experience in property valuation -- you know,        02:45:55

8    valuation of property.                               02:45:58

9            I think one of their emphasis was people     02:46:00

10   who could set up and adminis- -- you know, set up    02:46:04

11   offices, set up the right databases and computer     02:46:07

12   systems and form systems so that the                 02:46:10

13   administration -- you know, the intake of the        02:46:15

14   information was accurate and maintained and they     02:46:17

15   could maintain the proper database.                  02:46:23

16           And they had frontline people who would      02:46:26

17   make contact -- make sure they had lots of personal  02:46:28

18   contact with the victims.  So they wanted to have    02:46:32

19   those boots on the ground as community centers.      02:46:35

20           So they had logistics people who had to      02:46:38

21   set up intranet networks, you know, computer         02:46:41

22   connections, Wi-Fi, develop forms, develop intake    02:46:45

23   methods, develop databases so that -- which is a lot 02:46:50

24   of, you know, work to do just before you can even,   02:46:56

25   you know, start to administer the claim and evaluate 02:47:00
```

Page 191

Exhibit 60, Page 078

1       A    You know, other than what I've just        02:50:45

2    testified today and I just observed preparing for   02:50:46

3    this depo, I didn't go into further detail on it.    02:50:49

4       Q    Was that an expert opinion you intend to    02:50:52

5    offer at trial?                                      02:50:55

6       A    I wasn't asked to offer expert opinions on  02:50:56

7    the -- on the details of the Alix bills.             02:50:59

8       Q    Right.  So you're not -- you're not         02:51:02

9    intending to take the stand and testify as to the    02:51:04

10   observations as you've just described it; is that    02:51:07

11   fair?                                                02:51:10

12          MR. DeVRIES:  His testimony was -- was        02:51:11

13   clear as to what he was doing.  Asked and answered.  02:51:13

14   He wrote a rebuttal report.                          02:51:19

15          THE WITNESS:  Well, I testified -- you        02:51:21

16   asked me a question.  I answered your question.  Now  02:51:23

17   you're telling me you don't want me to say that at   02:51:26

18   trial.  Well, you guys will argue about what I get   02:51:29

19   to testify at trial.  I don't want to get into that.  02:51:32

20   BY MR. CROWE:                                        02:51:35

21      Q    Did you review and analyze all of the       02:51:35

22   AlixPartners invoices?                               02:51:37

23      A    Well, I looked at them quickly, and that    02:51:39

24   -- that one issue popped out at me, but I didn't     02:51:41

25   look at them in any depth.                           02:51:44

                                        Page 195

Exhibit 60, Page 079

1    Q    Did you inquire of AlixPartners, including    02:51:46

2   in your conversation with Mr. McEvoy and his boss,    02:51:49

3   about how they went about staffing the work that    02:51:52

4   they performed?    02:51:55

5    A    Yeah, I did.  And they said they wanted to    02:51:55

6   make sure they had at least 12 to 14 people there    02:51:58

7   around.  Mr. McEvoy said he flew back and forth.  He    02:52:02

8   said it was exhausting 'cause he would put in    02:52:06

9   like -- he said like 12-hour days, six days a week,    02:52:09

10   he'd fly back 'cause he said he wanted to see his    02:52:12

11   son in New York, then he'd fly back again.  He    02:52:16

12   said -- he said it was very, very intensive work,    02:52:19

13   nonstop work to address the needs of these claimants    02:52:22

14   and that it went on for several months like that.    02:52:27

15    Q    Did he tell you how they determined from    02:52:30

16   what offices and what individuals they would use to    02:52:32

17   staff the work?    02:52:36

18    A    No.    02:52:36

19    Q    Did you inquire of him on that question?    02:52:37

20    A    No.    02:52:39

21    Q    Did you -- does the scope of your opinions    02:52:41

22   involve any analysis as to the reasonableness or    02:52:43

23   necessity of the Baker Hostetler work and invoices?    02:52:46

24    A    I didn't go into any detail of that.  I    02:52:51

25   looked at that, but I didn't go into -- I didn't    02:52:54

Page 196

Exhibit 60, Page 080

1    go -- I wasn't asked to comment specifically on the          02:52:57

2    details of that.                                             02:53:00

3        Q    Do you have any expert opinions that you            02:53:01

4    intend to offer at trial as relates to the                   02:53:02

5    reasonableness or necessity of the Baker Hostetler           02:53:05

6    work and invoices?                                           02:53:08

7        A    Yeah, I wasn't asked to look at that, so I          02:53:10

8    don't have any further opinions on it.                       02:53:12

9        Q    Back to your notes.  And this is taking             02:53:14

10   some time, but I need you to read -- if you could            02:53:17

11   start with page 1, if you could read that into the           02:53:21

12   record, please.                                              02:53:23

13       A    Okay.  Top of the page, "Roseburg                   02:53:24

14   rebuttal."  Then there is the number "1" and I               02:53:28

15   have -- I wrote down "Molander" and then, No. 1,             02:53:31

16   "Conflict existed."                                          02:53:35

17            No. 2.  "Liberty only reserved on 3 cases.          02:53:41

18            "3.  If Baker had conflict, why didn't              02:53:50

19   Liberty let them choose their own counsel."                  02:53:54

20   Next line, "Hirschfeld - McLarens adjuster.                  02:53:59

21            "No. 1.  Liberty never appointed or asked           02:54:07

22   to appoint TPA.  No. 2, Liberty did not ask carriers         02:54:11

23   in tower to share in TPA."  3. "Admits a team of             02:54:19

24   adjusters was needed to deal with subro claims.              02:54:24

25            "4.  Claims that Roseburg did not follow            02:54:29

Page 197

Exhibit 60, Page 081

```
1    any legal opinions in this case.                02:57:04

2         Q    And that would include offering any   02:57:09

3    opinions on what legal duties Liberty did or did not  02:57:11

4    have; is that correct?                          02:57:14

5         A    Right.  My opinions are limited to    02:57:16

6    insurance industry custom and practice.         02:57:18

7         Q    And you would also agree that in offering  02:57:20

8    your opinions in this case it would not be      02:57:22

9    appropriate for you to conclude that Liberty    02:57:24

10   breached its duty to defend, correct?           02:57:27

11        A    Well, if there is a violation of industry  02:57:31

12   custom and practice as outlined in my reports,  02:57:33

13   that's what I opine on.  I wasn't opining on -- I  02:57:37

14   didn't go to legal opinions, I went to what the --  02:57:42

15   whether the conduct of Liberty violated -- whether  02:57:45

16   it was in compliance with insurance industry custom,  02:57:51

17   practices, and standards.                       02:57:53

18        Q    Right.  And therefore it did not include  02:57:56

19   an opinion on whether or not Liberty breached its  02:57:58

20   duty to defend Roseburg, correct?               02:58:01

21        A    Yeah.  As a legal opinion, yes, I don't  02:58:05

22   have a -- I didn't -- I didn't make any legal   02:58:06

23   opinions in this case.                          02:58:11

24        Q    And would you also agree that in offering  02:58:12

25   your opinions in this case it would not be      02:58:15
```

Page 199

| | | |
|---|---|---|
| 1 | there's been no recorded conversation of it. That | 03:05:10 |
| 2 | might be something that is left up to the jury to | 03:05:14 |
| 3 | evaluate the credibility of the witnesses. | 03:05:17 |
| 4 | Q    Do you agree that an insurer's assertion | 03:05:20 |
| 5 | of the no voluntary payments provision is not a | 03:05:21 |
| 6 | basis or reason that would trigger an insurance | 03:05:26 |
| 7 | right to cumis or independent defense counsel? | 03:05:29 |
| 8 | A    You know, I can't think of -- you know, | 03:05:47 |
| 9 | the duty to appoint cumises depends on whether there | 03:05:50 |
| 10 | is an overlap between the liability and coverage | 03:05:54 |
| 11 | issue. The issue of whether a pre-notice payment is | 03:05:57 |
| 12 | voluntary or first aid usually is not tied in with | 03:06:00 |
| 13 | the issue -- a liability issue in the case, so I | 03:06:04 |
| 14 | can't -- I can't think of a scenario where that | 03:06:08 |
| 15 | would come up. | 03:06:10 |
| 16 | Q    Right. Do you agree with me, sir, that at | 03:06:11 |
| 17 | no point in time did Liberty Mutual ever -- or | 03:06:14 |
| 18 | Liberty Insurance Corporation, rather, specifically | 03:06:17 |
| 19 | assert the pollution exclusion as a basis to deny | 03:06:21 |
| 20 | coverage? | 03:06:27 |
| 21 | A    Well, I disagree with that to the extent | 03:06:29 |
| 22 | they were making -- they were making a general | 03:06:31 |
| 23 | reservation of rights with a lengthy letter, and I | 03:06:34 |
| 24 | think that -- like I say, you won't give me the | 03:06:39 |
| 25 | letter, but it says in it, "We reserve all rights | 03:06:41 |

Page 205

Exhibit 60, Page 083

```
 1    policy -- policy terms, conditions.              03:07:54

 2         But it also said at the end of the letter,  03:07:59

 3    as I recall, that, you know, "We are not waiving any  03:08:01

 4    other defenses we may bring up later."  And that  03:08:04

 5    would include anything, including the pollution or  03:08:07

 6    occurrence or anything like that.               03:08:10

 7         But when you say that in a letter, you're   03:08:12

 8    conveying to the insured, you know, "We're not   03:08:15

 9    guaranteeing any coverage under the policy pending  03:08:20

10    our investigation."                             03:08:23

11    Q    Is it your opinion that in order to avoid  03:08:24

12    a cumis or independent counsel obligation, the   03:08:28

13    insurer in its letters to the insured must expressly  03:08:32

14    waive all policy defenses?                       03:08:36

15    A    What they do is, they need to certainly at  03:08:40

16    a minimum waive any policy defenses that create a  03:08:42

17    conflict.                                        03:08:48

18    Q    And do they have to say words to that     03:08:48

19    effect in their letter to the insured?           03:08:50

20    A    Yes.                                        03:08:54

21    Q    And short of saying in a letter to its    03:08:58

22    insured that they're waiving -- expressly waiving  03:09:01

23    all policy defenses, in your view, the insurer owes  03:09:03

24    a cumis or independent counsel obligation?       03:09:07

25    A    Well, that's not what I testified to.  You  03:09:10
```

Page 207

Exhibit 60, Page 084

1    just changed the question.  I said its defenses that    03:09:11

2    create a conflict, okay?  So I'm just repeating what    03:09:17

3    I just answered before.    03:09:21

4        Q    So there's a -- there's a caveat to the    03:09:22

5    rule.  It's not just expressly waiving all policy    03:09:25

6    defenses, it's expressly waiving policy defenses    03:09:28

7    that would create a conflict of interest?    03:09:32

8        A    That is correct.    03:09:34

9            THE REPORTER:  May I take a break, please?    03:09:39

10           MR. CROWE:  Absolutely.    03:09:41

11           THE REPORTER:  Yes.  Thank you.    03:09:41

12           THE VIDEOGRAPHER:  Off the record at    03:09:44

13   3:10 p.m.    03:09:46

14           (Recess.)    03:20:57

15           THE VIDEOGRAPHER:  Back on the record,    03:21:13

16   beginning media Unit 8 at 3:21 p.m.    03:21:14

17   BY MR. CROWE:    03:21:19

18       Q    Mr. Frangiamore, with respect to the    03:21:20

19   lawsuits that Roseburg tendered to Liberty for    03:21:23

20   defense, did you read those complaints cover to    03:21:28

21   cover?    03:21:32

22       A    I looked at them.  I don't think I read    03:21:38

23   them in -- in detail.  I don't recall reading them    03:21:39

24   in detail.    03:21:43

25       Q    What do you recall reading?    03:21:46

Page 208

Exhibit 60, Page 085

1        A     That they were personal injury claims for        03:21:48

2   wrongful death related to the Weed fire.                     03:21:51

3        Q     Anything more specific than that?                 03:21:57

4        A     Not that I can recall off the top of my           03:21:58

5   head.                                                        03:21:59

6        Q     If Liberty's reservation of rights letters        03:22:04

7   to Roseburg did not trigger a cumis or independent           03:22:07

8   counsel obligation, you would agree that Liberty had         03:22:14

9   no obligation to select Baker Hostetler to serve as          03:22:19

10  tripartite or carrier-selected counsel, correct?             03:22:24

11       A     I agree.                                          03:22:29

12       Q     And conversely, if Liberty's reservation          03:22:31

13  of rights letters never triggered a cumis                    03:22:34

14  obligation, Roseburg could not insist on Liberty's           03:22:37

15  approval or consent to the use of Baker Hostetler as         03:22:40

16  tripartite or carrier-appointed counsel, correct?            03:22:45

17       A     No.  I disagree.  They could agree.  They         03:22:49

18  could look -- I mean, because we have evidence in            03:22:52

19  the file that they were familiar with Baker                  03:22:54

20  Hostetler.  Baker Hostetler had defended other               03:22:57

21  Liberty insureds, so they could have agreed if they          03:23:01

22  wanted to.                                                   03:23:04

23       Q     Right.  But Roseburg could not insist that        03:23:05

24  Liberty agree, correct?                                      03:23:09

25       A     I agree.                                          03:23:10

                                        Page  209

Exhibit 60, Page 086

1    of that work besides Mr. Peterson?                    03:26:02

2        A    There was a -- a woman partner.  I can't     03:26:09

3    remember her name off the top of my head.  I -- I     03:26:13

4    knew her.  And then there was an associate Rob        03:26:16

5    worked with during my case, the CNA case, that I      03:26:21

6    became familiar -- and I can't remember their names   03:26:24

7    as I sit here today.                                  03:26:27

8        Q    Did you have any prior experience or         03:26:28

9    knowledge of Mr. Bona before your work on this        03:26:31

10   matter?                                               03:26:34

11       A    No.                                          03:26:35

12       Q    Okay.  And then on page 39 of your           03:26:35

13   report --                                             03:26:41

14       A    Oh, I don't mean to interrupt you,           03:26:41

15   Counsel.  I realize I made a little typographical     03:26:43

16   error.  Page 13, I double-numbered 4.  It should be   03:26:47

17   sequentially numbered for 5, so that the numbering    03:26:52

18   should go to 10.                                      03:26:55

19       Q    Thanks for the clarification.                03:26:56

20       A    Yeah.  Okay.                                 03:26:57

21       Q    And I just misspoke.  Not page 9 --          03:26:58

22   paragraph 39, which is page 20 of your report.        03:27:00

23       A    Okay.  Yes.  Go ahead.                       03:27:06

24       Q    Bear with me here.  Okay.  It's actually     03:27:11

25   the next page, 21, still part of paragraph 39.  You   03:27:35

                                              Page  212

Exhibit 60, Page 087

1    write in your report, quote, "Notwithstanding          03:27:39

2    Mr. Bona's qualifications and experience, the CCP        03:27:42

3    firm simply did not have the qualified staffing to       03:27:47

4    deal with these catastrophic losses alone and            03:27:50

5    achieve a prompt" -- "and achieved a prompt global       03:27:55

6    settlement within three months after the fire."          03:27:59

7    Close quote.  Did I read that correctly?                 03:28:00

8         A    You did.                                       03:28:03

9         Q    So did you -- as part of your expert work      03:28:04

10   in this case, have you reached the conclusion that       03:28:08

11   Mr. Bona and his firm were not competent to handle       03:28:12

12   Roseburg's defense in response to the lawsuits filed     03:28:20

13   against Roseburg?                                        03:28:25

14        A    No.                                            03:28:31

15        Q    You have not drawn that opinion, correct?      03:28:34

16        A    No, that was not part of my opinion.           03:28:37

17        Q    But you nevertheless have opined that          03:28:39

18   Mr. Bona and the CCP firm did not have the qualified     03:28:41

19   staffing to deal with the Mill Fire losses; is that      03:28:44

20   correct?                                                 03:28:47

21        A    Well, with all the other -- in other           03:28:49

22   words, Mr. Bona's firm defends lawsuits, okay,           03:28:51

23   whether it's on behalf of policyholders or they have     03:28:58

24   a very strong reputation in the industry                 03:29:04

25   representing insurers in high-exposure bad faith         03:29:07

                                            Page  213

Exhibit 60, Page 088

```
 1   cases.                                          03:29:12

 2         I know that 'cause I had -- when I was    03:29:12

 3   retained in a less adversarial matter by        03:29:16

 4   Mr. Peterson, we had talked -- you know, we had some  03:29:21

 5   friendly discussions.  And so I know that they are a  03:29:23

 6   go-to firm for defending the interests of the   03:29:29

 7   insurance industry when they are exposed to     03:29:32

 8   potential large bad faith claims.               03:29:36

 9         What I am simply saying is -- but they    03:29:40

10   are -- and Rob Peterson is an excellent lawyer and a  03:29:40

11   fine person, by the way, but his firm litigates 03:29:46

12   cases, okay?                                     03:29:53

13         What this catastrophic loss was, there    03:29:55

14   were a few very significant personal injury cases,   03:29:58

15   but that was -- the horse that was drawing the cart  03:30:02

16   were these thousands of other claims that amounted  03:30:07

17   to what easily could be, you know, more than a  03:30:10

18   hundred million or several hundred million dollars.  03:30:14

19   That's not something that Carlson Calladine &   03:30:17

20   Peterson does.  They don't adjust mass catastrophic  03:30:18

21   claims, okay?  They litigate individual cases, okay?  03:30:25

22         And that's my point here, is that this    03:30:30

23   firm, which -- I went to their offices.  You know,   03:30:33

24   they take up not even a -- they wouldn't even have  03:30:37

25   taken up a whole floor of a building.  They had  03:30:41
```

Page 214

```
1    their lawyers, but they were always a relatively        03:30:45

2    small firm, which meant that they just didn't --        03:30:48

3    wouldn't have -- even if they wanted to, they didn't     03:30:51

4    have enough horses to mass-adjust thousand- -- you       03:30:54

5    know, the thousands of claims in a mass casualty         03:30:59

6    event.  That's not what they were set up to do.          03:31:03

7        Q    So if I'm understanding your opinion,           03:31:05

8    then, it's not that Mr. Bona and his firm were           03:31:08

9    incompetent to defend Roseburg against lawsuits          03:31:11

10   arising from the Mill Fire but, rather, in your view     03:31:14

11   they didn't have the experience or the ability to        03:31:18

12   adjust mass catastrophe claims?                          03:31:21

13       A    That's part of it.  And there's another         03:31:26

14   part of it, okay, which is that -- and this is           03:31:28

15   something I was always conscious of when we              03:31:32

16   appointed defense counsel, is, initially Liberty was     03:31:35

17   reserving -- making a very comprehensive reservation     03:31:40

18   of rights, saying, you know, "We could assert any        03:31:43

19   number of provisions in our policy to limit or deny      03:31:47

20   coverage for your claim."                                03:31:50

21            You wouldn't appoint a law firm --              03:31:52

22   generally it would be very bad practice -- whose         03:31:54

23   main focus was defending the interests of the            03:32:00

24   insurance industry when you are asserting that you       03:32:03

25   don't owe coverage for a claim.                          03:32:06
```

Page 215

Exhibit 60, Page 090

1          In other words, that -- that firm -- and        03:32:09

2     there's nothing wrong with this, but if your firm        03:32:14

3     exclusively represents the interests of the        03:32:17

4     insurance industry, they generally don't handle        03:32:22

5     policyholder claims.        03:32:25

6          And we all know this who've been in the        03:32:25

7     industry.  If you have a situation like that,        03:32:25

8     usually a partner ends up leaving or the firm ends        03:32:28

9     up changing, but you just don't mix those two.        03:32:32

10          So if you're -- so from an industry custom        03:32:35

11     and practice standpoint, if you're a claims manager,        03:32:38

12     I would never appoint a firm that defended -- like        03:32:41

13     Wausau.  We had a number of firms who defended our        03:32:45

14     interests -- I would not appoint those firms to be        03:32:48

15     defense counsel for our insureds when I thought        03:32:53

16     there was gonna be a serious coverage issue between        03:32:56

17     us and the insured.        03:32:59

18          So that's the other concern I have about        03:33:01

19     Mr. Bona.  It's nothing personal about him or that        03:33:05

20     he is a bad lawyer.  It's the point that you don't        03:33:08

21     put your insured in a position where you're giving        03:33:14

22     business to a firm that mostly derives its income        03:33:20

23     from defending the insurance industry.        03:33:23

24          Q    Mostly or exclusively?        03:33:25

25          A    I think mostly that's what they did.        03:33:26

Page 216

Exhibit 60, Page 091

```
1    Mostly.  Now, I don't -- you know, I'm talking about      03:33:29
2    when I worked with Rob Peterson.                          03:33:32
3        Q    And that was back when?                          03:33:35
4        A    And that was way back when, okay?  And now       03:33:36
5    you're moving me essentially 20 years -- 18 to 20         03:33:40
6    years forward.  So do I know what the Carlson             03:33:45
7    Calladine firm is up to today in detail?  The answer      03:33:48
8    is no.                                                    03:33:53
9           But I know that in my experience they were         03:33:53
10   ones -- they were an exclusive boutique firm who          03:33:57
11   were very capable lawyers, who handled high-exposure      03:34:02
12   bad faith cases for the insurance industry.               03:34:06
13          And I learned through this case that               03:34:10
14   Mr. Bona was handling liability claims and fire           03:34:12
15   claims.  I don't -- I'm not questioning or doubting       03:34:17
16   his experience as he outlined here.  That is his          03:34:21
17   experience.  And I don't know Mr. Bona, so I have         03:34:25
18   no -- I'm not -- you know, I'm not gonna cast             03:34:29
19   aspersions on him personally, but that's --              03:34:32
20          I'm just saying from an industry custom            03:34:37
21   and practice standpoint, you gotta be careful about       03:34:39
22   that.  You know, you just don't send it to a firm         03:34:43
23   that defends insurance companies on bad faith cases       03:34:46
24   when you think you're gonna have a big fight with         03:34:50
25   your insured about coverage.                              03:34:53
```

Page 217

Exhibit 60, Page 092

```
1        Q    You read Mr. Bona's deposition?          03:34:54

2        A    Yes.                                      03:34:55

3        Q    Did you read the part where he testified  03:34:56

4   under oath that he had never represented an         03:34:58

5   insurance company or defended an insurance company  03:35:02

6   in a coverage or bad faith case?                    03:35:04

7        A    You know, I don't remember that testimony. 03:35:06

8   If that's what he said, I don't doubt what you're   03:35:08

9   saying.                                             03:35:10

10       Q    Right.  And isn't it true that Carlson    03:35:10

11  Calladine & Peterson today do much more than        03:35:12

12  insurance coverage and bad faith defense work for   03:35:17

13  carriers?                                           03:35:20

14       A    Well, like I just said in my previous     03:35:20

15  answer, I don't know -- I'm talking to you about a  03:35:23

16  snapshot that was somewhere between 20 and 18 years 03:35:26

17  ago.                                                03:35:29

18       Q    Okay.                                     03:35:29

19       A    So obviously in that time period can a law 03:35:29

20  firm change?  Of course.  I don't know what their -- 03:35:32

21  I didn't know what they were up to today other than 03:35:39

22  what I've learned in this case.                     03:35:41

23       Q    So just to summarize here, you have two   03:35:43

24  opinions, as I understand it, with respect to       03:35:47

25  Mr. Bona and his firm:  One is that they did not    03:35:49
```

Page 218

Exhibit 60, Page 093

```
 1   have the experience or the capability to adjust mass      03:35:52
 2   catastrophic claims, correct?                             03:35:56
 3       A    That's correct.                                  03:35:59
 4       Q    And then you've been testifying about            03:35:59
 5   another concern, which is appointing defense counsel      03:36:01
 6   who, in your understanding or at least experience,        03:36:06
 7   was predominantly involved in defending insurers in       03:36:08
 8   coverage and bad faith cases.                             03:36:13
 9       A    Well, a firm that defends insurance.  If         03:36:15
10   Mr. Bona says he didn't do coverage work, I take him      03:36:17
11   at his word, okay?  But I'm saying the situation is,      03:36:22
12   you don't -- you generally don't have a firm that         03:36:25
13   defends insurance companies and then takes on             03:36:31
14   policyholder work, okay?                                  03:36:33
15            I mean, I know of -- I know of specific          03:36:36
16   instances in my legal career which -- where I know        03:36:39
17   another firm in Northern California who took on some      03:36:44
18   lawyer who had some very lucrative -- I think it was      03:36:48
19   very lucrative product liability, personal injury         03:36:52
20   cases and then they realized, "Oops," you know,           03:36:55
21   "we're gonna step on the shoes of some" -- "of our        03:36:58
22   clients who are insurance companies," you know, and       03:37:02
23   they had to jettison -- that lawyer had to leave the      03:37:04
24   firm because of that very issue, that you don't           03:37:07
25   want -- in either you don't want a -- if you're a         03:37:12
```

Page 219

Exhibit 60, Page 094

1    policyholder lawyer, you don't want to have to          03:37:15

2    compromise your positions.  And same thing:  If you     03:37:18

3    represent insurance companies, you don't want to put    03:37:21

4    them in an awkward position.                            03:37:23

5            So it's just a practical thing that I           03:37:25

6    always did as a claims handler, 'cause you want         03:37:28

7    to -- you know, the key thing here is, you want to      03:37:30

8    avoid problems, you want to avoid lawsuits, you want    03:37:32

9    to settle stuff.  And that's -- that's, you know,       03:37:35

10   the whole point here.                                   03:37:37

11      Q    Did Mr. Bona or Carlson Calladine &             03:37:38

12   Peterson ever represent Liberty or any of the           03:37:39

13   Liberty Mutual affiliates in either coverage or bad     03:37:44

14   faith cases?                                            03:37:47

15      A    That's a good question, and I don't know        03:37:48

16   the answer to that.                                     03:37:49

17      Q    But you do agree that Mr. Bona had the          03:37:50

18   requisite experience and skill to defend Roseburg      03:37:53

19   against lawsuits arising from the Mill Fire?            03:37:56

20      A    From what I saw, I didn't -- I didn't -- I      03:37:58

21   didn't see anything -- it appeared he was a             03:38:02

22   qualified lawyer on fire -- on fire losses, yeah.       03:38:05

23            I didn't see -- I didn't see anything to       03:38:11

24   say, you know, if -- you know, if he was my panel       03:38:12

25   counsel or whatever, did he look -- from what I         03:38:16

                                           Page 220

1    could tell -- I wasn't asked to opine on this, but          03:38:19

2    just from the information, I could tell it appeared          03:38:22

3    he was competent.                                            03:38:25

4         Q    And not just fire losses, mass fire              03:38:25

5    losses, correct?                                             03:38:30

6         A    Well, I think for indivi- -- my                  03:38:30

7    understanding is, he defended individual cases.  He         03:38:33

8    did not -- my quarrel is, this -- this claim -- this        03:38:36

9    thing we're sitting and talking about today was --          03:38:42

10   you know, these four individual wrongful death cases        03:38:46

11   were -- these weren't litigated.                            03:38:50

12          The work that needed to be done was                 03:38:54

13   adjusting because Julian convinced the plaintiffs'          03:38:56

14   lawyers to not litigate the personal injury cases.         03:39:00

15   They went into mediation.  So there was nothing --         03:39:03

16   there was nothing to litigate.  That's why Bona's          03:39:06

17   bills were only like 66,000, because the bills --          03:39:09

18   these weren't litigated, they were settled.  And           03:39:13

19   that's a -- that's an appropriate way to go about          03:39:15

20   it, okay?                                                   03:39:17

21          And so -- and I think that the key was,             03:39:19

22   the hard work that had to be done here was                 03:39:25

23   adjusting.  And it was done by Roseburg,                    03:39:28

24   unfortunately, not done by your client, and that's        03:39:30

25   why we're sitting here today.                               03:39:34

Page 221

Exhibit 60, Page 096

1        Q    The four or five lawsuits that were filed        03:39:36

2   against Roseburg arising from the Mill Fire were         03:39:39

3   individual lawsuits and not class actions or mass        03:39:42

4   actions, correct?                                        03:39:44

5        A    That's what I believe they were, yes.          03:39:46

6        Q    All right.  And in fact Mr. Bona testified     03:39:47

7   that the suits arising out of the Mill Fire were         03:39:52

8   precisely the type of cases that he has skill and        03:39:54

9   experience in defending against, correct?               03:39:59

10       A    That's my understanding, yes.                  03:40:01

11       Q    You read that part of his testimony?           03:40:02

12       A    Well, you know, I don't have it memorized,     03:40:04

13  but that makes sense.                                    03:40:05

14       Q    And you have no reason to dispute his          03:40:06

15  testimony in that regard?                                03:40:10

16       A    I don't dispute his testimony in that          03:40:12

17  regard.                                                  03:40:13

18       Q    Let me ask just a couple of foundational       03:40:20

19  questions.  So, again, prior to your retention here,     03:40:24

20  you were not familiar with Mr. Bona, correct?           03:40:27

21       A    That is correct.                               03:40:29

22       Q    You never had an opportunity to litigate a     03:40:30

23  case with or against him?                                03:40:33

24       A    That is correct.                               03:40:34

25       Q    Did you have any experience with Mr. Bona      03:40:36

                                                    Page  222

Exhibit 60, Page 097

1    when you were handling and supervising claims?        03:40:38

2        A    No.  I didn't know about him -- his        03:40:40

3    existence until this case.        03:40:41

4        Q    Did you ever have the opportunity to        03:40:45

5    retain Mr. Bona or anybody at Carlson Calladine &        03:40:46

6    Peterson when you were a claims manager, as panel        03:40:48

7    counsel?        03:40:53

8        A    No.  We did not -- that wasn't our        03:41:01

9    designated firm that we used either for panel        03:41:04

10   counsel or for defense of bad faith actions.        03:41:09

11       Q    I know you mentioned before when you were        03:41:13

12   in practice -- you described it as insurance        03:41:15

13   defense.  Do you have personal experience defending        03:41:18

14   against mass tort or mass fire claims?        03:41:22

15       A    No.        03:41:25

16       Q    In your experience as a lawyer, do you        03:41:32

17   have any experience or skill in prosecuting on        03:41:33

18   behalf of one or more plaintiffs mass fire or mass        03:41:39

19   tort claims?        03:41:43

20       A    No.        03:41:45

21       Q    Did you ever interview Mr. Bona or anybody        03:41:48

22   at the Carlson Calladine & Peterson firm to evaluate        03:41:51

23   their skill, experience, and ability to defend        03:41:58

24   Roseburg against lawsuits arising out of the Mill        03:42:00

25   Fire?        03:42:04

<div align="right">Page  223</div>

1      A    Again, I think I answered that question.      03:42:05

2  I didn't even know about Mr. Bona before this case,      03:42:07

3  so I -- and I've never spoken to Mr. Bona.      03:42:10

4      Q    Or anybody at Carlson Calladine & Peterson      03:42:13

5  in that regard?      03:42:15

6      A    Right.  In that regard, with regard to      03:42:16

7  this -- well, I haven't talked to them at all,      03:42:17

8  either with regard to this case or any case, since I      03:42:20

9  had last contact with Mr. Peterson, which was, you      03:42:23

10  know, a long time ago.      03:42:27

11      Q    What did you do, if anything, to evaluate      03:42:29

12  whether Mr. Bona and Carlson Calladine & Peterson      03:42:35

13  could have staffed or adjusted mass casualty claims?      03:42:36

14      A    Well, they didn't.  I mean, like I said,      03:42:51

15  my familiarity with them, which goes back decades,      03:42:54

16  is that they're litigators.  And I don't -- you      03:42:57

17  know, and I've worked with law firms not just in      03:43:01

18  California, all over the country.  And in those      03:43:04

19  cases law firms do not adjust mass casualty claims.      03:43:07

20          The entities that adjust mass casualty      03:43:13

21  claims are either catastrophe -- CAT teams in-house      03:43:18

22  at insurance companies or through independent      03:43:24

23  adjusting agencies like McLarens and Crawford.      03:43:29

24  That's how it works.  So you don't -- you don't --      03:43:33

25  you know, lawyers don't adjust -- don't adjust      03:43:37

Page 224

Exhibit 60, Page 099

| | | |
|---|---|---|
| 1 | claims on that basis.  That's just the way -- it's | 03:43:40 |
| 2 | the way it works in the industry. | 03:43:44 |
| 3 | Q    Do you have any explanation as to why | 03:43:45 |
| 4 | Baker Hostetler was involved in claims adjusting | 03:43:47 |
| 5 | activities? | 03:43:51 |
| 6 | A    Well, I think that Baker Hostetler was | 03:43:53 |
| 7 | involved -- I think it was a mix of activities, | 03:43:55 |
| 8 | okay, because they were dealing with AlixPartners in | 03:43:59 |
| 9 | claims and they were dealing with the lawsuits, | 03:44:03 |
| 10 | both; so it was a mixture. | 03:44:05 |
| 11 | And I think with the goal being, as I | 03:44:11 |
| 12 | explained in my report, is, when you have -- and | 03:44:13 |
| 13 | this has been my experience with large losses, okay. | 03:44:17 |
| 14 | What you want to do is, you want to settle large | 03:44:20 |
| 15 | losses, you don't want to litigate large losses. | 03:44:23 |
| 16 | And that was their strategy.  That's a | 03:44:27 |
| 17 | strategy I have employed many times.  I dealt with | 03:44:29 |
| 18 | very large pollution losses, nine-figure losses; | 03:44:34 |
| 19 | large construction defect losses.  And what you want | 03:44:37 |
| 20 | to do, if you have the opportunity, is settle those | 03:44:41 |
| 21 | losses, not litigate those losses.  And if you want | 03:44:45 |
| 22 | me to explain why, I can explain why. | 03:44:48 |
| 23 | Q    Why couldn't David Bona and his firm do | 03:44:50 |
| 24 | the same type of work that Baker Hostetler did? | 03:44:53 |
| 25 | A    That's a good question.  My understanding | 03:45:01 |

Page 225

Exhibit 60, Page 100

```
 1    was he was hired just to defend those four cases or        03:45:04

 2    five cases.  There's nothing in the record that I          03:45:08

 3    see Liberty instructing them to do what your               03:45:12

 4    question suggests, which is mass-adjust this claim.         03:45:15

 5           There is no way -- I don't care how                 03:45:19

 6    competent or smart you are -- that you can take a          03:45:22

 7    firm like Carlson Calladine, who has, I think,             03:45:28

 8    around 12 lawyers or something.  You know, it              03:45:28

 9    varied.  They're not -- I think Bona said in his           03:45:32

10    deposition something along -- you know, he had             03:45:38

11    another lawyer and a paralegal or two who could            03:45:40

12    help.                                                      03:45:43

13           It was quite evident that with a mass               03:45:43

14    casualty event like this we needed lots of boots on       03:45:46

15    the ground to establish a community center, to             03:45:50

16    establish communication where people come in.  We          03:45:53

17    know from AlixPartners they were staffed up and they      03:45:57

18    had 12 to 14 people working it, you know, pretty           03:46:00

19    much around the clock for several months.                  03:46:03

20           How could -- you know, if Carlson                   03:46:07

21    Calladine was able to do that, I don't see how a           03:46:09

22    relatively small firm would have -- you know, they         03:46:12

23    were a busy, active firm -- I don't see instructions       03:46:15

24    from Liberty saying, "We want you to set up a mass         03:46:17

25    casualty adjustment team from your staff in                03:46:22
```

Page 226

Exhibit 60, Page 101

```
 1        Q    Yeah.  And I'm talking once you were given      03:48:40

 2   the case, did you do anything to interview             03:48:46

 3   colleagues or former colleagues about Mr. Bona and    03:48:48

 4   his firm's ability to not only defend suits arising   03:48:50

 5   out of the Mill Fire but also to settle them and      03:48:54

 6   settle claims?                                         03:48:57

 7        A    No, I didn't, but in the future, if we're    03:48:58

 8   in the same case, I'll call you and ask you if I can  03:49:02

 9   do that.                                               03:49:04

10        Q    Did you -- once you were retained in this    03:49:06

11   matter and as part of your expert analysis and        03:49:10

12   opinions, did you interview any lawyers who may have  03:49:13

13   been adverse to Mr. Bona and his firm about their     03:49:16

14   ability to not only defend suits arising out of the   03:49:19

15   Mill Fire but also to settle claims and suits?        03:49:23

16        A    Well, how can I interview a lawyer adverse   03:49:27

17   to Mr. Bona if I didn't know who Mr. Bona was?  That  03:49:30

18   would be kind of hard, wouldn't it?                    03:49:33

19        Q    Well, you -- at some point as part of your  03:49:35

20   work you found out who he was, right?                  03:49:35

21        A    Yeah.                                         03:49:39

22        Q    I'm not trying to be glib here, but at       03:49:39

23   some point as part of your expert analysis you        03:49:42

24   understood Mr. Bona was involved because Liberty had  03:49:45

25   appointed him to defend Roseburg against suits,       03:49:48
```

Page 229

```
1   correct?                                           03:49:51

2       A    Right.                                    03:49:51

3       Q    And you're drawing conclusions about      03:49:52

4   whether or not his firm had the ability or inability  03:49:54

5   to settle and adjust mass casualty claims, correct?   03:49:58

6       A    That's correct.                           03:50:03

7       Q    And so as part of that analysis, did you  03:50:03

8   do anything in interviewing colleagues, interviewing  03:50:05

9   Mr. Bona, interviewing former plaintiffs' lawyers to  03:50:07

10  evaluate whether he did in fact have the capability   03:50:11

11  and the experience and the skill to do the same type  03:50:15

12  of work that the Baker Hostetler firm did?           03:50:18

13      A    No, because I know from my experience     03:50:22

14  doing this for 40 years that Carlson Calladine &     03:50:24

15  Peterson did not adjust mass casualty claims as a    03:50:24

16  TPA.                                                 03:50:31

17      Q    Was Mr. Bona with the Carlson firm when   03:50:32

18  you were familiar with him back 20 years ago?        03:50:35

19      A    I don't think he was there.  This is from 03:50:38

20  my recollection when he joined the firm and based on 03:50:42

21  the timing -- like I said, the timing when I dealt   03:50:45

22  with Rob Peterson was somewhere between 2001 to      03:50:48

23  2006, maybe.  That would be the time when I was      03:50:51

24  dealing with him.                                    03:51:01

25      Q    Do you agree that Mr. Bona's experience   03:51:07
```

Page 230

```
1    and skill in defending against mass tort or mass        03:51:09

2    fire claims is, and was, far superior to                03:51:15

3    Mr. Julian's and the Baker Hostetler firm's             03:51:19

4    experience?                                             03:51:23

5         A     I wasn't asked to render an opinion on the   03:51:29

6    comparison of their qualifications.                     03:51:33

7         Q     And consequently, you didn't do so,          03:51:34

8    correct?                                                03:51:35

9         A     No, I didn't do an evaluation of that.       03:51:36

10        Q     Other -- or strike that.  What information   03:51:46

11   did you learn or discover about Mr. Julian's            03:51:49

12   experience in defending and settling large-scale or     03:51:53

13   mass fire claims and suits?                             03:51:58

14        A     Well, I think in his deposition he           03:52:00

15   outlined -- as I remember, he was dealing with the      03:52:03

16   PG&E claims and suits.  He had become familiar with     03:52:05

17   the plaintiffs' lawyers.  And that was a massive --     03:52:09

18   it's a massive suit.  And so he became familiar, I      03:52:12

19   understand, with many of the plaintiffs' lawyers who    03:52:16

20   were involved in that case.                             03:52:18

21            And that was a very important thing not        03:52:21

22   only because I think Mr. Julian learned how to          03:52:23

23   mass-adjust and settle these cases, but he developed    03:52:28

24   a relationship with many of the key plaintiffs'         03:52:31

25   lawyers that was instrumental in keeping -- holding     03:52:34
```

Page 231

Exhibit 60, Page 104

```
1      A    I believe that was part of it, yes.          03:54:09

2      Q    So he was not defending PG&E against mass     03:54:11

3    fire claims, he was prosecuting or advocating claims  03:54:14

4    on behalf of plaintiffs?                              03:54:18

5      A    Yes, I believe so.                             03:54:21

6      Q    Do you know of any prior experience that       03:54:24

7    Mr. Julian had prior to Mill Fire wherein he          03:54:26

8    defended an entity or a person against mass tort or   03:54:30

9    mass fire claims?                                     03:54:34

10     A    No, I don't recall seeing that in the          03:54:34

11   record.                                               03:54:37

12     Q    Do you agree that Liberty -- well, strike      03:54:57

13   that.  Do you agree that it's consistent with         03:55:01

14   industry standards and practices, as relates to the   03:55:05

15
```

Redacted Per Sealing Order

```
16

17   Poor question.  Let me rephrase it, please.           03:55:22

18     A    Yeah.                                           03:55:24

19     Q    Do you agree that Liberty owed no duty to       03:55:24

20   defend Roseburg against criminal matters under the    03:55:27

21   Liberty general liability policy?                      03:55:29

22     A    They would not have an obligation to fund      03:55:34

23   the defense of a criminal prosecution.  I would -- I   03:55:38

24   would agree with that.                                03:55:43

25     Q    Do you agree that Liberty would also owe        03:55:45
```

                                                    Page 233

| | | |
|---|---|---|
| 1 | no duty to reimburse Roseburg or pay for costs | 03:55:49 |
| 2 | associated with the evaluation of tax matters | 03:55:53 |
| 3 | arising from the Mill Fire, at least as it relates | 03:55:54 |
| 4 | to the obligations under the general liability | 03:55:58 |
| 5 | policy? | 03:56:01 |
| 6 |     A    I agree. | 03:56:01 |
| 7 |     Q    Do you agree that Liberty owed no duty to | 03:56:04 |
| 8 | defend Roseburg against any government | 03:56:07 |
| 9 | investigations of the Mill Fire? | 03:56:09 |
| 10 |     A    To the extent a government investigation | 03:56:20 |
| 11 | may impact their exposure in the liability cases, | 03:56:23 |
| 12 | there may be a duty to participate in -- or be | 03:56:28 |
| 13 | involved in those investigations 'cause those | 03:56:33 |
| 14 | investigations could involve evidence that could be | 03:56:36 |
| 15 | used against -- could impact Roseburg's liability, | 03:56:41 |
| 16 | depending on what the investigations were about. | 03:56:47 |
| 17 | I'd have to know more about the investigations. | 03:56:50 |
| 18 |     Q    Would that be a claims investigation | 03:56:52 |
| 19 | expense or a defense expense? | 03:56:55 |
| 20 |     A    Well, it could possibly impact defense. | 03:57:02 |
| 21 | Let me give you -- there is many different | 03:57:05 |
| 22 | scenarios.  Let me give you an example. | 03:57:08 |
| 23 |          Liberty was reserving its rights under the | 03:57:10 |
| 24 | occurrence definition and intentionality.  And the | 03:57:11 |
| 25 | question is, Redacted Per Sealing Order | 03:57:16 |

Page 234

1    Redacted Per Sealing Order                              03:57:19

2         Was there -- you know, were there              03:57:23

3    regulatory investigations or findings in any -- you    03:57:25

4    know, in a regulation, perhaps a fire inspection or    03:57:29

5    things that could impact the liability -- you know,   03:57:32

6    that could be used in the liability case against       03:57:36

7    Roseburg.  If that's the case, that would be           03:57:41

8    relevant to the defense and it would be a valid        03:57:43

9    defense expense.                                        03:57:46

10       Q    Were there any government investigations      03:57:47

11   of the Mill Fire that you are aware of?                03:57:50

12       A    I believe that there were references to      03:57:52

13   the fact there were government investigations.  I     03:57:54

14   don't know the specifics, but I believe there         03:57:56

15   were -- there were some.                               03:57:58

16       Q    Do you have any conclusions as to whether    03:58:00

17   or not expenses associated with government             03:58:02

18   investigations is compensable under the Liberty        03:58:04

19   policy?                                                 03:58:08

20       A    They might be for the reasons I've           03:58:08

21   testified to.                                           03:58:10

22       Q    Right.  But have you reached those           03:58:11

23   conclusions?                                            03:58:13

24       A    No.                                            03:58:13

25       Q    All right.                                    03:58:14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 60, Page 107

```
1   lawyer, if you are pursuing benefits against an      03:59:30

2   insurance company and they are unreasonably          03:59:33

3   withholding benefits, you can be entitled to         03:59:36

4   attorneys' fees to compensate you under Brandt for   03:59:40

5   that.  So that's --                                  03:59:43

6          And that's what your question addresses,      03:59:44

7   that's why I'm answering it the same way, because    03:59:46

8   the way you phrased your question says, you know, if  03:59:49

9   there's been an unreasonable denial of coverage, the 03:59:52

10  insured can ask for the Court to award Brandt fees   03:59:56

11  for the costs and fees to get the coverage to which  03:59:59

12  they were entitled to.                               04:00:03

13     Q    And you understand Brandt fees to be a       04:00:04

14  tort damage, correct?                                04:00:08

15     A    It would be a tort -- it would be a tort     04:00:10

16  damage, yes.                                         04:00:11

17     Q    Right.  So my question is not asking about   04:00:12

18  tort damages, it's asking about contract benefits    04:00:15

19  under the insurance policy.                          04:00:18

20         Would you agree with me that Liberty would    04:00:20

21  owe no obligation under its policy issued to         04:00:22

22  Roseburg to reimburse Roseburg for fees and costs    04:00:26

23  associated with pursuing insurance?                  04:00:30

24         MR. DeVRIES:  Objection.  Ambiguous with      04:00:33

25  respect to the term, quotes, "pursuing insurance,"   04:00:35
```

Page 237

1    close quotes, in the context of this case.                04:00:37

2            THE WITNESS:  I mean, to the extent they          04:00:40

3    are pursuing insurance other than the Liberty policy      04:00:41

4    or the policy of the insurance coverage tower, I          04:00:45

5    would agree with you.  But again, like I said,            04:00:50

6    what's payable under the policy is defense --             04:00:56

7    reasonableness or defense expenses and covered            04:01:00

8    indemnity.                                                04:01:06

9    BY MR. CROWE:                                             04:01:11

10       Q    So is it your understanding that Roseburg        04:01:25

11   successfully settled the majority of Mill Fire            04:01:29

12   claims and suits by December 7, 2022, at least in         04:01:34

13   principle?                                                04:01:40

14       A    That's my general understanding, yes.            04:01:41

15       Q    And is it your recollection and                  04:01:45

16   understanding that by February 9, 2023, Liberty had       04:01:47

17   exhausted its $4 million in policy limits by              04:01:53

18   reimbursing Roseburg for the settlements it had made      04:01:56

19   by that time?                                             04:02:00

20       A    I believe so.  I believe they paid out           04:02:04

21   their policy limits during that time, yes.                04:02:06

22       Q    And do you agree that once Liberty               04:02:08

23   exhausted its policy limits at Roseburg's request         04:02:11

24   for reimbursement, that Liberty no longer owed a          04:02:14

25   duty to defend Roseburg?                                  04:02:17

                                              Page 238

```
1              MR. DeVRIES:  You mean prospectively?  For    04:02:20

2    any prospective costs?                                 04:02:22

3    BY MR. CROWE:                                           04:02:23

4         Q    Let me restate the question.  Do you agree   04:02:24

5    with me, Mr. Frangiamore, that once Liberty paid its   04:02:26

6    policy limits and exhausted the policy limits at       04:02:32

7    Roseburg's request, it no longer owed a defense        04:02:35

8    obligation to Roseburg under the general liability     04:02:37

9    policy?                                                04:02:39

10        A    Right.  It wouldn't owe any additional       04:02:40

11   defense costs, expenses incurred after the             04:02:43

12   exhaustion was paid.                                   04:02:45

13        Q    Is it your understanding, sir, that          04:03:03

14   Liberty exhausted its $4 million in policy limits      04:03:04

15   before Roseburg filed suit in this action?             04:03:08

16        A    I think Roseburg filed suit ahead --         04:03:13

17   before that.                                           04:03:16

18        Q    So it's your understanding that Roseburg     04:03:18

19   had filed suit before Liberty exhausted his            04:03:23

20   $4 million limits?                                     04:03:27

21        A    Yeah.  I don't have the timing memorized,    04:03:28

22   but that's my general understanding.                   04:03:28

23        Q    Is that material to your opinions in any     04:03:29

24   way, that timing, as you understand it?                04:03:31

25        A    I can't think of anything off the top of     04:03:39
```

Page 239

1

2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, do hereby

4   certify:

5          That the foregoing proceedings were

6   reported by me at the time and place herein set

7   forth; that any witnesses in the foregoing

8   proceedings, prior to testifying, were placed under

9   oath; that a verbatim record of the proceedings was

10  made by me using machine shorthand which was

11  thereafter transcribed under my direction; further,

12  that the foregoing is an accurate transcription

13  thereof.

14         I further certify I am neither financially

15  interested in the action nor a relative or employee

16  of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:  October 31, 2024.

21

22

23

24

              CATHERINE A-M GAUTEREAUX

25                 CSR NO. 3122

                                        Page 249

EXHIBIT 61

EXHIBIT 61

EXHIBIT 61

1     UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3

4  RLC INDUSTRIES CO. and   )

   ROSEBURG FOREST PRODUCTS CO., )

5               )

        Plaintiffs,   )

6               )

         vs.    )Case No.

7               )2:23-cv-00649-TLN-DB

   LIBERTY INSURANCE CORPORATION, )

8   EVEREST NATIONAL INSURANCE  )

   COMPANY, and THE OHIO CASUALTY )

9   INSURANCE COMPANY,     )

               )

10       Defendants.   )

   _____)

11

12

13

14

15

16     VIDEO-RECORDED DEPOSITION OF

17       MERRI A. BALDWIN

18     Tuesday, November 5, 2024

19        Volume I

20

21

22  Reported by:

   CARLA SOARES

23  CSR No. 5908

24

25

               Page 1

Exhibit 61, Page 001

```
 1              UNITED STATES DISTRICT COURT

 2     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

 3

 4     RLC INDUSTRIES CO. and          )
       ROSEBURG FOREST PRODUCTS CO.,  )
 5                                      )
                    Plaintiffs,        )
 6                                      )
                    vs.                )Case No.
 7                                      )2:23-cv-00649-TLN-DB
       LIBERTY INSURANCE CORPORATION, )
 8     EVEREST NATIONAL INSURANCE      )
       COMPANY, and THE OHIO CASUALTY )
 9     INSURANCE COMPANY,              )
                                        )
10                  Defendants.         )
       _____)
11

12

13

14

15

16            VIDEO-RECORDED DEPOSITION OF MERRI A.

17     BALDWIN, Volume I, taken on behalf of Defendant,

18     beginning at 9:05 a.m., and ending at 3:31 p.m., on

19     Tuesday, November 5, 2024, before CARLA SOARES,

20     Certified Shorthand Reporter No. 5908.

21

22

23

24

25

                                              Page 2
```

Exhibit 61, Page 002

```
 1    APPEARANCES:

 2

 3    For the Plaintiffs:

 4         HUNTON ANDREWS KURTH LLP
           BY:  SCOTT P. DeVRIES, Attorney at Law

 5         50 California Street, Suite 1700
           San Francisco, California 94111

 6         415.975.3700
           sdevries@hunton.com

 7

           HUNTON ANDREWS KURTH LLP

 8         BY:  RACHEL E. HUDGINS, Attorney at Law
                 (via Zoom)

 9         Bank of America Plaza, Suite 4100
           600 Peachtree Street, N.E.

10         Atlanta, Georgia 30308
           404.888.4000

11         rhudgins@hunton.com

12

13    For the Defendant:

14         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
           BY:  JEFFREY S. CROWE, Attorney at Law

15         650 Town Center Drive, 10th Floor
           Costa Mesa, California 92626

16         714.513.5100
           jcrowe@sheppardmullin.com

17

18

19    ALSO PRESENT:  Caique Costa, Video Operator

20

21                      --o0o--

22

23

24

25

                                        Page 3
```

Exhibit 61, Page 003

1              San Francisco, California

2              Tuesday, November 5, 2024

3                  9:05 a.m.

4

5                  --o0o--

6          P R O C E E D I N G S

7              THE VIDEO OPERATOR:  Good morning.  We are

8      going on the record at 9:05 a.m. on November 5th,

9      2024.

10             Please note that the microphones are              09:05:15

11     sensitive and may pick up whispering and private

12     conversations.  Please mute your phones at this

13     time.  Audio- and video-recording will continue to

14     take place unless all parties agree to go off the

15     record.                                                   09:05:29

16             This is Media Unit 1 of the video-recorded

17     deposition of Merri A. Baldwin, taken by counsel, in

18     the matter of RLC Industries Co. and Roseburg Forest

19     Products Co. vs. Liberty Insurance Corporation,

20     Everest National Insurance Company, and Ohio             09:05:47

21     Casualty Insurance Company, filed in the United

22     States District Court, Eastern District of

23     California, Sacramento Division, Case

24     No. 2-23-CV-00649-TLN-DB.

25             The location of the deposition is Four           09:06:11

                                                      Page 8

Exhibit 61, Page 004

1    Embarcadero, San Francisco, California.                09:06:14

2            My name is Caique Costa, representing

3    Veritext, and I am the videographer.  The court

4    reporter is Carla Soares, from the firm Veritext.

5            I am not authorized to administer an oath;    09:06:26

6    I am not related to any party in this action; nor am

7    I financially interested in the outcome.

8            If there are any objections to proceeding,

9    please state them at the time of your appearance.

10           Counsel and all present, including            09:06:38

11   remotely, will now state their appearances and

12   affiliations for the record, beginning with the

13   noticing attorney.

14           MR. CROWE:  Good morning.  Jeffrey Crowe,

15   with Sheppard Mullin Richter & Hampton, for the        09:06:47

16   defendant Liberty Insurance Corporation.

17           MR. DeVRIES:  Scott DeVries, from Hunton

18   Andrews & Kurth, on behalf of plaintiff, Roseburg.

19           MS. HUDGINS:  Rachel Hudgins, on behalf of

20   Hunton Andrews Kurth, for plaintiff, Roseburg, and     09:06:59

21   appearing remotely.

22           THE VIDEO OPERATOR:  Will the court

23   reporter please swear in the witness, and then

24   counsel may proceed.

25   ///                                                    09:07:10

Page 9

Exhibit 61, Page 005

```
 1                      MERRI A. BALDWIN,                    09:07:10

 2    having been administered an oath, was examined and

 3    testified as follows:

 4                         EXAMINATION

 5    BY MR. CROWE:                                          09:07:18

 6         Q    Good morning, Ms. Baldwin.

 7         A    Good morning.

 8         Q    My name is Jeff Crowe.  I'm one of the

 9    lawyers who represents the defendant Liberty

10    Insurance Corporation in this matter, who I will      09:07:24

11    refer to as "Liberty" throughout this deposition.

12    Okay?

13         A    (Witness nods head.)

14         Q    Do you understand that?

15         A    Yes.                                         09:07:31

16         Q    Could you please state and spell your

17    name?

18         A    Merri Baldwin.  M-E-R-R-I; I usually use

19    my middle initial, A., as well, and then Baldwin,

20    B-A-L-D-W-I-N.                                         09:07:42

21         Q    Great.  Thank you.

22              Ms. Baldwin, you understand that you're

23    here today to testify as a retained expert on behalf

24    of the plaintiffs in this case, RLC Industries

25    Company and Roseburg Forest Products Company?         09:07:55
```

Page 10

```
1          A    Yes.                                    09:07:58

2          Q    Just for ease of reference, I'm going to

3     refer to both of those entities as "Roseburg" if

4     that's okay with you.

5          A    That is fine.                           09:08:04

6          Q    How would you best describe the subject

7     matter of your expertise, the scope of your

8     expertise in this matter?

9          A    I would say that I am an expert in legal

10    ethics and the standards applicable to attorneys.   09:08:19

11         Q    Standards of ethics that are applicable to

12    attorneys?

13         A    A little bit more broad than that.

14    Ethical standards, standard of care in a limited

15    sense here.                                        09:08:44

16         Q    Okay.  Thank you for that.

17              I'd like to show you what's been

18    previously marked as Exhibit 173.

19              And just for purposes of today's

20    deposition, we have some previously marked exhibits  09:08:54

21    and we have some new exhibits.  For new exhibits,

22    I'll hand them to the reporter.  She'll stamp them

23    and then she'll give you the original for the

24    transcript.

25         A    Understood.                             09:09:04
```

Page 11

```
 1          Q    Thank you.                                  09:09:05

 2               For now, I'd like to show you previously

 3     marked Exhibit 173, which is titled "Plaintiff's

 4     Expert Disclosure Pursuant to Federal Rule of Civil

 5     Procedure 26(a)(2)."                                  09:09:18

 6               Let me know when you've had a chance to

 7     review this, and more specifically, paragraph 1 on

 8     pages 1 through 2 of the designation.

 9          A    Yes.

10          Q    Have you seen this document before?         09:09:35

11          A    Yes.

12          Q    And did you review and approve the

13     description of your expert designation under

14     paragraph 1 on pages 1 and 2 of the designation?

15          A    I believe so.                               09:09:48

16               Let me just say that reading this also

17     makes me aware that my prior description of my --

18     the scope of my expertise as relevant to this matter

19     was probably a little understated.

20               I think I would also include in that        09:10:02

21     answer, as reflected here, the obligations of

22     insurers with respect to counsel.

23          Q    Okay.  Thank you for that clarification.

24               As you've read or reread the description

25     of your expert designation in Exhibit 173, is there   09:10:30
```

Page 12

```
1    as coverage counsel for Roseburg.                09:12:59

2         Q   And do you think that's a fair

3    characterization of BakerHostetler's role in its

4    representation, at least in part, of Roseburg in

5    response to the Mill Fire?                        09:13:15

6              MR. DeVRIES:  Ambiguous as to time.

7              THE WITNESS:  Let me answer this way:  I

8    don't regard "coverage counsel" as being a term of

9    art with a specific definition.

10             In fact, in preparation for today's     09:13:38

11   deposition, I did some very scientific research

12   involving the use of Google and confirmed my

13   understanding that "coverage counsel" can be used

14   many different ways.

15             That being said, I don't think that the -- 09:13:57

16   there is a -- there is a commonly understood

17   definition of "coverage counsel" that was expressed,

18   for example, by Julia Molander in her reports.

19             I don't believe that the role that

20   Mr. Chairez and the BakerHostetler firm, including  09:14:16

21   others such as Mr. Dow, played is fairly described

22   as coverage counsel, and I do not agree that that

23   would be an accurate term to describe that role.

24   BY MR. CROWE:

25        Q   With respect to the designation as       09:14:30
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 61, Page 009

```
1    describing BakerHostetler in a self-described role        09:14:32

2    as "coverage counsel," you're referring to Liberty's

3    recollection of the phone call, correct?

4         A    Yes.

5         Q    And you understand that Mr. Chairez and          09:14:44

6    others at Baker may dispute that they described

7    themselves as, quote/unquote, "coverage counsel"

8    during that call or at any other time, correct?

9         A    Yes.  It might have been more accurate in

10   my -- in this disclosure to say "purportedly             09:14:58

11   self-described role."

12        Q    Understood.

13             And you're not here as an expert to

14   evaluate or opine on whether or not Liberty's

15   recollection of that phone call and that description    09:15:09

16   is accurate or not, correct?

17        A    No.  I'm not a fact-finder.

18        Q    Now, back to the sentence that you were --

19   or the group of sentences that you had referred to

20   earlier, more specifically, on line 14, it says,       09:15:27

21   quote, "Ms. Baldwin will testify that Liberty had a

22   duty to appoint a law firm with sufficient resources

23   to handle the defense of the matter at issue within

24   the standard of care," closed quote.

25             Did I read that correctly?                     09:15:44
```

Page 16

```
 1        A    Yes.                                      09:15:45

 2        Q    And what did you mean by "to handle the

 3   defense of the matter at issue"?

 4        A    Well, that's a general statement, and it's

 5   intending to convey a general standard.             09:15:58

 6             But specifically here, I mean the defense

 7   of the various claims that were being asserted

 8   against Roseburg.

 9        Q    Specifically, does it mean -- are you

10   referring to the defense of the lawsuits filed      09:16:17

11   against Roseburg arising out of the Mill Fire or

12   something else or in addition to that?

13        A    Well, to defending Roseburg's interests

14   with respect to the lawsuits and other claims that

15   were asserted, and their interest generally with    09:16:34

16   respect to that situation which involved the

17   Mill Fire.

18        Q    So when you say -- when you refer to the

19   "matter," and you refer to -- you say that -- it

20   says that in this designation, and it says it in    09:16:46

21   your report.  We'll go through that in more detail

22   later.

23             But when you're referencing the "defense

24   of the matter," you're including not only the

25   defense of the lawsuits filed against Roseburg      09:16:55
```

Page 17

Exhibit 61, Page 011

1    arising out of the Mill Fire, but also claims that          09:17:00

2    were or could have been asserted against Roseburg?

3         A    I think that's a fair statement.

4         Q    When you write -- I'll read it into the

5    record first so we're clear -- quote, "The firm          09:17:23

6    Liberty appointed to defend Roseburg, Carlson

7    Calladine Peterson LLP, firm ('Carlson'), did not

8    have the resources that Baker did to devote to the

9    matter," and then, closed quote, it continues on.

10         Again, referring to the resources          09:17:44

11    necessary to devote to not only the defense of the

12    lawsuits but everything else that Baker did with

13    respect to responding to claims or potential claims

14    that could be asserted against Roseburg arising out

15    of the Mill Fire?          09:18:02

16         A    Well, number one, I didn't write this,

17    which was the predicate of your question.

18         With respect to what that's referring to,

19    I think that's generally correct, if I understood

20    your question.          09:18:18

21         Q    Yeah.  Thank you for the clarification.  I

22    didn't mean to infer that you wrote it.

23         But I guess what I'm trying to find out

24    is, when you're equating resources that Carlson

25    Calladine & Peterson did or did not have, you're          09:18:28

Page 18

Exhibit 61, Page 012

```
 1    equating it with the resources that Baker had in        09:18:32

 2    doing everything that they did in their

 3    representation of Roseburg arising from or

 4    responding to the Mill Fire.

 5         A    Generally, yes.  But I'm not taking a          09:18:50

 6    position specifically as to the scope of what Baker

 7    did or didn't do.

 8         Q    Understood.

 9              So you're not evaluating whether -- what

10    the scope of the work that Baker did or did not do      09:19:03

11    was within the standard of care, but you're

12    comparing the resources that Baker had to do what

13    they did do for Roseburg with the resources that you

14    believe the Carlson firm had, and you're comparing

15    those two firms and saying, "Carlson did not have       09:19:18

16    the same resources that Baker did to perform the

17    work that Baker had done on behalf of Roseburg"?

18         A    The part that I'm just hesitating on is, I

19    would say that what I'm doing is comparing the two

20    firms and the -- their apparent resources.              09:19:38

21              I have no inside knowledge beyond being

22    familiar with Carlson Calladine and then what I've

23    read, of course, here about Baker.

24              But I'm just making a slightly more

25    general point that Baker, based on its size, its        09:19:56
```

Page 19

```
 1    practice group structure, its, you know, resources,        09:20:01

 2    had more resources to handle the defense of this

 3    matter than Carlson Calladine did.

 4         Q    In your role as an expert in this case,

 5    have you done an independent evaluation and reached        09:20:19

 6    an independent opinion as to the resources necessary

 7    to properly and competently represent Roseburg or

 8    defend Roseburg against Mill Fire suits and claims?

 9         A    No.

10         Q    The designation continues on line 18, and        09:20:38

11    it reads, quote, "Ms. Baldwin will also testify that

12    the close corporate affiliation between Liberty and

13    Ohio Casualty Insurance Company ('Ohio Casualty')

14    created a conflict of interest requiring the

15    appointment of independent counsel, given the fact        09:20:58

16    that the Ohio Casualty excess policy contained a

17    wildfire exclusion that Ohio Casualty asserted as a

18    coverage to defense," closed quote.

19         Did I read that correctly?

20         A    No.  You read it -- the last four words,        09:21:12

21    you took them out of order.  It's actually, quote,

22    "as a defense to coverage."

23         Q    I'm sorry.  Thank you for that

24    clarification.

25         Did you -- did you receive a copy of the        09:21:23
```

Page 20

Exhibit 61, Page 014

```
1    Liberty Mutual in today's deposition to distinguish      09:24:47

2    it from Liberty.  And there are many aspects of that

3    affiliation, some of which -- most of which are set

4    forth in my report.

5          But the point that is being conveyed here          09:25:03

6    is that because of that close corporate affiliation

7    and almost -- that that created a unity of interests

8    such that there was a risk that the difference in

9    interests between Liberty and Ohio Casualty could

10   affect the representation provided by Liberty such       09:25:36

11   that Liberty and its counsel could steer the defense

12   in a way that would ultimately be to the detriment

13   of Roseburg.  And that specifically concerns the

14   wildfire exclusion.

15        Q   And I'll get to your opinion.                   09:25:55

16          For the moment, focusing on the close

17   corporate affiliation, it's your understanding that

18   Liberty and Ohio Casualty are -- I think you

19   described it as sister companies, correct?

20        A   I don't have a precise understanding of         09:26:11

21   their corporate affiliation.  My understanding is,

22   you know, somewhat general.

23          But, yes, my understanding is that they

24   are closely related such that they share personnel;

25   and personnel refer -- you know, use the term "we"      09:26:28
```

Page 24

Exhibit 61, Page 015

```
1    to refer to both companies interchangeably, for          09:26:34

2    example.

3            One company -- Liberty Mutual seems to

4    operate through both of the Liberty and Ohio

5    Casualty companies.  Not that I have any                  09:26:49

6    understanding of that beyond the facts in this case.

7    I don't, and I have not done anything to determine

8    the corporate relationship beyond the facts of this

9    case.

10       Q   Do you understand that one is the parent          09:27:00

11   company to the other?

12       A   And when you say the one, Ohio Casualty

13   versus Liberty?

14       Q   Well, either/or.  Is one or the other the

15   parent to the other entity?                               09:27:10

16       A   And when we're saying "the other" here,

17   we're excluding Liberty Mutual from that comparison?

18       Q   Right.  Let me ask the question a little

19   more carefully so the record is clear.

20           As between Liberty and Ohio Casualty, do         09:27:22

21   you understand that one is the parent entity to the

22   other?

23       A   No, that's not my understanding.

24       Q   Okay.  The next paragraph, still in

25   Exhibit 173, page 2, starts off with describing that      09:27:33
```

Page 25

Exhibit 61, Page 016

```
1    your testimony will be based on your areas of         09:27:39

2    training, practice, and expertise, among other

3    things.

4            What training, practice, and expertise do

5    you have, Ms. Baldwin, in the area of insurance       09:27:49

6    coverage matters?

7        A   I am not an insurance coverage expert.

8    And I would say my experience and training in

9    connection with insurance coverage comes from

10   handling cases that touch on or sometimes focus on    09:28:18

11   the standard of care or other issues relevant to

12   insurance coverage.

13           And then my work over many years on

14   various ethics committees that, from time to time,

15   look at issues concerning insurance coverage.         09:28:47

16       Q   Do you have any training, practice, and

17   expertise with respect to interpreting insurance

18   policy provisions, including exclusions?

19       A   Only in a general sense.

20       Q   What do you mean by that?                     09:29:09

21       A   It's common that I review insurance

22   policies as part of a representation of a client.

23   In fact, I'd say it's the standard of care in many

24   situations that most litigators have some basic

25   understanding of insurance coverage.                  09:29:29
```

Page 26

Exhibit 61, Page 017

```
1              But I -- again, I do not regard myself as          09:29:35

2    a coverage expert and don't hold myself out as a

3    coverage expert, including here.

4         Q    Great.  Thank you.

5              When I talk about the Liberty policy, I          09:29:45

6    think you understand that I'll be referring to the

7    primary policy, right, in the tower of insurance?

8         A    Right.

9         Q    Liberty was the lower-level insurer with a

10   primary policy and the right and duty to defend, and   09:29:56

11   Ohio Casualty had the top layer excess or umbrella

12   policy.

13             Did Liberty's policy contain a wildfire

14   exclusion?

15        A    No, not that I understand.                      09:30:11

16        Q    And, in fact, Liberty never asserted the

17   wildfire exclusion as a defense to coverage in

18   connection with Roseburg's claims arising out of the

19   Mill Fire, correct?

20        A    Never asserted it in connection with a          09:30:27

21   reservation of rights or by some other means, yes,

22   that's correct.

23        Q    And would you agree that at no point in

24   time did Ohio Casualty issue a coverage position

25   letter to Roseburg asserting a wildfire exclusion as   09:30:38
```

Page 27

```
1   a defense to coverage?                            09:30:43

2        A   I'm aware that Ohio Casualty never

3   specifically issued a coverage letter.

4            They were asked about their insurance

5   coverage policy and asked to clarify their coverage   09:30:57

6   policy.  But it wasn't until, as I understand it,

7   answering the complaint in this action that they

8   asserted an affirmative defense based on the

9   wildfire exclusion.

10       Q   Prior to this matter, have you ever       09:31:12

11  offered an expert opinion on the circumstances that

12  trigger an insured's right to independent or cumis

13  defense counsel under liability insurance coverage?

14       A   Can you -- I just need the first part of

15  your question.                                     09:31:32

16       Q   Would you like me to restate it?

17       A   Sure.

18       Q   Prior to this matter, have you ever

19  offered an expert opinion on the circumstances as to

20  when an insured is entitled to independent or cumis   09:31:42

21  defense counsel?

22       A   I don't think I've ever offered an expert

23  opinion on that issue.

24       Q   In your law practice, do you have any

25  experience in offering analyses as to the          09:31:56
```

Page 28

Exhibit 61, Page 019

```
 1    circumstances or factors that require a liability        09:32:01

 2    insurer to allow its insured to select independent

 3    or cumis defense counsel?

 4         A    Yes.

 5         Q    All right.  Can you please describe that        09:32:17

 6    experience?

 7         A    I've handled numerous cases in which the

 8    question of a party's entitlement to independent

 9    counsel has arisen, and my practice includes

10    advising clients on that issue.                           09:32:35

11              I'm trying to think if I've ever advised

12    an insurance company on that issue.  I may have.

13              That, I think, generally describes it.

14         Q    So let me break that down a little bit.

15              Do you have any prior experience in your        09:32:59

16    law practice in giving analysis to insurers about if

17    and when an obligation to provide the insured with

18    cumis or independent defense counsel arises?

19         A    I may have.

20         Q    Can you recall specifically whether you've      09:33:12

21    done that?

22         A    I can't recall specifically here, but I

23    have a general recollection of having done so.

24         Q    Is it accurate to say, though, that your

25    experience in giving advice on when independent or        09:33:22
```

Page 29

1    cumis defense counsel is owed by the insurer is        09:33:24

2    generally in relation to your representation of

3    policyholders?

4         A    I think that's correct, except I do -- as

5    I say, just subject to the caveat that I do have a     09:33:39

6    general recollection of advising an insurer with

7    respect to this question, but I can't think of a

8    specific instance.

9         Q    What percentage -- let me back up for a

10   second.                                                09:33:54

11             Can you give me an approximation as to the

12   number of matters that you've been responsible for

13   handling where you've offered advice to the client,

14   whether it's a policyholder or an insurer, as to

15   when and if an obligation to provide independent or   09:34:09

16   cumis defense counsel is owed?

17        A    My practice spans 35 years, and I just

18   can't give you a meaningful estimate.  And I'm

19   sorry.

20        Q    That's okay.                                 09:34:26

21             Can you give me a percentage of your

22   practice?  Maybe that's easier if you can't give me

23   an approximate number of matters.

24             As a percentage of your practice which

25   spans across attorney liability and conduct issues,   09:34:38

Page 30

Exhibit 61, Page 021

```
1    a cumis obligation is owed?                          09:35:53

2        A    The reason I am just raising the question

3    of the definition of "practice," you could define it

4    as number of matters, say, or percentage of time

5    billed to clients, for example.  And those answers    09:36:06

6    would be different.

7            I'm sure that I can safely say that less

8    than 5 percent of my time billed to client matters

9    over the past 35 years has been spent advising

10   clients about the right to independent counsel.       09:36:21

11       Q    Thank you.

12           Have you ever been hired by an insured or

13   an insurer as "coverage counsel," as that term has

14   been used by Ms. Molander?

15       A    No.                                           09:36:46

16       Q    Have you ever been employed by an insurer?

17       A    I don't recall as I sit here.  I may have

18   been.

19           I was at a firm for a while that

20   provided -- was very involved in insurance work, and  09:37:04

21   it's quite possible that I worked on matters while I

22   was at Chapman Popik & White where we were retained

23   by the insurer.

24       Q    That was a poor question on my part.  And

25   I'm not asking about retention by insurers, but I      09:37:21
```

                                                    Page 32

Exhibit 61, Page 022

1    written expert report in this case; is that correct?    09:39:41

2        A   Yes.

3            MR. CROWE:  I'll mark for identification

4    as Exhibit 247, which I believe is the next exhibit

5    in line, the expert report of Merri Baldwin and the    09:39:55

6    exhibits attached to it.

7            (Exhibit 247 was marked for identification

8        and is attached hereto.)

9    BY MR. CROWE:

10       Q   Ms. Baldwin, I know it's a lengthy    09:40:24

11   document.  But if you could just please -- and we're

12   going to be referring to this exhibit throughout the

13   day; so please keep it in front of you.

14           But for now, if you could just confirm

15   that this is a true and correct copy of your expert    09:40:34

16   report in this matter.

17       A   It appears to be.

18       Q   Are the -- strike that.

19           Have you written any other expert reports

20   in this matter other than this report?    09:40:45

21       A   No.

22       Q   And you've issued no rebuttal reports in

23   this matter, correct?

24       A   Correct.

25       Q   And does your expert report contain all of    09:40:58

Page 35

1          I mean, again, I didn't necessarily              09:42:32

2     include in the report every single fact that I

3     relied on in reaching these opinions, but I think I

4     certainly included the material facts.

5          Q    Right.                                       09:42:45

6          But you certainly included the most

7     material and important facts that supported your

8     opinions as you've described them in your report,

9     correct?

10         A    Yes.                                         09:42:53

11         Q    I assume you reviewed your report for

12    purposes of preparing for today's deposition?

13         A    Yes.

14         Q    Is there anything in your written report

15    that requires any correction or clarification, as    09:43:04

16    you sit here now?

17         A    Not that I can think of.

18         Q    And did you reach all of the opinions

19    reflected in your report, you know, on your own and

20    independent of any influence of others?               09:43:15

21         A    I would certainly say yes to that, but I

22    think that's a very difficult question to answer for

23    anyone.  And I don't -- let me put it this way:  I

24    don't completely understand what you mean.

25         Q    Sure.                                        09:43:34

                                                    Page 37

Exhibit 61, Page 024

```
 1    coverage matter?                                  09:46:55

 2         Q   Sure.  Let's --

 3         A   No.

 4         Q   -- start there.

 5             Okay.  Have you talked with him generally  09:47:02

 6    about this matter?

 7         A   I wouldn't say I've spoken to him

 8    generally about this matter.

 9         Q   Why don't you --

10         A   I wouldn't -- I haven't spoken to him      09:47:11

11    about this matter, this coverage case in which I'm

12    giving this deposition at all.

13         Q   Have you talked with him or communicated

14    with him about BakerHostetler's role in representing

15    Roseburg in response to the Mill Fire?             09:47:26

16         A   No.

17         Q   Okay.  And just so it's clear, have you

18    had any communications with Mr. Julian or anybody at

19    BakerHostetler with regard to this litigation

20    between Roseburg and Liberty?                      09:47:41

21         A   No.

22         Q   And so fair to say that you are not

23    relying on any opinions from Mr. Julian or anybody

24    at BakerHostetler in forming your opinions in this

25    case, correct?                                     09:47:55
```

Page 41

```
1    Liberty's standard of care specifically.              09:51:51

2          But when I review materials in this matter

3    or any expert matter, I'm looking to develop an

4    understanding of the factual record.  And it's -- I

5    don't look -- in that process, I don't look to        09:52:09

6    develop only the facts that are favorable to the

7    side or the position of the party that's retained me

8    because that wouldn't make me a very effective

9    expert.

10       Q   Would you agree that in offering your         09:52:21

11   opinions, it would not be appropriate for you to

12   make conclusions of law?

13       A   I'm hesitating because that's a difficult

14   and much debated issue, particularly with respect to

15   legal ethics experts.                                  09:52:39

16         Generally speaking, of course that's true,

17   and different courts interpret the appropriate scope

18   of expert testimony in different ways.

19         For example, as an ethics expert, we

20   sometimes skate pretty close to the edge of what you   09:52:58

21   might regard as a legal opinion, and that's kind of

22   a necessary part of the testimony and the value that

23   we bring to a proceeding.

24         And sometimes judges allow quite a bit of

25   latitude to ethics experts to testify as to what the  09:53:13
```

Page 45

Exhibit 61, Page 026

1    law is and sometimes judges do not.  And it's an            09:53:16

2    issue of much debate and discussion among legal

3    ethics experts and practitioners.

4         Q    Let me break it down a little bit, or at

5    least be a little more specific.                            09:53:35

6              Would you agree that it would be

7    inappropriate for you, as an expert, to opine that

8    Liberty owed and breached a duty to defend Roseburg

9    under the terms of its insurance policy?

10        A    No, I don't think that would be an               09:53:56

11   impermissible area of expert testimony, just like

12   Julia Molander did in her reports.

13        Q    You do agree that it would be improper for

14   you, as an expert, to resolve factual disputes,

15   correct?                                                    09:54:22

16        A    Well, there's no way an expert could

17   resolve anything.  But sometimes an expert may need

18   to decide whether a particular fact that is in the

19   record is credible or more likely than not.

20             But it's certainly not up to the expert to       09:54:42

21   decide disputed facts.  But again, sometimes it's

22   necessary for an expert to assume that a disputed

23   fact is true or not true for purposes of the

24   testimony.

25        Q    And did you do that in this case as part         09:55:01

Page 46

Exhibit 61, Page 027

1    of your expert opinions?                              09:55:03

2         A    I can't think of a fact, but it may be.

3    There are a couple of areas of disputed facts, and

4    there may have been occasions for me to -- to rely

5    on one side or the other in terms of forming my       09:55:19

6    opinion.

7         Q    Anything come to mind in that regard?

8         A    No.

9         Q    And to the extent you did do that, it

10   would clearly be identified in your report as an      09:55:27

11   assumption?

12        A    I believe so.

13        Q    Other than perhaps speaking with

14   Mr. DeVries or others at his firm, did you meet or

15   talk with anybody or communicate with anybody to      09:55:49

16   prepare for today's deposition?

17        A    No.

18        Q    I think you mentioned reviewing your

19   report to prepare for the deposition.

20             Did you review any other documents to       09:56:02

21   prepare for the deposition?

22        A    I looked over my notes; looked over a

23   couple of the depositions; looked over some of the

24   deposition exhibits; looked at the complaint; looked

25   at a couple of cases, I believe.  Just generally       09:56:18

                                              Page 47

Exhibit 61, Page 028

1    deposition transcripts, did you take any other notes          10:02:21

2    as part of your expert work?

3         A   From time to time I may have made brief

4    handwritten notes during telephone calls, but I

5    didn't retain those.  They weren't substantive.          10:02:37

6            Again, as you can see from me here today,

7    I sometimes take short notes during discussions.

8    But I did not take any written notes that I relied

9    on here.

10        Q   Other than your expert report, which we've          10:03:00

11   marked as Exhibit 247, have you created any other

12   documents in connection with your expert work in

13   this matter that you intend to rely on or use at

14   trial?

15        A   Not specifically.          10:03:15

16        Q   Did you review Ms. Molander's deposition

17   testimony?

18        A   No.

19        Q   Do you know Julia Molander?

20        A   Generally.          10:03:31

21        Q   In what way?  In what context?

22        A   I have known of her for a long time.

23            I believe that our firms had certain, you

24   know, work together.  I don't believe -- and I may

25   have worked directly with Ms. Molander maybe in her          10:03:51

Page 53

```
 1    role as monitoring counsel perhaps at some point in      10:03:55

 2    the past, but I don't have a specific recollection.

 3    But she is someone who is very familiar to me,

 4    especially by reputation.

 5          Q    Sure.  And I think she'd probably say the      10:04:13

 6    same as well.

 7                Can you think of a matter where you were

 8    adverse to Ms. Molander, either in her practice of

 9    law or as an expert?

10          A    No.                                            10:04:25

11          Q    And you have no reason to dispute

12    Ms. Molander's qualifications to serve as an

13    insurance coverage expert in this matter?

14                MR. DeVRIES:  Objection.  Lacks

15    foundation, incomplete, ambiguous.                       10:04:42

16                THE WITNESS:  I haven't given that any

17    thought.

18    BY MR. CROWE:

19          Q    You did review her report, correct?

20          A    Yes.                                           10:04:50

21          Q    Are you offering any opinions or do you

22    intend to offer any opinions in rebuttal to her

23    report?

24          A    To her initial report?

25          Q    Correct.                                       10:05:01
```

                                                    Page 54

Exhibit 61, Page 030

```
1         A    I can't think of any specific rebuttals to        10:05:14

2    anything in her original report as I sit here.

3         I do think that our areas of expert

4    opinion do correspond, in certain respects, and to

5    that extent, some of my testimony or opinions could    10:05:29

6    be regarded as relevant to opinions that she stated

7    in her original report.

8         But as I sit here, I don't have a specific

9    rebuttal to anything in Ms. Molander's original

10   report.                                                10:05:50

11        Q    Do you know who Jack Pierce is?  Is that a

12   name that's familiar to you?

13        A    Not really.

14        Q    He was -- he's one of the experts

15   designated by Liberty in this case.                    10:06:04

16        Fair to say that you have not reviewed

17   Mr. Pierce's report -- either initial report or

18   rebuttal report -- in this case?

19        A    I have not.

20        Q    Are you familiar with a gentleman by the     10:06:18

21   name of William Hirschfeld?

22        A    No.

23        Q    And fair to say that you have not reviewed

24   any expert report issued by Mr. Hirschfeld in this

25   matter?                                                10:06:29
```

Page 55

```
1          A   Yes, I think that's fair to say.          10:27:32

2          Q   Have you ever written or lectured on

3     standards governing an insurer's duty to defend or

4     indemnify an insured?

5          A   I don't think so.                         10:27:53

6          Q   Have you ever written or published or

7     lectured on when an insured is entitled to

8     independent or cumis defense counsel?

9          A   I'm fairly certain I have lectured on that

10    issue.  I don't think I've ever written or published   10:28:19

11    anything.

12         Q   Do you recall how many times you've

13    lectured on that issue, and where?

14         A   Well, certainly as part of my classes that

15    I teach.                                            10:28:30

16             I'm pretty sure that over the years I've

17    also lectured on that issue as part of a

18    presentation to lawyers.  But I can't think of a

19    specific program as I sit here.

20         Q   You mentioned lecturing on the topic as    10:28:58

21    part of classes that you teach.

22             What specific classes are you referring

23    to?

24         A   Well, I teach at the University of

25    California at Berkeley, and I have taught at Golden   10:29:10
```

Page 67

Exhibit 61, Page 032

1    experience in that regard, expert experience in that        10:33:32

2    regard?

3        A    Well, I've been retained as an expert in

4    connection with attorney-client fee disputes on a

5    number of occasions, both as a testifying expert and        10:33:41

6    as a consultant.

7        Q    Do you have -- strike that.

8            Have you done any work in this matter to

9    evaluate any fee dispute as between Roseburg/Baker

10   and Liberty?                                                10:34:02

11       A    No.

12       Q    Were you asked, as part of your expert

13   role in this case, to render an opinion on the

14   reasonableness and necessity of the fees and costs

15   that BakerHostetler billed to Roseburg?                     10:34:19

16       A    No.

17       Q    Fair to say you're not a fee expert in

18   this case, correct?

19       A    That is correct.

20       Q    Have you -- strike that.                           10:34:26

21           Ms. Baldwin, have you been given any of

22   the BakerHostetler invoices for the work they

23   performed for Roseburg in relation to the Mill Fire?

24       A    I don't recall.  I know that as part of

25   the deposition exhibits, I've seen spreadsheets.  I         10:34:59

                                                    Page 71

Exhibit 61, Page 033

1    may have seen actual invoices, but I don't recall as        10:35:04

2    I sit here.

3        Q   Okay.

4        A   It's somewhat familiar to me, and I

5    believe I may have looked at some.  But it would be         10:35:10

6    in the context of deposition exhibits, probably to

7    Mr. Julian's deposition.

8        Q   Understood.

9        And fair to say because your role in this

10   case doesn't involve reviewing the BakerHostetler          10:35:21

11   invoices, it wasn't material to your opinions that

12   you've rendered in this case, at least as relates to

13   the reasonableness and necessity of those fees?

14       A   Right.  I don't have an opinion as to the

15   reasonableness or necessity of BakerHostetler's            10:35:35

16   fees.

17       MR. CROWE:  Okay.  I'll mark for

18   identification as Exhibit 252, I think this is one

19   of the last exhibits from your website.  It's titled

20   "Complex Commercial Litigation," again, a printout         10:35:56

21   within the last couple of days.

22       (Exhibit 252 was marked for identification

23       and is attached hereto.)

24       THE WITNESS:  Okay.

25   ///                                                          10:36:46

Page 72

Exhibit 61, Page 034

```
1    specifically says, "May 20, 2014."  I don't recall        10:42:38

2    that specifically as being the date of publication,

3    so...

4         Q   Understood.

5             But you recognize Exhibit 253 as an              10:42:47

6    article that you authored, correct?

7         A   Generally.

8         Q   Did anybody assist you in preparing it or

9    authoring it?

10        A   I don't recall.  I don't think so, but I         10:42:57

11   don't recall.

12        Q   Is this article published or available on

13   the Rogers Joseph O'Donnell website?

14        A   I have no idea.

15        Q   In the summary page of the article, there        10:43:12

16   are four bullet points.  The first reads, quote,

17   "Conflicts of interest in law involve scenarios

18   where a lawyer's obligations to one client are at

19   odds with those to another, either concurrently or

20   with former clients," closed quotes.                      10:43:28

21            Did I read that correctly?

22        A   Yes.

23        Q   And the bullet point below that reads,

24   "Law firms must implement effective systems to

25   identify potential conflicts of interest, utilizing       10:43:37
```

Page 77

1    comprehensive, up-to-date databases and requiring          10:43:40

2    regular checks as cases evolve," closed quote.

3           Did I read that correctly?

4       A   Yes.

5       Q   And do you still subscribe to both of              10:43:49

6    those bullet points as identified in this article as

7    a standard?

8       A   Generally.

9           I'm sure that I did not draft these bullet

10   points.  These are intended, purportedly, to             10:44:04

11   summarize what's in the article.

12          You know, I might have drafted them

13   slightly differently had I done them myself.  But

14   generally speaking, I think these are correct

15   statements.                                               10:44:19

16      Q   Right.

17          And referencing to law firms needing to

18   "implement effective systems to identify potential

19   conflicts of interest," you're referring to a

20   process, a system, to run conflict checks as new         10:44:31

21   matters come into a law firm, correct?

22      A   Yes.

23          "Process" is probably a better word for a

24   general standard than "system."  I realize in my

25   article I say, "Every law firm, regardless of size,      10:44:50

                                                    Page 78

Exhibit 61, Page 036

1    needs to have in place an effective system for            10:44:53

2    checking conflicts."

3            My use of that language, "effective

4    system," in context, I would not summarize then to

5    say "must implement effective systems," only because     10:45:06

6    there are many ways to do a conflict check.

7            These days, software plays an important

8    role.  That can vary.  It's not necessary to use

9    software to have an effective conflicts-checking

10    process; and as written in the summary, to me,          10:45:27

11    suggests a particular perspective on software that I

12    would not ascribe to as being required.

13        Q    Right.

14            But the system to run conflicts

15    necessarily has to involve some sort of database of     10:45:43

16    former and current clients in which to run the

17    prospective client against, correct?

18        A    Yes, usually.

19        Q    Right.

20            And do you agree that the standard of care     10:45:56

21    under rules governing attorney conduct is that

22    lawyers and law firms should run a conflicts check

23    against former and current clients before accepting

24    a retention of a new matter?

25        A    Well, law firms need to check conflicts       10:46:19

                                                    Page 79

```
1    prior to engaging in new matters.  That requires        10:46:29

2    identifying people and entities that are involved in

3    the new matter, including correctly identifying the

4    client, identifying, you know, adverse parties,

5    counsel in some cases, and running those names          10:46:49

6    through the database to determine any prior

7    relationships or adversity to those people or

8    entities.

9         Q    Do you agree that the standard of care

10   also requires that lawyers and law firms supplement     10:47:04

11   a conflicts check with new, potentially adverse

12   parties after an initial conflict check is made?

13        A    Generally -- generally, yes.  I don't know

14   "potentially adverse parties."  I think that might

15   be too vague a description of what the requirement      10:47:29

16   is.

17             But, yes.  As additional parties or

18   witnesses or, you know, other relevant players

19   become known, a law firm should supplement a

20   conflicts check.                                        10:47:46

21        Q    The fourth bullet point on this first page

22   of Exhibit 253 references "advance conflict

23   waivers."

24             Do you see that?

25        A    Yes.                                          10:47:56
```

Page 80

1      Q   Do you know if BakerHostetler had an          10:47:56

2   advance conflict waiver with Liberty Mutual, or

3   Liberty, rather, at the time they were representing

4   Roseburg in response to the Mill Fire?

5      A   I do not know.                                 10:48:12

6      Q   Do you know whether BakerHostetler, at the

7   time of its representation of Roseburg in relation

8   to the Mill Fire, had an advance conflict waiver

9   with Roseburg?

10     A   No.                                            10:48:24

11     Q   You had mentioned -- I think you were

12  referring to page 2 of the article which reads, in

13  part, quote, "The larger the law firm, the greater

14  the likelihood that conflicts will arise," closed

15  quote.                                                10:48:40

16          Do you see that?  It's on page 2.

17     A   I was not referring to that earlier if

18  that was the predicate of your question, but I see

19  that.

20     Q   It was, and I apologize if I misstated        10:48:58

21  your testimony.  Let me ask the question

22  differently.

23          Your article references that large -- the

24  larger the law firm, the greater the likelihood that

25  conflicts will develop, correct?                      10:49:07

                                                          Page 81

1    would have to be a pretty significant conflict that,        10:53:30

2    for example, might be a simultaneous representation

3    of two parties.  It may even be before the same

4    court, for example, might be an example of when that

5    could be the case.                                          10:53:47

6        Q   So is it fair to say that, generally

7    speaking, positional conflicts might be a business

8    conflict in your view, not necessarily an ethical

9    conflict; but there could be circumstances where

10   that positional conflict is so severe, there might        10:53:58

11   be circumstances that would require a conflict

12   waiver?

13       A   Yes.

14       Q   Okay.  And then on page 2 of your article,

15   Exhibit 253, under "Conflicts of Interest," you're        10:54:18

16   describing concurrent conflicts, meaning conflicts

17   of interest between two current clients of the law

18   firm, correct?  That would be a concurrent conflict?

19       A   Generally.

20       Q   And then there's another potential             10:54:38

21   conflict of interest dealing with former clients,

22   which involve conflicts of interest between a

23   current client and a former client of the law firm,

24   correct?

25       A   Yes.                                            10:54:49

                                                        Page 85

1              Despite the fact that I look at the rules        10:58:24

2    every single day, that is still true.

3        Q   But as you sit here, your view is, under

4    California rules, informed written consent is

5    necessary from both clients?                              10:58:34

6        A   Under -- if a conflict, as defined in

7    Rule 1.7(a) or (b) is present.

8        Q   And informed written consent is referring

9    to a written conflict waiver; is that correct?

10       A   You can call "informed written consent" a        10:58:51

11   "written conflict waiver."  "Waiver" and "consent"

12   are -- the word "waiver" is not contained in the

13   rules, but it's how we colloquially refer to a

14   written consent.

15       Q   So it could be referred to as a "conflict        10:59:06

16   waiver," or maybe differently, a "conflict consent"

17   or "consenting to the conflict"?

18       A   Yes.

19           I think of it as slightly different.  It's

20   a consent to the representation subject to the           10:59:17

21   disclosure of the conflict.

22       Q   And the part requiring informed written

23   consent means that both clients have to be informed

24   of the conflict and consent to it to allow the

25   representation to either be undertaken or to             10:59:33

                                                    Page 89

Exhibit 61, Page 041

```
1    continue, correct?                              10:59:36

2        A   Yes.  If the situation involves the kinds

3    of conflicts as defined in the rule that require

4    informed written consent.

5        Q   Almost done with this exhibit.          10:59:47

6            On page 3, under "Early Detection of

7    Conflicts," I would invite your attention to the

8    second paragraph under that section.  And it's

9    describing the process and the systems associated

10   with conflicts checks.                          11:00:06

11           And then there's a sentence that you

12   wrote: quote, "Information must be updated as a

13   matter develops, and lawyers should run supplemental

14   conflicts checks to reflect additional parties,

15   witnesses, and counsel," closed quote.          11:00:22

16           Did I read that correctly?

17       A   Yes.

18       Q   And is that a true statement today?

19       A   Yeah.  That's what I've already testified

20   to.                                             11:00:28

21       Q   Did BakerHostetler run any supplemental

22   conflicts checks in relation to their representation

23   of Roseburg in response to the Mill Fire?

24       A   As I sit here, I don't know specifically

25   what conflicts checks were run.                 11:00:47
```

Page 90

```
 1              I recall generally testimony by Mr. Dow         11:00:50

 2    and perhaps Mr. Julian about the conflicts checks

 3    that were done.

 4         Q   Do you understand from that testimony that

 5    Baker ran a conflicts check before they took on the      11:01:04

 6    representation of Roseburg?

 7         A   I don't recall.

 8         Q   So as you sit here, can you say one way or

 9    the other whether BakerHostetler even ran a

10    conflicts check before undertaking Roseburg's            11:01:18

11    representation in response to the Mill Fire?

12         A   I don't specifically recall.

13         Q   And consequently, you don't know whether

14    or not they even -- if they ran an initial conflicts

15    check, you can't say whether or not they ran a           11:01:32

16    supplemental conflicts check, correct?

17         A   I believe that conflicts were checked, but

18    I don't -- I don't know the specifics.

19         Q   Do you believe that a supplemental

20    conflicts check was made?                                11:01:49

21         A   I don't know.

22         Q   In 2022 and 2023, to the extent you know,

23    what was BakerHostetler's process for identifying,

24    preventing, and managing conflicts of interest?

25         A   I don't specifically know beyond what           11:02:06
```

Page 91

Exhibit 61, Page 043

1          Q    And that was information that you learned          11:03:46

2     of from deposition testimony by either Mr. Dow or

3     Mr. Julian?

4          A    The only information I have about

5     conflicts at Baker came from the depositions.          11:03:55

6               As I sit here, I believe it was Mr. Dow

7     and/or Mr. Julian.  Mr. Chairez, I think, testified

8     that he wasn't involved in conflicts; so I don't

9     think it was from his testimony.

10         Q    Other than what you've already testified          11:04:11

11    to, was there anything that you already knew of from

12    a prior relationship with BakerHostetler or because

13    of an independent investigation that you did to

14    determine BakerHostetler's process for running

15    initial and supplement at that time conflicts          11:04:28

16    checks?

17         A    No.

18         Q    Do you know what database or software

19    system they used in 2022/2023 for conflict check

20    purposes?          11:04:39

21         A    No.

22         Q    Do you know if BakerHostetler, in 2022 and

23    2023, had any written policies and procedures for

24    running initial and supplemental conflicts checks?

25         A    I don't know.  I would assume they did.          11:04:48

                                                  Page 93

1          Q    But don't know?                              11:04:53

2          A    I don't know.

3          Q    Right.

4               In 2022 and 2023, did BakerHostetler have

5     any written policies and procedures governing        11:04:57

6     conflict waiver requests?

7          A    I don't know.

8          Q    In 2022 and 2023, did BakerHostetler have

9     any written policies and procedures governing

10    advance waiver requests that you know of?             11:05:16

11         A    I don't know.

12         Q    Ms. Baldwin, do you agree, under the

13    standard of care governing attorney conduct, that

14    once a lawyer or law firm identifies a conflict of

15    interest among concurrent clients, the lawyer and     11:05:45

16    the law firm must stop the representation of the

17    client and seek conflict waivers from both clients?

18         A    I think that hypothetical is incomplete.

19    I think that I would need to know more about what

20    the conflict is that the attorneys had identified     11:06:08

21    among the clients.

22         Q    Well, let's assume that there was direct

23    adversity between the concurrent clients.

24              Under that scenario, do you agree that

25    once that direct adversity is discovered by the       11:06:24

Page 94

Exhibit 61, Page 045

1    lawyer or the law firm, the lawyer and the law firm         11:06:26

2    should stop representation of the client and seek

3    conflict waivers from both clients?

4         A    Assuming that what you're describing as

5    "direct adversity" is truly something material such        11:06:40

6    that the interests of one client are directly

7    adverse to the interests of another client, the

8    answer is probably yes.

9         Q    And in that circumstance, if the lawyer or

10   the law firm fails to seek conflict waivers from          11:06:53

11   both clients, you would agree with me that they

12   would be falling below the standard of care

13   governing -- under rules governing professional

14   conduct?

15        A    Again, it would depend on the specific          11:07:07

16   facts.

17             Your question, again, assumes that there

18   is direct material adversity between those

19   concurrent clients.

20             And I think if that were the case, and the      11:07:24

21   law firm failed to obtain written consents to the

22   conflicted representation, then they certainly

23   would -- I think it's fair to say -- may violate

24   Rule 1.7, which may constitute a violation of the

25   standard of care, I suppose, depending on            11:07:47

                                              Page 95

Exhibit 61, Page 046

1    jurisdiction.                                          11:07:50

2        Q   Yeah, and I'm referring specifically to

3    California, California rules.

4            Does your answer change in any way if the

5    question is specific to California law?             11:08:02

6        A   No.  It's just, I don't equate every

7    violation of a rule of professional conduct with a

8    breach of the standard of care, which is a different

9    concept.  It's a concept from civil law.  It derives

10   from the law concerning negligence.  It's a          11:08:22

11   different concept.

12           And I don't think it's fair to say that

13   every time a lawyer breaches a duty of professional

14   conduct or rule of professional conduct, that that

15   constitutes a breach of the standard of care.        11:08:36

16       Q   I appreciate the clarification, but -- and

17   the hypothetical here is asking you to assume that

18   there is direct material adversity between

19   concurrent clients.  And the law firm knows about

20   that direct material adversity and continues the     11:08:52

21   representation without seeking conflict waivers from

22   both clients.

23           Under those circumstances, under

24   California law, do you agree that the lawyer and law

25   firm would be violating the standard of care under   11:09:06

                                                    Page 96

1    representation, I would not, as a general rule, just        11:21:46

2    regard all such billings as improper.

3         Q   Are there ethical rules in California that

4    govern under what circumstances a lawyer should be

5    charging a legal rate versus a non-legal rate for          11:22:00

6    tasks performed?

7         A   I can't think of a specific rule that

8    would govern that situation.

9         Q   Is there a standard of care that governs

10   when a lawyer may charge for a legal rate -- a legal        11:22:16

11   rate for non-legal work, for non-legal tasks?

12        A   What was your question?

13        Q   Yeah, it was a poor question.

14            Is there a standard of care that governs

15   the circumstances where a lawyer may charge a legal         11:22:33

16   rate for non-legal work?

17        A   No, I wouldn't generally regard this as

18   part of the standard of care.

19            The nature of the billing between an

20   attorney and a client, first you'd look to the              11:22:52

21   contract between the lawyer and the client.

22            Secondly, you'd look -- and there

23   certainly is a rule of professional conduct,

24   Rule 1.5, that talks about unconscionable fees.  I

25   can't think of specifically, you know, a provision          11:23:09

Page 105

Exhibit 61, Page 048

```
 1      of 1.5 that would apply here.                        11:23:13

 2              But you could imagine a situation where a

 3      law firm billed a client for significant tasks that

 4      were not directly related to legal services that

 5      might be regarded as unconscionable based on how and   11:23:34

 6      what those tasks were.

 7              But you could also -- again, I think

 8      lawyers routinely bill clients for tasks that are

 9      related to the legal services we perform but that

10      are not specifically legal services themselves.       11:23:54

11          Q   Were you asked as part of your work in

12      this matter to evaluate whether or not

13      BakerHostetler was charging an unconscionable fee

14      for the work they performed in their representation

15      of Roseburg?                                           11:24:06

16          A   No.

17          Q   Have you performed any such analysis?

18          A   No.

19          Q   What are the standards, as you understand

20      them, governing whether a lawyer's fee is            11:24:13

21      unconscionable?

22          A   There are about 12 factors set forth in

23      Rule 1.5.  I don't have them to mind as I sit here.

24      I haven't considered Rule 1.5 as part of my work in

25      this matter.  But that's where I would look to talk   11:24:35
```

Page 106

```
1    about unconscionability.                              11:24:39

2         Q   Is there an ethical rule or a standard of

3    care that governs how a lawyer or law firm should

4    review and edit pre-bills or pre-invoices before

5    they're sent to a client to account for billing      11:25:00

6    inefficiencies, excessive time, unconscionable work,

7    unconscionable fees?

8         A   I would say no; and just say

9    unconscionable fees, pursuant to Rule 1.5, is a --

10   is a significantly high standard.                     11:25:22

11          So the modern rules talk about

12   unreasonable fees.  That's how 1.5 is denoted in the

13   modern rules.

14          In California, again, we talk about -- and

15   seek to govern unconscionable fees, which is a --     11:25:36

16   you could certainly regard it as a more extreme

17   standard.  In other words, it takes more to violate

18   the rule in California, in a sense, than under the

19   modern rules.

20          So I'm just -- I -- I have never seen a        11:25:51

21   situation where a lawyer would, as a routine matter,

22   be reviewing pre-bills in order to screen for

23   unconscionable fees.  That would be a very unusual

24   situation.

25        Q   Putting unconscionable fees aside, is        11:26:10
```

Page 107

Exhibit 61, Page 050

1    there a standard of care in the industry or an              11:26:13

2    ethical rule that requires a lawyer or law firm to

3    review pre-bills or invoices for reasonableness or

4    necessity before those invoices are transmitted to a

5    client for payment?                                          11:26:29

6         A    No.

7         Q    Is there a standard of care in the

8    industry or an ethical rule that governs or

9    requires, rather, a lawyer or law firm to review

10   invoices and pre-bills before they're sent to the           11:26:40

11   client to remove any time that is excessive or

12   unreasonable?

13        A    No, not as a general rule.

14        Q    Do you agree that it's good billing

15   hygiene, good practice, for lawyers and law firms to         11:26:54

16   review invoices for reasonableness and necessity

17   before they're sent to a client?

18        A    It can be.  There are many law firms that

19   do not perform any kind of review.

20        Q    Do you know if BakerHostetler, in              11:27:07

21   2022/2023, had a process for reviewing pre-bills and

22   pre-invoices before they're sent to the client?

23        A    I don't know.

24        Q    Do you know what amount, if any, was

25   written off or written down by BakerHostetler for        11:27:20

                                                     Page 108

Exhibit 61, Page 051

1    the provision of legal services it provided to                11:27:24

2    Roseburg?

3        A   No.

4        Q   Not material to your opinions in this

5    case; is that correct?                                        11:27:31

6        A   I don't have any opinions on this issue.

7            MR. CROWE:  Why don't we take a break, if

8    that's all right.

9            MR. DeVRIES:  You bet.

10           THE VIDEO OPERATOR:  This is the end of                11:27:43

11   Media File No. 2.  We are off the record at

12   11:27 a.m.

13           (Recess, 11:27 a.m. - 11:36 a.m.)

14           THE VIDEO OPERATOR:  We are back on

15   record.  This is the beginning of Media File 2 --             11:36:07

16   pardon me -- 3.  The time is 11:36 a.m.

17   BY MR. CROWE:

18       Q   Ms. Baldwin, is there a standard of care

19   or ethical rule that governs when and under what

20   circumstances a lawyer should provide their client            11:36:23

21   with a budget?

22       A   No.

23       Q   Have you been asked to consider whether or

24   not BakerHostetler should have provided a budget to

25   Roseburg for their work in representing Roseburg in           11:36:39

                                                      Page 109

Exhibit 61, Page 052

```
1        Q    With respect to the "Matters" list,          11:42:02

2   Exhibit A to your report, did any of those matters

3   involve insurance coverage issues?

4        A    Not as the subject of my testimony.

5        Q    And what about the remaining matters not     11:42:42

6   on this list, up to the approximate 25?  Did any of

7   those matters involve insurance coverage issues as

8   you remember them?

9        A    I don't recall any that involved insurance

10  coverage issues as the subject of my testimony.       11:42:56

11       Q    With respect to the 13 matters listed in

12  your report, plus the additional Henderson matter,

13  do any of them -- or did any of them involve claims

14  that an insurer owed, and breached a duty to

15  provide, cumis or independent counsel to their       11:43:19

16  insured?

17       A    I don't believe so.

18       Q    And what about the remaining matters that

19  are not listed up to the 25 total?  Did any of them

20  involve issues or claims that an insurer owed and    11:43:31

21  breached a duty to provide independent or cumis

22  defense counsel?

23       A    I don't recall.

24       Q    In any of the 25 matters, including the 13

25  on your "Matters" list, did any of them involve      11:43:48
```

Page 115

Exhibit 61, Page 053

1    opinions by you, expert opinions by you, relative to        11:43:51

2    the competency of insurer-appointed counsel?

3          A    Probably.

4          Q    Do you recall specifically whether any of

5    the matters on this list, or the ones that aren't on        11:44:21

6    the list but you remember, that involved opinions

7    relative to the competency of insurer-appointed

8    counsel?

9          A    I'm sure a number of these matters

10   involved issues of competency of insurer-appointed         11:44:39

11   counsel.

12         Q    Can you identify them specifically?

13         A    As I sit here, I'm not certain which of

14   these involved insurer-appointed counsel as opposed

15   to insured-selected counsel because that issue, I          11:44:57

16   would say, was not relevant to my opinion.

17              But many of these cases here involved

18   issues of competency of counsel where the counsel

19   was being -- had been retained by and was being paid

20   by an insurance company.                                   11:45:18

21         Q    I appreciate that.

22              Can you specifically identify those

23   matters that involved your opinions on competency

24   issues?

25         A    The Michelman case, the first one listed.       11:45:36

                                                      Page 116

1    opinion on the competency of counsel involving the        11:47:39

2    issue of whether that lawyer or law firm had

3    adequate resources to undertake the representation,

4    how many out of the 25 matters that you recall

5    providing expert services involved those opinions,        11:47:56

6    whether it was for the plaintiff or the defendant?

7         A    I would say a number of the cases in which

8    I have testified as to attorney competence have

9    involved, in one way or the other, questions of

10   adequate resources.                                        11:48:34

11        Q    And what are the standards or factors that

12   are involved in evaluating as an expert whether a

13   law firm or lawyer has adequate resources to

14   undertake representation of a client?

15        A    Well, it's very fact-specific.  And in the       11:48:50

16   context of a civil negligence claim, it would be

17   based in standards of -- standard of care and

18   negligence, which is framed by the standard of what

19   a reasonable lawyer would do in the same or similar

20   circumstances.  Sorry.  Strike that.                       11:49:17

21             In California, it's what a reasonably

22   careful lawyer would do in the same or similar

23   circumstances.  So that would be the -- generally

24   the standard that would apply.

25        Q    What a reasonably careful lawyer would do        11:49:30

                                                    Page 118

1    correct?                                              11:55:57

2         A    No.

3         Q    Is that correct?  Sorry.

4         A    It's correct.

5         Q    Double negatives there.  Sorry.  My fault.    11:56:00

6              Have you authored any State Bar articles

7    or other publications governing specifically ethical

8    duties of tripartite defense counsel?

9         A    Identifying specifically that topic, no.

10        Q    And you understand what I mean by              11:56:29

11   "tripartite defense counsel"?

12        A    Yes.

13        Q    And that means it's counsel who's been

14   selected and appointed by the insurer to defend an

15   insured?                                               11:56:39

16        A    Not necessarily.  It could be counsel that

17   was selected and identified by the insured but is

18   being paid by the insurer, such that there's a

19   tripartite relationship involving the attorney

20   representing both the insured and the insurer.         11:56:56

21        Q    And in the tripartite relationship, the

22   attorney has two clients, the insured and the

23   insurer, correct?

24        A    Yes.

25        Q    And owes fiduciary obligations to both?       11:57:06

                                                 Page 124

Exhibit 61, Page 056

1        A    In a sense.  In California, we have          11:57:09

2    guidance that prioritizes the obligations that

3    insurers -- that the counsel owes to the insured

4    over the insurer.  But yes, generally speaking.

5            But those obligations and duties don't          11:57:20

6    depend upon who specifically identified counsel and

7    brought them on board.

8        Q    In the context of the tripartite

9    relationship, is the attorney-client privilege

10   shared as between both clients?                          11:57:37

11       A    Generally, if I understand your question.

12       Q    Right.

13           Meaning communications between one client

14   and defense counsel are generally not privileged as

15   to the other client?                                     11:57:51

16       A    That's not a correct statement of law in

17   California.

18       Q    So you --

19       A    That would be true under section --

20   Evidence Code 958.  In the event of a dispute            11:58:03

21   between the joint clients down the road, there would

22   be no privilege for communications during the

23   representation as to each other.  But I don't think

24   that's a correct statement.

25       Q    So it's your opinion and understanding          11:58:19

                                                    Page 125

```
1     at least two cases that you assert support your        12:09:05

2     opinions in the matter.  I'm sorry.  At least three

3     cases or four.  Let's just say --

4              MR. DeVRIES:  Do you want to start the

5     question over?                                          12:09:20

6              MR. CROWE:  Let me start it over.

7         Q   Your report does identify a number of

8     cases that you are relying on to support your

9     opinions.

10             Other than those cases, can you think of       12:09:26

11    any other case law that you reviewed to form your

12    opinions in this case?

13        A   To form my opinions, not specifically.

14        Q   The documents listed in Exhibit C to your

15    report, were all of those provided by the Hunton        12:09:47

16    Andrews Kurth firm?

17        A   Yes.

18        Q   Did you ask for any specific document or

19    category of documents to assist you in forming your

20    expert opinions in this case?                           12:10:02

21        A   I don't believe so.

22        Q   Were there documents that you didn't

23    receive from Hunton Andrews Kurth that you believed

24    were necessary to forming your opinions?

25        A   No.                                             12:10:14
```

Page 134

1    portions that were so included I did review.         12:11:21

2         Q   Besides the portion that may have been

3    attached as exhibits to depositions, were you given

4    Liberty's claim file, entire claim file, with regard

5    to the Roseburg matter?                              12:11:32

6         A   I don't believe so.

7         Q   Were you given Ohio Casualty's claim file

8    with regard to the Roseburg matter?

9         A   No.

10        Q   I believe the -- at least the Liberty       12:11:43

11   policy was attached to one of the deposition

12   transcripts; is that correct?

13        A   At least one.  I think it was more than

14   one.

15        Q   Were you separately given the Liberty       12:11:50

16   policy beyond them being attached to deposition

17   transcripts?

18        A   No, I don't think so.

19        Q   Were you given the Ohio Casualty excess

20   policy?                                              12:12:03

21        A   I don't believe so.  It may have been

22   included as one of the exhibits.  As I sit here, I

23   don't recall.

24        Q   Were you given -- other than the Liberty

25   policy and the Ohio Casualty policy, were you given  12:12:15

                                              Page 136

```
 1    the policies of any of the other insurers in              12:12:17

 2    Roseburg's tower of insurance?

 3         A   I feel like I may have seen the Everest

 4    policy.  I'm certainly familiar with language from

 5    the Everest policy.  But that may simply be from         12:12:31

 6    seeing it quoted in correspondence.

 7             I don't believe I've seen or are familiar

 8    with the policies of the remaining insurers.

 9         Q   Do you consider all the documents you

10    reviewed and have identified in your "Documents          12:12:50

11    Reviewed" list to be material to the opinions that

12    you reached in this matter?

13         A   No.

14         Q   Are there specific documents that were not

15    material to reaching your opinions in this case, any     12:13:02

16    that come to mind?

17         A   That's a tough thing to answer.  I don't

18    know that I can meaningfully answer that.

19         Q   Okay.  You were given a copy of Roseburg's

20    mediation brief, dated March 14, 2024?                   12:13:21

21         A   Yes.

22         Q   Was that a brief that you asked for or

23    were just given?

24         A   I think I was just given that.

25         Q   Were you given Liberty's mediation brief?       12:13:29
```

Page 137

```
 1        A   I don't recall.                         12:13:40

 2        Q   Had you been given Liberty's mediation

 3   brief, you would expect it to be listed on your

 4   "Documents Reviewed" exhibit, correct?

 5        A   Yes; again, assuming it was in the right   12:13:47

 6   place where it should be for my assistant to be able

 7   to locate it.

 8        Q   Did you rely on Roseburg's mediation brief

 9   to form your opinions in this case?

10        A   No.                                     12:13:58

11        Q   Not material to your opinions, correct?

12        A   No.

13        Q   Is that correct?

14        A   It's correct.

15        Q   But you reviewed it nonetheless?         12:14:07

16        A   Yes.  I often review mediation briefs as

17   part of an expert assignment.  They usually provide

18   a really good overview of at least one party's

19   perspective and usually the facts.

20        Q   The depositions listed are the transcripts  12:14:22

21   with exhibits that you received from the Hunton

22   Andrews Kurth firm, correct?

23        A   Yes.

24        Q   And you testified that those transcripts

25   included the exhibits themselves?                 12:14:30
```

Page 138

```
 1          Q    Are there any transcripts that you         12:15:27

 2    received that are not listed in your "Documents

 3    Reviewed" list?

 4          A    No.

 5          Q    Let me be fair.  Let me ask this question:  12:15:35

 6    Have you received any of the deposition transcripts

 7    of depos taken of experts in the case?

 8          A    No.

 9          Q    All right.  Were you given a copy of

10    Matthew Lawless's deposition transcript as PMK for    12:15:47

11    Roseburg?

12          A    No.

13          Q    Did you know he had been deposed in this

14    case?

15          A    I don't know.                              12:15:57

16          Q    The "Correspondence" list below the

17    "Depositions" list, does that reflect communications

18    that were not otherwise attached to deposition

19    transcripts?

20          A    I believe so.                              12:16:29

21          Q    And so this list, under "Correspondence,"

22    identifies other correspondence that you reviewed to

23    form or to assist you in forming your opinions in

24    this case?

25          A    Yes.  My assistant prepared this, and I    12:16:42
```

Page 140

```
1    BY MR. CROWE:                                        13:00:17

2         Q    Ms. Baldwin, back after the lunch break.

3              I'd like to invite your attention back to

4    your report, Exhibit 247, and specifically

5    paragraph 2.                                         13:00:24

6              Your paragraph 2 references that you're

7    basing the opinions that you've reached in this

8    matter and as reflected in your report on standards

9    of professional conduct, including the Rules of

10   Professional Conduct of California and the American  13:00:38

11   Bar Association Model Rules, et cetera.

12             Do those ethical rules -- strike that.

13             Do you agree that the Rules of

14   Professional Conduct of California govern and apply

15   to BakerHostetler in connection with its            13:00:59

16   representation of Roseburg in response to the Mill

17   Fire?

18        A    Yes.

19        Q    Do the ethical rules, as you're

20   referencing them in Exhibit -- I'm sorry --          13:01:06

21   paragraph 2 of your report, do any of them

22   specifically govern an insured's right to select

23   independent or cumis defense counsel under policies

24   of general liability insurance?

25        A    No, I don't believe so.                    13:01:27
```

Page 149

Exhibit 61, Page 063

```
 1          Q    And, in fact, the standard or rules         13:01:28

 2    governing when an insured is entitled to select

 3    independent or cumis defense counsel is governed by

 4    California Civil Code Section 2860, correct, and the

 5    case law construing it?                                13:01:42

 6          A    Yes.  I was going to make that

 7    clarification.  Yes.

 8               Of course, the independent right was first

 9    set forth in case law, which was then adopted into

10    the insurance code.  But case law continues to         13:01:53

11    construe and apply the cumis statute.

12          Q    Okay.  And you're familiar with the cumis

13    statute?

14          A    Yes.

15          Q    Have you written about it?                  13:02:04

16          A    I don't think so.

17          Q    Have you lectured on it?

18          A    Only as I've already testified.

19          Q    Okay.  I'll get to that in a moment.

20               Paragraph 3 of your report mentions that    13:02:13

21    you're outside counsel to a number of law firms.  Is

22    that in context of your retention as counsel

23    representing or defending a law firm or in some

24    other capacity or --

25          A    Some other capacity.                        13:02:28
```

Page 150

Exhibit 61, Page 064

1      Q    And what other capacity?                    13:02:30

2      A    As outside counsel.

3      Q    As outside general counsel?

4      A    Not usually.  But outside counsel -- the

5    scope of which could depend on the law firm --      13:02:43

6    usually focus on ethics, risk management, fees,

7    partnership issues, lawyer mobility, State Bar

8    discipline.  Things to do with attorney liability

9    and conduct mostly, but also risk management in the

10   context of litigation and other matters.            13:03:02

11     Q    Have you prosecuted or defended legal

12   malpractice and ethics claims involving counsel's

13   obligation and duties to both the insured and the

14   insurer under Civil Code section 2860?

15     A    I don't think so.                            13:03:28

16     Q    Have you ever testified as an expert

17   witness on the ethical obligations owed to both the

18   insured and the insurer under Section 2860, duties

19   by cumis counsel?

20     A    I may have.                                  13:03:44

21     Q    Do any come to mind?

22     A    No, not specifically.

23     Q    Other than the Roseburg matter, have you

24   prepared any expert reports on the ethical

25   obligations owed to both the insured and the insurer  13:03:58

                                                Page 151

Exhibit 61, Page 065

```
1    by cumis counsel under Section 2860?                    13:04:03

2         A   I don't believe so.

3         Q   Have you authored any articles, blog

4    posts, treatises, lecture materials, or any other

5    written material on the ethical obligations owed to    13:04:18

6    both the insured and the insurer by cumis counsel

7    under 2860?

8         A   I don't believe so.

9         Q   You mentioned being familiar with 2860,

10   and I'm going to ask you a series of questions about   13:04:35

11   what you understand 2860 requires.

12            Do you agree that independent or cumis

13   defense counsel and the insured owe a duty to

14   disclose to the insurer all information concerning

15   the action except privileged materials relevant to    13:04:48

16   coverage disputes and timely to inform and consult

17   with the insurer on all matters relating to the

18   action?

19            MR. DeVRIES:  Can you read the question

20   back, please?                                          13:04:59

21            (Record read as follows:

22             "Question:  Do you agree that independent

23        or cumis defense counsel and the insured owe a

24        duty to disclose to the insurer all

25        information concerning the action except        13:05:22
```

Page 152

Exhibit 61, Page 066

```
 1              privileged materials relevant to coverage          13:05:22

 2              disputes and timely to inform and consult with

 3              the insurer on all matters relating to the

 4              action?")

 5                   MR. DeVRIES:  Objection.  Compound.            13:05:31

 6                   THE WITNESS:  I think that generally is a

 7        fair statement.

 8   BY MR. CROWE:

 9        Q    And, Ms. Baldwin, would you agree that

10   cumis counsel and the insured violate that standard           13:05:44

11   if they fail to disclose or purposely delay the

12   disclosure of information concerning the action to

13   the liability insurer?

14        A    We're, again, going beyond the scope of my

15   testimony here.  So this is not anything that I have          13:06:06

16   specifically thought about or prepared for today.

17   So I don't know that I have a specific answer.

18              To answer that, I'd want to look at, you

19   know, relevant case law and -- yeah.  I don't have

20   an opinion on that right now.                                 13:06:28

21        Q    You anticipated my next question.

22              So given what you just said, is it fair to

23   say that you have not been asked to render an

24   opinion, nor have you rendered an opinion, on

25   whether or not BakerHostetler and Roseburg complied          13:06:39
```

Page 153

1    with their duties to disclose material information        13:06:43

2    to Liberty with regard to the Mill Fire?

3            MR. DeVRIES:  Objection.  Lacks

4    foundation.

5            THE WITNESS:  Yeah, I wasn't asked to do        13:06:54

6    that because, as I understand it, Baker was not ever

7    recognized as cumis counsel by Liberty.  So I don't

8    understand the question.

9    BY MR. CROWE:

10           Q   But you understand that Roseburg contends        13:07:06

11   that they were entitled to select independent or

12   cumis defense counsel?

13           A   Yes.  And Liberty consistently said no,

14   which is why we're here.

15           Q   And you understand that Roseburg had        13:07:17

16   selected BakerHostetler to serve in the capacity of

17   2860 counsel to the extent Liberty recognized that

18   obligation?

19           Let me ask the question again.

20           A   Okay.                                        13:07:35

21           Q   Do you understand, as you sit here,

22   Ms. Baldwin, that Roseburg had selected

23   BakerHostetler to serve as its 2860 or cumis defense

24   counsel?

25           MR. DeVRIES:  Lacks foundation.        13:07:48

                                            Page 154

```
 1              THE WITNESS:  My understanding is a little        13:07:49

 2    bit different because my understanding is that

 3    almost immediately after the fire, Roseburg retained

 4    Baker to represent it in connection with the fire.

 5              The question of independent counsel came         13:08:03

 6    up later.  I don't know whether Roseburg ever

 7    specifically retained Baker as specifically

 8    independent counsel.

 9              And again, since -- since Liberty never

10    recognized its obligation, that question kind of        13:08:23

11    didn't arise, as far as I'm aware.

12    BY MR. CROWE:

13         Q   I appreciate the clarification, because I

14    think it's spelled out that way in your report.

15              You understood that at least initially,         13:08:31

16    Roseburg had requested that Liberty recognize

17    BakerHostetler as its tripartite defense counsel,

18    right?

19         A   Yes.

20         Q   Right.                                           13:08:43

21              And then at some point later, when Hunton

22    Andrews got involved, did Roseburg then claim that

23    they were entitled to independent or cumis defense

24    counsel under Section 2860, correct?

25         A   Yes.  And I think partly my last answer          13:08:55
```

Page 155

```
 1    was -- what I was grappling with was Roseburg              13:09:02

 2    specifically itself requesting.

 3            But, yes, if we consider Roseburg acting

 4    through its coverage counsel at Hunton, I think

 5    that's correct.                                            13:09:12

 6        Q    And whether it's an obligation owed under

 7    2860 or just part of the insured's duty to cooperate

 8    with their liability insurer, have you been asked to

 9    render opinions, and have you rendered opinions, as

10    to whether or not Roseburg and Baker complied with         13:09:25

11    their duties to cooperate with Liberty or otherwise

12    complied with duties that would be owed under 2860?

13            MR. DeVRIES:  Lacks foundation and

14    compound.

15            THE WITNESS:  I don't believe I've been            13:09:38

16    asked to render an opinion in that regard.

17    BY MR. CROWE:

18        Q    Have you ever rendered an opinion as to

19    whether a lawyer has complied -- strike that.

20            Have you ever rendered an expert opinion           13:09:47

21    as to whether a lawyer identified and recognized as

22    independent or cumis defense counsel and the insured

23    have complied with their duties under California

24    Civil Code 2860?

25        A    I don't believe so.                               13:10:00

                                                      Page 156
```

Exhibit 61, Page 070

1          Q   With regard to Section 2860, do you agree          13:10:16

2     that independent or cumis defense counsel and the

3     insured owe a duty to allow the insurer's appointed

4     counsel to participate in all aspects of the

5     litigation against the insured?                            13:10:29

6              MR. DeVRIES:  Incomplete hypothetical.

7     Objection.

8              THE WITNESS:  Again, we're going beyond

9     the scope of my testimony since no one was

10    recognized as cumis counsel here, and it's not part        13:10:43

11    of my opinion.

12              I have a general understanding about the

13    duty to cooperate, but I don't -- I don't know that

14    it specifically includes the duty as you've just

15    phrased it.                                                13:10:59

16    BY MR. CROWE:

17         Q   Were you asked to render an opinion, and

18    have you rendered an opinion, as to whether

19    BakerHostetler and Roseburg allowed Liberty's

20    selected defense counsel to participate in the            13:11:08

21    defense of the insured?

22         A   No.

23         Q   Have you, in your law practice, ever been

24    selected as an independent or cumis defense counsel?

25         A   Yes.                                             13:11:31

                                                    Page 157

Exhibit 61, Page 071

 1    every instance, obviously.  That's not really my          13:17:29

 2    job.

 3          Q    Yeah.  Right.  Okay.

 4          A    Yeah.  So as I sit here and just leafing

 5    through it, I can't -- I think the one statement          13:17:38

 6    that I may not have seen supporting information

 7    for -- I may be basing this on discussion with

 8    counsel -- is in double C where I say, quote, "I am

 9    informed that the two companies share outside

10    counsel, management, personnel, systems, and a          13:17:57

11    balance sheet."

12          I believe that that was based on

13    representations from counsel to me.  That's on

14    page 11.

15          Q    Right.                                        13:18:11

16          So in other words, it wasn't based on your

17    independent conclusion based on review of documents

18    that the two companies share outside counsel,

19    management, personnel, systems, and a balance sheet,

20    correct?                                                 13:18:23

21          A    Well, I did -- I did see some documents

22    that supported that observation, including emails

23    from, you know, Holly Keahey and others which use

24    Liberty Mutual -- they all have Liberty Mutual email

25    addresses, for example.  So that would be a              13:18:44

                                                     Page 162

```
 1    supporting fact.                                13:18:48

 2            But as I've phrased it here, and the fact

 3    that I used "I am informed that" suggests to me this

 4    is primarily based on representations by counsel.

 5        Q   Okay.  Thank you.                       13:19:01

 6            Back to paragraph 8A, 8A is describing the

 7    date of the fire and the location that it started.

 8    And you note that the fire started on the premises

 9    of Roseburg.

10            Do you see that section?                13:19:18

11        A   Yes.

12        Q   Do you understand that, more specifically,

13    the fire started at or in the ash shed of the

14    Roseburg facility in Weed?

15        A   I've seen reference to that fact.       13:19:28

16        Q   And then paragraph B, you write, "Almost

17    immediately, Roseburg retained a law firm of

18    BakerHostetler ('Baker') to represent it in

19    connection with the Mill Fire."

20            Do you see that?                         13:19:41

21        A   Yes.

22        Q   Almost immediately, within a day or two of

23    the fire, correct?

24        A   Yes.

25        Q   And before Roseburg had given any        13:19:45
```

Page 163

1    notice -- strike that.                          13:19:48

2          Before Roseburg or anybody on its behalf

3    had given notice to Liberty of the Mill Fire,

4    correct?

5          A   I think that's right.                 13:19:55

6          Q   And then that paragraph continues -- 8B

7    continues, quote, "Baker partner Robert Julian is

8    experienced in handling disputes arising from fires

9    including fire litigation and claims," closed quote.

10         Did I read that correctly?                13:20:35

11         A   Yes.

12         Q   What are you basing your opinion that

13   Mr. Julian is experienced in handling disputes

14   arising from fires including fire litigation and

15   claims?                                          13:20:45

16         A   I think that's probably taken from the

17   complaint.

18         Q   Okay.  So in other words, not an

19   independent opinion of yours, but an allegation made

20   in the complaint?                               13:20:54

21         A   This is a "Factual Background" section.

22   I'm not intending to state opinions.

23         That statement, though, would also be

24   supported by Mr. Julian's testimony in his

25   deposition.  But I don't -- I'm not intending here  13:21:07

Page 164

1    to express an independent opinion about Mr. Julian's          13:21:13

2    experience, although this is something I do believe

3    is correct.

4          Q    Okay.  So let me break that down a bit so

5    I understand.                                                  13:21:26

6              You believe the statement is correct, but

7    you're not offering an expert opinion validating

8    Mr. Julian's experience as the way it's described in

9    this sentence; is that fair?

10         A    I can't imagine that such an opinion would         13:21:43

11   be an appropriate expert opinion in any event, but

12   that's not how it's intended here.

13         Q    Okay.  That's what I'm seeking to clarify

14   because it's stated in the report.  So that's why

15   I'm asking for the clarification.                             13:21:54

16         A    It is stated in the "Factual Background"

17   section, so -- and it reflects -- this list reflects

18   my understanding of material facts.  And I do

19   understand these facts to be correct.

20         Q    Okay.  What did you do, if anything,              13:22:12

21   besides reviewing Mr. Julian's deposition, to

22   confirm whether or not he had experience in handling

23   disputes arising from fires, including fire

24   litigation and claims?

25         A    Nothing beyond talking to counsel, reading        13:22:30

                                                      Page 165

```
 1    the complaint, reading the correspondence from the      13:22:36

 2    dispute below, and reading his deposition.

 3         Q   Did you know that prior to the Roseburg

 4    and Mill Fire matter that Mr. Julian had never

 5    defended against any mass fire or tort claims?         13:22:53

 6         A   I don't specifically know his experience

 7    in defending against fire claims.

 8         Q   And not just fire claims; mass fire

 9    claims, correct?

10         A   Yes.  If your question is asking me about    13:23:16

11    mass fire claims, yes, I would include that in my

12    answer.

13         Q   Bear with me just one second.  I'm trying

14    to interpret my notes.

15              Okay.  Here we go.                           13:23:39

16              Ms. Baldwin, I'd like to show you what's

17    been previously marked as Exhibit 31 in this matter.

18    It's the September 6th, 2022, BakerHostetler

19    engagement letter with Roseburg.

20         A   Thank you.  Yes.                              13:24:13

21         Q   And before I ask questions about

22    Exhibit 31 -- my apologies -- to the extent

23    Mr. Julian did not have experience prior to the

24    Mill Fire in defending against mass fire claims or

25    mass -- or fire claims at all, would that change       13:25:04
```

Page 166

1    "Factual Background" portion.                    13:26:07

2            MR. DeVRIES:  Okay.

3            MR. CROWE:  I'm sorry if I didn't make

4    that clear.

5            MR. DeVRIES:  Okay.                      13:26:11

6            MR. CROWE:  Let me ask the question again.

7        Q   In the "Factual Background" section of

8    your report identifying material facts, I didn't see

9    a discussion or summary of the scope of Roseburg's

10   retention of BakerHostetler.                     13:26:22

11           Do I have that right?

12       A   Correct.

13       Q   Do you view the scope -- as you sit here

14   now, do you view the scope of BakerHostetler's

15   retention as being material or a material fact to   13:26:30

16   the opinions you rendered in this matter?

17       A   No, not particularly.

18       Q   Was the scope of the retention considered

19   in forming any of your opinions in the case?

20       A   I would say it was at least implicitly    13:26:43

21   considered in my Opinion 2 about the adequacy of the

22   Carlson Calladine appointment as counsel in that the

23   scope of retention of BakerHostetler includes a

24   number of different areas which, as I read it and

25   based on my knowledge of Carlson Calladine, includes  13:27:11

                                            Page 168

Exhibit 61, Page 077

1    articles in which that firm does not have particular        13:27:15

2    expertise or experience.

3         Q    Was the scope of BakerHostetler's

4    retention as identified in its engagement letter

5    with Roseburg considered by you in forming the              13:27:25

6    opinions about whether or not there was a

7    disqualifying conflict of interest in Baker's

8    representation of Roseburg?

9         A    It was considered, yes.

10        Q    Considered and rejected as being material         13:27:43

11   to that opinion?

12        A    I wouldn't say it was rejected as being

13   material.

14             I considered this issue particularly with

15   respect to the inclusion in the description of the          13:27:59

16   scope of services of, quote, "insurance recovery."

17        Q    Right.

18        A    And then I read the depositions of Dustin

19   Dow, Joseph Chairez, and to a certain extent,

20   Mr. Julian, in connection with what the firm               13:28:21

21   actually did in connection with its work vis-a-vis

22   coverage, including reviewing and collecting

23   policies, notifying insurance companies, et cetera,

24   and did not -- and, yes, certainly considered

25   those -- whether those activities created a                13:28:40

Page 169

Exhibit 61, Page 078

1    disqualifying conflict as Liberty purported to            13:28:43

2    believe.

3        Q    And you concluded that the retention with

4    respect to insurance recovery as stated in the

5    engagement letter, along with the depositions of        13:28:55

6    Mr. Julian, Mr. Dow, and Mr. Chairez, did not

7    reflect a materially direct conflict of interest as

8    between BakerHostetler and Liberty Mutual as a

9    concurrent client; is that correct?

10       A    Yes.                                            13:29:16

11       Q    On the next page of the engagement letter,

12   still on Exhibit 31, the first sentence and then the

13   bullet list below it, you understand that to be

14   BakerHostetler's identification of entities in which

15   to run a conflicts check against?                        13:29:36

16       A    I understand this to be the entities for

17   which they did run the conflicts check.

18       Q    Did you see any documents in the record as

19   you reviewed it that confirmed that Baker had, in

20   fact, completed a conflicts check against these          13:29:52

21   listed entities?

22       A    Not specifically.

23       Q    And within the standard of care, who is

24   generally responsible within a law firm to identify

25   those entities in which to include in a conflicts        13:30:07

Page 170

1    check before accepting a matter?                    13:30:09

2        A    There's no specific requirement within the

3    standard of care, but somebody has to.

4        Q    Somebody at the firm, but there's not

5    necessarily a requirement that it be a specific      13:30:19

6    person, so to speak?

7        A    Right.

8        Q    Who was it at BakerHostetler that was

9    responsible for running the conflicts check before

10   accepting the Roseburg retention?                    13:30:28

11       A    We've kind of been over this before.

12            I don't specifically know how the

13   responsibility fell within the firm.  It appeared

14   that there was a central group, administrative

15   group, within the firm that may have conducted the   13:30:45

16   actual conflicts check.

17       Q    Okay.  Do you have an understanding that

18   at the time of Baker's retention by Roseburg, Baker

19   also had a separate practice group defending

20   insurance clients?                                   13:30:59

21       A    Yes.

22       Q    And in circumstances like this where an

23   entity hires a law firm, and the law firm is going

24   to be involved in tendering claims to liability

25   insurers, does the standard of care require the law  13:31:17

                                            Page 171

```
1    firm to include those liability insurers in the        13:31:21

2    conflict check?

3        A   I don't think there's a specific

4    requirement within the standard of care.

5            I would note that I think it is quite         13:31:32

6    common not to include insurers in that context in a

7    conflict check, particularly where there's no reason

8    to believe that there's going to be a coverage

9    dispute.

10       Q   Okay.  So is it -- have you rendered an        13:31:52

11   opinion as to -- strike that.

12           Have you been asked to, and have you

13   rendered an opinion as to whether BakerHostetler met

14   the standard of care with regard to their initial

15   conflicts check as it relates to the retention by      13:32:06

16   Roseburg?

17       A   I have not specifically been asked to

18   render an opinion on that issue.

19       Q   Was there some point in time when there

20   was direct adversity with Liberty in relation -- as    13:32:21

21   between Roseburg and Liberty in relation to the

22   Mill Fire?

23       A   It's an interesting question.

24           The coverage piece, as Julia Molander

25   would define it, was -- wherein there was              13:32:52
```

Page 172

1    actively -- active pursuit of coverage on behalf of          13:32:59

2    Roseburg with Liberty, was separated out when Hunton

3    was retained.

4            And prior to that, as I read the

5    testimony, Baker -- the Baker firm had not engaged          13:33:13

6    in that kind of advocacy or work on behalf of

7    Roseburg.

8            But at that point, of course, the -- that

9    responsibility has been moved to another firm.  So I

10   wouldn't say at that point there's adversity with --       13:33:34

11   between Liberty and Baker.  And I would say prior to

12   that point, I don't think there was adversity

13   between Baker and Liberty.

14       Q   Was there a point in time, though, where

15   there was adverse interests as between Roseburg and        13:33:53

16   Liberty?

17       A   At the time -- yes.  I would say that at

18   the time that Liberty denied Roseburg its choice of

19   counsel, I think that's an adverse interest.

20       Q   Was that the first point in time when           13:34:16

21   there were adverse interests as between Roseburg and

22   Liberty?

23       A   I think so, as I sit here.

24       Q   Besides the cumis dispute, were there

25   other adverse interests as between Liberty and            13:34:33

<div align="center">Page 173</div>

Exhibit 61, Page 082

```
1    Roseburg?                                          13:34:36

2        A    Well, there's an issue that emerges in

3    connection with the third part of my opinion, which

4    is the wildfire exclusion that Ohio Casualty has in

5    its policy.                                         13:34:58

6            You could say that's adversity to the

7    extent that Liberty identifies that as part of the

8    interests of its shared companies, which actually

9    did happen very early on, but not that Roseburg was

10   aware of.                                           13:35:20

11           But as of September 7th, Holly Keahey is

12   identifying this in an internal email, talking about

13   "our excess coverage" and "when we come into the

14   excess tower," and suggesting that the excess

15   carriers might want to litigate the enforceability   13:35:38

16   of the wildfire exclusion in Oregon, which she

17   suggests is a more friendly state to support

18   enforceability.  None of that is in Roseburg's

19   interest.

20           So I think you could say, as of            13:35:54

21   September 7th, there's a conflict between Liberty

22   and Roseburg in connection with the wildfire

23   exclusion.  But again, that's not something that's

24   known to either Roseburg or Baker as of that date.

25       Q    Other than the wildfire exclusion issue    13:36:10
```

Page 174

```
 1    and the cumis dispute issue, as you've just              13:36:13

 2    testified to, were there any other adverse interests

 3    as between Roseburg on the one hand and Liberty on

 4    the other that you can think of?

 5          A    Not specifically adverse interests that I     13:36:28

 6    can identify, as I sit here now.

 7          Q    You mentioned Ms. Keahey's email about the

 8    possibility of instituting litigation with regard to

 9    a wildfire exclusion.

10               Was there ever any litigation instituted      13:36:44

11    by either Roseburg or Liberty or even Ohio Casualty

12    on the application of that exclusion?

13          A    Not apart from the affirmative defenses in

14    this case --

15          Q    Back to the --                                13:36:59

16          A    -- as far as I'm aware.

17          Q    Back to the engagement letter, do you

18    have -- strike that.

19               Did BakerHostetler ever run a conflicts

20    check against any of Roseburg's liability insurers    13:37:09

21    in connection with the Mill Fire and their

22    representation of Roseburg in that matter?

23          A    I am not aware of any.

24          Q    Do you have any criticisms or opinions as

25    to whether or not that was within or not within the    13:37:21
```

Page 175

```
 1    hypothetical.                                      13:38:50

 2           THE WITNESS:  The question -- in the

 3    question, I don't know what the premise is with

 4    regard to Baker's relationship to Liberty in that

 5    question.                                          13:39:02

 6    BY MR. CROWE:

 7       Q   Well, you understood that Liberty was a

 8    concurrent client of the BakerHostetler firm at the

 9    time Baker was representing Roseburg, correct?

10       A   I have to say I've never seen clearly        13:39:11

11    identified facts on that issue.  I've seen reference

12    to it.

13           I've never seen anyone from Liberty

14    articulate that as the basis for the purported

15    conflict for which they deemed Baker disqualified.   13:39:26

16    I've never seen any conduct that I'm aware of by

17    Liberty that suggested that there was that kind of a

18    conflict.  As far as I know, the representation or

19    the relationship with Liberty continued on after

20    this situation arose.                               13:39:48

21           So I don't have a clear understanding as

22    to that, and it doesn't seem like that situation was

23    material in the decision not to retain Baker.  I've

24    seen nothing to suggest it was.

25       Q   As you sit here today, Ms. Baldwin, do you   13:40:00
```

Page 177

1    have an understanding that Liberty was a concurrent        13:40:03

2    client of the BakerHostetler firm at the time

3    BakerHostetler was representing Roseburg in relation

4    to the Mill Fire?

5        A    Again, my understanding of those facts is        13:40:13

6    not clear because I haven't seen those clearly laid

7    out.

8            For example, I don't know, from the

9    description of the relationship between Baker and

10   Liberty, separate from the Mill Fire, whether the        13:40:25

11   representation by Baker was as panel counsel

12   representing Liberty insureds, which I've seen

13   reference to, or whether it was actual ongoing

14   current -- then-current representation of Liberty as

15   a company or as a party.  That is -- it's not clear        13:40:44

16   in the record as far as I can see; so I don't have

17   an understanding of that.

18       Q    Assume at the time that BakerHostetler was

19   representing Roseburg, Liberty was a direct client

20   in the sense that Baker was representing Liberty        13:41:00

21   directly in other matters and concurrently.

22           To the extent BakerHostetler discovered

23   that Roseburg's interests were directly adverse to

24   Liberty Mutual's interest, would you expect that

25   Roseburg -- I'm sorry -- would you expect that Baker        13:41:18

Page 178

1    would have stopped the representation of Roseburg to      13:41:20

2    seek conflict waivers from both clients?

3            MR. DeVRIES:  Objection.  Incomplete

4    hypothetical.

5            THE WITNESS:  That would be one option if      13:41:29

6    those facts occurred.

7            Another option would be to stop the

8    representation of Roseburg and hand off to another

9    counsel the piece that was creating this purported

10   conflict.                                                 13:41:41

11   BY MR. CROWE:

12       Q   And in your view, that would resolve the

13   directly adverse interest that would obviate the

14   need for conflict waivers?

15       A   Yes.  If the scope of the legal services      13:41:48

16   that were being provided excluded the subject matter

17   that created that adversity, yes, that would cure

18   the conflict.

19       Q   Assuming there's a concurrent client

20   relationship as between Baker and Liberty on the one      13:42:02

21   hand and Baker and Roseburg on the other hand, and

22   notwithstanding that they may have moved the

23   adversity to a different firm, if Baker continued to

24   take actions that were directly adverse to Liberty

25   Insurance Company, do you agree that it would      13:42:19

Page 179

1    their involvement where BakerHostetler took action        13:44:46

2    that constituted an adverse interest or adverse

3    action against Liberty Mutual or any Liberty Mutual

4    entity?

5        A   Not that I can think of.                          13:44:59

6        Q   Let me show you Exhibit -- what's been

7    previously marked as Exhibit 160.

8            Let me know when you're ready for some

9    questions.

10       A   Sure.                                             13:45:24

11       Q   Okay.

12       A   Yes.

13       Q   Do you recognize this document?

14       A   Yeah, I've seen this before.

15       Q   I did not see this correspondence or the          13:45:45

16   substance of the communication as between Mr. Julian

17   and Mr. DeVries identified as a material fact under

18   the "Factual Background" section of your report.

19           Do I have that right?

20       A   Yes.                                              13:45:59

21       Q   All right.  And the first email of

22   September 7 -- or on September 7, 2022, is an email

23   from Mr. Julian to Mr. DeVries with copies to

24   others, correct?

25       A   Yes.                                              13:46:10

                                                    Page 182

1      Q    And he writes in part, "then I found out          13:46:11

2    that Baker also represents Liberty," closed quote.

3           Did I read that right?

4      A    Yes.

5      Q    And isn't this a communication                    13:46:21

6    identifying, at least from Mr. Julian's perspective,

7    that Liberty was a concurrent client of the

8    BakerHostetler firm as of September 7, 2022?

9      A    Yes.  But I don't see the adversity, which

10   is what we were talking about.                           13:46:40

11     Q    My question now isn't asking about

12   adversity.

13     A    Okay.

14     Q    It's just that they're -- at this time,

15   Liberty and Roseburg, you would agree, are               13:46:47

16   concurrent clients of the BakerHostetler firm?

17     A    At least as purported here.

18          But, again, I have not seen this very

19   clearly set forth, and no one seemed to care to set

20   it forth with a lot of clarity because it didn't         13:47:05

21   seem very relevant.  So --

22     Q    Set what forth?

23     A    The relationship between Baker and

24   Liberty.

25     Q    Well, this clearly identifies the                 13:47:16

                                                  Page 183

Exhibit 61, Page 089

1    relationship as that Liberty is a client of the          13:47:17

2    Baker firm, correct?

3         A    That's what it says.  Reading Mr. Julian's

4    deposition, I don't think he understood that much

5    about the relationship between Baker and Liberty.        13:47:23

6              And I've also seen -- colloquially,

7    lawyers will sometimes refer to a tripartite kind of

8    representation or panel counsel as a representation

9    of an insurance company.

10             And this does not -- this is not specific       13:47:41

11   enough for me to conclude, "Oh, Baker represents

12   Liberty, the company, in some kind of direct

13   attorney-client relationship."

14             But in any event, again, to me, it's -- I

15   don't see any adversity here; so it's not a material     13:47:55

16   fact for my purposes.

17        Q    But even in the context of Baker acting as

18   tripartite defense counsel, Liberty would still

19   constitute a client of the Baker firm, correct?

20        A    Yes, in that tripartite sense.  Yes.          13:48:09

21        Q    And consequently, Rule 1.7 would apply in

22   that context, correct?

23        A    Yes, subject to limitations.  It's not --

24   the tripartite relationship creates problems, you

25   know, in terms of applying the conflicts rules to        13:48:24

                                              Page 184

Exhibit 61, Page 090

```
 1              Did I read that correctly?                    13:52:30

 2         A   Yes.

 3         Q   Did you -- in reviewing documents, did you

 4    conclude one way or the other whether Roseburg, or

 5    Baker on behalf of Roseburg, demanded that Liberty      13:52:37

 6    waive the "no voluntary payments" provisions of its

 7    policy?

 8         A   I don't think I reached an opinion

 9    generally on that.  I don't think I ever saw a

10    demand, what I would characterize as a demand.          13:52:54

11              Specifically with respect to the

12    September 9th, '22, call, which is what's reflected

13    here at page 55, I did read a lot of the testimony

14    on -- from all the participants from that call who

15    testified about it, and I -- I didn't see anyone        13:53:14

16    characterize the discussion there as a demand that

17    the insurers waive the "no voluntary payment"

18    provisions.

19              There was discussion about, as I recall,

20    whether any -- asking whether any of the insurers       13:53:31

21    objected or, you know, language to that effect,

22    which sounded, frankly, a little bit ambiguous as to

23    what was being asked and what the insurers were

24    agreeing to.

25              But I certainly did not see a demand          13:53:46
```

Page 188

```
 1          A    Sure.  Sure.                            13:54:57

 2          Q    Let me ask it differently.

 3               If Baker had made a demand that Liberty

 4     waive the "no voluntary payments" provision of its

 5     policy, would you consider that to be directly       13:55:04

 6     adverse to Liberty?

 7               MR. DeVRIES:  Objection.  Lacks

 8     foundation.

 9               THE WITNESS:  A request by an insurer

10     that -- by an insured that an insurer waive part of   13:55:15

11     a policy, I wouldn't regard that as creating

12     adversity on its face and by itself.

13     BY MR. CROWE:

14          Q    What about a demand?  Not a request, but a

15     demand; a demand coupled with remarks that the        13:55:29

16     carrier was somehow obligated to waive the "no

17     voluntary payments" provision of its policy.  Would

18     that constitute being directly adverse to the

19     insurer?

20               MR. DeVRIES:  Objection.  Lacks foundation   13:55:43

21     and compound.

22               THE WITNESS:  I think I'd have to know

23     more.

24               Again, you could have a difference of

25     opinion between an insured and insurer as to the      13:55:52
```

Page 190

1    anything that led you to conclude that Mr. Julian          13:58:15

2    and the Baker firm had, in fact, taken acts in an

3    effort to support a bad faith claim against Liberty?

4         A    I saw one -- I don't know if this

5    qualifies for what you are referring to.                   13:58:37

6              I saw one -- I think it was an email from

7    Mr. Julian to some plaintiffs counsel, I believe,

8    that made reference to formulating claims or

9    something like that.  But I don't know that I would

10   regard that in the nature -- as being what you just        13:59:03

11   described.

12        Q    Okay.  Let's look at that document, which

13   has been previously marked as Exhibit 162.

14             If you could confirm this is the document

15   you're referring to.                                       13:59:17

16        A    Yes.

17        Q    Right.

18             And more specifically, it's the email at

19   the bottom of Bates No. 24642 and the top of 24643,

20   dated October 24, 2022, from Mr. Julian to James           13:59:56

21   Frantz?

22        A    Yes.

23        Q    And Mr. Frantz, as you understood it and

24   understand it, was one of the plaintiffs lawyers

25   associated with the Mill Fire?                             14:00:07

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 61, Page 093

```
 1            A    I believe so.                            14:00:09

 2            Q    And more specifically, the portion of the

 3      email that you're referring to on the top of 24643

 4      reads -- and again, this is Mr. Julian writing to

 5      Mr. Frantz -- quote, "I would appreciate it if you    14:00:21

 6      would send us your demands so we may tender them to

 7      the carriers to pay," closed quote.

 8                 Did I read that correctly?

 9            A    Yes.

10            Q    And one of the carriers is Liberty          14:00:32

11      Mutual -- or Liberty, correct?

12            A    Yes, at that time.  Yes.

13            Q    And then it continues, quote, "We have had

14      several conversations with them requesting them to

15      take immediate action, and your demands will help us   14:00:43

16      either obtain coverage or perfect our bad faith

17      claim," closed quote.

18                 Did I read that correctly?

19            A    Yes.

20            Q    And you understood his reference to "our"   14:00:54

21      to mean Roseburg?

22            A    I would have -- yes, that's what I

23      understood.

24            Q    And you would agree with me, Ms. Baldwin,

25      that Mr. Julian's effort to solicit settlement         14:01:03
```

Page 194

Exhibit 61, Page 094

1    demands from a plaintiff lawyer for the purpose, at        14:01:08

2    least in part, to perfect Roseburg's bad faith claim

3    against Liberty would constitute taking a directly

4    adverse action against Liberty?

5              MR. DeVRIES:  Objection.  Incomplete            14:01:23

6    hypothetical, lacks foundation.

7              THE WITNESS:  I don't regard this

8    statement in this email as taking action adverse to

9    Liberty.  I mean, in the context, I regard this,

10   frankly, as rhetorical, somewhat facetious, and just     14:01:37

11   aimed at trying to get settlement demands for which

12   there are a lot of good reasons, as I understand it

13   at that point, to try to obtain.

14              I don't see that that statement by itself

15   is a material adverse act against Liberty.              14:01:58

16   BY MR. CROWE:

17        Q   So you view this email as being rhetorical

18   and facetious, correct?

19        A   Not the email, but that statement at the

20   end, yes.                                                14:02:09

21              That's a sort of -- you might call it a

22   flippant comment by him.  He's clearly not intending

23   to perfect a bad faith claim.  He's trying to

24   encourage them to submit their settlement demands so

25   they could get going and try to resolve it.  I           14:02:23

Page 195

Exhibit 61, Page 095

1    regard that as a rhetorical flourish more than          14:02:27

2    anything else.

3        Q   How do you know what Mr. Julian was

4    intending?

5        A   I don't, but I'm familiar with the kinds        14:02:33

6    of negotiations that go on between counsel in a

7    setting like this with the kinds of pressures and

8    circumstances that existed at this time.  And I've

9    been a part of similar conversations myself.

10           I have a lot of law firm clients who are         14:02:54

11   involved in mass tort and other kinds of matters in

12   which these conversations take place.

13           And just looking at this in the context, I

14   don't see this as something that is materially

15   adverse to Liberty.                                      14:03:17

16       Q   I'm sorry.  What context do you view this

17   email to be in?

18           MR. DeVRIES:  Asked and answered.

19           THE WITNESS:  In the context of trying to

20   move the case forward, trying to position it for         14:03:26

21   settlement discussions.  He's trying to get

22   settlement demands, as I understand this.

23           There's a lot of things going on, but he's

24   trying to move this to a position where the parties

25   can settle the claims.                                   14:03:42

                                              Page 196

```
1    BY MR. CROWE:                                    14:03:45

2        Q   I didn't see reference to this email in

3    your expert report at all; is that fair to say?

4        A   Yes.  I mean, there are very few

5    references to any documents in my expert report.  14:03:55

6    This one is not referenced.

7        Q   There's nothing in your report that says

8    this email does not constitute any directly adverse

9    position with Liberty because it's rhetorical, it's

10   facetious, it's made in the context of trying to   14:04:08

11   move the matter forward in terms of settlement,

12   correct?

13       A   Why would I include that statement in my

14   expert report?  How is it relevant to anything that

15   I've opined on?                                    14:04:20

16           You've asked me questions about it, which

17   is how it came up.  But otherwise, I don't regard

18   this as material to my report.

19       Q   All right.  And for that reason, you

20   didn't even reference it in your report at all,     14:04:28

21   correct?

22       A   Just like I didn't reference any of the

23   250 other documents that I reviewed.

24       Q   If the email with regard to "perfecting

25   our bad faith claims" was not rhetorical, was not   14:04:38
```

Page 197

1    facetious, was not in the context of simply trying        14:04:42

2    to move the ball forward with settling but was, in

3    fact, intended to solicit demands to perfect a bad

4    faith claim against Liberty, would that constitute

5    taking a directly adverse position vis-a-vis             14:04:54

6    Liberty?

7            MR. DeVRIES:  Asked and answered, lacks

8    foundation, incomplete hypothetical.

9            THE WITNESS:  You know, potentially.  Yes,

10   potentially.                                            14:05:07

11   BY MR. CROWE:

12       Q   Did you consider that potential as part of

13   forming your opinions in this matter?

14       A   Well, it's not relevant to my opinions

15   because the first subject of my opinion is whether      14:05:16

16   Baker had a disqualifying conflict, and I was

17   specifically looking at the conflict that Liberty

18   identified as the reason it didn't retain Baker.

19            Liberty did not identify a conflict

20   between Baker -- Baker's client, Roseburg, and          14:05:32

21   Baker's client, Liberty, as a basis to not retain

22   Baker.

23       Q   Isn't it fair to say that Liberty did, in

24   fact, communicate that their concern was that Baker

25   was serving in a tripartite capacity while also, at     14:05:48

                                                     Page 198

Exhibit 61, Page 098

1    least from Liberty's perspective, giving coverage        14:05:54

2    advice to Roseburg that could constitute a conflict

3    of interest --

4            MR. DeVRIES:  Objection.

5    BY MR. CROWE:                                             14:06:00

6        Q   -- among concurrent clients?

7            MR. DeVRIES:  I'm sorry.  Objection.

8    Ambiguous as to time.

9            THE WITNESS:  Yes.  That was the expressed

10   concern.  Not expressed directly to Baker or             14:06:09

11   Roseburg, but yes.

12           But that wasn't -- the tripartite -- the

13   concurrent client relationship that gave rise to

14   that conflict was not Baker's separate

15   representation of Liberty in these other undefined        14:06:25

16   matters, but Baker's tripartite -- proposed

17   tripartite relationship of Liberty and Roseburg in

18   connection with the Mill Fires.

19   BY MR. CROWE:

20       Q   Back to your notes with regards to               14:06:43

21   Mr. Julian's deposition.  On page 184, you wrote,

22   quote, "I instructed team to give full access to

23   Bona and cooperate with him," closed quote.

24           Did I read that correctly?

25       A   Yes.                                             14:06:58

Page 199

```
 1   BY MR. CROWE:                                    14:17:42

 2       Q   Ms. Baldwin, just back to Exhibit 160,

 3   with regard to Mr. Julian's email to Mr. -- I'm

 4   sorry.  Not 160.  My mistake.  162.

 5       A   Yes.                                     14:17:58

 6       Q   I apologize.

 7           Back to Exhibit 162, with respect to

 8   Mr. Julian's email of October 24, 2022, to James

 9   Frantz, were you given Mr. Julian's purported errata

10   sheet to his deposition in this matter?           14:18:15

11       A   I don't believe so.

12       Q   Okay.  Now back to Exhibit 247, your

13   report, and more specifically, back to paragraph 8.

14       A   Okay.

15       Q   Paragraph 8C, you're making reference to a  14:18:45

16   community relief fund announced by Roseburg totaling

17   $50 million, correct?

18       A   Yes.

19       Q   And you write that "Consistent with

20   Baker's advice, on September 7, 2022, Roseburg     14:19:02

21   announced the community relief fund," correct?

22       A   Yes.

23       Q   Do you have any opinion on whether Liberty

24   owed to fund or operate the community relief fund?

25       A   I have no opinion on that issue.          14:19:19

                                            Page 201
```

1        Q    Did Baker or Roseburg ever demand that        14:19:20

2    Liberty fund or operate the community relief fund?

3        A    I don't have any -- I don't have any

4    knowledge of a demand to that regard.

5        Q    Was there a request and not necessarily a        14:19:37

6    demand?

7        A    We've been over this already.  I don't

8    have anything to add to my prior testimony on this.

9        Q    Your prior testimony with respect to the

10   community relief fund?  Is that what you're        14:19:51

11   referring to?

12       A    Well, yes.

13       Q    Let me strike the question and ask it

14   again.

15       A    Sure.        14:19:58

16       Q    Did you see anything in the record, so far

17   as you reviewed it, that reflected either a demand

18   or a request by Roseburg or Baker that Liberty fund

19   or operate the $50 million community relief fund?

20            MR. DeVRIES:  Compound.        14:20:17

21            THE WITNESS:  I don't know as I sit here.

22   BY MR. CROWE:

23       Q    If Baker had demanded that Liberty fund

24   the $50 million community relief fund, would that,

25   in your opinion, constitute taking a directly        14:20:29

                                          Page 202

1    adverse interest or position vis-a-vis Liberty?        14:20:32

2              MR. DeVRIES:  Lacks foundation, asked and

3    answered.

4              THE WITNESS:  My testimony here would be

5    the same as we went through a few minutes ago with      14:20:40

6    respect to your question about demands that

7    Liberty -- I think the subject matter of the

8    previous questions was demands by Baker that

9    Liberty -- well, actually, I don't know.  I'm sorry.

10   I don't -- I'm not sure that I completely remember      14:21:07

11   the subject.

12             So let me just answer.  An insured can

13   make a request of an insurer without that request

14   rising to the level of creating adversity between

15   the insured and the insurer.                            14:21:32

16             Your next question is going to be, "Well,

17   I'm not talking about a request.  I'm talking about

18   a demand."

19             I don't know enough about the

20   circumstances of the demand in this hypothetical or     14:21:44

21   how it's framed and what the purported consequences

22   are to know whether or not that would constitute

23   adverse action.

24   BY MR. CROWE:

25        Q   But a demand in that way could or could        14:21:56

Page 203

1    not constitute taking a directly adverse position        14:21:58

2    vis-a-vis Liberty; is that fair to say?

3            MR. DeVRIES:  Compound, incomplete

4    hypothetical.

5            THE WITNESS:  I think the request itself,        14:22:06

6    I don't see that that would create adversity.

7            You know, potentially, the other

8    circumstances could potentially create adversity.

9    For example, if some kind of a material threat was

10   being made as part of the demand or something.          14:22:25

11   BY MR. CROWE:

12       Q   All right.  To the extent BakerHostetler,

13   on behalf of Roseburg, claimed that Liberty owed an

14   obligation under its policy to fund the $50 million

15   community relief fund, would that constitute taking     14:22:40

16   a directly adverse position with Liberty?

17           MR. DeVRIES:  Lack of foundation, asked

18   and answered.

19           THE WITNESS:  I haven't seen any facts to

20   suggest that Baker did take that position.  So just     14:22:52

21   treating this as a hypothetical, I would say, you

22   know, possibly it could, but I would depend on the

23   context and the other facts.

24   BY MR. CROWE:

25       Q   The last few sentences or lines of             14:23:17

                                                Page 204

1        Q    Under the Markel and Federal Insurance          14:24:45

2    policies, did they also have a subsequent right or

3    duty to defend Roseburg?

4        A    I don't know, and I didn't look at those

5    policies.                                                 14:24:56

6        Q    Not material to any of your opinions?

7        A    I don't think so.

8        Q    With respect to the Allied World Assurance

9    Company policy, did that policy obligate Allied

10   World to defend Roseburg against Mill Fire suits and      14:25:07

11   claims?

12       A    I don't know.

13       Q    Was there a defense obligation owed by

14   Everest National under their excess policy?

15       A    I don't know.                                    14:25:23

16       Q    Was there a defense obligation owed by

17   Ohio Casualty under its excess policy?

18       A    I don't -- I don't know.  I haven't seen

19   that alleged as part of the issues in dispute here;

20   so -- and I haven't been asked to render an opinion       14:25:42

21   that would touch on those issues.  So I don't know.

22       Q    Paragraph 8D, sub 7, you write, "Liberty

23   agreed early on that the Mill Fire was an occurrence

24   and that damages claims were potentially covered by

25   the policy subject to its reservation of rights (as       14:26:03

```
 1    set forth below )."                              14:26:08

 2            Did I read that correctly?

 3       A    Yes.

 4       Q    Are you referring to the September 22,

 5    2022, letter?                                    14:26:14

 6       A    Yes.

 7       Q    Then paragraph 8E is your reference to the

 8    notice by Roseburg's broker, Alliant, to Liberty on

 9    September 6th, 2022, as the first notice of the Mill

10    claim?                                           14:26:38

11       A    Yes.

12       Q    Moving down to -- on page 6, it's going to

13    be paragraph 8, sub J, again, reference to the

14    Liberty reservation of rights letter, dated

15    September 22, 2022, correct?                     14:26:56

16       A    Yes.

17       Q    You're referencing that in that letter,

18    Liberty reserved the right to decline coverage for

19    punitive damages claims, correct?

20       A    Yes.                                     14:27:10

21       Q    And do you agree that reserving rights to

22    decline coverage for punitive damages does not

23    constitute a cumis-creating conflict?

24       A    I believe there's case law in California

25    to that effect.                                  14:27:22
```

Page 207

1          Q    And then you continue that the reservation        14:27:24

2     of rights letter reserved the right to withdraw from

3     the defense for any reason, correct?

4          A    Yes.

5          Q    Do you agree that reserving the right to          14:27:31

6     withdraw from the defense does not, in and of

7     itself, constitute a cumis-creating conflict?

8          A    I believe that's true in and of itself.

9          Q    And then paragraph 8K, you're referencing

10    or summarizing that the reservation of rights letter        14:27:50

11    disclaimed any obligation to recognize Roseburg's

12    right to independent or cumis defense counsel,

13    correct?

14         A    Yes.

15         Q    Do you agree --                                   14:28:07

16         A    That's the effect of that statement.  Yes.

17         Q    Thank you.

18              Do you agree, Ms. Baldwin, that absent a

19    cumis-creating conflict, Liberty had the right to

20    appoint competent counsel of its choice to defend          14:28:17

21    Roseburg against Mill Fire suits and claims?

22         A    Generally, yes.

23         Q    Moving to 8, sub O, on page 7, that

24    paragraph is summarizing Mr. Chairez's testimony

25    that from his perspective, he did not, at any time,        14:28:55

                                                        Page 208

```
1    BY MR. CROWE:                                    14:32:13

2        Q   Right.  It's a reasonable inference to

3    make, correct?

4        A   Yes.

5        Q   Did Mr. Chairez, or anybody at          14:32:16

6    BakerHostetler, as you know it, review those issues

7    in more detail, and did they ever get back to the

8    team on a proposed response?

9        A   I don't know.

10       Q   Do you know if Baker prepared a proposed  14:32:35

11   response to Liberty's September 22, 2022,

12   reservation of rights letter?

13       A   Well, I don't know.  I mean, it was right

14   around this time that Hunton was brought in, or

15   maybe even before.  So I don't know.              14:32:54

16       Q   To the extent BakerHostetler analyzed and

17   proposed to Roseburg a response that challenged

18   Liberty's conclusion that it did not owe a cumis or

19   independent counsel -- defense counsel obligation,

20   would that constitute taking a directly adverse     14:33:14

21   position vis-a-vis Liberty as a concurrent client?

22           MR. DeVRIES:  Lack of foundation,

23   incomplete hypothetical.

24           THE WITNESS:  Well, yeah, I -- I don't --

25   obviously the closer the firm gets to taking a      14:33:33
```

Page 212

1    position on behalf of Roseburg against Liberty that       14:33:41

2    creates a dispute between Liberty and Roseburg, it's

3    a problem.

4           But at this point, they've already been

5    told that they don't -- that Baker doesn't represent       14:34:00

6    Liberty here, that there's other counsel that now

7    is in that tripartite relationship.

8           So I'm not sure the -- and if we're going

9    back to the notion of this creating adversity with

10   Liberty as a client in unrelated other matters,           14:34:17

11   again, I haven't seen the facts that would support

12   that conclusion.

13   BY MR. CROWE:

14      Q    Assuming --

15      A    And I didn't see Liberty do anything that          14:34:33

16   supported that conclusion that they felt that there

17   was a conflict in that regard.

18      Q    Assuming Liberty is a concurrent client at

19   this time of the BakerHostetler firm, to the extent

20   BakerHostetler proposed responding to Liberty's           14:34:44

21   reservation of rights letter challenging Liberty's

22   position that it did not owe a cumis obligation, you

23   would agree with me, Ms. Baldwin, that that would

24   constitute taking a directly adverse position

25   against a concurrent client?                              14:35:03

                                                  Page 213

1          MR. DeVRIES:  Incomplete hypothetical,          14:35:05

2    ambiguous as framed.

3          THE WITNESS:  I think it's hard to say

4    without knowing more about what that proposed

5    response, as you've characterized it, said.          14:35:21

6    BY MR. CROWE:

7          Q    Right.

8          I mean, the jury in this case gets to make

9    reasonable inferences from the evidence.  And to the

10   extent BakerHostetler communicated to Roseburg that          14:35:31

11   there was a basis to challenge Liberty's conclusion

12   that it did not owe a cumis conflict -- a cumis

13   counsel, would you agree that that would constitute

14   taking a directly adverse position vis-a-vis

15   Liberty?          14:35:51

16          MR. DeVRIES:  Lack of foundation,

17   ambiguous.

18          THE WITNESS:  It possibly could.  I mean,

19   it doesn't matter for my opinion because my opinion

20   is focused on their purported conflict that Liberty          14:36:02

21   cited as the basis for not retaining Baker.  And I

22   have not analyzed whether Baker's conduct in this --

23   after that decision or outside of the scope of that

24   decision.

25   ///          14:36:23

                                                        Page 214

```
1    BY MR. CROWE:                                    14:36:24

2         Q    Then paragraph 8P of the factual

3    background, you're referencing Roseburg's retention

4    of the Hunton Andrews Kurth firm on or about

5    September 23, 2022, correct?                      14:36:34

6         A    Yes.

7         Q    And then you correctly note that the

8    retention agreement is dated September 27, but there

9    had been some communication as between Roseburg and

10   the Hunton firm before the retention letter was     14:36:47

11   signed.

12        A    Yes.

13        Q    Then paragraph 8S on page 8, with regard

14   to the October 7, 2022, letter from the Hunton firm,

15   do you see that?                                  14:37:05

16        A    Yes.  Um-hum.

17        Q    And you're noting that Hunton, on behalf

18   of Roseburg, was contending that Roseburg was

19   entitled to independent or cumis defense counsel?

20        A    Yes.                                    14:37:19

21        Q    And you agree this was the first time that

22   there had been any communication to Liberty

23   expressing that view?

24        A    I believe that's true.

25        Q    Paragraph 8T, on the bottom of page 8, is  14:37:36
```

Page 215

```
 1         Q    Paragraph 8AA, double A, on page 10 --        14:40:23

 2         A    Yes.

 3         Q    -- you write, "Ohio Casualty initially did

 4    not take a formal position on coverage."

 5              Did I read that correctly?                     14:40:33

 6         A    Yes.

 7         Q    And, in fact, at no time did Ohio Casualty

 8    issue a coverage position letter that reserved

 9    rights on any coverage defenses, correct?

10         A    I believe that's correct.                     14:40:48

11         Q    And then paragraph 8BB on the bottom of

12    page 10 and to the top of page 11, you write that,

13    quote, "Ohio Casualty did not waive that defense,"

14    closed quote.

15              Did I read that correctly?                     14:41:04

16         A    Yes.

17         Q    And that defense is in reference to the

18    wildfire exclusion endorsement as referenced in the

19    paragraph above?

20         A    Yes.                                           14:41:16

21         Q    Mr. Frangiamore, one of Roseburg's other

22    experts in this case, opines that Ohio Casualty did,

23    in fact, waive that exclusion because it failed to

24    take a coverage position vis-a-vis Roseburg.

25              Do you agree or disagree with that            14:41:32
```

Page 218

```
1    conclusion?                                    14:41:34

2         A   I agree that Ohio Casualty failed to take

3    a coverage position.

4             Mr. Frangiamore's conclusion seems right,

5    but I don't have an independent conclusion on that    14:41:51

6    point.

7         Q   Okay.  Let's turn to the "Opinions"

8    portion of your report, starting on page 11,

9    paragraph 9.

10            And essentially, paragraph 9 describes    14:42:32

11   generally three areas of expert opinions; is that

12   fair?

13        A   Yes.

14        Q   And the first is whether BakerHostetler's

15   self-described role or purported self-described role    14:42:47

16   as coverage counsel created a conflict of interest

17   between Baker and Liberty, correct?

18        A   Yes.

19        Q   And then the second area -- second area of

20   opinion relates to Liberty's obligation as a    14:43:02

21   liability insurer to appoint competent defense

22   counsel, correct?

23        A   Yes.

24        Q   And "competent" is a word of art?  It's

25   got some legal definition to it; is that correct?    14:43:14
```

Page 219

```
 1     under the Rules of Professional Conduct.  I'm also        14:44:59

 2     not certain that the Rules of Professional Conduct,

 3     and specifically Rule 1.1, define the scope of the

 4     duty to provide competent counsel that an insured

 5     has -- that an insurer has.                                14:45:17

 6         Q   Is there a different definition of what

 7     "competence" means in the context of an insurer's

 8     obligation to appoint competent defense counsel,

 9     other than Rule 1.1?

10         A   I've never seen any cases or anything else         14:45:29

11     specifically reference the Rule 1.1 or the

12     definition of "competence" in that disciplinary rule

13     as being the operative definition for purposes of

14     the requirement to provide competent counsel.

15         Q   What is the definition, as you understand          14:45:48

16     it, to the competency rule for purposes of a

17     liability insurer's duty to appoint competent

18     counsel?

19         A   Well, what's interesting about that is

20     that there's very little definition in the case law.      14:45:58

21     And I looked around to try to find a more clear and

22     specific definition and was basically unsuccessful.

23             I mean, I think that the standard of care

24     operates to define "competency," and as does -- I

25     don't think that Rule 1.1 is irrelevant to                14:46:31
```

Page 221

1    understanding what is competent representation in          14:46:34

2    the context of the duty to provide competent

3    counsel, but I don't think it's the only statement

4    on what competent counsel is.

5        Q   What is your view of what it means to          14:46:46

6    appoint competent counsel in the context of a

7    liability insurer's defense obligations?

8        A   I think it's a duty to appoint a law firm

9    or a lawyer who has sufficient skill to provide a

10    representation within the standard of care as well          14:47:09

11    as sufficient resources, time, you know, personnel,

12    other necessary resources to provide that

13    representation.

14        Q   What about experience, sufficient

15    experience?  Is that also --          14:47:25

16        A   Yes --

17        Q   -- a factor?

18        A   Yes, that would be relevant.

19        Q   So other than skill, experience, and

20    resources, including time and personnel to devote to          14:47:32

21    a matter, is there anything else, part of the

22    standard of care definition of "competency," in the

23    context of an insurer's duty to defend?

24            MR. DeVRIES:  Can you read that question

25    back, please?          14:47:46

                                                        Page 222

```
 1              (Record read as follows:              14:48:05

 2              "Question:  So other than skill,

 3         experience, and resources, including time and

 4         personnel to devote to a matter, is there

 5         anything else, part of the standard of care   14:48:05

 6         definition of "competency," in the context of

 7         an insurer's duty to defend?")

 8              THE WITNESS:  I don't believe so.

 9    BY MR. CROWE:

10         Q   And what do you base that definition on?   14:48:12

11    Other than saying the "standard of care," what

12    specifically are you basing the opinion that

13    competencies in the context of a liability insurer's

14    duty to defend involves factors associated with

15    skill, experience, and resources?                   14:48:28

16         A   Well, again, I looked at case law, and I

17    think this was an issue I looked at treatises in

18    connection with, going back to one of your earlier

19    questions.

20              And while there was no specific definition   14:48:42

21    set forth, some cases refer generally to the duty to

22    provide a competent representation.  So that's why I

23    go -- I look to the standard of care in this regard.

24         Q   Well, what do you mean by -- what did you

25    look at specifically in relation to the standard of    14:48:59
```

                                                    Page 223

Exhibit 61, Page 115

1    care for purposes of developing this opinion on what        14:49:02

2    "competency" means in this context?

3         A    Well, the standard of care is set forth in

4    the, you know, California case law.  You can look to

5    the jury instruction, which I think I did -- I did        14:49:11

6    cite in my report at paragraph 14, CACI No. 600.

7              And in California, as I already said here

8    today, the standard of care is the care and skill

9    that a reasonably careful lawyer would use in

10   similar circumstances.                                    14:49:28

11        Q    And it's CACI --

12        A    Number 600.

13        Q    -- 600.  And that's in the context of

14   standards governing insurance -- strike that.

15             That's the instruction governing attorney        14:49:37

16   malpractice claims?

17        A    Attorney standard of care.

18        Q    Attorney standard of care.

19             Does that jury instruction apply to --

20   expressly apply to evaluating the competency of           14:49:48

21   insurer-appointed counsel?

22        A    I don't have a definitive answer to that

23   because I have not found any source to definitively

24   define what "competent counsel" means in that

25   context.                                                  14:50:09

Page 224

```
 1          Q    And Rule 1.1 in the Rules of Professional        14:50:10

 2     Conduct defines "competency" and speaks to learning

 3     and skill and mental, emotional, and physical

 4     ability, but does not expressly reference resources,

 5     correct?                                                   14:50:22

 6          A    I believe that's correct.

 7          Q    And in your report, you cite to the Garlow

 8     decision to support your definition of what

 9     "competency" means in the context of

10     insurer-appointed counsel, correct?                        14:50:40

11          A    Well, I'm really -- if you look at

12     paragraph 13, I'm really pointing to that to help

13     flesh out the ethical duty of competence.

14          Q    Right.

15               And Garlow is a 1988 case that's referring       14:50:52

16     to a prior Rule of Professional Conduct, more

17     specifically, Rule 6-101B, correct?

18          A    Yeah.  That's several versions of rules

19     ago.

20          Q    So you're referring to a Rule of                 14:51:07

21     Professional Conduct at least as a basis in part in

22     developing your opinion as to what "competency"

23     means in the insurer-appointed context?

24          A    You know, I'm not intending to come up

25     with new law.  The problem is that as I looked, I          14:51:20
```

Page 225

1    couldn't find any concise, workable definition of          14:51:23

2    what "competent counsel" means.

3          I saw a number of cases referenced in some

4    of the treatises that just talked about the duty to

5    provide counsel who could provide a competent            14:51:36

6    representation, which doesn't really advance the

7    ball since you're using the same term that you're

8    seeking to define.

9          So that's why I looked to what "competent

10   representation" generally means, and looked to both      14:51:47

11   the duty of competence in the disciplinary rules as

12   well as the standard of care in the civil context.

13        Q    I didn't see it, but I may have missed it.

14          Does your report reference Rule -- the

15   current Rule 1.1 as part of your opinions on what        14:52:03

16   "competency" means in this context?

17        A    Yes, in paragraph 13.

18        Q    Okay.  Thank you.

19          And it also refers to the Garlow decision

20   interpreting Rule -- the prior Rule 6-101B?              14:52:15

21        A    Yeah.  I mean, I wouldn't put too much

22   weight on the Garlow decision.  I'm really pulling

23   out a -- you know, sort of one concept about what is

24   relevant to competency.

25        Q    Rule 6-101B, as discussed and analyzed in      14:52:32

Page 226

1    as tripartite defense counsel, correct?                14:55:09

2        A   Yes.

3        Q   And that later changed when there was a

4    claim that Liberty owed a cumis obligation, correct?

5        A   Yes.  Well, it changed when Liberty          14:55:19

6    refused to hire Baker.

7        Q   Okay.  So that position changed when

8    Liberty communicated that it was not consenting or

9    approving of Baker's role as tripartite counsel?

10       A   Well, Baker continued to seek to be          14:55:43

11   appointed as tripartite counsel -- I suppose that's

12   right -- until the point that Hunton articulated the

13   basis for the cumis request.

14       Q   Did Baker ever seek conflict waivers from

15   Roseburg and Liberty in connection with their          14:56:06

16   representation of Roseburg in response to the Mill

17   Fire?

18       A   I don't believe so.

19           MR. CROWE:  I'm pruning, Scott, as you

20   would call it.  So bear with me, I'm sorry.            14:57:13

21           THE WITNESS:  Bring out the giant shears.

22   BY MR. CROWE:

23       Q   All right.  Starting with the second

24   opinion or subject matter opinion on page 16,

25   starting at paragraph 11 and thereafter, you're        14:57:43

                                           Page 229

```
1    describing your opinions about whether or not         14:57:46

2    Liberty had appointed and selected competent defense

3    counsel in its selection of Mr. Bona and the Carlson

4    firm?

5         A    I wouldn't describe my opinion as that.      14:58:02

6         Q    I'm sorry.  How did I misspeak in that

7    way?

8         A    I don't take a position on whether

9    Mr. Bona and Carlson Calladine were competent

10   counsel.                                               14:58:11

11           My opinion solely goes to the duty to

12   provide competent counsel.

13        Q    Okay.  So it's not your opinion that

14   Mr. Bona and the Carlson firm did not constitute

15   competent defense counsel; is that fair?              14:58:22

16        A    I don't -- I don't have the information or

17   expertise to weigh in on whether they were competent

18   counsel.

19           I am merely pointing out the duty to

20   provide competent counsel, what that duty must mean,   14:58:38

21   and then I point out just the difference in capacity

22   between Carlson Calladine and Baker.

23           But I don't articulate an opinion that

24   Mr. Bona was not competent.  That's not my position.

25   I don't -- it's not my place.  I don't have a -- I      14:58:59
```

Page 230

1    don't have that expertise.  I'm not a fire lawyer.        14:59:02

2          Q    So with respect to capacity issues, or at

3    least the comparison of capacity as between Mr. Bona

4    and his firm on the one hand and BakerHostetler on

5    the other hand, you have not reached the conclusion       14:59:14

6    that their difference in capacity somehow rendered

7    Mr. Bona and his firm incompetent to handle

8    Roseburg's defense?

9          A    I think that's something that the finder

10   of fact should be tasked with.                            14:59:28

11         Q    Well, have you reached an opinion in that

12   regard that you intend to offer to the finder of

13   fact?

14         A    No.

15         Q    So to the extent your report says           14:59:36

16   otherwise, are you --

17         A    It doesn't.

18         Q    Maybe this is an example of my reading

19   something without -- misreading something.

20              Here we go.  Paragraph 15.  You write,      14:59:50

21   quote, "It appears clear that CCP, whatever its

22   experience handling such claims in the past, did not

23   have the resources that Baker did to devote to the

24   matter, in terms of lawyer and nonlawyer personnel,"

25   closed quote.                                            15:00:08

Page 231

```
1                Did I read that correctly?                    15:00:09

2        A    Yes.

3                MR. DeVRIES:   That's exactly what she

4    said.

5                MR. CROWE:   Okay.   I'm going to confirm      15:00:13

6    that.

7                MR. DeVRIES:   Okay.

8    BY MR. CROWE:

9        Q    So that opinion does not equate to your

10   conclusion that Mr. Bona and the Carlson firm were        15:00:20

11   incompetent to handle Roseburg's defense in response

12   to the Mill Fire, correct?

13       A    That's correct.

14       Q    You're merely indicating that the capacity

15   of both firms is different in the sense that              15:00:35

16   Mr. Bona's firm didn't have the capacity to do all

17   of the things that the Baker firm did on behalf of

18   Roseburg?

19       A    In a sense.

20       Q    But not then concluding that as a result        15:00:49

21   of that difference in capacity, that Mr. Bona and

22   Carlson was incompetent to handle Roseburg's

23   defense?

24       A    Right.

25       Q    Thank you.                                       15:00:58
```

Page 232

1          MR. DeVRIES:  Come on.  That should get          15:01:07

2     rid of a bunch of pages.

3     BY MR. CROWE:

4          Q    Well, a tag-along to that question is,

5     you've described Baker's role in paragraph 15 as          15:01:16

6     providing a multifaceted defense to Roseburg.

7              What did you mean by "a multifaceted

8     defense"?

9          A    Well, my understanding is that Baker

10    provided services in a number of different areas and     15:01:32

11    through a number of different identified work

12    streams, and these services included a wide array of

13    services to the client in connection with trying to

14    minimize liability and resolve the claims that were

15    made.                                                     15:01:52

16         Q    Can you be more specific as to the wide

17    array of services that you're referring to?

18         A    I don't specifically recall as I sit here.

19              I know Bob Julian testified at length

20    about this in his deposition.  Others did as well.       15:02:06

21    The work streams are set forth on the -- on various

22    exhibits to Bob Julian's deposition.

23              The specifics of the work done, again, is

24    not material to my opinion.  So I didn't spend a lot

25    of time trying to understand what those were.            15:02:26

                                                    Page 233

1          Q    Did you understand that their array of          15:02:29

2     services included responding to criminal

3     investigations?

4          A    Yes.

5          Q    And responding to government          15:02:37

6     investigations?

7          A    Yes.

8          Q    And evaluating third-party liability?

9          A    Yes.

10          Q    And responding to environmental claims or          15:02:43

11     anticipated environment litigation?

12          A    I believe that's right.

13          Q    And you understood their services to

14     include evaluating tax-related matters?

15          A    I don't specifically recall that now, but          15:02:55

16     that doesn't surprise me.

17               MR. CROWE:  If we can take maybe just a

18     five-minute break, I'd appreciate it.

19               MR. DeVRIES:  Sure.  You don't have to

20     give a further explanation.          15:03:07

21               MR. CROWE:  Thank you.

22               THE VIDEO OPERATOR:  We're going off the

23     record.  This is the end of Media File No. 5.  The

24     time is 3:03 p.m.

25               (Recess, 3:03 p.m. - 3:12 p.m.)          15:03:15

Page 234

Exhibit 61, Page 124

1          THE VIDEO OPERATOR:  We are back on the          15:11:56

2     record.  This is the beginning of Media No. 6.  The

3     time is 3:12 p.m.

4     BY MR. CROWE:

5          Q   Ms. Baldwin, inviting your attention again          15:12:05

6     to your expert report, starting at paragraph 16 and

7     the subparagraphs below that, which starts on

8     page 17 of your report, this is the area of your

9     opinion with respect to the wildfire exclusion, in

10    your view, creating a cumis obligation, right?          15:12:23

11         A   Yes.

12         Q   Generally speaking.

13             And 16A, you write, quote, "The close

14    corporate affiliation between Liberty and Ohio

15    Casualty created a conflict of interest requiring          15:12:38

16    the appointment of independent counsel, given the

17    fact that the Ohio Casualty excess policy contained

18    a wildfire exclusion that Ohio asserted as a defense

19    to coverage," closed quote.

20             Did I read that correctly?          15:12:56

21         A   Yes.

22         Q   And the wildfire exclusion that Ohio

23    asserted, you're referencing to their affirmative

24    defense in their answer, correct?

25         A   Yes.  They never did assert a coverage          15:13:07

Page 235

1    position even though they were asked to by                15:13:10

2    Roseburg's counsel.

3        Q   Is that the only basis for your opinion

4    that Liberty owed a cumis obligation to Roseburg?

5        A   I'm not quite sure what you mean.          15:13:31

6        Q   All right.  So you're opining that the

7    fact that the Ohio Casualty policy and the Everest

8    policy in which it followed form contained a

9    wildfire exclusion constituted a cumis-creating

10   conflict in the sense that Liberty, an affiliate of     15:13:48

11   Ohio Casualty, was obligated to allow Roseburg to

12   appoint or select independent or cumis defense

13   counsel, correct?

14       A   Yes.  I'd probably frame it a little bit

15   differently, but generally.                       15:14:07

16       Q   Is there any other basis for your opinion

17   that Liberty owed a duty to allow Roseburg to select

18   independent or cumis defense counsel?

19       A   In this third area of my opinion, I'm

20   focusing on the conflict created by the wildfire       15:14:18

21   exclusion.

22       Q   And nothing else?

23       A   Yes, that's fair to say.

24       Q   Would your opinion be different if Liberty

25   and Ohio Casualty were not related entities?          15:14:29

Page 236

```
 1        A    Yes.                                    15:14:32

 2        Q    So it's solely the -- your opinion is

 3   based solely on the fact that Liberty and Ohio

 4   Casualty are related entities, thereby, in your

 5   view, creating a cumis conflict because of the    15:14:45

 6   wildfire exclusion in the Ohio Casualty policy?

 7        A    Yes.

 8             I feel like we may be getting some

 9   incomplete testimony here by your use of the word

10   "solely," because my opinion is as it's stated here.  15:14:57

11   To reduce it down to one factor or another I think

12   is not accurate.

13             The opinion is that because of the close

14   affiliate relationship which, you know, as I see it

15   in the record, included an almost -- treating the    15:15:17

16   companies as almost interchangeable with a shared

17   administrative staff and personnel that were

18   employed by the parent, the fact that one of those

19   affiliates had a wildfire exclusion and was higher

20   up the tower than Liberty meant that Liberty and its  15:15:45

21   counsel could potentially shape the defense of the

22   litigation in such a way that it could create

23   basically the law of the case or admissions that

24   could be held against Roseburg in connection with

25   the wildfire exclusion.                          15:16:06
```

Page 237

1    Q   And so your opinion would be different,    15:16:09

2    and you would find that there would be no obligation

3    to provide or allow cumis counsel, if Liberty was

4    not closely related, or related at all, to Ohio

5    Casualty?    15:16:27

6    A   Yes, because that's where the conflict

7    comes in.  That's where the motivation and the

8    interest in shaping the defense so that it supports

9    the wildfire exclusion on behalf of Ohio Casualty

10   comes in.    15:16:46

11   Q   Liberty never reserved rights on a

12   wildfire exclusion, correct?

13   A   Liberty, in its policy, didn't have a

14   wildfire exclusion.

15   Q   Right.  Didn't have a wildfire exclusion    15:16:55

16   and, therefore, did not reserve rights on the

17   wildfire exclusion, correct?

18   A   Correct.

19   Q   And Mr. Bona and the Carlson firm was

20   appointed by Liberty and not Ohio Casualty as    15:17:03

21   defense counsel, correct?

22   A   Yes.

23   Q   And there's no --

24   A   Although -- yes.  I suppose that's right.

25   Yes.    15:17:13

Page 238

```
1          Q   Is there any evidence in the record, as        15:17:15

2     you've seen it and interpreted it, supporting that

3     Liberty ever instructed Mr. Bona or the Carlson firm

4     to defend Roseburg in a way which would steer the

5     defense to affect the availability of coverage under    15:17:32

6     the Ohio Casualty policy?

7          A   I haven't seen communications between

8     Liberty and Mr. Bona.

9              I've seen repeated references by Mr. Bona

10    to wildfire litigation and to characterizing the        15:17:51

11    Mill Fire as a wildfire, including -- in this

12    action, including after he'd been, as I understand

13    it from the deposition testimony, pretty soundly

14    schooled by Mr. Julian, that that -- to characterize

15    the fire in that way was not in Roseburg's best         15:18:13

16    interests.

17             So that's -- that's what I see.

18         Q   Did you see anything in the record where

19    Mr. Julian or anybody at BakerHostetler referred to

20    the Mill Fire as a wildfire?                            15:18:30

21         A   I think in his deposition, Mr. Julian, in

22    explaining the significance of that term, explained

23    that you could regard the fire as a part structural,

24    part wildfire, which is why the wildfire exclusion

25    was relevant and why it was a concern.                  15:18:48
```

                                            Page 239

```
 1          Q    Did you see anything outside of              15:18:52

 2    Mr. Julian's deposition where he characterized the

 3    Mill Fire as a wildfire?

 4          A    I don't recall, as I sit here.

 5          Q    In what way could Mr. Bona steer the         15:19:01

 6    defense of Roseburg in a way that would affect or

 7    impact coverage under the Ohio Casualty policy?

 8          A    My understanding is fairly rudimentary.

 9    And again, it really centers on characterizing the

10    fire in such a way that Roseburg's characterization  15:19:21

11    through counsel could be regarded as an admission

12    or, you know, law of the case or somehow be used

13    against Roseburg by Ohio Casualty.

14          Q    Any other way?

15          A    I mean, not -- that's the broad sense.  I   15:19:44

16    mean, that would filter down to the ways in which,

17    you know, experts were prepared or sensitized, the

18    ways in which facts may have been developed.

19          Q    Did you review the complaints in the

20    underlying lawsuits filed against Roseburg arising   15:20:02

21    out of the Mill Fire?

22          A    I've seen them.

23          Q    Did you study them carefully cover to

24    cover?

25          A    Probably not.                              15:20:10
```

Page 240

```
1          Q    Did you -- do you have any understanding      15:20:12

2     as you sit here today the causes of action alleged

3     in those complaints against Roseburg?

4          A    I have some understanding of them.

5          Q    What causes of action were alleged?          15:20:23

6          A    Various causes of action, and --

7          Q    Can you be specific, please?

8          A    Certainly negligence.  I don't -- I

9     really -- I think some contract, potentially,

10    claims.  I don't really recall.                         15:20:52

11         Q    Did you bother -- strike that.

12              Did you refer to and consider the jury

13    instructions and the verdict forms associated with

14    the causes of action alleged in those underlying

15    cases?                                                  15:21:11

16         A    No.

17         Q    You cite to the Morrison case,

18    paragraph 16C of your report, for the proposition

19    that, quote, "Corporate affiliates may be considered

20    the same entity for conflicts purposes where they      15:21:31

21    share a sufficient 'unity of interest,'" closed

22    quote.

23              Did I read that correctly?

24         A    Yes.

25         Q    The Morrison case had nothing to do with     15:21:41
```

Page 241

1    analyzing cumis-creating conflicts of interest,              15:21:43

2    correct?

3         A   Correct.

4         Q   Rather, it involved a motion to disqualify

5    counsel from representing the plaintiff in the                15:21:53

6    underlying case, the water district, because the law

7    firm had also represented a subsidiary of the

8    defendant in that case, correct?

9         A   Yes.

10        Q   And the Morrison case doesn't even mention           15:22:13

11   Civil Code Section 2860, correct?

12        A   Right.

13        Q   Do you agree that not every conflict of

14   interest requires the insurer to provide independent

15   counsel for the insured?                                      15:22:25

16        A   Yes.

17        Q   And do you agree that a conflict of

18   interest entitling the insured to independent

19   defense counsel, as described by some cases, must be

20   significant, not merely theoretical; actual, not             15:22:35

21   merely potential?

22        A   That sounds like a correct statement from

23   case law.

24        Q   Are you also familiar with the case law

25   that states that an insurer -- where the insurer has         15:22:55

Page 242

```
 1    not expressly reserved its right to deny coverage        15:22:59

 2    under a particular exclusion in its policy, there

 3    can be no actual conflict based on the application

 4    of that exclusion during the pendency of the

 5    underlying action?                                       15:23:08

 6        A    That sounds familiar, but I don't

 7    specifically recall that holding.

 8        Q    Do you recall reviewing case law to that

 9    effect for purposes of forming your opinions in this

10    case?                                                    15:23:28

11        A    Yes.

12        Q    Do you recall what cases you specifically

13    looked to in that regard?

14        A    I would say that I looked at the Centex

15    case, the Three James -- or the James Three,             15:23:38

16    whichever it is.  I looked at another one of the

17    truck insurance cases.  I probably looked at others.

18        Q    I didn't see either of those three cases

19    or others in that regard referenced in your report.

20    Is there a particular reason for that?                   15:24:13

21        A    No.  I didn't do an extensive case law

22    discussion.

23        Q    Do you agree that an insured is not

24    entitled to cumis defense counsel merely because

25    they're being sued for an amount in excess of their      15:24:25
```

Page 243

1    insurance?                                          15:24:27

2        A   Yes.

3        Q   Other than your opinion in this matter,

4    have you ever offered an opinion, an expert opinion,

5    that where there's a close relationship between a    15:24:40

6    primary insurer with a duty to defend and an excess

7    insurer that may have an exclusion to either limit

8    or negate coverage under the excess policy

9    constitutes a cumis-creating conflict?

10       A   Not specifically.                           15:24:59

11       Q   Even generally?

12       A   I don't recall.

13       Q   And would you agree, Ms. Baldwin, that

14   there is no case, treatise, Department of Insurance

15   opinion, ethical opinion, or any authority that says 15:25:12

16   that a cumis obligation is owed where there's an

17   affiliation between the primary insurer with the

18   duty to defend and the excess insurer where the

19   excess insurer has an exclusion that might limit or

20   negate coverage?                                    15:25:35

21       A   I'm not aware of a specific case that

22   holds that, but I think the law that governs the

23   duty to provide independent counsel, and

24   specifically the principle that where defense

25   counsel has an opportunity to shape the defense in a 15:25:57

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Exhibit 61, Page 134

1    that he would have obtained knowledge about the          15:28:48

2    wildfire exclusion?  Is it -- have you already

3    answered that question?

4         A    Well, I guess I've answered it in part.

5         Q    Okay.  Let me ask you that question again     15:29:03

6    so we have a clear record.

7              Why do you believe that it was likely that

8    had Mr. Bona continued to be involved in Roseburg's

9    defense, that he would likely have obtained

10   knowledge about the wildfire exclusion endorsement?     15:29:18

11        A    Well, partly because as of November,

12   Everest was asserting a reservation of rights based

13   on the wildfire exclusion, and that then becomes

14   relevant to the defense of the case.

15             It raises the same kinds of issues that       15:29:41

16   Ms. Keahey spotted from the very beginning of the

17   case, which is there's -- that the excess insurers,

18   including Ohio Casualty and Liberty Mutual,

19   operating through Ohio Casualty, have an interest in

20   seeing that wildfire exclusion apply.                   15:30:01

21        Q    But neither Everest nor Ohio Casualty

22   retained Mr. Bona to defend Roseburg, correct?

23        A    That's right.

24        Q    So how would Mr. Bona, in your view, learn

25   about or discover the reservation of rights letter      15:30:14

Page 247

1    issued by Everest?                                    15:30:17

2        A   Well, he'd probably learn about it from

3    his client.

4        Q   All right.  Can you say for a fact and

5    with confidence that Mr. Bona would have learned      15:30:28

6    about Everest's reservation of rights letter,

7    including its reservation on the wildfire exclusion,

8    had he continued to be involved in the defense of

9    Roseburg?

10       A   I think it would be irresponsible to not     15:30:40

11   inform defense counsel of that exclusion, given the

12   potential that the way in which counsel

13   characterized and participated in the defense could

14   affect that coverage.

15       Q   Irresponsible by Roseburg not to            15:30:57

16   communicate that to defense counsel?

17       A   Yes.

18           MR. CROWE:  Bear with me one second.

19           I have no further questions.  Thank you

20   for your time.                                        15:31:24

21           THE REPORTER:  Counsel, a copy for you?

22           MR. DeVRIES:  Yes, please.

23           THE REPORTER:  Rough draft or just the

24   final?

25           MR. CROWE:  I'm ordering a rough.            15:31:35

                                        Page 248

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12          Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [x] was [ ] was not requested.

16          I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19          IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  November 19, 2024.

23   *Carla Soares*

24

25   CARLA SOARES, CSR No. 5908

                                        Page  251

EXHIBIT 62

EXHIBIT 62

EXHIBIT 62

1          UNITED STATES DISTRICT COURT

2     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3

4     RLC INDUSTRIES CO. AND ROSEBURG)

      FOREST PRODUCTS CO.,          )

5                                   )

             PLAINTIFFS,            )

6                                   )

       V.                           )   No.

7                                   )   2:23-cv-00649-

      LIBERTY INSURANCE             )   TLN-SCR

8     CORPORATION, EVEREST NATIONAL )

      INSURANCE COMPANY, AND THE    )

9     OHIO CASUALTY INSURANCE       )

      COMPANY,                      )

10                                  )

             DEFENDANTS.            )

11    _____)

12

13

14

15        VIDEOTAPED DEPOSITION OF ROBERT MCEVOY

16            WEDNESDAY, NOVEMBER 13, 2024

17

18

19

20

21

22

23

24    JOB NO. 6966751

25    REPORTED BY:  D'ANNE MOUNGEY, CSR 7872

                                          Page 1

Exhibit 62, Page 001

1    DEPOSITION OF ROBERT MCEVOY, TAKEN ON BEHALF OF DEFENDANTS

2    AT NEW YORK, NEW YORK, COMMENCING AT 10:04 A.M. ON

3    WEDNESDAY, NOVEMBER 13, 2024, BEFORE D'ANNE MOUNGEY, CSR

4    7872.

5

6

7    APPEARANCES OF COUNSEL:

8

9        FOR THE PLAINTIFFS RLC INDUSTRIES CO. AND ROSEBURG

         FOREST PRODUCTS CO.:

10

             HUNTON ANDREWS KURTH LLP.

11           BY:  RACHEL E. HUDGINS, ESQ.

             BANK OF AMERICA PLAZA

12           SUITE 4100

             600 PEACHTREE STREET, NE

13           ATLANTA, GA  30308

             RHUDGINS@HUNTONAK.COM

14

15

         FOR THE DEFENDANT LIBERTY INSURANCE CORPORATION:

16

             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

17           BY:  SCOTT SVESLOSKY, ESQ.

             333 SOUTH HOPE STREET, 43RD FLOOR

18           LOS ANGELES, CALIFORNIA 90071-1422

             213.620.1780

19           SSVESLOSKY@SHEPPARDMULLIN.COM

20

21       ALSO PRESENT:

22           RACHEL STAMPER, ALIXPARTNERS LEGAL COUNSEL

23           DAVID WEST, VIDEOGRAPHER

24

25

                                                  Page 2

Exhibit 62, Page 002

```
1                        I N D E X

2

3    WITNESS              EXAMINATION              PAGE

4    ROBERT MCEVOY

5                         BY MR. SVESLOSKY         6

6                         BY MS. HUDGINS           113

7

8

9

10                    E X H I B I T S

11

     NO.          PAGE        DESCRIPTION

12

     EXHIBIT 259  16          ROBERT MCEVOY RESUME

13

     EXHIBIT 260  23          AP WEBPAGE

14

     EXHIBIT 261  30          RETAINER AGREEMENT

15

     EXHIBIT 262  55          ALIXPARTNERS INVOICE

16

     EXHIBIT 263  104         SEPTEMBER 26 EMAIL

17

     EXHIBIT 264  107         "ALIXPARTNERS BUILDS ONLINE

18                            PORTAL"

19

20

21

22

        EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION

23                 AND ATTACHED HERETO:

24   NO.          PAGE        DESCRIPTION

25   EXHIBIT 173  47          ROSEBURG'S EXPERT DESIGNATIONS

                                           Page 3
```

| | | |
|---|---|---|
| 1 | to any party in this action, nor am I financially | 10:05:15 |
| 2 | interested in the outcome. | 10:05:18 |
| 3 | If there are any objections to proceeding, | 10:05:20 |
| 4 | please state them at the time of your appearance. | 10:05:22 |
| 5 | Counsel will now state their appearances and | 10:05:25 |
| 6 | affiliations for the record, beginning with the noticing | 10:05:27 |
| 7 | attorney. | 10:05:30 |
| 8 | MR. SVESLOSKY:  Good morning.  Scott | 10:05:30 |
| 9 | Sveslosky for defendant Liberty Insurance Corporation. | 10:05:33 |
| 10 | MS. HUDGINS:  Rachel Hudgins on behalf of | 10:05:38 |
| 11 | plaintiffs RLC and Roseburg. | 10:05:42 |
| 12 | MS. STAMPER:  Rachel Stamper on behalf of | 10:05:44 |
| 13 | witness Robert McEvoy and AlixPartners. | 10:05:47 |
| 14 | THE VIDEOGRAPHER:  Thank you. | 10:05:52 |
| 15 | The court reporter may now swear in the | 10:05:53 |
| 16 | witness and we will proceed. | 10:05:54 |
| 17 | THE VIDEOGRAPHER:  Thank you.  Counsel, your | 10:06:11 |
| 18 | witness. | |
| 19 | /// | |
| 20 | /// | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 5

Exhibit 62, Page 004

```
 1                        ROBERT MCEVOY,

 2         having been first duly sworn by the reporter, was

 3              examined and testified as follows:         10:06:09

 4                                                         10:06:09

 5                        EXAMINATION                      10:06:13

 6    BY MR. SVESLOSKY:                                    10:06:13

 7         Q    Good morning, sir.                         10:06:13

 8         A    Good morning.                              10:06:14

 9         Q    How are you?                               10:06:15

10         A    Doing fine.                                10:06:16

11         Q    Good.  Thank you for joining us this morning   10:06:17

12    and also for your flexibility on scheduling.        10:06:19

13              Have you ever had your deposition taken    10:06:22

14    before?                                             10:06:24

15         A    Not professionally, but personally.        10:06:25

16         Q    And that -- the -- the deposition you had,   10:06:28

17    you said on a personal matter, how long ago was that?   10:06:33

18         A    It was in February this year.              10:06:37

19         Q    Well, I won't pry.  I'll just say that I'll   10:06:39

20    go ahead and go over some of the, you know, basic    10:06:45

21    admonitions and ground rules before we get started.   10:06:47

22              One of the most important rules here is -- is   10:06:50

23    that the court reporter can only take down one person   10:06:52

24    talking at a time.  It's -- it's very difficult to take   10:06:55

25    down two people talking at the same time.  She's, you   10:06:58
```

Page 6

Exhibit 62, Page 005

1    certifications not listed on your resume?              10:21:47

2         A    I don't think so.  Not that I can recall.    10:21:51

3         Q    Do you have -- do you have any training as an   10:21:57

4    insurance claim adjuster?                              10:22:00

5         A    No.                                          10:22:01

6         Q    Do you know if anyone at AlixPartners has any   10:22:03

7    training as an insurance claim adjuster?               10:22:06

8         A    Not to my knowledge.  But --                10:22:09

9         Q    I'm sorry.                                   10:22:13

10        A    There -- there could be, but not to my       10:22:14

11   knowledge.                                             10:22:16

12        Q    Have you attended any adjuster continuing     10:22:17

13   education courses?                                     10:22:22

14        A    No.                                          10:22:24

15        Q    Do you have any licenses, degrees or          10:22:25

16   certifications in the field of insurance?             10:22:28

17        A    No.                                          10:22:31

18        Q    Do you know if anyone at AlixPartners does?   10:22:32

19        A    I do not, no.                                10:22:35

20        Q    Do you have any licenses, degrees or          10:22:38

21   certifications in the field of risk management?       10:22:40

22        A    Can you clarify what risk management would --   10:22:43

23   would mean?                                            10:22:51

24        Q    Well, sure.                                  10:22:51

25             I mean, do you have -- do you have what's      10:22:53

Page 18

Exhibit 62, Page 006

```
 1    yeah when we're speaking kind of in a conversational        11:00:20

 2    colloquial tone.  And just so the record is clear, it       11:00:25

 3    will be important that your -- your responses are not       11:00:28

 4    only audible, but also just clear for the record so         11:00:31

 5    there's no ambiguity.                                       11:00:34

 6            So this may happen during the deposition.           11:00:36

 7    Please don't take -- take offense.  It -- it happens to     11:00:38

 8    most witnesses just because we -- we fall into that         11:00:41

 9    conversational tone.  I may just ask occasionally for --    11:00:45

10    for clarification.                                          11:00:47

11        A    Yes.                                               11:00:48

12        Q    In one of the other roles that AlixPartners        11:00:50

13    had here was to resolve the claims brought by potential     11:00:55

14    claimants who suffered property damage or bodily injury?    11:01:02

15        A    So yes, like I would say it's property            11:01:08

16    damage, bodily injury, emotional distress.  I would also    11:01:19

17    say that we worked very closely with BakerHostetler         11:01:25

18    in -- in doing all of that.                                 11:01:28

19        Q    And that resolution of claims took the form        11:01:29

20    of -- of monetary payments?                                 11:01:34

21        A    That's correct.                                    11:01:36

22        Q    Did you or anyone at AlixPartners have a           11:01:41

23    license to adjust claims in the State of California?        11:01:43

24        A    Not to my knowledge.                               11:01:48

25        Q    Prior to the Mill Fire, had you received any       11:01:51
```

Page 42

Exhibit 62, Page 007

```
 1    STATE OF CALIFORNIA    )                                    13:02:54

 2    COUNTY OF LOS ANGELES ) ss.

 3

 4          I, D'Anne Moungey, C.S.R. No. 7872 in and for the

 5    State of California, do hereby certify:

 6          That prior to being examined, the witness named

 7    in the foregoing deposition was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing but the

 9    truth;

10          That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction, and

13    the same is a true, correct, and complete transcript of

14    said proceedings;

15          That if the foregoing pertains to the original

16    transcript of a deposition in a Federal Case, before

17    completion of the proceedings, review of the transcript

18    {X} was { } was not required.

19          I further certify that I am not interested in the

20    event of the action.

21          Witness my hand this November 27, 2024

22

23

24          Certified Shorthand Reporter

            For the State of California

25
```

Page 117